KIM J. TROUT, ISB #2468
TROUT LAW, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID  83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
ktrout@trout-law.com
Attorney for the Plaintiff.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation, <br><br> Plaintiff, <br> vs. <br><br> SMITH & WESSON CORP., a Delaware corporation, and AMERICAN OUTDOOR BRANDS CORPORATION,  Nevada corporation, <br><br> Defendants. | Case No. 1:18-CV-00035-CWD <br><br> **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| SMITH & WESSON CORP., a Delaware corporation, <br><br> Counterclaimant, <br><br> vs. <br><br> GEMINI TECHNOLOGIES, INCORPORATED, an Idaho Corporation; RONALD J. MARTINEZ, an individual; and PHILIP H. DATER, an individual, <br><br> Counterdefendants. | |

## INTRODUCTION

1.      This case involves Smith & Wesson's breach of an asset purchase agreement. See attached Asset Purchase Agreement ("Agreement"), Exhibit A.

## PARTIES, VENUE, JURISDICTION

2.      Plaintiff Gemini Technologies, Incorporated ("Gemtech") is an Idaho corporation, with its principal mailing address at PO Box 140618, Boise, ID 83714. Gemtech's registered agent is Philip H. Dater, 15005 N. McFarland Creek Rd., Boise, ID 83714.

3.      Defendant Smith & Wesson Corp. ("Smith & Wesson") is a Delaware corporation, with its principal place of business at 2100 Roosevelt Ave., Springfield, MA 01104. Smith & Wesson's registered agent is Registered Agent Solutions, Inc., 9 E. Loockerman St., Ste 311, Kent, DE 19901.

4.      Defendant American Outdoor Brands Corporation, formerly known as Smith & Wesson Holding Corporation, is a Nevada corporation with its principal place of business at 2100 Roosevelt Ave., Springfield, MA 01104.

5.      Both Smith & Wesson Corp. and American Outdoor Brands Corporation are collectively referred to as "Smith & Wesson" throughout this complaint, as the acts and omissions of American Outdoor Brand Corporation were done on behalf of Smith & Wesson, and vice versa.

6.      This Court has jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, and the parties or entities herein are citizens of different states.

7.      Venue is proper in the Idaho Federal District Court under 28 U.S.C. § 1391 as the primary judicial district in which the asset purchase occurred.

## STATEMENT OF FACTS

### History of Gemtech:

8.      Gemtech is an industry leader in the design and manufacture of gun silencers, with sales in both domestic and foreign gun markets. Gemtech's silencers are currently used in all branches of the U.S. Military and in many branches of U.S. Special Operations Forces. Gemtech is in armed-services use around the world. Gemtech brand services many Soldiers, Sailors, Airmen, and Marines of the United States military, Intelligence Community, Federal Law Enforcement, state and local peace officers, wildlife and agricultural agencies, and friendly foreign military and police, along with service to tens of thousands of civilian shooters.

9.      Gemtech's modest beginnings started in the late 1960s with a physician named Phil Dater. Dr. Dater had a passion for machine guns, and he soon became interested in silencers.

10.     In 1976, Dater obtained his own manufacturers license and a lathe, and he started his own automatic weapons company. As business increased, Dater and his small crew moved from Albuquerque to northern New Mexico, and later to Boise, Idaho.

11.     In 1993, Dater started Gemini Technologies (Gemtech).

12.     At the end of 2014, Gemtech was near bankruptcy and the shareholders were in dispute about how to save the company. Ron Martinez, and former Bank of America Senior Executive, negotiated the purchase of the majority shares in Gemtech and pledged his personal assets, including his home, to infuse capital into Gemtech in order to keep the company operations going.

13.     From the beginning of 2016 to August 8, 2017, Martinez completely reversed the

economic fortunes of Gemtech through his leadership, management, strategic growth, and sales abilities.

14.     Martinez recruited and hired former U.S. Military experts to fill key positions in the Company. For instance, Martinez hired Jason Pace, a former U.S. Navy Seal and a graduate of the Naval Academy, to be in charge of the company's international sales.

15.     From January 2016 to July 31, 2017, Gemtech's sales increased as a direct result of Martinez's efforts and the efforts of those under his direct supervision and management.  The gross sales during this time period were in excess of $15,000,000.

### Smith & Wesson Purchases Gemtech's Assets:

16.     In early 2017, Smith & Wesson approached Martinez about purchasing Gemtech, and on March 9, 2017, Smith & Wesson provided a term sheet and exclusivity agreement to Gemtech for the purchase of Gemtech's products.

17.     After months of review of Gemtech's financials, operations, and sales by Smith & Wesson, Smith & Wesson offered to purchase all Gemtech's company assets.

18.     Gemtech accepted this offer, and on June 29, 2017, the parties signed the Asset Purchase Agreement attached to this complaint as Exhibit A ("APA").

19.     On August 7, 2017, the parties closed the asset purchase sale.

### Purchase Payments to Gemtech:

20.     As consideration for its purchase, Smith & Wesson promised to make two different kinds of payments to Gemtech: (1) a cash payment; and (2) an earn-out payment.

21.     First, Smith & Wesson promised to make a cash payment to Gemtech of ten million one hundred sixty thousand dollars ($10,160,000.00) for Gemtech's assets, plus or minus an

adjustment for the company's working capital as of the closing date. (APA Section 1.2).

22.     Smith & Wesson paid Gemtech $5,735,284.25 of this amount on the sale closing date.

23.     Smith & Wesson put the balance of this amount, minus a $250,000.00 hold-back amount which Smith & Wesson retained to cover the outstanding Gemtech receivables to be distributed to Gemtech according to the terms of the purchase agreement. (APA Sections 1.2(b) and (c)).

24.     Second, Smith & Wesson promised to pay Gemtech an earn-out payment based upon Smith & Wesson's 36-month post-purchase business sales (the "earn-out period sales"), with the term "business" including the design, manufacturing, and sale of silencers and suppressors, silencer and suppressor accessories, and any company-branded ammunition. (APA Sections 1.6, 10.4).

25.     This earn-out was calculated at fifteen cents ($0.15) for each dollar of total sales above thirty-six million dollars ($36,000,000.00) during the earn-out period. For instance, if the company grossed eighty million dollars ($80,000,000.00) in earn-out period sales, it would have to pay Gemtech six million six hundred thousand dollars ($6,600,000.00).

26.     Gemtech's potential earn-out was capped at seventeen million one hundred thousand dollars ($17,100,000.00). (APA Section 1.6(b)).

**Conditions on the Earn-Out:**

27.     The parties agreed that there would be certain conditions placed on the earn-out.

28.     One condition was that Smith & Wesson would retain sole discretion regarding business operations during the earn-out period.

29.     Another equally important condition was that Smith & Wesson would not to take any

direct or indirect actions, in bad faith, which would have the purpose of avoiding or reducing Gemtech's earn-out payments. Smith & Wesson agreed to consult with Ron Martinez before taking any action it knew would negatively impact the earn-out payments. (APA Section 1.6(c)).

30.    Gemtech relied on these conditions as part of its decision to enter the asset purchase agreement, *i.e.* that it would allow Smith & Wesson to have control of the business operations in exchange for Smith & Wesson's promises to act in good faith and its promises to consult Martinez in decisions which would affect the earn-out payment.

31.    Gemtech saw these conditions as a protection, particularly the ongoing requirement to consult with Martinez, because of what had happened to Advanced Armament Corp., LLC, and its owner Kevin Brittingham, in a similar asset purchase case by Remington. (*See* Random Ventures, Inc. v. Advanced Armament Corp., LLC, 2014 U.S. Dist. LEXIS 3984; 2014 WL 113745).

**Smith & Wesson Hires Gemtech Employees:**

32.    In addition to purchasing Gemtech's assets, Smith & Wesson hired Martinez as a new company executive. Smith & Wesson also hired Gemtech's former director of international sales, Jason Pace, as a new company sales employee.  Jason Pace was considered a key asset and his employment agreement/non-compete was changed at his request by Smith & Wesson.

33.    Smith & Wesson assured Martinez that he was "the secret sauce" and that the company would keep him employed as a long-term member of its team. This assurance was consistent with Smith & Wesson's promise to consult with Martinez on matters impacting the earn-out payment.

34.     Martinez and Pace accepted employment and immediately began their new jobs.

35.     Martinez was given the title "General Manager, Gemtech" and was in charge of the business activities related to the earn-out period sales and reported directly to the President of Smith & Wesson, Matt Buckingham.

## False Representations and Material Omissions

36.     Smith & Wesson made the following misrepresentations and/or material omissions in connection with the APA, thereby inducing Gemtech to enter the APA:

a.     On or about June 29, 2017, Smith & Wesson made false and misleading statements to Gemtech regarding the earn our payment. Smith & Wesson told Gemtech in the APA that it would not take any action, directly or indirectly, in bad faith that would have the specific purpose of avoiding or reducing the earn out payment. Smith & Wesson also promised Gemtech that it would consult with Ronald J. Martinez in advance of any decision relating to the operation of its business if it had knowledge that such decision would negatively impact the earn out payment. However, Smith & Wesson took several actions, in bad faith (detailed below), which negatively impacted the earn out payment. These representations were material to Gemtech entering the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's intentions to act in bad faith.

b.     On or about June 29, 2017 upon the execution of the APA, or on or about August 3, 2017 upon the closing, Smith & Wesson made false and misleading representations to Gemtech regarding Smith & Wesson's international sales intentions. Smith & Wesson told Martinez in his employment agreement that the future "territory" for the sale of

Gemtech products would include "any other country in the world where [Smith & Wesson] conducted business," and that "during the term of [Martinez's] employment…[it was Smith & Wesson's] and [Martinez's] intent to expand the Company's international operations." However, soon after entering the APA, Smith & Wesson canceled all Gemtech's pending international sales opportunities and terminated Martinez's employment without cause. These representations were material to Gemtech entering the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's intentions to cancel and/or forego its international sales and terminate Martinez's employment.

c. On or about the time of the APA, Smith & Wesson made false and misleading representations in its March 2017 Investor Presentation on its website, saying that it intended to keep Gemtech's "talent, brand, sales & marketing, development, operations, and management" in place after the close of the APA sale. However, Smith & Wesson promptly terminated Martinez's employment, the employment of Gemtech's international sales team member, and over time terminated nearly all Gemtech's former employees, and other members of the executive team without cause. These representations were material to Gemtech entering the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's intentions to fire the majority of the Gemtech team.

d. Prior to the signing of the APA and after the signing, Smith & Wesson failed to tell Gemtech that it had been subject to a Securities and Exchange Commission proceeding and had been charged with international sales bribery. Smith & Wesson also failed

to tell Gemtech that a business and ethics committee was required to approve future Smith & Wesson international sales orders. This information would have been material to Gemtech's decision to enter the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's international bribery charges and limitations in conducting future international sales.

e.  Prior to the signing of the APA and after the signing, Smith & Wesson failed to tell Gemtech that it was going to terminate nearly all of Gemtech's employees, close Gemtech's Idaho operations and transfer the operations to Massachusetts—at which point Smith & Wesson forced the Gemtech operations into a state of inactivity. This information would have been material to Gemtech's decision to enter the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's intentions to transfer Gemtech operations and stop Gemtech productions.

f.  Prior to the signing of the APA and after the signing, Smith & Wesson failed to tell Gemtech that it would not form any new domestic or international partnerships for the sale of Gemtech products. Likewise, Smith & Wesson failed to tell Gemtech that it would discontinue existing partnerships, either through inactivity or through restrictive requirements. This information would have been material to Gemtech's decision to enter the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's intentions to avoid new domestic and international sales partnerships.

g.  Prior to the signing of the APA and after the signing, Smith & Wesson failed to tell Gemtech that it would stop future Gemtech products development and marketing

efforts. This information would have been material to Gemtech's decision to enter the APA, and Gemtech would never have entered the APA had it known about Smith's & Wesson's intentions to stop all further Gemtech product development and marketing efforts.

37.     Smith & Wesson never intended to fulfill its' promises in connection with the APA, including its promises of good-faith conduct to avoid reducing the earn-out payment.

      a.  Following the APA, Smith & Wesson failed to timely ship existing customer products or deal with customer complaints.

      b.  Following the APA, Smith & Wesson fired Gemtech's management and staff and did not make adequate replacements for management and staff.

      c.  Following the APA, Smith & Wesson failed to market, manufacture, and sell Gemtech products consistent with Gemtech's historical sales volumes.

      d.  Following the APA, Smith & Wesson failed to consult with Ron Martinez about the ongoing business operations.

**Martinez and Pace Pursue International Sales:**

38.     Both before and after the purchase, Gemtech was contacted by multiple foreign countries about purchasing its silencers. Martinez and Pace then arranged for live product demonstrations in these countries, including the United Arab Emirates and Bahrain.

39.     These demonstrations and prospective sales would have earned Smith & Wesson approximately two-hundred seven million dollars ($207,000,000.00) upon closing of the sales.

40.     By August 15, 2017, Gemtech had already obtained approvals from the State Department of the United States, and the Bureau of Alcohol, Tobacco, and Firearms, to ship the

product for these prearranged demonstrations and sales.

41.    However, after the APA was signed, Martinez and Pace were met with immediate resistance to the international demonstrations and sales from other Smith & Wesson executives and employees.

42.    Martinez presented his plan to the Smith & Wesson executives on August 30, 2017. Martinez demonstrated, through specific documentation, that Gemtech had received all necessary sales approvals and that the purchasing countries had obtained the necessary purchase approvals. Martinez explained that he and Pace had already scheduled the product demonstrations and that such sales had a historically high rate of closing and that Smith & Wesson could close the sales with minimal additional effort.

43.    Unbeknownst to Martinez and Pace, Smith & Wesson's general counsel and compliance director had already canceled the licensing to permit the shipment of the products for international demonstrations and sales. Smith & Wesson did not consult Martinez in this decision.

### Smith & Wesson Breaches the Earn-Out Provisions:

44.    Following the presentation, Smith & Wesson terminated Martinez's employment, without consulting Martinez, without any explanation, and without cause.

45.    Smith & Wesson unilaterally and indefinitely postponed the international demonstrations, again without consulting Martinez.

46.    Smith & Wesson later terminated Jason Pace's employment without consulting Martinez

47.    Smith & Wesson failed to consult Martinez about these, and other important decisions,

notwithstanding its direct and immediate knowledge that the decisions would negatively impact Gemtech's earn-out period sales and, as a result, impact Gemtech's earn-out payments.

**<u>Smith & Wesson Breaches the Escrow Agreement:</u>**

48.     As part of the APA, Smith & Wesson and Gemtech entered into an escrow agreement to hold a portion of the funds in escrow with Washington Trust Bank. A true and correct copy of the agreement is attached as Exhibit B.  Gemtech deferred a large amount of the purchase price to be paid in January 2018 for federal tax purposes.

49.     On December 22, 2017, Smith & Wesson sent an indemnity claim to Washington Trust Bank, a copy of which is attached as Exhibit C.

50.     Pursuant to ¶6(a) of the escrow agreement, Smith & Wesson had a duty to "include a reasonably detailed description of the claim and the basis therefor and the amount, if known."

51.     Smith & Wesson's indemnity claim asserted seven (7) distinct claims.

52.     Claims 1, 4, 5, and 6 did not include any reasonable specificity or detail.

53.     Claims 2 and 3 were identical claims. Even though the claims lacked specificity or detail, Gemtech satisfied the claims with a payment of $45,163.45.

54.     Claim 7 was improper, as Smith & Wesson failed to comply with the Section 1.5 of the APA.

55.     On January 2, 2018, Washington Trust Bank released $3,160,000 in funds to Gemtech. This is $1,500,000 less than Gemtech should have received under the escrow agreement.

56.     Smith & Wesson made other indemnity claims, many of which lacked specificity or detail.

**Smith & Wesson Fails to Collect Receivables:**

57.     Section 1.2(c) of the APA allowed Smith & Wesson to keep a $250,000.00 hold-back amount to cover Gemtech's outstanding receivables, in case the receivables were non-collectable.

58.     This Section also required Smith & Wesson to send Gemtech the sum of any receivables which it collected prior to January 2, 2018.

59.     At the time of sale, Gemtech had approximately $287,683.85 in outstanding receivables.

60.     On January 8, 2018, Smith & Wesson sent Gemtech a letter explaining that it had only collected $47,039.75 of Gemtech's receivables and would forward that amount to Gemtech. This is much less than Gemtech should have received given the amount of its receivables, had Smith & Wesson made any reasonable, good faith effort in collecting the receivables.

## COUNT 1

## BREACH OF THE ASSET PURCHASE AGREEMENT

61.     Plaintiff incorporates the above paragraphs as if fully set out below.

62.     Smith & Wesson terminated Martinez's and Pace's employment, and knew, or should have known, that doing so would negatively impact, or help avoid, the earn-out payment to Gemtech.

63.     Smith & Wesson postponed and/or cancelled the pending international demonstrations, and knew, or should have known, that doing so would negatively impact, or help avoid, the earn-out payment to Gemtech.

64.     Smith & Wesson took other actions, including but not limited to the actions outlined

in paragraphs 36 and 37 of this Amended Complaint, , which Smith & Wesson knew or should have known, would negatively impact the earn-out payment to Gemtech.

65.     Smith & Wesson failed to consult with Martinez before making these decisions, in violation of Section 1.6 of the APA.

66.     Smith & Wesson's breaches of the APA have caused Gemtech more than $75,000.00 in damages, in amounts to be proven at trial.

## COUNT 2

### BREACH OF THE ESCROW AGREEMENT

67.     Plaintiff incorporates the above paragraphs as if fully set out below.

68.     Smith & Wesson made improper indemnity claims under the escrow agreement.

69.     Smith & Wesson failed to provide sufficient details for its indemnity claims.

70.     Smith & Wesson filed the indemnity claims to reduce the cash payments to Gemtech under the escrow agreement.

71.     Smith & Wesson's breaches of the escrow agreement have caused Gemtech more than $75,000.00 in damages, in amounts to be proven at trial.

## COUNT 3

### BREACH OF EXPRESS AND IMPLIED COVENANTS

72.     Plaintiff incorporates the above paragraphs as if fully set out below.

73.     The APA contains both express and implied covenants of good faith and fair dealing.

74.     Smith & Wesson breached its covenants of good faith and fair dealing by, among other things, terminating Martinez's and Pace's employment, postponing Gemtech's international demonstrations, and as further outlined in paragraphs 36 and 37 of this Amended Complaint.

75.     Smith & Wesson also breached its covenants of good faith and fair dealing by not diligently collecting Gemtech's receivables as a means to offset the $250,000.00 hold-back amount.

76.     Smith & Wesson's breaches violated, nullified, and significantly impaired the cash payments and the earn-out payments to Gemtech.

77.     Smith & Wesson's breach of its covenants has caused Gemtech more than $75,000.00 in damages, in amounts to be proven at trial.

## COUNT 4

## DECLARATORY JUDGMENT

78.     Plaintiff incorporates the above paragraphs as if fully set out below.

79.     The Court should broadly construe the term "negatively impact" in Section 1.6(c) of the APA to include any decision by Smith & Wesson which reduces, neglects, hinders, or otherwise affects the company's earn-out period sales, which sales affect the earn-out payment.

80.     The Court should broadly construe the term "consult" in Section 1.6(c) of the APA to require Smith & Wesson to confer with Martinez about its earn-out period sales, notwithstanding Martinez's termination. The Court should construe this term as an exception to Smith & Wesson's sole discretion on general business decisions and require Smith & Wesson to allow Martinez to participate in any decisions which will negatively impact the earn-out period sales.

81.     The Court should order that Smith & Wesson reasonably compensate Martinez for his ongoing consulting role in the earn-out period sales.

82.     The Court should enter all appropriate orders to carry these terms into effect.

## COUNT 5

## FRAUD IN THE INDUCEMENT

83.     Plaintiff incorporates the above paragraphs as if fully set out below.

84.     Smith & Wesson made false and misleading statements to Gemtech in connection with the APA, e.g., that it would not take any bad-faith actions to avoid or reduce the earn-out payment, and that it intended to expand its international operations to further the sale of Gemtech products, and as further outlined in paragraphs 36 and 37 of this Amended Complaint. Smith & Wesson never intended to fulfill these promises, as further outlined in paragraphs 36 and 37 of this Amended Complaint.

85.     Smith & Wesson had knowledge or belief that the above statements were false, and it acted with reckless indifference to the truth of the statements.

86.     Smith & Wesson also made several material omissions in connection with the APA, e.g., that it was limited in its international sales abilities, that it intended to close Gemtech's Idaho operations and relocate them to Massachusetts, and that it did not intend to actively pursue Gemtech's production and marketing and sales partnership efforts, and terminate the majority of Gemtech employees, as further outlined in paragraphs 36 and 37 of this Amended Complaint.

87.     Smith & Wesson sought to induce Gemtech's reliance in connection with the APA with its false statements and/or its material omissions.

88.     Gemtech justifiably relied on these statements and/or material omissions.

89.     Gemtech would never have entered the APA if it had known about the falsity of the statements and/or its material omissions.

90.     Smith & Wesson was responsible for making these representations/omissions and in-
tended to gain financially by making the representations/omissions.

91.     Smith & Wesson used the APA as an instrumentality to obtain Gemtech's assets with-
out any intention of meeting the earn-out payments.

92.     Gemtech has suffered more than $75,000.00 in damages, in amounts to be proven at
trial. The Court should award Gemtech rescissory damages for this claim, to put Gemtech in
as good a financial position as it occupied prior to the initiation of the APA.

## RESERVATION OF CLAIMS

Gemtech reserves the right to add additional claims as more information is discovered,
including claims for punitive damages. Gemtech also reserves the right to bring a motion for
receivership, should the Court find that Gemtech's legal remedies are inadequate.

## REQUEST FOR ATTORNEYS' FEES

Gemtech has incurred attorney fees related to the prosecution of this matter.  Gemtech
is entitled to recover its reasonable costs and attorneys' fees incurred in this matter pursuant
to the APA, as well as to applicable Delaware law.

## DEMAND FOR JURY TRIAL

Gemtech respectfully demands a trial by jury on all issues raised by the pleadings pur-
suant to 38(b) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Gemtech respectfully requests the following relief:

1.     An award of damages for breach of the APA, breach of the Escrow Agreement,
Breach of Implied Warranties, and Declaratory Judgment damages, in amounts to be proven

at trial;

2.      For rescissory damages under a fraud in the inducement theory, in amounts to be proven at trial.

3.      A declaration interpreting Section 1.6(c) of the APA, as set out above;

4.      An award of interest in favor of Gemtech, as permitted by law;

5.      An award of attorneys' fees and costs in favor of Gemtech in amounts to be proven at trial; and,

6.      For such further relief to which Plaintiffs are entitled.

        DATED September 30, 2020.


                        TROUT LAW, PLLC


                        */s/ Kim J. Trout*
                        Kim J. Trout – ISB No. 2468
                        ktrout@trout-law.com
                        Attorney for Gemini Technologies, Inc.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 30, 2020, a true and correct copy of the above and foregoing document was filed through the CM/ECF system, which caused the following parties or counsel to be served by electronic means.

