KIM J. TROUT, ISB #2468
TROUT LAW, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID  83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
ktrout@trout-law.com
Attorney for the Plaintiff.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,<br><br>　　Plaintiff,<br>vs.<br><br>SMITH & WESSON CORP., a Delaware corporation, and AMERICAN OUTDOOR BRANDS CORPORATION,  Nevada corporation,<br><br>　　Defendants. | Case No. 1:18-CV-00035-CWD<br><br>**DECLARATION OF GREGORY FELTON IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>F.R.C.P. 56 |
| SMITH & WESSON CORP., a Delaware corporation,<br><br>　　Counterclaimant,<br>vs.<br><br>GEMINI TECHNOLOGIES, INCORPORATED, an Idaho Corporation; RONALD J. MARTINEZ, an individual; and PHILIP H. DATER, an individual,<br><br>　　Counterdefendants. | |

Pursuant to 28 U.S.C. 1746, I declare the following is true and correct and submit the following declaration:

1. I am the owner and director of Law Enforcement International ("LEI"), and have personal knowledge of the statements contained herein.

2. I formed a business relationship with Dr. Philip Dater of Gemini Technologies, Incorporated in 2000.

3. On 7 July 2003, I registered the trademark Gemtech with the European Union Intellectual Property Office ("EUIPO").

4. In January 2019, I met Robert Cicero at SHOT Show ("Shooting, Hunting, Outdoor Trade Show") in Las Vegas about multiple items, including the EU trademark.

5. Following the 2019 SHOT Show, Mr. Cicero asked me what Smith & Wesson could do to acquire the trademark. After consulting with my partners, I responded to Mr. Cicero's request and offered (on 3 March 2019) to grant Smith & Wesson a non-exclusive (but perpetual) cost free license to use the Gemtech trademark in the EU. Mr. Cicero refused this offer.

6. I also offered to sell the EU trademark to Smith & Wesson for $100,000.00 USD. Again, Smith & Wesson refused the offer, saying the EU trademark for Gemtech was not worth even $100,000.00.

7. On 8 March 2019, Smith & Wesson formally requested the EUIPO to cancel the Gemtech Trademark owned by LEI.

8. On 31 March 2021 the EUIPO rendered its decision, a true and correct copy of which is attached hereto as **Exhibit 1**.

9. LEI has never asserted any trademark infringement claims against Smith & Wesson.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 02/09/2021.

Gregory Felton
SignNow signature ID: 8e5b2a1ca6...
09/02/2021 09:22:21 UTC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 24, 2021, a true and correct copy of the above and foregoing document was filed through the CM/ECF system, which caused the following parties or counsel to be served by electronic means.

B. Newal Squyres
    NSquyres@hollandhart.com

Stefan J. Hasselblad
    SJHasselblad@hollandhart.com

                                         /s/ *Kim J. Trout*
                                         Kim J. Trout

EXHIBIT 1

TO DECLARATION OF
GREGORY FELTON



Alicante, 31/03/2021

Lewis Silkin Ireland
26 Lower Baggot Street
Dublin 2
IRLANDA

**Notification of a decision to the EUTM proprietor/IR holder**

| | |
|---|---|
| *Your reference:* | **J191** |
| *Revocation number:* | **000033816 C** |
| *Contested trade mark:* | **003276235** |
| | **GEMTECH** |

Please find attached the decision terminating the proceedings referred to above. The decision was taken on **31/03/2021**.

> **Please note that the decisions of the Cancellation Division are not signed by the officials responsible but only indicate their full names and bear a printed seal of the Office in accordance with Article 94(2) EUTMR.**



**Andrea VALISA**

Enclosures (excluding the cover letter): 11 pages.



CANCELLATION No C 33 816 (REVOCATION)

**American Outdoor Brands Sales Company**, 2100 Roosevelt Avenue, 01104 Springfield, Massachusetts, United States of America (applicant), represented by **Marks & Clerk Llp**, 40 Torphichen Street, EH3 8JB Edinburgh, United Kingdom (professional representative)

a g a i n s t

**Law Enforcement International Limited**, P.O. Box 328, AL4 0WA St. Albans, United Kingdom (EUTM proprietor), represented by **Lewis Silkin Ireland**, 26 Lower Baggot Street, 2 Dublin, Ireland (professional representative).

