# EXHIBIT 11
# TO THE DECLARATION OF
# RONALD J. MARTINEZ



**PRIVATE AND CONFIDENTIAL**

February 4, 2019

Smith & Wesson Corporation.
c/o Alan Schutzman, Esq.
Associate General Counsel
American Outdoor Brands Corporation
2100 Roosevelt Avenue
Springfield, MA 01104

Grant Thornton LLP
757 Third Avenue, 9th FL
New York, NY 10017

T 212.542.9725
F 212.370.4520
www.GrantThornton.com

Gemini Technologies, Incorporated
c/o Kim J. Trout, Esq.
Trout Law, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703

**Re: Appointment of Settlement Accountants pursuant to Section 1.5(b) of the Asset Purchase Agreement by and among Smith & Wesson Corp., Gemini Technologies, Inc., and the Stockholders named therein dated June 29, 2017 (the "Contract")**

Dear Sirs:

Pursuant to the Engagement Letter dated August 14, 2018 documenting the understanding among and between Smith & Wesson Corporation (the "Buyer" or "Smith & Wesson") and Gemini Technologies Incorporated (the "Seller" or "Company" or "Gemtech"),[1] and Grant Thornton LLP ("Grant Thornton"), Grant Thornton was appointed as the Settlement Accountants with respect to a dispute arising under Section 1.5(b) of the Contract in connection with Buyer's acquisition of the assets of the Company.[2]

**Background**

The Buyer and Seller entered into the Contract with a closing date of August 7, 2017 (the "Closing Date")[3] whereby the Buyer acquired the assets of the Company (the "Transaction"). The Contract provides that the consideration for the Transaction (the "Purchase Price") is to include an adjustment for Working Capital.[4]

---

[1] Buyer and Seller are together referred to as the "Disputing Parties."
[2] Capitalized Terms used herein are as defined in the Engagement Letter and Contract unless otherwise stated.
[3] Engagement Letter, Attachment B
[4] Contract, §1.2



Section 1.4 of the Contract states that, no later than 60 days after the Closing Date, Buyer will prepare and deliver to Seller its proposed calculation of Working Capital as part of the Buyer's Report.[5] Seller agreed to provide Buyer with an extension of this deadline,[6] and Buyer prepared and delivered Buyer's Report to Seller on October 20, 2017.[7]

The Contract further provides that no later than 30 days after receiving Buyer's Report, Seller may prepare and deliver to Buyer its proposed calculation of Working Capital as part of the Company's Report.[8] Buyer agreed to provide Seller with an extension of this deadline,[9] and Seller prepared and delivered the Company's Report to Buyer on December 4, 2017.[10]

Pursuant to Section 1.5(a) of the Contract, Buyer may give notice to Seller of any dispute related to Company's Report within 30 days after the date of the Company's Report.[11] Buyer provided the Seller with its objections to the calculation of Working Capital included in the Company's Report on January 2, 2018 and provided further objections and additional calculations of Working Capital on January 18, 2018 (the "January 18th Letter").[12]

The Buyer and Seller have not been able to agree on the resolution of all of the Disputed Items,[13] so pursuant to Section 1.5(b) of the Contract, the Disputing Parties agreed to submit the dispute to Grant Thornton as the Settlement Accountants, for resolution in accordance with the terms of the Contract and the Engagement Letter, and the Disputing Parties appointed me, Charles Blank, to act in this role. Accordingly, this letter sets forth my determination of the Disputed Items submitted to me for resolution.

## Relevant Defined Terms

Relevant defined terms per the Contract are included in Appendix A to this determination letter.

Rest of Page Intentionally Left Blank

---

[5] Contract, §1.4
[6] Seller's Opening Submission, pg. 3
[7] Appendix B to Seller's Opening Submission
[8] Contract, §1.5(a)
[9] Seller's Opening Submission, pg. 3
[10] Appendix C to Seller's Opening Submission
[11] Contract, §1.5(a)
[12] Engagement Letter, Attachment B
[13] The Disputed Items submitted for resolution by Grant Thornton are included on Attachment B of the Engagement Letter.



## I.    DISPUTED ITEMS

The Buyer and Seller have identified the following Disputed Items:[14]

**Summary of Disputed Items**

| Disputed Item | Seller | Buyer | | Disputed Amount (Jan. 2, 2018) | Buyer Updated Amount | | Add'l Disputed Amount (Jan. 18, 2018) | Total Disputed Amount |
|---|---|---|---|---|---|---|---|---|
| Eval / Demo Suppressors | $ 146,158 | $ 109,618 | (1.a.) | $ (36,539) | $ 109,618 | $ | - | $ (36,539) |
| Suppressors for Sale | 1,094,665 | 960,633 | (1.b.) | (134,032) | 996,909 | (3.a.) | 36,277 | (97,755) |
| Stillwood Ammunition | 137,996 | 35,852 | (1.c.) | (102,144) | 76,452 | (3.b.) | 40,600 | (61,544) |
| Parts & Pieces Inventory | 168,946 | - | (2) | (168,946) | - | | - | (168,946) |
| Eagle 22 LR Ammunition | - | - | | - | 3,657 | (3.c.) | 3,657 | 3,657 |
| Accessories | 879,156 | 879,156 | | - | 889,656 | (3.d.) | 10,500 | 10,500 |
| Net Accounts Receivable | 1,075,488 | 1,075,488 | | - | 837,729 | (3.e.) | (237,759) | (237,759) |
| **Total:** | $ 3,502,408 | $ 3,060,747 | | $ (441,661) | $ 2,914,021 | $ | (146,726) | $ (588,387) |

Sources:
- Engagement Letter, Attachment B
- Appendix C to Seller's Opening Submission
- Exhibit 4 to Buyer's Opening Submission

## II.    INFORMATION RECEIVED AND CONSIDERED

The following information was received and considered by me in arriving at my determination:

| | |
|---|---|
| September 7, 2018 | Submission and exhibits by Seller ("Seller's Opening Submission") |
| September 20, 2018 | Submissions and exhibits by Buyer ("Buyer's Opening Submission") |
| October 22, 2018 | Rebuttal submissions and exhibits by Seller ("Seller's Rebuttal Submission") |
| October 22, 2018 | Rebuttal submissions and exhibits by Buyer ("Buyer's Rebuttal Submission") |

