UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>SMITH & WESSON CORP., a Delaware corporation, and AMERICAN OUTDOOR BRANDS CORPORATION, a Nevada corporation,<br><br>                    Defendants.<br><br>SMITH & WESSON CORP., a Delaware corporation,<br><br>                    Counterclaimant,<br><br>v.<br><br>GEMINI TECHNOLOGIES, INCORPORATED, an Idaho Corporation; RONALD J. MARTINEZ, an individual; and PHILIP H. DATER, an individual,<br><br>                    Counterdefendants. | Case No. 1:18-cv-00035-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

This case involves a dispute regarding the rights, obligations, and liabilities of the parties arising out of the purchase by Defendants Smith & Wesson Corp. and American Outdoor Brands Corp. (collectively, "Smith & Wesson") of Plaintiff Gemini Technologies, Inc.'s ("Gemtech") assets. The parties entered into an Asset Purchase Agreement ("APA") on June 29, 2017. The Gemtech sale closed on August 7, 2017. Gemtech initiated this action against Smith & Wesson, raising multiple contract claims. Smith & Wesson denies those claims and filed a counterclaim for indemnification against Gemtech and its former principles, Ronald Martinez and Philip Dater.

Before the Court is Gemtech's motion for partial summary judgment (Dkt. 63) on its claim for breach of the parties' escrow agreement, as well as on each of Smith & Wesson's indemnity claims. (Dkt. 63.) Gemtech contends that Smith & Wesson does not have a valid basis in fact or law to contest Gemtech's claim for breach of the escrow agreement, because Gemtech's counterclaims were either resolved in arbitration or there are no facts to substantiate them. Accordingly, Gemtech seeks distribution of the 1.5 million dollars still held in escrow, with accrued statutory interest from January 2, 2018, to the present. Gemtech also filed a motion to strike, (Dkt. 77), objecting to statements

contained in the declarations of Christopher Scott and Deana McPherson filed by Smith & Wesson in opposition to the motion for partial summary judgment.[1]

After careful consideration of the record, the parties' briefing and supporting materials, and oral argument on the motions, the Court will deny Gemtech's motion for partial summary judgment and deny its motion to strike as moot. The Court finds that Gemtech failed to carry its burden regarding Smith & Wesson's counterclaims, which in turn precludes entry of judgment as a matter of law on Gemtech's claim for breach of the escrow agreement. The Court did not rely upon the statements in the declarations to which Gemtech objected. The reasons for the Court's decision are explained below.

## FACTS

Ronald Martinez and Philip Dater are the former principles of Gemtech, which designs and manufactures gun silencers. In early 2017, Smith & Wesson approached Martinez about purchasing Gemtech. The parties' negotiations culminated in the execution of an Asset Purchase Agreement on June 29, 2017. (Dkt. 63-6 at 8.) On the closing date of August 7, 2017, the parties executed an Escrow Agreement, a Trademark Assignment, and an Estimated Purchase Price Acknowledgment. The purchase price for

---

[1] Gemtech also moved to strike certain statements and characterizations made by Smith & Wesson in its statement of facts as speculative or giving rise to a false inference. Pl. Mem. at 2 – 6. (Dkt. 77-1.) In this regard, the motion is not well taken. A party may object to material cited to support or dispute a fact that cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). The arguments presented in Gemtech's brief do not comply with Rule 56, as all of the objections could be overcome at trial, present additional argument, and essentially go to the weight of the evidence. Moreover, the Court relied upon the timeline of events as evidenced by the parties' correspondence, the language of the agreements signed by the parties, and the documents submitted in support of and in opposition to the motion for partial summary judgment.

**MEMORANDUM DECISION AND ORDER - 3**

acquiring Gemtech's assets as set forth in the Estimated Purchase Price Acknowledgment was $11,395,284.25.

