KIM J. TROUT, ISB #2468
STEVEN F. SCHOSSBERGER, ISB #5358
TROUT LAW, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID  83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
ktrout@trout-law.com
sschossberger@trout-law.com

Attorney for the Plaintiff.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| GEMINI TECHNOLOGIES, INC., an Idaho corporation,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>SMITH & WESSON SALES COMPANY., a Delaware Corporation; and AMERICAN OUTDOOR BRANDS, INC., a Nevada corporation,<br><br>　　　　　　　　Defendants. | **Case No. 1:18-CV-00035-CWD**<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

## <u>PARTIES, VENUE, JURISDICTION</u>

1.　　　Plaintiff Gemini Technologies, Incorporated (formerly doing business as "Gemtech") (referred to hereinafter as "GT") is an Idaho corporation, with its principal mailing address at PO Box 140618, Boise, ID 83714. GT's registered agent is Kim J. Trout, 3778 N. Plantation River Dr., Ste. 101, Boise, ID 83703.

2.　　　Defendant Smith & Wesson Sales Company ("Smith & Wesson") is a Delaware corporation, with its principal place of business at 2100 Roosevelt Ave., Springfield, MA 01104. Smith & Wesson was formerly known as Smith & Wesson Corp.

**Second Amended Complaint and Demand for Jury Trial | Page 1**

3.      Defendant American Outdoor Brands, Inc. ("AOB"),[1] formerly known as Smith & Wesson Holding Corporation, is a Nevada corporation with its principal place of business in Columbia, Missouri.  At the time of the transaction, AOB owned Smith & Wesson.

4.      This Court has jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, and the parties or entities herein are citizens of different states.

5.      Venue is proper in the Idaho Federal District Court under 28 U.S.C. § 1391 as the primary judicial district in which the asset purchase occurred.

## STATEMENT OF FACTS

### History of GT:

6.      Up until August 7, 2017, GT was an industry leader in the design and manufacture of gun silencers, with sales in both domestic and foreign gun markets. GT's silencers were used in all branches of the U.S. Military and in many branches of U.S. Special Operations Forces. GT was in armed services use around the world. GT brand serviced many Soldiers, Sailors, Airmen, and Marines of the United States military, Intelligence Community, Federal Law Enforcement, state and local peace officers, wildlife and agricultural agencies, and friendly foreign military and police, along with service to tens of thousands of civilian shooters.

7.      GT's modest beginnings started in the late 1960s with a physician named Phil Dater. Dr. Dater had a passion for machine guns, and he soon became interested in silencers.

8.      In 1976, Dater obtained his own manufacturers license and a lathe, and he started his own automatic weapons company. As business increased, Dater and his small crew moved from Albuquerque to northern New Mexico, and later to Boise, Idaho.

9.      In 1993, Dater started GT.

---

[1] Many of the executives at AOB were also concurrent executives and/or employees and/or had dual email addresses at both "aob.com" and "smith-wesson.com" because Smith & Wesson was a wholly owned subsidiary of AOB.  Therefore, many of the named AOB and Smith & Wesson individuals were acting as agents for both AOB and Smith & Wesson.

**Second Amended Complaint and Demand for Jury Trial | Page 2**

10.     At the end of 2014, GT was near bankruptcy and the shareholders were in a dispute about how to save the company. Ron Martinez, a former Bank of America Senior Executive, negotiated the purchase of the majority shares in GT and pledged his personal assets, including his home, to infuse capital into GT in order to keep the company's operations going.

11.     From the beginning of 2016 to August 8, 2017, Martinez chartered GT to realize positive revenues through his leadership, management, strategic growth, marketing and sales abilities.

12.     Martinez recruited and hired former U.S. Military experts to fill key positions in the Company. For instance, Martinez hired Jason Pace, a former U.S. Navy Seal and a graduate of the Naval Academy, to be in charge of the company's international sales.

13.     From January 2016 to July 31, 2017, GT's sales increased as a direct result of Martinez's efforts and the efforts of those under his direct supervision and management.  The gross sales during this time period were in excess of $15,000,000.

**AOB and Smith & Wesson Purchases GT's Assets:**

14.     In February 2015, AOB and Smith & Wesson prepared a financial model for a potential acquisition of GT's business.  A true and correct copy of the 2015 GT acquisition model is attached hereto as **Exhibit 1** and is incorporated herein by reference.

15.     AOB and Smith & Wesson based the 2015 acquisition model on GT's 2013 financial information. Smith & Wesson's model for revenue was as follows:

| | | 2013 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | | $ 8,819 | $ 9,525 | $ 10,287 | $ 11,110 | $ 11,999 | $ 12,959 | $ 13,996 | $ 15,116 | $ 16,325 | $ 17,631 | $ 19,041 | $ 20,564 |

Exhibit 1.

16.     According to AOB'S/Smith & Wesson' 2015 acquisition model GT was on track to make $54,070,000 in aggregate revenue in the years 2017 – 2020.  Exhibit 1.

17.     On June 16, 2016, Abigail Frasier of AOB and Smith & Wesson, who worked with Andrew Fulmer CPA, Vice President of Financial Planning and Analysis of AOB and of Smith &

Wesson, created a GT acquisition model which showed a First Year 70% decrease in revenue, Second Year 0%, and Third Year 80% revenue growth, and Fourth Year 40% revenue growth. A true and correct copy of the AOB'S/Smith & Wesson's 2016 model is attached hereto as **Exhibit 2** and is incorporated herein by reference.

18.     On January 2, 2017, AOB and Smith & Wesson, James Debney, CEO of AOB and CEO Smith & Wesson, and Matt Buckingham, Senior Vice President – Firearms of AOB, and President of Smith & Wesson, called Ron Martinez, President of GT, and expressed AOB's and Smith & Wesson's interest about purchasing GT's assets. Debney told Martinez that they were looking for stable good growth potential, that they want a good brand, and that there is interest in Gemtech now, that there is an immediate need to keep people around and keep talent, they already have plans for suppressors, strong manufacturing and production capability, and that the management team is the "secret sauce," and asked if Gemtech would be interested in an acquisition. A true and correct copy of Martinez's notes of the January 2, 2017 conversation with Debney is attached hereto as **Exhibit 3** and incorporated herein by reference.

19.     On January 24, 2017, Matt Buckingham had a telephone call with Martinez, and Buckingham told and represented to Martinez the following: that Andy Fulmer is head of acquisitions; there is interest in acquiring Gemtech; they need a company with a "strong management team"; that who comes with the deal is big; that Gemtech has good IP; that Gemtech has a good product; that Gemtech can sell suppressors; that Gemtech has a great brand name; that what they have seen so far - - Gemtech is superior and has a well know team; that Gemtech has better product than other suppressor companies; that Gemtech would come under the firearms division; that they are looking to acquire the Gemtech team; that the Gemtech team will be kept intact; that there is "equality, growth for me, i.e., Martinez"; and that very few targets meet the criteria for an acquisition. A true and correct copy of Martinez's notes of the January 24, 2017 conversation with Buckingham is attached hereto as

**Exhibit 4** and incorporated herein by reference.

20.     On February 6, 2017, Martinez of GT emailed Andrew Fulmer and Matt Buckingham, and per Mr. Fulmer's request provided a comprehensive financial and operational information.  A true and correct copy of the February 6, 2017 email and attachments are attached hereto as **Exhibit 5** and is incorporated herein by reference.

21.     Martinez provided Mr. Fulmer with the "GEMTECH EXCUTIVE SUMMARY." A true and correct copy of the executive summary is attached hereto as Exhibit 5 and is incorporated herein by reference.

22.     Martinez provided Mr. Fulmer and Mr. Buckingham with GT's Profit & Loss by Year for the years 2013, 2014, 2015 and 2016.  A true and correct copy of the GT's 2013-2016 P&L is attached hereto as Exhibit 5 and is incorporated herein by reference.

