# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, INC.,

               Plaintiff,

v.

SMITH & WESSON SALES COMPANY
and AMERICAN OUTDOOR BRANDS,
INC.,

               Defendants.

Case No. 1:18-cv-00035-REP

**MEMORANDUM DECISION AND
ORDER**

Before the Court are Defendants' Motion for Summary Judgment (Dkt. 194) and

Plaintiff's Motion to Amend (Dkt. 191). Also pending are three Motions to Seal (Dkts. 193, 195,

& 202). The parties have consented to a magistrate judge (Dkt. 16). The Court, having reviewed

the motions and exhibits thereto, held oral argument, and otherwise being fully informed, enters

the following Memorandum Decision and Order.

## BACKGROUND

This is a dispute about a corporate acquisition by Defendants Smith and Wesson Sales

Company ("Smith & Wesson") and American Outdoor Brands, Inc. ("AOB") of Plaintiff Gemini

Technologies, Inc. ("GemTech").

GemTech designed and manufactured firearm silencers. GemTech describes itself as a

company that rose from "modest beginnings" to "an industry leader in the design and

manufacture of gun silencers." Second Amend. Compl. at ¶¶ 6-7 (Dkt. 164) (hereinafter

"Compl."). In late 2014 or early 2015, Ronald Martinez purchased a majority of GemTech's shares and assumed control of the company as its President and CEO. *Id.* at ¶ 10.[1]

Smith & Wesson is a manufacturer of firearms incorporated in Delaware. Its co-defendant here, American Outdoor Brands, Inc. ("AOB"), is a sporting and outdoor goods manufacturer incorporated in Nevada.[2]

## A. Negotiations

In 2015, Smith & Wesson contemplated acquiring GemTech. Smith & Wesson was motivated to acquire GemTech, in large part, because of prospective federal legislation – the Hearing Protection Act – that would reduce regulation and taxes on silencer sales.[3] Smith & Wesson predicted that passage of the Act would greatly increase demand for GemTech's products. Defs.' Stmt. of Undis. Mat. Fact at ¶ 7 (Dkt. 194-2).

In early 2017, acquisition discussions began in earnest. Amid conversations between Mr. Martinez and Smith & Wesson executives, Mr. Martinez provided Smith and Wesson with detailed financial information, including Gemini's actual profit and loss statements for 2013 through 2016 and projected profit and loss statements for 2017-2019. Compl. at ¶ ¶ 22-23; Ex. 5.

---

[1]  GemTech is referenced herein as "Plaintiff" or by its proper name.

[2]  Plaintiff represents that at the time of the transaction at issue, Smith & Wesson was a wholly owned subsidiary of AOB. Compl. at ¶ 3. However, as Plaintiff's currently pending motion to amend makes clear, the exact corporate lineage of the two defendants is a matter of debate. Collectively, Smith & Wesson and AOB are referenced herein as "Defendants" or individually by their proper names.

[3]  In its first iteration, the Hearing Protection Act of 2015 – H.R. 3799 – was introduced as a bill in the House of Representatives on October 22, 2015. It did not advance beyond committee consideration and effectively failed to become law at the end of the 114th Congress on January 3, 2017. Hearing Protection Act of 2015, H.R. 3799, 114th Cong. (2015). Its next iteration, the Hearing Protection Act of 2017, was introduced as companion bills – S. 59 and H.R. 367– in the House and Senate on January 9, 2017. Neither bill advanced beyond committee consideration, and the Act effectively failed to become law at the end of the 115th Congress on January 3, 2019. Hearing Protection Act of 2017, H.R. 3139, 115th Cong. (2017); S. 59, 115th Cong. (2017); *see also* Def.'s MSJ (Dkt. 194), Ex. 20 at 133.

For years 2017 through 2019, GemTech projected its revenue at $25 million, $85 million, and $150 million, respectively. Ex. 5 at 5.

Internally, Smith & Wesson's projections of GemTech's revenues were less optimistic. In February 2015, Smith & Wesson had prepared a GemTech acquisition financial model. Compl. at ¶¶ 14-16; Ex. 1 (hereinafter "2015 financial model"). In the 2015 financial model, Smith & Wesson estimated that GemTech would earn approximately $38.9 million in revenue from 2017 through 2019 (well below GemTech's $260 million projection for 2017-2019). *Id.*

Moreover, in June of 2016, Smith & Wesson and AOB had prepared a GemTech rate-of-return analysis for 2017 and beyond. Second Amend. Compl. at ¶ 17; Ex. 2 (hereinafter "2016 rate-of-return analysis"). In the 2016 rate-of-return analysis, Smith & Wesson estimated that GemTech's revenue would decrease by 70 percent in 2017; not increase or decrease in 2018; increase by 80 percent in 2019; and increase by 40 percent in 2020. *Id.*

In contemporaneous emails, Smith & Wesson executives internally discussed these projections. *Id.* at ¶ 31; Ex. 13 (March 9, 2017 email comparing acquisition of another silencer company: "The way I would model this is very similar to GemTech -- I would assume a large decrease in revenue in calendar 2017, then increase it from there based on the same assumptions as GemTech."); ¶ 47; Ex. 21 (June 23, 2017 email string: "The financial model assumes a significant down turn year one, flat two and three, and then normal growth. We wanted to justify $10 million [purchase price for GemTech] without HPA [Hearing Protection Act] passing. . . Not a single acquisition we have made has hit the revenue number in their respective model.").

During negotiations, Smith & Wesson executives did not share their less sanguine revenue projections with Mr. Martinez. Instead, in various telephone calls with Mr. Martinez, Smith & Wesson executives touted GemTech's management team, brand name, product quality,

and earning potential. They praised GemTech's management team as the "secret sauce" and "strong," and committed to keeping the team "intact." Compl. at ¶¶ 18-19; Ex. 4. They applauded GemTech for having "a great brand name" and "better product than other suppressor companies." *Id.* And in what would become a pivotal part of this lawsuit, they discussed that GemTech could achieve an "earnout" of a percentage of GemTech's total revenues above $36 million ($12 million per year for the first three years after acquisition). Compl. at ¶ 28; Ex. 10 (notes of February 27, 2017 telephone call: GemTech has "a lot of upside [for the] earnout"); ¶ 38; Ex. 16 (notes of March 30, 2017 telephone call: earnout is achievable); ¶ 40; Ex. 17 (notes of March 31, 2017 telephone call: earnout is achievable and capping earn-out amount at $18.75 million).

On April 10, 2017, Smith & Wesson provided Mr. Martinez with a revised term sheet that outlined the major terms of the acquisition. *Id.* at ¶¶ 41-42; Ex. 18. Therein, Smith & Wesson proposed to acquire GemTech for a purchase price of $10 million in cash at closing, plus up to $17.1 million in earn-out payments. *Id.* at ¶ 42; Ex. 18. The earnout payments would be based on the cumulative revenue of GemTech for the three-year period after closing and be calculated at a formula of $0.15 per $1.00 of revenue earned above $36 million (and up to $150 million). *Id.* The parties agreed in principle on these financial parameters.

