Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
Cameron L. McCue (ISB #12329)
HOLLAND & HART LLP
800 West Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho 83701-2527
Telephone: (208) 342-5000
Email: efstidham@hollandhart.com
jmaiko@hollandhart.com
clmccue@hollandhart.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,

Plaintiff,

vs.

SMITH & WESSON SALES COMPANY, a Delaware corporation; and SMITH & WESSON BRANDS, INC., a Nevada corporation,

Defendants.

Case No. 1:18-CV-00035-REP

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF THOMAS J. SOUTH, CPA, CFF**

Defendants Smith & Wesson Sales Company and Smith & Wesson Brands, Inc. (collectively "Smith & Wesson" or "Defendants") submit this Memorandum in Support of their Motion in Limine to Exclude the Testimony of Thomas J. South, CPA, CFF.

## I. INTRODUCTION

Gemini Technologies, Incorporated ("Gemtech") intends to call Thomas J. South, CPA, CFF ("South"), to opine that Smith & Wesson's management "knew," before signing the Asset

Purchase Agreement ("APA"), that there was "zero probability" the earn-out would ever be paid. That opinion should be excluded under Federal Rule of Evidence 702.

First, South's testimony is irrelevant to the only claim remaining for trial—breach of APA § 1.6(c). His opinion addresses pre-closing "knowledge" and intent, not any identified post-closing decision made in subjective bad faith or with knowledge that it would negatively impact the earn-out.

Second, South's conclusion is not the product of any reliable accounting or forensic methodology. He performed no probability analysis, built no model, and conducted no calculations; when asked to explain the basis for "zero probability," he cited "common sense."

Third, South's proposed testimony is an impermissible expert opinion on intent and state of mind. He has no personal knowledge of Smith & Wesson's negotiations, internal deliberations, or decision-making, and his report extrapolates what executives were "thinking" from a spreadsheet, a one-sentence email, and an excerpt of a purchase-accounting valuation.

Fourth, South lacks the specialized qualifications necessary for the inferences he seeks to draw, including opinions tied to ASC 805 purchase accounting and related valuation concepts.

Finally, even if the Court were to find marginal relevance, the testimony should be excluded under Rule 403 because it risks confusing the issues by reintroducing a dismissed fraud theory and would be a waste of time.

For these reasons, Smith & Wesson respectfully requests that the Court exclude South's testimony in its entirety.

## II. BACKGROUND

### A. Summary Judgment Disposed of Gemtech's Fraud Theory and Left Only the Section 1.6(c) Breach Claim.

This case arises from Smith & Wesson's 2017 purchase of Gemtech's assets. The APA provided a cash payment at closing plus a contingent earn-out payable only if Gemtech's sales during the 36-month post-closing period exceeded $36 million. APA, ¶ 1.6(a)–(b) (Dkt. 194-14). Section 1.6(c) gave the Buyer "sole discretion with regard to all matters relating to the operation of the Business," subject to a bar on bad-faith actions taken "with the specific purpose of avoiding or reducing the Earn-Out Payment" and a requirement to consult Ronald J. Martinez ("Martinez") before decisions it knew would negatively impact the earn-out. *Id.*, ¶ 1.6(c). Gemtech acknowledged that the Buyer "has not promised or projected any Earn-Out Payment." *Id.* Gemtech's post-closing sales fell far short of the threshold, and no earn-out became due.

On summary judgment, the Court dismissed Gemtech's fraud in the inducement claim, holding that this "was an arm's length transaction between sophisticated and represented parties," that Smith & Wesson had no duty to disclose its internal revenue projections, and that Smith & Wesson "puffed about the future – but made no misrepresentations of existing fact." Dkt. 211 at 17–21. The Court also dismissed the implied covenant claim as duplicative. *Id.* at 30–33.

The sole claim remaining for trial is breach of Section 1.6(c). To prevail, Gemtech must prove: (1) a post-closing decision within Smith & Wesson's Section 1.6(c) discretion; (2) that Smith & Wesson either: (i) made that decision with the specific purpose of avoiding or reducing the Earn-Out Payment, judged subjectively "based on the circumstances existing at the time of [the] alleged breach" and "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith," or (ii) made a decision it knew would negatively impact the Earn-Out Payment without first consulting Martinez; and (3) that the breach

caused the shortfall against the $36 million threshold and resulting damages. Dkt. 211 at 23–29 (quoting *Brinckerhoff v. Enbridge Energy Co.*, 67 A.3d 369, 373 (Del. 2013)).