B. Newal Squyres
     NSquyres@hollandhart.com

Stefan J. Hasselblad
     SJHasselblad@hollandhart.com

          */s/ Kim J. Trout*
          Kim J. Trout

# EXHIBIT A

Execution Version

_____

**ASSET PURCHASE AGREEMENT**
_____


**By and Among**


**Smith & Wesson Corp.,**


**Gemini Technologies, Incorporated,**


**and**


**the Stockholders named herein**




**June 29, 2017**

# TABLE OF CONTENTS

**Page**

ARTICLE I - SALE AND PURCHASE OF ASSETS ................................................................ 1

    1.1     Sale and Purchase of Assets. ............................................................................ 1
    1.2     Payment for Assets ........................................................................................... 3
    1.3     Estimated Purchase Price and Payoff Letters. .................................................. 4
    1.4     Closing Date Balance Sheet and Buyer's Report ............................................. 4
    1.5     Disputes ............................................................................................................ 4
    1.6     Earn-Out .......................................................................................................... 5
    1.7     Allocation of the Purchase Price ...................................................................... 6
    1.8     Withholding ...................................................................................................... 6

ARTICLE II - CLOSING ................................................................................................ 6

    2.1     Closing .............................................................................................................. 6
    2.2     Deliveries by the Company .............................................................................. 6
    2.3     Deliveries by Buyer ......................................................................................... 7
    2.4     Termination in Absence of Closing. ................................................................. 7

ARTICLE III - REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS AND THE COMPANY 8

    3.1     Corporate Existence and Qualification ............................................................ 8
    3.2     Authority, Approval, and Enforceability ......................................................... 8
    3.3     Capitalization and Corporate Records. ............................................................ 9
    3.4     No Stockholder Defaults or Consents .............................................................. 9
    3.5     No Company Defaults or Consents .................................................................. 9
    3.6     No Proceedings ............................................................................................... 10
    3.7     Employee Benefit Matters. ............................................................................ 10
    3.8     Financial Statements; Liabilities; Accounts Receivable; Inventories; Title to Assets. ...................... 12
    3.9     Absence of Certain Changes. ......................................................................... 13
    3.10    Compliance with Laws .................................................................................. 15
    3.11    Litigation ....................................................................................................... 15
    3.12    Real Property. ................................................................................................ 15
    3.13    Commitments. ................................................................................................ 16
    3.14    Insurance ....................................................................................................... 17
    3.15    Intangible Rights. .......................................................................................... 17
    3.16    Equipment and Other Tangible Property ........................................................ 18
    3.17    Permits; Environmental Matters. ................................................................... 18
    3.18    Banks ............................................................................................................. 19
    3.19    Suppliers and Customers ............................................................................... 19
    3.20    Absence of Certain Business Practices ......................................................... 19
    3.21    Products, Services, and Authorizations. ........................................................ 20
    3.22    Export Controls, Economic Sanctions, and Import Compliance ................... 21
    3.23    Transactions With Affiliates .......................................................................... 21
    3.24    Privacy and Data Security ............................................................................. 22
    3.25    Title to Assets ............................................................................................... 22
    3.26    Broker or Finder Fees .................................................................................... 22
    3.27    Other Information .......................................................................................... 22

ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER .................................. 23

    4.1     Existence and Qualification ........................................................................... 23
    4.2     Authority, Approval, and Enforceability ....................................................... 23
    4.3     No Default or Consents .................................................................................. 23
    4.4     No Proceedings .............................................................................................. 23
    4.5     Broker or Finder Fees .................................................................................... 24

PHX 332426779v8

**TABLE OF CONTENTS**
**(CONT.)**

**Page**

ARTICLE V - OBLIGATIONS PRIOR TO CLOSING ................................................................. 24

| | | |
|---|---|---|
| 5.1 | Buyer's Access to Information and Properties | 24 |
| 5.2 | Company's Conduct of Business and Operations | 24 |
| 5.3 | General Restrictions | 24 |
| 5.4 | Notice Regarding Changes | 26 |
| 5.5 | Preferential Purchase Rights | 26 |
| 5.6 | Ensure Conditions Met | 26 |
| 5.7 | Termination of Insurance Policies | 26 |
| 5.8 | Casualty Loss | 26 |
| 5.9 | Employee Matters. | 27 |
| 5.10 | Payoff and Estoppel Letters | 27 |
| 5.11 | No Shop | 28 |
| 5.12 | Name Change | 28 |

ARTICLE VI - CONDITIONS TO COMPANY'S AND BUYER'S OBLIGATIONS ..................... 28

| | | |
|---|---|---|
| 6.1 | Conditions to Obligations of the Company | 28 |
| 6.2 | Conditions to Obligations of Buyer | 28 |

ARTICLE VII - POST-CLOSING OBLIGATIONS ................................................................... 30

| | | |
|---|---|---|
| 7.1 | Further Assurances | 30 |
| 7.2 | Publicity | 30 |
| 7.3 | Post-Closing Indemnity | 30 |
| 7.4 | Non-Competition, Non-Solicitation, and Non-Disclosure | 30 |
| 7.5 | Delivery of Property Received by the Company After Closing | 32 |
| 7.6 | Buyer Appointed Attorney for the Company | 32 |
| 7.7 | Assignment of Contracts | 32 |

ARTICLE VIII - TAX MATTERS .......................................................................................... 33

| | | |
|---|---|---|
| 8.1 | Representations and Obligations Regarding Taxes | 33 |
| 8.2 | Cooperation | 34 |
| 8.3 | Tax Returns | 34 |
| 8.4 | Indemnification for Taxes. | 34 |

ARTICLE IX - MISCELLANEOUS ....................................................................................... 36

| | | |
|---|---|---|
| 9.1 | Limitation on Liability. | 36 |
| 9.2 | Confidentiality. | 37 |
| 9.3 | Costs and Expenses | 38 |
| 9.4 | Notices | 38 |
| 9.5 | Governing Law; Waiver of Jury Trial | 39 |
| 9.6 | Entire Agreement; Amendments and Waivers | 39 |
| 9.7 | Binding Effect and Assignment | 40 |
| 9.8 | Remedies | 40 |
| 9.9 | Exhibits and Schedules | 40 |
| 9.10 | Multiple Counterparts | 40 |
| 9.11 | References and Construction. | 40 |
| 9.12 | Survival | 40 |
| 9.13 | Attorneys' Fees | 40 |
| 9.14 | Risk of Loss | 41 |

ARTICLE X - DEFINITIONS ................................................................................................ 41

| | | |
|---|---|---|
| 10.1 | Affiliate | 41 |
| 10.2 | Affiliated Group | 41 |
| 10.3 | Available Cash | 41 |

**TABLE OF CONTENTS**
**(CONT.)**

**Page**

| | | |
|---|---|---:|
| 10.4 | Business | 41 |
| 10.5 | Code | 41 |
| 10.6 | Collateral Agreements | 41 |
| 10.7 | Confidential Information | 41 |
| 10.8 | Contracts | 42 |
| 10.9 | Damages | 42 |
| 10.10 | Financial Statements | 42 |
| 10.11 | Funded Indebtedness | 42 |
| 10.12 | GAAP | 42 |
| 10.13 | Governmental Authorities | 42 |
| 10.14 | Hazardous Material | 42 |
| 10.15 | Inventory | 43 |
| 10.16 | Knowledge of the Company | 43 |
| 10.17 | Legal Requirements | 43 |
| 10.18 | Permits | 43 |
| 10.19 | Person | 43 |
| 10.20 | Product | 43 |
| 10.21 | Properties | 43 |
| 10.22 | Tax | 43 |
| 10.23 | Tax Return | 43 |
| 10.24 | Total Sales of the Business | 44 |
| 10.25 | Trade Secrets | 44 |
| 10.26 | Used | 44 |
| 10.27 | Working Capital | 44 |

## LIST OF SCHEDULES

Schedule 1.1(a)      Excluded Assets
Schedule 1.1(c)      Assumed Obligations
Schedule 1.2(c)      A/R Holdback Accounts Receivable
Schedule 1.3(c)      Funded Indebtedness
Schedule 1.7         Purchase Price Allocation
Schedule 3.1         Qualifications as Foreign Entity
Schedule 3.4         Stockholder Defaults or Consents
Schedule 3.5         Company Defaults or Consents
Schedule 3.7(a)      Employee Arrangements
Schedule 3.7(c)      Benefit Plan Liabilities
Schedule 3.7(e)      Current Employees
Schedule 3.8(a)      Company Financial Statements
Schedule 3.8(c)      Accounts Receivable
Schedule 3.8(d)      Inventory Condition
Schedule 3.8(e)      Encumbrances
Schedule 3.9(a)      Certain Changes
Schedule 3.9(b)      Certain Actions
Schedule 3.10        Compliance with Law
Schedule 3.11        Litigation
Schedule 3.12(b)     Leased Premises
Schedule 3.13(a)     Commitments
Schedule 3.13(c)     Non-Arm's Length Contracts
Schedule 3.14        Insurance
Schedule 3.15        Intangible Rights
Schedule 3.16        Tangible Assets Condition
Schedule 3.17(a)     Permits
Schedule 3.17(b)     Environmental Claims
Schedule 3.17(c)     Storage of Hazardous Materials
Schedule 3.17(d)     Noncompliance with Environmental Laws
Schedule 3.18        Banks, Accounts, and Authorized Signatories
Schedule 3.19        Suppliers and Customers
Schedule 3.21(b)     Product Listing
Schedule 3.21(e)     Other Person Authorizations
Schedule 3.23        Affiliate Transactions
Schedule 5.9         Employees to be Hired by Buyer
Schedule 8.1         Tax Matters
Schedule 10.27       Working Capital Methodologies

PHX 332426779v8

## LIST OF EXHIBITS

Exhibit A   -   Escrow Agreement.................................................................................A-1

Exhibit B   -   Form of Martinez Employment Agreement..............................................B-1

Exhibit C   -   Opinion of Company Counsel ..................................................................C-1

Exhibit D   -   Temporary License Agreement.................................................................D-1

PHX 332426779v8

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of June 29, 2017, by and among (i) Smith & Wesson Corp., a Delaware corporation ("Buyer"); (ii) Gemini Technologies, Incorporated, an Idaho corporation (the "Company"); and (iii) Ronald J. Martinez and Philip H. Dater (collectively the "Stockholders" and each individually a "Stockholder").

### Recitals

A.     Buyer desires to purchase substantially all of the Company's assets.

B.     The Company desires to sell and Buyer desires to purchase such assets upon the terms and subject to the conditions set forth herein.

C.     The Stockholders own 100% of the Company's outstanding capital stock.

### Agreement

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, the parties agree as follows:

### ARTICLE I - SALE AND PURCHASE OF ASSETS

1.1     Sale and Purchase of Assets.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing referred to in Section 2.1 hereof, the Company shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase, acquire, and accept delivery of, all assets and properties owned or Used by the Company in connection with the Business, except for (1) the Purchase Price and other rights of the Company under this Agreement, (2) the Company's corporate minute book and stock records, and (3) those assets specifically listed on Schedule 1.1(a) (collectively, the "Excluded Assets"), including, without limiting the generality of the foregoing:

(i)     all accounts receivable;

(ii)     all accounts payable;

(iii)     all raw materials, work-in-process, inventories, and other materials of the Company wherever located and including all inventory in transit or on order and not yet delivered, and all rights with respect to the processing and completion of any work-in-process of the Company, including the right to collect and receive payment for the work performed by the Company with respect thereto;

(iv)     all supplies, computer and other equipment, vehicles, machinery, furniture, fixtures, leasehold improvements, and other tangible property Used by the Company in connection with the Business;

(v)     all of the Company's right, title, and interest in and to its Contracts, including the Contracts listed or required to be listed on Schedule 3.13(a) hereto;

(vi)     all proprietary knowledge, Trade Secrets, Confidential Information, computer software and licenses, formulae, designs and drawings, quality control data, processes

1

(whether secret or not), methods, inventions, and other similar know-how or rights Used in the conduct of the Business, including, but not limited to, the areas of manufacturing, marketing, advertising and personnel training and recruitment, together with all other Intangible Rights Used in connection with the Business, including all files, manuals, documentation, and source and object codes related thereto;

(vii)　　all utility, security, and other deposits and prepaid expenses, including, but not limited to, the security deposit on the property located at 3750 E. Pewter Falls Street, Suite 100, Meridian, Idaho 83642;

(viii)　　the Business as a going concern and its franchises, Permits, and other authorizations of Governmental Authorities (to the extent such Permits and other authorizations of Governmental Authorities are transferable) and third parties, licenses, telephone numbers, customer lists, vendor lists, referral lists and contracts, advertising materials and data, restrictive covenants, choses in action, and similar obligations owing to the Company from its present and former stockholders, directors, officers, employees, agents, and others, together with all books, operating data, and records (including financial, accounting, and credit records), files, papers, records, and other data of the Company;

(ix)　　all rights of the Company in and to all tradenames, trademarks, and slogans Used in the Business, all variants thereof, and all goodwill associated therewith;

(x)　　all rights to real property Used by the Company;

(xi)　　all bank and other accounts; and

(xii)　　all other property and rights of every kind or nature Used by the Company in the operation of the Business.

It is specifically understood and agreed by the parties hereto that Buyer is acquiring, and the Company is selling, all of the tangible and intangible assets attributable to or Used by the Company in the Business, except the Excluded Assets. The aforesaid assets and properties to be transferred to Buyer hereunder are hereinafter collectively referred to as the "Assets."

(b)　　Method of Conveyance. The sale, transfer, conveyance, assignment, and delivery by the Company of the Assets to Buyer in accordance with Section 1.1(a) hereof shall be effected on the Closing Date by the Company's execution and delivery to Buyer of one or more bills of sale, assignments, certificates of title, and other conveyance instruments with respect to the Company's transfer of Intangible Rights, real property interests, and other Assets in form and scope reasonably satisfactory to Buyer (collectively the "Conveyance Documents"). At the Closing, good, valid, and marketable title to all of the Assets shall be transferred, conveyed, assigned, and delivered by the Company to Buyer pursuant to the Conveyance Documents, free and clear of any and all liens, encumbrances, mortgages, security interests, pledges, claims, equities, and other restrictions or charges of any kind or nature whatsoever.

(c)　　Assumed Obligations. At the Closing, Buyer shall assume, and agree to satisfy and discharge as the same shall become due, (i) all trade accounts payable and accrued business expenses that have been incurred in the ordinary course of the Company's business and are reflected on the Closing Date Balance Sheet, except as set forth below; (ii) the Company's liabilities and other obligations arising subsequent to the Closing under (x) the Contracts listed on Schedule 3.13(a), and (y) all other Contracts entered into by the Company in the ordinary course of its business (including open purchase orders) and not required to be listed on Schedule 3.13(a), in each case to the extent that the Company's rights

thereunder are effectively transferred to Buyer at Closing; and (iii) the obligations listed on <u>Schedule 1.1(c)</u> hereto (collectively the "<u>Assumed Obligations</u>").  Buyer shall not assume or be responsible at any time for any liability, obligation, debt, or commitment of the Company, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, or otherwise, including, but not limited to, any liabilities, obligations, debts, or commitments of the Company incident to, arising out of, or incurred with respect to, this Agreement and the transactions contemplated hereby (including any and all sales, income, or other Taxes arising out of the transactions contemplated hereby).  Without limiting the generality of the foregoing, the Company and the Stockholders expressly acknowledge and agree that the Company shall retain, and that Buyer shall not assume or otherwise be obligated to pay, perform, defend, or discharge, (a) any liability of the Company and/or the Stockholders for Taxes, whether measured by income or otherwise, (b) any liability of the Company in connection with any accrued payable or any Plan or Benefit Program or Agreement, including, without limitation, any liability of the Company under ERISA, (c) any liability of the Company under any federal, state, or local law, rule, regulation, ordinance, program, Permit, or other Legal Requirement relating to health, safety, Hazardous Materials, and environmental matters applicable to the Company's business and/or the facilities Used by the Company (whether or not owned by the Company), (d) any product liability pertaining to products sold or manufactured by the Company prior to the Closing Date, (e) any liability or obligation of the Company relating to any default taking place before the Closing Date under any of the Assumed Obligations to the extent such default created or increased the liability or obligation, or (f) any obligation of the Company to the Stockholders, any Affiliate of the Company or the Stockholders, or any Person claiming to have a right to acquire any capital stock or other securities of the Company.  The Company further agrees to satisfy and discharge as the same shall become due all obligations and liabilities of the Company not specifically assumed by Buyer hereunder.

   1.2 <u>Payment for Assets</u>.  As consideration for the Assets being acquired by Buyer hereunder, Buyer shall pay to the Company, in the manner set forth in this <u>Section 1.2</u>, the sum of (i) Ten Million One Hundred Sixty Thousand Dollars ($10,160,000),  plus (ii) the excess, if any, of the Company's Working Capital as of the Closing Date over $1,689,000, minus (iii) the excess, if any, of $1,689,000 over the Company's Working Capital as of the Closing, subject to further adjustment as provided in <u>Section 1.6</u>, <u>Section 7.3</u>, and <u>Section 8.4</u> hereof (such sum, as so adjusted from time to time, is herein referred to as the "<u>Purchase Price</u>").  On the Closing Date, Buyer shall make payment of the Purchase Price as follows:

   (a) Buyer shall deliver to the Company, by wire transfer of immediately available funds (to an account specified by the Company in writing at least three business days prior to Closing), the Estimated Purchase Price (as defined below) less the Escrow Amount (defined below) less the A/R Holdback Amount (defined below) less the Clean-Up Holdback Amount (defined below); and

   (b) Buyer shall deliver to Washington Trust Bank, as escrow agent (the "<u>Escrow Agent</u>"), the sum of Five Million Four Hundred Ten Thousand Dollars ($5,410,000), in immediately available funds (the "<u>Escrow Amount</u>").  The Escrow Amount shall be held by the Escrow Agent pursuant to the terms and conditions of the Escrow Agreement attached hereto as <u>Exhibit A</u> (with such changes as the Escrow Agent may reasonably request, the "<u>Escrow Agreement</u>"); and

   (c) Buyer shall withhold the sum of Two Hundred Fifty Thousand Dollars ($250,000) (the "<u>A/R Holdback Amount</u>") to satisfy the accounts receivable set forth on <u>Schedule 1.2(c)</u>.  To the extent that such accounts receivable are collected by January 2, 2018, Buyer shall pay the aggregate amount of such collections to the Company on January 2, 2018; and

   (d) Buyer shall withhold the sum of Two Hundred Thousand Dollars ($200,000) (the "<u>Clean-Up Holdback Amount</u>") for the purposes of abating the lead exposure at the Company's facility

3

located at 335 North Edgewood Lane, Eagle, Idaho 83616. Prior to the Closing Date, Buyer and Seller shall cooperate in selecting and hiring an appropriate lead abatement contractor to perform the abatement work as soon as practicable, but no later than 30 days after the Closing Date. To the extent that the aggregate cost of the lead abatement is less than the Clean-Up Holdback Amount, Buyer shall pay the balance of such Clean-Up Holdback Amount to the Company on January 2, 2018.

1.3     Estimated Purchase Price and Payoff Letters.

(a)     Not later than two business days prior to the scheduled Closing Date, Buyer and the Company shall execute and deliver an estimated purchase price acknowledgement, in a form reasonably acceptable to Buyer and the Company, that sets forth a calculation of estimated Working Capital and, on the basis of the foregoing, a calculation of the estimated Purchase Price (the "Estimated Purchase Price").

(b)     If the Purchase Price reflected on the Closing Date Balance Sheet is less than the Estimated Purchase Price, then the Company shall pay to Buyer an amount equal to the amount of such shortfall. If the Purchase Price reflected on the Closing Date Balance Sheet is greater than the Estimated Purchase Price, then Buyer shall pay to the Company an amount equal to the amount of such excess. Any payments made by Buyer to the Company or by the Company to Buyer pursuant to this Section 1.3(b), shall be made by wire transfer of immediately available funds to the account or accounts designated by the Company or Buyer, as the case may be, within ten days after the date in which the Closing Date Balance Sheet is final and binding on the parties.

(c)     At least three business days prior to the Closing Date, the Company will provide Buyer with customary pay-off letters from all holders of Funded Indebtedness, and make arrangements satisfactory to Buyer for such holders to provide to the Company, simultaneously with the Closing, recordable form lien releases, canceled notes, trademark and patent assignments, and other documents reasonably requested by Buyer. The Company represents and warrants to Buyer that all Contracts evidencing its Funded Indebtedness are set forth on Schedule 1.3(c) hereto.

1.4     Closing Date Balance Sheet and Buyer's Report. As soon as practical (and in no event later than 60 days after the Closing Date), Buyer shall cause to be prepared and delivered to the Company (i) a balance sheet for the Business and Assets acquired hereunder dated as of the Closing Date (the "Closing Date Balance Sheet"), and (ii) a written report (the "Buyer's Report") that includes a calculation of the actual Working Capital and, on the basis of the foregoing, the Purchase Price, including such schedules and data as may be appropriate to support such calculations. The Company and its accountants shall be entitled to review the Closing Date Balance Sheet, the Buyer's Report, and any working papers, trial balances, and similar materials relating to the Closing Date Balance Sheet and the Buyer's Report prepared by Buyer or its accountants. Buyer shall also provide the Company and its accountants with timely access, during Buyer's normal business hours, to Buyer's personnel, properties, books, and records to the extent required for the review of Buyer's calculations set forth in the Buyer's Report.

1.5     Disputes. The following clauses (a) and (b) set forth the procedures for resolving disputes among the parties with respect to the determination of the Purchase Price:

(a)     Within 30 days after delivery to the Company of the Buyer's Report pursuant to Section 1.4, the Company may deliver to Buyer a written report (the "Company's Report") prepared by the Company's accountants (the "Company's Accountants") advising Buyer either that the Company's Accountants (i) agree with Buyer's calculations in the Buyer's Report, or (ii) deem that one or more adjustments are required. The costs and expenses of the services of the Company's Accountants shall be borne by the Company. If Buyer shall concur with the calculations proposed by the Company's

4

Accountants, or if Buyer shall not object thereto in a writing delivered to the Company within 30 days after Buyer's receipt of the Company's Report, the calculations set forth in such Company's Report shall become final and shall not be subject to further review, challenge, or adjustment absent fraud.  If the Company does not submit a Company's Report within the 30-day period provided herein, then the calculations set forth in the Buyer's Report shall become final and shall not be subject to further review, challenge, or adjustment absent fraud.

(b)     In the event that the Company submits a Company's Report and Buyer's and the Company's Accountants are unable to resolve the disagreements set forth in such report within 30 days after the date of the Company's Report, then such disagreements shall be referred to a recognized firm of independent certified public accountants selected by mutual agreement of the Company and Buyer (the "Settlement Accountants"), and the determination of the Settlement Accountants shall be final and shall not be subject to further review, challenge, or adjustment absent fraud.  The Settlement Accountants shall use their best efforts to reach a determination not more than 45 days after such referral.  The costs and expenses of the services of the Settlement Accountants shall be paid by the Company if (i) the difference between (A) the Purchase Price resulting from the determinations of the Settlement Accountants, and (B) the Purchase Price resulting from the determinations set forth in the Company's Report, is greater than (ii) the difference between (A) the Purchase Price resulting from the determinations of the Settlement Accountants, and (B) the Purchase Price resulting from Buyer's calculations as set forth in the deliveries pursuant to Section 1.4 hereof; otherwise, such costs and expenses of the Settlement Accountants shall be paid by Buyer.

1.6     Earn-Out.

(a)     As additional consideration for the Assets being acquired by Buyer hereunder, and upon the terms and subject to the conditions and limitations set forth in this Section 1.6, Buyer shall pay to the Company the contingent payments, if any, as set forth in this Section 1.6 (the "Earn-Out Payment") as follows:  If Total Sales of the Business for the 36-month period following the Closing Date (the "Earn-Out Period") exceed Thirty-Six Million Dollars ($36,000,000) in the aggregate, Buyer shall pay to the Company Fifteen Cents ($0.15) for each One Dollar ($1.00) by which the Total Sales of the Business for the Earn-Out Period (the "Earn-Out Period Sales Amount") exceeds Thirty-Six Million Dollars ($36,000,000).  For purposes of illustration only, if the Earn-Out Period Sales Amount equals $80,000,000, then Buyer shall pay to the Company a total of $6,600,000 (($80,000,000 - $36,000,000) X $0.15).

(b)     In no event shall the Earn-Out Payment under this Section 1.6 exceed Seventeen Million One Hundred Thousand Dollars ($17,100,000) in the aggregate.  The Earn-Out Payment will be paid no later than ninety (90) days following the end of the Earn-Out Period by wire transfer of next day funds to an account or accounts designated by the Company in writing; provided, however, that (i) in the event of a dispute with respect to the calculation of the Earn-Out Period Sales Amount, any Earn-Out Payment to which the Company is entitled hereunder shall be paid within five (5) business days of the date the Earn-Out Period Sales Amount is final and binding upon the parties and (ii) subject to the terms and conditions set forth in this Agreement, including Section 9.1, any proper and good faith claim for indemnification by any Buyer Indemnified Party against the Company and/or the Stockholders may be satisfied by deducting and otherwise offsetting such claims against any Earn-Out Payment that is otherwise payable by Buyer pursuant to this Section 1.6.  Any disputes with respect to the calculation of the Earn-Out Period Sales Amount shall be resolved in accordance with the procedures contemplated by Section 1.5 hereof (with "Earn-Out Period Sales Amount" being substituted for "Purchase Price").