On 31/03/2021, the Cancellation Division takes the following

## DECISION

1. The application for revocation is upheld.

2. The EUTM proprietor's rights in respect of European Union trade mark No 3 276 235 are revoked in their entirety as from 08/03/2019.

3. The EUTM proprietor bears the costs, fixed at EUR 1 080.

## REASONS

On 08/03/2019, the applicant filed a request for revocation of European Union trade mark No 3 276 235 'GEMTECH' (word mark) (the EUTM). The request is directed against all the goods, covered by the EUTM, namely:

Class 9: *Firearm sights; firearm sights (electronic); firearm sights (laser); firearm sights (telescopic); firearm sights (infrared); personal protection devices (other than firearms or side arms); simulators for training personnel in the use of firearms.*

Class 13: *Firearms; target sights for firearms (other than electronic, laser or telescopic); silencers for firearms; trigger guards for firearms; gun barrels; gun carriages; gun butts; gun hammers; gun cotton; gun stocks; gun tables; gun turret base plates; gun turret shields; guns for firing paint bullets; containers for storing or carrying firearms; holsters for weapons; shoulder straps for weapons; firearms stands; protective shields adapted for firearms; apparatus for cleaning firearms; ammunition and projectiles; flamethrowers; tear-gas weapons; explosives; gunpowder; fireworks; parts and fittings for all the aforesaid goods.*

Class 14: *Precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; jewellery, precious stones; horological and chronometric instruments.*

The applicant invoked Article 58(1)(a) EUTMR.

**SUMMARY OF THE PARTIES' ARGUMENTS**

The applicant filed a request for revocation on 08/03/2019, claiming that the EUTM proprietor has not put its EUTM to genuine use for a continuous period of five years in relation to the goods for which it is registered.

On 20/05/2019, the EUTM proprietor submitted observations and evidence of use (listed further below). The EUTM proprietor argues that the products in question are of highly sensitive nature and that customers are the governmental, military and security services and normal consumers advertising and promotional methods are not available or pertinent. Besides, information regarding the sale of products is covered by confidential information agreements and thus cannot be adduced as evidence in the proceedings.

In its observations of 11/10/2019, the applicant argues that the EUTM proprietor failed to adduce clear and objective evidence demonstrating that the contested trade mark was put to genuine use in the European Union during the relevant period.

In particular, it claims that the materials such as Appendix 1, 2 and 3 do not demonstrate the nature, place, time or extent of use and, to the contrary that the applicant and not the EUTM proprietor was the party using the 'GEMTECH' mark in connection with the sale of goods in the EU.

According to the applicant, Appendix 4, that is an extract from an information brochure published in 2017, contains the statement "…unique (patented) mount by Gemtech ™). On page 2 of the submissions, the EUTM Proprietor claims that it "…manufactures a UK version of the Gemtech USA "quickmount"/bi-lock mount" which is the subject of US Patent No. 5559302. In this sense, the sole use of the 'GEMTECH' mark in Appendix 4 is not in reference to the suppressor but to the "mount" to which the suppressor is attached. While suppressors are within the goods covered by the contested EUTM, a "mount" of any kind is not.

As it regards Appendix 5, that is a user manual from 2017, also all references to "Gemtech" are to goods offered under the mark by the applicant. The images in the manual featuring the proprietor's products do not feature the contested mark but, on the contrary, the images feature "LEI" as an indicator of origin (being the acronym for Law Enforcement International Ltd) and "BLK-16" as the product number. Appendix 5 does not demonstrate use in the EU by LEI.

In other pieces of evidence such as Appendix 6, 8 or 11, the contested EUTM never appears or it is referred to, it is the case of Appendix 7, the use of the mark in relation to research services.

Appendix 13 features undated images of products. One of the images features the mark "LEI-GEMTECH" on a .22 "PREDATOR" suppressor. The other image features the Contested Mark "GEMTECH" on the "LEI BLK-16" branded suppressor. Importantly, the use of "GEMTECH" is followed by the ™ symbol and not the ® symbol. Whilst the EUTM Proprietor would be able to use the ® symbol to indicate that "Gemtech" is a registered trademark, it has opted to use the ™ symbol to indicate that "Gemtech" is an unregistered trademark. It can therefore be inferred that the reference to "Gemtech ™" is not a reference to the contested EUTM but a reference to the Gemtech suppressors that were developed by Greg Latka and GSL Technology before being sold to the applicant for Revocation. Appendix 13 also does not demonstrate use of the contested mark as an indicator of origin in respect of the contested goods within the relevant time period in the EU. As a result, the use of the ™ symbol could alternatively be interpreted to mean that

the goods pictured in Appendix 13 were from prior to the issue of the contested registration.