---

[14] Amounts presented under the "Seller" and "Buyer" columns represent the total amount of inventory that each party asserts should be included in final Working Capital related to each disputed category of inventory. Amounts presented under the "Disputed Amount" column represent the difference in the parties' proposed calculation of each disputed category of inventory  (i.e., Buyer's calculation of inventory, a component of Working Capital, is lower than Seller's calculation of inventory for each disputed category of inventory). Additionally, Attachment B to the Engagement Letter identifies two issues for resolution by the Settlement Accountants: 1) "What is the correct closing date Working Capital and Purchase Price adjustment as provided in the APA?" and 2) "Whether the APA precludes Buyer from supplementing its closing date Working Capital calculation and, if not, whether the various elements of the supplemental calculation in the sum of $146,725.98 were correct?" Item 1 is summarized in the column entitled "Disputed Amount (Jan. 2, 2018)" and Item 2 is summarized in the column entitled "Add'l Disputed Amount (Jan. 18, 2018)".



| | |
|---|---|
| November 30, 2018 | Submission of responses to the Settlement Accountants' questions and request for further documentation by Seller dated November 5, 2018 ("Seller's Response to the Settlement Accountants' First Information Requests") |
| November 30, 2018 | Submission of responses to the Settlement Accountants' questions and request for further documentation by Buyer dated November 5, 2018 ("Buyer's Response to the Settlement Accountants' First Information Requests") |
| December 4, 2018 | Correspondence from Buyer relating to Seller's Response to the Settlement Accountants' First Information Requests ("Buyer's December 4th Correspondence") |
| December 21, 2018 | Submission of responses to the Settlement Accountants' additional questions and request for further documentation by Seller dated December 7, 2018 ("Seller's Response to the Settlement Accountants' Second Information Requests") |
| December 20, 2018 | Submission of responses to the Settlement Accountants' additional questions and request for further documentation by Buyer dated December 7, 2018 ("Buyer's Response to the Settlement Accountants' Second Information Requests") |
| December 26, 2018 | Correspondence from Seller relating to Buyer's Response to the Settlement Accountants' Second Information Requests ("Seller's December 26th Correspondence") |
| December 26, 2018 | Correspondence from Buyer responding to Seller's December 26th Correspondence ("Buyer's December 26th Correspondence") |

## III.   SETTLEMENT ACCOUNTANTS DETERMINATION OF THE DISPUTED ITEMS

**1.   Inventory Valuation: Eval/Demo Suppressors, Suppressors for Sale, Stillwood Ammunition**

This Disputed Item relates to whether an adjustment to the carrying value of inventory for Eval/Demo Suppressors, Suppressors for Sale and Stillwood Ammunition (the "Inventory Valuation Adjustment") in the amount of $272,716 should be included in the calculation of Working Capital. Buyer asserts that the Company's[15] inventory was not stated at the lower of cost or market in accordance with GAAP, and additional reserves were required to record this inventory in accordance with GAAP.[16] Seller asserts that the Company's inventory accounting as of the Closing Date is consistent with its past practices and GAAP, and therefore in accordance with the Contract.[17] The positions of each Disputing Party are summarized below:[18]

---

[15] In the context of calculations and practices in the pre-Closing period, references to "the Company" in this determination letter relate to Gemini Technologies, Incorporated. Likewise, references to the "Acquired Business" in this determination letter means the acquired assets of Gemini Technologies, Incorporated in the period after the Closing Date.

[16] Exhibit 1 to Buyer's Opening Submission, pg. 2

[17] Seller's Opening Submission, pg. 13

[18] Amounts presented in the table below represent each of the Disputing Parties positions on the net carrying value of inventory organized by Buyer's classifications (i.e., Eval/Demo Suppressors, Suppressors for Sale, and Stillwood Ammunition) that each party asserts should be recorded as of the Closing Date. These amounts do not include Buyer's additional adjustments asserted on January 18, 2018 (which are discussed in Disputed Item # 3 of this determination letter).



| Disputed Item #1: Inventory Valuation | | | |
|---|---|---|---|
| **Disputed Item** | **Seller's Position** | **Buyer's Position** | **Disputed Amount** |
| **1.a.** Eval / Demo Suppressors | $ 146,158 | $ 109,618 | $ (36,539) |
| **1.b.** Suppressors for Sale | 1,094,665 | 960,633 | (134,032) |
| **1.c.** Stillwood Ammunition | 137,996 | 35,852 | (102,144) |
| **Total Disputed Amount** | $1,378,818 | $1,106,102 | $ (272,716) |

**Notes:**

Negative amounts presented under Disputed Amount represent the amount of Buyer's proposed decrease to Working Capital. Positive amounts presented under Disputed Amount represent the amount of Buyer's proposed increase to Working Capital.

### *Seller's Position*[19]

Seller argues that the Buyer's Inventory Valuation Adjustment should not be included in the determination of Working Capital, in part, based on the following:

- *Eval/Demo Suppressors:*
  - Historically, the Company did not set reserves on its inventory[20] because inventory was recorded at cost, and the Company would never sell an item below its cost.[21] Further, Seller asserts that the Company historically would either destroy damaged inventory or send it back to the vendor, but would not keep damaged inventory its books.[22] Therefore, consistent with past practice, the Company recorded used items at their acquisition cost in Working Capital as calculated in Company's Report, and did not consider worn or damaged items because Seller believes they did not exist. Seller therefore believes the Company complied with GAAP by listing the book value at the lower of cost or market.[23]
  - Buyer's Report added inventory reserves to the amounts included in Company's Report, thereby reducing the net inventory value of the Eval/Demo Suppressors by 25% (an adjustment of $36,539). Seller states that Buyer failed to perform any detailed lower of cost or net realizable value analysis according to GAAP and assumes a "flat discount" of 25% should be applied based only on internal procedures.[24]

- *Suppressors for Sale:*
  - Consistent with how the Company accounted for Eval/Demo Suppressors, the Company did not set reserves on its inventory historically[25] or in Working Capital included in the Company's Report.

---

[19] Neither here nor elsewhere in this determination letter do I represent to provide either the Seller's or the Buyer's complete position. Rather, a summary is provided solely to provide general context.
[20] Seller's Response to the Settlement Accountants' First Information Requests, pg. 3
[21] Seller's Response to the Settlement Accountants' First Information Requests, pg. 5
[22] Seller's Response to the Settlement Accountants' First Information Requests, pg. 2
[23] Seller's Response to the Settlement Accountants' First Information Requests, pgs. 4 – 5
[24] Seller's Opening Submission, pg. 7
[25] Seller's Response to the Settlement Accountants' First Information Requests, pg. 3



Seller believes the Company complied with GAAP by listing the book value at the lower of cost or market.[26]

- o  Buyer's Report added inventory reserves to the amounts included in Company's Report, thereby reducing the net inventory value of 1,081 inventory items by 25%, 69 R&D inventory items by 50%, and 228 inventory items which were reduced to their "garage sale price" based on the judgment of Gemtech employees.[27] While Seller accepted $98,584 of Buyer's adjustments,[28] Seller objects to $134,032 of Buyer's adjustment and states that Buyer never performed an analysis to determine what the net realizable value of this inventory is.[29] Buyer subsequently proposed an additional upward adjustment of $36,277 to this inventory in its January 18th Letter, resulting in a net disputed amount of $97,755.