## 1. The APA[2]

Under the terms of the APA, at the Closing, Gemtech agreed to "sell, convey, assign, transfer, and deliver" to Smith & Wesson, and Smith & Wesson in turn agreed to "purchase, acquire, and accept delivery of, all assets and properties owned or Used by the Company," unless such assets were otherwise excluded. The assets sold included all accounts receivable, all accounts payable, inventories, supplies, proprietary knowledge, and all rights of the Company in and to all trademarks "Used in the Business…." APA § 1.1(a). In turn, Smith & Wesson "shall assume…all trade accounts payable…the Company's liabilities and other obligations arising subsequent to the Closing…." APA §1.1(c).

The APA contained a formula for arriving at the purchase price for Gemtech's assets, which included a "Working Capital" adjustment. APA § 1.2, <u>Payment for Assets</u>. The Working Capital adjustment provision provides:

> As consideration for the Assets being acquired by Buyer hereunder, Buyer shall pay to the Company, in the manner set forth in this Section 1.2, the sum of (i) Ten Million One Hundred Sixty Thousand Dollars ($10,160,000), plus (ii) the excess, if any, of the Company's Working Capital as of the Closing Date over $1,689,000, minus (iii) the excess, if any, of $1,689,000 over the Company's Working Capital as of the Closing, subject to further adjustment as provided in Section 1.6, Section 7.3, and Section 8.4 hereof (such sum, as so adjusted from time to time, is herein referred to as the "Purchase Price").

---

[2] The APA is in the record as Exhibit 1 to the Declaration of Ronald Martinez, at Docket 63-6.

**MEMORANDUM DECISION AND ORDER - 4**

APA § 1.2, <u>Payment for Assets</u>.

Because the Purchase Price involved a calculation of Working Capital, the APA included a formula for estimating the purchase price on the Closing date. Sections 1.3 and 1.4 of the APA contain the parties' agreement concerning the exchange of the Estimated Purchase Price, and Section 1.5 set forth the dispute resolution process related to the Estimated Purchase Price.

The first step in calculating the Estimated Purchase Price required the parties to "execute and deliver an estimated purchase price acknowledgement, in a form reasonably acceptable to Buyer and the Company, that sets forth a calculation of estimated Working Capital and, on the basis of the foregoing, a calculation of the estimated Purchase Price (the "Estimated Purchase Price")." APA § 1.3(a). Smith & Wesson then had sixty days from the Closing Date to prepare and deliver "(i) a balance sheet for the Business and Assets acquired hereunder dated as of the Closing Date (the "Closing Date Balance Sheet"), and (ii) a written report (the "Buyer's Report") that includes a calculation of the actual Working Capital and, on the basis of the foregoing, the Purchase Price…." APA § 1.4, <u>Closing Date Balance Sheet and Buyer's Report</u>.

Gemtech had thirty days to respond to the Buyer's Report, and could either "advise Buyer…that the Company's Accountants (i) agree with Buyer's calculations in the Buyer's Report, or (ii) deem that one or more adjustments are required…." APA § 1.5(a), <u>Disputes</u>.

If the parties could not resolve their disagreements within 30 days after the date of the Company's report, the parties were required to refer the matter to an independent certified public accountant selected by mutual agreement, and the APA provided that "the determination of the Settlement Accountants shall be final and shall not be subject to further review, challenge, or adjustment absent fraud." *Id.*

Article III of the APA contained Gemtech's warranties and representations. Pursuant to APA § 3.8, Gemtech represented it "has delivered to Buyer true and complete copies of unaudited Financial Statements" for calendar years ending in 2016, 2015, and 2014, as well as certain "unaudited Financial Statements" for the five months up through May 31, 2017. APA § 3.8(a). Gemtech further represented that: "All of such Company Financial Statements present fairly the financial condition and results of operations of the Company for the dates or periods indicated thereon." *Id.* The APA includes also provisions related to Gemtech's accounts receivable and inventory. APA Schedule 3.8(c); APA § 3.8(d).