23.     Martinez provided Mr. Fulmer and Mr. Buckingham with GT's projected P&L for the years 2017, 2018 and 2019.  A true and correct copy of GT's projected 2017-2019 P&L is attached hereto as Exhibit 5 and is incorporated herein by reference. Martinez/GT projected sales revenue as follows:

| GEMINI TECHNOLOGIES, INCORPORATED<br>Profit & Loss<br>By Year | | | | | | |
|---|---|---|---|---|---|---|
| **Sales Revenue** | **2017** | **% of Revenue** | **2018** | **% of Revenue** | **2019** | **% of Revenue** |
| Total Revenue | $25,000,000 | | $85,000,000 | | $150,000,000 | |
| **Cost of Goods Sold** | | | | | | |
| Total Cost of Goods Sold | $13,774,301 | 55.10% | $46,832,625 | 55.10% | $82,645,808 | 55.10% |
| **Gross Margin** | | | | | | |
| Gross Margin | $11,225,699 | 44.90% | $38,167,375 | 44.90% | $67,354,192 | 44.90% |
| Total SG&A Expenses | $7,857,989 | 31.43% | $26,717,163 | 31.43% | $46,579,833 | 31.05% |
| Net Profit or (Loss) | $3,367,710 | 13.47% | $11,450,213 | 13.47% | $20,774,358 | 13.85% |

**ASSUMPTIONS**

Revenues are estimates by year of the development and closing of opportunties listed on the Gemtech Revenue Resource Summary.

Gross Margin is based on attained 2016 percentage with an objective to increase this through improved designs aimed at improving manufacturing efficiencies and reduced production costs.

SG&A Expenses are based on attained 2016 percentage less ownership transitionary expenses.

24.    On February 8, 2017, Andy Fulmer forwarded Martinez's February 6, 2017 emails with its attachments to Brian Murphy, President of the Outdoor Recreation Division of AOB, James Debney of AOB and Smith & Wesson, and Matt Buckingham of AOB & Smith & Wesson, and said "Brian, FYI, a little reading material for the beach. I'm putting together a list of questions and financial model. . . will send to the whole group later today." A true and correct copy of Fulmer's email dated February 8, 2017 is attached hereto as **Exhibit 6** and incorporated herein by reference.

25.    On February 8, 2017, Andy Fulmer sent an email to Martinez and Thompson, copying Matt Buckingham and Brian Murphy, and acknowledging GT's 2017 revenue projection, asked the questions: "What level of capital expenditures would be required to realize the $25M of projected revenue in 2017? Also, has any of the capital been either purchased or ordered?" A true and correct copy of Fulmer's email dated February 8, 2017 is attached hereto as **Exhibit 7** and incorporated herein by reference.

26.    On February 15, 2017, Matt Buckingham, Andy Fulmer and Ron Martinez had a

**Second Amended Complaint and Demand for Jury Trial | Page 6**

telephone call, and Buckingham and Fulmer represented that they have done a modeling approach and agreed that Gemtech is a perfect fit with Smith & Wesson; that an offer would be on a dollar basis on company basis and on an earnout; that there would be x dollars of earnout for every $5.00 revenue of company level; that when Gemtech hit $5 million above Gemini Technologies would get paid out x$; that the earnout would be 2 year period; that James Debney wants to go after the Gemtech opportunity full boar and get the acquisition done ASAP; and again that they had done a lot of modeling that makes sense for the acquisition.  A true and correct copy of Martinez's notes of the February 15, 2017 call is attached hereto as **Exhibit 8** and is incorporated herein by reference.

27.    On February 16, 2017, Andy Fulmer sent an email to Martinez, copying Matt Buckingham and Mark Thompson, and asked the questions: "1. Can you send us a P&L from the month of January 2017? 2. How much of your 2016 revenue was to international and military customers? 3. How much of your 2017-2019 growth is expected to be from the consumer channel vs. the international/military channels?" A true and correct copy of Fulmer's February 16, 2017 email is attached hereto as **Exhibit 9** and incorporated herein by reference.

28.    On February 27, 2017, Matt Buckingham, Andy Fulmer and Ron Martinez had a telephone call during which they said that they would base an offer off of the correct business range of $6 to 10 million, plus a payout of future business, that the earnout would be .15cents to a dollar, that the earnout would be for the first couple of years, that there is ***a lot of upside for the earnout***; that there would be a two year earnout; that the earnout would start at $12 million up to $84 million; and that Gemtech is the one we want. A true and correct copy of Martinez's notes of the February 27, 2017 call is attached hereto as **Exhibit 10** and is incorporated herein by reference.

29.    On February 28, 2017, Matt Buckingham, Andy Fulmer and Ron Martinez had a telephone call further discussing the price terms of the potential acquisition.  A true and correct copy of Martinez's notes of the February 28, 2017 call is attached hereto as **Exhibit 11** and is incorporated

herein by reference. Martinez told them that the earnout period needed to be three years because of Gemtech's upward revenues and growth opportunities, and Buckingham and Fulmer agreed and said yes on a three-year earnout. Exhibit 11.

30.     On, or about, March 2017, American Outdoor Brands Corporation, the parent of Smith & Wesson, did an Investor Presentation.  A true and correct copy of the March 2017 Investor Presentation is attached hereto as **Exhibit 12** and is incorporated herein by reference. On page 9, AOB and Smith & Wesson represented:



31.     On March 9, 2017, Andrew Fulmer sent an email to James Debney, CEO of AOB and CEO of Smith & Wesson , Jeff Buchanan, CFO of AOB, Matt Buckingham, Senior Vice President – Firearms of AOB and President of Smith & Wesson, and Brian Murphy, President, Outdoor Products & Accessories Division of AOB, discussing a potential to purchase another silencer company, and said, "I think it's a pretty simple modeling exercise if we choose to move forward. The way I would model this is very similar to GemTech - - I would assume a large decrease in revenue in calendar 2017, then increase it from there based on the same assumptions as GemTech. On the margins, I would assume the same 40-45% margins as GemTech, . . . ." A true and correct copy of the March 9, 2017 email is attached hereto as **Exhibit 13** and is incorporated herein by reference.

32.     Prior to March 9, 2017,  including in January and February of 2017,  AOB'S/Smith & Wesson's acquisition financial model for GT showing a large decrease (first model showed a 70% decline and second model showed a 55% decline) in revenue in calendar year 2017, 0% percent revenue in calendar year 2018, and 80% revenue growth in calendar year 2019, was material information known by Andrew Fulmer and Matt Buckingham when they were conversing and negotiating with Martinez and Thompson, CFO of GT.  AOB and Smith & Wesson, Buckingham and Fulmer, did not disclose their GT acquisition financial model information for Gemtech to GT.

33.     On March 10, 2017, AOB and Smith & Wesson provided a TERM SHEET and exclusivity agreement to GT for the possible asset purchase of GT's assets. A true and correct copy of the March 10, 2017 Term Sheet is attached hereto as **Exhibit 14** and is incorporated herein by reference.

34.     AOB and Smith & Wesson proposed "The purchase price will be (1) $10 million in cash payable at closing plus (b) up to $10.95 million in earn-out payments. The earn-out payments will be based on revenue of the Company during the three 12-month periods after closing and will be paid in cash. The earn-out payment will be $0.15 for every $1.00 of revenue of the Company in excess of

$12 million and for revenue up to $85 million, based on the revenue milestones we have previously discussed. . . . If revenue were to decline in any period, you would not be paid any earn-out and would be subject to repayment of previous earn-out payments to the extent of such decline." Exhibit 14.

35.     AOB and Smith & Wesson, by and through Andrew Fulmer and Matt Buckingham, had personal knowledge before providing this term sheet to Martinez and GT, that based on their model of revenue after the acquisition that there would be negative revenue in year 1, 0% revenue growth in year 2, some growth in year 3, and therefore there was no chance of the AOB's and Smith & Wesson's Gemtech revenue achieving $12 million a year in years 1, 2 and 3 of the earnout period.

36.     On March 17, 2017, Martinez and Mark Thompson, CFO of GT, discussed the March 10, 2017 term sheet with Matt Buckingham and Andrew Fulmer, and Buckingham and Fulmer represented that they wanted to get the acquisition done. A true and correct copy of Martinez's notes of the March 17, 2017 call with Buckingham and Fulmer is attached hereto as **Exhibit 15** and is incorporated herein by reference.