In May and June 2017, the parties negotiated other terms of the acquisition. As part of the acquisition, Mr. Martinez and key members of the GemTech staff sought continued employment at the GemTech segment after acquisition. Specifically, Mr. Martinez sought a guaranteed five-year employment term. *See* Defs.' MSJ (Dkt. 194) at Ex. 9 (June 26, 2017 email, counsel for Mr. Martinez stating: "Some provision for a payout will have to be addressed if there is *any* termination within the three (3) year earn out period for any reason. [Mr. Martinez's] preference

is for a guaranteed five (5) year agreement, guaranteed even if discharged."). Smith & Wesson

declined guaranteed employment for Mr. Martinez. *Id.*

## B. The Asset Purchase Agreement (APA)

On June 29, 2017, the parties executed an Asset Purchase Agreement consummating the

acquisition and memorializing its terms (hereinafter "APA"). Compl. at ¶ 68; Ex. 25.[4] As it

related to the earnout payments, Section 1.6 of the APA provided the same formula for

calculating the payments as the revised term sheet, but also conditioned the payments as follows:

> (a) As additional consideration for the Assets being acquired by
> Buyer hereunder, and upon the terms and subject to the conditions
> and limitations set forth in this Section 1.6, Buyer shall pay to the
> Company the contingent payments, if any, as set forth in this
> Section 1.6 (the "Earn-Out Payment") as follows: If Total Sales of
> the Business for the 36-month period following the Closing Date
> (the "Earn-Out Period") exceed Thirty-Six Million Dollars
> ($36,000,000) in the aggregate, Buyer shall pay to the Company
> Fifteen Cents ($0.15) for each One Dollar ($1.00) by which the
> Total Sales of the Business for the Earn-Out Period (the "Earn-Out
> Period Sales Amount") exceeds Thirty-Six Million Dollars
> ($36,000,000). For purposes of illustration only, if the Earn-Out
> Period Sales Amount equals $80,000,000, then Buyer shall pay the
> Company a total of $6,600,000 (($80,000,000 - $36,000,000) X
> $0.15).
>
> (b) In no event shall the Earn-Out Payment under this Section 1.6
> exceed Seventeen Million One Hundred Thousand Dollars
> ($17,100,000) in the aggregate. . . .
>
> (c) Subject to the terms and conditions set forth in this Agreement
> and the Collateral Agreements, subsequent to the Closing, Buyer
> shall have sole discretion with regard to all matters relating to the
> operation of the Business; provided, that Buyer shall not, directly
> or indirectly, take any actions in bad faith that would have the
> specific purpose of avoiding or reducing the Earn-Out Payment
> hereunder. In addition, Buyer agrees to consult with Ronald J.
> Martinez in advance of any decision made relating to the operation
> of the Business only if Buyer has knowledge that such decision

---

[4]    Present counsel for Plaintiff represented GemTech at the time and negotiated the terms of the
Asset Purchase Agreement and Mr. Martinez's subsequent employment contract.

> will negatively impact the Earn-Out Payment. The Company and the Stockholders further acknowledge that (i) there is no assurance that the Company will receive an Earn-Out Payment and Buyer has not promised or projected any Earn-Out Payment, and (ii) the parties hereto solely intend the express provisions of this Agreement to govern their contractual relationship with respect to the subject matter of this Section 1.6.

Compl. Ex. 25 at 5-6.

After the execution of the APA – and prior to the closing of the deal – executives at Smith & Wesson and AOB privately expressed doubts about Mr. Martinez and his ongoing role at GemTech. Compl. at ¶ 71; Ex. 27 (July 21, 2017 email from AOB Senior Vice President (Firearms) Matt Buckingham to Smith & Wesson/AOB CEO James Debney describing the closing process as "very messy" and that he was "getting alarmed with Ron Martinez staying with us post close.").

**C. After the APA**

On August 7, 2017, the parties closed the deal. Compl. at ¶ 72. In addition to purchasing the assets of GemTech, Smith & Wesson hired a number its former employees, including Mr. Martinez as General Manager, Jason Pace as International Sales Representative, and at least five other employees. Compl. at ¶¶ 86-89, 116.

The same day, Mr. Martinez and Smith & Wesson executed an Employment Agreement. *See* Defs.' MSJ at Ex. 27. That Employment Agreement provided only for his at-will employment. *Id.* at 5, 8. Moreover, as to Mr. Martinez ("the Executive"), the Agreement provided in part:

> The Executive has been an employee of Gemini. The Company and the Executive each desire that the Executive serve in such capacity with the Company. . .
>
> The Business (as defined below) that is being acquired by the Company is highly specialized and the Executive, has, and

> increasingly will have, access to the Company's Proprietary and
> Confidential Information [parenthetical omitted] and will
> participate in the growth the Company's goodwill. . .
>
> The Company desires to employ the Executive on and after the
> closing of the Transaction, to provide services to the Company
> pursuant to the terms of this Agreement.

*Id.* at 1.

Abruptly, on September 18, 2017 – 41 days after closing – Smith & Wesson terminated

Mr. Martinez's employment. Compl. at ¶ 98. Prior to doing so, Smith & Wesson had not

consulted him pursuant to Section 1.6(c) of the APA. Smith & Wesson publicly characterized the

break as Mr. Martinez having "left the company to pursue other business opportunities." Compl.

at ¶ 98; Ex. 28. Internally, however, Smith & Wesson terminated him for cause. Defs.' MSJ

(Dkt. 194), Ex. 17 at 3 (Smith & Wesson CEO terminated Mr. Martinez because of his "personal

loss of trust and confidence in Mr. Martinez's ability to lead the business."). Likewise, on

September 28, 2017, Smith & Wesson terminated Mr. Pace's employment. Compl. at ¶ 104. It

did so without first consulting Mr. Martinez. *Id.*

On December 7, 2017, AOB filed a Form 10-Q with the Securities & Exchange

Commission that referenced the GemTech earn-out payment as a contingent liability; as of

October, 31, 2017, AOB allocated only $100,000 for the liability (of a possible $17.1 million).

Pl. Mot. to Amend (Dkt. 191), Ex. 46 at 10 ("In connection with the Gemtech acquisition,

addition consideration of up to a maximum of $17.1 million may be paid contingent upon the

cumulative three year sales volume of Gemtech products. . . Based on current forecasted revenue

projections, we believe it is unlikely that the acquired business will achieve the performance

metrics. Therefore, as of October 31, 2017, the contingent liability was recorded at a fair value of

$100,000 in non-current liabilities.").

Between January 2018 and June 2018, Smith & Wesson conducted a reduction in force and terminated the remaining employees of the GemTech segment. Compl. at ¶¶ 115-120. Again, prior to doing so, it did not consult Mr. Martinez. *Id.* at ¶ 121.

In January 2019, Smith & Wesson shuttered GemTech's business operations in Idaho, again without consulting Mr. Martinez. *Id.* at ¶¶ 122-23; Ex. 43.

According to Smith & Wesson, it closed GemTech because GemTech had supply chain issues and underperformed in generating revenue. Defs.' Stmt. of Undis. Mat. Fact at ¶¶ 29-30. Moreover, the Hearing Protection Act failed to pass. *Id.* at ¶ 33. Accordingly, Smith & Wesson allocated its limited resources and assets to other business segments that offered better rates of return. *Id.* at ¶¶ 31-32.

During the three-year earnout period after closing, GemTech earned total revenue of $7.2 million. *Id.* at ¶ 34. Thus, GemTech did not achieve the aggregate $36 million in revenue needed to trigger any earnout payment. *Id.*

### D. Procedural History

GemTech first sued Smith & Wesson and AOB on January 24, 2018 (Dkt. 1). The case was initially assigned to Magistrate Judge Candy W. Dale. Plaintiff filed its operative Second Amended Complaint on February 2, 2024 (Dkt. 164). On August 7, 2024, Judge Dale entered a stay (Dkt. 180) because Mr. Martinez, GemTech's representative in this suit, was involved in a major car crash. The case was stayed for eight months while he recovered. The undersigned was assigned the case on November 5, 2024 (Dkt. 183) and subsequently entered an Amended Scheduling Order on April 16, 2025 (Dkt. 188).

GemTech's Second Amended complaint (Dkt. 164) brings three claims: (i) breach of contract, (ii) breach of the implied covenant of fair dealing, and (iii) fraud in the inducement.

Defendants' Motion for Summary Judgment argues that each of these three claims do not raise a genuine dispute of material fact and should be dismissed as a matter of law (Dkt. 194). Simultaneously, GemTech has moved to amend its complaint a third time to add a claim for punitive damages, as well as to name corporate entities related to Defendants who they claim are successors in interest to the acquisition (Dkt. 191).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. The court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted).