**B. South Offers a Single Opinion About What Smith & Wesson's Management Expected Before Closing**.

Gemtech designated South as a retained expert under Rule 26(a)(2)(B) and served his report, captioned "Report on Modeling," dated June 20, 2024. Declaration of Erik F. Stidham ("Stidham Decl."), Ex. E (Pl.'s Expert Witness Disclosures); *id.*, Ex. A at 1 ("South Report"). South is a CPA who runs a Boise litigation consulting firm; he described his work as principally "preparing damage calculations and testifying." South Report, Scheds. 2–3; Stidham Decl., Ex. B (South 15:10–14; 22:13–22).

South's six-page report yields a single opinion:

> [A]s early as June of 2016 . . . and up to and including the date of the APA, Smith & Wesson operational management (CEO/CFO), and staff including, Mr. Fulmer and Mr. Buckingham, knew that based upon revenue projections . . . there was no probability, or a zero probability that the Gemtech Assets would achieve any earnout payment.

South Report at 8. He confirmed at his deposition that this is the "sum total" of his opinions and that the rest of his report is "background" or "recitation of facts"—drawn from the Second Amended Complaint, whose allegations he assumed were correct. *Id.*, Ex. B (South 96:5–13; 97:10–16; 46:19–21; 47:23–48:2; 125:9–18). He defined "zero probability" as "zero, which means that there is no chance." *Id.*, Ex. B (South 42:8–11).

South rests his opinion on three documents: (1) the revenue projections in Schedule 5, an internal financial model Andrew Fulmer prepared for the June 27, 2017 AOB board presentation seeking approval of the Gemtech acquisition; (2) the projections Smith & Wesson gave KPMG for its post-closing ASC 805 purchase price allocation valuing Gemtech's intangible assets; and (3)

an email from then-CEO James Debney stating that no prior Smith & Wesson acquisition had hit the revenue number in its model. *Id.*, Ex. B (South 80:5–16; 81:16–23; 87:17–88:5).

## III. LEGAL STANDARD

The Court acts as gatekeeper for expert testimony and "must ensure that all admitted expert testimony is both relevant and reliable." *Glenn v. B & R Plastics, Inc.*, 326 F. Supp. 3d 1044, 1056 (D. Idaho 2018) (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017)); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert*'s gatekeeping obligation to all expert testimony, not just scientific evidence). Under Rule 702, the proponent must show by a preponderance that: (a) the expert's specialized knowledge will help the trier of fact; (b) the testimony rests on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert reliably applied those methods to the facts of the case. Fed. R. Evid. 702 & advisory committee's note to 2023 amend.; *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049–50 (9th Cir. 2025). Gemtech bears that burden, and there is "no presumption in favor of admission." *Engilis*, 151 F.4th at 1050.

A motion in limine is "a procedural mechanism to limit in advance testimony or evidence in a particular area," *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009), and serves to "exclude anticipated prejudicial evidence before the evidence is actually offered," *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). Pretrial exclusion is appropriate in a bench trial where the opinions are unqualified, unreliable, and would not aid the trier of fact. *See Alves v. United States*, No. 3:19-cv-00044-REP, 2022 U.S. Dist. LEXIS 105246, at *4–11 (D. Idaho June 10, 2022) (excluding portions of expert testimony prior to bench trial as outside the expert's field and unhelpful).

## IV. ARGUMENT

South offers a single bottom-line opinion—what Smith & Wesson's management "knew" pre-closing. That opinion is inadmissible for four independent reasons. First, it does not fit the elements of the sole remaining breach-of-contract claim and will not assist the Court. Second, it is not the product of any reliable accounting or forensic methodology. Third, it is impermissible expert testimony on intent and state of mind. Fourth, it exceeds South's qualifications as applied to the specific inferences he proposes. For these reasons, and alternatively under Rule 403, the Court should exclude South's opinions.

### A. South's Testimony Is Neither Relevant to the Surviving Claim Nor Helpful to the Court.

Expert testimony is relevant only if it "logically advance[s] a material aspect of the party's case," *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc), and bears "a valid scientific connection to the pertinent inquiry as a precondition to admissibility," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1320 (9th Cir. 1995) ("*Daubert II*").