(c)     Subject to the terms and conditions set forth in this Agreement and the Collateral Agreements, subsequent to the Closing, Buyer shall have sole discretion with regard to all matters relating

to the operation of the Business; provided, that Buyer shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder. In addition, Buyer agrees to consult with Ronald J. Martinez in advance of any decision made relating to the operation of the Business only if Buyer has knowledge that such decision will negatively impact the Earn-Out Payment.  The Company and the Stockholders further acknowledge that (i) there is no assurance that the Company will receive any Earn-Out Payment and Buyer has not promised or projected any Earn-Out Payment, and (ii) the parties hereto solely intend the express provisions of this Agreement to govern their contractual relationship with respect to the subject matter of this Section 1.6.

(d)    In the event that the Company receives any Earn-Out Payment pursuant to this Section 1.6, the Company reserves the right to assign such Earn-Out Payment to Gemtech Idaho, LLC, an Idaho limited liability company.

1.7    Allocation of the Purchase Price.  The pro forma allocation of the Purchase Price is set forth in Schedule 1.7.  Within 120 days of the Closing Date, Buyer shall provide the Stockholders with an allocation of the Purchase Price (plus other relevant items) to the Assets (the "Purchase Price Allocation").  Each party agrees (a) to act in a manner consistent with the Purchase Price Allocation in the preparation of financial statements and the filing of all Tax Returns, and (b) not to voluntarily take any position inconsistent therewith in the course of any Tax audit or other proceeding, unless required to do so by applicable Legal Requirements.

1.8    Withholding.  Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amounts required to be deducted and withheld with respect to the making of such payments under any applicable Legal Requirements.  Buyer shall pay any such withheld amounts to the appropriate Governmental Authority within the time periods required under the applicable Legal Requirements and, promptly after payment of any such deducted or withheld amounts to the appropriate Governmental Authority, provide the Person in respect of which such deduction and withholding were made with an official receipt or a certified copy thereof evidencing such payment.  Any amounts so withheld and paid over to the appropriate Governmental Authority will be treated as paid to the Company under this Agreement.

## ARTICLE II - CLOSING

2.1    Closing.  Subject to the conditions stated in Article VI of this Agreement, the closing of the transactions contemplated hereby (the "Closing") shall occur via the electronic exchange of signature pages between the parties on July 28, 2017, or, if the conditions set forth in Section 6.1 and Section 6.2 have not been satisfied or waived on such date, on the fifth business day after all such conditions shall have been satisfied or waived.  The date upon which the Closing occurs is hereinafter referred to as the "Closing Date."  The Closing shall be deemed completed as of 12:01 a.m. local time on the morning of the Closing Date.

2.2    Deliveries by the Company.  At or prior to the Closing, the Company shall deliver or cause to be delivered to Buyer:

(a)    the Conveyance Documents, duly executed by the Company and/or the Stockholders, as applicable;

(b)    the Escrow Agreement, duly executed by the Company;

6

(c)     an Employment Agreement, in the form attached hereto as <u>Exhibit B</u>, duly executed by Ron Martinez (the "<u>Martinez Employment Agreement</u>");

(d)     a Temporary License Agreement, in the form attached hereto as <u>Exhibit D</u>, duly executed by the Company;

(e)     a certificate executed by the Company to the effect that the conditions set forth in <u>Section 6.2(a)</u> and <u>Section 6.2(c)</u> have been satisfied;

(f)     a certificate of non-foreign status executed by the Company meeting the requirements of Treasury Regulation Section 1.1445-2(b);

(g)     constructive possession of all originals and copies of agreements, instruments, documents, deeds, books, records, files, and other data and information within the possession of the Company or any Affiliate of the Company pertaining to the Company (collectively, the "<u>Records</u>"); <u>provided</u>, <u>however</u>, that the Company may retain (i) copies of any Tax Returns and copies of Records relating thereto; (ii) copies of any Records that the Company is reasonably likely to need for complying with Legal Requirements; and (iii) copies of any Records that in the reasonable opinion of the Company will be required in connection with the performance of its obligations under <u>Article VIII</u> hereof; and

(h)     evidence satisfactory to Buyer that Buyer's designees shall be the only authorized signatories with respect to the Company's various accounts, credit lines, safe deposit boxes, or vaults set forth or required to be set forth in <u>Schedule 3.18</u>.

2.3     <u>Deliveries by Buyer</u>.   At or prior to the Closing, Buyer shall deliver or cause to be delivered to the Company:

(a)     the amount and form of Purchase Price required to be paid at Closing pursuant to <u>Section 1.2(a)</u> hereof;

(b)     the Escrow Agreement, duly executed by Buyer;

(c)     the Martinez Employment Agreement, duly executed by Buyer; and

(d)     a certificate executed by an authorized officer of Buyer, on behalf of Buyer, to the effect that the conditions set forth in <u>Section 6.1(a)</u> have been satisfied.

2.4     <u>Termination in Absence of Closing</u>.

(a)     Subject to the provisions of <u>Section 2.4(b)</u>, if by the close of business on September 30, 2017, the Closing has not occurred, then either the Company or Buyer may thereafter terminate this Agreement by written notice to such effect, to the other parties hereto, without liability of or to any party to this Agreement or any stockholder, director, officer, employee, or representative of such party unless the reason for Closing having not occurred is (i) such party's willful breach of the provisions of this Agreement, or (ii) if all of the conditions to such party's obligations set forth in <u>Article VI</u> have been satisfied or waived in writing by the date scheduled for the Closing pursuant to <u>Section 2.1</u>, the failure of such party to perform its obligations under this <u>Article II</u> on such date; <u>provided</u>, <u>however</u>, that the provisions of <u>Sections 9.2</u> through <u>9.5</u> shall survive any such termination; and <u>provided</u> <u>further</u>, <u>however</u>, that any termination pursuant to this <u>Section 2.4</u> shall not relieve any party hereto who was responsible for Closing having not occurred as described in clauses (i) or (ii) above of any liability for (x) such party's willful breach of the provisions of this Agreement, or (y) if all of the conditions to such

party's obligations set forth in <u>Article VI</u> have been satisfied or waived in writing by the date scheduled for the Closing pursuant to <u>Section 2.1</u>, the failure of such party to perform its obligations under this <u>Article II</u> on such date.

(b)    Buyer shall also have the right to terminate this Agreement without liability to any party by so notifying the Company at any time within 15 days after the date of this Agreement if, in Buyer's sole discretion, any schedule (or any instrument referred to therein) that was not furnished to Buyer at least 10 business days prior to the date of this Agreement contains or refers to any matter that, or may cause or lead to any result that, in Buyer's sole discretion and judgment, is adverse to Buyer in any way; <u>provided</u>, <u>however</u>, that the provisions of <u>Sections 9.2</u> through <u>9.5</u> shall survive any such termination.

(c)    Notwithstanding the approval of the sole member of Buyer, this Agreement and the transactions contemplated herein may be terminated and abandoned at any time on or prior to the Closing Date by Buyer if:

(i)    any representation or warranty made herein for the benefit of Buyer, or any certificate, schedule, or document furnished to Buyer pursuant to this Agreement is untrue in any material respect; or

(ii)    the Company or the Stockholders shall have defaulted in any material respect in the performance of any material obligation under this Agreement.

## ARTICLE III - REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS AND THE COMPANY

Each of the Stockholders and the Company hereby jointly and severally represents and warrants to Buyer that:

3.1    <u>Corporate Existence and Qualification</u>.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the state of Idaho; the Company has the corporate power to own, manage, lease, and hold its Properties and to carry on its business as and where such Properties are presently located and such business is presently conducted; and neither the character of the Company's Properties nor the nature of the Company's business requires the Company to be duly qualified to do business as a foreign corporation in any jurisdiction outside those identified in <u>Schedule 3.1</u> attached hereto, and the Company is qualified as a foreign corporation and in good standing in each listed jurisdiction.

3.2    <u>Authority, Approval, and Enforceability</u>.  This Agreement has been duly executed and delivered by the Company and the Stockholders, and each of the Stockholders and the Company has all requisite power and legal capacity to execute and deliver this Agreement and all Collateral Agreements executed and delivered or to be executed and delivered in connection with the transactions provided for hereby, to consummate the transactions contemplated hereby and by the Collateral Agreements, and to perform its, his, and her obligations hereunder and under the Collateral Agreements.  The execution, delivery, and performance of this Agreement and the Collateral Agreements and the consummation by each of the Company and the Stockholders of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all necessary action on the part of the Company, and no other proceedings on the part of the Company or the Stockholders are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement and each Collateral Agreement to which any of the Stockholders and/or the Company is a party constitutes, or upon execution and delivery will constitute, the legal, valid, and binding obligation of such party, enforceable in

8

accordance with its terms, except as such enforcement may be limited by general equitable principles or by applicable bankruptcy, insolvency, moratorium, or similar laws and judicial decisions from time to time in effect which affect creditors' rights generally.

       3.3    <u>Capitalization and Corporate Records.</u>

       (a)    All issued and outstanding shares of capital stock of the Company are owned beneficially and of record by Stockholders.

       (b)    The copies of the charter and bylaws of the Company provided to Buyer are true, accurate, and complete and reflect all amendments made through the date of this Agreement.  The Company's stock and minute books made available to Buyer for review were correct and complete as of the date of such review, no further entries have been made through the date of this Agreement, and such minute books contain an accurate record of all stockholder and corporate actions of the stockholders and board of directors (and any committees thereof) of the Company taken by written consent or at a meeting since inception.  All corporate actions taken by the Company have been duly authorized or ratified.  All accounts, books, ledgers, and official and other records of the Company fairly and accurately reflect all of the Company's transactions, properties, assets, and liabilities.

       (c)    The Company does not own, directly or indirectly, any outstanding voting securities of or other interests in any other corporation, partnership, joint venture, or other business entity.

       3.4    <u>No Stockholder Defaults or Consents</u>.  Except as otherwise set forth in <u>Schedule 3.4</u> hereto, the execution and delivery of this Agreement and the Collateral Agreements by the Stockholders and the performance by the Stockholders of their obligations hereunder and thereunder will not violate any provision of law or any judgment, award, or decree or any indenture, agreement, or other instrument to which any Stockholder is a party, or by which the properties or assets of the Stockholder is bound or affected, or conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any such indenture, agreement, or other instrument, in each case except to the extent that such violation, default, or breach could not reasonably be expected to delay or otherwise significantly impair the ability of the parties to consummate the transactions contemplated hereby.

       3.5    <u>No Company Defaults or Consents</u>.  Except as otherwise set forth in <u>Schedule 3.5</u> attached hereto, neither the execution and delivery of this Agreement nor the carrying out of the transactions contemplated hereby will:

       (a)    violate or conflict with any of the terms, conditions, or provisions of the charter or bylaws of the Company;

       (b)    violate any Legal Requirements applicable to the Company;

       (c)    violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), or accelerate or permit the acceleration of the performance required by, or give any other party the right to terminate, any Contract or Permit binding upon or applicable to the Company;

       (d)    result in the creation of any lien, charge, or other encumbrance on any Properties of the Company; or

9

(e)     require either the Stockholders or the Company to obtain or make any waiver, consent, action, approval, or authorization of, or registration, declaration, notice, or filing with, any private non-governmental third party or any Governmental Authority.

3.6     No Proceedings.  No suit, action, or other proceeding is pending or, to the Knowledge of the Company, threatened before any Governmental Authority seeking to restrain the Company or the Stockholders or prohibit their entry into this Agreement or prohibit the Closing, or seeking damages against the Company or its Properties as a result of the consummation of this Agreement.

3.7     Employee Benefit Matters.

(a)     Schedule 3.7(a) provides a true and complete list of each of the following, if any, which is sponsored, maintained, or contributed to by the Company for the benefit of the employees or agents of the Company, which has been so sponsored, maintained, or contributed to at any time during the Company's existence or with respect to which the Company has or may have any actual or contingent liability:

(i)     each "employee benefit plan," as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA") (including, but not limited to, employee benefit plans, such as foreign plans, which are not subject to the provisions of ERISA) ("Plan"); and

(ii)     each personnel policy, employee manual, or other written statements of rules or policies concerning employment, stock option plan, collective bargaining agreement, bonus plan or arrangement, incentive award plan or arrangement, vacation and sick leave policy, severance pay policy or agreement, deferred compensation agreement or arrangement, consulting agreement, employment contract, and each other employee benefit plan, agreement, arrangement, program, practice, or understanding which is not described in Section 3.7(a)(i) ("Benefit Program or Agreement").

(b)     True, correct, and complete copies of each of the Plans (if any), and related trusts, if applicable, including all amendments thereto, have been furnished to Buyer.  There has also been furnished to Buyer, with respect to each Plan required to file such report and description, the three most recent reports on Form 5500 and the summary plan description.  True, correct, and complete copies or descriptions of all Benefit Programs or Agreements have also been furnished to Buyer.

(c)     Except as otherwise set forth in Schedule 3.7(c),

(i)     The Company does not contribute to or have an obligation to contribute to, and the Company has not at any time contributed to or had an obligation to contribute to, and the Company does not have any actual or contingent liability under a multiemployer plan within the meaning of Section 3(37) of ERISA ("Multiemployer Plan") or a multiple employer plan within the meaning of Section 413(b) and (c) of the Code;

(ii)     The Company has substantially performed all obligations, whether arising by operation of law or by contract, required to be performed by it in connection with the Plans and the Benefit Programs and Agreements, and to the Knowledge of the Company, there have been no defaults or violations by any other party to the Plans or Benefit Programs or Agreements;

(iii)     All reports and disclosures relating to the Plans required to be filed with or furnished to governmental agencies, Plan participants, or Plan beneficiaries have been filed or

10

furnished in accordance with applicable law in a timely manner, and each Plan and each Benefit Program or Agreement has been administered in substantial compliance with its governing documents;

(iv)     Each of the Plans intended to be qualified under Section 401 of the Code satisfies the requirements of such Section and has received a favorable determination letter from the Internal Revenue Service regarding such qualified status and has not, since receipt of the most recent favorable determination letter, been amended or operated in a way which could adversely affect such qualified status;

(v)     There are no actions, suits, or claims pending (other than routine claims for benefits) or, to the Knowledge of the Company, threatened against, or with respect to, any of the Plans or Benefit Programs or Agreements or their assets;

(vi)     All contributions required to be made to the Plans pursuant to their terms and provisions and applicable law have been made timely;

(vii)     As to any Plan subject to Title IV of ERISA, there has been no event or condition which presents the material risk of Plan termination, no accumulated funding deficiency, whether or not waived, within the meaning of Section 302 of ERISA or Section 412 of the Code has been incurred, no reportable event within the meaning of Section 4043 of ERISA (for which the disclosure requirements of Regulation Section 2615.3 promulgated by the Pension Benefit Guaranty Corporation ("PBGC") have not been waived) has occurred, no notice of intent to terminate the Plan has been given under Section 4041 of ERISA, no proceeding has been instituted under Section 4042 of ERISA to terminate the Plan, there has been no termination or partial termination of the Plan within the meaning of Section 411(d)(3) of the Code, no liability to the PBGC has been incurred, and the assets of the Plan equal or exceed the aggregate present value of the benefit liabilities (within the meaning of Section 4001(a)(16) of ERISA) under the Plan, computed on a "plan termination basis" based upon reasonable actuarial assumptions and the asset valuation principles established by the PBGC;

(viii)     None of the Plans nor any trust created thereunder or with respect thereto has engaged in any "prohibited transaction" or "party-in-interest transaction" as such terms are defined in Section 4975 of the Code and Section 406 of ERISA which could subject any Plan, the Company, or any Stockholder, director, officer, or employee thereof to a Tax or penalty on prohibited transactions or party-in-interest transactions pursuant to Section 4975 of the Code or Section 502(i) of ERISA;

(ix)     To the Knowledge of the Company, there is no matter pending (other than routine qualification determination filings) with respect to any of the Plans or Benefit Programs or Agreements before the Internal Revenue Service, the Department of Labor, or the PBGC;

(x)     Each trust funding a Plan, which trust is intended to be exempt from federal income taxation pursuant to Section 501(c)(9) of the Code, satisfies the requirements of such section and has received a favorable determination letter from the Internal Revenue Service regarding such exempt status and has not, since receipt of the most recent favorable determination letter, been amended or operated in a way which would adversely affect such exempt status;

(xi)     The Company does not have any obligation to provide health benefits or death benefits to former employees, except as specifically required by law;

(xii)     Neither the execution and delivery of this Agreement nor the consummation of any or all of the transactions contemplated hereby will (A) entitle any current or

11

former employee of the Company to severance pay, unemployment compensation, or any similar payment; (B) accelerate the time of payment or vesting or increase the amount of any compensation due to any such employee or former employee; or (C) directly or indirectly result in any payment made to or on behalf of any Person to constitute a "parachute payment" within the meaning of Section 280G of the Code;

(xiii)   The Company has not incurred any liability or taken any action, and no action or event has occurred that could cause the Company to incur any liability (A) under Section 412 of the Code or Title IV of ERISA with respect to any "single-employer plan" within the meaning of Section 4001(a)(15) of ERISA that is not a Plan, or (B) to any Multiemployer Plan, including, without limitation, an account of a partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA;

(xiv)   Since January 1, 1996, there have not been any (A) work stoppages, labor disputes, or other significant controversies between the Company and its employees, (B) labor union grievances or organizational efforts, or (C) unfair labor practice or labor arbitration proceedings pending or threatened.

(d)      Except as set forth in Schedule 3.7(a), the Company is not a party to any agreement, and has not established any policy or practice, requiring the Company to make a payment or provide any other form or compensation or benefit to any Person performing services for the Company upon termination of such services which would not be payable or provided in the absence of the consummation of the transactions contemplated by this Agreement.

(e)      Schedule 3.7(e) sets forth by number and employment classification the approximate number of employees employed by the Company as of the date of this Agreement, and, except as set forth therein, none of said employees are subject to union or collective bargaining agreements with the Company.

(f)      Neither Buyer nor any of its Affiliates shall have any liability or obligations under or with respect to the Workers Adjustment Retraining Notification Act in connection with any of the transactions contemplated in connection herewith.

3.8      Financial Statements; Liabilities; Accounts Receivable; Inventories; Title to Assets.

(a)      The Company has delivered to Buyer true and complete copies of unaudited Financial Statements with respect to the Company and its business as of and for the years ended December 31, 2016, 2015, and 2014, as well as unaudited Financial Statements with respect to the Company and its business as of and for the five months ended May 31, 2017 (the "Company Financial Statements"), and said Company Financial Statements are attached hereto as Schedule 3.8(a).  All of such Company Financial Statements present fairly the financial condition and results of operations of the Company for the dates or periods indicated thereon.  All of such Company Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated.

(b)      Except for (i) the liabilities reflected on the Company's December 31, 2016 balance sheet included with the Company Financial Statements attached as Schedule 3.8(a), (ii) trade payables and accrued expenses incurred since December 31, 2016 in the ordinary course of business, none of which are material, and (iii) executory contract obligations under (x) Contracts listed on Schedule 3.13(a), and/or (y) Contracts not required to be listed on Schedule 3.13(a), the Company does not have any liabilities or obligations (whether accrued, absolute, contingent, known, unknown, or otherwise, and

12

whether or not of a nature required to be reflected or reserved against in a balance sheet in accordance with GAAP).

(c)     Except as otherwise set forth in Schedule 3.8(c), the accounts receivable reflected on the December 31, 2016 balance sheet included in the Company Financial Statements referenced in Section 3.8(a) and all of the Company's accounts receivable arising since December 31, 2016 (the "Balance Sheet Date") arose from bona fide transactions in the ordinary course of business, and the goods and services involved have been sold, delivered, and performed to the account obligors, and no further filings (with governmental agencies, insurers, or others) are required to be made, no further goods are required to be provided, and no further services are required to be rendered in order to complete the sales and fully render the services and to entitle the Company to collect the accounts receivable in full. Except as set forth in Schedule 3.8(c), no such account has been assigned or pledged to any other Person, firm, or corporation, and, except only to the extent fully reserved against as set forth in the December 31, 2016 balance sheet included in such Company Financial Statements, no defense or set-off to any such account has been asserted by the account obligor or exists.

(d)     Except as otherwise set forth in Schedule 3.8(d), the Inventory of the Company as of the Closing Date shall consist of items of a quality, condition, and quantity consistent with normal seasonally-adjusted Inventory levels of the Company and be usable and saleable in the ordinary and usual course of business for the purposes for which intended, except to the extent written down or reserved against on the Closing Date Balance Sheet. Except as otherwise set forth in Schedule 3.8(d), the Company's Inventory is valued on the Company's books of account in accordance with GAAP (on an average cost basis) at the lower of cost or market, and the value of obsolete materials, materials below standard quality, and slow-moving materials have been written down in accordance with GAAP.

(e)     Except as provided under the provisions of the agreements described in Schedule 3.8(e), the Company has and will have as of the Closing Date legal and beneficial ownership of its Properties, free and clear of any and all liens, mortgages, pledges, adverse claims, encumbrances, or other restrictions or limitations whatsoever ("Liens").

    3.9    Absence of Certain Changes.

(a)     Except as otherwise set forth in Schedule 3.9(a) attached hereto, since the Balance Sheet Date, there has not been:

(i)     any event, circumstance, or change that had or might have a material adverse effect on the business, operations, prospects, Properties, financial condition, or working capital of the Company;

(ii)     any damage, destruction, or loss (whether or not covered by insurance) that had or might have a material adverse effect on the business, operations, prospects, Properties, or financial condition of the Company; or

(iii)     any material adverse change in the Company's sales patterns, pricing policies, accounts receivable, or accounts payable.

(b)     Except as otherwise set forth in Schedule 3.9(b) attached hereto, since the Balance Sheet Date, the Company has not done any of the following:

(i)     merged into or with or consolidated with, any other corporation or acquired the business or assets of any Person;

(ii)     purchased any securities of any Person;

(iii)    created, incurred, assumed, guaranteed, or otherwise become liable or obligated with respect to any indebtedness, or made any loan or advance to, or any investment in, any Person, except in each case in the ordinary course of business;

(iv)    made any change in any existing election, or made any new election, with respect to any tax law in any jurisdiction which election could have an effect on the tax treatment of the Company or the Company's business operations;

(v)     entered into, amended, or terminated any material agreement;

(vi)    sold, transferred, leased, mortgaged, encumbered, or otherwise disposed of, or agreed to sell, transfer, lease, mortgage, encumber, or otherwise dispose of, any Properties except (A) in the ordinary course of business, or (B) pursuant to any agreement specified in Schedule 3.13(a);

(vii)   settled any claim or litigation, or filed any motions, orders, briefs, or settlement agreements in any proceeding before any Governmental Authority or any arbitrator;

(viii)  incurred or approved, or entered into any agreement or commitment to make, any expenditures in excess of $50,000 (other than those arising in the ordinary course of business or those required pursuant to any agreement specified in Schedule 3.13(a));

(ix)    maintained its books of account other than in the usual, regular, and ordinary manner in accordance with GAAP and on a basis consistent with prior periods or made any change in any of its accounting methods or practices that would be required to be disclosed under GAAP;

(x)     adopted any Plan or Benefit Program or Agreement, or granted any increase in the compensation payable or to become payable to stockholders, directors, officers, or employees (including, without limitation, any such increase pursuant to any bonus, profit-sharing, or other plan or commitment), other than merit increases to non-officer employees in the ordinary course of business and consistent with past practice;

(xi)    suffered any extraordinary losses or waived any rights of material value;

(xii)   made any payment to any Affiliate or forgiven any indebtedness due or owing from any Affiliate to the Company;

(xiii)  (A) liquidated Inventory or accepted product returns other than in the ordinary course, (B) accelerated receivables, (C) delayed payables, or (D) changed in any material respect the Company's practices in connection with the payment of payables and/or the collection of receivables;

(xiv)   engaged in any one or more activities or transactions with an Affiliate or outside the ordinary course of business;

(xv)    declared, set aside, or paid any dividends, or made any distributions, or made any other payments in respect of its equity securities, or repurchased, redeemed, or otherwise acquired any such securities;

14

(xvi)   amended its charter or bylaws;

(xvii)   issued any capital stock or other securities, or granted, or entered into any agreement to grant, any options, convertible rights, other rights, warrants, calls, or agreements relating to its capital stock; or

(xviii)   committed to do any of the foregoing.