The only sales evidenced by the EUTM proprietor are the purchase of 73 suppressors by a United Kingdom police force – although the sales do not evidence that the goods sold by the EUTM proprietor bear the contested mark. It is the opinion of the applicant that a single sale to a single entity within a single EU Member State is not sufficient to constitute genuine commercial use when taking into consideration the characteristics of the market concerned and the nature of the goods in question. The EUTM proprietor's submission of export licenses authorising the export of limited units for promotional exhibitions or for testing purposes, do not demonstrate use throughout a substantial part of the EU. Besides, no materials have been produced to indicate actual sales of goods bearing the contested mark occurred in Finland or in France, notwithstanding the existence of documents that mention those two countries. The applicant contends that even if actual sales occurred, provision of goods to such a limited number of organisations ought not to be considered sufficient for the creation and maintenance of a market share in a substantial part of the European Union.

The applicant considers that for most of the goods covered by the contested mark, no materials whatsoever were produced to evidence its use. For specific goods, namely "silencers for firearms" and "parts and fittings", the materials produced, similarly, do not demonstrate that the EUTM proprietor has been able to establish and/or maintain a market share.

On 27/02/2020, the EUTM proprietor reiterates its arguments, and in particular underlines the fact that the products were designed jointly by the EUTM proprietor and the applicant and includes a Witness Statement as Appendix 14.

On 23/07/2020 the applicant submits as part of Exhibit 2 extracts of the Asset Purchase Agreement dated 29 June 2017 by and among Smith & Wesson Corp., Gemini Technologies, Incorporated, and the Stockholders, that would confirm that the applicant purchased all of the rights to the 'GEMTECH' trade mark in the EU because it purchased all of the predecessor's assets. The applicant also claims that the Appendix 14 submitted by the EUTM proprietor implies that Gemtech was aware and had no objection to the application for the 'GEMTECH' mark in the EU in 2003 by LEI but that this is directly contracted by the content of Exhibit 3. Furthermore, the applicant argues that existence of a "gentleman's agreement" between the parties for use of each other's patented inventions and the statement that Gemtech was aware and had no objection to the application for the GEMTECH mark in the EU in 2003 by LEI has no bearing on the actual use of the mark.

On 08/12/2020 the EUTM proprietor claims that the contested EUTM is not, and was never, the property of the applicant. According to the EUTM proprietor, no supporting evidence is provided as to the intangible property owned by the predecessor in title, and it is the EUTM proprietor's submission that the intangible property did not and does not include EUTM No 3 276 235 and so the assertion is irrelevant to the proceedings at issue. The EUTM proprietors admits that it cannot be denied that the original owners of the US rights and the EUTM proprietor co-operated with one another and shared Intellectual Property knowledge and rights with a view to both creating markets in their respective territories. However, that does not entitle the applicant to claim that it is the owner of all the rights created as a result of that partnership. Together with these further observations, the applicant produces additional evidence.

On 04/01/2020, the applicant submits that the EUTM Proprietor has had multiple opportunities and much beyond the normal time limit for providing proof of genuine use

of its trade mark. With regard to Articles 19(1) and 10(7) of the EUTMDR, the Applicant requests that the new evidence submitted by the EUTM proprietor in its observations of 08/12/2020 be disregarded as a) it is not relevant for the outcome of the case and b) there are no valid reasons for the late submission of the evidence. The applicant maintains that even if the new evidence submitted by the EUTM proprietor were to be found admissible, it is of such a nature as not to demonstrate genuine use of the contested trade mark.

**GROUNDS FOR THE DECISION**

According to Article 58(1)(a) EUTMR, the rights of the proprietor of the European Union trade mark will be revoked on application to the Office, if, within a continuous period of five years, the trade mark has not been put to genuine use in the Union for the goods or services for which it is registered, and there are no proper reasons for non-use.