- **Stillwood Ammunition:**
  - o  Historically, the Company would ship raw materials to third-party manufacturers such as Stillwood,[30] and pay those third parties for the cost of the finished good. The actual cost of the finished goods that was paid to manufacturers would be recorded on the Company's books without a reserve.[31] Therefore, as of the Closing Date, there were no inventory reserves included in Working Capital as calculated in Company's Report.[32]
  - o  Buyer's Report included inventory reserves reducing the net inventory balances for Stillwood Brass, Packaging, Powder, Projectiles, 187gr 300 BLK (the "Stillwood Inventory") included in Company's Report by a total of $165,155. Of this amount, Seller accepted $63,011, therefore resulting in a net disputed amount of $102,144. Buyer's adjustment solely relied on discussion with the President of Stillwood and Buyer did not further investigate the detail behind this adjustment. Further, no explanation was provided for this adjustment.[33]

### Buyer's Position

Buyer argues that the Buyer's Inventory Valuation Adjustment should be included in the determination of Working Capital, in part, based on the following:

- **Eval/Demo Suppressors:**
  - o  Historically, the Company did not establish reserves on Eval/Demo Suppressor inventory,[34] and as of the Closing Date, this inventory was recorded at its full cost.[35] Upon physical inspection, Buyer observed that these items were used[36] and could not be sold at cost as new products to a third party. Therefore, Buyer decreased the inventory balance by its best estimate of the reserve that was needed to bring the inventory to the lower of cost or market.[37]

---

[26] Seller's Response to the Settlement Accountants' First Information Requests, pgs. 4 – 5
[27] Seller's Opening Submission, pgs. 9 – 10
[28] Seller's Opening Submission, pg. 10
[29] Seller's Opening Submission, pg. 8
[30] "Stillwood" refers to Stillwood Ammunition Systems.
[31] Seller's Response to the Settlement Accountants' First Information Requests, pg. 6
[32] Seller's Response to the Settlement Accountants' First Information Requests, pg. 5
[33] Seller's Opening Submission, pg. 11 – 12
[34] Buyer's Response to the Settlement Accountants' First Information Requests, pg. 2
[35] Buyer's Opening Submission, pg. 4
[36] Buyer's Response to the Settlement Accountants' First Information Requests, pg. 2
[37] Buyer's Opening Submission, pg. 2



- Buyer states that it based its reserve estimates for this inventory on its extensive experience in valuing used firearms inventory at Smith & Wesson,[38] as well as a visual inspection of each item of inventory when performing the opening serial number inventory.[39]

- **Suppressors for Sale:**
  - Historically, the Company did not establish reserves on Suppressors for Sale inventory,[40] and as of the Closing Date, this inventory was recorded at its full cost.[41] Upon physical inspection, Buyer observed that these items were used and could not be sold at cost.[42] Therefore, Buyer decreased the inventory balance by its best estimate of the reserve that was needed to bring the inventory to the lower of cost or market.[43]
  - Buyer states that it based its reserve estimates for this inventory on its extensive experience in valuing used firearms inventory at Smith & Wesson,[44] as well as a visual inspection of each item of inventory when performing the opening serial number inventory.[45]

- **Stillwood Ammunition:**
  - Historically, the Company did not apply reserves to inventory held at Stillwood.[46] Buyer applied additional reserves of $102,144[47] to Stillwood inventory to bring the value of this inventory to the lower of cost or market.[48] Buyer later proposed an additional upward adjustment[49] to inventory of $40,600 in its January 18th Letter (resulting in a net disputed amount of $61,544), which was based on third-party information provided by the President of Stillwood. Buyer's adjustments correct for quantity differences of brass inventory as well as valuation issues of brass and projectiles located at Stillwood Ammunition.[50]
  - Further, Buyer does not expect to get any benefit out of this inventory because Mr. Kratky indicated the casings were compromised, and he does not believe they are safe to load. This ammunition remains at Stillwood and will not be used to manufacture any ammunition in the future.[51]

## Settlement Accountants' Determination

I partially find in favor of Buyer that $52,193 of the Inventory Valuation Adjustment should be included in the calculation of Working Capital as part of the Purchase Price. I partially find in favor of Seller that $220,523 of the Inventory Valuation Adjustment should be included in the calculation of Working Capital as part of the Purchase Price.

My determination is summarized as follows:

---

[38] Buyer's Rebuttal Submission, pg. 2
[39] Buyer's Response to the Settlement Accountants' First Information Requests, pg. 2
[40] *Id*
[41] Buyer's Opening Submission, pg. 4
[42] Buyer's Rebuttal Submission, pg. 2
[43] Buyer's Opening Submission, pg. 2
[44] Buyer's Rebuttal Submission, pg. 2
[45] Buyer's Response to the Settlement Accountants' First Information Requests, pg. 2
[46] Buyer's Response to the Settlement Accountants' First Information Requests, pg. 4
[47] Buyer's Report originally proposed reserves of $165,155, of which Seller accepted $63,011 in the Company's Report, resulting a net disputed amount of $102,144.
[48] Buyer's Opening Submission, pg. 3
[49] This additional amount is discussed as part of Disputed Item 3 (*See* page 14).
[50] Buyer's Opening Submission, pg. 2
[51] Buyer's Response to the Settlement Accountants' First Information Requests, pgs. 3 – 4



| Disputed Item #1: Inventory Valuation | | | |
|---|---|---|---|
| **Disputed Item** | Disputed Amount | In Favor of Seller | In Favor of Buyer |
| **1.a. / 1.b.** Eval / Demo Suppressors & Suppressors for Sale | $(170,571) | $(128,032) | $ (42,539) |
| **1.c.** Stillwood Ammunition | (102,144) | (92,490) | (9,654) |
| **Settlement Accountants' Determination** | $(272,716) | $(220,523) | $ (52,193) |

In making my determination, I first considered the requirements of Section 1.4 of the Contract which states that the Closing Date Balance Sheet and Buyer's Report will include a calculation of "actual Working Capital," which is included in determining the Purchase Price. "Working Capital" is defined in the Contract, in relevant part, as:

*...the remainder, if any, of (i) the Company's accounts receivable and inventory, minus (ii) the Company's accounts payable, in each case calculated on a basis consistent with the methodologies used for the calculation of working capital as of December 31, 2016 as set forth on Schedule 10.27"*[52]

Additionally, I observed that Section 3.8(d) of the Contract states that "*Except as otherwise set forth in Schedule 3.8(d), the Company's Inventory is valued on the Company's books of account in accordance with GAAP (on an average cost basis) at the lower of cost or market, and the value of obsolete materials, materials below standard quality, and slow-moving materials have been written down in accordance with GAAP."*[53]

As such, I found that Working Capital, which includes Inventory, is required to be calculated:
        (1) including only the Company's accounts receivable and inventory minus accounts payable
        (2) in a manner consistent with the methodologies applied as of December 31, 2016, and;
        (3) in accordance with GAAP, with inventory recorded at the lower of cost or market.