The APA contemplated that the sale included Gemtech's intangible rights, including all trade names, trademarks, or service marks "owned, Used, licensed, or controlled by the Company and all goodwill associated therewith." APA § 3.15, Intangible Rights.

To effectuate the provisions of the APA, Smith & Wesson was granted access to information and properties from the date of the Agreement through the Closing, which access included access to all files, records, data, and information "for the purpose of conducting an investigation of the Company's financial condition, corporate status,

MEMORANDUM DECISION AND ORDER  - 6

operations, prospects, business, and Properties." APA § 5.1, <u>Buyer's Access to Information and Properties</u>.

Article VII set forth certain Post-Closing obligations, including a Post-Closing Indemnity provision. APA § 7.3(a). According to the Indemnity provision, Gemtech agreed to "indemnify and hold harmless Buyer" from any and all "Damages arising out of, resulting from, or in any way related to" a breach of or inaccuracies in any representations made by Gemtech. APA § 7.3(a), <u>Post-Closing Indemnity</u>

Section 9.1(d) set forth the procedure for making an indemnity claim. The procedure required the party seeking indemnification to "notify in writing the Indemnifying Party of such claim or demand stating with reasonable specificity the circumstances of the Indemnified Party's claim for indemnification." APA § 9.1(d).

The Escrow Agreement required Smith & Wesson to deposit funds held in a segregated escrow account "to be held by Escrow Agent for the purpose of indemnifications that may become due to Buyer" pursuant to the APA. Escrow Agreement, Background, Section A. (Dkt. 63-8 at 2.) Washington Trust Bank served as the escrow agent for the deposit and disbursement of funds pursuant to the terms of the APA and the Escrow Agreement.

The Escrow Period continued up through August 7, 2019, unless earlier terminated pursuant to the Escrow Agreement. Escrow Agreement § 1. <u>Definitions</u>. The Escrow Agreement included a procedure for making a claim for indemnity. Section 6 of the Escrow Agreement allowed for Smith & Wesson to make a written demand during the escrow period with a reasonably detailed description of the claim and the basis therefore,

**MEMORANDUM DECISION AND ORDER - 7**

as well as the amount, if known, asserted by Smith & Wesson for the claim. Escrow Agreement § 6(a). Gemtech next had 10 calendar days to respond.

If Gemtech objected to the Claim Notice within 10 calendar days, and delivered a written "Claim Response," the Escrow Agent could release to Smith & Wesson all amounts except for the amounts contested. Escrow Agreement § 6(c).

## 2. The Parties' Dispute

Smith & Wesson submitted its "Buyer's Report" to Gemtech on October 20, 2017, pursuant to APA § 1.5(a). Martinez Decl., Ex. 8 (Dkt. 63-13.) The Buyer's Report demanded a purchase price adjustment in Smith & Wesson's favor in the amount of $358,821.58, based upon adjustments to accounts receivables, bad debts, inventory, and accounts payable. (Dkt. 63-13 at 2.) Gemtech disputed the calculation of "Working Capital" in the Buyer's Report, and submitted its Seller's Report on December 4, 2017. Martinez Decl., Ex. 9. (Dkt. 63-14.) Gemtech demanded a purchase price adjustment in its favor in the amount of $82,839.61, and detailed its own accounting of adjustments to inventory, accounts receivables, bad debts, and accounts payable. On January 2, 2018, Smith & Wesson sent its response to Gemtech's Working Capital notice and objections. Martinez Decl., Ex. 5. Smith & Wesson's letter simply stated it objected to Gemtech's calculations, but did not provide further exp0lanation or analysis.

On January 18, 2018, Smith & Wesson submitted a supplemental Buyer's Report, demanding a revised purchase adjustment in its favor in the amount of $505,547.56. Martinez Decl. Ex. 10. The letter outlines the valuation of certain ammunition in

**MEMORANDUM DECISION AND ORDER - 8**

inventory; physical inventory counts; R&D valuations; and other adjustments to accounts receivables and inventory.