37.     On March 30, 2017, Martinez and Mark Thompson again discussed the March 10, 2017 term sheet with Matt Buckingham and Andrew Fulmer. A true and correct copy of Martinez's notes of the March 30, 2017 call with Buckingham and Fulmer is attached hereto as **Exhibit 16** and is incorporated herein by reference.

38.     During the March 30, 2017 phone call, Fulmer and Buckingham told Martinez and Thompson that $12 million a year during the earnout period is achievable and Martinez and Thompson agreed based upon GT's current 2017 financial performance, positive yearly growth trending and the targeted domestic and international growth opportunities. **Exhibit 16**. Buckingham and Fulmer told Martinez and Thompson that there would be a payout as of year three, and a cap from $85 million to $125 million. Exhibit 16.

39.     On March 31, 2017, Martinez and Mark Thompson further discussed the March 10,

2017 term sheet with Matt Buckingham and Andrew Fulmer. A true and correct copy of Martinez's notes of the March 31, 2017 call with Buckingham and Fulmer is attached hereto as **Exhibit 17** and is incorporated herein by reference.

40.    During the March 31, 2017 phone call Fulmer and Buckingham confirmed their statements made to Martinez and Thompson that $12 million a year for years 1, 2 and 3 of the earnout to set a threshold aggregate sum of $36 million under the earnout formula is achievable and Martinez and Thompson agreed.  Martinez expressed to Fulmer and Buckingham that Gemtech's revenues could exceed $150,000,000 during the earnout period, and Fulmer and Buckingham set a maximum of $125,000,000, yielding a maximum payout of $18,750,000. **Exhibit 17**.

41.    On April 10, 2017, AOB and Smith & Wesson, Andrew Fulmer, provided Martinez and Thompson with a revised term sheet. A true and correct copy of the April 10, 2017 revised term sheet is attached hereto as **Exhibit 18** and is incorporated herein by reference.

42.    The revised term sheet changed that the "purchase price will be (a) $10 million in cash payable at closing, plus (b) up to $17.1 million in earn-out payments. The earn-out payments will be based on the cumulative revenue of the Company during the 36-month period after closing and will also be paid in cash. The earn-out payment will be $0.15 for every $1.00 of cumulative revenue of the Company in excess of a base of $36 million for revenue up to $150 million. For instance, in the 36-month period, if cumulative revenue is $80 million, then the Company would be paid $6.6 million ($80M - $36M x 0.15)." Exhibit 18.

43.    Based upon the factual representations of AOB and Smith & Wesson, by and through Fulmer and Buckingham, that $12 million a year in the earnout years 1, 2 and 3 totaling an aggregate base of $36 million is achievable and that GT could realize an earnout payment not to exceed $17.1 million, and GT having agreed with and relied on those factual representations, GT accepted AOB'S and Smith & Wesson's term of the purchase price.

44.     As of April 10, 2017, AOB and Smith & Wesson, Buckingham and Fulmer, did not disclose their GT acquisition financial revenue model information for Gemtech to GT.

45.     On June 20, 2017 Fulmer prepared a memo "To: File" and copied "Jeffrey Buchanan, EVP, CFO & Treasurer" and stated: "Our analysis of Stealth's current and projected income statements focused on the following items: Historical monthly revenue patterns; Historical changes in units compared to NICS; Historical unit changes vs. SWC's unit changes; Historical changes in average selling price; Revenues by customers; Gross margins per category; OPEX Trends. . . .*In our financial modeling for both purposes of providing an initial valuation and to provide projections for use in the fairness opinion we used our knowledge of the industry and historical trends*. As such, __we modeled an overall 55% decrease in revenue in FY2018 and no growth in FY2019 due the Hearing Protection Act that will remove the $200 transfer fee__. *We have modeled that this Act will be enacted in FY2020 and will cause an 100% increase in revenue. . . . We noted that gross margins in Stealth's projections in 2017 and 2018 will remain at the 45% level. It is worth noting that if production is moved to Springfield, Stealth's margins are anticipated to increase to 60%*." A true and correct copy of Fulmer's June 20, 2017 report is attached hereto as **Exhibit 19** and incorporated herein by reference. (Emphasis added).

46.     On June 21, 2017, Fulmer sent an email to James Debney, Jeff Buchanan, and Matt Buckingham, "Subject: Stealth BOD Presentation" and he attached "Project Stealth BOD Presentation New Template V4.pdf." A true and correct copy of Fulmer's June 21, 2017 email with its attachment is attached hereto as **Exhibit 20** and incorporated herein by reference. Fulmer stated that the draft presentation for Stealth is to be included in the strategy section for the Board (AOB). Exhibit 20.

47.     On June 23, 2017, James Debney wrote an email at 9:02 a.m. to Matt Buckingham and included discussion about the Gemtech Acquisition as follows: "9. Gemtech Acquisition – please find

**Second Amended Complaint and Demand for Jury Trial | Page 12**

time on Monday to take Jeff and I through the financial model and detail your 3 − 5 year organic growth plan is for the acquisition in terms of new product development, brand leverage and driving consumer awareness of brand/product benefits. We should assume that the Hearing Protection Act does not pass. With that in mind does model in board presentation assume it does?" Matt Buckingham responded: "Responses below in CAPs" and "***THE FINANCIAL MODEL ASSUMES A SIGNIFICANT DOWN TURN IN YEAR ONE. FLAT TWO AND THREE, AND THEN NORMAL GROWTH***. WE WANTED TO JUSTIFY $10 MILLION WITHOUT APA PASSING. I CAN WALK YOU GUYS THROUGH. I THINK IT IS ABOUT A MISTAKE NOT TO HAVE ANDY THERE. IT IS THE MODEL HE PUT TOGHETER AND WE SHARED WITH YOU AND JEFF." Debney then replied to Buckingham in connection with who was going to make the Gemtech acquisition presentation to the AOB Board of Directors saying, "9. No one is suggesting excluding Andy from the meet but you need to do all the talking to demonstrate the strength of your recommendation. ***Not a single acquisition we have made has hit the revenue number in their respective model***. After we approve, you are going in front of board to make a pitch. Don't forget 3-5 year business plan highlights." (Emphasis added).  A true and correct copy of the Debney and Buckingham email string dated June 23, 2017 is attached hereto as **Exhibit 21** and is incorporated herein by reference.

48.     On or about June 27, 2017, AOB adopted the Resolutions of the Board of Directors of AOB to approve the proposed transaction indirectly through its subsidiary Smith & Wesson to acquire substantially all of the assets of GT.  A true and correct copy of the AOB resolution of the board is attached hereto as **Exhibit 22** and is incorporated herein by reference.

49.     The resolution provides, in relevant part, that ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Exhibit 22.

50.     On June 27, 2017, Matt Buckingham and Andrew Fulmer made a presentation of the GT "Gemtech" Acquisition seeking the approval of the AOB Board of Directors. A true and correct copy of the final presentation presented and provided to the AOB Board of Directors attached hereto as **Exhibit 23** and is incorporated herein by reference.

**Second Amended Complaint and Demand for Jury Trial | Page 14**

51.     The presentations provided under "Acquisition Details" "Acquisition Type & Timing"

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Exhibit 23.

███████████████████████████████████████████████ chart:



Exhibit 23.

53.    The presentation provided under "Discounted Cash Flow" the following chart:



Exhibit 23.

54.    The presentation provided under "Proforma Financials" "Proforma Financial Metrics (in millions)" for the "Net Sales" the following chart:



Exhibit 23.

55.    The minutes of the AOB Meeting of the Board of Directors dated June 27, 2017 reads that, "███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ " Exhibit 22.

56.     Prior to and as of June 27, 2017, AOB and Smith & Wesson calculated totaled revenues of the acquired Gemtech business to be in the sum of $19.2 million for the years 2018, 2019 and 2020.  **Exhibit 24.**

57.     Prior to and as of June 27, 2017, AOB's and Smith & Wesson's financial model calculations for the Gemtech acquisition demonstrated that the $36 million threshold for the earnout was not achievable.