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.; Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing evidence in the light most favorable to the nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). To defeat

a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Zetwick*, 850 F.3d at 441 (citation omitted). Accordingly, the court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

## DISCUSSION

The court will begin by discussing applicable law, proceed to address the parties' arguments on summary judgment, and conclude by resolving the motions to amend and seal.

### A. Choice of Law

The parties agree that Delaware law applies to Plaintiff's two contract claims: Count One (breach of contract) and Count Two (breach of implied covenant). *See* Defs.' Resp. at 9 (Dkt. 205); P.'s Mot. to Amend at 7 (Dkt. 191-11). However, there is some disagreement as to whether Delaware or Idaho law applies to Count Three (fraud in the inducement).

Plaintiff first argued that Delaware law applied to the fraud in the inducement claim based on the APA's choice of law provision. Then, in its response to Defendant's Motion for Summary Judgment, Plaintiff continued to press for the application of Delaware law to the fraud in the inducement claim, claiming that Defendant had waived the issue by citing Delaware law in earlier briefing. P.'s MSJ Resp. at 12-13 (Dkt. 199). However, Plaintiff's Response then proceeded to address the fraud in the inducement claim under both Delaware and Idaho law. *Id.* at 13. Finally, in its Reply in support of the Motion to Amend, Plaintiff argued that its fraud in the inducement claim was "fully cognizable under Idaho law" and only addressed that claim under Idaho law. Reply at 3 (Dkt. 207).

Federal courts sitting in diversity "must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). Thus, this court looks to Idaho choice of law rules to determine the law that controls here.

The APA contains a choice of law provision. The Idaho Supreme Court has long held "[c]hoice-of-law provisions are recognized in Idaho both in commercial and noncommercial transactions" and will be enforced. *Great Plains Equip., Inc. v. Nw. Pipeline Corp.*, 979 P.2d 627, 639 n.3 (Idaho 1999).

Specifically, Section 9.5 of the APA states "The provisions of this Agreement and the documents delivered pursuant hereto shall be governed by and construed in accordance with the laws of the state of Delaware (excluding any conflict of law rule or principle that would refer to the laws of another jurisdiction)." Dkt. 164-4, Ex. 25 at 39.

However, while this choice of law provision is recognized under Idaho law, its scope is subject to interpretation. As drafted, it applies to a narrow set of issues: interpreting and applying the provisions of the APA, not analyzing conduct that occurred in the lead-up to the agreement. Thus, because the fraud in the inducement claim involves conduct that took place before the APA was executed, and plainly does not involve the interpretation of any provision of that agreement, the fraud in the inducement claim falls outside of the choice of law provision. Courts in this district have reached the same conclusion when interpreting similarly narrow choice-of-law provisions. *See Matunas v. Practiceworks Sys., LLC*, No. CV-06-484-S-BLW, 2007 WL 1729738, at *2 (D. Idaho June 13, 2007); *Pro-Formance Lube Ctr., Inc. v. BP Lubricants USA, Inc.*, No. CV 08-00290-BLW, 2009 WL 10678745, at *3 (D. Idaho July 31, 2009). Because the fraud in the inducement claim falls outside the choice-of-law provision here, the Court conducts an analysis of choice-of-law under Idaho state law principles.

Idaho applies the Restatement (Second) Conflict of Laws to resolve choice-of-law questions. *Melaleuca, Inc. v. Kot Nam Shan*, No. 4:18-cv-00036-DCN, 2018 WL 1952523, at *4 (D. Idaho Apr. 24, 2018). Here, the relevant Restatement provision applicable law to tort claims – for which fraud in the inducement qualifies – is Section 145, which sets forth the "most significant relationship" test. *Id.*

Idaho courts applying the "most significant relationship" test consider the following: (i) the place where the injury occurred, (ii) the place where the conduct causing the injury occurred, (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (iv) the place where the relationship, if any, between the parties is centered. *Grover v. Isom*, 137 Idaho 770, 53 P.3d 821, 824 (2002). In addition to these factors, courts also consider various policy concerns outlined in Section 6 of the Restatement (Second) of Conflicts of Laws. *Id.*

The most significant relationship test dictates that Idaho law applies to the fraud in the inducement claim here. The business relationships, conduct, and alleged injuries at issue occurred or were centered in Idaho. The allegations involve the acquisition and operation of an Idaho-incorporated company (GemTech), as well as subsequent economic harm, including the closure of GemTech's business, that would be most felt in Idaho. The only factor cutting against the application of Idaho law here – the fact that Defendants are incorporated and primarily conduct business in other states – is not substantial enough to change the outcome.

Accordingly, the Court will apply Delaware law to Plaintiff's breach of contract and implied covenant claims. The Court will apply Idaho law to Plaintiff's fraud in the inducement claim.

**B. Fraud in the Inducement**

Defendants move for summary judgment on Plaintiff's fraud in the inducement claim (Count Three). That claim alleges Defendants committed fraud during negotiations over the GemTech acquisition by making affirmative misrepresentations, and omitting material information, that induced Plaintiff to enter into the APA. *See generally* Compl. at ¶¶ 132-164. Defendants argue that Plaintiff's claim fails as a matter of law because it does not allege actionable misrepresentations of existing fact, Defendants had no duty to disclose the alleged omitted information, and Plaintiff did not justifiably rely on any alleged misrepresentations or omissions. *See generally* Defs.' MSJ (Dkt. 194).

### 1. Legal Standards

Under Idaho law, the elements of fraud in the inducement are: (1) a statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate injury. *Craig v. Silver Sage Ranch, LLC*, No. 1:22-cv-00115-AKB, 2024 WL 3892525, at *8 (D. Idaho Aug. 21, 2024) (citing *Country Cove Dev., Inc. v. May*, 150 P.3d 288, 293 (Idaho 2006)). Fraud must be "determined from all the facts and circumstances of the case." *Penn Mut. Life Ins. Co. v. Ireton*, 57 Idaho 466, 482, 65 P.2d 1032, 1039 (1937).

Representations underlying a fraud claim must "concern past or existing material facts." *Maroun v. Wyreless Systems, Inc.*, 141 Idaho 604, 615, 114 P.3d 974, 985 (Idaho 2005) (citing *Magic Lantern Prods, Inc. v. Dolsot*, 126 Idaho 805, 807, 892 P.2d 480, 482 (1995) (overruled on other grounds by *Great Plains Equip., Inc. v. Northwest Pipeline Corp.*, 136 Idaho 466, 36 P.3d 218 (2001)). Conversely, "a representation consisting of promise or a statement as to a future event will not serve as basis for fraud, even though it was made under circumstances as to

knowledge and belief which would give rise to an action for fraud had it related to an existing or past fact." *Sharp v. Idaho Inv. Corp.,* 95 Idaho 113, 122, 504 P.2d 386, 395 (1972). Similarly, "[o]pinions or predictions about the anticipated profitability of a business are usually not actionable as fraud." *Id.; see also Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc*., No. CV 2017-0500-JRS, 2018 WL 2727542, at *12 n.119 (Del. Ch. June 6, 2018); *Earth Pride Organics, LLC v. Corona-Orange Food Int. Holdings, LLC*, No. N23C-05-009-EMD CCLD, 2024 WL 1905384, at *8 (Del. Super. Ct. Apr. 17, 2024) ("Sales projections are forecasts of future business and those 'predictions about the future cannot give rise to actionable common law fraud.").

Idaho courts have recognized two exceptions to the general rule that fraud in the inducement cannot be based upon a future promise. First, there may be fraud "where a false prediction or opinion is given with the intent to mislead'" such as "where actual value is known and false statements are knowingly made with intention to deceive[.]" *April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 510, 328 P.3d 480, 490 (2014). Second, fraud may exist "if the promise was accompanied by statements of existing fact which show the promisor's ability to perform the promise and those statements were false." *Gillespie v. Mt. Park Estates*, LLC, 142 Idaho 671, 674, 132 P.3d 428, 431 (2006).