South proposes to narrate three pre-closing documents—Schedule 5, the Debney email, and a page from the KPMG valuation—and opine that Smith & Wesson's management "knew" before signing the APA that there was "zero probability" any earn-out would ever be paid. That opinion is irrelevant to Gemtech's two surviving breach-of-contract theories.

Gemtech's first theory is that Smith & Wesson took post-closing actions "in bad faith" with "the specific purpose of avoiding or reducing the Earn-Out Payment." Dkt. 211 at 22; *see also* APA § 1.6(c). But the bad-faith inquiry focuses on the buyer's conduct and purpose at the time of the alleged breach, not at the time of contracting. *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418–19 (Del. 2013). The operative question is whether Smith & Wesson made a

post-closing decision "with the specific purpose of avoiding or reducing the Earn-Out Payment," judged subjectively "based on the circumstances existing at the time of [the] alleged breach," *ev3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014), and "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Brinckerhoff*, 67 A.3d at 373; Dkt. 211 at 24. South's opinion addresses none of this. It does not identify any post-closing decision, address the purpose behind any operational action, or explain why any action was "essentially inexplicable" on any ground other than bad faith. It is an opinion about what Smith & Wesson expected before the deal closed—not what the surviving claim asks the Court to decide.

South's opinion also fails as circumstantial evidence of post-closing purpose because it bears no connection to Smith & Wesson's purpose at the time of the alleged breach. *See ev3*,114 A.3d at 537–38 (holding non-binding letter-of-intent provision was admissible only to rebut buyer's claim about what it understood, not to establish a binding promise or temper the sole-discretion standard). His "zero probability" conclusion describes a buyer that entered the deal expecting the earn-out would not be achieved. A buyer that already projected no earn-out payment had no reason to take steps after closing for the specific purpose of avoiding a payment it did not expect to make. Managing the business in line with that understanding is the exercise of contractual discretion—not evidence of a dishonest purpose to defeat the earn-out.

Gemtech's second theory regarding an obligation to consult Martinez is likewise disconnected from South's opinion. Section 1.6(c) requires the Buyer to have actual knowledge, at the time of a specific decision, that the decision would negatively impact the Earn-Out Payment. APA ¶ 1.6(c); Dkt. 211 at 28–29. Pre-closing awareness that the earn-out was unlikely is not the same as knowing, when making a particular post-closing decision, that the decision would hurt the

earn-out. South ties his opinion to no identified decision and therefore does not address the contested element.

Even setting aside relevance, South's testimony would not assist the Court. The documents are in the record, and the Court has shown it can evaluate them—the summary judgment order quotes the Debney email and cites the financial model and $100,000 contingent-liability figure in evaluating Smith & Wesson's subjective intent. Dkt. 211 at 25–26. Expert testimony assists the trier of fact only when it "provides information beyond the common knowledge of the trier of fact." *Hardy v. Kish*, No. 1:23-cv-00306-BLW, 2025 U.S. Dist. LEXIS 141438, at *6 (D. Idaho July 22, 2025) (quoting *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002)). South's testimony does not.

Reading these documents requires no expertise. Schedule 5 is a spreadsheet; a model showing $0 on an earn-out line is not, without more, a reliable basis to opine on what management "knew" or intended. The relevant passage from the Debney email is a single sentence. The KPMG excerpt states a dollar figure. South is not proposing to explain what the documents say or how they were generated—he is proposing to testify about what Smith & Wesson executives *thought*. That is not accounting. There is no accounting principle, forensic methodology, or specialized framework for inferring corporate state of mind from a spreadsheet. *See Hardy*, 2025 U.S. Dist. LEXIS 141438, at *18 (excluding expert opinion on "lay matters which a [factfinder] is capable of understanding and deciding without the expert's help"); *Tekoh v. Cnty. of Los Angeles*, 75 F.4th 1264, 1267 (9th Cir. 2023) (Miller, J., dissenting) (testimony "is not helpful if the factfinder is 'well equipped' to determine the issue"). South confirmed his "goal is to educate the jury as to what the intent of management was at the time that they entered into the transaction." Stidham Decl., Ex. B (South 100:13–17). That is the dismissed fraud theory presented as expert testimony.