3.10   <u>Compliance with Laws</u>.   Except as otherwise set forth in <u>Schedule 3.10</u>, the Company is and has been in compliance in all respects with all Legal Requirements applicable to the Company, other than failures to so comply that would not have an adverse effect on the business, operations, prospects, Properties, or financial condition of the Company.   Except as otherwise set forth in <u>Schedule 3.10</u>, the Company (x) has not received or entered into any citations, complaints, consent orders, compliance schedules, or other similar enforcement orders, or received any written notice from any Governmental Authority or any other written notice that would indicate that there is not currently compliance with all such Legal Requirements, except for failures to so comply that would not have an adverse effect on the business, operations, prospects, Properties, or financial condition of the Company, and (y) is not in default under, and no condition exists (whether covered by insurance or not) that with or without notice or lapse of time or both would constitute a default under, or breach or violation of, any Legal Requirement or Permit applicable to the Company.   Without limiting the generality of the foregoing, the Company has not received notice of and there is no basis for, any claim, action, suit, investigation, or proceeding that might result in a finding that the Company is not or has not been in compliance with Legal Requirements relating to (a) the development, testing, manufacture, packaging, distribution, and marketing of products; (b) employment, safety, and health; (c) environmental protection, building, zoning, and land use; and/or (d) the Foreign Corrupt Practices Act and the rules and regulations promulgated thereunder.

3.11   <u>Litigation</u>.   Except as otherwise set forth in <u>Schedule 3.11</u>, there are no claims, actions, suits, investigations, or proceedings against the Company pending or, to the Knowledge of the Company, threatened in any court or before or by any Governmental Authority, or before any arbitrator, that might have an adverse effect (whether covered by insurance or not) on the business, operations, prospects, Properties, or financial condition of the Company and there is no basis for any such claim, action, suit, investigation, or proceeding.   <u>Schedule 3.11</u> also includes a true and correct listing of all material actions, suits, investigations, claims, or proceedings that were pending, settled, or adjudicated since January 1, 2011.

3.12   <u>Real Property</u>.

(a)   The Company does not own and has never owned any real property.

(b)   <u>Schedule 3.12(b)</u> sets forth a list of all leases, licenses, or similar agreements relating to the Company's use or occupancy of real estate owned by a third party ("<u>Leases</u>"), true and correct copies of which have previously been furnished to Buyer, in each case setting forth (i) the lessor and lessee thereof and the commencement date, term, and renewal rights under each of the Leases, and (ii) the street address and legal description of each property covered thereby (the "<u>Leased Premises</u>"). The Leases and all guaranties with respect thereto, are in full force and effect and have not been amended in writing or otherwise, and no party thereto is in default or breach under any such Lease.   No event has occurred which, with the passage of time or the giving of notice or both, would cause a material breach of or default under any of such Leases.   Neither the Company nor its agents or employees have received written notice of any claimed abatements, offsets, defenses, or other bases for relief or adjustment.

(c)     With respect to each of the Leased Premises (i) the Company has a valid leasehold interest in the Leased Premises, free and clear of any Liens, encumbrances, covenants, and easements or title defects that have had or could have an adverse effect on the Company's use and occupancy of the Leased Premises; (ii) the portions of the buildings located on the Leased Premises that are used in the business of the Company are each in good repair and condition, normal wear and tear excepted, and are in the aggregate sufficient to satisfy the Company's current and reasonably anticipated normal business activities as conducted thereon; (iii) each of the Leased Premises (A) has direct access to public roads or access to public roads by means of a perpetual access easement, such access being sufficient to satisfy the current transportation requirements of the business presently conducted at such parcel, and (B) is served by all utilities in such quantity and quality as are necessary and sufficient to satisfy the current normal business activities conducted at such parcel; and (iv) the Company has not received notice of (A) any condemnation, eminent domain, or similar proceeding affecting any portion of the Leased Premises or any access thereto, and, to the Knowledge of the Company, no such proceedings are contemplated, (B) any special assessment or pending improvement liens to be made by any governmental authority which may affect any of the Leased Premises, or  (C) any violations of building codes and/or zoning ordinances or other governmental regulations with respect to the Leased Premises.

3.13    Commitments.

(a)     Except as otherwise set forth in Schedule 3.13(a), the Company is not a party to or bound by any of the following, whether written or oral:

(i)     any Contract that cannot by its terms be terminated by the Company with 30 days' or less notice without penalty or whose term continues beyond one year after the date of this Agreement;

(ii)     contract or commitment for capital expenditures by the Company in excess of $50,000 per year in the aggregate;

(iii)     lease or license with respect to any Properties, real or personal, whether as landlord, tenant, licensor, or licensee;

(iv)     agreement, contract, indenture, or other instrument relating to the borrowing of money or the guarantee of any obligation or the deferred payment of the purchase price of any Properties;

(v)     partnership agreement;

(vi)     contract with any Affiliate of the Company (including a Stockholder) relating to the provision of goods or services by or to the Company;

(vii)     agreement for the sale of any assets that in the aggregate have a net book value on the Company's books of greater than $50,000;

(viii)     agreement that purports to limit the Company's freedom to compete freely in any line of business or in any geographic area;

(ix)     preferential purchase right, right of first refusal, or similar agreement; or

(x)     other Contract that is material to the business of the Company.

16

(b)      All of the Contracts listed or required to be listed in <u>Schedule 3.13(a)</u> are valid, binding, and in full force and effect, and the Company has not been notified or advised by any party thereto of such party's intention or desire to terminate or modify any such Contract in any respect, except as disclosed in <u>Schedule 3.13(a)</u>.  Neither the Company nor, to the Knowledge of the Company, any other party is in breach of any of the terms or covenants of any Contract listed or required to be listed in <u>Schedule 3.13(a)</u>.  Following the Closing, the Company will continue to be entitled to all of the benefits currently held by the Company under each Contract listed or required to be listed in <u>Schedule 3.13(a)</u>.

(c)      Except as otherwise set forth in <u>Schedule 3.13(c)</u>, the Company is not a party to or bound by any Contract or Contracts the terms of which were arrived at by or otherwise reflect less-than-arm's-length negotiations or bargaining.

3.14      <u>Insurance</u>.  <u>Schedule 3.14</u> hereto is a complete and correct list of all insurance policies (including, without limitation, fire, liability, product liability, workers' compensation, and vehicular) presently in effect that relate to the Company or its Properties, including the amounts of such insurance and annual premiums with respect thereto, all of which have been in full force and effect from and after the date(s) set forth on <u>Schedule 3.14</u>.  Such policies are sufficient for compliance by the Company with all applicable Legal Requirements and all material Contracts.  None of the insurance carriers has indicated to the Company an intention to cancel any such policy or to materially increase any insurance premiums (including, without limitation, workers' compensation premiums), or that any insurance required to be listed on <u>Schedule 3.14</u> will not be available in the future on substantially the same terms as currently in effect.  The Company has no claim pending or anticipated against any of its insurance carriers under any of such policies and, to the Knowledge of the Company, there has been no actual or alleged occurrence of any kind which could reasonably be expected to give rise to any such claim.  During the prior three years, all notices required to have been given by the Company to any insurance company have been timely and duly given, and no insurance company has asserted that any claim is not covered by the applicable policy relating to such claim.

3.15      <u>Intangible Rights</u>.  Set forth on <u>Schedule 3.15</u> is a list and description of all foreign and domestic patents, patent applications (whether pending or abandoned), invention disclosures, or any other patent rights (collectively, "<u>Patent Rights</u>"); design registrations, trademarks of any type (whether registered, pending, or common law) (collectively, "<u>Trademark Rights</u>"); service marks of any type (whether registered, pending, or common law) (collectively, "<u>Service Mark Rights</u>"); trade names; brands; and/or copyrights (whether or not registered and, if applicable, including pending applications for registration) owned, Used, licensed, or controlled by the Company and all goodwill associated therewith.  The Company owns or has the right to use and shall as of the Closing Date own or have the right to use any and all information, know-how, trade secrets, Patent Rights, copyrights, Trademark Rights, Service Mark Rights, design registrations, trade names, software, formulae, methods, processes, and other intangible properties that are necessary or customarily Used by the Company for the ownership, management, or operation of its Properties ("<u>Intangible Rights</u>"), including, but not limited to, the Intangible Rights listed on <u>Schedule 3.15</u>.  Except as set forth on <u>Schedule 3.15</u>, (i) the Company is the sole and exclusive owner of all right, title, and interest in and to all of the Intangible Rights, and has the exclusive right to use and license the same, free and clear of any claim or conflict with the Intangible Rights of others; (ii) no royalties, honorariums, or fees are payable by the Company to any Person by reason of the ownership or use of any of the Intangible Rights; (iii) there have been no claims made against the Company asserting the invalidity, abuse, misuse, or unenforceability of any of the Intangible Rights, and no grounds for any such claims exist; (iv) the Company has not made any claim of any violation or infringement by others of any of its Intangible Rights or interests therein and, to the Knowledge of the Company, no grounds for any such claims exist; (v) the Company has not received any notice that it is in conflict with or infringing upon the asserted intellectual property rights of others in connection with the Intangible Rights, and neither the use of the Intangible Rights nor the operation of the

Company's businesses is infringing or has infringed upon any intellectual property rights of others; (vi) the Intangible Rights are sufficient and include all intellectual property rights necessary for the Company to lawfully conduct its business as presently being conducted; (vii) no interest in any of the Company's Intangible Rights has been assigned, transferred, licensed, or sublicensed by the Company to any Person other than Buyer pursuant to this Agreement; (viii) to the extent that any item constituting part of the Intangible Rights has been registered with, filed in, or issued by, any Governmental Authority, such registrations, filings, or issuances are listed on Schedule 3.15 and were duly made and remain in full force and effect; (ix) to the Knowledge of the Company, there has not been any act or failure to act by the Company or any of its stockholders, directors, officers, employees, attorneys, or agents during the prosecution or registration of, or any other proceeding relating to, any of the Intangible Rights or of any other fact which could render invalid or unenforceable, or negate the right to issuance of any of the Intangible Rights; (x) to the extent any of the Intangible Rights constitutes proprietary or confidential information, the Company has adequately safeguarded such information from disclosure; and (xi) all of the Company's current Intangible Rights will remain in full force and effect following the Closing without alteration or impairment.

3.16    Equipment and Other Tangible Property.  Except as otherwise set forth on Schedule 3.16, the Company's equipment, furniture, machinery, vehicles, structures, fixtures, and other tangible property included in the Properties (the "Tangible Company Properties"), other than Inventory, is suitable for the purposes for which intended and in good operating condition and repair consistent with normal industry standards, except for ordinary wear and tear, and except for such Tangible Company Properties as shall have been taken out of service on a temporary basis for repairs or replacement consistent with the Company's prior practices and normal industry standards.  To the Knowledge of the Company, the Tangible Company Properties are free of any structural or engineering defects, and during the past five years there has not been any significant interruption of the Company's business due to inadequate maintenance or obsolescence of the Tangible Company Properties.

3.17    Permits; Environmental Matters.

(a)    Except as otherwise set forth in Schedule 3.17(a), the Company has all Permits necessary for the Company to own, operate, use, and/or maintain its Properties and to conduct its business and operations as presently conducted and as expected to be conducted in the future.  Except as otherwise set forth in Schedule 3.17(a), all such Permits are in effect, no proceeding is pending, or, to the Knowledge of the Company, threatened to modify, suspend, or revoke, withdraw, terminate, or otherwise limit any such Permits, and no administrative or governmental actions have been taken or, to the Knowledge of the Company, threatened in connection with the expiration or renewal of such Permits which could adversely affect the ability of the Company to own, operate, use, or maintain any of its Properties or to conduct its business and operations as presently conducted and as expected to be conducted in the future.  Except as otherwise set forth in Schedule 3.17(a), (i) no violations have occurred that remain uncured, unwaived, or otherwise unresolved, or are occurring in respect of any such Permits, other than inconsequential violations, and (ii) no circumstances exist that would prevent or delay the obtaining of any requisite consent, approval, waiver, or other authorization of the transactions contemplated hereby with respect to such Permits that by their terms or under applicable law may be obtained only after Closing.

(b)    Except as set forth on Schedule 3.17(b), there are no claims, liabilities, investigations, litigation, administrative proceedings, whether pending or, to the Knowledge of the Company, threatened, or judgments or orders relating to any Hazardous Materials (collectively called "Environmental Claims") asserted or threatened against the Company or relating to any real property currently or formerly owned, leased, or otherwise Used by the Company.  Neither the Company nor, to the Knowledge of the Company, any prior owner, lessee, or operator of said real property, has caused or

18

permitted any Hazardous Material to be used, generated, reclaimed, transported, released, treated, stored, or disposed of in a manner which could form the basis for an Environmental Claim against the Company or Buyer.  Except as set forth on Schedule 3.17(b), the Company has not assumed any liability of any Person for cleanup, compliance, or required capital expenditures in connection with any Environmental Claim.

(c)     Except as set forth on Schedule 3.17(c), no Hazardous Materials are or were stored or otherwise located, and no underground storage tanks or surface impoundments are or were located, on real property currently or formerly owned, leased, or Used by the Company or, to the Knowledge of the Company, on adjacent parcels of real property, and no part of such real property or, to the Knowledge of the Company, any part of such adjacent parcels of real property, including the groundwater located thereon, is presently contaminated by Hazardous Materials.

(d)     Except as set forth on Schedule 3.17(d), the Company has been and is currently in compliance with all applicable environmental laws, including obtaining and maintaining in effect all Permits required by applicable environmental laws.

3.18     Banks.  Schedule 3.18 sets forth (i) the name of each bank, trust company, or other financial institution and stock or other broker with which the Company has an account, credit line, or safe deposit box or vault; (ii) the names of all Persons authorized to draw thereon or to have access to any safe deposit box or vault; (iii) the purpose of each such account, safe deposit box, or vault; and (iv) the names of all Persons authorized by proxies, powers of attorney, or other like instrument to act on behalf of the Company in matters concerning any of its business or affairs.  Except as otherwise set forth in Schedule 3.18, no such proxies, powers of attorney, or other like instruments are irrevocable.

3.19     Suppliers and Customers.  Schedule 3.19 sets forth (i) the ten principal suppliers of the Company during each of the fiscal years ended December 31, 2016 and 2015, together with the dollar amount of goods purchased by the Company from each such supplier during each such period, and (ii) the ten principal customers of the Company during each of the fiscal years ended December 31, 2016 and 2015, together with the dollar amount of goods and/or services sold by the Company to each such customer during each such period.  Except as otherwise set forth in Schedule 3.19, the Company maintains good relations with all suppliers and customers listed or required to be listed in Schedule 3.19 as well as with governments, partners, financing sources, and other parties with whom the Company has significant relations, and no such party has canceled, terminated, or made any threat to the Company to cancel or otherwise terminate its relationship with the Company or to materially decrease its services or supplies to the Company or its direct or indirect purchase or usage of the products or services of the Company.

3.20     Absence of Certain Business Practices.

(a)     None of the Stockholders, the Company, nor any Affiliate, director, officer, employee, or agent of the Company, or any other Person acting on behalf of or associated with the Company, acting alone or together, has (i) received, directly or indirectly, any rebates, payments, commissions, promotional allowances, or any other economic benefits, regardless of their nature or type, from any customer, agent, supplier, or any employee or agent of any customer, agent, or supplier; or (ii) directly or indirectly given or agreed to give any money, gift, or similar benefit to any customer, agent, supplier, or any employee or agent of any customer, agent, or supplier, any official or employee of any government (domestic or foreign), any political party or candidate for office (domestic or foreign), or any other Person who was, is, or may be in a position to help or hinder the business of the Company (or assist the Company in connection with any actual or proposed transaction), in each case which (A) could reasonably be expected to subject the Company to any damage or penalty in any civil, criminal, or

19

governmental litigation or proceeding, (B) if not given in the past, could reasonably be expected to have had an adverse effect on the business, results of operation, prospects, Properties, financial condition, liabilities, cash flows, or working capital of the Company, or (C) if not continued in the future, could reasonably be expected to adversely affect the business, results of operations, prospects, Properties, financial condition, liabilities, cash flows, or working capital of the Company

(b)     None of the Stockholders, the Company, nor any Affiliate, director, officer, employee, or agent of the Company, or any other Person acting on behalf of or associated with the Company is aware of any action, or any allegation of any action, or has taken any action, directly or indirectly, (i) that would constitute a violation in any material respect by such Persons of the Foreign Corrupt Practices Act of 1977, 15 USC §§ 78dd-1, et seq., as amended, and the rules and regulations thereunder (the "FCPA"), or other relevant multilateral measures such as the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and the United Nations Convention Against Corruption, including making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give or authorization of the giving of anything of value to any "foreign official" (as defined under the FCPA) or employee, political party or campaign, official or employee of any public international organization, or official or employee of any government-owned enterprise or institution to obtain or retain business or to secure an improper advantage, or (ii) that would constitute an offer to pay, a promise to pay, or a payment of money or anything else of value, or an authorization of such offer, promise, or payment, directly or indirectly, to any employee, agent, or representative of another company or entity in the course of their business dealings with the Company or any of its Affiliates, in order to induce such person to act against the best interest of his or her employer or principal.

3.21     Products, Services, and Authorizations.

(a)     Each Product designed, manufactured, repaired, or serviced by the Company has been designed, manufactured, repaired, or serviced in accordance with (i) the specifications under which the Product is normally and has normally been manufactured, and (ii) the provisions of all applicable laws, policies, guidelines, and any other governmental requirements.

(b)     Schedule 3.21(b) sets forth (i) a list of all Products which at any time have been recalled, withdrawn, or suspended by the Company, whether voluntarily or otherwise, including the date recalled, withdrawn, or suspended and a brief description of all completed or pending proceedings seeking the recall, withdrawal, suspension, or seizure of any Product; (ii) a brief description of all completed or pending proceedings seeking the recall, withdrawal, suspension, or seizure of any Product; and (iii) a list of all regulatory letters received by the Company or any of its agents relating to the Company or any of the Products or the Company's establishments.

(c)     There exists no set of facts which could reasonably be expected to furnish a basis for the recall, withdrawal, or suspension of any product registration, product license, repair, or overhaul license, manufacturing license, wholesale dealers license, export license, or other license, approval, or consent of any governmental or regulatory authority with respect to the Company or any of the Products.

(d)     There are no claims existing or threatened under or pursuant to any warranty, whether express or implied, on products or services sold by the Company.  There are no claims existing and there is no basis for any claim against the Company for injury to persons, animals, or property as a result of the sale, distribution, or manufacture of any product or performance of any service by the Company, including, but not limited to, claims arising out of the defective or unsafe nature of its products

20

or services.  The Company has full and adequate insurance coverage for products liability claims against it.

(e)     Set forth on <u>Schedule 3.21(e)</u> is a list of all authorizations, consents, approvals, franchises, licenses, and permits required by any Person (other than a Governmental Authority) for the operation of the business of the Company as presently operated (the "<u>Other Person Authorizations</u>").  All of the Other Person Authorizations have been duly issued or obtained and are in full force and effect, and the Company is in compliance with the terms of all the Other Person Authorizations.  Neither the Company nor any Stockholder has any knowledge of any facts which could be expected to cause them to believe that the Other Person Authorizations will not be renewed by the appropriate Person in the ordinary course.  Each of the Other Person Authorizations may be assigned and transferred to Buyer in accordance with this Agreement and will continue in full force and effect thereafter, in each case without (i) the occurrence of any breach, default, or forfeiture of rights thereunder, or (ii) the consent, approval, or act of, or the making of any filings with, any Person.

3.22    <u>Export Controls, Economic Sanctions, and Import Compliance</u>.

(a)     <u>Export Controls and Economic Sanctions Compliance</u>.  The Company is in compliance and has been in compliance with all laws relating to U.S. export controls and economic sanctions, including but not limited to the International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130 (2016)) of the U.S. Department of State; the Export Administration Regulations ("<u>EAR</u>") (15 C.F.R. Parts 730-774 (2016)) of the U.S. Department of Commerce; the U.S. antiboycott regulations and guidelines, including those under the EAR and U.S. Department of the Treasury regulations; and the various economic sanctions, regulations, and guidelines of the U.S. Department of the Treasury, Office of Foreign Assets Control ("<u>OFAC</u>").  The Company has not (a) made a voluntary disclosure with respect to violations of such laws; (b) been subject to any (i) claim, action, audit, compliance assessment, or focused assessment for alleged or actual underpayment of import or export duties, Taxes, or fees, (ii) suspension of export privileges, or (iii) investigation or enforcement action or sanction by any Governmental Authority arising under such laws; (c) made or provided any false statement or omission to any Governmental Authority or to any customer in connection with the importation or exportation of merchandise; or (d) exported or re-exported, directly or, to the Knowledge of the Company, indirectly, any items to Cuba, Iran, Sudan, Syria, North Korea, or to the Crimea region, or to any prohibited, debarred, denied, or specially designated entities or individuals under statutes, regulations, orders, and decrees of carious agencies of the U.S. Government, including, but not limited to, the Denied Persons List or Entity List, as administered by the U.S. Department of Commerce, Bureau of Industry and Security's, or the OFAC List of Specially Designated Nationals or Blocked Persons.

(b)     <u>Import Compliance</u>.  The Company is in compliance and has been in compliance with all import laws and regulations, including, but not limited to, the laws and regulations administered by U.S. Customs and Border Protection ("<u>CBP</u>").  The products imported by the Company have not, over the past five years, been subject to any penalties (civil or criminal), claims for liquidated damages, or notices of redelivery issued by CBP, or to any detentions, seizures, or forfeitures by CBP or any other U.S. Government agency.  The Company has not made any prior disclosures to CBP of any violation of the customs laws during this period.  The Company has not been, nor is currently, subject to any CBP investigation or enforcement action (and has no knowledge of any possible future action).  The Company has paid all import duties, fees, and other charges owed to CBP, and the products that it imports are not subject to any antidumping duty, countervailing duty, or other penalty duty.  The Company is not sourcing products from facilities that use forced or indentured labor (including child labor).

3.23    <u>Transactions With Affiliates</u>.  Except as set forth on <u>Schedule 3.23</u> and except for normal advances to employees consistent with past practices, payment of compensation for employment to

21

employees consistent with past practices, and participation in scheduled Plans or Benefit Programs and Agreements by employees, the Company has not purchased, acquired, or leased any property or services from, or sold, transferred, or leased any property or services to, or loaned or advanced any money to, or borrowed any money from, or entered into or been subject to any management, consulting, or similar agreement with, or engaged in any other significant transaction with any of the Stockholders or any other officer, director, or stockholder of the Company or any of their respective Affiliates.  Except as set forth on Schedule 3.23, none of the Stockholders nor any other Affiliate of the Company is indebted to the Company for money borrowed or other loans or advances, and the Company is not indebted to any such Affiliate.

3.24    Privacy and Data Security.  No Person has obtained unauthorized access to third party information or data in the possession of the Company (including any personal information, personally identifiable information, and personal data, which is collectively referred to herein as "Personal Information"), nor has there been any other compromise of the security, confidentiality, or integrity of such information or data.  The Company has complied in all material respects with (i) all applicable laws relating to privacy, personal data security and protection, and the collection, processing, and use of Personal Information (collectively, "Privacy Laws"); (ii) the Payment Card Industry Data Security Standards (the "PCI DSS"); and (iii) its own internal employee-facing and external customer-facing privacy and data security policies and guidelines. The operation of the Business does not violate, and has not violated, any right to privacy or publicity of any third person in any material respect, including through the violation of any applicable Privacy Laws or the PCI DSS.  The Company has not received any notice, claim, or demand from (i) a Governmental Authority asserting or claiming that the Company has violated or has failed to comply with any Privacy Law or (ii) any Person asserting a breach of a Privacy Law or seeking compensation for breach of a Privacy Law.  The Company has not notified and has not been required or obligated to notify any Person with respect to a breach of privacy or security, or unauthorized misappropriation, access, or use of, any Personal Information.