Genuine use of a trade mark exists where the mark is used in accordance with its essential function, which is to guarantee the identity of the origin of the goods or services for which it is registered, in order to create or preserve an outlet for those goods or services. Genuine use requires actual use on the market of the registered goods and services and does not include token use for the sole purpose of preserving the rights conferred by the mark, nor use which is solely internal (11/03/2003, C-40/01, Minimax, EU:C:2003:145, in particular § 35-37 and 43).

When assessing whether use of the trade mark is genuine, regard must be had to all the facts and circumstances relevant to establishing whether commercial exploitation of the mark is real, particularly whether such use is viewed as warranted in the economic sector concerned to maintain or create a market share for the goods or services protected by the mark (11/03/2003, C-40/01, Minimax, EU:C:2003:145, § 38). However, the purpose of the provision requiring that the mark must have been genuinely used 'is not to assess commercial success or to review the economic strategy of an undertaking, nor is it intended to restrict trade-mark protection to the case where large-scale commercial use has been made of the marks' (08/07/2004, T-203/02, Vitafruit, EU:T:2004:225, § 38).

According to Article 19(1) EUTMDR in conjunction with Article 10(3) EUTMDR, the indications and evidence of use must establish the place, time, extent and nature of use of the contested trade mark for the goods and/or services for which it is registered.

In revocation proceedings based on the grounds of non-use, the burden of proof lies with the EUTM proprietor as the applicant cannot be expected to prove a negative fact, namely that the mark has not been used during a continuous period of five years. Therefore, it is the EUTM proprietor who must prove genuine use within the European Union, or submit proper reasons for non-use.

In the present case, the EUTM was registered on 13/04/2005. The revocation request was filed on 08/03/2019. Therefore, the EUTM had been registered for more than five years at the date of the filing of the request. The EUTM proprietor had to prove genuine use of the contested EUTM during the five-year period preceding the date of the revocation request, that is, from 08/03/2014 until 07/03/2019 inclusive, for the contested goods listed in the section 'Reasons' above.

As the EUTM proprietor requested to keep certain commercial data contained in the evidence confidential vis-à-vis third parties, the Cancellation Division will describe the evidence only in the most general terms without divulging any such data.

On 20/05/2019, the EUTM proprietor submitted the following evidence:

- Appendix 1: Exchange of two e-mails dated 27/11/2018 between the EUTM proprietor and a United Kingdom governmental subject in which it is mentioned that the EUTM proprietor confirms a bidding of, inter alia 'Gemtech suppressed weapon system'.

- Appendix 2: Email of 10/05/2018 that accompanies an order confirmation dated 20/04/2018 issued to the EUTM proprietor from and American company for items listed as 'Integra-Upper' together with other specifications such as '5.56 SA.-1500141'. No mention of 'GEMTECH' is made in this document.

- Appendix 3: Extracts from the webpage www.gemtech.com in which items belonging to the categories 'silencer accessories'/'quickmounts' are displayed. Prices are indicated in US Dollars.

- Appendix 4: Page of a catalogue in which a weapon in which a 'BLK-16 5.56mm Commando Suppressor' is described and in which it is mentioned that the suppressor is designed to function reliably and efficiently in the most hostile environments and attaches to the weapon using a unique patented mount by Gemtech and a 'Phantom' flash hider.

- Appendix 5: Operation and Maintenance Manual for 5.56mm Suppressor Model BLK-16. In this manual it is mentioned that 'the suppressor incorporates a patented 'bi-lock' type (Gemtech) flash hider mount'. Also, that 'this uses our Gemtch suppressor mount'. The BLK series of suppressor is compatible with flash hiders/Quickmounts manufactured by Gemtech (USA)'.

- Appendix 6: 'Standard Individual Export Licence' in which appears the EUTM proprietor as 'Exporter' and 'Consignees' in France for periods comprised in the years 2016, 2017 and 2018. The description of the items contains a reference to 'Suppressor (silencers) – multicaliber (556mm/.300/7.62mm) and to 'LEI sound suppressor (silencer).

- Appendix 7: Screenshot of a webpage, namely www.dcicontracts.com, dated 05/03/2014 and concerning, inter alia, the provision of 'research services' and 'to design, manufacture and evaluate the effectiveness of bespoke suppressor […]. The contractor is indicated as LEI/GEMTECH.