Therefore, I evaluated whether the Disputed Item met the above criteria as follows:

**Step 1 – Includes only Accounts Receivable, Inventory and Accounts Payable**
The Inventory Valuation Adjustment relates to the accounting for inventory including inventory reserves, which are presented net within inventory. The definition of Working Capital includes inventory. As such, I found that the Inventory Valuation Adjustment is included in the definition of Working Capital and therefore meets the first criteria of the Contract, above.

**Step 2 – Consistent with methodologies as applied at December 31, 2016**
I then evaluated whether the Inventory Valuation Adjustment met the next part of the definition of Working Capital (i.e., Part 2 per the Working Capital requirements above). In making my evaluation of whether this criterion was met, I first considered what methodologies were applied by the Company in the calculation of the inventory reserves as of December 31, 2016. While Seller states that the Company did not have formal documented accounting policies for measurement of inventory, they assert the Company always listed items in inventory at the lower of cost or market.[54] Further, Seller indicates that the Company did not historically include a reserve for damaged or used inventory because damaged inventory could not be sold and was not kept on the books, and used inventory was sold to employees above cost.[55] I observed that the Company's inventory recorded as of December 31, 2016 did not include reserves, which is consistent with its stated historical

---

[52] Contract, §10.27
[53] Schedule 3.8(d) to the Contract did not note any exceptions to Section 3.8 to the Contract.
[54] Seller's Response to the Settlement Accountants' First Information Requests, pg. 2
[55] *Id.*



practice, and the inventory included in the Company's calculation of Working Capital included in the Company's Report, also did not include reserves. Therefore, I found that Company followed its methodologies as of December 31, 2016 in its preparation of Closing Date inventory included in the Company's Report.

### Step 3 – In accordance with GAAP at the lower of cost market

In order to evaluate whether the Company's December 31, 2016 methodology (applied as of the Closing Date) for measuring inventory was consistent with GAAP, I first considered the applicable GAAP guidance with respect to recognition and measurement of inventory reserves. I found that ASC 330 *Inventory* is the relevant guidance. In particular, ASC 330-10-35-1[56] states that "*A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as their cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.*"[57]

"Market" is defined in GAAP as "*current replacement cost (by purchase or reproduction, as the case may be) provided that it meets both of the following conditions: (a) market shall not exceed the net realizable value, and (b) market shall not be less than the net realizable value reduced by an allowance for an approximately normal profit margin.*"[58] For purposes of my review of the Disputing Parties' positions in this determination letter, I have considered "net realizable value" to be the appropriate measure of utility of inventory per ASC 330-10-35-4.[59] Further, I considered estimated sales value to be the appropriate measure of net realizable value given that neither party indicated that current replacement cost was lower than the estimated sales value of inventory.

Per the above, I found that the relevant GAAP guidance that inventory is to be measured at the net realizable value when evidence exists that the net realizable value of inventory is lower than cost.

I then evaluated whether the measurement of each category of inventory included in the Inventory Valuation Adjustment as of the Closing Date was at net realizable value given the evidence presented to me, as required by ASC 330 above. My evaluation for each category of inventory is discussed below.

*Eval/Demo Suppressors (1.a.) & Suppressors for Sale (1.b.)*

For Eval/ Demo Suppressors and Suppressors for Sale inventory, I considered the analyses put forward by Seller's expert and Buyer supporting their respective positions as to the valuation of inventory in accordance with GAAP. In its Opening Submission, Seller's expert provided an analysis of historical sales data, in which Seller's expert opined that the sales evidence for items tested demonstrated that those items have a greater net realizable value than their cost and a reduction in value is not warranted.[60] While the analysis by Seller's expert demonstrated that historical sales of items tested were predominantly above cost,[61] I found that this analysis had several limitations, including:

1.  The historical data reviewed by Seller's expert likely would have related to inventory items that were not used or worn, which is not comparable to the condition of items Buyer is seeking a reserve for;

[56] ASC 330-10-35-1 was amended by ASU 2015-11 (July 2015), which was effective for private companies in fiscal years beginning after December 15, 2016 and interim periods within fiscal years beginning after December 15, 2017. As the Closing Date was within a fiscal year beginning before December 15, 2017, I have referred to the version ASC 330 that was applicable prior to ASU 2015-11.
[57] ASC 330-10-35-1
[58] *See* "Market" in FASB Master Glossary
[59] ASC 330-10-35-4 states "Replacement or reproduction prices would not be an appropriate measure of utility when the estimated sales value, reduced by costs of completion and disposal, is lower, in which case the realizable value so determined more appropriately measures utility."
[60] Seller's Opening Submission, pgs. 9 - 10
[61] For the 25% reserve population, 312 of 313 items tested sold above cost. For the 50% reserve population, 23 of 23 items tested sold above cost. For the garage sale inventory population, 165 of 184 items sold above cost.



2. Seller was only provided with sales information for 520 inventory items,[62] which only comprises approximately 38% of the items Buyer placed a reserve on;

3. Seller's expert did not analyze the age of the inventory for which Buyer seeks a reserve for, although this information appears to have been available to Seller's expert.[63]

For these reasons, I found that Seller's expert's analysis did not sufficiently support its assertion that the net realizable value of this inventory was at or above cost. Further, I observed that a portion of the garage sale inventory sold below cost in Seller's expert's analysis[64], and that the age of the inventory in Buyer's reserve population appeared to be significantly older than inventory for which no reserve was proposed by Buyer.[65] These factors were indicators that the net realizable value of this inventory may be lower than its cost as of the Closing Date.