On August 14, 2018, the Working Capital dispute was submitted to Grant Thornton, a certified public accounting firm, for arbitration. Martinez Decl. Ex. 11. On February 4, 2019, Grant Thornton issued a written determination settling the parties' dispute regarding the Working Capital calculation, and reduced the total Purchase Price by $138,299.25 in Smith & Wesson's favor. Martinez Decl. Ex. 11. Further, Grant Thornton's determination expressly excluded consideration of Smith & Wesson's claims and calculations included in the January 18, 2018 supplemental Buyer's Report, on the grounds that the APA did not allow for untimely submitted claims as part of the Working Capital dispute resolution process. Neither party sought review of the Grant Thornton determination.

Meanwhile, Smith & Wesson had submitted claim notices to Washington Trust Bank, the escrow holder, which were copied to Gemtech. The first claim notice was dated December 22, 2017, referencing APA § 7.3(a)(i) and (ii), claiming $150,000 in invalid accounts receivables; misappropriated cash in excess of $40,000, and in a second amount to be determined; unknown amounts representing duplicate shipments overstating Gemtech sales, profitability, and accounts receivables; unknown amounts regarding other irregular transactions; a claim that Gemtech misrepresented the status of a trademark it allegedly used for doing business in the EU (the EU Mark); and demanding a Working Capital adjustment of $358,821 to the extent the "underlying transactions constitute

breaches of or inaccuracies in various representations and warranties." Martinez Decl. Ex. 4.

Gemtech responded to the December 22, 2017 claim notice the same day, objecting to Smith & Wesson's instructions to Washington Trust Bank that it withhold the remaining $1,500,000.00 held in trust. Gemtech contended in its response letter that Smith & Wesson: failed to provide a reasonably detailed description of certain claims; should have discovered these issues earlier; and that the claim for Working Capital adjustment is duplicative of the issue submitted to the arbitrator. Gemtech further asserted the claims were not yet ripe. Martinez Decl. Ex. 6, 7.

Additional claim notices from Smith & Wesson ensued on February 27, 2018; October 16, 2018; February 11, 2019; March 12, 2019; and August 6, 2019. McPherson Decl., Exs. 3, 4, 5, 6, and 7. (Dkt. 71-2.)

Smith & Wesson also pursued international patent litigation related to the EU Mark in the spring of 2019. Smith & Wesson claimed it learned in January of 2019 that Law Enforcement International (LEI) had registered the EU Mark and was using it internationally to market Gemtech products. On March 8, 2019, Smith & Wesson submitted an application to the EUIPO to cancel the EU Mark owned by LEI. Felton Decl. ¶ 7. (Dkt. 63-3.) Smith & Wesson prevailed in the international patent litigation, and the EUIPO revoked the Gemtech mark owned by LEI. Felton Decl., Ex. 1.

In the claim letters and in its counterclaim in this lawsuit, Smith & Wesson asserts it is entitled to indemnification pursuant to the APA for: (1) unpaid taxes, fees, and penalties owed to the state of Oregon; (2) uncollectible accounts receivables; (3)

**MEMORANDUM DECISION AND ORDER  - 10**

inaccurate inventory valuations; (4) pre-acquisition liabilities and obligations; and (5)

inaccurate representations and warranties regarding intellectual property rights related to

the GEMTECH trademark. Smith & Wesson claims in excess of $2,250,000.00 in

damages, and has instructed the escrow holder not to release the 1.5 million dollars

remaining in escrow.