58.     Prior to and as of June 27, 2017, AOB's/Smith & Wesson's financial model calculations for the Gemtech acquisition demonstrated that there was no possibility of an earn-out payment to GT following the 36-month period after closing.

59.     Prior to and as of June 27, 2017, AOB and Smith & Wesson had knowledge that the $36 million threshold for the earnout was not achievable.

60.     Prior to and as of June 27, 2017, AOB and Smith & Wesson had knowledge that there was no possibility of an earn-out payment to GT following the 36-month period after closing.

61.     Prior to June 29, 2017, AOB and Smith & Wesson, Buckingham and Fulmer, did not disclose their GT acquisition financial model information for Gemtech to GT.

62.     Prior to June 29, 2017, AOB and Smith & Wesson did not disclose to GT that it calculated the acquired Gemtech net revenue growth in the year 2018 at -55% or $4.8M, in the year 2019 at 0% or $4.8M, and in the year 2020 at 100% or $9.6M.

63.     Prior to June 29, 2017, AOB and Smith & Wesson did not disclose to GT that the $36 million threshold for the earnout was not achievable.

64.     Prior to June 29, 2017, AOB and Smith & Wesson did not disclose to GT that there was no possibility of an earn-out payment to GT following the 36-month period after closing.

65.     Prior to June 29, 2017, had AOB and Smith & Wesson disclosed the whole truth to

GT that it calculated the acquired Gemtech net revenue growth in the year 2018 at -55% or $4.8M, in the year 2019 at 0% or $4.8M, and in the year 2020 at 100% or $9.5M, GT would not have agreed to enter and sign the APA and sell its assets to AOB and Smith & Wesson.

66.    Prior to June 29, 2017, had AOB and Smith & Wesson disclosed the whole truth to GT that the $36 million threshold for the earnout was not achievable, GT would not have agreed to enter and sign the APA and sell its assets to AOB and Smith & Wesson.

67.    Prior to June 29, 2017, had AOB and Smith & Wesson disclosed the whole truth to GT that there was no possibility of an earn-out payment to GT following the 36-month period after closing, GT would not have agreed to enter and sign the APA and sell its assets to AOB and Smith & Wesson.

68.    On June 29, 2017, the parties signed the Asset Purchase Agreement ("APA"). A true and correct copy of the APA is attached hereto as **Exhibit 25** and incorporated herein by reference.

69.    On July 10, 2017, Jeff Buchanan, Executive Vice President and CFO of AOB, sent an email to Andrew Fulmer, and copied James Debney, CEO, and Brian Murphy of AOB and Smith & Wesson, and said, ". . . We got quite a bit of heat on the lousy forecast for gemtech. . . ." A true and correct copy of the July 10, 2017 email is attached hereto as **Exhibit 26** and incorporated herein by reference.

70.    Prior to June 29, 2017, had AOB and Smith & Wesson disclosed the whole truth to GT of the lousy forecast for Gemtech, GT would not have agreed to sign and enter the APA and sell its assets to AOB and Smith & Wesson.

71.    On July 21, 2017, Matt Buckingham wrote an email to James Debney: "Gemtech – A lot to update you on here. It is very messy and at a minimum the closing will be delayed. I have no doubt we can operationally "fix" the issues after close, but I'm getting alarmed with Ron Martinez staying with us post close. The entire team is circling the wagons Monday to redo the closing plan. I'll

have a new date after that meeting but I'm guessing an end of September close." A true and correct copy of the July 21, 2017, email is attached hereto as **Exhibit 27** and incorporated herein by reference.

72.     On August 7, 2017, GT as Seller and Smith & Wesson as Buyer closed the APA.

### Purchase Payments to Gemtech:

73.     As consideration for its purchase, Smith & Wesson promised to make two different kinds of payments to GT: (1) a cash payment; and (2) an earn-out payment.

74.     First, AOB and Smith & Wesson promised to make a cash payment to GT of ten million one hundred sixty thousand dollars ($10,160,000.00) for GT's assets, plus or minus an adjustment for the company's working capital as of the closing date. (APA Section 1.2).

75.     Smith & Wesson paid GT $5,735,284.25 of this amount on the sale closing date.

76.     Smith & Wesson put the balance of this amount, minus a $250,000.00 hold-back amount which Smith & Wesson retained to cover specifically identified account receivables. (APA Sections 1.2(b) and 1.2(c)), into an escrow account with Washington Trust Bank.

77.     Second, AOB and Smith & Wesson promised "as additional consideration" to pay GT an earn-out payment based upon Smith & Wesson's 36-month post-purchase Gemtech sales revenue (the "earn-out period sales"), with the term "business" including the design, manufacturing, and sale of silencers and suppressors, silencer and suppressor accessories, and any company-branded ammunition. (APA Sections 1.6, 10.4).

78.     This earn-out was calculated at fifteen cents ($0.15) for each dollar of total sales above thirty-six million dollars ($36,000,000.00) during the earn-out period. For instance, if the company grossed eighty million dollars ($80,000,000.00) in earn-out period sales, it would have to pay Gemtech six million six hundred thousand dollars ($6,600,000.00).

79.     Gemtech's potential earn-out was capped at seventeen million one hundred thousand dollars ($17,100,000.00). (APA Section 1.6(b)).

80.    Given that prior to the June 29, 2017 signing of the APA, AOB's/Smith & Wesson's financial model calculations for the Gemtech acquisition demonstrated that the $36 million threshold for the earnout was not achievable, and that there was no possibility of an earn-out payment to GT following the 36-month period after closing, the language AOB/ Smith & Wesson included in Section 1.6 "Earn-Out" of the APA was illusory.

**Section 1.6 Stated Conditions on the Earn-Out:**

81.    Under Section 1.6(c) of the APA, Smith & Wesson and GT agreed that there would be certain conditions placed on the earn-out.

82.    One condition was that Smith & Wesson would retain sole discretion regarding business operations during the earn-out period.

83.    Another equally important condition was that Smith & Wesson shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing GT's earn-out payment. (APA Section 1.6(c)).

84.    In addition, Smith & Wesson agreed to consult with Ron Martinez in advance of any decision made relating to the operation of the Business if it had knowledge that such decision would negatively impact the GT's earn-out payment. (APA Section 1.6(c)).

85.    GT relied on these stated conditions as part of its decision to enter the APA and as protection in place for the earnout, *i.e.* that it would allow Smith & Wesson to have control of the Gemtech business operations in exchange for Smith & Wesson's promises to act in good faith and its promises to consult Martinez in decisions which would negatively affect the earn-out payment.

**Smith & Wesson Hires GT's Employees:**

86.    In addition to purchasing GT's assets, Smith & Wesson hired Martinez as a new company executive, and he reported directly to James Debney. Smith & Wesson also hired GT's director of international sales, Jason Pace, as a new company international sales employee.

87.    AOB and Smith & Wesson, James Debney, assured Martinez that he was "the secret sauce" and that the company would keep him employed as a long-term member of its team.  In early March of 2017, Debney and Buckingham had told Martinez to look at their Investor Acquisition Strategy presentation on their website in support of their representations, and Martinez followed their directed and reviewed it. This assurance was consistent with Smith & Wesson's promise to consult with Martinez on any business action that would negatively impact the earn-out payment.

88.    Martinez and Pace accepted employment and immediately began their new jobs.

89.    Martinez was given the title "General Manager, Gemtech" and he was in charge of the Gemtech business activities related to the earnout period sales.