A fraud in the inducement claim also may be based on a material omission. However, an omission generally constitutes fraud only where a duty to disclose exists. *Humphries v. Becker*, 159 Idaho 728, 736, 366 P.3d 1088, 1096 (2016) (citations omitted). A duty to disclose may arise (i) if there is a fiduciary or other similar relationship of trust and confidence between the two parties; (ii) in order to prevent a partial statement of the facts from being misleading; or (iii) if a fact known by one contracting party and not the other is so vital that if the mistake were mutual

14

the contract would be voidable, and the party knowing the fact also knows that the other does not know it. *Knudsen v. J.R. Simplot Co.*, 168 Idaho 256, 268 (2021). Under Idaho law, a fiduciary duty does not ordinarily arise between parties to an arm's length business transaction. *High Valley Concrete, L.L.C. v. Sargent*, 234 P.3d 747, 752 (Idaho 2010).

Whether based on affirmative misrepresentations or material omissions, a plaintiff must show justifiable reliance in order to sustain a fraud in the inducement claim. *Craig*, 2024 WL 3892525, at *8. In the context of a written contract, a plaintiff cannot successfully demonstrate reliance on an extra-contractual misrepresentation or omission where the plaintiff had the opportunity to review the contract – which corrected the misrepresentation or disclosed the omitted information – prior to its execution. *King v. Lang,* 136 Idaho 905, 911, 42 P.3d 698, 704 (2002) (holding that, even if misrepresentations were made by real estate agents regarding easement access to river, purchaser could not prove justifiable reliance as she was afforded the opportunity to inspect the easement agreements – which did not permit access to river – prior to closing). Likewise, where the plaintiff conducts his own independent investigation, and as a result has access to information that might contradict the misrepresentation or omission, he cannot successfully demonstrate reliance. *Faw v. Greenwood*, 101 Idaho 387, 389, 613 P.2d 1338, 1340 (1980) (holding that "when a purchaser is given the opportunity to conduct an independent investigation of the records and does so, it is generally held that he is not entitled to rely on misrepresentations of the seller") (citations omitted); *see also Atari Corp. v. Ernst & Whinney,* 981 F.2d 1025, 1030 (9th Cir. 1992) (holding that investor plaintiff's reliance was not justifiable where plaintiff had significant financial information and moved forward with the transaction).

### 2. Misrepresentations

Here, while difficult to track precisely in the complaint, Plaintiff alleges that Defendants made the following affirmative misrepresentations that induced Plaintiff to agree to the acquisition: (i) January 2, 2017 telephone call: "immediate need to keep people around and keep talent" and the GemTech "management team is the 'secret sauce'" (Compl. at ¶ 18); (ii) January 24, 2017 telephone call: "GemTech has a great brand name"; GemTech is superior and has a well know[n] team"; Defendants "are looking to acquire the GemTech team"; and "the GemTech team will be kept intact" (Compl. at ¶ 19); (iii) February 15, 2017 telephone call: "GemTech is a perfect fit with Smith & Wesson" (Compl. at ¶ 26); (iv) February 27, 2017 telephone call: "a lot of upside for the earnout" (Compl. at ¶ 28); (v) March 30, 2017 telephone call: "$12 million a year during the earnout period is achievable" (Compl. at ¶ 38); and (vi) March 31, 2017 telephone call: "threshold aggregate sum of $36 million under the earnout formula is achievable" (Compl. at ¶ 40). Defendants respond that none of these alleged misrepresentations are actionable because they are forward-looking predictions or puffery, not binding promises based on existing facts. *See* Defs.' MSJ at 16-24 (Dkt. 194). The Court agrees.

First, representations about the quality of GemTech's brand and products, its fit with Defendants' companies, and compliments about the abilities of GemTech's management are not promises or statements that "concern past or existing material facts." *Maroun*, 141 Idaho at 615. Indeed, they are mere opinions that promise nothing, or in other words, puffery. Such statements cannot form the basis of a fraud claim. See *SEC v. Aqua Vie Bev. Corp.*, No. CV 04-414 SEJL, 2007 WL 1430765, at *8 (D. Idaho May 14, 2007), *report and recommendation adopted in part*, No. CV 04-414-S-EJL, 2007 WL 2025231 (D. Idaho July 9, 2007), *aff'd sub nom. S.E.C. v. Gillespie*, 349 F. App'x 129 (9th Cir. 2009) ("mere 'puffery' or 'misguided optimism' is not

actionable[.]"); *G & M Farms v. Funk Irr. Co.*, 119 Idaho 514, 522, 808 P.2d 851, 859 (1991)

("the general rule with regards to 'trade talk,' 'dealer's talk,' 'puffing,' and 'seller's talk,' is that

such statements do not amount to actionable misrepresentation"); *Earth Pride Organics*, 2024

WL 1905384, at *8 (representations about capabilities "are pre-transaction 'puffery' and cannot

form the basis for a fraud claim").

Second, representations that GemTech's management team would be kept on after the

acquisition are promises or statements "as to a future event." *Sharp,* 95 Idaho at 122. Even if

Defendants contemplated that they might eventually part with members of GemTech's

management team – which they clearly did after signing the APA on July 21, 2017 when

Buckingham and Debney discussed terminating Mr. Martinez after closing – such decisions were

both prospective and not sufficiently concrete at the time the APA was being negotiated to

constitute fraud. Further, such representations were not made with the contemporaneous intent to

mislead because all employees were hired at-will, signaling that they could be let go at any time.

*See April Beguesse, Inc.*, 156 Idaho at 510. Defendants, in fact, did what they represented they

would: they had an "immediate need" to keep GemTech's management team around and "intact"

and did so by keeping Mr. Martinez and others as at-will employees after acquisition. Only later

did Defendants make the firm decision to terminate them. *See infra.* Accordingly, these forward-

looking representations do not "serve as basis for fraud." *Id.; see also See Earth Pride Organics,*

2024 WL 1905384, at *8-9 (pre-acquisition statements expressing enthusiasm for target's

management team not fraudulent despite post-closing terminations); *Knight Broadband LLC v.*

*Knight*, No. CVN21C07076EMDCCLD, 2022 WL 1788855, at *9-11 (Del. Super. Ct. June 2,

2022) (no misrepresentation of existing fact based on statements buyer would retain key management, grow the business, and seller would receive $5M in earn-out payments).[5]

Finally, Defendants' representations that the earnout payment was achievable by – and had upside for – GemTech qualify as "[o]pinions or predictions about the anticipated profitability of a business are usually not actionable as fraud." *Id.*; *Sharp*, 95 Idaho at 122. Nor do they fall under the two recognized exceptions related to intent to mislead. First, Defendants' representations about earnout achievability do not fall under the "actual value is known" exception. *See April Beguesse*, 156 Idaho at 510. While Defendants internally may have *projected* that GemTech's revenue would decrease during the earnout period and barely trigger the earnout payment – *see* 2015 financial model (Compl. Ex. 1) and 2016 rate-of-return analysis (Compl. Ex. 2) – Defendants did not *know* the "actual value" of GemTech's prospective revenue. Second, Defendants' representations about earnout achievability do not fall under the "ability to perform" exception. *Id.* Defendants did not accompany its representations with "statements of existing fact which showed [Defendants'] ability" to guarantee that GemTech achieved the earnout payment. *Id.* Conversely, Defendants explicitly represented in the Section 1.6(c) of the APA that there is "no assurance" that GemTech would receive an earnout payment and Defendants has "not promised or projected" any earnout payment. *See* Compl. Ex. 25 at 5-6.[6]

---

[5] While these prospective representations are not actionable for a fraud in the inducement claim, the Court considers them and Defendants' internal communications – wherein they arguably premeditated Mr. Martinez's post-acquisition termination – as evidence of bad faith and specific purpose in subsequently breaching the contract. *See infra*, Section C.2.