### B. South's Methodology Is Unreliable, and His Conclusions Are Unsupported.

#### 1. South Performed No Independent Analysis.

South's opinion is connected to the underlying data by nothing but his say-so. *See Engilis*, 151 F.4th at 1048 (nothing "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

An expert's "bald assurance of validity is not enough"; he must "explain precisely how [he] went about reaching [his] conclusions." *Daubert II*, 43 F.3d at 1316, 1319. South's opinion fails because he performed no analysis at all. He conducted no probability assessment or independent financial modeling. Stidham Decl., Ex. B (South 34:1-12, 35:1). When asked to explain his analytical approach, South distinguished his work from a "probability analysis," which he described as involving "actuarial work and some very detailed number crunching, and that I haven't" done, adding, "I'm not sure that I really totally understand what a probability analysis is." *Id.*, Ex. B (South 34:1–12). Asked the basis for his conclusion, he identified "common sense." *Id.*, Ex. B (South 67:6–8). He seemingly read a few documents, noted the number, and announced a conclusion. South admitted he never asked to review deposition testimony before rendering his opinion—testifying that "[t]here was nothing in the depositions that was material in my rendering of my opinion"—and did not read the deposition of any Smith & Wesson employee. *Id.*, Ex. B (South 75:1–7; 110:11–19). And although his report invokes AICPA professional standards, South could not identify any AICPA provision supporting his methodology. *Id.*, Ex. B (South 122:18–24; 123:5–14).South's opinion follows no recognized methodology and simply parrots Gemtech's position without analysis. It should be excluded.

### 2. South Failed to Account for the Obvious Alternative Explanation.

An expert who "fail[s] to rule out other causes" exhibits a "[s]ign[] of a faulty methodology." *Christiansen v. Siemens Corp.*, No. 1:18-cv-00068-REP, 2020 U.S. Dist. LEXIS 189737, at *9 (D. Idaho Oct. 13, 2020). An expert who rejects an alternative must give "reasons for rejecting alternative hypotheses" resting on "more than 'subjective beliefs or unsupported speculation.'" *Engilis*, 151 F.4th at 1053.

South assumed his central premise—that Schedule 5 reflects what management actually expected—without considering the obvious alternative. The person who created the document, Andrew Fulmer, testified that it was designed "to support a minimum rate of return that we needed on the base purchase price for our board of directors to either approve or disapprove" and that the figures were "by no means a forecast or even, really, estimated numbers." Stidham Decl., Ex. C (Fulmer 70:21-24) *Id,* Ex. F (Debney 130:23-25); *id.*, Ex. D (Pickett Report at 38-39). South never investigated that explanation. He admitted he did not know how Smith & Wesson personnel used the term "financial model" or whether anyone at the company had described Schedule 5 as a revenue forecast. *Id.*, Ex. B (South 108:18–19; 109:10-14). This omission demonstrates his opinion is unreliable under *Christiansen* and *Engilis* and should be excluded for this additional reason.

### 3. South's "Zero Probability" Conclusion Contradicts His Own Evidence.

South's own evidence refutes his conclusion. He opined that there was "zero probability" of the earn-out being paid—"there is no chance" and "there's no way that earnout was going to be paid." *Id.*, Ex. B (South 42:1–5; 87:8–10). Yet the KPMG ASC 805 valuation he relies on booked the earn-out contingency at $100,000—and South acknowledged that KPMG valued the earn-out as a contingent liability rather than concluding it was impossible. *Id.*, Ex. B (South 98:14–99:16; 120:13–121:3). A nonzero expected value is consistent with a probability-weighted analysis

reflecting some chance of payment. If the methodology behind the $100,000 valuation is sound, then a "zero probability" conclusion resting on no methodology is not. *See Engilis*, 151 F.4th at 1050, 1052. "[C]onclusions that differ from those of other professionals who followed the same process" are a recognized "[s]ign[] of a faulty methodology." *Christiansen*, 2020 U.S. Dist. LEXIS 189737, at *9. South cannot invoke KPMG's work to support his opinion while reaching a conclusion KPMG's work contradicts.

### C. South's Intent Testimony Is Impermissible Testimony Purporting to Opine on Subjective State of Mind.

"Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind." *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases); *accord Hardy*, 2025 U.S. Dist. LEXIS 141438, at *7. Such testimony may be received, if at all, only where it rests on "the facts presented, analyzed through the lens of [the expert's] experience and knowledge as an expert" in a recognized field—not on "psychological analysis or an improper investigation [of state of mind]." *Id.* at *8.