3.25    Title to Assets.  The Company owns, leases, or has the legal right to use all the Assets, and Buyer will be vested with good, valid, marketable, and undivided title to the Assets free and clear of all liens, claims, interests, and encumbrances, other than the Assumed Obligations.  The Assets constitute all of the assets necessary to conduct the Business as currently being conducted, and no Person other than the Company owns any assets used in the Business.

3.26    Broker or Finder Fees.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried out without the intervention of any Person acting on behalf of the Company or the Stockholders in such a manner as to give rise to any valid claim against Buyer for any broker's fee, finder's fee, or similar compensation.

3.27    Other Information.  The information furnished by the Stockholders and the Company to Buyer pursuant to this Agreement (including, without limitation, information contained in the exhibits hereto, the schedules identified herein, the instruments referred to in such schedules, and the certificates and other documents to be executed or delivered pursuant hereto by the Stockholders and/or the Company at or prior to the Closing) is not, nor at the Closing will be, false or misleading in any material respect, or contains, or at the Closing will contain, any misstatement of material fact, or omits, or at the Closing will omit, to state any material fact required to be stated in order to make the statements therein not misleading.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Company that:

4.1     <u>Existence and Qualification</u>.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the state of Delaware; has the power to own, manage, lease, and hold its properties and to carry on its business as and where such properties are presently located and such business is presently conducted; and is duly qualified to do business and is in good standing as a foreign entity in each of the jurisdictions where the character of its properties or the nature of its business requires it to be so qualified.

4.2     <u>Authority, Approval, and Enforceability</u>.  This Agreement has been duly executed and delivered by Buyer and Buyer has all requisite power and legal capacity to execute and deliver this Agreement and all Collateral Agreements executed and delivered or to be executed and delivered by Buyer in connection with the transactions provided for hereby, to consummate the transactions contemplated hereby and by the Collateral Agreements, and to perform its obligations hereunder and under the Collateral Agreements.  The execution, delivery, and performance of this Agreement and the Collateral Agreements and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all necessary action on the part of Buyer.  This Agreement and each Collateral Agreement to which Buyer is a party constitutes, or upon execution and delivery will constitute, the legal, valid, and binding obligation of Buyer, enforceable in accordance with its terms, except as such enforcement may be limited by general equitable principles or by applicable bankruptcy, insolvency, moratorium, or similar laws and judicial decisions from time to time in effect which affect creditors' rights generally.

4.3     <u>No Default or Consents</u>.  Neither the execution and delivery of this Agreement nor the carrying out of the transactions contemplated hereby will:

(a)     violate or conflict with any of the terms, conditions, or provisions of Buyer's Articles of Incorporation or bylaws;

(b)     violate any Legal Requirements applicable to Buyer;

(c)     violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), or accelerate or permit the acceleration of the performance required by, or give any other party the right to terminate, any Contract or Permit binding upon or applicable to Buyer;

(d)     result in the creation of any lien, charge, or other encumbrance on any property of Buyer; or

(e)     require Buyer to obtain or make any waiver, consent, action, approval, or authorization of, or registration, declaration, notice, or filing with, any private non-governmental third party or any Governmental Authority.

4.4     <u>No Proceedings</u>.  No suit, action, or other proceeding is pending or, to Buyer's knowledge, threatened before any Governmental Authority seeking to restrain Buyer or prohibit its entry into this Agreement or prohibit the Closing, or seeking Damages against Buyer or its properties as a result of the consummation of this Agreement.

23

4.5    Broker or Finder Fees.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried out without the intervention of any Person acting on behalf of Buyer in such a manner as to give rise to any valid claim against the Company or the Stockholders for any broker's fee, finder's fee, or similar compensation.

## ARTICLE V - OBLIGATIONS PRIOR TO CLOSING

From the date of this Agreement through the Closing:

5.1    Buyer's Access to Information and Properties.  The Company shall permit Buyer and its authorized employees, agents, accountants, legal counsel, and other representatives to have access to the books, records, employees, counsel, accountants, engineers, and other representatives of the Company at all times reasonably requested by Buyer for the purpose of conducting an investigation of the Company's financial condition, corporate status, operations, prospects, business, and Properties.  The Company shall make available to Buyer for examination and reproduction all documents and data of every kind and character relating to the Company in possession or control of, or subject to reasonable access by, the Company and/or the Stockholders, including, without limitation, all files, records, data, and information relating to the Properties (whether stored in paper, magnetic, or other storage media) and all agreements, instruments, contracts, assignments, certificates, orders, and amendments thereto.  Also, the Company shall allow Buyer access to, and the right to inspect, the Properties, except to the extent that such Properties are operated by a third-party operator, in which case the Company shall use its best efforts to cause the operator of such Properties to allow Buyer access to, and the right to inspect, such Properties.

5.2    Company's Conduct of Business and Operations.  The Company and the Stockholders shall keep Buyer advised as to all material operations and proposed material operations relating to the Company.  The Company shall (a) conduct its business in the ordinary course, (b) keep available the services of present employees, (c) maintain and operate its Properties in a good and workmanlike manner, (d) pay or cause to be paid all costs and expenses (including but not limited to insurance premiums) incurred in connection therewith in a timely manner, (e) use reasonable efforts to keep all Contracts listed or required to be listed on Schedule 3.13(a) in full force and effect, (f) comply with all of the covenants contained in all such material Contracts, (g) maintain in force until the Closing Date insurance policies (subject to the provisions of Section 5.7) equivalent to those in effect on the date hereof, and (h) comply in all material respects with all applicable Legal Requirements.  Except as otherwise contemplated in this Agreement, the Company will use its best efforts to preserve the present relationships of the Company with Persons having significant business relations therewith.

5.3    General Restrictions.  Except as otherwise expressly permitted in this Agreement, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, the Company shall not:

(a)    declare, set aside, or pay any dividends, or make any distributions, or make any other payments in respect of its equity securities, or repurchase, redeem, or otherwise acquire any such securities;

(b)    merge into or with or consolidate with, any other corporation or acquire the business or assets of any Person;

(c)    purchase any securities of any Person;

(d)    amend its charter or bylaws;

24

(e)     issue any capital stock or other securities, or grant, or enter into any agreement to grant, any options, convertibility rights, other rights, warrants, calls, or agreements relating to its securities;

(f)     create, incur, assume, guarantee, or otherwise become liable or obligated with respect to any indebtedness, or make any loan or advance to, or any investment in, any Person, except in each case in the ordinary course of business;

(g)     make any change in any existing election, or make any new election, with respect to any tax law in any jurisdiction which election could have an effect on the tax treatment of the Company or the Company's business operations;

(h)     enter into, amend, or terminate any material agreement;

(i)     sell, transfer, lease, mortgage, encumber, or otherwise dispose of, or agree to sell, transfer, lease, mortgage, encumber, or otherwise dispose of, any Properties except (i) in the ordinary course of business, or (ii) pursuant to any agreement specified in Schedule 3.13(a);

(j)     settle any material claim or litigation, or file any material motions, orders, briefs, or settlement agreements in any proceeding before any Governmental Authority or any arbitrator;

(k)     other than in the ordinary course of business consistent with past practices, incur or approve, or enter into any agreement or commitment to make, any expenditures in excess of $25,000 (other than those required pursuant to any agreement specified in Schedule 3.13(a));

(l)     maintain its books of account other than in the usual, regular and ordinary manner in accordance with GAAP and on a basis consistent with prior periods or make any change in any of its accounting methods or practices;

(m)     make any change, whether written or oral, to any agreement or understanding with any of the suppliers or customers listed or required to be listed on Schedule 3.19;

(n)     accelerate or delay collection of any notes or accounts receivable in advance of or beyond their regular due dates or the dates when they would have been collected in the ordinary course of business consistent with past practices;

(o)     delay or accelerate payment of any accrued expense, trade payable, or other liability beyond or in advance of its due date or the date when such liability would have been paid in the ordinary course of business consistent with past practices;

(p)     allow its levels of Inventory to vary in any material respect from the levels customarily maintained;

(q)     adopt any Plan or Benefit Program or Agreement or increase the compensation payable to any employee (including, without limitation, any increase pursuant to any bonus, profit-sharing, or other incentive plan or commitment);

(r)     become a party to or bound by any of the arrangements described in Section 3.13(a), whether written or oral;

25

(s)      engage in any one or more activities or transactions outside the ordinary course of business;

(t)      enter into any transaction or make any commitment which could result in any of the representations, warranties, or covenants of the Company and/or the Stockholders contained in this Agreement not being true and correct after the occurrence of such transaction or event; or

(u)      commit to do any of the foregoing.

5.4      <u>Notice Regarding Changes</u>.  The Company and the Stockholders shall promptly inform Buyer in writing of any change in facts and circumstances that could render any of the representations and warranties made herein by the Company and/or the Stockholders inaccurate or misleading if such representations and warranties had been made upon the occurrence of the fact or circumstance in question.  Buyer shall promptly inform the Company in writing of any change in facts and circumstances that could render any of the representations and warranties made herein by it inaccurate or misleading if such representations and warranties had been made upon the occurrence of the fact or circumstance in question.

5.5      <u>Preferential Purchase Rights</u>.  To the extent there are any parties entitled or who may become entitled to exercise preferential purchase or consent rights with respect to the transactions contemplated hereby, the Company and the Stockholders shall promptly use their best efforts to obtain the agreement in writing of such parties to waive or not exercise such rights, which request shall be in form reasonably satisfactory to and approved by Buyer.

5.6      <u>Ensure Conditions Met</u>.  Subject to the terms and conditions of this Agreement, each party hereto shall use all reasonable commercial efforts to take or cause to be taken all actions and do or cause to be done all things required under applicable Legal Requirements in order to consummate the transactions contemplated hereby, including, without limitation, (i) obtaining all Permits, authorizations, consents, and approvals of any Governmental Authority or other Person which are required for or in connection with the consummation of the transactions contemplated hereby and by the Collateral Agreements, (ii) taking any and all reasonable actions necessary to satisfy all of the conditions to each party's obligations hereunder as set forth in <u>Article VI</u>, and (iii) executing and delivering all agreements and documents required by the terms hereof to be executed and delivered by such party on or prior to the Closing.

5.7      <u>Termination of Insurance Policies</u>.  The Company shall take all actions necessary or appropriate to cause any and all insurance coverage currently carried by or for the benefit of the Company to remain in full force and effect; <u>provided</u>, <u>however</u>, that the Company shall cooperate with Buyer to cause termination as of the Closing Date of the insurance coverage identified in writing for this purpose by Buyer to the Company and the Company shall take all actions necessary to discharge any and all liabilities or obligations of the Company arising with respect to any such coverage that is to be terminated hereunder.

5.8      <u>Casualty Loss</u>.  If, between the date of this Agreement and the Closing, any of the Properties of the Company shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty, or any other cause, then the Company shall, at Buyer's election, (i) cause such Properties to be repaired or replaced prior to the Closing with Properties of substantially the same condition and function, (ii) deposit in a separate account an amount sufficient to cause such Properties to be so repaired or replaced, or (iii) enter into contractual arrangements satisfactory to Buyer so that the Company will have at the Closing the same economic value as if such casualty had not occurred.

26

5.9     Employee Matters.

(a)     Effective as of 12:01 a.m., local time, on the day after the Closing Date, the employment by the Company of the employees listed on Schedule 5.9 shall terminate and Buyer shall be deemed to have offered employment to each individual whose employment was so terminated (the "Business Employees"), effective at 12:01 a.m., local time, on the day after the Closing Date or, in the case of a Business Employee not actively at work on the Closing Date on account of a disability, on the day such employee reports for work after termination of such disability upon substantially the same terms and conditions with substantially the same duties and responsibilities and at substantially the same rate of pay as in effect on the Closing Date while such individuals were employed by the Company.   The Company shall retain responsibility for the payment of any employee benefits or entitlement, including severance pay, accrued vacation, sick, or holiday pay, to any Business Employee pursuant to any Plan, Benefit Program or Agreement, or law or regulation as a result of the consummation of the transactions contemplated hereby.

(b)     The parties acknowledge that the transactions provided for in this Agreement may result in obligations on the part of the Company and one or more of the Plans that is a welfare benefit plan (within the meaning of Section 3(1) of ERISA) to comply with the health care continuation requirements of Part 6 of Title 1 of ERISA and Code Section 4980B, as applicable.  The parties expressly agree that Buyer and Buyer's benefit plans shall have no responsibility for compliance with such health care continuation requirements (i) for qualified beneficiaries who previously elected to receive continued coverage under the Company's ERISA benefit plans or who between the date of this Agreement and the Closing Date elect to receive continued coverage, or (ii) with respect to those employees or former employees of the Company who may become eligible to receive such continued coverage as a result of the transactions provided for in this Agreement.

(c)     Except as specifically set forth in this Agreement (i) Buyer shall not be obligated to assume, continue, or maintain any of the Plans or Benefit Programs or Agreements; (ii) no assets or liabilities of the Plans shall be transferred to, or assumed by, Buyer or Buyer's benefit plans; and (iii) the Company shall be solely responsible for funding and/or paying any benefits under any of the Plans or Benefit Programs or Agreements, including any termination benefits and other employee entitlements accrued under such plans by or attributable to employees of the Company prior to the Closing Date.

(d)     Nothing in this Agreement, express or implied, shall confer upon any employee of the Company, or any representative of any such employee, any rights or remedies, including any right to employment or continued employment for any period, of any nature whatsoever.

(e)     The Company shall permit Buyer to contact and make arrangements with the Company's employees for the purpose of assuring their continued employment by the Company after the Closing and for the purpose of ensuring the continuity of the Company's business, and the Company agrees not to discourage any such employees from consulting with Buyer.

(f)     The Company shall use its best efforts to keep available the services of its present employees through the Closing Date.

5.10    Payoff and Estoppel Letters.  Prior to Closing, (a) the Company shall request payoff and estoppel letters with respect to all Funded Indebtedness, which letters shall contain payoff amounts, per diems, wire transfer instructions and an agreement to deliver, upon full payment, UCC-3 termination statements, other appropriate releases and any original promissory notes or other evidences of indebtedness marked canceled, and (b) the Company shall provide Buyer with evidence of satisfaction in

27

full or release of all guarantees, notes, or obligations of the Company to or on behalf of each of the Stockholders or any other Affiliate of the Company.

5.11    No Shop.  From the date of this Agreement until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, the Company and the Stockholders shall not, and the Company shall cause the Company's stockholders, directors, officers, employees, and other agents not to, directly or indirectly, take any action to solicit, initiate, or encourage any offer or proposal or indication of interest in a merger, consolidation, or other business combination involving any equity interest in, or a substantial portion of the assets of the Company, other than in connection with the transactions contemplated by this Agreement.  The Company shall immediately advise Buyer of the terms of any offer, proposal, or indication of interest that it receives or otherwise becomes aware of.

5.12    Name Change.  The Company hereby represents, warrants, and covenants to Buyer that the corporate name of the Company is as set forth on the signature page hereof and further agrees and acknowledges that such name is included with the Assets and that the exclusive right to use such name will be transferred to Buyer on the Closing Date.  The Company and the Stockholders shall, prior to or as of the Closing, file an appropriate amendment to the Company's charter changing its name to a name which is in no way similar to the corporate name set forth on the signature page hereof and shall furnish such written consents and assignments as Buyer shall hereafter reasonably request in connection with such name change.

## ARTICLE VI - CONDITIONS TO COMPANY'S AND BUYER'S OBLIGATIONS

6.1    Conditions to Obligations of the Company.  The obligations of the Company to carry out the transactions contemplated by this Agreement are subject, at the option of the Company, to the satisfaction or waiver of the following conditions:

(a)    All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing, and Buyer shall have performed and satisfied in all material respects all covenants and agreements required by this Agreement to be performed and satisfied by Buyer at or prior to the Closing.

(b)    As of the Closing Date, no suit, action, or other proceeding (excluding any such matter initiated by or on behalf of the Company or any Stockholder) shall be pending or threatened before any Governmental Authority seeking to restrain the Company or prohibit the Closing or seeking Damages against the Company as a result of the consummation of this Agreement.

(c)    Buyer shall have delivered or cause to be delivered to the Company and the Stockholders all of the documents required by Section 2.3 hereof.

6.2    Conditions to Obligations of Buyer.  The obligations of Buyer to carry out the transactions contemplated by this Agreement are subject, at the option of Buyer, to the satisfaction, or waiver by Buyer, of the following conditions:

(a)    All representations and warranties of the Company and the Stockholders contained in this Agreement shall be true and correct in all material respects at and as of the Closing, and the Company and the Stockholders shall have performed and satisfied in all material respects all agreements and covenants required by this Agreement to be performed and satisfied by them at or prior to the Closing.

PHX 332426779v8

(b)     As of the Closing Date, no suit, action, or other proceeding (excluding any such matter initiated by or on behalf of Buyer) shall be pending or threatened before any Governmental Authority seeking to restrain Buyer or prohibit the Closing or seeking Damages against Buyer or the Company or its Properties as a result of the consummation of this Agreement.

(c)     Except for matters disclosed in Schedule 3.9(a) or Schedule 3.9(b), since the Balance Sheet Date and up to and including the Closing, there shall not have been any event, circumstance, change, or effect that, individually or in the aggregate, had or might have a material adverse effect on the Company's business, operations, prospects, Properties, or financial condition.

(d)     Buyer shall have received the opinion of Trout Law, PLLC, counsel to the Company ("Company Counsel"), dated as of the Closing Date, addressed to Buyer and in form and substance reasonably satisfactory to Buyer, to the effect set forth on Exhibit C hereto.  In rendering such opinion, Company Counsel may rely as to factual matters on certificates of officers, directors, and stockholders of the Company and on certificates of governmental officials.

(e)     The Company shall have furnished Buyer with a certified copy of all necessary corporate action on its behalf approving the Company's execution, delivery, and performance of this Agreement and the transactions contemplated hereby.

(f)     All agreements, commitments, and understandings between the Company and any Affiliate thereof shall have been terminated in all respects on terms satisfactory to Buyer, and all obligations, claims, or entitlements thereunder shall be unconditionally waived and released by such Affiliates and written evidence thereof satisfactory in form and substance to Buyer shall have been delivered to Buyer.

(g)     Buyer shall have completed its due diligence investigation, and the results thereof shall not have revealed that any of the representations of the Company or the Stockholders set forth herein are untrue or incorrect in any respect or shall not be otherwise unsatisfactory to Buyer.

(h)     All proceedings to be taken by the Company in connection with the transactions contemplated hereby and all documents incident thereto shall be satisfactory in form and substance to Buyer and its counsel, and Buyer and said counsel shall have received all such counterpart originals or certified or other copies of such documents as it or they may reasonably request, including, but not limited to, the Conveyance Documents.

(i)     Buyer shall have received written evidence, in form and substance satisfactory to Buyer, of the consent to the transactions contemplated by this Agreement of all governmental, quasi-governmental, and private third parties (including, without limitation, Persons or other entities leasing real or personal property to the Company) where the absence of any such consent would result in a violation of law or a breach or default under any agreement to which the Company is subject, including, but not limited to, the written consent required to assign that certain lease pursuant to the Lease Agreement, dated March 17, 2017, between Sundance Investments, L.L.L.P. and the Company.

(j)     No proceeding in which any of the Stockholders or the Company shall be a debtor, defendant, or party seeking an order for its own relief or reorganization shall have been brought or be pending by or against such Person under any United States or state bankruptcy or insolvency law.

(k)     Buyer shall have received copies of "payoff" or "estoppel" letters or other evidence, reasonably satisfactory to it, of the termination, at or prior to Closing, of all Funded Indebtedness and any and all Liens that encumber the Company's Properties pursuant thereto.

(l)     The Company and the Stockholders shall have delivered or cause to be delivered to Buyer all of the documents required by Section 2.2 hereof.

## ARTICLE VII - POST-CLOSING OBLIGATIONS

7.1     Further Assurances.  Following the Closing, the Company, the Stockholders, and Buyer shall execute and deliver such documents, and take such other action, as shall be reasonably requested by any other party hereto to carry out the transactions contemplated by this Agreement.  In addition, within 30 days following the Closing Date, the Company will provide Buyer with evidence of the satisfaction of that certain line of credit between Washington Trust Bank and the Company.

7.2     Publicity.  None of the parties hereto shall issue or make, or cause to have issued or made, any public release or announcement concerning this Agreement or the transactions contemplated hereby, without the advance approval in writing of the form and substance thereof by each of the other parties, except as required by any applicable Legal Requirement (in which case, so far as possible, in cases other than relating to any Securities and Exchange Commission reporting obligations to be made by Buyer, there shall be consultation among the parties prior to such announcement), and the parties shall endeavor jointly to agree on the text of any announcement or circular so approved or required.

7.3     Post-Closing Indemnity.

(a)     Subject to the provisions of the Escrow Agreement and the other provisions of this Agreement (including, but not limited to, Section 9.1 hereof), from and after the Closing, the Company and the Stockholders shall jointly and severally indemnify and hold harmless Buyer and its Affiliates, members, managers, officers, and employees from and against any and all Damages arising out of, resulting from, or in any way related to (i) a breach of, or inaccuracy in, any of the representations or warranties made by the Company and/or the Stockholders in this Agreement (except the representations and warranties set forth in Article VIII, (ii) a breach or default in performance by the Company or any Stockholder of any covenant or agreement of the Company and/or the Stockholders contained in this Agreement, (iii) the Excluded Assets, (iv) the existence of any liabilities or obligations of the Company or any of the Stockholders (whether accrued, absolute, contingent, known or unknown, or otherwise, and whether or not of a nature appropriate for inclusion in a balance sheet in accordance with GAAP) other than the Assumed Obligations, (v) any and all of the Company's agreements, transactions, or arrangements with Daniel J. Whelan, whether as an employee, officer, director, stockholder, independent contractor, debtor, creditor, or otherwise.  Any payment made to Buyer by the Company or the Stockholders pursuant to the indemnification obligations under this Section 7.3 shall constitute a reduction in the Purchase Price hereunder.

(b)     Subject to the provisions of this Agreement (including, but not limited to, Section 9.1 hereof), from and after the Closing, Buyer shall indemnify and hold harmless the Company and the Stockholders from and against any and all Damages arising out of or resulting from (i) a breach of, or inaccuracy in, any of the representations or warranties made by Buyer in this Agreement, (ii) a breach or default in performance by Buyer of any covenant or agreement of Buyer contained in this Agreement, (iii) any Assumed Obligations, and/or (iv) any breach of any Contract assigned to Buyer pursuant to this Agreement following the Closing Date.