- Appendix 8: Email dated 27/10/2014 received by the EUTM proprietor concerning a Technical Trial. No mention of 'GEMTECH' is made in this document.

- Appendix 9: Untitled document issued on 19/01/2016 in which are mentioned a 'Foreign End-User' in the United Kingdom, a 'Manufacturer of the Commodity', a 'Foreign Consignee' that corresponds to the EUTM proprietor, together with 'Source of Commodity' and 'U.S. Seller'. The names of the three different commodities, namely handgun suppressors and adjustable bolt carrier for two kind of rifles, include the sign 'Gemtech'.

- Appendix 10: Two purchase orders originating from a police institution dated 06/02/2018 and 25/01/2019 issued to the EUTM proprietor concerning, inter alia, 'BLK16 5.56 mm Suppressor', 'BLK10 7.62 Suppressor' and 'Suppressor'.

- Appendix 11: Standard Individual Export Licence' in which appears the EUTM proprietor as 'Exporter' and 'Consignees' in Finland and France for period comprised in the years 2016, 2017 and 2018. The description of the items contains a reference to 'LEI 5.56mm suppressor (silencer)', 'Suppressors (sound moderators). Calibres. 17-.46 inclusive.

- Appendix 12: Exchange of emails between the applicant and the EUTM proprietor regarding draft distribution agreement in which it is discussed, inter alia, 'the ownership of the Gemtech name in the EU'. The messages are dated 27/05/2018, 01/06/2018 and 04/06/2018.

- Appendix 13: Undated pictures of what appear to be two silencers on which it is impressed, inter alia, the name 'GEMTECH', together with the names 'LEI', 'LEI BLK-16' and 'PREDATOR'.

On 27/02/2020, the EUTM proprietor also submitted the following:

- Appendix 14: Witness statement signed on 20/02/2020 by a former shareholder of 'Gemini Technologies Incorporated ("Gemtech") in the period between 1993 and 2016. In this document it is claimed that in 2003 the EUTM proprietor and 'Gemtech' agreed to cooperate with reciprocity as regards the use of patented inventions for a mount in the United States of America and in the European Union and that the two were aware of the intention to register a EUTM for 'Gemtech'.

On 08/12/2020, the EUTM proprietor, after the deadline for submitting evidence, submitted the following:

- Appendix 15: Extracts from a US legal proceedings in relation to revocations actions in two different Court jurisdictions concerning, in particular, the exclusive ownership and control of Gemtech's EU trade mark.

- Appendix 16: Email from 06/09/2013 between the EUTM proprietor and the person who issued the witness statements, Appendix 14, in which it is said, inter alia, that 'It doesn't hurt in that you own the Gemtech trademark in the EU'.

- Appendix 17: Correspondence (30/11/2014), together with an extract of a US registered patent, between the EUTM proprietor and the person who issued the witness statements, Appendix 14, regarding the share of profit from the partnership contract.

- Appendix 18: Machine drawings of the EUTM proprietor's flash hider relating to its part number BLK-556 together with the accompanying invoice from Clayton Precision Engineering Co. Ltd, dated 22/07/2009. In this document there is no reference whatsoever to the sign 'GEMTECH'.

- Appendix 19: Standard Individual Export Licence' in which appears the EUTM proprietor as 'Exporter' and unspecified 'Consignees' (the data being blanked). The description of the items contains references to, inter alia, 'BLK-10 suppressor' together with five invoices regarding, inter alia, 'LEI BLK16 suppressor, 5.56mm'. In this document there is no reference whatsoever to the sign 'GEMTECH' a part of handwritten indications.

- Appendix 20: Pages of unknow origin, undated, in which 'GEMTECH ONE SUPPRESSOR SPECIFICATIONS' and 'GEMTECH SHIELD SUPPRESSOR SPECIFICATIONS' are given in details.

- Appendix 21: Various pages containing the National Stock Numbers (NSN), as part of the NATO system. According to the EUTM proprietor's, these numbers are granted by the UK authorities for UK companies for UK products. In this document there is no reference whatsoever to the sign 'GEMTECH'.

- Appendix 22: Some pictures of the same items depicted in Annex 13.