Accordingly, I next considered Buyer's position that the net realizable value of inventory included in the Inventory Valuation Adjustment was less than cost as of the Closing Date. I found that while Buyer appropriately considered whether the carrying value of used inventory was impaired as of Closing Date based on physical inspection, I did not find that Buyer provided compelling evidence how the reserve percentages historically applied by Smith & Wesson were applicable to the inventory being valued.[66]

However, I found that Buyer's analysis of subsequent losses[67] on this inventory shortly after the Closing Date provided an indication of its net realizable value as of the Closing Date, and information known or knowable[68] prior to the date Buyer's Report was prepared should be considered when measuring inventory as of the Closing Date.[69] As such, I considered the subsequent losses on inventory to be a reasonable measure of the required reserves on this inventory to the extent that the loss had occurred or was knowable prior to October 20, 2017 (the date Buyer's Report was prepared). I found that Buyer provided sufficient evidence to support that $42,539 in additional reserves should be included in order to comply with GAAP. This amount is comprised of:[70]

[62] Seller indicated in its Opening Submission that it was provided sales information for 313 items that were reduced by 25% (pg. 9), 23 items that were reduced by 50% (pg. 10), and 184 items that were reduced to garage sale prices (pg. 10) (313 + 23 + 184 = 520).
[63] Seller's Response to Settlement Accountants' First Information Requests, pg. 3
[64] 9 items out of 184 items tested sold below cost (approximately 5%), and 10 items sold at cost (approximately 5%).
[65] Seller states on page 3 of its Response to the Settlement Accountants' First Information Requests that "If it is a Gemtech item, the serial number is a three-digit code followed by five or six additional digits (i.e. S10-40243A, or S15-90321). The year the silencer was manufactured by Gemtech is the number immediately preceding [sic] the "S" in the serial number." As such, I reviewed the age of the inventory that Buyer had proposed reserves for and the age of the inventory that Buyer did not propose reserves for. Excluding inventory that did not have the serial number syntax described above by Gemtech, I found that 97% of the inventory in the non-reserved population was manufactured in the last five years (i.e., 2013-2017), but only 66% of the reserved inventory was manufactured within the last five years. As the reserved population of inventory appeared to be older than the non-reserved population, I found that this was an indicator that the reserved inventory was not selling as quickly as other inventory and therefore may have quality issues.
[66] Buyer used its internal reserve percentages of 25%, 50% and "garage sale" to establish reserves on this inventory.
[67] This analysis was provided in Schedule 3 to Buyer's Rebuttal Submission, in which Buyer calculated a total of $165,185 in additional losses incurred subsequent to the Closing Date.
[68] I considered a loss on destroyed items to be known or knowable on the date they were destroyed. For "garage sale" items sold at a loss, I found that the loss was known or knowable on the date of Buyer's Report as the Company's former compliance auditor and other engineering employees were able to estimate sales prices on an item-by-item basis in the file "Request 8(c) Copy of Garage Sale 10-18-17 COPY for WC.xlsx", and I also noted that the majority of these items that were ultimately sold (as included in the file "Request 4 (a) Copy of Gemtech Inventory Working Capital – GT File v4.xlsx") sold for the price that was estimated by the Company's employees in "Request 8(c) Copy of Garage Sale 10-18-17 COPY for WC.xlsx." Therefore, I found that the prices of the garage sale inventory were reasonably estimable prior to the date of Buyer's Report.
[69] Additionally, GAAP requires the recognition of the effects of subsequent events to the extent they provide additional evidence about conditions that existed at the date of the balance sheet (See ASC 855-10-25-1).
[70] Amounts shown below only include losses to the extent Seller did not accept reserve adjustments on these items. For example, Buyer identified $49,367 in losses related to destroyed items prior to October 20, 2017, but Seller had accepted reserve adjustments for items with losses of $33,278. As such, I only included additional losses of $16,089 related to items for which Seller did not accept adjustments.



1. Losses related to inventory destroyed prior to October 20, 2017:  $16,089
2. Losses related to items with disputed ownership by Gemtech:[71]   $ 9,633
3. Losses for garage sale items:                                     $16,817
   **Total**                                                         **$42,539**

*Stillwood Inventory*

As it relates to the Stillwood Inventory, I considered whether Buyer's proposed adjustments totaling $102,144[72] to increase the reserve for this inventory as per the table below should be included in the calculation of Working Capital.

| Stillwood Inventory Summary | | | | | |
|---|---|---|---|---|---|
| Stillwood Inventory | Seller's Position | Buyer's Position | Disputed Amount | Seller Accepted Adjustment | Remaining Disputed Amount |
| Stillwood Brass | $ 100,315 | $  - | $ (100,315) | $  - | $ (100,315) |
| Stillwood Packaging | 150 | - | (150) | - | (150) |
| Stillwood Powder | 277 | - | (277) | - | (277) |
| Stillwood Projectiles | 1,402 | - | (1,402) | - | (1,402) |
| FGI @ Stillwood 187 gr 300 BLK | 98,863 | 35,852 | (63,011) | (63,011) | - |
| **Total** | $ 201,007 | $ 35,852 | $ (165,155) | $ (63,011) | $ (102,144) |

While Buyer argues that it does not expect to get any benefit from the remaining Stillwood Inventory (and therefore valued Stillwood Brass, Packaging, Powder and Projectiles at $0), Buyer also presents evidence in its Rebuttal Submission to support a value of $40,600 for Stillwood Brass. Buyer's arguments, taken together, allege two disputed issues: 1) the quantity of inventory, and 2) the estimated value per unit of inventory. These two issues are addressed separately below.

I first evaluated the evidence presented to me supporting the remaining quantity of brass on hand at Stillwood as of the Closing Date. Seller asserts that there were 418,249 pieces of brass in remaining inventory,[73] however, I observed that Seller's calculation included an estimate (e.g., 150,000 "Brass Pieces Shipped to Stillwood (Estimated)"[74]). Conversely, I found the amount of pieces of brass on hand as of the Closing Date as presented by Buyer of 378,000[75] pieces to be more reliable because: (1) it was based on a third party source which held the inventory; and (2) the third party indicated the quantities were "exact".[76]

I then considered the net realizable value per unit as estimated by both Buyer and Seller. I observed that Buyer's estimate is based on a value per unit provided by Mr. Kratky which he indicated to be an "*[estimation] and open to*

---

[71] Items with disputed ownership includes items described as "Part of the GSL dispute. Sent to Latka", "Shipped to Ron Martinez off of Gemini book" and "Actually Owed by Kel Whalen" (See "Reserve v. Losses Incurred" tab included in the file "Request 4 (a) Copy of Gemtech Inventory Working Capital – GT File v4.xlsx"). I found that it was reasonable that these losses would have been known or knowable as of the date of Buyer's Report.

[72] Buyer also proposed an additional upward adjustment of $40,600 to Stillwood Brass in its January 18th Letter, which is addressed in Disputed Item #3 of this determination letter (*See* page 14).