The following table summarizes Smith & Wesson's counterclaims for

indemnification, and Gemtech's asserted defenses:

| Claim | Source | Amount | GemTech Defense |
|---|---|---|---|
| Unpaid pre-APA tax liabilities | Oregon | $607.11 | denies owed |
| Accounts Receivable | General A/R | $237,759.15 | Collateral estoppel |
| | Arsenal A/R | $219,700.00 | Collateral estoppel |
| Inventory | Overvalued inventory | $174,535.22 | collateral estoppel |
| Preacquisition liabilities/obligations | Withheld Cash | $84,179.51 | denies owed |
| | Defective products | $36,695.86 | denies owed |
| | Defective Suppressor | $1,725.00 | denies owed |
| Trademark | EU Mark | $1,500,000.00 | duty to mitigate |
| Total | | $2,255,201.85 | |
| | | | |
| | | | |

Gemtech denies it owed any pre-APA tax liabilities to the state of Oregon or that it

owed Smith & Wesson for any pre-acquisition liabilities. Regarding Smith & Wesson's

claims for indemnification for uncollectible accounts receivables and alleged inaccurate

inventory, Gemtech asserts that the arbitration proceedings before Grant Thornton

collaterally estop Smith & Wesson's claims. Last, concerning the trademark claim,

Gemtech contends Smith & Wesson had a duty to mitigate its damages, and denies that it

misrepresented ownership of the EU Mark.

**MEMORANDUM DECISION AND ORDER - 11**

## STANDARDS OF LAW

### 1.      Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id*. at 250; Fed. R. Civ. P. 56(c), (e). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp*. 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant

probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc*., 127 F.3d 1150, 1152 (9th Cir. 1997).

In ruling on a summary judgment motion, "the judge's function is not…to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions…." *Id*. at 255.

## 2.     Applicable Law

Section 9.5 of the APA provides that Delaware law governs disputes concerning interpretation of the APA. At the hearing, the parties agreed that Delaware law applies to the contract disputes.[3]

Delaware follows the objective theory of contract. *See Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch.1995); *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co*., No. C.A. 19209, 2002 WL 1558382, at *7 (Del.Ch.2002) (unpublished opinion). Although the law of contract generally strives to enforce agreements in accord with their makers' intent, the objective theory considers "objective acts (words, acts and context)" the best evidence of that intent. *Haft*, 671 A.2d at 417. Unambiguous written agreements should be enforced according to their terms, without using extrinsic evidence "to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v.*

---

[3] However, both parties contend Idaho law regarding collateral estoppel would apply to other aspects of the dispute. This issue is not squarely before the Court at this time.

**MEMORANDUM DECISION AND ORDER  - 13**

*DeVilbiss Health Care, Inc*., 702 A.2d 1228, 1232 (Del. 1997); *see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co*., 624 A.2d 1191, 1198 (Del.1993).

Under Delaware law, a contract is not ambiguous merely because the parties disagree about its interpretation. Whether a contract is ambiguous is determined according to an objective, reasonable-person standard and is a question of law. *See Eagle Indus*., 702 A.2d at 1233 n. 8 ("The true test is what a reasonable person in the position of the parties would have thought it meant," not what the parties to the contract intended it to mean). Words are to be given their ordinary meaning and should not be "torture[d]" to impart ambiguity where none exists. *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co*., 616 A.2d 1192, 1196 (Del. 1992). When the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. In that event, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc*., 702 A.2d 1228, 1232 (Del. 1997).

## DISCUSSION

**1.      Unpaid Tax Claim**

 APA § 8.1 states that the Company [Gemtech] and the Stockholders represent and warrant that "[a]ll taxes owed by the Company…have been paid," and that "the Company has withheld and timely paid over all Taxes required to be withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, or third party." APA § 8.1(a), (b). (Dkt. 63-6 at 40.)

**MEMORANDUM DECISION AND ORDER  - 14**

APA § 8.4 <u>Indemnification for Taxes</u> reads that the Company and the Stockholders "agree to indemnify, jointly and severally, Buyer…against…any and all claims…resulting from: A claim by any taxing authority for [] any Taxes of the Business or related to the Assets allocable to any taxable period ending on or prior to the Closing Date…." APA §8.4(a)(i). (Dkt. 63-6 at 41.) Gemtech does not dispute the applicability of APA §§ 8.1 and 8.4.