90.    In addition to the misrepresentations, and/or material omissions when AOB and Smith & Wesson  had a duty to speak and make a full and fair disclosure of the whole truth in connection with the APA as set forth in paragraphs 14 – 70 above, which allegations are restated herein by reference, thereby fraudulently inducing GT to enter into the APA, AOB and Smith & Wesson also made the following misrepresentations, and/or material omissions when it had a duty to speak and make  a full and fair disclosure of the whole truth in connection with the APA:

a.    On or about June 29, 2017, AOB and Smith & Wesson made false and misleading statements to GT in the APA that the earnout and earnout payment is additional consideration for the purchase price when it knew the earnout and any earnout payment to GT was an impossibility, the entire Section 1.6 provision was illusory, and it was included for the purpose of inducing GT to agree to and execute the APA. AOB and Smith & Wesson misrepresented in the APA its promise to GT that it would not take any action, directly or indirectly, in bad faith that would have the specific purpose of avoiding or reducing the earnout payment. AOB and Smith & Wesson misrepresented in the APA its promise to GT that it would consult with Ronald J.

Martinez in advance of any decision relating to the operation of its business if it had knowledge that such decision would negatively impact the earnout payment. AOB and Smith & Wesson knew these representations were false when made because it knew the earnout and any earnout payment to GT was an impossibility and that the language in Section 1.6 of the APA was illusory. Additionally, AOB and Smith & Wesson took several actions, in bad faith (detailed below), which further demonstrates its misrepresentations and that it did not care about taking direct or indirect actions that would negatively impact the Gemtech sales revenue during the earnout period. The representations in Section 1.6 of the APA were material and relied upon by GT in entering the APA.  GT would never have agreed to and executed the APA had it known about Smith's & Wesson's misrepresentations.

b.  On or about June 29, 2017 upon the execution of the APA, or on or about August 7, 2017 upon the closing, AOB and Smith & Wesson made false and misleading representations to GT regarding AOB's/Smith & Wesson's international sales intentions and opportunities for Gemtech. AOB and Smith & Wesson told Martinez in his employment agreement that the future "territory" for the sale of Gemtech products would include "any other country in the world where [Smith & Wesson] conducted business," and that "during the term of [Martinez's] employment…[it was Smith & Wesson's] and [Martinez's] intent to expand the Company's international operations." However, soon after the closing, AOB and Smith & Wesson canceled all of GT's pending international sales opportunities and terminated both Martinez's and Pace's employment without cause. These representations were material to GT and relied upon in entering the APA. GT would never have entered the APA had it known about AOB's/Smith's & Wesson's intentions to cancel and/or forego its international

sales and terminate Martinez's and Pace's employment.

c.    On or about the time of the APA, AOB and Smith & Wesson made false and misleading representations in its March 2017 Investor Presentation, Acquisition Strategy, on its website, which James Debney directed Martinez to look at for reassurance and Martinez did view the presentation and relied upon it and Debney's representation that AOB and Smith & Wesson intended to keep GT's "talent, brand, sales & marketing, development, operations, and management" in place after the close of the APA sale. However, AOB and Smith & Wesson terminated Martinez's employment on September 18, 2017 within 41 days of the closing on August 7, 20-17, terminated Pace's employment ten days later on September 28, 2017,  and in October 2017 through the year 2018 terminated nearly all of GT's former employees, significantly reduced and stopped the marketing of Gemtech products,  disallowed Gemtech representatives attendance at trade shows and events, discontinued and reduced the sales of Gemtech products, significantly reduced manufacturing and manufacturing capabilities of Gemtech products, and completely closed Gemtech Idaho by the second quarter of 2019. These representations were material to GT and relied upon in agreeing to and executing the APA. GT would never have entered the APA had it known about AOB's/Smith & Wesson's false representations.

d.    Prior to the signing of the APA and after the signing, AOB and Smith & Wesson failed to tell and inform GT that in the year 2014 it had been subject to a Securities and Exchange Commission proceeding and had been charged with international sales bribery under the Foreign Corrupt Practices ACT ("FCPA") involving violations of improper payments to Pakistani, Turkish and Indonesian officials to secure minor firearm supply contracts. AOB and Smith & Wesson agreed to pay more than $2

million in fines and to provide ongoing reporting about FCPA compliance to settle the charges, which included violations of the FCPA's anti-bribery, books and records, and internal control provisions. The SEC highlighted in the charges AOB and Smith & Wesson's failure to implement anticorruption controls specific to the conduct of third-party agents abroad. As a result of its settlement with the SEC, AOB and Smith & Wesson established a Business and Ethics Committee (the "BEC") which was required to preview, implement restrictions and approve all future AOB and Smith & Wesson international sales orders and activities. Prior to the signing of the APA and after the signing, AOB and Smith & Wesson failed to tell and inform GT about the BEC's requirement involvement with all international sales orders and activities. The full disclosure and truth of this information would have been material to GT's decision to enter the APA, and GT would never have entered the APA had it known about AOB's/Smith's & Wesson's international bribery charges and the BEC's restrictions and limitations in conducting future international sales and activities.

e.    Prior to the signing of the APA and after the signing, AOB and Smith & Wesson failed to tell GT and Martinez that it was going to terminate nearly all of Gemtech's employees, and close Gemtech's Idaho operations, which planning and closure forced the Gemtech operations into a state of inactivity. This information would have been material to GT's decision to enter the APA, and GT would never have entered the APA had it known about AOB's/Smith's & Wesson's misrepresentations.

f.    Prior to the signing of the APA and after the signing, AOB and Smith & Wesson failed to tell GT that it would not form any new domestic or international partnerships for the sale of Gemtech products. Likewise, AOB and Smith & Wesson failed to tell GT that it would discontinue existing partnerships, either through inactivity or through

restrictive requirements in connection with the BEC's involvement. This information would have been material to GT's decision to enter the APA, and GT would never have entered the APA had it known about AOB's/Smith's & Wesson's misrepresentations.

g. Prior to the signing of the APA and after the signing, AOB and Smith & Wesson failed to tell GT that it would stop future Gemtech product development and marketing efforts. This information would have been material to GT's decision to enter the APA, and GT would never have entered the APA had it known about AOB's/Smith's & Wesson's misrepresentations.

91. AOB and Smith & Wesson never intended to fulfill its promises in connection with the APA, including its promises of good-faith conduct to avoid reducing the earn-out payment.

a. Following the APA, AOB and Smith & Wesson failed to timely ship existing customer products or deal with customer complaints.

b. Following the APA, AOB and Smith & Wesson fired Gemtech's management and staff and did not make adequate replacements for management and staff.

c. Following the APA, AOB and Smith & Wesson failed to market, manufacture, and sell Gemtech products consistent with Gemtech's historical sales volumes.

d. Following the APA, AOB and Smith & Wesson failed to consult with Ron Martinez about the ongoing business operations.

**Martinez and Pace Pursue International Sales:**

92. Both before and after the purchase, GT was contacted by multiple foreign countries about purchasing its silencers. Martinez and Pace then arranged for live product demonstrations in these countries, including the United Arab Emirates and Bahrain.

93. These demonstrations and prospective sales would have earned Smith & Wesson

Gemtech approximately two-hundred seven million dollars ($207,000,000.00) upon closing of the sales.

94.    By August 15, 2017, GT had already obtained approvals from the State Department of the United States, and the Bureau of Alcohol, Tobacco, and Firearms, to ship the product for these prearranged demonstrations and sales.

95.    However, after the APA was signed, Martinez and Pace were met with immediate resistance to the international demonstrations and sales from other Smith & Wesson executives and employees.

96.    Martinez, along with other GT employees, including Pace, and Daniel Nakashima, Director of Compliance, presented GT's plan to the AOB and Smith & Wesson executives on August 30, 2017. GT demonstrated, through specific documentation, that GT had received all necessary sales approvals and that the purchasing countries had obtained the necessary purchase approvals. GT explained that Martinez and Pace had already scheduled the product demonstrations and that such sales had a historically high rate of closing and that AOB and Smith & Wesson "Gemtech" could close the sales with minimal additional effort.

97.    On August 29, 2017, unbeknownst to GT, Martinez and Pace and Nakashima, AOB's/Smith & Wesson's General Counsel and Compliance Director, Robert Cicero, put a hold on all current licenses including Bahrain, MRKAS, and UK MOD so that the product which was ready for shipment and export for international demonstrations and sales would not ship. AOB and Smith & Wesson did not consult Martinez in this decision.