[6] In this way, the instant case is readily distinguishable from *G&M v. Funk Irr. Co.*, the case Plaintiff's counsel repeatedly invoked during oral argument. In that case, defendant –a vendor of irrigation systems – visited plaintiff's property to assess whether the at-issue irrigation system was compatible with the property. 119 Idaho at 516. After inspecting the property, defendant clearly (but falsely) stated that the system "[would] work." *Id.* Here, Defendants made no such statement of existing fact that showed their ability to guarantee the earnout payment, but rather, quite the opposite in the APA.

Accordingly, none of Defendants' statements that Plaintiff alleges were false or misleading rise to the level of actionable misrepresentation needed to support a fraud in the inducement claim.

### 3. Omissions

Here, Plaintiff alleges a material omission based on Defendants' failure to disclose their internal projections of GemTech's revenue. *See* Compl. ¶¶ 14-17, 136-55. Specifically, Plaintiff alleges that Defendants did not disclose its 2015 financial model (which projected GemTech's revenue at only $54 million in aggregate revenue for years 2017 through 2020) or its 2016 rate-of-return analysis (which estimated that GemTech's revenue would decrease by 70 percent in 2017 and be level in 2018). *See* Compl. Exs. 1 & 2. In response, Defendants argue that they had no duty to disclose their internal model because this was an arm's length business transaction. *See generally* Defs.' MSJ at 11-14. The Court agrees with Defendants.

Here, Defendants were under no duty to disclose their internal projections, including the 2015 financial model and 2016 rate-of-return analysis. First, Plaintiff and Defendants were parties to an arm's length business transaction and were represented by counsel. Indeed, Plaintiff was represented by counsel of record in this lawsuit. As such, the parties were sophisticated business adversaries and did not share a fiduciary or other similar relationship of trust and confidence that would create a duty to disclose. *See Knudsen*, 168 Idaho at 268; *High Valley Concrete,* 234 P.3d at 752.

Second, Defendants never made a "partial statement of fact" that could be considered misleading. *See Knudsen*, 168 Idaho at 268. As set forth *supra,* during negotiations, Defendants made aspirational statements about GemTech's ability to achieve the earnout payment; none involved statements of fact. Indeed, Plaintiff does not allege that Defendants ever disclosed to

Plaintiff concrete revenue projections that contradicted the revenue projections in the 2015 financial model and 2016 rate-of-return analysis. Thus, Defendants did not have a duty to disclose to correct a partial statement of fact that could be misleading.

Similarly, Defendants did not "know" a "fact" that Plaintiffs did not, thereby creating a mistake that would void the APA. *Id.* Again, future projections of revenue, by definition, are not existing facts that can be known. *See Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. CV 2017-0500-JRS, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) ("Whether those revenues would, in fact, be achieved was not *knowable* at the time [Defendants] made the representations.") (emphasis in original). Critically, at the time Defendants created their 2015 financial model and 2016 rate-of-return analysis, Defendants did not own or operate GemTech's business; Plaintiff did. Thus, Plaintiff knew as much, if not more, than Defendants about GemTech's operations and ability to earn revenue. Likewise, Defendants were no better situated than Plaintiff to know if the Hearing Protection Act would pass. Stated another way, there is nothing that Defendant included in its 2015 financial model and 2016 rate-of-return analysis, or otherwise knew about GemTech's future revenue, that Plaintiff could not know itself. Under such circumstances, there was no mistake of fact that would impose a duty to disclose on Defendants.

Thus, Defendants had no duty to disclose their 2015 financial model and 2016 rate-of-return analysis to Plaintiff. As a result, their failure to disclose these analyses does not support a claim for fraud in the inducement.

### 4. Reliance

Even if Plaintiff was able to show actionable misrepresentations or omissions, it cannot demonstrate a genuine dispute of material fact as to the element of justifiable reliance. *Craig*,

2024 WL 3892525, at *8. Here, Defendants argue that – as to GemTech's ability to achieve the earnout payment – Plaintiff was as well-situated as Defendants to project its revenue based on its own independent investigation during APA negotiations. Defs.' MSJ at 18 (Dkt. 194). And further, the APA that Plaintiff subsequently signed explicitly warned "there is no assurance that [GemTech] will receive an Earn-Out Payment and [Smith & Wesson] has not promised or projected any Earn-Out Payment." Compl. Ex. 25 at 6. Accordingly, Defendants contend that Plaintiff could not justifiably rely on any of Defendants' alleged misrepresentations or omissions that suggested GemTech would generate sufficient revenue to achieve the earnout payment. Defs.' MSJ at 18-19. The Court agrees.

As was the case in *Faw* and *Atari*, Plaintiff here independently investigated its own financial records and projected its revenue for the earnout period. *See* Compl. Ex. 5 at 5 (For 2017-2019, projecting GemTech revenue at $25 million, $85 million, and $150 million, respectively). Again, Plaintiff knew as much, if not more, than Defendants about GemTech's ability to generate revenue and had the same access to information about the prospects of the Hearing Protection Act passing. Under such circumstances, Plaintiff is not entitled to rely on the alleged misrepresentations or omissions of the Defendant as to GemTech's ability to generate revenue and achieve the earnout payment. *Faw,* 101 Idaho at 389; *Atari Corp.,* 981 F.2d at 1030.

Additionally, as in *King,* the acquisition here culminated in the signing of a written contract: the APA. Therein, at Section 1.6(c), Defendants disclaimed any guarantee that Plaintiff would achieve the earnout payment. Compl. Ex. 25 at 6. Indeed, the APA specifically stated that Defendants have not "projected any Earn-Out payment." *Id.* Defendants' earnout projection is precisely what Plaintiff says Defendants misrepresented and omitted, and which forms the basis of its fraud in the inducement claim. Yet, in black-and-white in the APA, Defendants expressly

stated that they had not projected that GemTech would achieve any earnout payment. Plaintiffs had an opportunity to inspect the APA prior to executing it. Accordingly, Plaintiffs cannot demonstrate justifiable reliance on Defendants' alleged misrepresentations and omissions prior to the execution of the APA. *King,* 136 Idaho at 911.

In sum, there is no genuine dispute of material fact as to Plaintiff's fraud in the inducement claim, and that claim fails as a matter of law. This was an arm's length transaction between sophisticated and represented parties. Independently, each projected GemTech's revenue and prospects for achieving the earnout payment. Defendants projected that revenue far less optimistically than Plaintiff. Defendants did not disclose their projections. Nothing required them to do so; if sharing such projections were a prerequisite, no business acquisition would ever get done. And Defendants puffed about the future – but made no misrepresentations of existing fact – to get the deal done. That is not fraud. Therefore, Count Three does not survive summary judgment.

## C. Breach of Contract

Defendants next move for summary judgment on Plaintiff's breach of contract claim (Count One). That claim alleges that Defendants breached Section 1.6 of the APA by (i) acting in bad faith and with the specific purpose of avoiding or reducing the earnout payment; and (ii) by not consulting Mr. Martinez in advance of decisions it knew would negatively impact the earnout payment. Defendants respond that they did not act with subjective bad faith and specific purpose to avoid or reduce the earnout payment. Rather, they exercised their "sole discretion" under Section 1.6 to reallocate resources to other business segments when GemTech became unprofitable. Further, Defendants argue that there is no evidence that Defendants knew that terminating Mr. Martinez would negatively impact the earnout payment; and even if there were,

Plaintiffs suffered no damages because Defendants were only obligated to consult with him, not defer to him. *See generally* Defs.' MSJ at 5-6. As set forth below, the court finds that disputes of material fact preclude summary judgment on this claim.