South proposes to testify about "the intent of management"—that management "never ever thought there would be any payout." Stidham Decl., Ex. B (South 100:13–17). But no accounting methodology supports inferring intent from financial documents. No one of expertise treats reading a spreadsheet and announcing what its author was thinking as a valid analytical method, and South has no training in cognitive psychology, behavioral analysis, or any discipline that purports to assess mental states. South is a CPA who read three documents and proposes to supply the Court with his reading of corporate intent. That is not expert analysis; it is an attempt "to substitute the expert's judgment" for the Court's. *See Hardy*, 2025 U.S. Dist. LEXIS 141438, at *13–14 (quoting *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017)) (testimony that "undertakes to tell the

[factfinder] what result to reach . . . attempts to substitute the expert's judgment" for that of the factfinder).

**D. South Lacks the Specialized Qualifications Necessary for the Specific Opinions He Offers.**

Rule 702 requires that an expert be "qualified . . . by knowledge, skill, experience, training or education" as to "the subject matter" of the opinion. Fed. R. Evid. 702; *Hardy*, 2025 U.S. Dist. LEXIS 141438, at *5. Credentials "sufficient to qualify [a witness] as an expert in other cases[] are insufficient here" where the proponent "has presented no evidence that [the expert] has any knowledge, skill, or experience in the area" on which he opines. *TB Holding Co. v. J&S Siding*, No. 4:22-cv-00307-BLW, 2025 U.S. Dist. LEXIS 146520, at *5–6, *8 (D. Idaho Jul. 29, 2025) (excluding expert on patent damages where expert lacked experience valuing patents).

South's CPA credential does not qualify him for the opinions he offers. He has no expertise in the suppressor market and has never worked in the firearms industry, Stidham Decl., Ex. B (South 32:10–12); has never performed an ASC 805 purchase-price allocation, *id.*, Ex. B (South 101:9–11); does not consider himself an expert in SEC disclosures, *id.*, Ex. B (South 23:1–4). Yet his opinion rests on characterizing an ASC 805 valuation as proof of management's expectations, interpreting a Board presentation in a public-company acquisition, and drawing inferences from an SEC-reporting company's internal processes. He lacks the requisite qualifications to do so.

**E. Even If Marginally Relevant, South's Testimony Should Be Excluded Under Rule 403.**

Even if South's testimony were marginally relevant, it should be excluded under Rule 403 for three reasons: it risks confusing the issues, it wastes time, and it is cumulative. Evidence "that meets *Daubert*'s reliability and relevance requirements may still be excluded on Rule 403 grounds." *Glenn*, 326 F. Supp. 3d at 1056. Courts "must . . . exclude proffered [expert] evidence

under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead" the trier of fact. *Daubert II*, 43 F.3d at 1321 n.17.

First, South's testimony risks confusing the issues by relitigating the dismissed fraud theory. His opinion—that Smith & Wesson knew the earn-out would never be paid and had no intention of paying it—is the fraud claim repackaged as expert testimony. The Court dismissed that claim because, in an arm's-length transaction between sophisticated parties, "[n]othing required" Smith & Wesson to disclose its internal projections. Dkt. 211 at 17–21. Admitting South's testimony would invite the Court to decide the case on a theory it has already rejected.

Second, the testimony wastes time. This is a bench trial, and the Court has already reviewed the three documents South relies on. The summary judgment order cites the same financial model, the same Debney email, and the same KPMG valuation in evaluating Smith & Wesson's subjective intent. Dkt. 211 at 25–26. The Court does not need an expert witness without factual foundation or a valid methodology to tell the Court what inferences to make regarding those documents.

## V. CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Thomas J. South in its entirety.

DATED this 28th day of September, 2026.

HOLLAND & HART LLP

By */s/Erik F. Stidham*
Erik F. Stidham
Jennifer M. Aiko
Cameron L. McCue

*Attorneys for Defendants*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of September, 2026, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kim J. Trout
Alyssa R. Jones
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703
Telephone: (208) 577-5755

- ktrout@trout-law.com
- ajones@trout-law.com

*Attorneys for Plaintiff*

*/s/Erik F. Stidham*
Erik F. Stidham
of HOLLAND & HART LLP

37178031.v6