7.4     Non-Competition, Non-Solicitation, and Non-Disclosure.

(a)     General.  In consideration of the payment of the Purchase Price, and in order to induce Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, each

of the Stockholders hereby acknowledges that he or she is a beneficiary of the Purchase Price payments to the Company and each of the Stockholders hereby severally covenants and agrees as follows:

(i)        Without the prior written consent of Buyer, such Stockholder shall not for a period of five (5) years from and after the Closing Date, or, in the alternative, in the event any reviewing court finds five (5) years to be overbroad in duration and unenforceable, for a period of four (4) years from and after the Closing Date, or, in the alternative, in the event any reviewing court finds four (4) years to be overbroad in duration and unenforceable, for a period of three (3) years from and after the Closing Date, or, in the alternative, in the event any reviewing court finds three (3) years to be overbroad in duration and unenforceable, for a period of two (2) years from and after the Closing Date (the "Restricted Period"), (A) directly or indirectly acquire or own in any manner any interest in any Person, firm, partnership, corporation, association, or other entity which engages or plans to engage in any facet of the Business or which competes or plans to compete in any way with Buyer or any of its subsidiaries or Affiliates, anywhere Buyer or the Company have customers or market products manufactured by Buyer or the Company (the "Territory"), (B) be employed by or serve as an employee, agent, officer, director of, or as a consultant to, any Person, firm, partnership, corporation, association, or other entity which engages or plans to engage in any facet of the Business or which competes or plans to compete in any way with Buyer or any of its subsidiaries or Affiliates within the Territory, or (C) utilize his or her special knowledge of the Business and his, her, or its relationships with customers, suppliers, and others to compete with Buyer and/or any of its Affiliates in any business which engages or plans to engage in the Business; provided, however, that nothing herein shall be deemed to prevent such Stockholder from acquiring through market purchases and owning, solely as an investment, less than three percent in the aggregate of the equity securities of any class of any issuer whose shares are registered under §12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, and are listed or admitted for trading on any United States national securities exchange or are quoted on the National Association of Securities Dealers Automated Quotation System, or any similar system of automated dissemination of quotations of securities prices in common use, so long as such Stockholder is not a member of any "control group" (within the meaning of the rules and regulations of the United States Securities and Exchange Commission) of any such issuer.  Such Stockholder acknowledges and agrees that the covenants provided for in this Section 7.4(a) are reasonable and necessary in terms of time, area, and line of business to protect the Company's Trade Secrets.  Such Stockholder further acknowledges and agrees that such covenants are reasonable and necessary in terms of time, area, and line of business to protect Buyer's legitimate business interests, which include its interests in protecting Buyer's (i) valuable confidential business information, (ii) substantial relationships with customers throughout the world, and (iii) customer goodwill associated with the ongoing Business.  Stockholder expressly authorizes the enforcement of the covenants provided for in this Section 7.4(a) by (A) Buyer and its subsidiaries, (B) Buyer's permitted assigns, and (C) any successors to Buyer's business.  To the extent that the covenants provided for in this Section 7.4(a) may later be deemed by a court to be too broad to be enforced with respect to its duration or with respect to any particular activity or geographic area, the court making such determination shall have the power to reduce the duration or scope of the provision, and to add or delete specific words or phrases to or from the provision.  The provision as modified shall then be enforced.

(ii)        Without the prior consent of Buyer, such Stockholder shall not for the Restricted Period, directly or indirectly, for himself, herself, or for any other Person, firm, corporation, partnership, association, or other entity (including the Company), (i) attempt to employ or enter into any contractual arrangement with any employee or former employee of the Business, unless such employee or former employee has not been employed by the Business for a period in excess of nine months, and/or (ii) call on or solicit any of the actual or targeted prospective customers or clients of the Business, nor shall such Stockholder make known the names and addresses of such customers or any information relating in any manner to the Company's trade or business relationships with such customers.

(iii)    Such Stockholder shall not at any time divulge, communicate, use to the detriment of Buyer or for the benefit of any other Person or Persons, or misuse in any way, any Confidential Information pertaining to the Business.  Any confidential information or data now known or hereafter acquired by such Stockholder with respect to the Business shall be deemed a valuable, special, and unique asset of Buyer that is received by such Stockholder in confidence and as a fiduciary, and such Stockholder shall remain a fiduciary to Buyer with respect to all of such information.

(b)    Injunction.  It is recognized and hereby acknowledged by the parties hereto that a breach or violation by a Stockholder of any or all of the covenants and agreements contained in this Section 7.4 may cause irreparable harm and damage to Buyer in a monetary amount which may be virtually impossible to ascertain.  As a result, each Stockholder recognizes and hereby acknowledges that Buyer shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining any breach or violation of any or all of the covenants and agreements contained in this Section 7.4 by such Stockholder and/or his associates, Affiliates, partners, or agents, either directly or indirectly, and that such right to injunction shall be cumulative and in addition to whatever other rights or remedies Buyer may possess hereunder, at law or in equity.  Nothing contained in this Section 7.4 shall be construed to prevent Buyer from seeking and recovering from a Stockholder damages sustained by it as a result of any breach or violation by such Stockholder of any of the covenants or agreements contained herein.

7.5    Delivery of Property Received by the Company After Closing.  From and after the Closing, Buyer shall have the right and authority to collect, for the account of Buyer, all receivables and other items which shall be transferred or are intended to be transferred to Buyer as part of the Assets as provided in this Agreement, and to endorse with the name of the Company any checks or drafts received on account of any such receivables or other Assets, and the Company agrees to provide Buyer with a power of attorney in furtherance of the foregoing.  The Company agrees that it will transfer or deliver to Buyer, promptly after the receipt thereof, any cash or other property which the Company receives after the Closing Date in respect of any claims, contracts, licenses, leases, commitments, sales orders, purchase orders, receivables of any character, or any other items transferred or intended to be transferred to Buyer as part of the Assets under this Agreement.

7.6    Buyer Appointed Attorney for the Company.  Effective at the Closing Date, the Company hereby constitutes and appoints Buyer, and Buyer's successors and assigns, its true and lawful attorney, in the name of either Buyer or the Company (as Buyer shall determine in its sole discretion) but for the benefit and at the expense of Buyer (except as otherwise herein provided), (a) to institute and prosecute all proceedings which Buyer may deem proper in order to collect, assert, or enforce any claim, right, or title of any kind in or to the Assets as provided for in this Agreement; (b) to defend or compromise any and all actions, suits, or proceedings in respect of any of the Assets, and to do all such acts and things in relation thereto as Buyer shall reasonably deem advisable; and (c) to take all action which Buyer may reasonably deem proper in order to provide for Buyer the benefits under any of the Assets where any required consent of another party to the sale or assignment thereof to Buyer pursuant to this Agreement shall not have been obtained.  The Company acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable.  Buyer shall be entitled to retain for its own account any amounts respecting the Assets collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

7.7    Assignment of Contracts.  At the option of Buyer, and notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an assignment of any claim, contract, license, franchise, lease, commitment, sales order, sales contract, supply contract, service agreement, purchase order, or purchase commitment if an attempted assignment thereof without the consent of a third party thereto would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder.  If such consent is not obtained, or if any attempt at an assignment thereof would be

32

ineffective or would affect the rights of the Company thereunder so that Buyer would not in fact receive all such rights, the Company shall cooperate with Buyer to the extent necessary to provide for Buyer the benefits under such claim, contract, license, franchise, lease, commitment, sales order, sales contract, supply contract, service agreement, purchase order, or purchase commitment, including enforcement for the benefit of Buyer of any and all rights of the Company against a third party thereto arising out of the breach or cancellation by such third party or otherwise.

## ARTICLE VIII - TAX MATTERS

8.1     <u>Representations and Obligations Regarding Taxes</u>.  Except as otherwise set forth in <u>Schedule 8.1</u>, the Company and the Stockholders jointly and severally represent and warrant to and agree with Buyer as follows:

(a)     The Company has filed all Tax Returns that it was required to file.  All such Tax Returns were correct and complete in all respects.  All Taxes owed by the Company (whether or not shown on any Tax Return and whether or not any Tax Return was required) have been paid.  The Company is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by a taxing authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.  There are no liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax, except for liens for Taxes not yet due.

(b)     The Company has withheld and timely paid over all Taxes required to be withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, or other third party.

(c)     No stockholder, director, or officer (or employee responsible for Tax matters) of the Company expects any taxing authority to assess any additional Taxes for any period for which Tax Returns have been filed.  There is no dispute or claim concerning any Tax liability of the Company either (i) claimed or raised by any taxing authority in writing or (ii) as to which any of the stockholders, directors, or officers (or employees responsible for Tax matters) of the Company has actual knowledge (after reasonable investigation) based upon personal contact with any agent of such taxing authority. <u>Schedule 8.1</u> lists all federal, state, local, and foreign income Tax Returns filed with respect to the Company for taxable periods ended on or after December 31, 2012.  No issue relating to Taxes has been raised in writing by a taxing authority during any pending audit or examination, and no issue relating to Taxes was raised in writing by a taxing authority in any completed audit or examination, that reasonably can be expected to recur in a later taxable period.

(d)     The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     The Company is not a party to any Tax allocation or sharing agreement.  The Company has no liability for the Taxes of any Person under Treasury Regulation section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract or otherwise.

(f)     The Company is not a party to any joint venture, partnership or other arrangement or contract that could be treated as a partnership for federal income Tax purposes.

(g)     The Company has not entered into any sale leaseback or leveraged lease transaction that fails to satisfy the requirements of Revenue Procedure 2001-28 (or similar provisions of foreign law) or any safe harbor lease transaction.

33

(h)     All material elections with respect to Taxes affecting the Company or Assets are disclosed or attached to a Tax Return of the Company.

(i)     All private letter rulings issued by the Internal Revenue Service to the Company (and any corresponding ruling or determination of any state, local or foreign taxing authority) have been disclosed on <u>Schedule 8.1</u>, and there are no pending requests for any such rulings (or corresponding determinations).

(j)     The Company has been treated as a partnership within the meaning of Treasury Regulation Section 301.7701-3(b) for U.S. federal and state income tax purposes since the date of its formation.

8.2     <u>Cooperation</u>.  The Company shall grant to Buyer or its designees access at all reasonable times to all of the Company's books and records (including tax workpapers and returns and correspondence with tax authorities), including the right to take extracts therefrom and make copies thereof, to the extent such books and records relate to taxable periods ending on or prior to or that include the Closing Date.  Buyer shall (i) grant to Company access at all reasonable times to all of the Company's books and records (including tax workpapers and returns and correspondence with tax authorities), including the right to take extracts therefrom and make copies thereof, to the extent that such books and records relate to the operations of the Company during taxable periods ending on or prior to or that include the Closing Date, and (ii) otherwise cooperate with Company in connection with any audit of Taxes that relate to the business of the Company prior to Closing.

8.3     <u>Tax Returns</u>.  Buyer shall be responsible for preparing and filing all Tax Returns relating to the Assets required to be filed after the Closing Date (other than income and excise tax returns).  The Company shall pay to Buyer within five days after the date on which Taxes (other than income taxes) are paid with respect to periods beginning before the Closing Date and ending on or after the Closing Date an amount equal to the portion of those Taxes that relates to the portion of the taxable period ending on the Closing Date.  For purposes of this Agreement, in the case of any period that begins before the Closing Date and ends after the Closing Date, any Tax based directly or indirectly on gross or net income or receipts or imposed in respect of specific transactions, and any credits available with respect to any Tax, shall be allocated by assuming that the taxable period ended on the Closing Date, and any other Tax shall be allocated based on the number of days in the taxable period ending on the Closing Date divided by the total number of days in the taxable period.

8.4     <u>Indemnification for Taxes.</u>

(a)     The Company and the Stockholders agree to indemnify, jointly and severally, Buyer and its Affiliates (each herein sometimes referred to as an "<u>Indemnified Taxpayer</u>") against, and agree to protect, save and hold harmless each Indemnified Taxpayer from, any and all claims, damages, deficiencies, and losses and all expenses, including, without limitation, attorneys', accountants', and experts' fees and disbursements (all herein referred to as "<u>Losses</u>") resulting from:

(i)     A claim by any taxing authority for (A) any Taxes of the Business or related to the Assets allocable to any taxable period ending on or prior to the Closing Date or that relates to that portion of any taxable period on or before the Closing Date of any period that begins before and ends after the Closing Date, (B) any Taxes of the Company or the Stockholders, and (C) any Taxes of any corporation that is or was a member of an Affiliated Group of which the Company was or is a member;

34

(ii)     A claim by any taxing authority for any Taxes arising from or occasioned by the sale of the Company's Assets pursuant to this Agreement; or

(iii)     Any misrepresentation or breach of any representation, warranty or obligation set forth in this <u>Article VIII</u>.

(b)     Subject to the resolution of any Tax contest pursuant to <u>Section 8.2(c)</u>, upon notice from Buyer to the Company that an Indemnified Taxpayer is entitled to an indemnification payment for a Loss pursuant to <u>Section 8.2(a)</u>, the Company shall thereupon pay to the Indemnified Taxpayer an amount that, net of any Taxes imposed on the Indemnified Taxpayer with respect to such payment, will indemnify and hold the Indemnified Taxpayer harmless from such Loss.

(c)     (i)     If a claim shall be made by any taxing authority that, if successful, would result in the indemnification of an Indemnified Taxpayer, the Indemnified Taxpayer shall promptly notify the Company in writing of such fact; <u>provided</u>, <u>however</u>, that any failure to give such notice will not waive any rights of the Indemnified Taxpayer except to the extent the rights of the indemnifying party are actually materially prejudiced.

(ii)     The Company shall have the right to defend the Indemnified Taxpayer against such claim with counsel of its choice satisfactory to the Indemnified Taxpayer so long as (A) the Company notifies the Indemnified Taxpayer in writing within 15 days after the Indemnified Taxpayer has given notice of such claim that the Company will indemnify the Indemnified Taxpayer from and against the entirety of any Losses the Indemnified Taxpayer may suffer resulting from, arising out of, relating to, in the nature of, or caused by the claim, (B) the Company provides the Indemnified Taxpayer with evidence acceptable to the Indemnified Taxpayer that the Company will have the financial resources to defend against the claim and fulfill his indemnification obligations hereunder, (C) if requested by the Indemnified Taxpayer, the Company provides to the Indemnified Taxpayer an opinion, in form and substance satisfactory to the Indemnified Taxpayer, of counsel satisfactory to the Indemnified Taxpayer, that there exists a reasonable basis for the Company to prevail in that contest, (D)  if the Indemnified Taxpayer is requested to pay the Tax claimed and sue for a refund, the Company shall have advanced to the Indemnified Taxpayer, on an interest free basis, the full amount the Indemnified Taxpayer is required to pay, and (E) the Company conducts the defense of the claim actively and diligently.

(iii)     Subject to the provisions of paragraph (ii) above, the Company shall be entitled to prosecute such contest to a determination in a court of initial jurisdiction, and if the Company shall reasonably request, to a determination in an appellate court provided that, if requested by the Indemnified Taxpayer, the Company shall provide to the Indemnified Taxpayer an opinion, in form and substance satisfactory to the Indemnified Taxpayer, of counsel satisfactory to the Indemnified Taxpayer, that there exists a reasonable basis for the Company to prevail on that appeal.

(iv)     The Company shall not be entitled to settle or to contest any claim relating to Taxes if the settlement of, or an adverse judgment with respect to, the claim would be likely, in the good faith judgment of the Indemnified Taxpayer, to cause the liability for any Tax of the Indemnified Taxpayer or of any Affiliate of the Indemnified Taxpayer for any taxable period ending after the Closing Date to increase (including, without limitation, by making any election or taking any action having the effect of making any election, by deferring the inclusion of any amount in income or by accelerating the deduction of any amount or the claiming of any credit) or to take a position that, if applied to any taxable period ending after the Closing Date, would be adverse to the interest of the Indemnified Taxpayer or any Affiliate of the Indemnified Taxpayer.

35

(v)     If, after actual receipt by the Indemnified Taxpayer of an amount advanced by the Company pursuant to paragraph (ii)(D) above, the extent of the liability of the Indemnified Taxpayer with respect to the indemnified matter shall be established by the judgment or decree of a court that has become final or a binding settlement with an administrative agency having jurisdiction thereof that has become final, the Indemnified Taxpayer shall promptly pay to the Company any refund received by or credited to the Indemnified Taxpayer with respect to the indemnified matter (together with any interest paid or credited thereon by the taxing authority and any recovery of legal fees from such taxing authority); provided, however, that the Indemnified Taxpayer shall have been indemnified and held harmless from all Losses by reason of any indemnification payments retained by the Indemnified Taxpayer net of any Taxes imposed on the Indemnified Taxpayers with respect to indemnification payments received by the Indemnified Taxpayer or with respect to the receipt of any payment from the taxing authority.  Notwithstanding the foregoing, the Indemnified Taxpayer shall not be required to make any payment hereunder before such time as the Company shall have made all payments or indemnities then due with respect to Indemnified Taxpayer pursuant to this Article VIII.

(vi)     If any of the conditions in Section 8.2(c)(ii) above are or become unsatisfied, (A) the Indemnified Taxpayer may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the claim in any manner it may deem appropriate (and the Indemnified Taxpayer need not consult with, or obtain any consent from, the Company in connection therewith), (B) the Company will reimburse the Indemnified Taxpayer promptly and periodically for the costs of defending against the claim (including, without limitation, attorneys', accountants' and experts' fees and disbursements), and (C) the Company will remain responsible for any Losses the Indemnified Taxpayer may suffer to the fullest extent provided in this Section 8.2.

(d)     Anything to the contrary in this Agreement notwithstanding, the indemnification obligations of the Company and the Stockholders under this Article VIII shall survive the Closing until the end of the applicable statutes of limitations.  With respect to any indemnification obligation for any Tax for which a taxing authority asserts a claim within 90 days before the end of the applicable statute of limitations, an Indemnified Taxpayer shall be treated as having provided timely notice to the Company by providing written notice to the Company on or before the 90th day after the Indemnified Taxpayer's receipt of a written assertion of the claim by the taxing authority.

(e)     All transfer, documentary, sales, use, stamp, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid by the Company when due, and the Company will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

## ARTICLE IX - MISCELLANEOUS

9.1     Limitation on Liability.

(a)     The representations, warranties, agreements, and indemnities of the Company, the Stockholders, and Buyer set forth in this Agreement or in connection with the transactions contemplated hereby shall survive the Closing except as expressly provided in Section 9.1(b) and Section 8.2(d).

(b)     The Company and the Stockholders shall have no liability to indemnify Buyer pursuant to clause (i) of Section 7.3(a) with respect to the representations and warranties set forth in Section 3.5 (clauses (b), (c), (d), and (e)), Section 3.6, and Section 3.8 through Section 3.27 (collectively

36

the "Business Indemnities"), in each case unless the Company receives notice in writing from Buyer of Buyer's claim under said indemnity on or before the 24-month anniversary of the Closing Date.  Said limitations shall not apply to any breaches of or obligations to comply with any of the other provisions of this Agreement, regardless of whether such breach or obligation also constitutes a breach or obligation under any of the provisions specifically listed in this Section 9.1(b).

(c)     The Company and the Stockholders shall be obligated to indemnify as and to the extent set forth in Section 7.3(a)(i) of this Agreement only if the aggregate of all of their liability under such indemnity obligations exceeds $125,000, it being understood that such $125,000 figure is to serve as a "trigger" for the indemnification and not as a "deductible" (for example, if the indemnity claims for which the Company and the Stockholders would, but for the provisions of this paragraph (c), be liable aggregate $200,000, the Company and the Stockholders would then be liable for the full $200,000, and not just $75,000).   In addition, in no event shall the aggregate liability of the Company and the Stockholders with respect to the Business Indemnities exceed Five Million Dollars ($5,000,000).

(d)     For purposes of this Section 9.1(d), a party making a claim for indemnity under Section 7.3 is hereinafter referred to as an "Indemnified Party" and the party against whom such claim is asserted is hereinafter referred to as the "Indemnifying Party."  All claims by any Indemnified Party under Section 7.3 hereof shall be asserted and resolved in accordance with the following provisions.  If any claim or demand for which an Indemnifying Party would be liable to an Indemnified Party is asserted against or sought to be collected from such Indemnified Party by such third party, said Indemnified Party shall with reasonable promptness notify in writing the Indemnifying Party of such claim or demand stating with reasonable specificity the circumstances of the Indemnified Party's claim for indemnification; provided, however, that any failure to give such notice will not waive any rights of the Indemnified Party except to the extent the rights of the Indemnifying Party are actually prejudiced or to the extent that any applicable period set forth in Section 9.1(b) has expired without such notice being given.   The Indemnified Party shall defend, manage, and conduct any proceedings, negotiations or communications involving any claimant whose claim is the subject of the Indemnified Party's notice to the Indemnifying Party as set forth above.  Upon request of the Indemnified Party, the Indemnifying Party shall

(i)     take such action as the Indemnified Party may reasonably request in connection with such action; and

(ii)     render to the Indemnified Party all such assistance as the Indemnified Party may reasonably request in connection with such dispute and defense.

9.2     Confidentiality.

(a)     Prior to the Closing, Buyer shall, and shall cause its Affiliates and its and their employees, agents, accountants, legal counsel, and other representatives and advisers to, hold in strict confidence all, and not divulge or disclose any, information of any kind concerning the Company and its business; provided, however, that the foregoing obligation of confidence shall not apply to (i) information that is or becomes generally available to the public other than as a result of a disclosure by Buyer or its Affiliates or any of its or their employees, agents, accountants, legal counsel, or other representatives or advisers; (ii) information that is or becomes available to Buyer or its Affiliates or any of its or their employees, agents, accountants, legal counsel, or other representatives or advisers on a nonconfidential basis prior to its disclosure by Buyer or its Affiliates or any of its or their employees, agents, accountants, legal counsel or other representatives or advisers; and (iii) information that is required to be disclosed by Buyer or its Affiliates or any of its or their employees, agents, accountants, legal counsel, or other representatives or advisers as a result of any applicable law, rule, or regulation of any Governmental Authority; and provided further that Buyer promptly shall notify the Company of any disclosure pursuant

37

to clause (iii) of this Section 9.2(a); and, provided, further, that the foregoing obligation of confidence shall not apply to the furnishing of information by Buyer in bona fide discussions or negotiations with prospective lenders.

(b)      The Company and each of the Stockholders shall, and shall cause its, his, or her Affiliates and their respective employees, agents, accountants, legal counsel, and other representatives and advisers to, hold in strict confidence all, and not divulge or disclose any, information of any kind concerning the transactions contemplated by this Agreement, the Company, Buyer, or their respective businesses; provided, however, that the foregoing obligation of confidence shall not apply to (i) information that is or becomes generally available to the public other than as a result of a disclosure by the Company, any of the Stockholders, or any of their respective Affiliates, employees, agents, accountants, legal counsel, or other representatives or advisers; (ii) information that is or becomes available to the Company, any of the Stockholders or any of their respective Affiliates, employees, agents, accountants, legal counsel, or other representatives or advisers after the Closing on a nonconfidential basis prior to its disclosure by the Company, any of the Stockholders or any of their respective employees, agents, accountants, legal counsel or other representatives or advisers; and (iii) information that is required to be disclosed by the Company, any of the Stockholders, or any of their respective employees, agents, accountants, legal counsel, or other representatives or advisers as a result of any applicable law, rule, or regulation of any Governmental Authority; and provided further that the Company promptly shall notify Buyer of any disclosure pursuant to clause (iii) of this Section 9.2(b).

9.3      Costs and Expenses.  Buyer shall bear the expenses incurred by Buyer in connection with the negotiation, preparation, execution, and closing of this Agreement and the transactions contemplated hereby. The Stockholders shall bear the expenses incurred by the Stockholders and the Company in connection with the negotiation, preparation, execution, and closing of this Agreement and the transactions contemplated hereby.

9.4      Notices.  Any notice, request, instruction, correspondence, or other document to be given hereunder by any party hereto to another (herein collectively called "Notice") shall be in writing and (i) delivered personally, (ii) mailed by registered or certified mail, postage prepaid, and return receipt requested, (iii) sent by a national overnight delivery service, return receipt requested, fees prepaid, or (iv) sent by electronic mail, as follows:

IF TO BUYER:

c/o American Outdoor Brands Corporation
2100 Roosevelt Avenue
Springfield, MA 01104
Attn.: Robert J. Cicero
E-mail: rcicero@aob.com

With a copy to:

Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 700
Phoenix, AZ  85016
Attn.: Brian H. Blaney
E-mail: blaneyb@gtlaw.com

IF TO THE COMPANY AND/OR ANY OF THE
   STOCKHOLDERS:

Gemini Technologies, Incorporated
335 N. Edgewood Lane
Eagle, ID 83616

Attn: Ron Martinez
E-mail: ron@martinez.net

With a copy to:

Trout Law, PLLC
3778 Plantation River Drive, Suite 101
Boise, ID  83703
Attn.:  Kim J. Trout
E-mail: ktrout@trout-law.com

Each of the above addresses for Notice purposes may be changed by providing appropriate Notice hereunder.  Notice given by personal delivery shall be effective upon actual receipt. Notice given by registered or certified mail shall be effective upon the third business day after mailing. Notice given overnight by national overnight courier shall be effective the end of the next business day after deposit with such courier. Notice given by electronic mail shall be effective upon actual receipt if received during the recipient's normal business hours or at the beginning of the recipient's next normal business day after receipt if not received during the recipient's normal business hours. Any Notice provided by electronic mail shall be confirmed by registered or certified mail or by overnight delivery.  Anything to the contrary contained herein notwithstanding, notices to any party hereto shall not be deemed effective with respect to such party until such Notice would, but for this sentence, be effective both as to such party and as to all other Persons to whom copies are provided above to be given.