- Appendix 23: Witness statement signed on 01/10/2020 by a Finnish firearms dealer who claims having been importing 'LEI' suppressors for many years and selling 'LEI-GEMTECH' UK manufactured suppressor/silencers. The witness also declares that some of these were suppressors using the bi-lock mount and 'phantom flash hiders which are the same 'LEI-Gemtech' suppressors sold in Finland.

- Appendix 24: Standard Individual Export Licence' in which appears the EUTM proprietor as 'Exporter' and an unspecified 'Consignee' in Belgium. The description of the items contains references to 'Suppressors (5.56mm - .300 - 7.62mm'. In this document there is no reference whatsoever to the sign 'GEMTECH'.

**PRELIMINARY REMARKS**

*On belated evidence*

Even though, according to Article 19(1) EUTMDR, the proprietor has to submit proof of use within a time limit set by the Office, Article 10(7) EUTMDR (applicable to cancellation proceeding by virtue of Article 19(1) EUTMDR) expressly invites the Office to exercise its discretionary power if relevant evidence was submitted in time and, after the expiry of the time limit, supplementary evidence was filed.

However, in the present case, the issue of whether or not the Office may exercise the discretion conferred on it by Article 95(2) EUTMR to take into account the additional evidence submitted on 08/12/2020 can remain open. The Cancellation Division considers it appropriate to proceed on the premise that the belated evidence is to be taken into account, even though the applicant has not been given the opportunity to comment on these documents, as this is the best-case scenario for the EUTM proprietor and it will not be to the applicant's detriment, as shown below. For the same reasons, the Cancellation Division does not consider it necessary to re-open the cancellation proceedings and give the applicant an opportunity to comment on the proprietor's late evidence.

*On evidence related to the United Kingdom*

The EUTM proprietor has submitted, inter alia, evidence relating to the United Kingdom with a view to demonstrating use of the contested mark. The evidence relates to a period prior to 01/01/2021.

On 01/02/2020, the United Kingdom withdrew from the EU subject to a transition period until 31/12/2020. During this transition period EU law remained applicable in the United Kingdom. Therefore, use in the United Kingdom prior to the end of the transition period

constituted use 'in the European Union'. Consequently, the evidence relating to the United Kingdom and to a period prior to 01/01/2021 is relevant with a view to maintaining rights in the European Union and will be taken into account.

*On witness statements*

As far as the disputed witness statements are concerned, Article 10(4) EUTMDR (applicable to cancellation proceedings by virtue of Article 19(1) EUTMDR) expressly mentions written statements referred to in Article 97(1)(f) EUTMR as admissible means of proof of use. Article 97(1)(f) EUTMR lists, as means of giving evidence, sworn or affirmed written statements or other statements that have a similar effect under the law of the State in which they were drawn up. As far as the probative value of this kind of evidence is concerned, statements drawn up by the interested parties themselves, their employees or companies from the same commercial group are generally given less weight than independent evidence. This is because the perceptions of a party involved in a dispute may be more or less affected by its personal interests in the matter.

However, this does not mean that such statements do not have any probative value at all.

The final outcome depends on the overall assessment of the evidence in the particular case. The probative value of such statements depends on whether or not they are supported by other types of evidence (labels, packaging etc.) or evidence originating from independent sources.

In view of the foregoing, the remaining evidence must be assessed in order to see whether or not the contents of the declaration are supported by the other items of evidence.

*Assessment of genuine use – factors*

As already mentioned above, the indications and evidence required in order to provide proof of use must consist of indications concerning the place, time, extent and nature of use of the trade mark for the relevant goods and/or services.

These requirements for proof of use are cumulative (judgment of 05/10/2010, T-92/09, STRATEGI, EU:T:2010:424, § 43). This means that the EUTM proprietor is obliged not only to indicate but also to prove each of these requirements. However, the sufficiency of the indication and proof as to the place, time, extent and nature of use has to be considered in view of the entirety of the evidence submitted. A separate assessment of the various relevant factors, each considered in isolation, is not suitable (judgment of 17/02/2011, T-324/09, Friboi, EU:T:2011:47, § 31).

At this point, the Cancellation Division considers it appropriate to focus the assessment of the evidence on the criteria of nature of use (use as a trade mark and use in relation to the registered goods) and extent of use, as in its opinion, the evidence submitted by the EUTM proprietor is insufficient to prove that these requirements have been met in the present case.