[73] Seller's Opening Submission, pg. 12

[74] *Id*.

[75] 378,000 is the sum of 322,000 units of 300BLK Brass Casings plus 56,000 units of 300BLK 110 TAC-TX AMMO.

[76] Schedule 1 to Buyer's Rebuttal Submission. Mr. Kratky's email is dated November 13, 2017.



*interpretation*"[77] and that Buyer did not provide any other analysis or support for this value. In the absence of any compelling evidence supporting the net realizable value of Stillwood Brass presented by Buyer, I did not find the value assigned by Mr. Kratky to be reliable, and therefore considered Seller's value per unit to be the more reliable indicator of net realizable value. Seller's Opening Submission indicates that the estimated value of Stillwood Brass is $100,315, which equates to a value of $0.24 per unit (rounded) based on a quantity of 418,249 units as of the Closing Date.[78] Accordingly, I found in favor of Seller in the amount of $90,662 based on the 378,000 pieces on hand as of the Closing Date multiplied by $0.24 per unit and I ruled in favor of Buyer for the remaining $9,654 calculated based on 40,249 units[79] (the additional units included in Seller's calculation) multiplied by $0.24 price per unit.

As it relates to Stillwood Packaging, Powder and Projectiles, I found that neither party articulated a position as to why the net realizable value of this inventory was less then cost. As such, I did not find sufficient evidence to support Buyer's adjustment to this inventory of $1,829, and have ruled in favor of Seller for this portion of the Stillwood Inventory.

## 2.  Inventory Existence: Parts & Pieces Inventory

This Disputed Item relates to whether an adjustment to the carrying value of inventory listed in Exhibit 10 to Seller's Opening Submission ("Parts & Pieces Inventory") in the amount of $168,946 should be included in the calculation of Working Capital (the "Parts & Pieces Adjustment"). Buyer asserts that this inventory should be excluded from the calculation of Working Capital, while Seller asserts it should be included. The positions of each Disputing Party are summarized below:

### *Seller's Position*

Seller argues that the Buyer's Parts & Pieces Adjustment should not be included in the determination of Working Capital, in part, based on the following:

- o  Seller states that the Company's historical practice from 2016 through the Closing Date was to account for Parts & Pieces Inventory purchases by "placing them in the physical inventory counts and then costing them when they were used."[80]
- o  Seller asserts in its Opening Submission that Parts & Pieces Inventory was located offsite, and was left out of the physical inventory count performed by Buyer.[81] Seller also states that Buyer provided no proof that these items were previously expensed, which refutes Buyer's statement that "Seller has represented that these parts have no future value."[82]
- o  Seller subsequently stated in its response to the Settlement Accountant's First Information Requests that "these items were likely ran through the P/L accounts," but they are inventory items that have value.[83] Seller also asserts that the Parts & Pieces Inventory are new inventory which has historically been used in warranty repairs. Seller states that Parts & Pieces Inventory cannot be used inventory as there would be a large liability due to the potential for exploding silencers.[84]

---

[77] *Id*
[78] Seller's Opening Submission, pg. 12, Ex. 9 to Seller's Opening Submission
[79] Calculated as 418,249 units (from Seller's calculation) less 378,000 units (as indicated by Mr. Kratky in Schedule 1 to Buyer's Rebuttal Submission).
[80] Seller's Response to the Settlement' Accountants' First Information Requests, pg. 6
[81] Seller's Opening Submission, pg. 12
[82] *Id*
[83] Seller's Response to the Settlement Accountants' First Information Requests, pg. 6
[84] Seller's Response to the Settlement Accountants' Second Information Requests, pg. 3

**Grant Thornton**

Smith & Wesson Corporation
Gemini Technologies Incorporated
February 4, 2019
Page 13 of 18

*Buyer's Position*

Buyer argues that the Parts & Pieces Adjustment should be included in the determination of Working Capital, in part, based on the following:

- o Seller expensed $168,946 in Parts & Pieces Inventory prior to the Closing Date, therefore representing that these parts have no future value. If these parts did have future value, they would have been capitalized in inventory and included in the beginning working capital inventory calculation.[85]
- o Based on communication with Mark Thompson (former Gemtech CFO), Buyer believes that Parts & Pieces Inventory was used in repairs and research and development. Therefore, these items were not used in the assembly of finished goods or available for part sales.[86] Buyer further states that these items continue to be used in the R&D process, and will never be used in the manufacturing process, as they are heavily used.[87]

*Settlement Accountants' Determination*

I find in favor of Buyer that the Parts & Pieces Adjustment totaling $168,946 should be included in the calculation of Working Capital as part of the Purchase Price.

As previously explained on page 8 of this determination, I found that Working Capital, which includes Inventory, is required to be calculated:
- (1) including only the Company's accounts receivable and inventory minus accounts payable
- (2) in a manner consistent with the methodologies applied as of December 31, 2016, and;
- (3) in accordance with GAAP, with inventory recorded at the lower of cost or market.

Accordingly, I evaluated the Parts & Pieces Adjustment in the context of the above criteria.

**Step 1 – Includes only Accounts Receivable, Inventory and Accounts Payable**
The Parts & Pieces Adjustment relates to the recognition of inventory. The definition of Working Capital includes both accounts receivable and inventory. As such, I found that the Parts & Pieces Adjustment, to the extent it meets the GAAP definition of inventory, is included in the definition of Working Capital and therefore meets the first criteria to be included as Working Capital.

**Step 2 – Consistent with methodologies as applied at December 31, 2016**

I then evaluated whether the Parts & Pieces Adjustment met the next part of the definition of Working Capital (i.e., Part 2 per the Working Capital requirements above). In making my evaluation of whether this criterion was met, I first considered what methodologies were applied by the Company in the calculation of inventory as of December 31, 2016. I found that Seller's description of the Company's past practice of accounting for Parts & Pieces purchases by "placing them in the physical inventory counts and then costing them when they were used"[88] was not clear as to whether the Company kept Parts & Pieces Inventory on its balance sheet, or if it expensed these items. Seller also indicated that the items included in the Parts & Pieces Adjustment "were likely ran through the P&L accounts"[89] prior to the Closing Date, and did not indicate that this inventory was included in the inventory accounts as of December 31, 2016. Based on the explanations provided by Seller, I

---

[85] Buyer's Opening Submission, pg. 4
[86] Buyer's Response to the Settlement Accountants' First Information Requests, pg. 4
[87] Buyer's Response to the Settlement Accountants' Second Information Requests, pg. 3
[88] Seller's Response to the Settlement Accountants' First Information Requests, pg. 6
[89] *Id*



found that Seller did not provide compelling evidence that the Company's past practice was to account for Parts & Pieces Inventory in the inventory accounts on its balance sheet.