Smith & Wesson notified Martinez on October 16, 2018, that it received a statement of account from the Oregon employment tax authority that indicated an amount of $607.11 was owed. This amount allegedly represented taxes, interest, and penalties assessed on unpaid tax liabilities for taxes incurred by Gemtech prior to June 29, 2017, the effective date of the APA. McPherson Decl. Ex. 4. (Dkt. 71-2 at 24-26.)

Gemtech claims it had no prior knowledge of any unpaid tax liabilities in connection with the APA. In the Declaration of Martinez, he states he reached out to the State of Oregon tax authorities[4] and "verified that there are no outstanding claims, including any claims from the Oregon taxing authority relating to Gemtech." Martinez Decl. ¶ 22. (Dkt. 63-5.) Martinez does not include reference to any document received from the Oregon tax authority. Nonetheless, Gemtech argues the damages claimed by Smith & Wesson are remote, speculative, and uncertain, and therefore not recoverable.

The facts are disputed. On the one hand, the Court has a statement of account dated October 1, 2018, purporting to be an invoice from the State of Oregon reflecting

---

[4] It is unclear from the record when Martinez made this inquiry.

tax liabilities incurred by Gemtech prior to June 29, 2017, the effective date of the APA. On the other, the Court has Martinez's statement that he verified there were no outstanding claims from the Oregon taxing authority. Gemtech does not dispute the meaning of APA § 8.4, or otherwise appear to contest Smith & Wesson's assertion that Gemtech must indemnify Smith & Wesson for pre-closing tax liabilities. Rather, Gemtech relies solely upon Martinez's testimony that no pre-closing taxes were owed.

The Court cannot decide the factual dispute regarding this claim on summary judgment, and finds Gemtech has failed to carry its burden on its motion.

**2.     Accounts Receivable and Inventory Claims**

Gemtech argues Smith & Wesson's claims for accounts receivables and inventory are duplicative of the claims submitted during the Working Capital dispute and were subject to, and resolved by, the Grant Thornton arbitration determination or otherwise were waived because Smith & Wesson failed to discover these issues during the 60-day Buyer's Report period. In response, Smith & Wesson denies that the claims are duplicative, and contends it was unable to discover the misrepresentations related to Gemtech's accounts receivables and inventory during the Buyer's Report period. Smith & Wesson asserts that several customers refused to pay their outstanding accounts for various reasons when Smith & Wesson attempted to collect amounts owed. Smith & Wesson contends it gave notice of the accounts receivable claims to Gemtech on January 18, 2018, but that Gemtech objected to the inclusion of these claims in the arbitration proceedings. The inventory claim is premised upon Smith & Wesson's assertion that it

made additional inventory adjustments beyond those made by Grant Thornton "due to the decrease in value of the inventory" that Smith & Wesson had purchased.

First, the Court does not interpret the APA as precluding the submission of post-closing indemnity claims by Smith & Wesson to Gemtech related to inventory and accounts receivable. Acceptance of Gemtech's argument that all claims relating to inaccurate or unsaleable inventory and uncollectible accounts receivable must have been raised during the binding arbitration process, and within the 60-day Buyer's Report period, would render the entirety of Sections 7.3 and 9.1 of the APA, and the Escrow Agreement, a virtual nullity. Further, the dispute resolution provision related to the Working Capital adjustment contains no qualifying language encompassing "all known and unknown" adjustments to Working Capital. And, the unambiguous language of the Limitation on Liability section provides for a two-year indemnity period. APA § 9.1. According to Section 7.3, the Post-Closing Indemnity clause, all of the representations set forth in Sections 3.8 through Section 3.27 "survive the Closing," and any "breach of, or inaccuracy in, any of the representations made by" Gemtech constitutes "a breach or default in performance…."

In contrast, the provisions in the APA relating to the calculation of Working Capital and the settlement of the Purchase Price, reflect different considerations. Grant Thornton deemed the provisions of Sections 1.4 and 1.5 of the APA unambiguous, and limited its review of the Working Capital dispute to only those items set forth in the written submissions allowed during the Buyer's Report period and Company Response

period following the Closing Date. The Working Capital dispute resolution procedures were expressly limited to arriving at a final adjusted Purchase Price.