**Smith & Wesson Breaches Section 1.6 Earn-Out Provisions:**

98.    On September 18, 2017, AOB and Smith & Wesson terminated Martinez's employment, without consulting Martinez, without any explanation, and without cause. AOB and Smith & Wesson had been covertly planning the termination of Martinez, and on September 13, 2017,

Daniel McDonough, Vice President, Human Resources, wrote an email to Robert Cicero, General Counsel and Compliance Director and Secretary, proposing the false script: "We are here to inform you all that Ron Martinez has Gemtech/Smith & Wesson effective today to pursue other career opportunities. . . ." A true and correct copy of the September 18, 2017 email is attached hereto as **Exhibit 28** and incorporated herein by reference.

99.     On September 18, 2017, James Debney, CEO, provided a false and misleading narrative memorandum to "All Gemtech Employees" about Martinez's firing, with the Subject: "Organizational Changes" stating: "Effective today, Ron Martinez has left the company to pursue other business opportunities and we thank him for his contributions to Gemtech wishing him well in his future endeavors. . . ." A true and correct copy of the September 18, 2017 Debney memorandum is attached hereto as **Exhibit 29** and incorporated herein by reference.

100.     Mr. Debney's note to all Gemtech employees was false and misleading because AOB and Smith & Wesson fired Martinez, Martinez did not voluntarily leave to pursue other business opportunities, and Martinez could not pursue any business opportunities after his termination because AOB and Smith & Wesson had subjected to him to a 5 year non-compete restrictive covenant in his employment agreement.

101.     Further demonstrating the bad faith conduct of AOB and Smith & Wesson in terminating Martinez without cause, without telling Martinez any offense AOB and Smith & Wesson believed he had committed, without documenting anything in writing, without speaking with Martinez about any reasons for the termination and hearing his responses, without completing its form "Termination Checklist", without conducting an exit interview, AOB and Smith & Wesson violated its written policy title "HR-046 Corrective Action – Disciplinary Procedure." A true and correct copy of the disciplinary procedure is attached hereto as **Exhibit 30** and incorporated herein by reference**.**

102.     Immediately following August 7, 2017, AOB and Smith & Wesson unilaterally and

indefinitely postponed Jason Pace's international sales demonstrations, travels and activities without first consulting with Martinez.

103.    On September 28, 2017, Jason Pace wrote James Debney an email about his commitment to perform his job duties, noting AOB's/Smith & Wesson's interference with the performance of his job duties and addressing the rumors circulating about him which he found extremely offensive and hostile. A true and correct copy of the September 28, 2017 email is attached hereto as **Exhibit 31** and incorporated herein by reference.

104.    On September 28, 2017, within hours of Jason Pace sending his email to James Debney, Debney forwarded the email to Dan McDonough and Robert Cicero, and AOB and Smith & Wesson terminated Jason Pace's employment without first consulting Martinez, without any explanation, and without cause.

105.    Further demonstrating the bad faith conduct of AOB and Smith & Wesson in terminating Pace without cause, without telling Pace any offense AOB and Smith & Wesson believed he had committed, without documenting anything in writing, without speaking with Pace about any reasons for the termination and hearing his responses, without completing its form "Termination Checklist", without conducting an exit interview, AOB and Smith & Wesson violated its written polity title "HR-046 Corrective Action – Disciplinary Procedure." Exhibit 30.

106.    On October 26, 2017, Gemtech employee Lance Henning resigned and sent an email to AOB and Smith & Wesson's Human Resources Kathy Salvador and Dan McDonough and used the email as his exit interview. A true and correct copy of the October 26, 2017 email is attached hereto as **Exhibit 32** and incorporated herein by reference.

107.    Mr. Henning documented that AOB's/Smith & Wesson's termination of Martinez negatively affected GemTech's current and future sales.  He stated, ". . . it is my responsibility to leave having you and S&W know some of the facts and cultural changes once Mr. Martinez left the

company, which was a terrible loss for both Gemtech and S&W! The loss of Mr. Martinez has affected the leadership, strategy, accountability in both the current and future sales tremendously! Morale is at an all time low, due to lack of leadership and transparency to the staff, in regards to their jobs and companies direction. Key leadership felt and expressed, that as long as Mr. Martinez was at the helm after the sale, we would all stay informed and would continue upward with our success. . . When Mr. Martinez left the company, there was zero accountability to our sales goals, except for the days I was in the office, as I was always asking how sales were and pushed Kevin Frank to make calls and do follow up, since he reported directly to me. Hi answer was "why push for new sales, because we cannot ship anything during the inventory transition anyway." . . . Since Mr. Martinez was no longer there holding the other two salesmen accountable, sales plummeted over 75%. . . The loss of Mr. Martinez leadership has had a direct affect on morale with key personnel, as he was the sole key reason for the fast growth of Gemtech over the last two years. To this day, I am still receiving calls and texts from my customer base with complaints of Joey Harris and others not responding to their emails or voicemails. . . ." Kathy Salvador's response to Dan McDonough and Gary Leach of AOB was, "the things that make you go hmmmm. . . ." Exhibit 32.

108.    On November 7, 2017, Matt Buckingham wrote an email to James Debney about "Gemtech pressing issues/decisions" and said, "potential to reduce workforce in the inventory and control group – 5 total people, January timeframe." A true and correct copy of the November 7, 2017 email is attached hereto as **Exhibit 33** and incorporated herein by reference.  AOB and Smith & Wesson did not first consult with Martinez before deciding to terminate 5 Gemtech employees in the inventory and control group in January 2018.

109.    In connection with AOB's/Smith & Wesson's acquisition pursuant to the APA, AOB and Smith & Wesson engaged KPMG to do a valuation of certain tangible identifiable intangible assets acquired and liabilities assumed as of August 8, 2017.  On November 7, 2017, Gina Drocz of KPMG

wrote an email to Kyle Carter of AOB, Deana McPherson, Andrew Fulmer, Brenden Boucher of AOB, stating, ███████████████████████████████████████████████████ ███████████████████████████████████████████" A true and correct copy of the November 7, 2017 email and selected draft valuation schedules is attached hereto as **Exhibit 34** and incorporated herein by reference.

110.    KPMG was provided with, utilized and relied upon the same Gemtech financial model information presented on June 27, 2017 to AOB's Board of Directors. KPMG's schedule of Gemtech revenue showed:

██████████████████████████████████████████████████████████████

Exhibit 34.

111.    In KPMG's "Valuation of the Gemini Technologies, Incorporated Earn-Out Monte Carlo Simulation as of August 8, 2017" Schedule 1.7, the simulated cumulative revenue during the 36-month earnout period was:



Exhibit 34.

112.    On November 27, 2017, Gina Drocz of KPMG provided Kyle Carter of AOB, Deana McPherson, Andrew Fulmer, Brenden Boucher of AOB, with the draft narrative report of the valuation.  A true and correct copy of the November 27, 2017 email and draft narrative report is attached hereto as **Exhibit 35** and incorporated herein by reference.  A true and correct of the final report is attached hereto as **Exhibit 36** and incorporated herein by reference.

113.    On January 17, 2018, Jeff Buchanan emailed Liz Sharp of AOB, "subject RE: Did I miss something on Gemtech?" and said, "Probably going to shut down Idaho entirely in a month or two. Confidential."  A true and correct copy of the January 17, 2018 email is attached hereto as

**Exhibit 37** and incorporated herein by reference.  AOB and Smith & Wesson did not first consult with Martinez before making a decision to entirely shut down Gemtech Idaho.

114.    On January 23, 2018, Deana McPherson emailed with Brendan Boucher of AOB, "Subject Noncompete for Gemtech", and she said "How did we resolve this? Did we change it when Ron was Terminated?" Boucher responded, "We spoke to KPMG about that when it happened and I believe we ultimately concluded the value was de minimis because of the low margins of the business in the first few years after the purchase ***and the additional consideration possible for the Earn Out would entice Ron not to compete***. . . ." McPherson replied, "***With the thought that the earnout is almost likely NOT to happen and we all know that***, I wonder if that changes things."  Boucher replied, "Yes I was just thinking the same thing. I'll see what Ted has to say." A true and correct copy of the January 23, 2018 email is attached hereto as **Exhibit 38** and incorporated herein by reference.