### 1. Legal Standards

To state a claim for breach of contract under Delaware law, a plaintiff must allege (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damage to the plaintiff. *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 139 (Del. 2022). When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016). While Delaware courts have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement. *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018). "[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, No. CIV.A. 1384-N, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

Where, as here, a contract contains an explicit provision that requires a defendant to act in "good faith" (or without "bad faith"), a court construes the good faith provision differently than the implied covenant of good faith and fair dealing. *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101, 109 (Del. 2013); *see infra* Section D. "When a trial court is addressing an express contractual provision requiring the exercise of good faith, it

must focus the breach inquiry on whether the party bound by the provision had acted in subjective bad faith based on the circumstances existing at the time of its alleged breach, within the context defined by the terms of the parties' contractual bargain. Accordingly, when a contract's express terms incorporate a good faith requirement, the trial court should focus on the meaning of that express contractual duty." *ev3, Inc. v. Lesh,* 114 A.3d 527, 539 (Del. 2014), as revised (Apr. 30, 2015) (citing *DV Realty,* 75 A.3d at 109). Where the contract does not explicitly define "good faith" or "bad faith," a court may apply the traditional common law definition of the business judgment rule. *DV Realty,* 75 A.3d at 110. Under the business judgment rule, bad faith exists where the judgment is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Brinckerhoff v. Enbridge Energy Co.*, 67 A.3d 369, 373 (Del. 2013), *abrogated by Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242 (Del. 2017). In evaluating a good faith/bad faith provision, the court has an "obligation to construe the agreement's 'overall scheme'" and view the provision "in the context of the larger provision—or value—it sought to protect." *DV Realty,* 75 A.3d at 110 (citing and quoting *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)).

### 2. Analysis

Here, Defendants seek summary judgment on Plaintiff's breach of contract claim primarily because Section 1.6(c) afforded them "sole discretion" to operate the GemTech segment as they saw fit. They argue that any allegation of bad faith or specific purpose must be viewed in the context of that broad authority. Defendants also argue that both sides were equally interested in GemTech earning as much revenue as possible, considering that Defendants "kept 100% of every dollar [GemTech] earned up to $36M and kept 85 cents of every dollar earned over the $36M." Defs.' MSJ at 3 (Dkt. 194). Thus, their argument goes, they would not have

24

acted with subjective bad faith and specific purpose to reduce GemTech's revenue – and thereby deny GemTech the earnout payment – because doing so would have cost Defendants "millions in profits." *Id.* at 6. Moreover, Defendants deny any subjective bad faith and specific purpose to deny GemTech the earnout payment by terminating Mr. Martinez. *Id.* Rather, they claim that they fired him for cause to protect the GemTech brand and because he lost the CEO's trust and confidence. *Id*

At this stage, however, the Court must view the facts in the light most favorable to the Plaintiff and draw reasonable inferences in its favor. In so doing, the Court finds that there is a genuine dispute of material fact as to whether Defendants acted in bad faith and with the specific purpose to deny Plaintiff the earnout payment. While the Court acknowledges Defendants' sole discretion under Section 1.6(c) to operate the GemTech segment as it wished, the Court is obliged to construe the integrated sole discretion and good faith/specific purpose clause "in the context of the larger provision—or value—it sought to protect." *DV Realty*, 75 A.3d at 110. Here, that value is just as much GemTech's opportunity to achieve the earnout payment, and Mr. Martinez's opportunity to act as a check on decisions that would negatively affect that payment, as it is the exercise of Defendants' sole discretion to operate GemTech. In the light most favorable to Plaintiff, a genuine dispute of material fact exists as to whether Defendants' discretionary business decisions were "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Brinckerhoff*, 67 A.3d at 373.

Evaluation of Defendants' subjective intent begins with their assessment of GemTech's revenue prospects. Prior to closing, Defendants internally projected a significant reduction in GemTech's revenue during the three-year earnout period. *See* Compl. at Ex. 21 (June 23, 2017 email: "The financial model assumes a significant down turn year one, flat two and three, and

then normal growth. We wanted to justify $10 million [purchase price for GemTech] without HPA [Hearing Protection Act] passing. . . Not a single acquisition we have made has hit the revenue number in their respective model."). Indeed, Defendants estimated GemTech's total revenue for 2017 through 2019 at $38.9 million, only slightly above the $36 million earnout trigger. Compl. at Ex. 1. Consistent with this projection, and for the quarter ending October 31, 2017, Defendant AOB reported to the SEC that "[b]ased on current forecasted revenue projections, we believe it is unlikely that the acquired business will achieve the performance metrics" and only allocated $100,000 as a prospective contingent liability for the earnout payment. Pl.'s Mot. to Amend, Ex. 46 at 10. In the light most favorable to Plaintiff, then, Defendants did not believe that GemTech would generate the revenue needed to achieve the earnout payment.[7]

Likewise, at this stage the Court must reasonably infer that, after the execution of the APA, Defendants never intended to consult Mr. Martinez about decisions that they knew would negatively affect the earnout payment. Indeed, after the APA was signed, but prior to closing, the Smith & Wesson/AOB CEO and AOB Senior Vice President expressly discussed his termination. Compl. at Ex. 27 (Buckingham July 21, 2017 to Debney: describing closing process as "very messy" and that he was "getting alarmed with Ron Martinez staying with us post close.").

Against this backdrop, within the first year-and-a-half of the earnout period, Defendants made momentous decisions about GemTech's operation that seem "essentially inexplicable on any ground other than bad faith" to deny it the earnout payment. *Brinckerhoff*, 67 A.3d at 373.

---

[7] Again, as set forth *supra,* Defendants had no duty to share this opinion during negotiations and Defendants' contrary expressions of optimism about GemTech's ability to achieve the earnout payment were not actionable misrepresentations because they were forward-looking.

Crucially, on September 18, 2017, only 41 days after closing, Defendants fired Mr. Martinez. It is difficult to fathom that Defendants' proffered cause for terminating him – CEO Debney's "loss of trust and confidence in his ability to lead the business" as a result of "compliance failures and ethical lapses" – could have materialized in just 41 days. Defs.' Stmt. of Undis. Mat. Fact at ¶ 28. This is especially true given that Defendants expressed a desire in the Employment Contract – executed at closing – that Mr. Martinez remain an executive at GemTech to grow its goodwill. *See* Defs.' MSJ, Ex. 27 at 1. In the light most favorable to Plaintiff, Defendants' cause for firing him was pretextual, consistent with Buckingham and Debney's premeditated plan to remove him soon after closing, and indicative of bad faith.

In firing Mr. Martinez only 41 days in, Defendants prospectively nullified the "Martinez consultation" clause of Section 1.6(c) of the APA.[8] Reading Section 1.6(c) as a whole, the "Martinez consultation" clause was an integral component of the integrated sole discretion and good faith/specific purpose provision and the value of providing GemTech a meaningful opportunity to achieve the earnout payment that the provision, in part, sought to protect. *See DV Realty,* 75 A.3d at 110. In the light most favorable to Plaintiff, nullifying the "Martinez consultation" clause allowed Defendants to exercise their sole discretion without *any* check on decisions that could negatively impact GemTech's ability to achieve the earnout payment. The Court considers this another indicator of Defendants' bad faith and specific purpose.

Without such a check, Defendants effectively dismantled the GemTech segment less than a year and a half after acquiring it. Within 51 days of closing, Defendants fired Mr. Pace, the international sales representative. Compl. at ¶ 104. Within 6 months of closing, Defendants fired five key GemTech employees as part of a GemTech reduction in force. *Id.* at ¶ 115-120. Within a

---

[8] As set forth *infra,* this is an independent ground for the breach of contract claim to go forward.

year and a half of closing, Defendants shuttered GemTech's business operations in Idaho. *Id.* at ¶¶ 122-23; Ex. 43. The haste with which Defendants dismantled GemTech gives rise to a reasonable inference that Defendants purposely intended to acquire and dismantle it, and thereby deny it a meaningful opportunity to achieve the earnout payment during the three-year earnout period.[9] In the light most favorable to the Plaintiff, this is subjective bad faith and specific purpose.