9.5     Governing Law; Waiver of Jury Trial.   The provisions of this Agreement and the documents delivered pursuant hereto shall be governed by and construed in accordance with the laws of the state of Delaware (excluding any conflict of law rule or principle that would refer to the laws of another jurisdiction).  Each party hereto irrevocably submits to the jurisdiction of the Circuit Court of the state of Delaware, in any action or proceeding arising out of or relating to this Agreement or any of the Collateral Agreements, and each party hereby irrevocably agrees that all claims in respect of any such action or proceeding must be brought and/or defended in such court; provided, however, that matters which are under the exclusive jurisdiction of the federal courts shall be brought in the Federal District Court for the District of Delaware.  Each party hereto consents to service of process by any means authorized by the applicable law of the forum in any action brought under or arising out of this Agreement or any of the Collateral Agreements, and each party irrevocably waives, to the fullest extent each may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING HEREUNDER.

9.6     Entire Agreement; Amendments and Waivers.   This Agreement and the Collateral Agreements, together with all exhibits and schedules attached hereto, constitutes the entire agreement between and among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations, or other agreements between and among the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.   No supplement, modification, or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

9.7     Binding Effect and Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns; but neither this Agreement nor any of the rights, benefits, or obligations hereunder shall be assigned, by operation of law or otherwise, by any party hereto without the prior written consent of the other parties, provided, however, that nothing herein shall prohibit the assignment of Buyer's rights and obligations to any direct or indirect subsidiary or prohibit the assignment of Buyer's rights (but not obligations) to any lender. Nothing in this Agreement, express or implied, is intended to confer upon any Person or entity other than the parties hereto and their respective permitted successors and assigns, any rights, benefits, or obligations hereunder.

9.8     Remedies.  The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party hereto shall not preclude or constitute a waiver of its right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights and remedies a party may have by law, statute, or otherwise.

9.9     Exhibits and Schedules.  The exhibits and schedules referred to herein are attached hereto and incorporated herein by this reference.  Disclosure of a specific item in any one schedule shall be deemed restricted only to the Section to which such disclosure specifically relates except where (i) there is an explicit cross-reference to another schedule, and (ii) Buyer could reasonably be expected to ascertain the scope of the modification to a representation intended by such cross-reference.

9.10    Multiple Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.11    References and Construction.

(a)     Whenever required by the context, and is used in this Agreement, the singular number shall include the plural and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural, as the identification of the Person may require. References to monetary amounts and specific named statutes are intended to be and shall be construed as references to United States dollars and statutes of the United States of the stated name, respectively, unless the context otherwise requires.

(b)     The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted, and no rule of strict construction shall be applied against any party.  Each of the parties acknowledges that it has been represented by an attorney in connection with the preparation and execution of this Agreement.

9.12    Survival.  Any provision of this Agreement which contemplates performance or the existence of obligations after the Closing Date, and any and all representations and warranties set forth in this Agreement, shall not be deemed to be merged into or waived by the execution and delivery of the instruments executed at the Closing, but shall expressly survive Closing and shall be binding upon the party or parties obligated thereby in accordance with the terms of this Agreement, subject to any limitations expressly set forth in this Agreement.

9.13    Attorneys' Fees.  In the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this Agreement, the parties hereto agree that the prevailing party or parties shall be entitled to recover from the other party or parties upon final judgment on the merits

reasonable attorneys' fees (and sales Taxes thereon, if any), including attorneys' fees for any appeal, and costs incurred in bringing such suit or proceeding.

9.14   Risk of Loss.  Prior to the Closing, the risk of loss of damage to, or destruction of, any and all of the Company's assets, including without limitation the Properties, shall remain with the Company, and the legal doctrine known as the "Doctrine of Equitable Conversion" shall not be applicable to this Agreement or to any of the transactions contemplated hereby.

## ARTICLE X - DEFINITIONS

Capitalized terms used in this Agreement are used as defined in this Article X or elsewhere in this Agreement.

10.1   Affiliate.  The term "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.  The term "Control" as used in the preceding sentence means, with respect to a corporation, the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the shares of the controlled corporation and, with respect to any Person other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person.

10.2   Affiliated Group.  The term "Affiliated Group" shall mean any affiliated group within the meaning of Section 1504(a) of the Code or any similar group defined under a similar provision of state, local, or foreign law.

10.3   Available Cash.  The term "Available Cash" shall mean all cash and cash equivalents held by the Company as of 12:01 a.m. on the morning of the Closing Date less the amount of cash and cash equivalents necessary to cover outstanding checks which have been mailed or otherwise delivered by the Company prior to such time but have not cleared.

10.4   Business.  The term "Business" shall mean (i) the design, manufacturing, and sale of silencers and suppressors for firearms (but, for the avoidance of doubt, excluding integrally suppressed firearms), (ii) the design, manufacturing, and sale of silencer and suppressor accessories, and (iii) the sale of Company-branded ammunition.

10.5   Code.  The term "Code" shall mean the Internal Revenue Code of 1986, as amended.

10.6   Collateral Agreements.  The term "Collateral Agreements" shall mean any or all of the exhibits to this Agreement and any and all other agreements, instruments, or documents required or expressly provided under this Agreement to be executed and delivered in connection with the transactions contemplated by this Agreement.

10.7   Confidential Information.  The term "Confidential Information" shall mean confidential data and confidential information relating to the Business (which does not rise to the status of a Trade Secret under applicable law) which is or has been disclosed to any of the Stockholders or of which any of the Stockholders became aware as a consequence of or through his employment or other relationship with the Company and which has value to the Company and is not generally known to the competitors of the Company.  Confidential Information shall not include any data or information that (i) has been voluntarily disclosed to the general public by the Company or its Affiliates, (ii) has been independently developed and disclosed to the general public by others, or (iii) otherwise enters the public domain through lawful means.

41

10.8     Contracts.  The term "Contracts," when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, franchises, understandings, arrangements, leases, licenses, registrations, authorizations, easements, servitudes, rights of way, mortgages, bonds, notes, guaranties, liens, indebtedness, approval, or other instruments or undertakings to which such Person is a party or to which or by which such Person or the property of such Person is subject or bound, excluding any Permits.

10.9     Damages.  The term "Damages" shall mean any and all damages, liabilities, losses, obligations, penalties, fines, judgments, claims, deficiencies, losses, costs, penalties, wages, expenses, and assessments (including, without limitation, income and other Taxes, interest, penalties, attorneys' and accountants' fees and disbursements, and punitive consequential, and incidental damages).

10.10    Financial Statements.  The term "Financial Statements" shall mean any or all of the financial statements, including balance sheets and related statements of income and statements of changes in financial position and the accompanying notes thereto, of the Company's business prepared in accordance with GAAP consistently applied, except as may be otherwise provided herein.

10.11    Funded Indebtedness.  The term "Funded Indebtedness" shall mean the aggregate amount (including the current portions thereof) of all (i) indebtedness for money borrowed from others, capital lease obligations, distributions payable to the Stockholders, bonus payables to employees, and purchase money indebtedness of the Company; (ii) indebtedness of the type described in clause (i) above guaranteed, directly or indirectly, in any manner by the Company, or in effect guaranteed, directly or indirectly, in any manner by the Company, through an agreement, contingent or otherwise, to supply funds to, or in any other manner invest in, the debtor, or to purchase indebtedness, or to purchase and pay for property if not delivered or to pay for services if not performed, primarily for the purpose of enabling the debtor to make payment of the indebtedness or to assure the owners of the indebtedness against loss, but excluding endorsements of checks and other instruments in the ordinary course; (iii) indebtedness of the type described in clause (i) above secured by any Lien upon property owned by the Company, even though the Company has not in any manner become liable for the payment of such indebtedness; and (iv) interest expense accrued but unpaid, and all prepayment premiums, on or relating to any of such indebtedness.

10.12    GAAP.  The term "GAAP" shall mean U.S. generally accepted accounting principles.

10.13    Governmental Authorities.  The term "Governmental Authorities" shall mean any nation or country (including but not limited to the United States) and any state, commonwealth, territory, or possession thereof and any political subdivision of any of the foregoing, including but not limited to courts, departments, commissions, boards, bureaus, agencies, ministries, or other instrumentalities.

10.14    Hazardous Material.  The term "Hazardous Material" shall mean all or any of the following: (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as of the date hereof, and all amendments thereto in the future, as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," "Toxic materials," "toxic wastes" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity"; (b) oil, petroleum or petroleum-related substances or a petroleum by-product, natural gas, natural gas liquids or synthetic gas and drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; (d) asbestos in any form or electrical equipment which contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in

42

excess of fifty parts per million; or (f) Freon gas, radon, a pesticide or herbicide, or any other agricultural product.

10.15   Inventory.  The term "Inventory" shall mean all goods, merchandise, and other personal property owned and held for sale, and all raw materials, works-in-process, materials, and supplies of every nature which contribute to the finished products of the Company in the ordinary course of its business, specifically excluding, however, damaged, defective, or otherwise unsaleable items.

10.16   Knowledge of the Company.  The term "Knowledge of the Company" shall mean the actual knowledge of Ronald J. Martinez, Mark Thompson, Philip H. Dater, Daniel Nakashima, Jason Pace, John D. Smith, Blake N. Young, and Franklin Lerum upon diligent investigation and inquiry into the matter in question.

10.17   Legal Requirements.   The term "Legal Requirements," when described as being applicable to any Person, shall mean any and all laws (statutory, judicial, or otherwise), ordinances, rules, regulations, decisions, judgments, orders, directives, policies, guidelines, injunctions, writs, decrees, or awards of, and any Contracts with, any Governmental Authority, in each case as and to the extent applicable to such Person or such Person's business, operations, or properties.

10.18   Permits.  The term "Permits" shall mean any and all permits, rights, approvals, licenses, authorizations, legal status, orders, or Contracts under any Legal Requirement or otherwise granted by any Governmental Authority.

10.19   Person.  The term "Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust, or other enterprise or any governmental or political subdivision or any agency, department, or instrumentality thereof.

10.20   Product.  The term "Product" shall mean each product, repair process, or service under development, developed, manufactured, licensed, distributed, or sold by the Company and any other products in which the Company has any proprietary rights or beneficial interest.

10.21   Properties.  The term "Properties" shall mean any and all properties and assets (real, personal, or mixed, tangible or intangible) owned or Used by the Company, including all Assets to be conveyed to Buyer pursuant to this Agreement.

10.22   Tax.  The term "Tax" shall mean (i) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), vehicle, custom duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, unclaimed property, escheat, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not, and any amounts payable pursuant to the determination or settlement of an audit, and (ii) liability of the Company or the Stockholders for the payment of any amounts of the type described in clause (i) above as a result of any express or implied obligation to indemnify or otherwise assume or succeed to the liability of any other Person.

10.23   Tax Return.  The term "Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

10.24   <u>Total Sales of the Business</u>.   The term "<u>Total Sales of the Business</u>" shall mean (i) net sales of the Business, <u>minus</u> (ii) customer discounts, rebates, and returns and allowances.

10.25   <u>Trade Secrets</u>.   The term "<u>Trade Secrets</u>" shall mean information of the Company, including, but not limited to, technical or nontechnical data, formulas, patterns, compilations, programs, financial data, financial plans, product or service plans, or lists of actual or potential customers or suppliers which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10.26   <u>Used</u>.   The term "<u>Used</u>" shall mean, with respect to the Properties, Contracts, or Permits of the Company, those owned, leased, licensed, or otherwise held by the Company which were acquired for use or held for use by the Company in connection with the Company's business and operations, whether or not reflected on the Company's books of account.

10.27   <u>Working Capital</u>.   The term "<u>Working Capital</u>" shall mean the remainder, if any, of (i) the Company's accounts receivable and inventory, <u>minus</u> (ii) the Company's accounts payable, in each case calculated on a basis consistent with the methodologies used for the calculation of working capital as of December 31, 2016 as set forth on <u>Schedule 10.27</u>.

[Signature Page Follows]

44

EXECUTED as of the date first written above.

**BUYER:**

SMITH & WESSON CORP.

By: _____

Name: JEFFREY BUCHANAN

Title: EVP & CFO

**COMPANY:**

GEMINI TECHNOLOGIES, INCORPORATED

By: _____

Name: Ronald J Martin

Title: CEO

**STOCKHOLDERS:**

_____

RONALD J. MARTINEZ

_____ POA

PHILIP H. DATER

*Signature Page to Asset Purchase Agreement*

# EXHIBIT B

Execution Version

## ESCROW AGREEMENT

This **ESCROW AGREEMENT**, dated as of August 7, 2017 (this "<u>Escrow Agreement</u>"), is made by and among **SMITH & WESSON CORP.**, a Delaware corporation ("<u>Buyer</u>"); **GEMINI TECHNOLOGIES, INCORPORATED**, an Idaho corporation (the "<u>Company</u>"); and **WASHINGTON TRUST BANK**, a Washington banking association, as escrow agent hereunder ("<u>Escrow Agent</u>").

## BACKGROUND

A.     Buyer and the Company have entered into that certain Asset Purchase Agreement (the "<u>Underlying Agreement</u>"), dated as of June 29, 2017, pursuant to which Buyer is purchasing substantially all of the assets of the Company.  The Underlying Agreement provides that Buyer shall deposit on behalf of the Company the Escrow Funds (defined below) in a segregated escrow account to be held by Escrow Agent for the purpose of indemnifications that may become due to Buyer pursuant to the Underlying Agreement.

B.     Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

C.     Buyer and the Company have appointed the Representatives (as defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent and this Escrow Agreement.

## AGREEMENT

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.     <u>Definitions</u>.  The following terms shall have the following meanings when used herein:

"<u>Buyer Representative</u>" shall mean the person(s) so designated on <u>Schedule C</u> hereto or any other person designated in a writing signed by Buyer and delivered to Escrow Agent and the Company Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

"<u>Claim Notice</u>" shall have the meaning set forth in <u>Section 6(a)</u>.

"<u>Company Representative</u>" shall mean the person(s) so designated on <u>Schedule C</u> hereto or any other person designated in a writing signed by the Company and delivered to Escrow Agent and the Buyer Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

"<u>Escrow Funds</u>" shall mean the funds deposited with Escrow Agent pursuant to <u>Section 3</u> of this Escrow Agreement, together with any interest and other income thereon.

"<u>Escrow Period</u>" shall mean the period commencing on the date hereof and ending at the close of Escrow Agent's business day on August 7, 2019, unless earlier terminated pursuant to this Escrow Agreement.

"<u>Indemnified Parties</u>" shall have the meaning set forth in <u>Section 11</u>.

"Indemnity Claim" shall have the meaning set forth in Section 6(a).

"Joint Written Direction" shall mean a written direction executed by the Representatives and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Escrow Agreement.

"Representatives" shall mean the Buyer Representative and the Company Representative.

2.  Appointment of and Acceptance by Escrow Agent.  Buyer and the Company hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with Section 3 below, agrees to hold, invest, and disburse the Escrow Funds in accordance with this Escrow Agreement.

3.  Deposit of Escrow Funds.  Simultaneously with the execution and delivery of this Escrow Agreement, Buyer, on behalf of the Company, will transfer the Escrow Funds in the amount of $5,410,000.00, by wire transfer of immediately available funds, to an account designated by Escrow Agent.

4.  Disbursements of Escrow Funds.  Escrow Agent shall disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with, a Joint Written Direction.  Such Joint Written Direction shall contain complete payment instructions, including wiring instructions or an address to which a check shall be sent.  In addition, subject to the terms of this Escrow Agreement, Escrow Agent shall disburse the Escrow Funds to the Company according to the following schedule:

(a)  on January 2, 2018 (the "Initial Release Date"), Escrow Agent shall disburse from the Escrow Funds $4,660,000.00; provided, however, that the amount so disbursed from the Escrow Funds pursuant to this paragraph (a) shall be reduced by the aggregate amount of all Indemnity Claims that have been paid or remain unresolved, if any, delivered by the Buyer to the Escrow Agent on or prior to the Initial Release Date;

(b)  on August 7, 2018 (the "Second Release Date"), Escrow Agent shall disburse from the Escrow Funds $375,000.00; provided, however, that the amount so disbursed from the Escrow Funds pursuant to this paragraph (b) shall be reduced by the aggregate amount of all Indemnity Claims that have been paid or remain unresolved, if any, delivered by the Buyer to the Escrow Agent on or prior to the Second Release Date;

(c)  on February 7, 2019 (the "Third Release Date"), Escrow Agent shall disburse from the Escrow Funds $187,500.00; provided, however, that the amount so disbursed from the Escrow Funds pursuant to this paragraph (c) shall be reduced by the aggregate amount of all Indemnity Claims that have been paid or remain unresolved, if any, delivered by the Buyer to the Escrow Agent on or prior to the Third Release Date; and

(d)  on August 7, 2019 (the "Final Release Date"), Escrow Agent shall disburse from the Escrow Funds $187,500.00; provided, however, that the amount so disbursed from the Escrow Funds pursuant to this paragraph (d) shall be reduced by the aggregate amount of all Indemnity Claims that have been paid or remain unresolved, if any, delivered by the Buyer to the Escrow Agent on or prior to the Final Release Date.

Prior to any disbursement of Escrow Funds, Escrow Agent shall have received reasonable identifying information regarding the recipient such that Escrow Agent may comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal

2

Revenue Service ("IRS") Form W-9 or original IRS Form W-8, as applicable.  All disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Indemnified Parties pursuant to Section 11 and Section 12 below.

5.      Suspension of Performance; Disbursement Into Court.  If, at any time, (i) there shall exist any dispute between Buyer, the Company, or the Representatives with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, in any venue convenient to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) the Representatives have not, within fifteen (15) calendar days of the furnishing by Escrow Agent of a notice of resignation pursuant to Section 8 hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

(a)      suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed; or

(b)      petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction, in any venue convenient to Escrow Agent, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Buyer, the Company, or the Representatives, their respective owners or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

6.      Resolutions and Disbursement of Claims.  If during the Escrow Period Buyer elects to make a claim for indemnity against the Company, then the procedures for administering and resolving such claims shall be as follows:

(a)      If Buyer elects to assert a claim for indemnity in accordance with the Underlying Agreement (an "Indemnity Claim"), it must give written notice of such claim (a "Claim Notice") to Escrow Agent and the Company prior to the expiration of the Escrow Period.  Such Claim Notice shall include a reasonably detailed description of the claim and the basis therefor and the amount, if known, asserted by Buyer for such claim (including, if appropriate, an estimate of all costs and expenses reasonably expected to be incurred by Buyer by reason of such claim).  Within ten (10) calendar days after the date upon which such Claim Notice is delivered to Escrow Agent and the Company (the "Claim Notice Delivery Date"), the Company may advise Buyer and Escrow Agent in writing (a "Claim Response") whether the Company objects to any or all (the "Contested Amount") of the Claim Notice amount, and the reasons for such objection in reasonable detail.

(b)      Escrow Agent shall pay an Indemnity Claim to Buyer in the amount of the Claim Notice (i) if Escrow Agent has not received from the Company a Claim Response within ten (10) calendar days after the Claim Notice Delivery Date and Buyer has provided a written statement to Escrow Agent

stating that Buyer has delivered the Claim Notice to the Company in accordance with the notice provisions as defined herein, and that Buyer has not received the Company's Claim Response; or (ii) pursuant to a Joint Written Direction.

(c)    If the Company delivers to Escrow Agent and Buyer a Claim Response, Escrow Agent shall release to Buyer all of the Claim Notice amount except for the Contested Amount, if any. Thereafter, Escrow Agent shall release the Contested Amount only pursuant to (i) a Joint Written Direction or (ii) the order, judgment, or decree of any court or the award of an arbitrator chosen by Buyer and the Company.

(d)    Escrow Agent shall have no responsibility to determine the validity or sufficiency of any Claim Notice or Claim Response or whether any Claim Notice or Claim Response has been received by, or to provide a copy of any Claim Notice or Claim Response to, any of Buyer, the Company, or their respective Representatives.

7.    <u>Investment of Funds</u>.  Based upon Buyer's and the Company's prior review of investment alternatives, in the absence of further specific written direction to the contrary, Escrow Agent is directed to initially invest and reinvest the Escrow Funds in the investment indicated on <u>Schedule B</u> hereto. The Company and Buyer may provide written instructions changing the investment of the Escrow Funds to Escrow Agent; provided, however, that no investment or reinvestment may be made except in the following: (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United State of America; (b) U.S. dollar denominated deposit accounts and certificates of deposits issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which such deposits are either (i) insured by the Federal Deposit Insurance Corporation or a similar governmental agency, or (ii) with domestic commercial banks which have a rating on their short- term certificates of deposit on the date of purchase of "A-1" or "A-1+" by S&P or "P-1" by Moody's and maturing no more than 360 days after the date of purchase (ratings on holding companies are not considered as the rating of the bank); (c) repurchase agreements with any bank, trust company, or national banking association (including Escrow Agent and its affiliates); or (d) institutional money market funds, including funds managed by Escrow Agent or any of its affiliates; provided that Escrow Agent will not be directed to invest in investments that Escrow Agent in its sole discretion determines are not consistent with Escrow Agent's policy or practices. Buyer and the Company acknowledge that Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

If Escrow Agent has not received a Joint Written Direction at any time that an investment decision must be made, Escrow Agent is directed to invest the Escrow Funds, or such portion thereof as to which no written investment instruction has been received, in the investment indicated on <u>Schedule B</u> hereto.  All investments shall be made in the name of Escrow Agent.  Notwithstanding anything to the contrary contained herein, Escrow Agent may, without notice to Buyer and the Company, sell or liquidate any of the foregoing investments at any time for any disbursement of Escrow Funds permitted or required hereunder.  All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds.  Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Escrow Agreement, or for any loss, cost, or penalty resulting from any sale or liquidation of the Escrow Funds.  With respect to any Escrow Funds received by Escrow Agent after twelve o'clock, p.m., Eastern Standard Time, Escrow Agent shall not be required to invest such funds or to effect any investment instruction until the next day upon which banks in New York, New York and the New York Stock Exchange are open for business.

8.    <u>Resignation or Removal of Escrow Agent</u>.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving thirty (30) days prior written notice to

Buyer and the Company specifying a date when such resignation shall take effect, and, after the date of such resignation notice, notwithstanding any other provision of this Escrow Agreement, Escrow Agent's sole obligation will be to hold the Escrow Funds pending appointment of a successor Escrow Agent. Similarly, Escrow Agent may be removed at any time by Buyer and the Company giving at least thirty (30) days' prior written notice to Escrow Agent specifying the date when such removal shall take effect. Buyer and the Company jointly shall appoint a successor Escrow Agent hereunder prior to the effective date of such resignation. If Buyer and the Company fail to appoint a successor Escrow Agent within such time, Escrow Agent shall have the right to petition a court of competent jurisdiction to appoint a successor Escrow Agent, and all documented costs and expenses (including without limitation reasonable and documented attorneys' fees) related to such petition shall be paid by Buyer and the Company jointly and severally. The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and reasonable and documented attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation or removal, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement.

9. <u>Binding Effect; Successors</u>. This Escrow Agreement shall be binding upon the respective parties hereto and their heirs, executors, successors, or permitted assigns. If Escrow Agent consolidates, merges, or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this Escrow Agreement) to another corporation, the successor or transferee corporation without any further act shall be the successor Escrow Agent.