As regards **the nature of use**, in the context of Rule 22(3) Commission Regulation (EC) No 2868/95 (in the version in force at the time of filing the application for revocation), the expression 'nature of use' includes, inter alia, evidence of the use of the sign as a trade mark in the course of trade and of its use for the goods and/or services for which it is registered.

Concerning **the extent of use**, it is settled case-law that account must be taken, in particular, of the commercial volume of the overall use, as well as of the length of the period during which the mark was used and the frequency of use (e.g. 08/07/2004, T-334/01, Hipoviton, EU:T:2004:223, § 35). Furthermore, the Court has held that 'use of the mark need not … always be quantitatively significant for it to be deemed genuine, as that depends on the characteristics of the goods or service concerned on the corresponding market' (11/03/2003, C-40/01, Minimax, EU:C:2003:145, § 39). The assessment of genuine use entails therefore a degree of interdependence between the factors taken into account. Thus, the fact that commercial volume achieved under the mark was not high may be offset by the fact that use of the mark was extensive or very regular, and vice versa. Likewise, the territorial scope of the use is only one of several factors to be taken into account, so that a limited territorial scope of use can be counteracted by a more significant volume or duration of use. The evidence cannot be assessed in absolute terms but must be assessed in relation to other relevant factors. In this respect, the evidence should be viewed in relation to the nature of the goods and services and the structure of the relevant market (30/04/2008, T-131/06, Sonia Sonia Rykiel, EU:T:2008:135, § 53).

The documents submitted by the proprietor with a view to demonstrate the genuine use of the contested EUTM consist of, inter alia, witness statements, an order confirmation, a catalogue, some so defined ''Standard Individual Export Licence', purchase orders and five invoices, as detailed above when listing the evidence of use.

Firstly it must be noted that several pieces of evidence submitted by the EUTM proprietor bear no mention of the sign 'GEMTECH'. This is the case of Appendixes 2, 6, 8, 10, 11, 18, 19, and 24.

This fact acquires particular relevance when one considers that there is no mentioned of 'GEMTECH' in none of the documents that could, for their nature, hypothetically demonstrate actual commercial transaction, namely the 'Standard Individual Export Licence', the purchase orders and the invoices. In all of these documents the goods are listed without mentioning the sign 'GEMTECH', being present, for instance, items called 'Suppressor (silencers) – multicaliber (556mm/.300/7.62mm)', 'LEI sound suppressor (silencer)', 'BLK-10 suppressor', 'BLK16 5.56 mm Suppressor', 'BLK10 7.62 Suppressor', 'Suppressor', 'LEI BLK16 suppressor, 5.56mm'.

As pointed out by the applicant, in view of that it is therefore impossible to directly link these sales to the sign 'GEMTECH'. It is true that a mount bearing the sign 'GEMTECH' seems to be possibly a part or piece of the suppressors and silencers distributed by the EUTM proprietor, but the fact that this could be a component of said goods does not necessarily mean that that sign is used by the EUTM proprietor, when on the contrary all the other circumstances point towards another direction, that is to say, the existence of clearly different goods bearing different signs.

The fact, often mentioned in its observations by the EUTM proprietor, that the parties of the present case have had a commercial relationship or agreement in the past or even in the present is irrelevant for the sake of the analysis of the use of the mark in the context of revocation proceedings. The exchange of email submitted as Annexes 1, 12, 16 and 17 do not contain any relevant data as regards the extent of use. The same is valid for the witness statements submitted as Annexes 14 and 23, in which there are no indication of the commercial volume of the alleged use of the sign and that are not corroborated by other pieces of evidence capable of confirming the rather general statements they do

contain, such as could be the case of turnovers, or simply invoices or orders in which the sign appears.

Furthermore, other documents such as Appendix 3, an extract of a webpage in which the goods displayed are clearly aimed at the American market, being the prices indicated in US Dollars, or Appendix 15, that concerns legal proceedings in the United States of America, give no contribution whatsoever when it comes to confirm an actual use of the trade mark 'GEMTECH' in the territory of the European Union.