**Step 3 – In accordance with GAAP at the lower of cost market**

In order to evaluate whether the Company's methodology for measuring Parts & Pieces Inventory as of the Closing Date was consistent with GAAP, I considered the applicable GAAP guidance with respect to recognition and measurement of inventory and research and development expense.[90]

While Seller asserts that the Parts & Pieces Inventory was new inventory which is used in warranty repairs,[91] I found that this statement was inconsistent with other evidence presented to me including: (1) Seller's description of these items in the Company's Report, which describes these items as "R&D Parts Inventory" and "engineering R&D parts inventory";[92] (2)Mark Thompson's (former CFO of the Company) statement that this inventory was previously used in the R&D process; and (3) these items had not been set up in Quickbooks, and therefore likely had been expensed when it was used in the R&D process.[93]  I also found that after the Closing Date, Buyer determined that these items were used inventory that was not saleable based on a physical inspection.[94]

Based on the above, I found that the evidence presented supports that the Parts & Pieces Adjustment related to used parts utilized in the research and development process and therefore should not be included in inventory. Accordingly, since the Parts & Pieces Adjustment did not meet Step 2 or 3 above, I found in favor of Buyer that the Parts & Pieces Adjustment of $168,946 should be included in Working Capital (i.e., that the Parts & Pieces Inventory should not be recognized in Working Capital).

**3.  January 18th Letter Adjustment: Net Accounts Receivable, Suppressors for Sale, Stillwood Ammunition, Accessories, Eagle 22 LR Ammunition**

This Disputed Item relates to whether additional adjustments of $146,726 that were asserted by Buyer in a letter dated January 18, 2018 (the "January 18th Letter Adjustment") should be included in the calculation of Working Capital. Buyer argues that these additional adjustments should be admissible pursuant to the Contract, and Seller argues that these adjustments were submitted after the due date prescribed in Section 1.4 of the Contract and should be excluded from the Disputed Amounts and therefore excluded as an adjustment to Working Capital. The positions of each Disputing Party are summarized below:

---

[90] ASC 330 (*Inventory*) requires the recognition of inventory at the lower of cost or market on the balance sheet (discussed on page 9 of this letter), while ASC 730 (*Research & Development*) requires that research and development costs be charged to expense when incurred (*See* ASC 730-10-25-1).
[91] Seller's Response to the Settlement Accountants' Second Information Requests, pg. 3
[92] Appendix C to Seller's Opening Submission, pgs. 11 and 39 – 45.
[93] Buyer's Rebuttal Submission, pg. 4
[94] Buyer's Response to the Settlement Accountants' Second Information Requests, pgs. 2 – 3, Buyer's Response to the Settlement Accountants' First Information Requests, pg. 2

| Disputed Item #3: January 18th Letter Adjustment | | | | |
|---|---|---|---|---|
| **Disputed Item** | **Seller's Position** | **Buyer's Jan. 2nd Position** | **Buyers' Jan. 18th Position** | **Additional Disputed Amount** |
| | [a] | [b] | [c] | [d]=[c]-[b] |
| **3.a.** Suppressors for Sale | $1,094,665 | $ 960,633 | $ 996,909 | $ 36,277 |
| **3.b.** Stillwood Ammunition | 137,996 | 35,852 | 76,452 | 40,600 |
| **3.c.** Eagle 22 LR Ammunition | - | - | 3,657 | 3,657 |
| **3.d.** Accessories | 879,156 | 879,156 | 889,656 | 10,500 |
| **3.e.** Net Accounts Receivable | 1,075,488 | 1,075,488 | 837,729 | (237,759) |
| **Total** | $3,187,305 | $2,951,129 | $2,804,403 | $ (146,726) |

**Notes:**
Negative amounts presented under Disputed Amount represent the amount of Buyer's proposed decrease to Working Capital. Positive amounts presented under Disputed Amount represent the amount of Buyer's proposed increase to Working Capital.

## *Seller's Position*

Seller argues that the January 18th Letter Adjustment should not be included in the determination of Working Capital, in part, based on the following:

- Seller asserts that the Contract includes a contractually agreed upon time frame for due dates of both Buyer's and Company's Reports. Pursuant to Section 1.4 of the Contract, Buyer should have delivered Buyer's Report on October 6, 2017, but was granted an extension to October 20, 2017. Subsequently, Seller delivered Company's Report on December 4, 2017, and Buyer delivered its objections to Company's Report on January 2, 2018. Nowhere in the Contract does it state that Buyer can submit a second Buyer's Report after the 60-day period.[95]
- Furthermore, many of the adjustments are based on "post-closing events and decisions that occurred after the fact and are not relevant to the Working Capital calculation as of the Closing Date."[96]

## *Buyer's Position*

Buyer argues that the January 18th Letter Adjustment should be included in the determination of Working Capital, in part, based on the following:

- Buyer asserts that there is nothing in the Contract that explicitly precludes additional adjustments to Working Capital after the submission of Buyer's Report, and that the parties could have easily added such a provision but chose not to do so.[97] Moreover, the facts underlying the additional adjustments were not known at the time Buyer submitted Buyer's Report due to the fact that Seller's books and records "were in total disarray."[98]
- Buyer timely submitted Buyer's Report within the timeframe specified by the APA, and the APA does not preclude the parties from supplementing its timely filed working capital calculations.[99]

---

[95] Seller's Opening Submission, pg. 12
[96] Seller's Rebuttal Submission, pg. 5
[97] Buyer's Opening Submission, pg. 5
[98] Buyer's Opening Submission, pg. 5 – 6, Buyer's Rebuttal Submission, pg. 4
[99] Buyer's Rebuttal Submission, pg. 4



*Settlement Accountants' Determination*

I find in favor of Seller that the January 18th Letter Adjustment of $146,726 should not be included in the calculation of Working Capital as part of the Purchase Price. In making this determination, I considered Section 1.4 of the Contract, which states, in part

*"As soon as practical (and in no event later than 60 days after the Closing Date), Buyer shall cause to be prepared and delivered to the Company...(ii) a written report (the "Buyer's Report") that includes a calculation of the actual Working Capital and, on the basis of the foregoing, the Purchase Price, including such schedules and data as may be appropriate to support such calculations."*

I found that Sections 1.4 and 1.5 of the Contract, which are consistent with other purchase agreements I have reviewed, are clear that the Buyer's Report, which includes its calculation of Working Capital, is to be delivered by Buyer to the Company within 60 days after the Closing Date (which the parties agreed to extend to October 20, 2017) and that after submission of the Buyer's Report, the Buyer is limited to objecting to the calculations included in the Company's Report. In addition, I observed that Buyer objected to the Company's Report on January 2, 2018 and did not provide any further adjustments to Buyer's calculation of Working Capital at that time. Accordingly, I did not find a basis in the Contract for the Buyer to provide further adjustments to its calculation of Working Capital after submission of the Buyer's Report (and even if the Contract provided for such, Buyer failed to make such adjustments on January 2, 2018, which was the latest opportunity for Buyer to provide objections to Company's Report).