Nonetheless, the Court cannot resolve the parties' dispute on summary judgment. It is unclear from the record whether the indemnity claims raised by Smith & Wesson are duplicative of the Working Capital adjustment made by Grant Thornton when it valued accounts receivables and inventory as part of the Working Capital calculation. The Court is ill-equipped to parse through, line by line, the accounting records reviewed by Grant Thornton, compare them to the records comprising Smith & Wesson's disputed accounts receivable and inventory claims, and reconcile the two. Further, the parties dispute what could or should have been included in the Working Capital dispute resolution process. On the one hand, Smith & Wesson claims it could not have discovered the alleged inaccuracies in the Gemtech accounts receivables and inventory during the limited 60-day Buyer's Report period. Yet, Gemtech argues Smith & Wesson had access to Gemtech's books and records, and had sufficient resources to conduct a thorough review. The Court cannot resolve this dispute on summary judgment.

Thus, while some of the accounts receivable and inventory claims by Smith & Wesson may be precluded because they could have or should have been raised before the arbitrator, the Court cannot make such a determination on the record before it. The Court therefore finds Gemtech has not carried its burden on summary judgment related to Smith & Wesson's accounts receivable and inventory claims.

3.     **Preacquisition Liabilities and Obligations– Withheld Cash, Defective Products, and Suppressor Claim**

Smith & Wesson demanded indemnification for several preacquisition liabilities and obligations it claims Gemtech failed to disclose in its records. First, Smith & Wesson demanded reimbursement of $84,179.51 in cash "misappropriated by Mr. Ron Martinez." McPherson Decl., Ex. 5. According to one of the attachments to the February 11, 2019 demand letter, after Smith & Wesson acquired Gemtech, "the former controller continued to collect A/R cash receipts and web sale credit card charges" into a bank account not owned by Smith & Wesson. McPherson Decl., Ex. 5. Second, Smith & Wesson demanded reimbursement for alleged defective products in the amount of $36,695.86, for products sold by Gemtech prior to Closing that Smith & Wesson replaced. McPherson Decl., Ex. 6. And third, in a letter dated February 27, 2018, Smith & Wesson requested indemnification for $1,725.00 for a defective and discontinued suppressor manufactured and sold prior to closing, for which a Gemtech customer demanded a refund. McPherson Decl., Ex. 3. (Dkt. 71-2 at 22.)

Gemtech argues Smith & Wesson does not have a factual basis for these claims, because Smith & Wesson has not provided proof of actual damages and is therefore not entitled to recover for them. However, in its reply, Gemtech does not dispute the evidence presented by Smith & Wesson to support these indemnity claims. Rather, Gemtech reiterated its argument that these claims related to the purchase of assets under the APA were capable of discovery during the Buyer's Report period, and were not the product of fraud or misrepresentation. Accordingly, Gemtech contends these claims are

also barred by res judicata, because they should have been raised instead during the arbitration proceedings.

The Court cannot resolve the disputes related to these claims for the same reasons discussed above regarding Smith & Wesson's claims for indemnification related to accounts receivable and inventory. The record is unclear whether these claims bear any relationship to the Working Capital calculation, and whether Smith & Wesson could or should have discovered them during the Buyer's Report period.

## 4.    EU Mark

Smith & Wesson contends that, because LEI owned and registered the trademark GEMTECH in the EU in 2005, Gemtech's representations in Section 3.15 of the APA constitute a breach of the parties' agreement. McPherson Decl., Ex. 5. On August 6, 2019, Smith & Wesson demanded $1,500,000 in damages for Gemtech's misrepresentation that it owned the EU Mark when the mark was registered to LEI in the EU. McPherson Decl., Ex. 7.