115.    In January 2018, within five months of closing, AOB and Smith & Wesson planned its "GT RIF Plan" and script to deliver to the terminated employees. A true and correct copy of the January 2018 GT RIF Plan and Gemtech termination script is attached hereto as **Exhibit 39** and incorporated herein by reference.  Smith & Wesson did not first consult with Martinez before making its decision to terminate more Gemtech employees in February 2018.

116.    On February 1, 2018, AOB and Smith & Wesson terminated John "Derek" Smith, New Product Development, Travis Bundy, Testing & Quality Control, Stacy Walker, Testing & Quality Control, Doug Paxton, Testing & Quality Control, and Daniel Nakashima, Gemtech compliance specialist.  On February 1, 2018, Dan McDonough informed AOB's/Smith & Wesson's management in an email that they had "completed the process" of the terminating the unsuspecting Gemtech employees. A true and correct copy of the February 1, 2018 email is attached hereto as **Exhibit 40** and incorporated herein by reference.

117.    AOB and Smith & Wesson did not first consult with Martinez before making its

**Second Amended Complaint and Demand for Jury Trial | Page 32**

decision to terminate these five important Gemtech employees on February 1, 2018.

118.    On May 15, 2018, James Debney made an announcement to "All Employees" "RE: Organizational Announcement: Firearms Division – Gemtech" that "I am pleased to announce that effective immediately, Tony Miele will be responsible for managing the Gemtech Brand in addition to the Performance Center Brand. . . ." A true and correct copy of the May 15, 2018 email is attached hereto as **Exhibit 41** and incorporated herein by reference.

119.    AOB and Smith & Wesson did not first consult with Martinez before making its decision to make Tony Meile, a non-Gemtech employee, responsible for managing the Gemtech Brand.

120.    On June 27, 2018 AOB and Smith & Wesson "finished up" with the terminations of more Gemtech employees in Idaho.  A true and correct copy of Dan McDonough's June 27, 2018 email to AOB's/Smith & Wesson's management is attached hereto as **Exhibit 42** and incorporated herein by reference.

121.    AOB and Smith & Wesson did not first consult with Martinez before making its decision to terminate more Gemtech employees on June 27, 2018.

122.    In January 2019, less than 1 ½ years after the closing and within the earnout period, AOB and Smith & Wesson prepared and executed on the "Gemtech Closure" of all business and operations in Idaho.  True and correct copies of the Gemtech Closure Precedence Listing for January through March 2019 are attached hereto collectively as **Exhibit 43** and incorporated herein by reference.

123.    AOB and Smith & Wesson did not first consult with Martinez before making its decision to wind down and close all business and operations in Idaho.

124.    AOB and Smith & Wesson failed to consult Martinez about these, and other important decisions, notwithstanding its direct and immediate knowledge that the decisions would negatively

impact Gemtech's earnout period sales and, as a result, impact GT's earnout payments.

## COUNT 1
## BREACH OF THE ASSET PURCHASE AGREEMENT
## (AS AGAINST SMITH & WESSON)

125.    Plaintiff incorporates herein paragraphs 5 – 124 as though fully set forth herein.

126.    Smith & Wesson had a duty to comply with its promises and obligations set forth in Section 1.6 of the APA.

127.    Smith & Wesson breached Section 1.6 of APA and GT has been proximately damaged in excess of $75,000.00 in damages, in an amount to be proven at trial.

## COUNT 2
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AS AGAINST SMITH & WESSON)

128.    Plaintiff incorporates herein paragraphs 5 – 127 as though fully set forth herein.

129.    The APA contains an implied covenant of good faith and fair dealing.

130.    Smith & Wesson breached its covenant of good faith and fair dealing as specifically alleged above and incorporated herein by reference.

131.    As a result of Smith & Wesson's breaches of its covenant of good faith and fair dealing, GT has been proximately damaged in excess of $75,000.00 in damages, in an amount to be proven at trial.

## COUNT 3
## FRAUD IN THE INDUCEMENT
## (AS AGAINST AOB AND SMITH & WESSON)

132.    Plaintiff incorporates herein paragraphs 5 – 131 as though fully set forth herein.

133.    As specifically complained of above and incorporated herein by reference, AOB actively engaged in the fraud, participated in the fraud, acted in concert with Smith & Wesson in carrying out said fraud, and ratified said fraud.

134.    As specifically complained of above and incorporated herein by reference, Smith &

Wesson actively engaged in the fraud, participated in the fraud, and acted in concert with AOB in carrying out the fraud.

135.    AOB and Smith & Wesson committed fraud in the inducement due to each of their affirmative falsehoods represented as truth to GT, active concealment of facts which prevented GT from discovering them, and silence in the face of a duty to speak and disclose the whole truth to GT.

136.    In AOB'S and Smith & Wesson's 2015 Gemtech acquisition financial model, AOB/ Smith & Wesson projected that Gemtech would have significant sales growth for each year following its acquisition.

137.    To the contrary, in AOB'S/Smith & Wesson's 2017 Gemtech acquisition financial model, AOB and Smith & Wesson projected significant losses following its acquisition (i.e., during the 36-month earnout period), followed by more significant growth only after completion of the earnout period.

138.    AOB and Smith & Wesson thereby had material information, i.e., the negative and lousy revenue projections, in its possession while it was discussing and negotiating with GT about the additional consideration of the purchase price's earnout.  AOB and Smith & Wesson  failed to disclose the negative and lousy revenue projections to GT in advance of the execution of the APA.

139.    AOB's and Smith & Wesson's ongoing "concealment" or "half-truths" shows and reveals that AOB and Smith & Wesson did not intend to and/or did not believe it could achieve the earnout, which in itself makes the entire earnout provision (Section 1.6 of the APA) a ruse to induce GT to sell its assets to Smith & Wesson.

140.    AOB's and Smith & Wesson's fraud in the inducement is egregious, wanton, reckless and an extreme deviation from reasonable standards of conduct between a buyer and seller, given that GT had provided AOB and Smith & Wesson with its 2013-2016 financial statements demonstrating that the company was capable of steady revenue growth, something that is clearly reflected in AOB's

and Smith & Wesson's 2015 acquisition financial revenue model, and is also reflected in the 2017 acquisition financial revenue model for the post-earnout period, and given that GT provided AOB and Smith & Wesson with its 2017 – 2020 revenue projections which exceeded the $36 million earnout threshold.

141.    Although AOB and Smith & Wesson had knowledge of GT's opposite understanding that the earnout threshold was achievable and that GT's expectation of the earnout payment was reasonable, AOB and Smith & Wesson did not disclose or speak the whole truth to GT of the 2017 Gemtech acquisition financial revenue model.

142.    Through AOB's and Smith & Wesson's concealment and failure when they had a duty to speak, AOB and Smith & Wesson fraudulently led GT to believe that following the sale, Gemtech would continue its positive yearly revenue growth, that AOB and Smith & Wesson would support and allow Gemtech, under Martinez's leadership, to make the sales necessary to achieve the earnout threshold, that the earnout threshold would be achieved,  and that there would be an earnout payment to GT.  For example:

    a.    On March 1, 2017, AOB and &Wesson made an "Investor Presentation" to GT in which it said that its focus was on "companies that have achieved success through talented management teams, trusted brands, and market leadership, and that it intended to preserve these elements in its acquisition of GT's assets.

    b.    On March 10, 2017, AOB and Smith & Wesson provided GT with a term sheet in which it was represented to GT that the earnout would start to accrue after the first $12M in annual sales during the earnout period.

    c.    On March 31, 2017, GT (Ron Martinez and Mark Thompson) had a call with AOB and Smith & Wesson, Matt Buckingham and Andy Fulmer, and they confirm that the $36 million earnout threshold is achievable based on GT's existing sales and revenue

trends, and an earnout payment maximum was set. Martinez and Thompson agreed,
and expressed their excitement they could perform during the three years to achieve
the $17.1 million earnout payment.

d.  On April 10, 2017, AOB and Smith & Wesson provided GT with an amended term
sheet in which it confirmed that the earnout would start to accrue after reaching $36
million in combined earnout period sales.

e.  In both terms sheets, AOB and Smith & Wesson led GT to believe that the earnout
threshold was achievable and an earnout payment was a real possibility based on the
fact that the company (Gemtech) was already achieving at least $12M in annual sales
and had strong revenue growth projections.

f.  AOB and Smith & Wesson prepared a press release in which it confirmed the earnout
model and said "$17.1M will be due after a period of three years following the closing,
contingent upon the financial performance of the acquired business."