Defendants disagree. In their view, GemTech failed on its own accord because the Hearing Protection Act did not pass. Because no other source of increased customer demand for silencers materialized, Defendants chose to reallocate their resources to other business segments with better rates of return. Defs' Stmt. of Undis. Mat. Fact at ¶¶ 31-33.[10] While a reasonable explanation, it is difficult to reconcile with the fact that GemTech earned $11.2 million in revenue in 2016 – the year before Defendants acquired it – under similar circumstances (without passage of the Hearing Protection Act). Compl. at Ex. 5. Accordingly, given the standard that the Court must apply at this stage, the Court finds that Defendants made business decisions that were "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Brinckerhoff*, 67 A.3d at 373. As a result, there is a genuine dispute of material fact that Defendants breached the bad faith and specific purpose clauses of Section 1.6(c) of the APA.

---

[9] It is not uncommon for large corporations to acquire other businesses whose assets they consider undervalued with the intent to promptly liquidate those assets as a profit. While Defendants' proffered explanation – that the Hearing Protection Act failed and demand did not increase – is reasonable, in the light most favorable to Plaintiff, so is a premeditated sell-off.

[10] Indeed, according to Defendants, GemTech earned only a total of approximately $7.2 million in revenue during the earnout period. *Id.* at ¶ 34.

28

Independently, there can be little doubt that there is a genuine dispute of material fact that Defendants breached the "Martinez consultation" provision of Section 1.6(c). Again, Defendants fired Mr. Martinez only 41 days after closing. While their at-will employment contract with Martinez undoubtedly allowed them to do so, it is undisputed that Defendants did not consult with Mr. Martinez about GemTech operations before or after his termination. Certainly, Defendants' termination of Mr. Martinez, termination of Mr. Pace in late September 2017, termination of 5 key GemTech employees by June 2018, and shuttering of GemTech's business operations in Idaho in January 2019 were decisions – for which a genuine dispute of material fact exists – that Defendant knew would negatively impact the earnout payment.[11]

Accordingly, because genuine disputes of material fact exist as to Defendants' breach of both the bad faith/specific purpose and "Martinez consultation" clauses of Section 1.6(c) of the APA, Count One survives summary judgment. Defendants' motion is denied in this part.

### D. Implied Covenant

Defendants finally move for summary judgment on Plaintiff's implied covenant claim (Count Two). That claim alleges that the APA contains an implied covenant of good faith and fair dealing, and that Defendants breached it by acting in bad faith to intentionally divert resources away from GemTech and deny it a meaningful opportunity to achieve the earnout payment. Defendants argue the APA contains no contractual gap for an implied covenant to fill.

---

[11] Defendants argue that, even if they arguably breached the "Martinez consultation" provision of Section 1.6, Plaintiff cannot prove damages, so summary judgment is still appropriate. Damages are an element of a breach of contract claim under Delaware law. However, even where actual damages cannot be proven in a breach of contract claim, nominal damages are generally available. In Delaware, "[a] party need not plead cognizable damages as an element of a claim for breach of contract because the court can vindicate a breach of contract through an award of nominal damages." *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 471 (Del. Ch. 2024); *see also Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, No. CIV.A. 3158-VCL, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009). As a result, Defendants' argument fails.

*See* Defs.' MSJ at 7-8. Even if there were, they argue, they did not breach an implied covenant *Id.* Here, the Court applies Delaware law in evaluating Count Two and agrees that no implied covenant exists.

### 1. Legal Standards

The implied covenant of good faith and fair dealing "'is inherent in all contracts' and ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'" *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (citing *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)). The covenant "'embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.'" *Id.* (quoting *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006)). "The covenant also encompasses 'the principle of contract construction that 'if one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination.'" *Id.* (citing cases and quoting *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990)).

Courts apply the implied covenant "to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated[,]' and courts will invoke the implied covenant to imply terms when necessary to protect the reasonable expectations of the parties." *Id.* (citing *Dieckman*, 155 A.3d at 367). "It follows that where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch.), *aff'd sub nom. David Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 609 A.2d 668 (Del. 1992). Likewise,

courts "Delaware courts do not use the implied covenant as 'an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract.'" *Baldwin*, 283 A.3d at 1117 (citing *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019)). As such, the implied covenant "is a limited and extraordinary legal remedy." *Nemec v. Schrader*, 991 A.2d 1120, 1128 (Del. 2010).

"To sufficiently plead [a] breach of the implied covenant of good faith and fair dealing, a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Baldwin*, 283 A.3d at 1117-18 (quoting *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)).

### 2. Analysis

Here, the Court finds that Defendants' obligation to act in good faith and deal fairly was anticipated and expressly provided for in the APA. Indeed, the APA contained an integrated clause that vested Defendants with sole discretion to manage GemTech and prohibited the exercise of that discretion in bad faith. Thus, there is no contractual gap for the implied covenant of good faith and fair dealing to fill here; Count Two (implied covenant) is duplicative of Count One (breach of contract) and cannot survive summary judgment.

Section 1.6(c) of the APA is an integrated clause that states that "[Smith & Wesson] shall have sole discretion with regard to all matters relating to the operation of [GemTech]; provided, that [Smith & Wesson] shall not, directly or indirectly, take any action in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder." Compl. Ex. 25 at 6. Clearly, in the same clause, the parties anticipated *both* Defendants' sole discretion and the obligation for them to exercise it in good faith. *Id.* Indeed, the parties defined good faith in

context: namely, that Defendants could not take any action with specific purpose of avoiding or reducing GemTech's earnout payment. *Id.* They further required Defendants to consult with Mr. Martinez if they had knowledge of a decision that would negatively impact the earnout payment. *Id.*

Accordingly, Section 1.6(c) protected the reasonable expectations of both sides by affording Defendants sole discretion to manage GemTech's business, provided they did not purposely deny GemTech the earnout payment. *See Baldwin,* 283 A.3d at 1116. Because the parties addressed their reasonable expectations by express contractual provision, the implied covenant of good faith and fair dealing does not come into play here. *Dave Greytak Enters., Inc.,* 622 A.2d at 23.

Plaintiff concedes as much in its briefing. In its response, in the section addressing its implied covenant claim, Plaintiff states "[t]he parties here contracted to consider good faith and faith dealing, evidenced by Section 1.6 of the APA." Pl. Resp. to Defs.' MSJ at 6 (Dkt. 199). Further, it claimed that "[Smith & Wesson] directly breached these [no bad faith and Martinez consultation] provisions [of Section 1.6]." *Id.* Thus, Plaintiff effectively admits that there is no gap in the APA for the implied covenant to fill.

Notwithstanding, Plaintiff seems to claim its implied covenant claim survives because the APA contains a clause that affords Defendants discretion to manage GemTech and the covenant independently applies to the exercise of that discretion. *Id.* at 8-12. Plaintiff misconstrues the breadth of the covenant in this regard. It is true that the covenant encompasses the principle of contract construction that, where a contract contains a clause affording one party discretion to act as to a certain subject, it cannot exercise that discretion in a way that is impliedly proscribed by the contract's terms. *See Baldwin,* 283 A.3d at 1116. However, where, as here, the contract

contains a provision that integrates the discretion clause with an express good faith clause, that general principle of contract construction is superseded by the mutual intent of the parties. Here, in the APA, the parties expressly defined the limitations of the discretion clause and described how that discretion was to be exercised; namely, not in bad faith and with purpose to deny the earnout payment, and in consultation with Mr. Martinez. As such, there is no support for the independent application of the covenant to the discretion clause given its integration with the express good faith clause. As none of the cases cited by Plaintiff address an integrated contractual provision like this, those cases are inapposite. *See, e.g.*, *Red Cat Holdings, Inc. v. Autonodyne, LLC,* No. C.A. No. 2022-0878-NAC, 2024 WL 342515 at *11-13 (Del. Ch. Jan. 30, 2024); *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1202 (10th Cir. 2004).