10. <u>Liability of Escrow Agent</u>. Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement, including without limitation any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein. Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that Escrow Agent's gross negligence or willful misconduct was the sole cause of any loss to Buyer or the Company. Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement. Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. Escrow Agent may rely upon any notice, instruction, request, or other instrument, not only as to its due execution, validity, and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential, or punitive damages or penalties (including, but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action. Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control, including without limitation acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, power failures, earthquakes, or other disasters. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement, or the Underlying Agreement, or to appear in, prosecute, or defend any such legal action or proceeding. Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the advice of

5

such counsel.  Buyer and the Company, jointly and severally, shall promptly pay, upon demand, the reasonable and documented fees and expenses of any such counsel.  Buyer and the Company agree to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request in connection with its duties hereunder.

Escrow Agent is authorized, in its sole discretion, to comply with final orders issued or process entered by any court with respect to the Escrow Funds, without determination by Escrow Agent of such court's jurisdiction in the matter.  If any portion of the Escrow Funds is at any time attached, garnished, or levied upon under any court order, or in case the payment, assignment, transfer, conveyance, or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment, or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment, or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if Escrow Agent complies with any such order, writ, judgment, or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment, or decree may be subsequently reversed, modified, annulled, set aside, or vacated.

      11.    <u>Indemnification of Escrow Agent</u>.  From and at all times after the date of this Escrow Agreement, Buyer and the Company, jointly and severally, shall, to the fullest extent permitted by law, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent, and affiliate of Escrow Agent (collectively, the "<u>Indemnified Parties</u>") against any and all documented actions, claims (whether or not valid), losses, damages, liabilities, penalties, costs, and expenses of any kind or nature (including without limitation reasonable and documented attorneys' fees, costs, and expenses) incurred by or asserted against any of the Indemnified Parties, whether direct, indirect, or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action, or proceeding (including any inquiry or investigation) by any person, including without limitation Buyer, the Company, and the Representatives, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance, or failure of performance in connection with this Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit, or the target of any such inquiry or investigation; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. Buyer and the Company further agree, jointly and severally, to indemnify each Indemnified Party for all costs, including without limitation reasonable attorney's fees, incurred by such Indemnified Party in connection with the enforcement of Buyer's and the Company's indemnification obligations hereunder. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by Buyer and the Company jointly and severally.  The obligations of Buyer and the Company under this <u>Section 11</u> shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

The parties agree that neither the payment by Buyer or the Company of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between Buyer and the Company, the respective rights and obligations of Buyer and the Company under the Underlying Agreement.

12.     <u>Compensation of Escrow Agent</u>.

(a)     <u>Fees and Expenses</u>.  Upon execution of this Escrow Agreement, Buyer and the Company agree, jointly and severally, to compensate Escrow Agent for its services hereunder in accordance with <u>Schedule A</u> attached hereto.  The obligations of Buyer and the Company under this <u>Section 12</u> shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

(b)     <u>Disbursements from Escrow Funds to Pay Escrow Agent</u>.  Escrow Agent is authorized to, and may disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of documented out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent or any Indemnified Party is entitled to seek indemnification hereunder), provided that the Company shall retain any rights it has against Buyer pursuant to the Underlying Agreement and Buyer shall retain any rights it has against the Company pursuant to the Underlying Agreement.  Escrow Agent shall notify Buyer and the Company of any disbursement from the Escrow Funds to itself or any Indemnified Party in respect of any compensation or reimbursement hereunder and shall furnish Buyer and the Company copies of related invoices and other statements.  If either Buyer or the Company has failed to pay its share of any such compensation and reimbursement of out-of-pocket expenses due and payable hereunder in accordance with <u>Section 29</u> <u>hereof</u>, such party shall promptly restore to the Escrow Fund its share of such amounts.

(c)     <u>Security and Offset</u>.  The Company, Buyer, and the Representatives hereby grant to Escrow Agent and the Indemnified Parties a security interest in, lien upon, and right of offset against the Escrow Funds with respect to any compensation or reimbursement due any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds are insufficient to cover such compensation and reimbursement, Buyer and the Company shall promptly pay such amounts to Escrow Agent or any Indemnified Party upon receipt of an itemized invoice.  Escrow Agent acknowledges that the Escrow Funds are the property of the Company, subject only to the terms of this Escrow Agreement.

13.     <u>Representations and Warranties</u>.  Buyer and the Company each respectively make the following representations and warranties to Escrow Agent:

(a)     it has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder; and this Escrow Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms; and

(b)     each of the applicable persons designated on <u>Schedule C</u> attached hereto have been duly appointed to act as authorized representatives hereunder and individually have full power and authority to execute and deliver any Joint Written Direction; to amend, modify, or waive any provision of this Escrow Agreement; and to take any and all other actions as authorized representatives under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party, provided that any change in designation of such authorized representatives shall be provided by written notice delivered to each party to this Escrow Agreement.

14.     <u>Identifying Information</u>.  To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a trust, or other legal entity, Escrow Agent requires documentation to verify its formation and existence as a legal entity.  Escrow Agent may ask to see financial statements, licenses, identification, and authorization documents from individuals claiming authority to represent the entity or

7

other relevant documentation.  The parties acknowledge that a portion of the identifying information set forth herein is being requested by Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"), and each agrees to provide any additional information requested by Escrow Agent in connection with the Act or any other legislation or regulation to which Escrow Agent is subject, in a timely manner.

15.     Consent to Jurisdiction and Venue.  In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree to the personal jurisdiction by and venue in the state and federal courts in the state of Delaware and waive any objection to such jurisdiction or venue.  The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

16.     Notices.  All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered (i) by personal delivery, or (ii) by national overnight courier service, or (iii) by certified or registered mail, return receipt requested, or (iv) via facsimile transmission, with confirmed receipt, or (v) via email by way of a PDF attachment thereto of an executed document. Notice shall be effective upon receipt except for notice via email, which shall be effective only when the recipient, by return email or notice delivered by other method provided for in this Section 16, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section 16.) Such notices shall be sent to the applicable party or parties at the address specified below:

If to Buyer or Buyer Representative at:

>           Smith & Wesson Corp.
>           c/o American Outdoor Brands Corporation
>           2100 Roosevelt Avenue
>           Springfield, MA 01104
>           Attention:     Jeffrey D. Buchanan,
>                          Executive Vice President, Chief Financial Officer,
>                          Chief Administrative Officer, and Treasurer
>           Telephone:     (413) 747-3341
>           Facsimile:
>           E-mail:        jbuchanan@aob.com

With a copy (which shall not constitute notice) to:

>           American Outdoor Brands Corporation
>           2100 Roosevelt Avenue
>           Springfield, MA 01104
>           Attention:     Robert J. Cicero,
>                          Vice President, General Counsel, Chief Compliance
>                          Officer, and Secretary
>           Telephone:     (413) 747-3443
>           Facsimile:     (413) 747-3373
>           E-mail:        rcicero@aob.com

and

PHX 332458823v6

> Greenberg Traurig, LLP
> 2375 East Camelback Road, Suite 700
> Phoenix, AZ 85016
> Attention:     Brian H. Blaney
> Telephone:    (602) 445-8322
> Facsimile:    (602) 445-8603
> E-mail:        blaneyb@gtlaw.com

If to the Company or Company Representative at:

> Gemini Technologies, Incorporated
> 335 N. Edgewood Lane
> Eagle, ID 83616
> Attention:     Ronald J. Martinez
> E-mail:         ron@martinez.net

With a copy (which shall not constitute notice) to:

> Trout Law, PLLC
> 3778 Plantation River Drive, Suite 101
> Boise, ID 83703
> Attention:    Kim J. Trout
> Telephone: (208) 577-5755
> Facsimile: (208) 577-5756
> E-mail:        ktrout@trout-law

If to Escrow Agent at:

> Washington Trust Bank
> 945 West Bannock Street
> Boise, ID 83702
> Attention:    Zach Bethel
> Facsimile:    (208) 385-5039
> Telephone:    (208) 385-5021
> E-mail:        ZBethel@watrust.com

or to such other address as each party may designate for itself by like notice and unless otherwise provided herein shall be deemed to have been given on the date received.

17.    _Optional Security Procedures._  In the event funds transfer instructions, address changes, or change in contact information are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile, or otherwise, Escrow Agent is authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule C hereto, and Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes.  If Escrow Agent is unable to contact any of the designated representatives identified in Schedule C, Escrow Agent is hereby authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to any one or more of Buyer or the Company's executive officers ("Executive Officers"), as the case may be, which shall include the titles of Chief Executive Officer, President, and Vice President, as

9

Escrow Agent may select.  Such Executive Officer shall deliver to Escrow Agent a fully executed incumbency certificate, and Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer.  Buyer and the Company agree that Escrow Agent may at its option record any telephone calls made pursuant to this <u>Section 17</u>.  Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Buyer or the Company to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.  Escrow Agent may apply any of the Escrow Funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated.  Buyer and the Company acknowledge that these optional security procedures are commercially reasonable.

18.    <u>Amendment, Waiver, and Assignment</u>.  None of the terms or conditions of this Escrow Agreement may be changed, waived, modified, discharged, terminated, or varied in any manner whatsoever unless in writing duly signed by a duly authorized officer of each party to this Escrow Agreement.  No course of conduct shall constitute a waiver of any of the terms and conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion.  Except as provided in <u>Section 9</u> hereof, this Escrow Agreement may not be assigned by any party without the written consent of the other parties.

19.    <u>Severability</u>.  To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

20.    <u>Governing Law</u>.  This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the state of Delaware without giving effect to the conflict of laws principles thereof.

21.    <u>Entire Agreement, No Third Party Beneficiaries</u>.  This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment, and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds.  Nothing in this Escrow Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit, or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

22.    <u>Execution in Counterparts, Facsimiles and Electronic Images of Signatures</u>.  This Escrow Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.  The delivery of copies of this Escrow Agreement and any Joint Written Instruction and their respective signature pages by PDF or facsimile transmission shall constitute effective execution and delivery as to the parties and may be used in lieu of originals for all purposes.

23.    <u>Termination</u>.  This Escrow Agreement shall terminate upon the distribution of all the Escrow Funds pursuant to any applicable provision of this Escrow Agreement, including the disbursement of all amounts in the Escrow Funds into a court, and Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

24.    <u>Dealings</u>.  Escrow Agent and any stockholder, director, officer, or employee of Escrow Agent may buy, sell, and deal in any of the securities of Buyer or the Company and become pecuniarily

interested in any transaction in which Buyer or the Company may be interested, and contract and lend money to Buyer or the Company and otherwise act as fully and freely as though it were not Escrow Agent under this Escrow Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for Buyer or the Company or for any other entity.

25.    Brokerage Confirmation Waiver.  Buyer and the Company acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant either the right to receive brokerage confirmations for certain security transactions as they occur, Buyer and the Company specifically waive receipt of such confirmations to the extent permitted by law.  Escrow Agent will furnish Buyer and the Company periodic cash transaction statements that include detail for all investment transactions made by Escrow Agent.

26.    Tax Reporting.  Escrow Agent shall have no responsibility for the tax consequences of this Escrow Agreement and Buyer and the Company shall consult with independent counsel concerning any and all tax matters.  Buyer and the Company shall provide Escrow Agent Form W-9 and an original Form W-8, as applicable, for each payee, together with any other documentation and information requested by Escrow Agent in connection with Escrow Agent's reporting obligations under applicable IRS regulations.  If such tax documentation is not so provided, Escrow Agent shall withhold taxes as required by the IRS.  The Company and Buyer have determined that any interest or income on Escrow Funds shall be reported on an accrual basis and deemed to be for the account of the Company.  Buyer and the Company shall prepare and file all required tax filings with the IRS and any other applicable taxing authority; provided that the parties further agree that:

(a)    Escrow Agent IRS Reporting.  Buyer shall provide Escrow Agent with all information requested by Escrow Agent in connection with the preparation of all applicable Form 1099 and Form 1042-S documents with respect to all distributions as well as in the performance of Escrow Agent's reporting obligations under the Foreign Account Tax Compliance Act and Foreign Investment in Real Property Tax Act or other applicable law or regulation.

(b)    Withholding Requests and Indemnification.  Each of Buyer and the Company jointly and severally agrees to (i) assume all obligations imposed now or hereafter by any applicable tax law or regulation with respect to payments or performance under this Escrow Agreement, (ii) request Escrow Agent in writing with respect to withholding and other taxes, assessments, or other governmental charges, and advise Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations, and (iii) indemnify and hold Escrow Agent harmless pursuant to Section 11 hereof from any liability or obligation on account of taxes, assessments, additions for late payment, interest, penalties, expenses, and other governmental charges that may be assessed or asserted against Escrow Agent.

(c)    Imputed Interest.  To the extent that IRS imputed interest regulations apply, Buyer and the Company shall so inform Escrow Agent, provide Escrow Agent with all imputed interest calculations and direct Escrow Agent to disburse imputed interest amounts as Buyer and the Company deem appropriate.  Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information.

27.    WAIVER OF TRIAL BY JURY.  EACH PARTY TO THIS ESCROW AGREEMENT HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING OUT OF OR IN ANY WAY RELATED TO THIS ESCROW AGREEMENT OR (2) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS ESCROW AGREEMENT OR IN CONNECTION WITH THIS ESCROW

11

AGREEMENT OR THE EXERCISE OF ANY SUCH PARTY'S RIGHTS AND REMEDIES UNDER THIS ESCROW AGREEMENT OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES TO THIS ESCROW AGREEMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT, OR OTHERWISE. EACH OF THE PARTIES HERETO HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT EACH HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS ESCROW AGREEMENT MAY BE FILED AS A CONSENT BY ALL PARTIES TO A TRIAL BY THE COURT.

28.     <u>Publicity</u>.  No party will (a) use any other party's proprietary indicia, trademarks, service marks, trade names, logos, symbols, or brand names, or (b) otherwise refer to or identify any other party in advertising, publicity releases, or promotional or marketing publications, or correspondence to third parties without, in each case, securing the prior written consent of such other party.

29.     <u>Joint and Several Obligations</u>.  Without limiting the joint and several nature of their obligations to Escrow Agent in this Escrow Agreement, Buyer and the Company agree between themselves that each will be responsible for one-half of all such joint and several obligations.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

Buyer:

**SMITH & WESSON CORP.**

By:_____

Name:    Jeffrey D. Buchanan
Title:     Executive Vice President, Chief Financial
            Officer, and Treasurer

Company:

**GEMINI TECHNOLOGIES, INCORPORATED**

By:_____

Name:    Ronald J. Martinez
Title:     President and Chief Executive Officer

Escrow Agent:

**WASHINGTON TRUST BANK**

By:_____
Name:_____
Title:_____

Signature Page to Escrow Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

Buyer:

**SMITH & WESSON CORP.**


By:_____
Name:      Jeffrey D. Buchanan
Title:       Executive Vice President, Chief Financial
             Officer, and Treasurer


Company:

**GEMINI TECHNOLOGIES, INCORPORATED**

*Ron Martinez*

By:_____
Name:      Ronald J. Martinez
Title:       President and Chief Executive Officer

Escrow Agent:

**WASHINGTON TRUST BANK**


By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

Buyer:

**SMITH & WESSON CORP.**

By: _____
Name:   Jeffrey D. Buchanan
Title:   Executive Vice President, Chief Financial
Officer, and Treasurer

Company:

**GEMINI TECHNOLOGIES, INCORPORATED**

By: _____
Name:   Ronald J. Martinez
Title:   President and Chief Executive Officer

Escrow Agent:

**WASHINGTON TRUST BANK**

By: _Zacharie Scott Bethel_
Name: _ZACHARIE BETHEL_
Title: _AVP, RELATIONSHIP MANAGER_

By: _Camilla Shiller_
Name: _Camilla Strickler_
Title: _VP, Sr Trust Officer_

Signature Page to Escrow Agreement

**SCHEDULE A**

**Schedule of Fees**

**SMITH & WESSON CORP.**, a Delaware corporation ("Buyer");
**GEMINI TECHNOLOGIES, INCORPORATED**, an Idaho corporation (the "Company");
**WASHINGTON TRUST BANK**, a Washington banking association, ("Escrow Agent").

| | |
|---|---|
| **Administration:** | **fiduciary escrow agent - Holdback on sale** |
| **Fee Schedule:** | **$5000.00** |
| **Administration Period:** | **August 7, 2017 – August 7, 2019** |
| **Required Administration:** | **fiduciary control**<br>**Distribution to provisions**<br>**Distribution reporting**<br>**1099-tax reporting** |

**The fee for this service is a** *set / flat fee* **for period above and not conditioned or calculated upon asset value and subject to Escrow Administration in the Federated Government Obligations Fund #117- GOFXX as subject to:**

      1.    <u>Investment of Funds</u>Based upon Buyer's and the Company's prior review of investment alternatives, in the absence of further specific written direction to the contrary, Escrow Agent is directed to initially invest and reinvest the Escrow Funds in the investment indicated on Schedule B hereto.  The Company and Buyer may provide written instructions changing the investment of the Escrow Funds to Escrow Agent; provided, however, that no investment or reinvestment may be made except in the following: (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United State of America; (b) U.S. dollar denominated deposit accounts and certificates of deposits issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which such deposits are either (i) insured by the Federal Deposit Insurance Corporation or a similar governmental agency, or (ii) with domestic commercial banks which have a rating on their short- term certificates of deposit on the date of purchase of "A-1" or "A-1+" by S&P or "P-1" by Moody's and maturing no more than 360 days after the date of purchase (ratings on holding companies are not considered as the rating of the bank); (c) repurchase agreements with any bank, trust company, or national banking association (including Escrow Agent and its affiliates); or (d) institutional money market funds, including funds managed by Escrow Agent or any of its affiliates; provided that Escrow Agent will not be directed to invest in investments that Escrow Agent in its sole discretion determines are not consistent with Escrow Agent's policy or practices. Buyer and the Company acknowledge that Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.



**<u>SCHEDULE B</u>**

**Escrow Funds Investment**

Federated Government Obligations #117 | CUSIP 608919718 | Symbol GOFXX

## SCHEDULE C

### Representatives

      Each of the following person(s) is a Buyer Representative authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes, and contact information changes, on Buyer's behalf (only one signature required):

| Jeffrey D. Buchanan | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| Robert J. Cicero | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| Deana L. McPherson | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations:

| | |
|---|---|
| Name | Telephone Number |

Each of the following person(s) is a Company Representative authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes, and contact information changes, on the Company's behalf (only one signature required):

| Ronald J. Martinez | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations:

| | |
|---|---|
| Name | Telephone Number |

## SCHEDULE C

### Representatives

Each of the following person(s) is a Buyer Representative authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes, and contact information changes, on Buyer's behalf (only one signature required):

| Jeffrey D. Buchanan | | ███████ |
| Name | Specimen signature | Telephone No. |

| Robert J. Cicero | | (███████ |
| Name | Specimen signature | Telephone No. |

| Deana L. McPherson | | ███████ |
| Name | Specimen signature | Telephone No. |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations:

| | |
| Name | Telephone Number |

Each of the following person(s) is a Company Representative authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes, and contact information changes, on the Company's behalf (only one signature required):

| Ronald J. Martinez | *Ron Martinez* | (208) 991-6825 |
| Name | Specimen signature | Telephone No. |

| | | |
| Name | Specimen signature | Telephone No. |

| | | |
| Name | Specimen signature | Telephone No. |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations:

| | |
| Name | Telephone Number |

# EXHIBIT C

2100 ROOSEVELT AVENUE, SPRINGFIELD, MA 01104

 WWW.AOB.COM  413-747-3341  JBUCHANAN@AOB.COM

December 22, 2017

(Via FedEx, Fax & Email)
Washington Trust Bank
945 West Bannock Street
Boise, ID 83702
Attention: Zach Bethel
Facsimile: (208) 385-5039
E-mail: ZBethel@watrust.com

> Re:  Claim Notice Pursuant to Smith & Wesson/Gemini Technologies
> Escrow Agreement, dated August 7, 2017

Dear Mr. Bethel:

Reference is made to the Escrow Agreement, dated August 7, 2017, by and among Smith & Wesson Corp., Gemini Technologies, Incorporated and Washington Trust Bank (the "Escrow Agreement"). Reference is also made to the Asset Purchase Agreement, dated June 29, 2017, by and among Smith & Wesson Corp., Gemini Technologies, Incorporated and the Stockholders named therein (the "APA"). Capitalized terms used herein and not otherwise defined have the meaning assigned to them in the Escrow Agreement or the APA, as applicable.

Section 7.3(a)(i) of the APA provides that the Company and the Stockholders shall indemnify Buyer for Damages arising from a "breach of, or inaccuracy in, any of the representations or warranties made by the Company and/or the Stockholders" in the APA. Section 7.3(a)(ii) of the APA provides that the Company and the Stockholders shall indemnify Buyer for Damages arising from a "breach or default in performance by the Company or any Stockholder of any covenant or agreement of the Company and/or the Stockholders" contained in the APA. The following constitute breaches of or inaccuracies in various representations, warranties, covenants and agreements:

1. Invalid accounts receivable in excess of $150,000, as follows:
    a. Charges to customer credit cards for sales where a credit was issued to the customer but the sale was not reversed.
    b. Credits issued to customers that were not accrued or recorded on the Company's balance sheet.
2. Misappropriated cash in excess of $40,000, as follows:

1



2100 ROOSEVELT AVENUE, SPRINGFIELD, MA 01104

WWW.AOB.COM    413-747-3341    JBUCHANAN@AOB.COM

      a. Checks issued to the Company for accounts receivable acquired by the Buyer and deposited in the Company's bank account but not transferred to the Buyer.

3. Misappropriated cash in an amount to be determined, as follows:

      a. Credit card transactions post-Closing that were credited to the Company's bank account but not transferred to the Buyer.

4. Ongoing investigation of various duplicate shipments which overstated the Company's sales, profitability and accounts receivable in an amount to be determined.

5. Ongoing investigation of other irregular transactions in an amount to be determined.

6. Ongoing investigation of a claim that the Company did not have title to certain assets that were transferred to the Buyer in an amount to be determined.

7. Working capital adjustment of $358,821 in favor of Buyer to the extent the underlying transactions constitute breaches of or inaccuracies in various representations and warranties.

The transactions and conduct described above constitute breaches of or inaccuracies in various representations and warranties in the APA, including, among others: (a) Section 3.8 Financial Statements; Liabilities; Accounts Receivable; Inventories; Title to Assets; (b) Section 3.9 Absence of Certain Changes; and (c) Section 3.25 Title to Assets. The transactions and conduct described above also constitute a breach by the Company of its obligation under Section 7.5 of the APA to "transfer or deliver to Buyer, promptly after the receipt thereof, any cash or other property which the Company receives after the Closing Date in respect of any claims, contracts, licenses, leases, commitments, sales orders, purchase orders, receivables of any character, or any other items transferred or intended to be transferred to Buyer as part of the Assets under this Agreement." The Company has also breached its duty of good faith and fair dealing.

As a result of the foregoing, Buyer has incurred and will continue to incur Damages and Buyer hereby asserts an Indemnity Claim from the Company and the Stockholders for breach of Section 7.3(a) of the APA in the sum of $1,500,000. Buyer's investigation is continuing and Buyer reserves the right to supplement this Indemnity Claim and assert additional Indemnity Claims against the Company and the Stockholders.

Very truly yours,

SMITH & WESSON CORP.

By: _____

Name: Jeffrey D. Buchanan

Title: Executive Vice President & Chief Financial Officer

Cc: (via FedEx & Email)

    Gemini Technologies, Incorporated

    335 N. Edgewood Lane



2100 ROOSEVELT AVENUE, SPRINGFIELD, MA 01104

WWW.AOB.COM  413-747-3341  JBUCHANAN@AOB.COM

Eagle, ID 83616
Attention: Ronald J. Martinez
E-mail: ron@martinez.net

(via FedEx & Email)
Trout Law, PLLC
3778 Plantation River Drive, Suite 101
Boise, ID 83703
Attn: Kim J. Trout
E-mail: ktrout@trout-law.com

(via email)
Greenberg Traurig, LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
Attention: Brian H. Blaney
E-mail: blaneyb@gtlaw.com