It has to be pointed out that for the vast majority of the goods for which the EUTM is registered, the Cancellation Division did not identify on file any evidence showing the extent and/or nature of use of the mark. This is the case for: *firearm sights; firearm sights (electronic); firearm sights (laser); firearm sights (telescopic); firearm sights (infrared); personal protection devices (other than firearms or side arms); simulators for training personnel in the use of firearms* in Class 9; *firearms; target sights for firearms (other than electronic, laser or telescopic); trigger guards for firearms; gun barrels; gun carriages; gun butts; gun hammers; gun cotton; gun stocks; gun tables; gun turret base plates; gun turret shields; guns for firing paint bullets; containers for storing or carrying firearms; holsters for weapons; shoulder straps for weapons; firearms stands; protective shields adapted for firearms; apparatus for cleaning firearms; ammunition and projectiles; flamethrowers; tear-gas weapons; explosives; gunpowder; fireworks; parts and fittings for all the aforesaid goods* in Class 13; *precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; jewellery, precious stones; horological and chronometric instruments* in Class 14.

The fact that some mentions of the mark 'GEMTECH' are present among the documents submitted by the EUTM proprietor in relation to mount for silencers, which could be considered *parts and fittings for all the aforesaid goods [silencers for firearms]* in Class 13 or that the EUTM proprietor is distributing *silencers for firearms* in Class 13 does not call into question the above, since it is clear the EUTM proprietor produced no evidence showing the extent of use as it regards the mounts and, in the case of the silencers for firearms, no documents capable of connecting the claimed sales and the mark 'GEMTECH' used as a trade mark on the market, that is in accordance with its essential function, as an indicator of the commercial origin, strictly connected to the EUTM proprietor. In view of all the foregoing, the Cancellation Division considers that the evidence does not contain sufficient indications of nature and extent of use.

It is recalled that genuine use requires actual presence of the goods or services on the market to the customers so that the mark can exercise its essential function, which is to identify the commercial origin of the goods or services, thus enabling the consumer who acquired them to repeat the experience, if it proves to be positive, or to avoid it, if it proves to be negative, on the occasion of a subsequent purchase (judgment of 12/12/2002, T-39/01, Hiwatt, EU:T:2002:316, § 37).

An overall assessment of the evidence does not allow the conclusion, without resorting to probabilities and presumptions, that the mark was genuinely used during the relevant period for the relevant goods and services (15/09/2011, T-427/09, Centrotherm, EU:T:2011:480, § 43).

The methods and means of proving genuine use of a mark are unlimited. The finding that genuine use has not been proven in the present case is due not to an excessively high standard of proof, but to the fact that the EUTM proprietor chose to restrict the evidence submitted (15/09/2011, T-427/09, Centrotherm, EU:T:2011:480, § 46).

Failure to fulfil one of the conditions is sufficient and, as at least extent of use and/or nature of use (use as a trade mark and/or in relation to the registered goods) have not been established, it is not necessary to enter into the other requisites.

**Conclusion**

It follows from the above that the EUTM proprietor has not proven genuine use of the contested EUTM for any of the goods for which it is registered. As a result, the application for revocation is wholly successful and the contested EUTM must be revoked in its entirety.

According to Article 62(1) EUTMR, the revocation will take effect from the date of the application for revocation, that is, as of 08/03/2019.

**COSTS**

According to Article 109(1) EUTMR, the losing party in cancellation proceedings must bear the fees and costs incurred by the other party.

Since the EUTM proprietor is the losing party, it must bear the cancellation fee as well as the costs incurred by the applicant in the course of these proceedings.

According to Article 109(7) EUTMR and Article 18(1)(c)(ii) EUTMIR, the costs to be paid to the applicant are the cancellation fee and the representation costs, which are to be fixed on the basis of the maximum rate set therein.



**The Cancellation Division**

Solveiga BIEZA    Andrea VALISA    Ioana Cristina MOISESCU

According to Article 67 EUTMR, any party adversely affected by this decision has a right to appeal against this decision. According to Article 68 EUTMR, notice of appeal must be filed in writing at the Office within two months of the date of notification of this decision. It must be filed in the language of the proceedings in which the decision subject to appeal was taken. Furthermore, a written statement of the grounds of appeal must be filed within four months of the same date. The notice of appeal will be deemed to be filed only when the appeal fee of EUR 720 has been paid.