## IV.  CONCLUSION

The amounts below summarize the financial impact of my findings described throughout this report.

| Disputed Item | Disputed Amount | Settlement Accountants' Determination: | |
|---|---|---|---|
| | | In Favor of Seller | In Favor of Buyer |
| (1) Inventory Valuation Adjustment | $  (272,716) | $  (220,523) | $  (52,193) |
| (2) Parts & Pieces Adjustment | (168,946) | - | (168,946) |
| **Disputed Amount** | **$  (441,661)** | **$  (220,523)** | **$  (221,139)** |
| (3) January 18th Letter Adjustment | (146,726) | (146,726) | - |
| **Additional Disputed Amount** | **$  (146,726)** | **$  (146,726)** | **$  -** |
| **Total of Disputed Amount and Additional Disputed Amount** | **$  (588,387)** | **$  (367,249)** | **$  (221,139)** |

**Notes:**
Negative amounts presented under Disputed Amount represent the amount of Buyer's proposed decrease to Working Capital.

Pursuant to Section 1.5(b) of the Contract, the costs and expenses of the services of the Settlement Accountants shall be paid by the Company if (i) the difference between (A) the Purchase Price resulting from the determinations of the Settlement Accountants, and (B) the Purchase Price resulting from the determinations set forth in the Company's Report, is greater than (ii) the difference between (A) the Purchase Price resulting from the determinations of the Settlement Accountants, and (B) the Purchase Price resulting from Buyer's calculations as set forth in the deliveries pursuant to Section 1.4 of the Contract; otherwise, such costs and expenses shall be paid by Buyer.

In determining the fee allocation between the Disputing Parties, I did not include Disputed Item #3 (the January 18th Letter Adjustment) in this calculation because Section 1.5(b) states that only the Purchase Price resulting from Company's Report and Buyer's calculations set forth in the deliveries pursuant to Section 1.4 of

**Grant Thornton**

the Contract (i.e., Buyer's Report) are to be used in the allocation of fees. As such, I calculated the fee allocation as follows:

| Settlement Accountants' Fee Allocation Per §1.5 of Contract | |
|---|---|
| (A) Purchase Price resulting from Settlement Accountants' Determination | $ 11,256,985 |
| (B.1) Purchase Price resulting from Company's Report | 11,478,124 |
| **(C) Difference between (A) and (B.1)** | **$      221,139** |
| | |
| (A) Purchase Price resulting from Settlement Accountants' Determination | $ 11,256,985 |
| (B.2) Purchase Price resulting from Buyer's calculations per §1.4 of Contract | 11,036,462 |
| **(D) Difference between (A) and (B.2)** | **$      220,523** |

**Notes:**
- Purchase Prices resulting from the Company's Report and Buyer's calculations were calculated by taking the excess Working Capital from the Company's Report (Appendix C to Seller's Opening Submission) and Buyer's Report (Appendix B to Seller's Opening Submission) over $1,689,000 plus $10,160,000, pursuant to §1.2 of the Contract.

- Item (A) includes 1) $10,160,000, **plus** 2) Accounts Receivable of $1,075,488, **plus** 3) Inventory of $2,959,559, **less** 4) Accounts Payable of $1,249,062 and **less** 5) $1,689,000.

Because the difference between the Purchase Price resulting from the determinations of the Settlement Accountants and the Purchase Price resulting from the determinations set forth in the Company's Report ("C" above) was greater than the difference between the Purchase Price resulting from the determinations of the Settlement Accountants, and  the Purchase Price resulting from Buyer's calculations as set forth in the deliveries pursuant to Section 1.4 of the Contract ("D" above), I found that the Settlement Accountants' fees of $66,815.28 are to be paid by the Company.

The Disputing Parties are each responsible for payment of half of the total fees and expenses to Grant Thornton, and will settle amongst themselves the allocation of fees and expenses based on the Settlement Accountants' determination.

This report is intended solely for the use of the addressed parties and may not be disseminated to any third party without Grant Thornton's or my prior written consent.

I appreciate the opportunity to work with you and to be of your service in the matter.

Sincerely,

*Charles Blank*

Charles Blank

Managing Director

Attachments:
Appendix A, Relevant Defined Terms

Smith & Wesson Corporation
Gemini Technologies Incorporated
February 4, 2019
Page 18 of 18

# Appendix A

### Relevant Defined Terms

**"Assets"** means all of the tangible and intangible assets attributable to or Used by the Company in the Business, except the Excluded Assets.[100]

**"Business"** means (i) the design, manufacturing, and sale of silencers and suppressors for firearms (but, for the avoidance of doubt, excluding integrally suppressed firearms), (ii) the design, manufacturing, and sale of silencer and suppressor accessories, and (iii) the sale of Company-branded ammunition.[101]

**"Closing Date Balance Sheet"** means a balance sheet for the Business and Assets acquired hereunder dated as of the Closing Date.[102]

**"GAAP"** means U.S. generally accepted accounting principles.[103]

**"Inventory"** means all goods, merchandise, and other personal property owned and held for sale, and all raw materials, works-in-process, materials, and supplies of every nature which contribute to the finished products of the Company in the ordinary course of its business, specifically excluding, however, damaged, defective, or otherwise unsaleable items.[104]

**"Purchase Price"** means the sum of (i) Ten Million One Hundred Sixty Thousand Dollars ($10,160,000), plus (ii) the excess, if any, of the Company's Working Capital as of the Closing Date over $1,689,000, minus (iii) the excess, if any, of $1,689,000 over the Company's Working Capital as of the Closing, subject to further adjustment as provided in Section 1.6, Section 7.3, and Section 8.4.[105]

 **"Working Capital"** means the remainder, if any, of (i) the Company's accounts receivable and inventory, minus (ii) the Company's accounts payable, in each case calculated on a basis consistent with the methodologies used for the calculation of working capital as of December 31, 2016 as set forth on Schedule 10.27.[106]

---

[100] Contract, §1.1(xii)
[101] Contract, §10.4
[102] Contract, §1.4
[103] Contract, §10.12
[104] Contract, §10.15
[105] Contract, §1.2
[106] Contract, §10.27