Gemtech argues Smith & Wesson does not have a valid trademark indemnification claim, because: Smith & Wesson suffered no damages; Smith & Wesson failed to mitigate any damages, as it could have purchased the mark from LEI for $100,000.00, or accepted a free license from LEI; Smith & Wesson obtained a revocation of the EU trademark; and Gemtech is not responsible for damages because Gemtech did not own the EU Mark and never represented that it did.

According to the plain language of APA § 3.15, the list and description in Schedule 3.15 of Gemtech's marks constituted a list of "all" trademarks of any type

"owned, Used, licensed, or controlled by the Company," and that the Company "owns or has the right to use and shall as of the Closing Date own or have the right to use any…Trademark Rights…that are necessary or customarily Used by the Company for the ownership, management or operation of its Properties…including, but not limited to, the Intangible Rights listed on Schedule 3.15."

APA § 3.25 states that Gemtech "owns, leases, or has the legal right to use all the Assets, and Buyer will be vested with good, valid, marketable, and undivided title to the Assets….The Assets constitute all of the assets necessary to conduct the Business as currently being conducted, and no Person other than the Company owns any assets used in the Business."

When capitalized, "Used" has a specific definition. It is defined as property "owned, leased, licensed, or otherwise held by the Company which were acquired for use or held for use by the Company in connection with the Company's business…." APA § 10.26.

Gemtech represented in the APA that the list of marks on Schedule 3.15 comprised only those owned, "Used," licensed or controlled by Gemtech. Prior to the Closing Date, Martinez responded to an inquiry concerning Gemtech's trademarks that Gemtech transferred "only domestic" marks for Gemtech, "no foreign." Martinez Decl., Ex. 13.  Schedule 3.15 does not include reference to the Gemtech mark owned by LEI. According to Felton's declaration, LEI owned the EU Gemtech mark, and it was registered and used by LEI, not Gemtech. Further, the complaint does not specifically

mention sales in the EU, instead referring generally to "international sales." First Am.

Compl. at 7 – 8. (Dkt. 54.)

However, Smith & Wesson provided documents in support of its opposition to the

motion that purportedly demonstrate Gemtech used the mark in the EU. Decl. of Squires,

Exs. 2 and 3. (Dkt. 71-3.) These documents reflect that Gemtech's Director of Global

Sales, who was located in Meridian, Idaho, was discussing potential sales of Gemtech

products with customers in Denmark and Belgium in March and May of 2017. The sales

representative's email signature included Gemtech's mark.

On the record before it, the facts are disputed concerning Gemtech's use of the EU

Mark. The Court has evidence (albeit limited) before it in the form of correspondence

between a representative of Gemtech in Idaho and customers in Denmark and Belgium

sufficient to create a disputed issue of fact as to Gemtech's use of the mark to market its

products in the EU. Otherwise, the Court has no evidence concerning how Gemtech may

have been using the EU Mark to generally market its products in the EU. And, although

Gemtech's representations to Smith & Wesson never claimed ownership of any foreign

marks, the APA arguably encompasses disclosure of any marks "Used" by Gemtech in

connection with its business. The Court cannot resolve this factual dispute as a matter of

law in Gemtech's favor under the facts presently before the Court, and therefore finds

that Gemtech did not carry its burden on its motion for summary judgment.

## CONCLUSION

The Court finds that Gemtech, in seeking to invalidate every one of Smith & Wesson's indemnity claims to prevail on its counterclaim, did not carry its burden on its motion for summary judgment. As discussed above, there are genuine disputes as to the material facts, and the record before the Court does not clearly establish that Gemtech is entitled to judgment as a matter of law.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's and Counterdefendants' Motion for Partial Summary Judgment (Dkt. 63) is **DENIED**.

2) Plaintiff's and Counterdefendants' Motion to Strike (Dkt. 77) is **DENIED as MOOT**.

3) The Court will conduct a telephonic status conference with the parties for the purpose of discussing scheduling deadlines. A separate notice of hearing is forthcoming.

DATED: June 27, 2022

Honorable Candy W. Dale
United States Magistrate Judge