143.  While this "inducement" was taking place, AOB and Smith & Wesson had knowledge
(based on its previously completed Gemtech acquisition financial revenue model and projections) that
there was no chance of Gemtech realizing $12 million in the first, second or third years of the earnout
period, and had knowledge that the earnout was an impossibility.

144.  Shockingly, AOB and Smith & Wesson knew that it was not even going to try to
achieve the earnout, and it withheld that material information from GT because AOB and Smith &
Wesson needed a shiny lure of "additional consideration" earnout to entice or induce GT into selling
its assets when it had no business reasons to do so at the time.

145.  AOB's and Smith & Wesson's fraud in the inducement is further shown by the
following indisputable events and/or communications:

a.  Starting in 2016, AOB and Smith & Wesson began making negative sales revenue

forecasts for Gemtech.

b. In February of 2017, AOB and Smith & Wesson told GT that their acquisition model for Gemtech would be a perfect fit for Smith & Wesson, and that there is a lot of upside for the earnout.

c. On March 9, 2017, AOB and Smith & Wesson sends an internal email regarding another potential acquisition, acknowledging that their APA model for Gemtech would lead to a decrease in sales: "The way I would model this is very similar to Gemtech--I would assume a large decrease in revenue in calendar 2017, then increase it from there based on the same assumptions in Gemtech."

d. On June 27, 2017, AOB and Smith and Wesson present the 2017 Gemtech financial model projections to AOB's Board of Directors, showing significant losses during the earnout period. GT did not have any knowledge of these negative revenue projections during the earnout period.

146.    AOB and Smith & Wesson withheld its 2017 Gemtech acquisition financial revenue model information from GT because they knew, or should have known, or acted with reckless indifference, that disclosing it would have led to the immediate termination of the potential acquisition and sale by GT.

147.    Outwardly, AOB and Smith & Wesson gave every appearance, every assurance to GT that it would work toward the achievement of the earnout. AOB and Smith & Wesson went so far as to promise Ron Martinez in his employment agreement (which was an exhibit to the APA) that "during the term of [his] employment…the Company and its Executive[s] intend to expand the Company's international operations." In secret, however, AOB and Smith & Wesson already knew that Gemtech would never achieve the earnout threshold and that there would be no earnout payment to GT, and AOB's and Smith & Wesson's failure to openly share and disclose their projections and

forecasts with GT, Ron Martinez, constituted fraud in the inducement.

148.    The known and undisclosed negative revenue projections demonstrate that AOB and Smith & Wesson did not ever intend to work toward the earnout following the acquisition — a fact that is confirmed by AOB's/Smith & Wesson's subsequent abysmal sales figures and "I don't care" actions of terminating all Gemtech employees, other than a couple who resigned under AOB's/Smith & Wesson's dysfunctional ownership, and the dismantling, shutting down and destroying all of what was Gemtech Idaho.

149.    AOB's and Smith & Wesson's actual sales revenue during the 36-month earnout period totaled approximately ███████

| | |
|---|---|
| 2017 | ███████ |
| 2018 | |
| 2019 | |
| 2020 | |
| **TOTAL** | ███████ |

150.    AOB's and Smith & Wesson's financial revenue performance of Gemtech during the earnout period was much worse that even the dismal 2017 projections made in its acquisition model that was presented to AOB's Board of Directors and provided to KPMG to perform is valuation.

151.    The above-described fraud by AOB and Smith & Wesson and their reckless indifference of the illusory nature of the additional consideration of the earnout, and reckless indifference of GT's reasonable expectancy that the earnout threshold would be met and reasonable expectancy that there would be an earnout payment to GT, induced GT to enter the APA.

152.    AOB's and Smith & Wesson's misrepresentations, concealments, omissions, and failures of their duty to speak and tell the whole truth were material.

153.    AOB and Smith & Wesson knew, should have known, or acted with reckless indifference that they were misrepresenting, concealing, omitting and failing to tell the whole truth to GT about their material negative Gemtech financial revenue information for the years 2017 – 2020

when AOB and Smith & Wesson knew that GT had the oppositive understanding.

154.   GT's reliance on AOB's and Smith & Wesson's misrepresentations, concealments, omissions, and failures to tell the whole truth to GT was reasonable and justified under the factual circumstances.

155.   GT has been proximately damaged as a result of AOB's and Smith & Wesson's fraud, and is entitled to an award of its lost profits in an amount of at least $34,000,000.00 or higher.

156.   AOB and Smith & Wesson further made false and misleading statements to GT in connection with the APA, e.g., that it would not take any bad-faith actions to avoid or reduce the earnout and earnout payment, and that it intended to expand its international operations to further the sale of Gemtech products.  AOB and Smith & Wesson never intended to fulfill these promises.

157.   AOB and Smith & Wesson had knowledge or belief that the above statements were false, and it acted with reckless indifference to the truth of the statements.

158.   AOB and Smith & Wesson also made several material omissions in connection with the APA, e.g., that it was limited in its international sales abilities, that it would close Gemtech's Idaho operations, that it did not intend to actively pursue Gemtech's production, marketing and domestic and international sales partnership efforts, and that it would terminate the majority of Gemtech's employees.

159.   AOB and Smith & Wesson sought to induce GT's reliance in connection with the APA with its false statements and/or its material omissions.

160.   GT justifiably relied on these statements and/or material omissions.

161.   GT would never have entered the APA if it had known about the falsity of the statements and/or its material omissions by AOB and Smith & Wesson.

162.   AOB   and   Smith   &   Wesson   was   responsible   for   making   these representations/omissions and intended to gain financially through the usurpation of GT's assets by

making the representations/omissions.

163.    AOB and Smith & Wesson used Section 1.6 of the APA as an illusory instrumentality to obtain GT's assets without any intention of meeting the earnout threshold and ever making an earnout payment to GT.

164.    GT was injured as a result of AOB's and Smith & Wesson's fraud, and is entitled to an award of its lost profits in an amount of at least or more than $34,000,000.00.

**REQUEST FOR ATTORNEYS' FEES**

165.    GT has incurred attorney fees related to the prosecution of this matter.  GT is entitled to recover its reasonable costs and attorneys' fees incurred in this matter pursuant to the APA, and applicable Delaware law.

**DEMAND FOR JURY TRIAL**

166.    GT demands a trial by jury on all issues raised by the pleadings pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**PRAYER FOR RELIEF**

WHEREFORE, GT respectfully requests the following relief against the Defendants:

1.    An award of expectancy damages in the sum of $17,100,000.00 for breach of the APA; damages in the sum of $17,100,000.00 for Breach of the Implied Warranty of Good Faith and Fair Dealing; said amounts to be proven at trial.

2.    For rescissory damages constituting lost profits in the sum of $34,000,000.00 or higher for AOB's and Smith & Wesson's fraud in the inducement; said amount to be proven at trial.

3.    An award of pre-judgment and post-judgment interest on each awarded claim for damages in favor of GT, as permitted by Delaware law.

4.    An award of attorneys' fees and costs in favor of GT; and,

5.    For such other and further relief as the Court deems just.

DATED <u>February 1, 2024</u>.

TROUT LAW, PLLC


<u>/s/ Kim J. Trout</u>
Kim J. Trout – ISB No. 2468
ktrout@trout-law.com
Attorney for Plaintiff Gemini Technologies, Inc.

<u>/s/ Steven F. Schossberger</u>
Steven F. Schossberger – ISB No. 5358
sschossberger@trout-law.com
Attorney for Plaintiff Gemini Technologies, Inc.