In sum, while a genuine dispute of material fact exists as to whether Defendants breached the express language Section 1.6(c) so as to permit Count One to survive summary judgment, *see supra,* no such genuine dispute of material fact exists at to Count Two. Count Two is duplicative of Count One. There being no contractual gap to fill, or standalone discretion clause, the implied covenant does not apply here. The Court grants summary judgment on Count Two.

**E. Amendment**

The Court next considers Plaintiff's motion to amend (Dkt. 191). Plaintiff seeks to amend its operative complaint in two respects: (i) to add a claim for punitive damages, and (ii) to name new parties. The court addresses each proposed amendment in turn.

**1. Punitive Damages**

Plaintiff's motion to amend first seeks to add a claim for punitive damages. Because Plaintiff's fraud and implied covenant claims fail at the summary judgment stage, Plaintiff's attempt to add punitive damages flowing from those claims fails as well. Thus, the only claim the

court considers in evaluating Plaintiff's attempt to add punitive damages is its breach of contract claim. As it relates to that claim, the court denies the request.

Punitive damages claims are substantive in nature and, accordingly, controlled by state law in diversity cases. *Strong v. Unumprovident Corp.*, 393 F. Supp. 2d 1012, 1025 (D. Idaho 2005). Because Plaintiff's breach of contract claim is governed by Delaware law, the Court likewise applies Delaware's law on punitive damages in weighing Plaintiff's proposed amendment.

In Delaware, punitive damages may only be imposed where the defendant's conduct is "outrageous" as a result of either "evil motive" or "reckless indifference to the rights of others." *Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 529 (Del. 1987). Moreover, "punitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort." *Richard A. Schuetze, Inc. v. Utilligent, LLC*, No. 1:21-CV-00476-SB, 2022 WL 958359, at *3 (D. Del. Mar. 30, 2022) (citing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996)). None of Plaintiff's allegations as to breach of contract – specifically, Defendants' business decisions as to the GemTech segment following the closing of the APA – amount independently to a tort. As a result, Plaintiff's effort to add punitive damages fails.

## 2. New Parties

Finally, Plaintiff seeks to amend its operative complaint to properly name the appropriate successor-in-interest to Smith & Wesson's parent company. The Court will allow this amendment.

Parties who seek to amend pleadings after amendment deadlines must satisfy two standards: the "good cause" standard of Rule 16(b) as well as the more lenient standard of Rule 15(a). Once a scheduling order is entered, it may "be modified only for good cause and with the

judge's consent." Fed. R. Civ. P. 16(b)(4). The focus of the good cause analysis is on "the diligence of the party seeking the extension." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Thus, the issue under Rule 16(b) is whether "pretrial schedule ... cannot reasonably be met despite the diligence of the party seeking the extension." *Id.*

If there is good cause to modify the schedule, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend lies within the sound discretion of the trial court, which "must be guided by the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). Rule 15's "policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (cleaned up).

In November 2016, the holding company housing Smith & Wesson – Smith & Wesson Holding Corporation – changed its name to American Outdoor Brands Corporation. Stidham Dec. at ¶ 6, Ex. C (Dkt. 206). The events underlying Plaintiff's complaint occurred while Smith and Wesson was under the American Outdoor Brands Corporation umbrella.

In August 2020, after the events at issue in the complaint, American Outdoor Brands Corporation appears to have split into two independent companies: American Outdoor Brands, Inc. (for outdoor products) and Smith & Wesson Brands, Inc. (for firearms). Pl. Mot. to Amend at 6 (Dkt. 191-11); Stidham Dec. at ¶ 8, Ex. E (Dkt. 206). The deadline to amend pleadings and join parties expired shortly after this reorganization – on September 30, 2020 (Dkt. 49).

Plaintiff's motion seeks only to identify the appropriate successor-in-interest to Smith & Wesson's parent company, which might be liable to pay damages should Plaintiff succeed at trial. Mot. to Amend at 5-6 (Dkt. 191-11). Considering the relatively tight window between Defendants' corporate restructuring and the operative deadline to amend pleadings in this case

(which spanned roughly a month from August 2020 to September 2020), the Court finds that good cause exists under Rule 16(b)(4).

Having found good cause under Rule 16, and mindful of the Ninth Circuit's guidance that Rule 15 be approached with "extreme liberality", the Court will exercise its discretion to grant Plaintiff leave to amend its complaint. *Eminence Capital*, 316 F.3d at 1051.

### F. Motions to Seal

The parties filed three motions to seal alongside their motions to amend and for summary judgment (Dkts. 193, 195, & 202). Each side's motion seeks to file under seal certain documents that have been designated by the other side as "Confidential" under the terms of the parties' protective order. (Dkt. 64). That Protective Order, entered September 24, 2021, defines certain financial and competitively sensitive business information as Confidential. *Id.* at 2. None of the motions are opposed.

There is a strong presumption in favor of public access to judicial records. *Kamakana v. City & Cnty. Of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). There are two standards that govern motions to seal portions of documents: (i) a 'compelling reasons' standard, which applies to dispositive motions, and (ii) a 'good cause' standard, which applies to non-dispositive discovery-type motions. *New Phase Development LLC v. Cook*, No. 4:13-cv-00520-REB, 2016 WL 1755374, at *3 (D. Idaho May 2, 2016) (citing *Kamakana*, 447 F.3d at 1179; *Pintos v. Pac. Creditors Assn.*, 605 F.3d 665, 677 (9th Cir. 2010)). The terms "dispositive" and "non-dispositive" are not mechanical classifications in the context of motions to seal. *Ctr. for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092, 1098 (9th Cir. 2016). In order to apply the lesser good cause standard, the Court must conclude that the subject material is "unrelated or only

tangentially related to the underlying cause of action." *Pintos*, 605 F.3d at 678 (quoting *Kamakana*, 447 F.3d at 1179).

What constitutes a compelling reason is "best left to the sound discretion of the trial court." *Ctr. for Auto Safety*, 809 F.3d at 1097 (citing *Nixon v. Warner Commnc'ns, Inc.*, 435 U.S. 589, 599 (1978)). There may be compelling reasons to seal "business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598. Other compelling reasons to justify sealing may exist where the subject documents "might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets. The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179.

The Court has reviewed the exhibits that the parties seek to seal, and finds the material described therein to involve confidential information and proprietary business strategies and analysis. Thus, the Court finds there are compelling reasons to grant the parties' motions to seal.

## **CONCLUSION**

For the reasons set forth above:

1. Defendants' Motion for Summary Judgment (Dkt. 194) is GRANTED in part and DENIED in part:

   a. Defendants' Motion for Summary Judgment as to Count One of the Complaint (breach of contract) is DENIED.

   b. Defendants' Motion for Summary Judgment as to Count Two of the Complaint (implied covenant of good faith and fair dealing) is GRANTED; Count Two is dismissed with prejudice.

    c.   Defendants' Motion for Summary Judgment as Count Three of the Complaint (fraud in the inducement is granted) claim is GRANTED; Count Three is dismissed with prejudice.

2.   Plaintiff's Motion to Amend the Complaint (Dkt. 191) is GRANTED in part and DENIED in part:

    a.   Plaintiff's request to add punitive damages is DENIED.

    b.   Plaintiff's request to name a new party is GRANTED.

        i.   Defendants are ordered to filed an updated Rule 7.1 corporate disclosure statement within 14 days of the date of publication of this order.

       ii.   Thereafter, Plaintiff is ordered to file an amended complaint properly naming the successor-in-interest. Such complaint shall be filed within 14 days of the filing of Defendants' updated corporate disclosure statement.

3.   The three outstanding Motions to Seal (Dkts. 193, 195, & 202) are GRANTED.

**SO ORDERED.**



DATED:  January 23, 2026

_____

Honorable Raymond E. Patricco

Chief U.S. Magistrate Judge