KIM J. TROUT, ISB #2468
ALYSSA R. JONES, ISB #12181
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
ktrout@trout-law.com
ajones@trout-law.com
Attorney for the Plaintiff.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,<br><br>Plaintiff,<br>vs.<br><br>SMITH & WESSON, CORP., a Delaware corporation; and AMERICAN OUTDOOR BRANDS CORPORATION, a Massachusetts corporation,<br><br>Defendants. | Case No. 1:18-CV-00035-REP<br><br>**PLAINTIFF'S REBUTTAL EXPERT WITNESS DISCLOSURE** |

PLAINTIFF, pursuant to Fed. R. Civ. P. 26(a)(2), hereby designates their retained rebuttal expert witnesses, as follows:

1. **Rick Vasquez**
Rick Vasquez Firearms, LLC
102 Mulholland Place
Jacksonville, NC 28540
540-535-6633

**A. Complete statement opinions and the basis and reasons for them:**

Mr. Vasquez is an expert in the National Firearms Act and the Gun Control Act. With over 40 years' experience working on firearms and maintaining his own FFL, he also worked at ATF, including working in the Firearms Technology Branch for 12 years rising to the position of Acting Branch Chief of the Firearms Technology Branch and as the Acting Chief of the Firearms Training

Branch. In this capacity, Mr. Vasquez wrote the first formal Standard Operating Procedures for the Firearms Technology Branch. Mr. Vasquez has authored a report, a copy of which is attached hereto as **Exhibit 1**.

**B. Facts or data considered by the witness in forming the opinions:**

Mr. Vasquez reviewed Philip Milks of Orchid Advisors report, along with all documents produced by Smith & Wesson as having been reviewed and/or considered by Mr. Milks.

**C. Exhibits that will be used to summarize or support the opinions:**

Mr. Vasquez may utilize any of the emails produced by Smith & Wesson as having been reviewed by Mr. Milks, as these were also reviewed by Mr. Vasquez.

**D. Witness's qualifications, including a list of all publications authored in the previous 10 years:**

Mr. Vasquez's CV is attached hereto as **Exhibit 2**. In addition, Mr. Vasquez's authored articles are disclosed in Exhibit 1.

**E. List of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition:**

Mr. Vasquez's previous testimony is attached hereto as Exhibit 2.

**F. Compensation**

Mr. Vasquez has been paid a rate of $12,000 for his work. However, Mr. Vasquez will charge the rate of $300 per hour plus expenses for trial and preparation, and depositions are billed at $350 per hour. In addition, Mr. Vasquez bill travel time at $150 per hour plus out of pocket expenses.

**G. Misc.**

Discovery in this matter is ongoing. Mr. Vasquez reserves the right to supplement his opinion as new information becomes available. In addition, Mr. Vasquez reserves the right to observe the trial and supplement his opinion based on information elicited during the course of the trial.

2. **Matthew Murdock**
The GEC Group, Inc.
950 West Bannock Street, Ste. 1100
Boise, ID 83702
(312) 922-8001, ext. 101

**A. Complete statement opinions and the basis and reasons for them:**

Mr. Murdock is an expert in the areas of labor economics, finance, and actuarial science. He has extensive testifying and consulting experience and has led international teams on large consulting engagements as well as been retained and testified for both plaintiff and defense counsel as an expert witness regarding economic damages. He has conducted wage loss analysis for children and adults, across a variety of occupations and industries, from sole proprietorships to unions. Additionally, Mr. Murdock has extensive experience determining economic damages associated with commercia damage claims across a wide array of industries. Mr. Murdock has authored two rebuttal reports, copies of which are attached hereto as **Exhibits 3 and 4**.

**B. Facts or data considered by the witness in forming the opinions:**

Mr. Murdock reviewed, among other things, the reports of Mr. Yacek and Mr. Pickett, along with the following documents:

- SW354714-SW354722
- Exhibit 590 Email, SW354377-SW354379
- GT084257-GT084266
- ProFab Letter – A copy of which is being produced herewith.
- 2024 Firearms Commerce in the United States, Statistical Update 2024 – A copy of which is being produced herewith.

**C. Exhibits that will be used to summarize or support the opinions:**

Mr. Murdock may utilize any of the documents produced by Smith & Wesson as having been reviewed by Mr. Suber, Mr. Yacek, or Lone Peak Valuation Group, as well as any charts or other data relied upon.

**D. Witness's qualifications, including a list of all publications authored in the previous 10 years:**

Mr. Murdock's CV was previously produced. Mr. Murdock has not authored any publications in the previous 10 years.

**E. List of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition:**

Mr. Murdock's previous testimony is attached hereto as **Exhibit 5**.

**F. Compensation**

Mr. Murdock is paid at a rate of $385 per hour, while other members of The GEC Group staff are billed at $225 per hour for a senior consultant, and $90 per hour for the office assistant.

**G. Misc.**

Discovery in this matter is ongoing. Mr. Murdock reserves the right to supplement his opinion as new information becomes available. In addition, Mr. Murdock reserves the right to observe the trial and supplement his opinion based on information elicited during the course of the trial.

DATED July 22, 2025.

Trout & Jones, PLLC

By */s/ Alyssa R. Jones*
Alyssa R. Jones
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 22, 2025, a true and correct copy of the above and foregoing document was forwarded via email to the following:

Erik F. Stidham
efstidham@hollandhart.com

Jennifer M. Jensen
jmjensen@hollandhart.com

Zachery J. McCraney
zjmccraney@hollandhart.com

/s/ *Alyssa* R. *Jonest*
Alyssa R. Jones

# EXHIBIT 1

EXHIBIT 1

RICK VASQUEZ FIREARMS, LLC
CONSULTING SERVICES

To: Kim J. Trout & Alyssa R. Jones
Trout & Jones, PLLC

From: Richard Vasquez
Rick Vasquez Firearms, LLC

I have been retained by Trout & Jones, PLLC to provide an opinion on a report provided by Orchid Advisors. I have over 40 years' experience working on firearms and maintaining my own FFL. During my tenure at ATF, I worked in the Firearms Technology Branch for 12 years rising to the position of Acting Branch Chief of the Firearms Technology Branch (FTB). My final two years with ATF I was with Field Operation where I was the Acting Chief of the Firearms Training Branch.

In my capacity with FTB I wrote the first formal Standard Operating procedures (SOP) for FTB. During this time frame I also spearheaded the advanced firearms training for Industry Operations Inspectors/Investigators. I wrote numerous classes on all aspects of the GCA, NFA, and importation procedures for ATF and other Federal agencies. Additionally, I organized and assisted with preparing the SOPs for the NFA Branch

After leaving ATF I worked for FFLGUARD (a compliance company) and administered ATF procedures to several hundred customers. I have provided on-site compliance training to all levels of FFLs. Additionally, I have my own compliance LLC, my own shooting school, and security

consulting business. I have sold my share in Active Crisis Consulting but continue to dabble in security training.

Further qualifications:

Firearms Instructor, Consulting and Testifying Expert, Compliance Expert, and Concealed Carry Expert to Governments and Private Industry

Rick Vasquez is a certified law enforcement and United States Marine Corps firearms shooting instructor. During employment with the U.S. government, Rick provided foreign and domestic firearms training and technical assistance to the Border Patrol, Customs and Border Protection, Secret Service, and many other federal and state law enforcement agencies. He is widely recognized in both the state and federal courts as a subject matter expert with respect to firearms and ammunition and has testified in numerous criminal and civil matters involving firearms.

Rick is also a United States government certified firearms classification expert who has represented the U.S. government as a firearms technical representative to aid other nations. He not only provides firearms and ammunition classification expertise but also assists both foreign and domestic governments in firearms origin, functionality, and importability. He has also worked within the U.S. federal government assisting various departments and agencies with firearms policies and issues. His training, experience, and background make him a continued valuable resource to both governments and private companies as a technical advisor on National Firearms Act (NFA), Gun Control Act (GCA), International Traffic in Arms (ITAR), Arms Export Control Act (AECA), and manufacturing- and import-related concerns.

EXPERTISE & SERVICES OFFERED

- Provide expert advice and testimony in criminal, civil, and administrative matters involving firearms.
- Testing of firearms and silencers.
- Tailored firearms training in a state-of-the-art training facility, including firearms safety and firearms manipulation.
- Provider of security protocols, site surveys, and personal security training.
- Preparation of Standard Operation Procedures for ranges and FFL operations.
- Preparation of FFL compliance and SOPs for compliance.
- Preparation of standard safety briefs.
- Firearms identification training based on the needs of the agency.
- Evaluation of firearms related to ATF firearms classification and firearms import compliance.
- NFA classification, NFA transfer procedures, and NFA forms.
- Machinegun identification and function checks.
- Foreign weapons identification and use.
- Nomenclature on all firearms.
- Ammunition identification.
- U.S. firearms regulations and marking requirements.
- Expert services on the importation of firearms and firearms components under the GCA and AECA.
- Armorer, firearms safety instructor, and certified gunsmit_______

Articles authored:

1. Articles:

A. In the previous ten years, I have authored the following publications:

B. October 2015 Peer Review of articles for Swiss Small Arms Survey, "MECHANICS OF FIREARMS TRAFFICKING"

C. January 2016 Small Arms review, "80% RECEIVERS" MYTHS AND TRUTHS"

D. April 2016 Small Arms Review, "WHAT ARE SILENCERS AND HOW ARE THEY REGULATED"

E. October 2016 Small Arms Review, "GIFTING A FIREARM"

F. January 2017 Small Arms Review, "SHOTGUN VS FIREARM"

G. 2022 Center for Disease Control, "FIREARMS AND AMMUNITION IDENTIFICATION"

H. More Trouble in Paradise, Rick Vasquez, Pistol Stabilizing Braces, and Joe Biden's America, Will Dabbs MD

I. Amicus Brief No. 23-852 In the Supreme Court of the United States__ MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., *Petitioners*, V.JENNIFER VANDERSTOK, ET AL., *Respondents*.

I have been asked to review a report conducted by Philip Milks from Orchid Advisors. Philip conducted a review of the operating procedures and the compliance program that Gemini had in place. For the purpose of reviewing the report I was provided with a copy.

The report by Phil is approximately 19 pages long and copies of the A&D book were attached which adds several thousand pages. There is no reason to review and explain the majority of the report as it consists of the regulations pertaining to conducting business as an FFL and an SOT holder. Even though these regulations are cited there is no indication they were inserted for violations that occurred. It is very

heavy on all procedures that should be followed not how those procedures apply to Gemini and S&W. Mr. Milks did not affirmatively assert that Gemini's FFL would have been terminated.

To be clear I did not have the opportunity to review the operation of the company. My review is what has been provided by Phil Milks. As part of this review I read all of the emails provided with the report.

Comments:

To ensure my comments are read in context I put my comments into the report where I was commenting. My review will begin with the paragraph I have inserted below. It appears that S&W did not take over Gemini when the purchase was initiated. It was a purchase of inventory and a working relationship.

# EXHIBIT B

## I. SCOPE OF THIS REPORT

On June 29, 2017, Gemini Technologies, Inc. ("GT" or "Plaintiff") and Smith & Wesson signed an Asset Purchase Agreement ("APA") for the sale of Plaintiff's assets to Smith & Wesson. Among many other necessary actions, part of the transition required obtaining certain government licenses, permits, and approvals for both domestic and international operations and sales. As with any corporate acquisition, also required was the training of Plaintiff's employees on the standard operating procedures and corporate policies of Smith & Wesson, not

least of which were its compliance requirements.

Following the execution of the APA and during the course of addressing government requirements and integrating the Gemtech brand and GT's employees into Smith & Wesson's organization, the relationship between the Parties deteriorated. Following termination of the then-owner of Plaintiff, Ron Martinez, litigation ensued.

I have been asked to analyze whether certain actions taken by Defendants following the acquisition of GT's assets were necessary and/or reasonable insofar as they pertain to Defendants' regulatory obligations under the GCA and NFA.

## II. MATERIALS RELIED UPON OPINIONS

I have reviewed and relied on documents, transcripts of testimony, and other information provided to me as described in Exhibit B, in addition to Orchid's regulatory assessments of Plaintiff's facilities conducted as part of the due diligence process in advance of the acquisition of Plaintiff's assets by Smith & Wesson, one of which I was a party thereto (the Eagle, ID facility).

My opinions stated in this report are all expressed to a degree of reasonable certainty, based upon my education, training, and experience as an attorney and regulatory professional in the firearms industry. More information may become available, including, but not limited to, expert reports and deposition testimony, and production of information relative to facts or circumstances not stated in the operative complaint or documents I have reviewed which may result in a need for my opinions stated herein to be supplemented or amended. Therefore, I reserve the right to amend or supplement this report.

Comments:

My review will begin with the paragraph I have inserted below. It appears that S&W did not take over Gemini when the purchase was initiated. It was a purchase of inventory and a working relationship.

**“”II. SCOPE OF THIS REPORT**

On June 29, 2017, Gemini Technologies, Inc. (“GT” or “Plaintiff”) and Smith & Wesson signed.
an Asset Purchase Agreement (“APA”) for the sale of Plaintiff's assets to Smith & Wesson. Among many other necessary actions, part of the transition required obtaining certain government licenses, permits, and approvals for both domestic and international operations and sales. As with any corporate acquisition, also required was the training of Plaintiff's employees on the standard operating procedures and corporate policies of Smith & Wesson, not least of which were its compliance requirements.

Gemini could have surrendered their license and submitted all A&D records and any 4473s to the ATF if they were closing. If remaining in business, they should have been advised to obtain a new license, which would benefit both parties by separating old and new records under a new corporation. S&W's license is not liable for issues with Gemini's former license. FFLs are typically advised to update licenses during major changes.

This statement confirms the transfer of ownership. Inspection findings from the previous owner do not carry over; each FFL's inventory and procedures are independently inspected. For example, if S&W is inspected after acquiring

inventory, only their records are reviewed. Violations found in one FFL Corp. records do not impact another. Gemini retained its license at the correct address until S&W obtained theirs.

*Top of Page 4*
*"With limited exceptions6, FFLs are only valid for one physical address unless a variance7 is obtained from the ATF. Finally, because of the licensing requirements and necessary vetting of applicants by the ATF, FFLs are not transferrable from one legal entity to anothers. Thus, in the case of an asset purchase, such as the one at issue here, if the acquiring company plans on continuing operations at the physical premises that were being utilized by the target company, the acquiring company must obtain an FFL in its own name prior to beginning operations. Should the acquiring company not already be operational in that state, it must go through the necessary processes under state law to establish and register its company to conduct business in the state prior to applying to the ATF for an FFL."*

Licenses are neither intermingled nor transferable, and the associated records are also not transferred. The firearms inventory was purchased and transferred to S&W. These are physical items that can be touched and inventoried. Not any of the issues Gemini had in the past (which were administrative) stopped the transfer of assets.

## III. CASE BACKGROUND AND OPINIONS

### A. Regulatory Requirements of the GCA and NFA

The ATF is the primary governmental authority charged with the enforcement of the criminal and regulatory provisions of the GCA and NFA. The implementing regulations of those Acts can be found at Parts 478 and 479 of the Code of Federal Regulations ("CFR"). The administrative regulations and other Rulings and guidance documents issued by the ATF can effectively be grouped into four main subject areas: licensing, recordkeeping, security and asset control, and firearm identification.

1. *Licensing*

The GCA requires that any individual or entity that desires to engage in the business of manufacturing, importing, or dealing in firearms[1] obtain the appropriate federal firearms license ("FFL") from the ATF[2]. Should

that licensee also desire to deal in firearms regulated by the NFA[3] – such as silencers – after obtaining their FFL they must go through a separate process to register as a Special Occupational Taxpayer[4] ("SOT"). Retention of the FFL and the ability to remain in business in the firearms industry is conditioned upon compliance with all applicable laws and regulations under the GCA and NFA.

As part of the FFL licensing process, the individuals who will operate the company – Responsible Persons ("RP") – undergo a background check to ensure they are not in a class of persons prohibited by law from possessing firearms and/or ammunition[5]. In light of federal and state prohibitions on certain classes of individuals from possessing firearms and ammunition, companies possessing FFLs ("licensees") are expected not to employ individuals who are subject to such prohibitions in positions which would provide them access to and/or possession of firearms and ammunition.

---

[1] The term "firearm" as used herein should be read to include silencers as they are so defined under applicable law unless otherwise noted. *See* 18 USC 921(a)(3)(C).
[2] 18 USC 923(a).
[3] Firearms regulated under the NFA include silencers, short-barreled rifles, short-barreled shotguns, machine guns, "any other weapons", and destructive devices, all as defined by applicable law. *See* 27 CFR 479.11.
[4] 27 CFR 479.31.
[5] 18 USC 923(d)(1)(B).

With limited exceptions[6], FFLs are only valid for one physical address unless a variance[7] is obtained from the ATF. Finally, because of the licensing requirements and necessary vetting of applicants by the ATF, FFLs are not transferable from one legal entity to another[8]. Thus, in the case of an asset purchase, such as the one at issue here, if the acquiring company plans on continuing operations at the physical premises that were being utilized by the target company, the acquiring company must obtain an FFL in its own name prior to beginning operations. Should the acquiring company not already be operational in that state, it must go through the necessary processes under state law to establish and register its company to conduct business in the state prior to applying to the ATF for an FFL.

As previously noted, each FFL may define products and operating methods differently from others. FFL business can only be conducted at the actual address on the license.

2. *Recordkeeping*

The core of a licensee's daily operations to meet federal regulatory obligations primarily revolves around recordkeeping. From the ATF's perspective, perfection of a company's FFL records should be the daily objective, as the various records maintained in the industry enable law enforcement authorities to trace firearms that are used unlawfully. Recordkeeping errors and omissions may compromise law enforcement's ability to trace firearms, which presents various safety risks and vulnerabilities, including the inability to establish critical information needed for criminal prosecution. Of the many records that are required to be kept, two are of particular relevance in the context of this situation.

a. The Book of Acquisition and Disposition

One of the primary records maintained by every licensee is the Book of Acquisition and Disposition ("A&D Book" or "Bound Book"). The A&D Book includes a log of all firearms received (or "acquired") and transferred (or "disposed") by the business through the course of operation[9]. Acquisitions and dispositions come in various forms (e.g., original manufacture, receipt from a third party, etc.) and include the change of a regulated firearm from one physical state or classification to another[10]. The A&D Book contains three categories of information applicable to each transaction: (1) information about the firearm (to include its serial number, manufacturer, importer (if applicable), model, caliber or gauge, and type); (2) acquisition information, or information about the source of the firearm (to include date of acquisition, name of the source of the firearm, the license information of the licensee, if applicable, and the address of the source); and (3) disposition information, or information about to whom the firearm was transferred (to include the date of disposition, name of the transferee, the license information of the licensee, if applicable, and the address of the transferee). The A&D Book may be maintained.

---

[6] Companies holding FFLs may utilize a location away from their licensed premises for storage of inventory. However, such companies are expected to notify the ATF of the "alternative storage location" such that the ATF is aware of where the company is maintaining its regulated inventory and can inspect such location to ensure compliance with ATF regulations. *See* FFL Newsletter, March 2006, pg. 8.

[7] ATF may issue authorization to a licensee to deviate from prescribed regulatory procedures when a request is received from the licensee and meets certain criteria. *See* 27 CFR 478.22, 27 CFR 479.26.
[8] 27 CFR 478.51.
[9] *See* 27 CFR 478.121; 27 CFR 478.122; 27 CFR 478.123; 27 CFR 478.125.
[10] For example, if a licensee has a "Receiver" in its inventory and it uses that receiver to assemble a "Rifle", the A&D Book must reflect this change in form and the licensee must make the applicable entries in the A&D Book.

in hard copy form as mandated by regulation or may be retained in an electronic format provided it is compliant with ATF Ruling 2016-1[11].

Depending upon the type of FFL an entity holds and the firearm that is the subject of the record, the time allotted for recording these acquisitions and dispositions varies. In the case of a manufacturer, such as is at issue here, the licensee has seven days to record the acquisition of a firearm regulated under the GCA,[12] but must record the acquisition of a firearm regulated under the NFA, such as a suppressor, by the close of the next business day.[13] Regardless of firearm type, the manufacturer has seven days to record the disposition of the firearm[14]. Further, the record is to reflect the date the physical process of acquisition or disposition occurred, not the date on which the record was created[15].

The time limit for recording a firearm in the A&D book can be confusing—even major FFL corporations and ATF staff often misunderstand the definition of manufacturing. I frequently clarify this for the firearms industry, compliance organizations, and ATF employees. As an FTB expert, I defined manufacturing functions for all of ATF to include writing policy letters and ATF rulings. These standards were accepted by the firearms industry. I also instructed the Tax and Trade Bureau (TTB) on these definitions during their integration with the treasury.

Manufacturers may partially complete firearms and choose not to record them if they believe the manufacturing process has not advanced to the point where the ATF would consider the item a firearm. Currently, there are no explicit written guidelines detailing which machining steps constitute the creation of a firearm. This ambiguity also affects the recording of firearms on Form 2. In some instances, NFA firearms are documented before completion; for example, a silencer is not considered complete until fully assembled, and a receiver does not qualify as a finished firearm until additional processes are performed. Manufacturers may mark these incomplete firearms and subsequently record them on a Form 2. However, because the item has not yet changed form or become a complete firearm, it may be inadvertently omitted from entry into the Acquisition & Disposition (A&D) book.

In short, and as can be deduced from the information above, the A&D Book is very similar to a general ledger of debits and credits. As a firearm is received, its information and source are recorded in a row on one side of the ledger; as the firearm is transferred, the information regarding

the transferee is recorded in the same row on the other side of the ledger. While the idea is simple in concept, implementation of the mandate requires careful thought on behalf of the licensee. While a small retailer with a couple hundred square foot store may only have a handful of firearms coming and going per day, the largest manufacturers in the country have thousands of firearms being machined, thousands more being assembled, thousands more being received from third parties, and thousands more being shipped out. An actual physical book or simple spreadsheet maintained by a single individual may be appropriate for the former, but a complex electronic system with daily input from hundreds of employees is likely required for the latter.

Should the A&D Book be mismanaged – whether by untimely entries, completely omitted entries, or inaccurate entries – the ability of law enforcement to trace firearms used in crimes or to prevent crime before it even happens can be severely compromised. A few examples can illustrate.

If a manufacturer delays recording the acquisition of a firearm by a few weeks, it frustrates the manufacturer's ability to determine if and when a firearm is stolen. Without an immediate entry of the serial number, a physical inspection of that batch of firearms may not reveal that one is missing. Consequently, the manufacturer might remain unaware of the theft and fail to alert authorities promptly. This oversight can give a bad actor additional time to use the stolen firearm in a crime or sell it on the black market and can frustrate law enforcement's efforts to prevent and solve crimes.

A second example shows how inaccurate information can create traceability problems. Assume a manufacturer has sold hundreds of firearms to a retailer that operates multiple stores in multiple states. If that manufacturer records an incorrect destination address for several of the firearms in

---

[11] ATF Ruling 2016-1 is a ruling issued by ATF that authorizes the use of electronic A&D Books in lieu of the bound volumes required by regulation. It sets forth 14 conditions which must be met in order to utilize electronic records.

[12] 27 CFR 478.123(a).

[13] *Ibid.*

[14] 27 CFR 478.123(b).

[15] *See* 27 CFR 478.123(a) ("...each licensed manufacturer shall record...*the date of* such manufacture or other acquisition..."; 27 CFR 478.123(b) ("The record shall show *the date of* such sale or other disposition...) (emphasis added).

its A&D Book and the firearms are stolen while in transit, the manufacturer's report to the authorities about the theft may have authorities investigating the matter in a completely different jurisdiction, impeding the criminal investigation and allowing more time for a firearm to be used in a crime. Omitted and inaccurate records can result in impacts on tracing and thereby impact public safety.

Tracing firearms is a critical role of ATF. I Have traveled to most Central American Countries, Colombia, Mexico, France, many US Sates, and others to provide tracing classes. The majority of improper traces are conducted by US Law Enforcement. This is garbage in garbage out. In other words, they do not complete a trace request properly. When a trace gets to a manufacturer or the first person who put a serial number on it, they for the most part jump through hoops to find the nexus of the firearm. The clearer an A&D book is the smoother the trace can occur. But once again this is not unique to Gemini, there are many incidents where major FFL corporations have done this also. There is nothing in the ROV that ATF has been tracing Gemini firearms. Additionally, there is nothing in the ROV that indicates Gemini did not complete any trace requests that ATF submitted to Gemini,

b. NFA Registrations

The second record of relevance to be discussed are more accurately described as a collection of records; NFA registrations. Stated briefly, all firearms regulated under the NFA that are not in the possession of government authorities are registered in a central repository named the National Firearms Registration and Transfer Record ("NFRTR"). Each NFA firearm is registered to an identified individual or organization (e.g., a corporation, LLC, or trust). Like the A&D Book and all other records mandated by the ATF, the NFRTR's accuracy aids in the tracing of firearms and prosecution of criminal acts and thus its inaccuracy also presents potential risk to public safety.

NFA registrations are effectuated by filing applicable paperwork with the ATF. The specific paperwork depends upon the type of registration (e.g., transfer of an existing NFA item or creation of a new NFA item), and the types of parties involved (e.g., federal firearm licensee/SOT, consumer, government entity, etc.). Manufacturer licensees who have also registered as an SOT generally file the following NFA Forms for the following purposes[16]:

- Form 2[17] – Upon creation of a new NFA firearm, this is the firearm's original registration in the NFRTR.
- Form 3[18] – Utilized by a federal firearm licensee/SOT to transfer an NFA firearm to another federal firearm licensee/SOT.[19]
- Form 4[20] – Utilized by a federal firearm licensee/SOT to transfer an NFA firearm to an individual or entity that does not hold both an FFL and SOT.[21]

- Form 5[22] – Utilized by a federal firearm licensee/SOT to transfer an NFA firearm to a government agency.

[16] Other purposes exist for these forms, however, only the applicable summaries are stated above.
[17] 27 CFR 479.103.
[18] 27 CFR 479.88.
[19] One single firearm may be identified on several Forms 3 before it lands in a consumer's hands. For example, if a manufacturer sells a single firearm to a distributor who then sells it to a retailer who in turn advertises the firearm online which is purchased by a customer in another state, that single firearm would appear on three (3) Forms 3 even though only one consumer sale is made. A Form 3 would be filed for each of the following transfers in that scenario: manufacturer to distributor; distributor to retailer; retailer to licensee in the online purchaser's state who would then file a Form 4 to transfer it to the retailer.
[20] 27 CFR 479.84.
[21] This Form is also utilized by consumers to transfer NFA-controlled firearms to other consumers or even to an FFL/SOT. Like Forms 3, one single firearm may be identified on multiple Forms 4. Subsequent Forms 4 after the initial Form 4 would be a "used" firearm transfer.
[22] 27 CFR 479.90.

- Form 9[23] – Utilized by a federal firearm licensee/SOT to export an NFA firearm. The licensee/SOT must have an approved export license issued by the Department of State or Commerce prior to filing the Form 9.

Upon ATF approval of any of these Forms, the firearm is registered in the NFRTR to the transferee identified on the Form. Therefore, the federal firearm licensee/SOT filing these Forms is not permitted to ship or transfer the firearm(s) identified on the Forms until ATF has approved such transfer. Further, in the eyes of the ATF, with limited exception, the registrant is the only person or entity who is legally entitled to possess that NFA firearm and thus the ATF expects prompt or near-immediate shipment of the firearm upon the licensee's/SOT's receipt of the approved Form.[24]

3. *Security and Asset Control*

The ATF has no regulations that mandate specific security controls, and none exist in the GCA or NFA. However, implied throughout both Acts and ATF regulations is an obligation on behalf of all licensees to implement some form of reasonable security measures to ensure that firearms are accounted for while in the possession of the licensee.

First and foremost, it is a criminal offense for certain individuals to possess firearms or ammunition,[25] and it is unlawful for anyone – including licensees – to sell or otherwise dispose of firearms or ammunition to such individuals[26]. It is therefore an obligation of a licensee to not permit access to firearms or ammunition to such individuals and to implement controls to ensure such access does not occur. This includes securing their licensed premises in general and potentially specific areas of their licensed premises in which firearms are present. If a licensee permits unvetted individuals – whether employees or third parties – to roam throughout their facility without some level of control or monitoring, it has the potential to provide such prohibited persons access to firearms or ammunition.

Through the population and maintenance of the A&D Book discussed above, and the requirement to inform ATF and local law enforcement of firearms that are missing[27], licensees are responsible for knowing what firearms are on their premises at all times. It is therefore an obligation of a licensee to secure firearms within their control to a reasonable extent to deter the theft or loss of firearms.

Given the lack of regulations specifying certain security measures and the many types of premises and locations at which licensees may operate, it is incumbent upon each licensee to determine how they will secure their premises[28]. At the least secure end of the spectrum, one may see a facility with locked doors. At the other end of the spectrum, a licensee may implement robust, multi-

---

[23] 27 CFR 479.114.

[24] The ATF has traditionally allotted a 30-day grace period for the transferring party to ship or transfer the NFA firearm. Upon expiration of that 30-day period the ATF expects notification of the failure to transfer with an explanation of the circumstances leading to the delayed transfer.

[25] 18 USC 922(g).

[26] 18 USC 922(d).

[27] 27 CFR 478.39a.

[28] While some states have adopted legislation or promulgated regulations within their borders mandating certain security requirements, with respect to the current litigation, no such states are involved.

layered security measures consisting of property line fencing and barbed wire, electronic badged access to the facility to monitor the presence of individuals arriving and departing, differing authorization levels on badges to permit or restrict certain personnel from accessing different areas within the facility itself, metal detection apparatus, monitored camera coverage on the premises with backed up recording for a defined period of time, and armed security personnel. Most of the industry falls within those two ends of the spectrum with very few having a top-tier security package as described above.

4. *Firearm Identification*

Firearm identification as mandated by the federal regulations[29] consists of engraving certain information on a firearm. The primary identifying marking of a firearm is its serial number. The serial number is what permits traceability of firearms through all licensees' records. With limited exception, a serial number may not be duplicated once it has been applied to a firearm[30] (as this would destroy traceability). The serial number must be engraved on the frame or receiver of the firearm to a depth of .003" and must be of a height no less than 1/16th of an inch[31].

Certain other markings must also appear on the firearm to include the manufacturer's name and its city and state of operation, the model of the firearm, and the caliber or gauge of the firearm.

As with the records, it is paramount these markings are engraved accurately on the firearm as well as recorded in the records. Without this alignment traceability of firearms is destroyed and public safety may be put at risk.

Serial numbers are not authorized to be duplicated.

B. **State of Plaintiff's Compliance at the Time of Acquisition**

Orchid was contracted prior to the acquisition of Plaintiff's assets to assess Plaintiff's facilities for the purpose of determining current levels of compliance with government regulations and to provide an estimate of cost to address any operational matters – whether rooted in process, technology, or education – that were identified as leading to any observed regulatory deficiencies. Following the visit of the Eagle and Tucson locations, Orchid provided two reports to Smith & Wesson, dated April 25, 2017[32] and May 26, 2017[33]. The following is my opinion of the state of compliance at the facilities based upon my observations and those reports insofar as they pertain to the regulatory matters discussed above[34].

---

[29] 27 CFR 478.92.

[30] The ATF permits silencer manufacturers to re-use serial numbers already engraved on a silencer if the following circumstances exist: (1) a manufacturer FFL/SOT has made a silencer (2) that has not left the manufacturer's premises (3) which is determined by the manufacturer to be defective. *See*, National Firearms Act Handbook, April 2009, pg. 175 "Frequently Asked Questions – Silencers".

[31] Due to recent regulatory revisions included in ATF 2021R-05F there is a cutoff date (August 24, 2022) at which time additional information must be engraved on the frame or receiver depending upon the manufacturer and type of firearm. To simplify the regulatory requirements for present purposes those distinctions are omitted.

[32] P. Milks Stealth ID Report

[33] SW546606 – J. Rydberg Stealth AZ Report.

[34] To be clear, there are many other regulatory mandates that fall into the four categories above that were not discussed. For example, there are dozens of other records to be maintained in addition to the A&D Book and NFA registrations. Any regulatory requirements not discussed above nor addressed here are omitted for one of three

1. *Recordkeeping*

a. The Book of Acquisition and Disposition

The A&D Books at both facilities had significant issues with both respect to the structure of the books themselves as well as the accuracy of the records contained therein. The state of the A&D Books and the manner in which they were maintained resulted in thousands of incorrect record entries, each representing regulatory violations.

Is there any record where ATF decided to revoke the license because of the method that records were kept. I could not find any. However, I did find where Gemini was attempting to correct any issues they discovered. In addition, Gemini had retained counsel to assist it with its compliance programs.

2016-06-16 AM1113 O.Miller Eml re Michigan A&D Book_SW302158 Owen Miller reviewing Gemtch Michigan and calling out discrepancies.; *See also*, Melissa Burgess email from October 2016 regarding a detailed review while she was employed at Mark Barnes & Associates.

The latest ATF ROV from the most recent inspection was reviewed and there was nothing in the report where ATF indicated they were going to revocation or even a warning. When ATF reviews an FFL if mistakes have been made it is critical that the manufacturer finds the mistakes and shows a correction. ATF sees that perhaps a duplicate serial number was used but the manufacturer found it and made the necessary correction. Same as a missing firearm. Did the manufacturer research it and find a solution even if it results in reporting it missing? I have worked with major manufacturers where this procedure was found on a large scale. ATF has allowed the addition of a prefix to differentiate the serial number. or had manufacturers recall and destroy firearms. Based upon my experience and training, these administrative issues would not likely result in Gemini losing its FFL.

i. Structure of the A&D Books

It was NOT discovered that due to the use of this electronic system firearms were stolen and concealed. There is no indication firearms were lost or concealed. In the record of inspection did ATF inform Gemini to remove this system and install a different system? No. ATF did not point out any failures in the system. Firearms that cannot be located are not the same as stolen firearms. Firearms are frequently destroyed during manufacturing and through administrative hiccups become misplaced due to being discarded prior to accounting. When a missing or destroyed firearm is discovered it is reported as such.

Plaintiff maintained two types of electronic records at each of the Eagle and Tucson facility. The Eagle facility utilized a homegrown software program it had created itself. The Tucson facility utilized a simple Excel spreadsheet. While neither of these are, in themselves, noncompliant, they lacked critical controls to assist the licensee in avoiding recordkeeping violations. For example, the Tucson A&D Book – being an Excel worksheet – could easily have information deleted from it and therefore provided ample opportunity for theft of firearms to be concealed. Further, the Tucson A&D Book was managed by multiple employees who emailed the file back and forth, providing even more opportunity for concealment of theft or loss of critical data. The Tucson A&D Book was also maintained by a "permanent intermittent employee" on a computer owned by a third party in violation of ATF Ruling 2016-1[35].

This permanent intermittent employee term does not seem to be an issue. All of the requirements were followed. See below:
§ 340.401 Definitions.

The regulations and the ruling specify the type of employee that should be managing an A&D book. Is the third-party server computer accessible at the licensed premises during business hours? If so, what is the violation?

The intermittent employee use was verified by legal counsel: (b) \2016-03-30 PM0240 O.Miller Eml re Gemtech Tucson Planning_SW481009.pdf"

9. Electronic firearms acquisition and disposition records may be stored on a computer server or device owned and operated by the licensee, or contracted/leased by the licensee through a host facility (e.g., remote server or cloud storage provider), provided that:
a. The firearms acquisition and disposition records are readily accessible through a computer or device located at the licensed premises during regular business hours; and
b. The licensee's server is located within the United States or its territories, or if a host facility is used, that facility must have a business premises within the United States or its territories, and must be subject to U.S. legal process. Licensees are

strongly encouraged to ensure that there are proper and robust security protection measures in place (e.g., encryption) to ensure all data is protected.
10. If the licensee contracts with, leases from, or changes a host facility (e.g., remote server or cloud storage provider), the licensee must, within 30 days, notify his/her respective ATF Area Office of the name and address of the host facility.
11. Each licensee must maintain its firearms acquisition and disposition records on a separate/partitioned database that cannot be intermingled with the records associated with another license.

The Eagle facility maintained their A&D Book in three separate books. This is not the best practice in the industry and generally results in creation of regulatory violations. Typical examples include omission of acquisition records in the case of multiple employees managing the books and each assuming the other has acquired a given firearm on the book, and creation of multiple acquisition records for the same firearm which can result in conflicting disposition information.

It is best practice to use only one A&D book, but it is not restricted by the regulations.

ii. Accuracy of the A&D Books

The lack of controls in the A&D Books, the manner in which information was entered, the lack of employee knowledge on the requirements of the A&D Book, and the absence of company policies and procedures led to thousands of errors in the regulatory records maintained between the two facilities.

---

reasons: (a) the action required under the regulation is not of a nature such that modification to the business process would have been material enough to warrant a significant enough investment to modify and was thus not investigated in our time on site (e.g., application of a serial number outside the range permitted by a variance); (b) a violation of an applicable regulation would be so minor that ATF is not likely to issue citation or more extreme penalties (e.g., posting of a copy of the license); or (c) no violation was found with respect to the applicable regulation.

[35] Condition 9 of ATF Rul. 2016-1 governs where the electronic record's data is stored. It permits storage on a server or physical device (e.g., computer, hard drive, etc.) owned by the licensee or on a remote server operated by a host facility (e.g., cloud server) with whom it has a contractual agreement.

Despite not performing a full data analysis on Plaintiff's A&D Books, Orchid still discovered thousands of errors in Plaintiff's A&D Books. Perhaps the most egregious recordkeeping violation discovered at the Eagle facility was the disposition of serial numbers in the A&D Book as being physically destroyed *prior to* their actual physical destruction. While on site, Orchid viewed over 20 intact firearms that were, according to the A&D Book, destroyed several months prior to our arrival. This presents an obvious safety risk, in addition to compliance violations.

Also at the Eagle facility, in dozens of instances the name of the transferee was completely omitted from the record. The transferee's name is not only required by regulation, but lack of such a name is potentially fatal to tracing a firearm. In hundreds of instances, the FFL number and/or address of the transferee was not recorded, which constitutes additional violations. And for inventory that was on site at the time of our visit, the storage location was recorded in the disposition field that, at best, demonstrates a lack of knowledge regarding how to operate the records and, at worst, another violation of the regulatory requirements[36]. Other data inaccuracies representing regulatory violations include serial numbers on the A&D Book with duplicate acquisition entries,[37] and firearms being acquired using the incorrect date of acquisition.

The Tucson visit revealed contradiction between the records of the two facilities resulting in additional recordkeeping violations. In approximately 3,900 instances, the disposition date of firearms being shipped to Eagle in the Tucson records was a date *after* the acquisition date of the firearms at the Eagle facility; a physical and logical impossibility. In approximately 100 instances, the acquisition date in Eagle of firearms shipped from Tucson was 315 days after the disposition date from the Tucson records, an implausible scenario considering standard shipping times. These findings highlight a serious flaw in the recordkeeping processes at both facilities, which necessitated immediate attention and remedial action to ensure compliance with regulatory standards.

Based on my experience viewing the records of hundreds of federal firearms licensees and viewing the records of Plaintiff's FFL and the reports resulting therefrom, it is clear that there were significant accuracy issues and violations in the records. I am of the opinion that had Orchid performed a deeper analysis, it is more likely than not we would have found at least several hundred more, and potentially thousands of additional recordkeeping violations. It is my assessment that these errors stem from inadequate technology, lack of company policies to ensure adherence to the law, lack of standard operating procedures to standardize recordkeeping practices, and lack of employee education on behalf of those charged with maintaining the records. Employee negligence or outright disregard for known regulatory obligations cannot be ruled out. While these issues were created by employees executing their duties, it is incumbent upon the Responsible Person to ensure compliance with ATF regulations. In my opinion, the violations identified reveal that the Responsible Person and executive personnel were not monitoring the company's state of compliance with ATF regulations.

These seem to be issues that are correctable. But S&W only bought the inventory of Gemini.
2018-10-16 PM0607 H.Sholes Eml re Gemtech FFL A&D Records_SW367670-367671
If it was a concern of S&W, they could have discussed the issue with Gemini and if

necessary, the IOI who provided oversight.

---

[36] The requirements of the A&D Book are extremely simple with respect to additional information that does not involve the firearm, the acquisition source, and the transferee (e.g., storage location): "*Additional columns* can be utilized to capture certain additional information (e.g., inventory number, new/used, *etc.*), *so long as the additional information is separate* from the required information and the required information is readily apparent." (ATF Ruling 2016-1, Condition #1) (emphasis added). GT did not keep such additional information separate.

[37] This could have been evidence of a recordkeeping error (citable) and/or could have represented multiple firearms on premises with the same serial number (citable), both of which are compliance violations.

b. NFA Registrations

Plaintiff also demonstrated poor compliance controls and/or lack of understanding of the effect of NFA registrations at its facilities and among its personnel. Upon creation of an NFA firearm at the Tucson facility, that licensee would – as required – file a Form 2 to register the NFA firearm. Upon registration of the NFA firearm, the licensee would submit paperwork to transfer the NFA firearm to its Eagle facility. At that point in time, the Eagle facility would acquire the NFA firearms on their A&D Book even though the firearm was still physically at the Tucson facility. This procedure is not a violation by the Tucson facility FFL, but rather a recordkeeping violation by the Eagle FFL. Nevertheless, it demonstrates a lack of understanding on behalf of the personnel managing the regulatory records of the effect of NFA registrations.

At the Tucson facility, four Form 2s were sampled to investigate alignment with the A&D Book records, and it was discovered that the dates on the registrations and the A&D Book differed by nearly a week.

The most egregious NFA registration violation was already noted above. The Plaintiff's employees filed paperwork with the NFA Branch[38] of the ATF attesting to the fact that NFA regulated firearms were destroyed and requesting that the ATF remove such items from the NFRTR. In conjunction with the recordkeeping violations, this removal from the NFRTR of items that were not actually destroyed would have rendered these firearms completely untraceable. Finally, Plaintiff's employees admitted to shipping NFA assets to transferees prior to receiving the required approval from the ATF.

Is this the situation where they were waiting for the removal to come back prior to destruction? It would not be recommended to destroy any firearm prior to receiving notification from ATF. Of course, manufacturers can destroy any defective firearm when they want. Under the GCA regulations, any FFL can destroy defective firearms regulated by the GCA.

Shipping NFA items prior to approval, especially dealer to dealer was a common occurrence in the NFA community. This common practice began when the transfer times were exceedingly long. SOTs would transfer the item on a form 3 so the receiving SOT could commence a Form 4 to a customer. The Form3s would be approved prior to the Form 4 being reviewed by the NFA. This method shaved off several months of transfer time. I discussed this with the branch chief Steve Albro who is now the division chief and informed any of the customers I dealt with to cease this practice, however it was common at the time of Gemini's operations. As is clear

from the communication I've reviewed between Gemini and Melissa Burgess and others, Gemini strived to comply with the NFA and the best practices of compliance under the GCA.

As with the recordkeeping violations, the actions taken by the employees in charge of Plaintiff's regulatory compliance is demonstrative of an environment with very weak to completely absent company procedures or policies to ensure the company abided by federal regulations. If such policies or procedures did exist, they were not followed by employees.

2. *Security and Asset Control*

The security and asset control measures in place at the Plaintiff's facilities at the time leading up to acquisition of Plaintiff's assets by Smith & Wesson could be classified as existing on the lower end of the spectrum of control.

With respect to physical security measures, there were not many more security measures in place other than locking of the doors upon the close of business. Despite dealing in NFA regulated firearms and parts and pieces thereof that are very concealable and transportable, there were no metal detection apparatus at either facility. Further, there was no camera coverage in place at the Eagle assembly facility that would aid any investigation in the event of the theft of these highly portable goods. At both facilities the garage doors were open and unattended throughout the day.

---

[38] Now known as the NFA Division.

Control over assets at the facilities was also questionable. At the Eagle location, regulated products were walked outside between the various suites in the office park with no procedure in place to confirm the quantity of assets entering one address matched the quantity of assets exiting the prior address; again providing opportunity for diversion of assets. It was also noted at the Eagle location that sales sample and demonstration firearms that would be in the hands of sales personnel would be obtained by employees at the premises and returned thereto on an honor system[39]. While this is not technically a violation, it does present yet another company practice that provides ample opportunity for theft of firearms.

As stated previously, the ATF does not have specific regulations governing security measures or how assets are controlled within the four walls of a federal firearm licensee's building. Yet, given other regulations and the inherent nature of these assets, most licensees take it upon themselves to implement some security measures, no matter how meager.

However, it is my opinion that given the size and character of Plaintiff's company at the point in time, it was observed its security measures were subpar and below that of its peers in the industry, and even below that of operations of significantly smaller scale and resources. Considering the attractiveness of the products to bad actors the choices made with respect to security measures were questionable at best. At the very minimum, a well-controlled environment does not see its largest doors open and unattended or unmonitored throughout the day providing potential bad actors the opportunity to misappropriate regulated assets. Camera coverage, lacking at the Eagle location, is another bare minimum for nearly every firearm manufacturer I have observed. Movement of NFA firearms between suites and buildings at the Eagle location in an unsecured public office park without verification procedures at either end of the movement was also an alarming procedure. Combined with the recordkeeping deficiencies noted above, the security and asset control methods in place created an environment with so great an opportunity for concealed theft that I struggle to recall another environment with similar deficiencies.

The GCA, NFA, or the CFR, does not specify any security posture. As a security consultant having served two tours of security duty in the USMC (selected by Battalion Commander to Lead the Detachment at the American Embassy Moscow from 1994-1996 due to security issues), working for Diplomatic Security as a firearms and tactics instructor, and having started my own security firm, I believe that it is prudent to have some type of measures in place to prevent theft, fire, flood, or even electronic issues that could cause the loss of all a business's documents. It is inherent for me when entering a firearms business or any business to observe what type of security procedures both human and electronic are in place. When visiting any FFL I advise them on what I see and what can be improved. However, a security program due to cost is not only based on possibility of a break-in but on location and threat level.

If a business is in an industrial area with certain security measures already in place, or there is no perceived threat in the location of the business, the facility is staffed 24 hours, then the physical security put in place could be negligible. There is no "one size fits all plan". Therefore, it is left up to the owner to determine what precautions must be put in place.

Movement of firearms in a manufacturing environment is a common practice. It does not matter if there is a possibility of a concealed theft, or any type of theft; what matters is has theft occurred. If thievery abounds, security measures will slow it down, but it will not stop theft. As indicated in Mr. Milks notes there has never been any report of theft or loss.

2017-05-26 Orchard Advisors SW AZ Stealth Diligence Memo_SW546608
Theft/Loss:
a. No theft / loss has ever been reported. It should be noted that the ATF has not visited the facility and your target has not conducted an independent wall-to-wall physical despite the shared inventory access and the fact that ATF / Inventory transactions are managed by employees who are paid by both organizations.
b. There are 770 serial numbers that show as Open Dispositions in Tucson despite the fact that they show as received / acquired in Boise. The observation is particularly troubling giving the % error (770 / 5,100 and that this only relates to six months of operation).

3. *Firearm Identification*

Plaintiff's method of applying markings to its firearms was performed at the time of our assessment in a manner comparable to most similarly-sized manufacturers in the industry – use of a laser engraver with a manual serial number input. It does through its highly manual process, however, provide some level of risk of improper duplication of serial numbers or use of improper serial number ranges. Of more concern was our observation of several receivers that had been fully machined but remained unmarked for several months at the Tucson facility. Yet again, the lack of a serial number on a firearm and its nonappearance in the regulatory records renders it subject to concealed theft, providing risk to the company and public safety.

Firearms, silencers and silencer components are required to be marked when complete as a silencer. Duplication is always possible, and due diligence must be adhered to regardless of if the serial numbers are manually or electronically counted.

Silencer components do not have to be serialized by the manufacturer until a

complete silencer has been assembled. This direction was in an ATF ruling and has been codified in the new frame or receiver rule 2021R-05F

4. *Compliance Program Management*

The ATF does not require a company to establish a compliance program. However, given the nature of the regulations and the fact that operational personnel (e.g., assembly, shipping & receiving, etc.) have a far greater impact on a company's level of compliance and risk profile than

[39] Firearms could also be shipped by the company to its employees in the field.

the compliance department in any manufacturing environment, in my opinion and experience it is nearly impossible to operate in compliance with federal firearms regulations without establishing such a program. While there are many elements of an effective compliance program[40], I would group the key components of an effective compliance program into four categories.

First is polices and procedures. Without documented policies and procedures there is no compliance program. These documents are the backbone of a compliance program, drafted to specify appropriate corporate and employee behavior.

Second would be education and training. First and perhaps foremost, the head of any compliance department must have the appropriate expertise in the relevant subject area(s) to establish and manage a company's compliance program. Beyond the person "responsible for" compliance, however, the entire workforce must be trained in the regulatory requirements not only generally applicable to the company, but they should also be trained in those requirements that are specifically applicable to their job duties. If an employee is not educated and unaware, they cannot know whether their action is compliant or not.

Third, the best compliance programs – at least when dealing with ATF regulations – utilize the technology that is available to them to the fullest extent possible with the resources available to them. As calculators reduce mathematical errors and handheld GPS reduces chances of becoming lost, so too does properly configured and deployed software help reduce the regulatory violations created by the human element.

And finally, security. Especially when dealing with firearms, security is of significant importance. A company may have policies drafted by the best corporate counsel, procedures drafted by the smartest managers, and the most expensive technology available on the market. If there is no security supporting these systems, regulated assets can disappear, records are then incorrect, and traceability of these assets is lost.

Our reports do not identify the existence or nonexistence of a documented compliance program complete with policies and procedures at Plaintiff's facilities. The errors that were viewed were so open and obvious with very little investigation required, and of such a fundamental nature that it cannot be credibly claimed a compliance program was in place to ensure compliance with federal regulations. The most basic ATF recordkeeping policy at any company would dictate that acquisitions and dispositions be recorded when they happen, in a timely fashion, and specify the very simple elements of information to be recorded. As discussed above, the A&D Books at Plaintiff's facilities exhibited violations of such a fundamental nature (e.g., not entering the transferee's name) that it is our belief no documented policies or procedures existed[41]. If they did exist, they were ignored.

It appears counsel did put a compliance program in place,

2016-03-25 PM0841 M.Burgess Eml re Compliance Plan_SW060124

[40] For example, the United States Sentencing Commission identifies seven minimum elements of an effective compliance and ethics program within The Organizational Sentencing Guidelines at Section 8B2.1(b) that I believe all FFLs should strive to achieve.

[41] On October 21, 2016, Daniel Williams did state to outside counsel via email that he desired to create "an SOP to make things better here". (*Ref*, SW606816 – 2016-10-24 AM1040 D.Williams Eml re Inspection) It is not apparent that this was accomplished.

The most glaring example of the complete absence of any program that bears repeating again was the disposition of undestroyed firearms as having been destroyed and the attestation to federal authorities that NFA firearms were destroyed and direction to remove them from the NFRTR when they were in fact not destroyed. Not only not destroyed prior to such actions, but not destroyed for several months prior to our visit. Such an action is simply so far beyond the pale of acceptable actions under the GCA and NFA it cannot be claimed any policies, procedures, or controls were in place or adhered to.

With respect to education and training, I cannot speak to any training that was provided to the broader employee group. What I can speak to is the lack of training and expertise of the individual who Plaintiff placed in charge of maintaining the company's compliance with federal firearms laws. I in no way mean to disparage the individual placed in charge of ATF compliance at Plaintiff nor do I in any way mean to imply he was not intelligent. However, Mr. Nakashima was hired at GT in late July or early August of 2016 per his testimony during his deposition. It was his first job out of college, and he was tasked with filing paperwork with the ATF. Within 6 months of his hire his superior departed and he was placed "in charge of compliance" for all aspects of the GCA, NFA, and Arms Export Control Act of 1976 for a company that dealt in arms nationally and internationally. The violation of any of these Acts could have resulted in the company being shut down by the Federal government, fined millions of dollars, or having employees arrested for conduct in contravention of these Acts. It is, in my opinion, irresponsible of a company to place such an inexperienced individual in such a position.

Mr. Nakashima's inexperience can be gleaned from his testimony during his deposition. When asked in multiple different ways what his duties and/or responsibilities were as head of compliance, he primarily and almost exclusively referred to paperwork that he was required to file. When pressed on matters concerning how he ensured that sales agents operating in foreign countries were behaving appropriately, he could only allude to sporadic discussions that had occurred at various points in time. When asked about international sales and evaluating foreign consignees to assess risk, Mr. Nakashima was unaware of what should be done beyond the text of the Federal regulations. It is fairly clear from the text of the deposition that Mr. Nakashima was unaware about concepts such as debarred parties, OFAC sanctions, and due diligence on foreign parties (whether an entity or individual).

While international transactions and the regulations thereunder are beyond the scope of this report, the responses to those inquiries makes it clear that Mr. Nakashima did not hold the requisite expertise or background to have been placed in the position in which he was. Also not mentioned in his responses about his job duties was any reference to a compliance program, creating documented policies and procedures for employees to follow (excluding a passing mention of a "policy" the company had for sales personnel to "check[] in and check[] out any of the items in our inventory"), training the workforce on ATF regulations, performing internal audits of the company, or reporting the company's risk profile to executive leadership. His responses and the state of the facilities at the time paint a picture of a clerical compliance "clerk" as opposed to an employee or officer of the company responsible for evaluating and mitigating the company's regulatory risk profile.

As for the utilization of technology at the company, the Plaintiff did spend money on creation of a homegrown electronic recordkeeping system to maintain the required A&D Book records at the Eagle facility. However, although GT created this homegrown electronic software to maintain the A&D Book at the Eagle location, given the violations noted above and in our report it was either insufficient or not being utilized properly.[42] Further, the fact that this same technology was not deployed at its second location – which used an Excel file – was a questionable decision introducing additional regulatory risk.

And as for security as part of a compliance program, I have stated above my concerns with their security.

The discussion is of past practices. S&W was purchasing inventory. If the inventory purchased was recorded and disposed of to S&W properly, past practices have nothing to do with the purchase of the property. Of course, if there was criminal action that showed the physical item being transferred was a part of a criminal conspiracy that part could be seized. From reading the emails all inventory transferred to S&W was accounted for.

The regulations are non-specific on destruction of firearms and timeliness of the destruction. Of course, common practice is when a firearm is removed from the NFRTR it should be destroyed as soon as possible simply to take it out of your inventory. If these firearms that were supposed to be destroyed were still on inventory, then they at a minimum are not lost and should continue to be recorded.

atf-ruling-76-25_0_0_0

The Orchid report speculates regarding fines, arrests, violations, and being shut down. In my opinion and experience, none of the administrative issues would result in the loss of Gemini's FFL, and Gemini was working with Counsel to remain in compliance

C. **Prudence of S&W's Actions as it Pertains to GCA and NFA Regulatory Obligations**

Questions have been raised regarding the prudence of S&W's actions insofar as they pertain to taking over ATF regulatory compliance and certain business decisions that followed as a result following execution of the APA and during the period of the transition for which I have been asked to provide insight.

In my opinion, S&W had no option but to take over the compliance function of GT and make the

decisions they did with respect to that responsibility. I hold this opinion irrespective of any of the penalties that were imposed upon S&W following charges levied against them as a result of alleged FCPA violations that had occurred several years prior to the acquisition as those charges have little to no relation to matters regulated by ATF.

As discussed above, once the APA was entered into, it was incumbent upon S&W to establish a legal entity in Idaho where the Gemtech brand would continue to operate and obtain its own FFL and SOT. This process generally takes approximately eleven weeks[43] although ATF may under special circumstances expedite such applications. Even when expedited it still takes several weeks for both the FFL and SOT to be issued and the entity to be properly licensed. Thus, no matter what, S&W would have had to pause operations to a certain extent until it could properly become licensed at the Eagle facility.

Under certain conditions a target company such as Plaintiff may continue to operate under its legal umbrella using its FFL/SOT for the benefit of an acquiring company without pausing operations; this is sometimes accomplished by adding a Transitional Services Agreement ("TSA") as an addendum to the APA (sometimes a separate TSA is executed altogether). However, there are practical and regulatory complications that render this a short-term solution, and facts may present themselves to render this a solution that should not be entertained and that a pause on operations is more preferable.

---

[42] During our brief visit we did not perform a deep dive into the software to determine whether the software was fully compliant or what, if any, regulatory controls were contained within.

[43] Under 18 USC 923(d)(2) ATF has sixty days to approve or deny the application for an FFL and although it often takes longer the Bureau most often complies with that timeline. After receipt of the FFL the entity must thereafter apply for the SOT which generally takes 2-4 weeks.

The first issue to address when operating under a TSA is the additional negotiation that may result to identify assets of the prior company excluded from the APA, assets subject to the time period in which the TSA is operational, and assets included in the APA. The second practical consideration is the relative lack of control of the acquiring company over the target company's employees. Whether an issue of loyalty to old owners or bosses, the fact that new corporate leadership may not be physically on site so there is no appearance of repercussions, or any other reason that may apply, until a target is fully integrated with the purchaser there is less control. This was demonstrated in the case at hand whereby Mr. Nakashima and Mr. Pace conspired to ignore corporate direction on whether they were permitted to resume operations and proceeded to attempt to perform a sale of assets to foreign parties[44].

Next is the legal matter of the fact that an acquiring company cannot operate a target company (its own distinct legal entity) indefinitely. The regulations do not even contemplate or address a situation governed by a TSA, but ATF has approved of their use in the past. However, even if not "indefinitely" operating under a TSA, given their ambiguous status as a legal mechanism for a company acquisition if the integration process takes too long there could be questions about unlicensed dealing in firearms as the profits and benefits received by the target company are all supposed to flow to the acquiring company who is not licensed to perform the regulated and licensed activity at that location.

Finally, and specifically with respect to the acquisition at issue, given the effectively absent compliance controls and business practices of the employees that provably created risk on a day-to-day basis that were reported by Orchid Advisors to S&W during the due diligence process, it presented far too much risk for an organization like S&W to tolerate, and were I counsel to them and involved in that transition I would have advised them to proceed as they did. Information on S&W's ATF compliance program provides further insight.

S&W, as a large corporation with hundreds of employees and significant resources, had developed a robust, yet efficient, ATF compliance program. The program was replete with dozens of policies and procedures covering nearly every activity that occurred on their premises having to deal with regulated assets. They had multiple employees as part of their compliance apparatus including a General Counsel/Chief Compliance Officer to whom the Director of Compliance reported and a Board of Directors to whom regulatory affairs were to be reported. S&W had invested over six figures in the development of a robust recordkeeping system that monitored all transactions as they were performed and automatically entered the appropriate acquisitions and dispositions into the A&D Book. And with respect to the security of its regulated assets, S&W has multi-layered security protocols at its manufacturing facilities consisting of armed guards, lot fencing, metal detection systems, supervised entry and exit, grounds cameras and cameras on the manufacturing floors and at areas of ingress and egress, and invite-only visitor policies. The lack of security would not have been tolerable for S&W upon acquisition, nor should it have been as a manufacturer of firearms.

GT013163-13166 – 2017-08-14 PM0533 On Aug 15, 2017, at 12:33 AM, Daniel Nakashima <Daniel.Nakashimaa,gemtech.com> wrote:

Jason,

I currently have a request in with the compliance director with S&W about getting our exports back up and running. That being said, I plan to continue operations and ask forgiveness later. See the attachments.

I need more information to adjust the sales order, including any consignees, their addresses, end-user addresses.
Let me know if you need anything further.
Best,Daniel

The explanation of this email by Mr. Milks appears to be nefarious in nature, but it is more an overzealous employee. After reading the entire email it appears that employees were attempting to secure contracts for major sales and were in a hurry to get proper authorization in place. Showing a lack of patience the employee makes a comment that could be taken the wrong way.

[44] *Ref*, GT013163-13166 – 2017-08-14 PM0533 D.Nakashima Eml re paperwork is ready for signatures, wherein Daniel Nakashima emailed Jason Pace "I currently have a request in with the compliance director with S&W about getting our exports back up and running. That being said, I plan to continue operations and ask forgiveness later."

## IV. PENALTIES FOR VIOLATION OF GCA & NFA REGULATIONS

Between the two Gemtech facilities we observed violations of the regulations issued pursuant to both the Gun Control Act and the National Firearms Act. The potential penalties for the regulatory violations range from minor to crippling.

At the lowest end of the spectrum are a citation issued in a Report of Violations ("ROV") following an ATF inspection. These are not financial in nature and the net effect of a violation in an ROV is to establish that a violation has occurred that can later be used as a establishing a licensee's history of repeated violations should the ATF find a similar violation in the future. Repeated violations can lead to loss of a company's license.

The next potential penalty is a Warning Letter issued by ATF following an inspection. These are more punitive in nature and effectively notify the licensee that the ATF deems the violations serious. The Letter will direct the licensee to ensure that the violations do not occur in the future or additional adverse actions will be taken by the ATF.

A Warning Conference is the next level of action the ATF can take. A Warning Conference is similar in nature to a Warning Letter but involves the ATF – generally the Director of Industry Operations ("DIO") for the area in which the licensee conducts business – bringing the RP(s) of the FFL to the ATF offices to discuss the seriousness of the violations. Warning Conferences generally see the DIO giving an FFL their last chance at addressing the regulatory violations. Should the same violations continue after a Warning Conference the ATF may move to revoke the company's license.

Revocation is the last non-financial and non-criminal penalty. Revocation of a company's FFL is a finding by the ATF the RPs of the license willfully violated the Gun Control Act. This finding prevents those RPs from holding an FFL in their name, from operating a company as an RP, or from being employed by a licensee in a position that would render them an RP.[45]

The effect of a license revocation on a firearms business varies from company to company. The immediate effect of a license revocation is that the company is at least temporarily not operational[46]. Companies may not engage in commerce in firearms without a license. For small businesses this may mean that the company goes out of business as the owner/operator has lost their ability to hold a Federal Firearms License. For a large corporation such as Smith & Wesson, the result of a license revocation would mean that those executive officers and other employees who are RPs would have to be terminated and replaced with new individuals who could run the company as an RP.

It must be noted here that the non-financial and non-criminal penalties listed above need not occur step by step. Stated otherwise, the ATF can revoke a license for a licensee's first regulatory

[45] *See* 18 USC 923(d)(1)(C).

[46] Unless the licensee appeals the revocation.

violation and multiple courts have agreed that the ATF may revoke a license for a single willful violation.[47]

Beyond the penalties listed above, both the Gun Control Act and National Firearms Act provide statutory authority to impose financial and criminal sanctions for violations of regulatory provisions. With respect to recordkeeping regulations, the GCA at 18 USC 924(a)(3)(B) provides that "Any [licensee] who knowingly…violates subsection (m) of section 922[48], shall be fined under this title, imprisoned not more than one year, or both." With respect to other general matters under the GCA, such as serialization and marking, 18 USC 924(a)(1)(D) provides that anyone who "willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both." The NFA at 28 USC 5871 provides that: "Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both." Further, the NFA also contains a forfeiture provision for any firearm regulated under the NFA that is involved with any violation.

Our due diligence assessments did not include a total mock inspection and analysis of all records and inventory. However, in our limited time on site we did note several thousand recordkeeping entries that were not compliant with regulatory requirements as well as representations made to ATF that NFA-controlled firearms were destroyed when they were in fact not yet physically destroyed. As can be gleaned from above, compiling the penalties identified above for several thousand instances of violation would amount to tremendous amounts of potential penalties.

## Conclusion:

The report provided by Phil was authoritative and thorough. However, it missed the mark. The area from his report that is significant is highlighted in yellow below.

## In his own words

**Executive Summary**

The following is a summary of our ATF diligence observations.

1. The legitimacy of the relationship between the parties and the use of the temporary employment to avoid traditional on-site presence, recordings and transfers, as well as the nature of IP ownership, leasing, and other financial relationships is a legal matter beyond our expertise. However, we believe it is worthy of further consideration by S&W. We recommend that you obtain copies of the MOU, ATF-issued variances, lease agreements and Mark Barnes issued letters between the two parties and the ATF.
   - Additionally, it should be noted that we identified other practices that conflict with the argument supporting their relationship. For example, the desktops and servers that house the A&D book are owned by Abrams conflicting with Ruling 2016-1.

2. We did not observe any issues that would likely result in license revocation. However, we did note several *moderate to high-level* violation risks. It should be noted that the ATF has not visited the facility and your target has not conducted an independent wall-to-wall physical despite the shared inventory access and the fact that ATF / Inventory transactions are managed by employees who are paid by both organizations. (See comment below regarding 770 non-reconciling open dispositions).

When reading the commentary in the manner that it was written it is swayed to imply that ATF would be swooping in at any minute and S&W would be out of business because of the record keeping by Gemini. Yet when Gemini was inspected the violations given were immediately corrected and ATF moved on with no recommendations for additional scrutiny. There is no implication that as a result of the inspection ATF asked to see [S&W's compliance manuals]. There was no warning conference. All discrepancies were fixed by Gemini.

The transition could have been smoother if Gemini had secured a new license and established a clear starting point for transactions with S&W, while focusing

more on adapting to S&W's business practices. Despite these oversights, S&W was not liable for Gemini's compliance issues.

To revoke an FFL's license, the ATF must prove flagrant and willful noncompliance with regulations. This can occur after a single visit if there is evidence of widespread disregard for recordkeeping or missing firearms without accountability. In this case, while recordkeeping issues were noted after inspection and reported to Gemini all issues were corrected, the FFL has never been threatened with license revocation.

After reviewing Mr. Milks' report and all related emails, I found only examples of clerical and administrative errors, as well as personality conflicts. There is no evidence of incomplete traces, intentional regulatory violations, or disregard for FFL requirements. The asset transfer to S&W poses no apparent risk. Furthermore, and based upon my education, training, and experience, the administrative issues raised in Mr. Milks' report do not rise to the level of revocation, and more probably than not, Gemini would not have lost its FFL

Respectfully submitted,

Richard (Rick) Vasquez

ATF O. 3310.4b

149. FEDERAL FIREARMS LICENSEES (FFLS).

FEDERAL FIREARMS LICENSEES (FFLS). This paragraph sets forth policy and

procedures for obtaining licensee warrants and conducting criminal investigations of licensed persons, their agents or employees, and business entities engaged in the firearms business.

a. In passing the GCA, as amended, Congress declared that the purpose of the act was to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence while not placing undue Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms for lawful activity.

b. Most persons licensed to engage in the firearms business are pursuing their interests for lawful purposes. It is the policy of ATF to initiate criminal investigations of licensees only when there is reason to believe that they are engaged in criminal activity such as dealing in stolen/contraband firearms or ammunition, knowingly supplying firearms to criminals, terrorists, gang offenders, or juveniles, or engaged in such willful and flagrant violations that it can be reasonably assumed that the firearms will find their way into the hands of criminals, terrorists, gang offenders, or juveniles.

(1) The GCA provides misdemeanor penalties for licensees who make false statements or representations with respect to information required in their records (18 U.S.C. § 922(m)). The successful use of misdemeanor charges enhances licensee denials or revocations. In cases of flagrant and willful violations of recordkeeping requirements that can be shown to pose a genuine threat to the public safety, the licensee should be recommended for felony prosecution under 18 U.S.C. § 922(b)(5) and/or 18 U.S.C. § 1001.

EXHIBIT 2

EXHIBIT 2

RICK VASQUEZ FIREARMS, LLC
CONSULTING SERVICES

102 Mullholland Place,
Jacksonville. NC
540-535-6633
rickvasquezfirearms.com

Firearms Instructor, Consulting and Testifying Expert, Compliance Expert, and Concealed Carry Expert to Governments and Private Industry

Rick Vasquez is a certified law enforcement and United States Marine Corps firearms shooting instructor. During employment with the U.S. government, Rick provided foreign and domestic firearms training and technical assistance to the Border Patrol, Customs and Border Protection, Secret Service, and many other federal and state law enforcement agencies. He is widely recognized in both the state and federal courts as a subject matter expert with respect to firearms and ammunition and has testified in numerous criminal and civil matters involving firearms.

Rick is also a United States government certified firearms classification expert who has represented the U.S. government as a firearms technical representative to aid other nations. He not only provides firearms and ammunition classification expertise but also assists both foreign and domestic governments in firearms origin, functionality, and importability. He has also worked within the U.S. federal government assisting various departments and agencies with firearms policies and issues. His training, experience, and background make him a continued valuable resource to both governments and private companies as a technical advisor on National Firearms Act (NFA), Gun Control Act (GCA), International Traffic in Arms (ITAR), Arms Export Control Act (AECA), and manufacturing- and import-related concerns.

---

EXPERTISE & SERVICES OFFERED

- Provide expert advice and testimony in criminal, civil, and administrative matters involving firearms.
- Testing of firearms and silencers.
- Tailored firearms training in a state-of-the-art training facility, including firearms safety and firearms manipulation.
- Provider of security protocols, site surveys, and personal security training.
- Preparation of Standard Operation Procedures for ranges and FFL operations.

- Preparation of FFL compliance and SOPs for compliance.
- Preparation of standard safety briefs.
- Firearms identification training based on the needs of the agency.
- Evaluation of firearms related to ATF firearms classification and firearms import compliance.
- NFA classification, NFA transfer procedures, and NFA forms.
- Machinegun identification and function checks.
- Foreign weapons identification and use.
- Nomenclature on all firearms.
- Ammunition identification.
- U.S. firearms regulations and marking requirements.
- Expert services on the importation of firearms and firearms components under the GCA and AECA.
- Armorer, firearms safety instructor, and certified gunsmith.

---

Articles authored:

1. Articles:

A. In the previous ten years, I have authored the following publications:

B. October 2015 Peer Review of articles for Swiss Small Arms Survey, "MECHANICS OF FIREARMS TRAFFICKING"

C. January 2016 Small Arms review, "80% RECEIVERS" MYTHS AND TRUTHS"

D. April 2016 Small Arms Review, "WHAT ARE SILENCERS AND HOW ARE THEY REGULATED"

E. October 2016 Small Arms Review, "GIFTING A FIREARM"

F. January 2017 Small Arms Review, "SHOTGUN VS FIREARM"

G. 2022 Center for Disease Control, "FIREARMS AND AMMUNITION IDENTIFICATION"

H. More Trouble in Paradise, Rick Vasquez, Pistol Stabilizing Braces, and Joe Biden's America, Will Dabbs MD

I. Amicus Brief No. 23-852 In the Supreme Court of the United States__
MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., *Petitioners*, *V.* JENNIFER VANDERSTOK, ET AL., *Respondents*.

RESUME

Richard Vasquez
Country of Citizenship: United States
Security Clearance: Previous top secret

EMPLOYMENT

October 2014 - Present
Independent Firearms Consultant

- Professional firearms/shooting instructor; instruct at all levels of firearms use and training.
- Completed a contract for the Center for Disease Control to develop a firearms identification manual and PowerPoint for firearms abstractors. Created a current menu of firearm models and manufacturers.
- Provide expert advice and testimony in criminal and civil litigation pertaining to firearms.
- Provide evaluations of firearms functionality for product liability cases.
- Provide security protocols for physical facilities and personal safety.
- Prepared and presented to the United States Senate discussion on ghost guns/homemade firearms.
- Provided firearms classification expertise to the Australian Crime Commission. Instructed two trafficking seminars in 2023.
- Served as a firearms expert to the United Nations on the Small Arms and Light Weapons panel in Brussels, Belgium.
- Prepared and presented to the Federal Bar Association firearms training based on the Gun Control Act (GCA) and the National Firearms Act (NFA).
- Provide services to the firearms industry and the private sector relating to firearms identification and classification under the GCA and the NFA.
- Conducted a firearms identification course in El Salvador for El Salvadoran prosecutors.
- Provide training to the firearms industry on all aspects of the GCA and NFA compliance.
- Developed and led team building events centered around firearms and leadership.
- Have performed product evaluations on firearms for importation and compatibility with current firearms laws.
- Provide expert advice on the identification of firearms and components for the importation of firearms in relation to the Arms Export Control Act (AECA).

- Conversant with requirements for exporting firearms and components under the International Traffic in Arms Regulations (ITAR).

August 2011 - September 2014
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Firearms Trafficking and Interdiction Branch, Firearms Operations Division Program Manager/Branch Chief, Firearms Training Branch

- Developed programs and training on firearms trafficking and interdiction.
- Assisted Field Operations in identifying and instructing on firearms trafficking trends.
- Assisted in updating and writing all Standard Operating Procedures (SOPs) of the National Firearms Act Branch (NFA).
- Developed specific training on 3D printing, partially complete receivers, and counterfeit firearms.
- Trained all Central American and Mexican federal law enforcement counterparts on U.S. firearms laws and regulations.
- Served as the firearms expert for Field Operations on all firearms-related subjects.
- Trained a cadre of the Mexican Naval Infantry in the use of foreign weapons and machineguns.
- In conjunction with NATO forces, I fired all Bosnian military firearms (in Bosnia) and recovered the cartridges for entry into NIBIN. This evidence was used in prosecution in the War Crimes Tribunals.
- Presented United States firearms regulations and trafficking trends to Interpol and the Royal Canadian Mounted Police.
- Developed foreign weapons identification courses.
- Developed and presented a course on importation guidelines and United States firearms laws to the Australian Federal Police, Australian Crime Commission, and Australian Customs.
- Provided firearms identification and trafficking training to the Judges of the Guatemalan Supreme Court, which led to collaboration between our countries to destroy a large cache of firearms that were being trafficked to the U.S.

June 1999 – August 2011
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Firearms Technology Branch Assistant Branch Chief, Acting Chief, Firearms Technology Branch (FTB)

- Supervised, organized workload, and trained a staff of 14 persons, including eight firearms enforcement officers, one evidence technician, one writer-editor, one program analyst, and two gunsmiths.
- Developed training in all aspects of firearms use and identification. Instrumental in

developing and implementing training for law enforcement counterparts in several federal, state, and local law enforcement agencies.

- Served as the expert on all Gun Control Act (GCA) and National Firearms Act (NFA) identifications and classifications.
- Wrote SOP for all aspects of FTB operations. These SOPs have now been used to defend ATF policies in criminal and civil litigation.
- Served as a Firearms (shooting) Instructor.
- Instrumental in developing firearms identification training specifically for the "Southwest Border" program.
- Reviewed and corrected all reports which were based on evidence submitted by ATF special agents.
- Served as the expert on classification of items submitted by the firearms industry for classification under the GCA and the NFA.
- Served as the expert on firearms importation guidelines and reviewed all items submitted for approval for importation.
- Developed foreign weapons identification and use training and have provided this instruction to Secret Service, DEA, ATF, and other law enforcement agencies.
- As a representative of ATF, provided firearms instruction to the Australian Crime Commission, Border Protection, and Federal Police.
- Expert on "prop" firearms, *i.e.,* firearms which function as manufactured but are incapable of firing a shot.
- As the chief technology expert for ATF, reviewed prop firearms submitted by movie industry gunsmiths and wrote opinions on whether they were real firearms or non-firearms.
- Expert on homemade firearms and 80% receivers. Provided all technical guidance on a comprehensive guide for ATF and taught this curriculum throughout ATF (2012).

June 1996 - June 1999
Diplomatic Security Service (DSS) Firearms Instructor – November 1996 – June 1999

- Conducted all manner of firearms training for DSS. Developed training syllabi for long-range rifle training, fire and maneuver tactics, submachine gun, handgun, and evacuation techniques under live fire.
- Certified the Mobile Security Division and the Tactical Response team as firearms instructors.
- Wrote training manuals and training syllabi to cover all aspects of firearms training.
- Developed and conducted training in force protection, IED detection, surveillance, and counter terrorism.
- Taught force continuum policy to DSS Special Agents.
- Constructed prop firearms as a gunsmith for the USMC and during employment with

DSS and served as a firearms and tactics instructor and gunsmith.

January 1974 - April 1996
United States Marine Corps, Attained the rank of Master Sergeant and served in many key leadership roles.

August 1994 - April 1996
Detachment Commander – American Embassy, Moscow, Russia

January 1993 - August 1994
Detachment Commander – American Embassy, Kingston, Jamaica

January 1989 - January 1993
Floor Chief – Weapons Training Battalion – Quantico, Virginia

- Chief instructor at the USMC precision weapons shop.
- Taught an armorer training course in Colombia, South America, in support of "Operation Snowcap".
- Certified as a High-Risk Personnel (firearm trainer) instructor.
  January 1974 - January 1989
- Assisted with the development and introduction of the M16A2 while at Weapons Training Battalion.
- Recruiter – Winston Salem NC – and other various duty stations.
- Received the award for Non-Commissioned Officer-in-Charge of the Year and was meritoriously promoted to Gunnery Sergeant.

---

ADDITIONAL QUALIFICATIONS AND AWARDS

- Interstate Nexus Instructor.
- Testified more than 50 times in federal and state court and certified as an expert witness on firearms statutes and regulations.
- Distinguished high power rifle shooter.
- FFL holder, successful business in custom rifle repair and sales.
- Certified armorer for the following gun companies: Ruger, Glock, Smith and Wesson, and Heckler and Koch.
- Received manufacturing and historical instruction at the following firearms sites both in conus and overseas: Marlin, Savage, H&R Inc., Winchester, Mossberg, Springfield Armory, Wilson Tools, Sig, Glock, Walther, Mauser, Sig Sauer.

- Completed course of instruction in Principles of Acoustics and the Measurement of Sound.
- Developed a course in recognition of silencers/silencer components and served as an expert in the classification of silencers and silencer components under federal statutes.
- Wrote numerous training lesson plans in the use and identification of firearms and related subjects.
- Trained government personnel in firearms identification in the following countries: France, Canada, Colombia, El Salvador, Mexico, Belize, Jamaica, Curacao, and Guatemala.
- Knowledgeable in the requirements for importing firearms and firearms components.
- Presented firearms regulations to the Guatemalan Supreme Court.
- Received public service award from a United States Attorney in the Fourth Circuit.
- Recipient of ATF's Distinguished Service Medal.
- Recipient of numerous letters of appreciation from ATF, FBI, and foreign law enforcement.
- Headquarters USMC representative to introduce the M16A2 into the hands of 6th Marine Regiment.
- 1974 Company High Shooter Parris Island, SC.
- Winning Team, Parris Island Recruit Rifle and Pistol Team.
- Infantry Weapon Repair, Small Arms School, Aberdeen Md., Honor Graduate.
- Tactical implementation of squad automatic weapons and security procedures, Marine Barracks Naples Italy.
- 2112 Armorer Gunsmith MOS.
- 2161 Machinists MOS.
- Deployed to Desert Storm and Desert Shield with a team of snipers and introduced the Barrett M82A1 directly into hands of Marine Snipers.
- Developed and implemented the Barrett M82A1 Sniper rifle along with developing the Technical Manuals for subject rifle.
- Detachment Commander in Kingston Jamaica. In partnership with DSS, developed an emergency response team from host country nationals. I was recognized by the Director of DSS for this effort.
- Served at the American Embassy in Moscow Russia and defended the embassy against a missile attack (1995).
- Certified as an instructor in submachineguns, shotguns, sniper rifles, all handguns, squad automatic weapons, grenade launchers, missile launchers, and all small arms.
- Instructed Special Agents of DSS in rescuing a protectee under live fire replicating combat operations.
- In conjunction with the Special Agents of the ATF SRT developed firearms drill sheets and training for the SRT.
- Wrote, developed, and instructed the foreign firearms nexus course.

- Rewrote and taught the interstate nexus course.
- Developed the Cartridge Headstamp Identification Guide.
- Developed a machineguns identification course that is still posted on the ATF website.
- Evaluated and enhanced all firearms training taught at the Federal Law Enforcement Training Center.
- Developed and taught "Project Imports," a program developed to coordinate with Homeland Security to stop illegal firearms importations.
- Taught courses on silencers, machineguns, and homemade and counterfeit weapons to the Colombian Forensic Services, Mexico Attorney General's Office, Interpol, and Canadian Provincial Enforcement Unit.
- Developed and taught a course of instruction on machinegun identification, silencers, and all firearms regulations to the annual Association of Firearms and Tool Mark Academy (multiple years).
- Assisted with writing several ATF Rulings.
- Presented numerous trafficking seminars throughout Central America and Mexico.
- Evaluated evidence in criminal cases in Mexico, Guatemala, and El Salvador, which led to briefing the Guatemalan Supreme Court's Justices and the first ever evaluation of Mexican firearms at the ATF crime lab for a joint U.S. Mexico case.
- Met with the minister of Australia and developed a relationship between ATF and Australia to share trafficking information.
- Instructed members of all facets of the Australian federal and local governments on U.S. firearms regulations and statutes.
- Wrote the first official SOPs for the Firearms Technology Branch which include: Use and safe handling of firearms, Machinegun Testing, Test Fire Procedures, Silencer Testing, etc.

**RICK VASQUEZ**

**FOUR YEAR TESTIMONY LIST**

JAMES FLETCHER v. CENTURY ARMS, INC.
Deposition, New Jersey, 7/26/2019

SHAYNE TAYLOR v. BARSONY HOLSTERS
Deposition, Virginia, 5/4/2021

RASHAAD PICQUET v. GAMO OUTDOOR USA
Deposition, New Jersey, 4/26/2022

ZACHARY LONG, individually Plaintiff, vs. DONNY CHALMERS, individually; GAMO OUTDOOR USA INC., Case No.:A-16-748401-C, North Carolina 9/13/2022

United States VS Kelland Wright CASE NO.: 3:18CR162 10/3/2018

UNITED STATES OF AMERICA VS. DAVID SCHIEFERLE 22-20083-CR-WILLIAMS/MCALILEY 17/7/2022

CASE NO.: 21STCV06257 THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, vs. POLYMER80, INC., a Nevada corporation; DAVID BORGES, an individual; LORAN KELLEY, an individual Deposition

*United States v. Bradley Eugene Wendt*,

Criminal No. 4:22-cr-199 (S.D. Iowa).

EXHIBIT 3

EXHIBIT 3

THE GEC GROUP

# Rebuttal Report to Jeffrey S. Pickett

***Gemini Technologies, Incorporated, an Idaho Corporation v. Smith & Wesson Corp., a Delaware Corporation, and American Outdoor Brands Corporation, a Massachusetts corporation***

**July 22, 2025**

Matthew J. Murdock

950 West Bannock Street, Suite 1100
Boise, ID 83702

## I. Introduction

This report serves to rebut the opinions and findings presented by Jeffrey S. Pickett, CPA/ABV, of Lone Peak Valuation Group (hereafter "Mr. Pickett"), in his Expert Witness Report dated May 21, 2025 (the "Pickett Report"). Mr. Pickett's report aims to review and respond to the reports of Matthew Murdock (the "Murdock Report" or "GEC Report") and Thomas South dated June 21, 2024 . This rebuttal will address the criticisms and alternative conclusions presented in the Pickett Report, demonstrating where Mr. Pickett's analysis is flawed, incomplete, or based on a misinterpretation of facts or standard methodologies.

## II. Rebuttal Arguments

### A. Rebuttal to Pickett's Opinion 1 & 2: The Earn-Out Structure

Mr. Pickett asserts that the Earn-Out structure in the Asset Purchase Agreement (APA) was "consistent with what [he] typically recommends to clients who enter into Earn-Out agreements" and was "structured in a manner that benefits both buyer and seller." He highlights that Earn-Outs are effective when parties differ on future financial performance and that the optimal structure incentivizes both parties, ideally based on a revenue hurdle with a percentage paid that is less than the incremental profit margin.

**Rebuttal:** The core of Gemtech's claim is that S&W did not fulfill their contractual obligations post-close and made misrepresentations and/or material omissions prior to closing that, if disclosed, would have made Gemtech reconsider their sale of the assets. If these allegations are true, then the "optimal structure" of the Earn-Out becomes irrelevant, as the buyer allegedly took actions that prevented the Earn-Out from being achieved, directly undermining the principle of mutual benefit that Mr. Pickett espouses.

Mr. Pickett directly contradicted his statement that it would be financially unreasonable to conclude that a buyer would intentionally take actions with the sole objective of avoiding paying the Earn-Out by introducing the idea that ultimately, the buyer of the business should be able to operate the business in a way that maximizes

the value of that business, as opposed to maximizing the Earn-Out payment. Thus, Mr. Pickett explains a reason why S&W, in their mind, chose to take action that would avoid paying the Earn-Out.

Mr. Pickett highlights that the APA acknowledges the risk of no Earn-Out payment and contains a clause stating that "Buyer shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder." This clause itself implies that such bad faith actions are a recognized risk, and Gemtech's claim alleges that S&W acted in bad faith, regardless of the theoretical "optimal" structure of the APA. The presence of this clause suggests that the upfront payment was indeed tied to the expectation of the Earn-Out being pursued in good faith.

Mr. Pickett concludes that since his incremental profit margin of 69.35% is bigger than the 15% they would have to pay on the earn-out, both parties would benefit and it wouldn't make sense for S&W to deliberately reduce sales to avoid the earn-out. However, this is beside the point and contradicts Mr. Pickett's own statements. Mr. Pickett quotes Mr. Mark Smith, President & CEO of Smith & Wesson Brands, Inc., who states that "the goal of the company...is not to maximize any one product or product portfolio at the expense of others. It's to manage the overall success of the business. So we balance resources within the organization based on the – you know, we only have limited resources. We have limited assets. We have limited human assets and limited physical assets."[1] Therefore, the question isn't whether the Gemtech venture would be profitable with the Earn-Out, it's if the venture is *more* profitable than other ventures within S&W, as determined by S&W. Again, undermining the idea that the execution by S&W, as alleged, was aligned with mutual incentivization.

In summary, Mr. Pickett's opinion on the Earn-Out structure focuses solely on its theoretical design without adequately addressing the alleged breach of contract and misrepresentations by S&W, which are central to Gemtech's claim. The purpose of the Earn-Out was to bridge the gap in revenue expectations, but if S&W then actively sabotaged the revenue generation, the Earn-Out's "optimal" structure becomes irrelevant in the face of alleged bad faith conduct.

[1] Pickett Report, p. 31.

## B. Rebuttal to Pickett's Opinion 3: Nonsensical Foregoing of Profits

Mr. Pickett argues that it is "nonsensical" and "defies logic" that S&W would forego between $19.2 million and $38.0 million in profits (as calculated in the Murdock Report) to avoid paying an Earn-Out of $1.1 million to $3.5 million. He asserts that S&W would not act against its own best interests.

**Rebuttal:** According to Mr. Pickett, S&W decided to allocate resources away from Gemtech,[2] perhaps due to perceived difficulties in integrating the brand, supply chain issues, or a shift in overall corporate strategy. Mark Smith's deposition acknowledges that the company's goal is not to maximize one product line at the expense of others, but to manage the overall success of the business and allocate resources for the best overall return for shareholders.[3] This means that even if Gemtech could have produced revenues to generate an Earn-Out, Mr. Pickett indicates that S&W has prioritized other ventures that they deemed to be more profitable. This decision, while perhaps rational for S&W, does not absolve them of potential contractual obligations or damages related to the Earn-Out.

Mr. Pickett concludes that he would have expected revenues to increase after the Earn-Out period if S&W was purposefully suppressing Gemtech revenues during this time period. Mr. Pickett fails to demonstrate that S&W made a good faith effort to sell Gemtech products after their purchase. By doing so, he asks one to accept the actual performance of Gemtech under S&W as their good faith effort. For example, if S&W failed to actively market Gemtech products, one would expect damage to their brand that cannot be quickly reversed. Additionally, Mr. Pickett admits that resources were prioritized to different parts of the S&W organization by S&W.[4] Mr. Pickett states that Gemtech's 2024 annual revenues were around $1 million.[5] This is around 90% less than what revenues were when Gemtech was acquired in 2017 in a market that has more than doubled since the purchase date.[6] The revenue and growth that has been realized by Gemtech under S&W control, is irrelevant and has no bearing on what Gemtech's capabilities would have been had the operations been handled in good faith.

---

[2] Pickett Report, p. 31.
[3] Smith, Mark. Deposition Transcript, July 31, 2024, pp. 145-146.
[4] Pickett Report, p. 31.
[5] Pickett Report, p. 12.
[6] Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024

Mr. Pickett states that "the notion that a buyer should maximize an Earn-Out payment when it is not in the best interest of maximizing the value of a company is akin to the tail wagging the dog."[7] This is a straw man argument. The Plaintiff's claim is not that S&W should prioritize the Earn-Out above all else, but that S&W's actions allegedly constituted a breach of contract or misrepresentation that prevented Gemtech from achieving its potential, thereby triggering damages. The question is whether S&W's actions were in bad faith or breached contractual obligations, which then led to damages for Gemtech.

### C. Rebuttal to Pickett's Opinion 4: Fair Market Valuation and Upfront Payment

Mr. Pickett concludes that his valuation analysis supports the upfront cash payment of $10,160,000 as "reasonably consistent with the fair market value of Gemtech at the time of the Transaction under the assumption that revenues over the first three years would be $36 million." He states that this amount "reasonably reflected the value of Gemtech assuming it would not generate sufficient revenue to pay an Earn-Out."

**Rebuttal:** Mr. Pickett fails to address the allegation that S&W's actions caused this underperformance and prevented the Earn-Out from being realized, thereby reducing the actual value delivered to Gemtech's sellers below the agreed-upon potential.

Mr. Pickett's valuation analysis for Opinion 4 is a self-serving exercise that attempts to validate the upfront payment by sidestepping the fundamental issue of whether S&W's alleged actions undermined the realization of the full consideration contemplated by the APA and whether the buyer's actions allowed for a good faith attempt to achieve the contingent Earn-Out and/or did not provide misrepresentations to Gemtech.

### D. Rebuttal to Pickett's Opinion 5: Lost Profits Exceeding Maximum Purchase Price

Mr. Pickett argues that "the economic losses arising from an action such as this generally cannot exceed the value of the subject business." He points out that the Murdock Report's calculated lost profits (ranging from $19.2 million to $38.0 million ) exceed the maximum total available purchase price of Gemtech, which he states was

[7] Pickett Report, p. 8.

between $10.2 million and $28.5 million. He concludes that this renders the Murdock Report's calculation of damages "speculative and unreliable."

**Rebuttal:** Mr. Pickett's assertion that lost profits[8] cannot exceed the maximum value of the business at the time of transaction is a misapplication of damages principles, particularly in cases involving fraud or breach of contract where the goal is to make the injured party whole.

Mr. Pickett is attempting to say that the lost profits cannot exceed the maximum purchase price. What he is actually saying is the expected lost profits that were established in 2017 at the time of the transaction wouldn't exceed the "maximum purchase price" in 2017. What he fails to consider is that actual lost profits, and in-turn the value of the business, can exceed the purchase price based on actual performance of the business and the market it operates in. As with any acquisition, companies will overperform and underperform the expectation that was set at the time of the purchase. We now have the benefit of hindsight and actual market performance that demonstrates the suppressor market has experienced significant growth, but at the time in 2017 there was uncertainty about how much the suppressor market could grow. Rarely will a company's actual future profits equal the purchase price of the business, there is no crystal ball that can accurately predict future performance, and a contractual price does not mean that is the limit on future cash flows for an organization.

Mr. Pickett argues that if Gemtech's owners believed such profits could have been generated, they "would have never been willing to sell Gemtech for the price agreed to in the APA." Mr. Pickett fails to consider other factors of why Mr. Martinez would sell Gemtech. Mr. Martinez believed there were opportunities, resources, relationships, etc. that would help Gemtech to maximize value with S&W. Ron expected to work hard at S&W and be rewarded through wages, stock options, and other benefits long-term.

Therefore, Mr. Pickett's argument is flawed because it conflates the maximum contractual Earn-Out payment with the total potential lost profits that Gemtech might have suffered due to alleged wrongful conduct. The Earn-Out only compensated for sales up to a certain point; if Gemtech would have continued to grow and generate profits beyond that, those profits would be recoverable damages. Mr. Pickett arguing that the maximum total available purchase price of Gemtech as established in the APA

[8] Lost profits are rescissory damages as presented and modeled here and in my original report.

is the maximum possible performance of Gemtech is not accurate. In addition, I've been advised by counsel that Mr. Pickett's asserted legal theory is fiction. The goal of rescissory damages is to restore the injured party, and in some cases, that may legitimately exceed the negotiated contingent consideration if the actions of the breaching party led to a larger economic loss. I have calculated the rescissory damages of Gemtech to a reasonable degree of economic certainty.

### E. Rebuttal to Pickett's Opinion 6: Failure to Address Intervening Factors

Mr. Pickett details "intervening factors" that he claims the Murdock Report failed to address, implying they would have impeded Gemtech's ability to increase sales and profits independently. I will address each point individually.

**Rebuttal:** Mr. Pickett does not perform any economic analysis on many of the factors listed below, and fails to verify or quantify many of the factors discussed.

#### 1. Capacity Limitations of Gemtech's Manufacturer, Abrams Airborne

Mr. Pickett highlights issues with Gemtech's relationship with Abrams Airborne, including late payments and Abrams holding completed products, and that Abrams "lacked the capacity to produce the products ordered, let alone the increased quantities required." He also notes that Mark Smith identified supply chain issues as a reason for lagging sales post-transaction.

**Rebuttal:** According to Schedule 4 and 5 of Mr. Pickett's report, he assumed that the maximum capacity that Gemtech could obtain is 18,523 units which is how many units they sold in 2016. It would be expected that a company could increase their manufacturing capacity over an 8 year period in a growing industry. It is unreasonable to assume that Gemtech would not be able to increase capacity from 2016 levels. Ron was in active discussions with Alexandria Pro-Fab that would allow Gemtech to exceed their capacity in 2016.[9] Furthermore, my analysis did not assume Gemtech would exceed their 2016 capacity until 2020 under Scenario 1 and 2 and 2019 under Scenario 3. Thus, providing Gemtech additional time to ramp up capacity.

S&W themselves recognized capacity concerns but believed their own manufacturing facilities could replace and expand the manufacturing needs.[10] This indicates S&W

---

[9] Letter from Alexandria Pro-Fab Co., Inc, July 17, 2025.
[10] Pickett Report, p. 22.

either accepted the risk or believed they could mitigate it, and thus cannot attribute subsequent failure solely to pre-existing Gemtech issues.

The very nature of the acquisition and subsequent alleged actions by S&W (like laying off staff and diverting resources) would have disrupted Gemtech's ability to manage its supply chain effectively. If S&W absorbed Gemtech's operations, it was S&W's responsibility to manage these supply chain issues, not use them as an excuse for underperformance, if those issues could have been resolved independently by Gemtech.

Mr. Pickett criticizes the lack of explanation for why Alexandria Pro-Fab wasn't the primary manufacturer for its capacity. At the time of the transaction with S&W, Gemtech was utilizing multiple manufacturers including Abrams, Alexandria Pro-Fab, and Primary Weapons Systems (PWS), along with several others. Had Gemtech not sold to S&W, Gemtech would have expanded relationships with Alexandria Pro-Fab to meet demand or secure other manufacturing partners and would have continued manufacturing relationships with existing manufacturers.[11] The limitations with Abrams do not equate to a permanent ceiling on Gemtech's growth especially since Gemtech was actively moving away from Abrams to other manufacturers.

**2. Flawed Drawings and Specifications**

Mr. Pickett claims that Gemtech's designs had "significant flaws and did not work," leading to a delay of "seven to eight months" for S&W to troubleshoot and modify them. He also mentions the "hand-fitting" process at Gemtech's Idaho facility as labor-intensive and limited scalability, attributing it to flawed designs.

**Rebuttal:** Mr. Pickett once again unreasonably assumes that Gemtech's 2016 capacity of 18,523 units would never increase. In 2016, Gemtech was facing actual capacity constraints as described above and still achieved over $10 million in revenue with these alleged "flawed drawings and specifications." In Mr. Pickett's report, Schedule 5.1 to 5.3 assumes that Gemtech would not be able to increase their capacity established in 2016 over the next eight years. Mr. Pickett provides no explanation as to why capacity could not be increased beyond manufacturing capacity that Gemtech had already established in 2016 and was seeking to improve in 2017. He ignores the possibilities over eight years to improve product design for easier and faster

[11] Letter from Alexandria Pro-Fab Co., Inc, July 17, 2025.

manufacturing, improvements to existing processes and efficiencies, and expanding manufacturing partners. As mentioned above, my capacity projections allow additional time for Gemtech to increase its capacity.

S&W, a company founded in 1852 and a leading firearms manufacturer, would have conducted extensive due diligence on Gemtech's designs and manufacturing processes before the acquisition. If there were "significant flaws," this should have been identified. Engineering teams worked directly with manufacturers to address any issues found during the manufacturing process.

The hand-fitting process was part of Gemtech's existing successful operation. My projections for increased capacity imply that Gemtech would have addressed issues, if it remained independent. Gemtech was expanding manufacturing at Alexandria Pro-Fab, which they felt would resolve this issue. Attributing S&W's subsequent delays to Gemtech's initial designs, without acknowledging S&W's own capacity to resolve them or Gemtech's potential to do so independently, is disingenuous.

**3. Violations of Federal Laws (ATF)**

Mr. Pickett states that S&W discovered Gemtech had finished inventory without serial numbers (a violation of ATF regulations) and that some Gemtech suppliers were also in violation. He claims this resulted in the destroyed product and that the Murdock Report "overstated damages as it assumed that Gemtech's operations would have continued with no adjustments for these violations."

**Rebuttal:** Mr. Pickett fails to prove this point and to quantify how many units were impacted by the claimed violation and what impact that would have on damages.

According to the July 2025 report of Richard Vasquez, None of these ATF violations against Gemtech required additional correction after Gemtech quickly resolved them nor did these violations cause them to lose Federal Firearms Licenses (FFL).[12] After review, Mr. Vasquez found only examples of clerical and administrative errors or personality conflicts and no evidence of incomplete traces, intentional regulatory violations, or any disregard for FFL requirements. He concludes that the asset transfer to S&W posed no apparent risk.[13]

---

[12] Vasquez Report, pp. 34, 41-42.
[13] Vasquez Report, p. 42.

Just like many of Mr. Pickett's other assertions, Mr. Pickett provides no quantifiable impact for this claim and Mr. Vasquez concludes that there was no apparent risk with the asset transfer to S&W. I relied on the financials of Gemtech which would have included the cost of any destroyed product, therefore the damages I presented are not overstated.

**4. Strategic Shift to Higher-Priced Products and Market Share Decline**

Mr. Pickett points out that Gemtech's market share (based on units sold) declined from 12.0% in 2016 to 11.5% in 2017, and that this coincided with a strategic shift to higher-priced suppressors like the Integra. He argues that the Murdock Report's assumption of maintaining or increasing market share (12%, 15%, and 20% in Scenarios 1, 2, and 3 respectively) is speculative.

**Rebuttal:** The market share that is presented in my report is demonstrative that Gemtech had established a market share of approximately 12%. The units sold in 2017 were annualized based on 5 months of sales data available and is a difference of 438 additional units needing to be sold in 2017 to obtain a 12.0% market share. My report's scenarios for market share growth (15% and 20%) are tied to "additional efforts and opportunities", such as placing products in big box stores (e.g., Cabela's ), partnerships with firearms manufacturers and effective marketing through social media influencers and websites.

Ron was focused on selling Gemtech products through Silencer Shop, the largest suppressor distributor in the United States. A relationship that was important to S&W even in 2020 as they identified Silencer Shop as their number one distributor for suppressors.[14]

The five months of data in 2017 demonstrates that Gemtech was successfully shifting to higher-priced units while holding their market share very similarly to 2016 as they ramped up capacity efforts for the higher priced units. Gemtech had product back-ordered as noted in my report, which highlights that demand for their product was not falling; it was once again a capacity issue.[15]

---

[14] SW354714-354722.

[15] Murdock Report, pp. 10-11.

### 5. Gemtech's Financial Difficulties

Mr. Pickett presents evidence of Gemtech's cash flow shortages and inability to obtain additional financing, suggesting this would impede its growth. He highlights emails indicating a maxed-out line of credit and the bank's condition of a second lien on Mr. Martinez's house if the sale failed.

**Rebuttal:** It is common for smaller businesses, especially those experiencing rapid growth or strategic shifts, to experience cash flow constraints and utilize lines of credit to their maximum.[16] This indicates a functioning financial relationship, not a complete inability to secure funds.

However, Mr. Pickett's argument is misguided. According to Mr. Martinez, the e-mail that Mr. Pickett refers to on line 602 of his report, where Mr. Pickett concludes Gemtech was in financial difficulty, was initiated to facilitate a buyout of Gemtech shareholder Kel Whelan as required by the APA. This increased line of credit wasn't part of Gemtech's normal business operations. In the normal course of business, if Gemtech needed an increase in their line of credit, Mr. Martinez would contact Washington Trust and they would increase the line of credit based on their relationship. This is demonstrated in the June 25th e-mail, which Mr. Pickett presented in his report from Jack Heath, President of Washington Trust Bank. The e-mails shown on rows 597 and 599 of Mr. Pickett's report assumed that Gemtech was not in a strong financial situation. Mr. Pickett misunderstands the nature of the e-mails and presents Gemtech's financial situation under false pretenses. He ignores that these discussions regarding Mr. Martinez's line of credit are related to closing the transaction as dictated by the APA, not a part of Gemtech's normal business operations. According to Mr. Martinez, S&W was intimately aware of Gemtech's financial status at the time of the acquisition. Gemtech was not experiencing a cash flow shortage nor did they need additional loans to operate.

### 6. Foregoing Other, More Profitable Opportunities (S&W's Resource Allocation)

Mr. Pickett reiterates Mark Smith's deposition testimony that S&W's goal is to "manage the overall success of the business," balancing limited resources and directing them towards activities with the "best return overall for the business," not maximizing any

[16] Binks, Martin R., and Christine T. Ennew. "Growing Firms and the Credit Constraint." Small Business Economics 8, no. 1 (1996): 17–25.

one product line. He uses this to argue that S&W was justified in allocating resources away from Gemtech, especially given the failure of the HPA.

**Rebuttal:** While S&W directors have fiduciary duties to act in the best interests of the company and shareholders , the APA also explicitly states that S&W "shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder." The crux of the plaintiff's claim is whether S&W's actions crossed the line into bad faith, regardless of their broader corporate strategy. Mark Smith's deposition acknowledges in reference to Gemtech that the decision to reduce force was due to "a lot of business factors" and "revenue wasn't coming in as we anticipated", but this doesn't preclude the possibility that S&W's actions actively contributed to that revenue shortfall.[17]

In summary, Mr. Pickett's "intervening factors" represent challenges that any business might face. The key question for damages is whether S&W's alleged actions exacerbated these challenges for Gemtech, prevented Gemtech from overcoming them, or constituted a breach of their contractual obligations related to the acquisition and the Earn-Out.

### F. Rebuttal to Pickett's Opinion 7: Failure to Account for Risk

Mr. Pickett argues that the Murdock Report failed to account for risk and uncertainty by not discounting projected cash flows, implying that the forecasted cash flows were assumed to be earned with "absolute certainty." He states that "all years of the claimed damages should be discounted back to the date that the alleged damage was incurred." He provides examples of risks not accounted for, such as increased competition, capacity issues, and ATF violations.

**Rebuttal:** While Mr. Pickett emphasizes "absolute certainty", the AICPA guidance he cites discusses two approaches: "risk-adjusted discount rate" (Capital Markets Approach) and "adjustments for risk directly in the cash flow" (Expected Cash Flow Approach). My report's projections, by their nature, are "but-for" scenarios that account for a hypothetical reality like that of an Expected Cash Flow Approach. If the projections are based on reasonable assumptions of market conditions and Gemtech's capabilities, the "risk" may be addressed through the construction of the "but-for" scenario itself rather than solely through a discount rate. My analysis

[17] Pickett Report, p. 23.

accounts for risk and reduces uncertainty by relying on the actual past performance of the suppressor market as captured in the number of ATF Form 3 applications per year. This establishes the market opportunity available for Gemtech to capture with reasonable certainty. By establishing the market revenue opportunity, I attempted to discount Gemtech's performance based on their potential market share which was stable over 29 months to calculate the revenue opportunity available to Gemtech under Scenario 1.[18]

The Capital Markets Approach relies on systematic and unsystematic risk to calculate a discount rate to apply to cash flows. I chose to not implement this approach in my analysis by relying on a single discount rate to account for risk because I have accounted for systematic risk (market risk) by using actual historical performance of the suppressor market during the damage period which encompasses the market risk related to things such as economic downturn and inflation. The unsystematic risk (idiosyncratic or specific risk) is partly captured by my reliance on actual suppressor market data to capture the risk specific to the industry Gemtech was operating in. The other idiosyncratic risk can be captured in my market share assumption for Gemtech, based on a 29 month operating period. My approach is reasonable.

My analysis assumes Gemtech would have continued to operate and grow. If the "but-for" cash flows are well-supported by evidence of Gemtech's potential and market conditions, then the application of a discount rate to all past and future lost profits would be excessive, especially if it leads to double-counting risk already considered in the "but-for" projection.[19]

Even if we consider Mr. Pickett's approach, he states that his method should account for pre-judgment interest but he does not calculate the pre-judgment interest in his report, and thus he understates damages using his own proposed methodology.[20] To demonstrate this, if I were to account for prejudgment interest utilizing the Idaho statutory rate of 12%, even when using Mr. Pickett's overstated discount rate, the damages would range from $15.7 million to $31.2 million. As one can see, the differences presented by Mr. Pickett relative to my report after adjusting for pre-judgment interest are much smaller than those presented in his report.

---

[18] The Comprehensive Guide to Economic Damages: Volume One, Fifth Edition, Chapter 6, p. 97.
[19] Robert Dunn & Everett Harry, "Determining Economic Damages" (10th ed.). AICPA Forensic and Valuation Services Practice Aid.
[20] Pickett Report, p. 34.

| Impact on Lost Profits by Accounting for Pickett's Risk Factor and Pre-Judgment Interest | | | |
|---|---|---|---|
| Scenario | Lost Profits Net of S&W Payments (Original) | Lost Profits Net of S&W Payments and Pre-judgement Interest | Lost Profits Per Pickett Net of S&W Payments |
| 1 | $19,290,704 | $15,745,759 | $8,101,756 |
| 2 | $26,692,246 | $22,155,112 | $12,613,503 |
| 3 | $38,007,063 | $31,209,303 | $19,234,702 |

As another example, if we applied a risk free rate and discounted the past losses, the damages would range between $25.5 million to $47.6 million, after accounting for pre-judgment interest.

| Impact on Lost Profits by Accounting for Risk-Free Rate Factor and Pre-Judgment Interest | | | |
|---|---|---|---|
| Scenario | Lost Profits Net of S&W Payments (Original) | Lost Profits Net of S&W Payments + Pre-judgement Interest | Lost Profits Per Pickett Net of S&W Payments |
| 1 | $19,290,704 | $25,549,886 | $8,101,756 |
| 2 | $26,692,246 | $34,494,086 | $12,613,503 |
| 3 | $38,007,063 | $47,616,672 | $19,234,702 |

The damages presented in my report are reasonable and appropriately account for risk.

### G. Rebuttal to Pickett's Opinion 8: Lack of Analysis for Market Share Growth

Mr. Pickett contends that the Murdock Report lacks sufficient analysis to support its assumptions of Gemtech maintaining or increasing its market share (12%, 15%, and 20% in various scenarios). He dismisses opportunities like Cabela's and partnerships with firearms manufacturers as unquantified, and criticizes the reliance on Mr. Martinez's beliefs and three years of historical sales.

**Rebuttal:** Mr. Pickett unfairly downplays the potential and planning that underpinned Gemtech's market share projections. My analysis gives time for the ramp up of additional capacity to meet the customer demand for the suppressor market.

Gemtech's sales improved under Ron Martinez's leadership, with total sales increasing to $11.2 million in 2016, of which $7.5 million were suppressor sales. This demonstrates

a positive growth trajectory leading up to the acquisition, providing a basis for projecting future growth.

My report details concrete opportunities that Gemtech was actively pursuing:

- **Cabela's:** Martinez's belief that Cabela's would purchase a significant number of SKUs and push them to over 70 stores represents a substantial potential revenue stream.
- **Firearms Manufacturers:** Partnerships to replace flash hiders with Gemtech Quickmounts represent a significant Original Equipment Manufacturer (OEM)-style sales channel. This was a strategic initiative that could reasonably drive market share growth.
- **Marketing Efforts:** Gemtech had successfully leveraged social media influencers, magazine ads, and social media advertising (Facebook, Instagram) to increase brand awareness indicating a planned marketing strategy, not just a vague hope for growth. Gemtech's tax returns reflect the additional efforts of advertising and marketing under Mr. Martinez's leadership starting in 2015.

| Gemtech's Advertising Expenses as Reported on Gemtech's Annual Tax Returns | | | | | | |
|---|---|---|---|---|---|---|
| 2011 | 2012 | 2013[21] | 2014 | 2015 | 2016 | 2017 |
| $114,412 | $142,474 | $172,259 | $301,608 | $659,321 | $666,923 | $669,590 |

Mr. Pickett's criticism of these opportunities as "unquantified" is a semantic distinction. My report identifies these opportunities as contributing factors to the projected market share growth. While precise revenue figures for each might not be individually broken out in the report because Gemtech was sold before these came to fruition and S&W did not capitalize on these opportunities, they collectively support the reasonableness of the overall market share assumptions.

Ultimately, my analysis was conservative and assumed that approximately 1.75 million suppressors would be sold from August 7, 2017 through December 31, 2024. This assumption is conservative based on the data contained in the ATF Firearms

[21] I did not have access to the 2013 tax return, this is from Gemtech's P&L.

Commerce in the United States statistical reports which shows that from February 2018 to May 2024 approximately 2.05 million suppressors were registered.[22] To emphasize, the data stopping in May 2024 results in an understatement of the actual market of suppressors sold in 2024. Therefore, my estimate of the sales opportunity in the suppressor market is reasonable.

| ATF Firearms Commerce in the United States - Annual Statistical Update | | |
|---|---|---|
| **Date** | **Total Registered Silencers** | **Increase Since Last Date** |
| 12/2010 | 285,087 | - |
| 3/2012 | 360,534 | 75,447 |
| 4/2013 | 494,452 | 133,918 |
| 3/2014 | 571,750 | 77,298 |
| 2/2015 | 792,282 | 220,532 |
| 2/2016 | 902,805 | 110,523 |
| 4/2017 | 1,360,020 | 457,215 |
| 2/2018 | 1,489,790 | 129,770 |
| 5/2019 | 1,750,430 | 260,640 |
| 4/2020 | 2,042,720 | 292,290 |
| 5/2021 | 2,664,770 | 622,050 |
| 5/2024 | 3,536,620 | 871,850 |

As demonstrated in the table above there were 2,046,830 suppressors registered from February 2018 through May 2024. Scenario 1 from my original analysis assumed that Gemtech would sell 203,138 or 12% of the expected market. With additional data available now my Scenario 1 only assumes a 10% market share of the known sales from February 2018 through May 2024. Also this does not include additional suppressors registered from August 2017 to February 2018 and June 2024 through December 2024.

[22] United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update 2018. Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024

| | | Projected Market (Aug. 2017 to Dec. 2024) | | Actual Market (Feb. 2018 to May 2024) | |
|---|---|---|---|---|---|
| | Units Sold | Market | Market Share | Market | Market Share |
| Scenario 1 | 203,138 | 1,692,817 | 12.0% | 2,046,830 | 9.9% |
| Scenario 2 | 252,870 | 1,692,817 | 14.9% | 2,046,830 | 12.4% |
| Scenario 3 | 327,732 | 1,692,817 | 19.4% | 2,046,830 | 16.0% |

Mr. Pickett states my report didn't address the competitive landscape, disadvantages or advantages of the suppressor market. However, I do address this in my report and I reviewed documentation relevant to this.[23] Gemtech products have been sold for decades and have maintained a positive reputation with customers over that time.[24] When S&W announced their purchase of Gemtech, James Debney, President and CEO of American Outdoor Brands, said, "Gemtech is widely recognized for producing some of the finest rifle and pistol suppressors in the market. Gemtech's strong product development capabilities, combined with our experience in brand management and our manufacturing expertise, will help us to efficiently develop both firearms and suppressors, minimizing our time to market for both product categories. We view this acquisition as opportunistic, allowing us to enter the suppressor category, which resonates strongly with our core firearm consumer, at a time when the market is particularly soft. These elements combine to make Gemtech an excellent fit with our long term strategy."[25] This indicates that S&W viewed Gemtech had a strong competitive position in the market and a product that could capture market share. Ultimately, I account for this by relying on Gemtech's actual market share of the suppressor market.

In summary, my report provides a narrative of strategic initiatives and a growing market that, when combined with Gemtech's pre-acquisition performance, supports the projected market share increases. Mr. Pickett's dismissal of these factors as speculative relies on a higher burden of proof than is reasonable for a "but-for" projection, especially when S&W's alleged actions prevented the full realization of these opportunities. There have been significant opportunities in the suppressor

---

[23] Murdock Report, p. 2. GT00359-00363.
[24] GT000360.
[25] https://ir.smith-wesson.com/news-releases/news-release-details/smith-wesson-corp-acquire-gemini-technologies

market since 2017 and Gemtech was positioned to capitalize on the industry growth.[26] Meanwhile, Mr. Pickett fails to present a market share and focuses on a 2016 manufacturing capacity which ultimately concludes that Gemtech's market share would have been 6% before applying a discount rate.[27]After adjusting for the discount rate that Mr. Pickett applied, his assumption is that Gemtech would have a 4% market share.[28] Mr. Pickett fails to justify why Gemtech's market share would be so low relative to their historical performance prior to being acquired by S&W.

### H. Rebuttal to Pickett's Opinion 9: Financial Model vs. Projection

Mr. Pickett distinguishes between financial models used for "stress testing" and "projections," suggesting that S&W's internal "rate of return model" was merely a conservative scenario presented to the board to meet a minimum required rate of return for the base purchase price, not a realistic forecast.

**Rebuttal:** Mr. Pickett attempts to minimize the significance of S&W's internal financial models, but his explanation still supports the idea that S&W had expectations for Gemtech's performance that were not presented to Gemtech prior to the acquisition. Thomas J. South outlines these issues further in his report dated June 20, 2024.

I am a credentialed actuary with significant experience in evaluating financial disclosures included in public company filings with the U.S. Securities and Exchange Commission (SEC). Historically, I have participated in audits of public companies as well as filings included in quarterly (10-Q) and annual (10-K) filings.

I have also served on finance, risk, and audit committees, where I helped review and oversee financial statements and public disclosures. This work required an understanding of both SEC regulations and the professional standards that govern the preparation of financial disclosures, including those related to mergers and acquisitions.

It is my understanding that the model being referenced by Mr. Pickett was disclosed by S&W as part of their 10-K and 10-Q filings. A financial model being disclosed in its 10-K or 10-Q, particularly in the context of a material transaction such as a business

---

[26] https://smokinggun.org/nssf-americans-bought-1-4-million-silencers-in-first-six-months-of-2024/
[27] See Pickett Report, Schedule 2 to 2.2 as he assumes only Gemtech would sell 124,949 to 132,026. Whereas the number of suppressors registered from February 2018 to May 2024 was 2,048,832.
[28] He assumes Gemtech would produce 83,696 to 89,774 units from August 2017 through December 2024.

acquisition, must reflect a good-faith, reasonable estimate of management's expectations at the time. It is not acceptable to later recharacterize that model as merely a "stress test" or an unrealistic scenario if it was used to justify the acquisition to the board and incorporated—explicitly or implicitly—into the company's public filings.

This principle is reinforced by both SEC regulations and U.S. GAAP standards, particularly ASC 805 – Business Combinations, which KPMG references in their Valuation Summary as of August 8, 2017, where the Gemtech Earn-Out is valued at $100,000. ASC 805 requires that acquirers measure and recognize the fair value of assets acquired, liabilities assumed, and any resulting goodwill at the acquisition date using the acquisition method. This process often relies on financial models and projections, which must reflect management's best estimates, not hypothetical or extreme-case scenarios, unless specifically disclosed as such.

Under ASC 805, assumptions that support the valuation of future cash flows (used to value intangible assets or test for goodwill impairment) must be supportable and aligned with management's actual plans and outlook.[29] Any use of highly speculative or "stress test" projections would not comply with ASC 805 unless those projections were clearly identified as non-base-case and used strictly for sensitivity analysis—not as the basis for fair value or board approval.

Further, under Regulation S-K, Item 303(a), companies are required to disclose "known trends or uncertainties" that are reasonably likely to affect financial performance.[30] The Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section must be a transparent narrative that shows investors how management views the business. Any model used to justify a major transaction—and especially one that is included in a public filing—is presumed to be material and must meet the threshold of being not misleading, reasonably supported, and disclosed in good faith.

In my opinion, financial models presented to a company's board to justify an acquisition—and subsequently disclosed in a 10-K or 10-Q—must reflect reasonable, supportable expectations consistent with both SEC disclosure obligations and U.S.

---

[29] ASC 805 – Business Combinations, FASB Accounting Standards Codification (especially ASC 805-10-25 and ASC 805-20-25).
[30] 17 C.F.R. § 229.303(a) (Regulation S-K, Item 303).

GAAP, including ASC 805. Downplaying the model after the fact as merely a "stress test" or unrealistic undermines the reliability of the disclosure and is inconsistent with the standards of care required for public company reporting and governance.

**I. Rebuttal to Pickett's Opinion 10: Domestic and International Police and Military (DIPM) Sales and the May 21, 2025 Expert Report of Robert G. Suber of MGS, LLC.**

Mr. Pickett discounts the potential for Domestic and International Police and Military (DIPM) sales, arguing that Gemtech lacked manufacturing capacity, S&W was incentivized to make these sales, and there was uncertainty about achieving them. He highlights Jason Pace's testimony acknowledging "no guarantee" of closing sales.

Additionally Robert G. Suber, of MGS, LLC (hereafter "Mr. Suber"), in his Expert Witness Report dated May 21, 2025 opines that S&W's compliance program is reasonable and that Gemtech's international sales projections, particularly those in the Executive Review of International Sales Potential (the "BEC" Presentation), were unrealistic and reflected a lack of industry experience and credibility, leading to his conclusion that S&W did not unreasonably prevent Gemtech from making sales and that Gemtech's brand reputation was poor.

**Rebuttal:** This does not impact my analysis, as DIPM sales were not taken into consideration and my analysis was completed independently.

However, Mr. Pickett's and Mr. Suber's dismissal of DIPM sales potential ignores significant pre-acquisition efforts and the alleged direct interference by S&W.

My report explicitly alleges that S&W's general counsel and compliance director "had already canceled the licensing to permit the shipment of the products for international demonstrations and sales," unbeknownst to Mr. Martinez and Mr. Pace. This is a direct allegation of S&W actively thwarting potential sales, not simply choosing other profitable opportunities. If this is true, it is not about a lack of Gemtech capacity or S&W's incentives; it is about S&W preventing the realization of these sales.

Mr. Pickett argues Gemtech lacked capacity. However, had S&W not purchased Gemtech and Gemtech retained control, Gemtech would have focused on building or securing the necessary capacity to fulfill these orders. It is S&W's alleged

responsibility for failing to bring that capacity to bear post-acquisition, or for preventing Gemtech from doing so independently.

Mr. Pace's testimony that there was "no guarantee" of closing sales is a statement of commercial reality. No deal is ever "guaranteed" until signed. However, "no guarantee" does not equate to "no potential" or "no probability." Businesses pursue opportunities that have a reasonable probability of success. If S&W allegedly cut off the ability to pursue these opportunities, it is a lost potential for Gemtech that should be considered.

Mr. Pickett argues that S&W was incentivized to make these sales and would have pursued them if "actually realizable and feasible." Again, this ignores the reality of deliberate interference. The most crucial point, as alleged, is S&W's active cancellation of licensing. Additionally, S&W fired Mr. Pace and Mr. Martinez and as stated by Mr. Pickett, allocated resources to different parts of their operations and away from Gemtech pursuits. This is not about S&W's incentives; it's about alleged deliberate action that prevented the sales.

In conclusion, the dismissal of DIPM sales by Mr. Pickett relies on shifting blame to Gemtech's pre-existing limitations while ignoring the explicit allegations of S&W's direct interference that allegedly prevented the realization of these substantial opportunities. I am not providing an opinion on any lost DIPM sales and my analysis is presented independent of these opportunities. However, if it is determined by the trier of fact that there is a lost opportunity of DIPM sales, they should be added to the damages I presented in my report utilizing the tool I provided in Appendix A, based on the magnitude of the DIPM sales that are determined to have been lost.

## III. Conclusion

Mr. Pickett's Report attempts to question the methodologies, assumptions, and the underlying factual basis for Gemtech's claims indicated in my report. However, Mr. Pickett's criticisms are found to be flawed, incomplete, or based on a misinterpretation of facts or standard methodologies.

Unlike Mr. Pickett, I utilized a method that was based on a specific state of facts, prepared a model based on Gemtech's historical data and the market data, and

demonstrated to a reasonable degree of economic certainty, the calculation of Gemtech's damages as a result of post-closing breaches as well as pre-closing misrepresentations.

Despite Mr. Pickett's lengthy report, he adopts almost the entirety of my analysis and model by utilizing the same assumptions I established. The only two factors that Mr. Pickett ultimately varies on are Gemtech's manufacturing capacity and applying a discount rate. For Mr. Pickett to assume that Gemtech could not make any improvements to their annual capacity over a 7 year period is unreasonable. Mr. Pickett's discount rate applied to Gemtech is excessive based on the data available and fails to consider the risk already captured in my analysis.

The purpose of my report, particularly in the context of rescissory damages, is to illustrate what Gemtech would have achieved had the alleged wrongful conduct not occurred. Mr. Pickett's report fails to provide a compelling counter-narrative that fully accounts for the alleged actions of S&W and their direct impact on Gemtech's economic potential.

The arguments presented in this report aim to demonstrate that Gemtech's claims of economic loss, as outlined in my report, remain robust and are not rendered speculative or unreliable by Mr. Pickett's analysis. Mr. Pickett's analysis is flawed, incomplete, or based on a misinterpretation of facts or standard methodologies. My analysis is reasonable and economically sound.

## Bibliography


Plaintiff's Economic Loss Report by Matthew Murdock: 6/21/2024.

Defendants Designation of Expert Witnesses': 5/21/2025.

Exhibit A: Lone Peak Valuation Group Expert Report: 5/21/2025.

Exhibit C: Expert Report of Robert G. Suber: 5/21/2025.

Exhibit D: Expert Report of Hank Yacek: 5/21/2025.

Text Confirming SOCOM Pursuit: 2016.

Exhibit 590 Email: Manufacturing Issues: 4/28/2020.

Email: Suppressors Silencer Shop Priority Distributor: 7/27/2020.

Letter: Pro-Fab Confirming Operation Abilities: 7/17/2025.

United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update 2018.

Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024.

EXHIBIT 4

EXHIBIT 4

THE GEC GROUP

# Rebuttal Report to Hank Yacek

## *Gemini Technologies, Incorporated, an Idaho Corporation v. Smith & Wesson Corp., a Delaware Corporation, and American Outdoor Brands Corporation, a Massachusetts corporation*

**July 21, 2025**

Matthew J. Murdock

950 West Bannock Street, Suite 1100
Boise, ID 83702

## I. Introduction

This report serves to rebut the opinions and findings presented by Hank Yacek (hereafter "Mr. Yacek"), in his Expert Report dated May 21, 2025 (the "Yacek Report"). Mr. Yacek's report aims to review and respond to the report of Matthew Murdock (the "Murdock Report" or "GEC Report") . This rebuttal will address the criticisms and alternative conclusions presented in the Yacek Report, demonstrating where Mr. Yacek's analysis is flawed, incomplete, or based on a misinterpretation of facts or standard methodologies.

## II. Rebuttals to Yacek's Report

### A. Market Conditions and the Hearing Protection Act (HPA) (Section IV.A)

Mr. Yacek discusses that the potential passage of the HPA in 2017 created an expectation of significant market growth, which justified S&W's earn-out provision. However, the HPA's languishing state and ultimate failure to pass caused consumers to delay purchases (the "$200 tax" issue), negatively impacting suppressor sales from 2017 into 2019. This uncertainty meant S&W was justified in using a conservative internal model.

**Rebuttal:** My analysis relies on the actual market data as reported by the ATF during these years to form an opinion. However, this argument being made by Mr. Yacek is beside the point. It is my understanding that the claim being made by Gemtech is that S&W should have disclosed their internal models and projections to Gemtech prior to the closing of the transaction. There is no foundational basis in Mr. Yacek's use of the phrase "conservative internal model."

### B. 2016 Market as an Inappropriate Baseline ("Trump Slump") (Section IV.B)

Mr. Yacek points out that 2016 was an atypical year for suppressor demand due to the hotly contested election and fears of Hillary Clinton winning (an "anti-gun candidate"). This led to "ghost orders" and inflated backlogs, giving manufacturers a false sense of hyper-inflated demand. After Trump's win, the "Trump Slump" led to mass order cancellations and product surpluses, severely impacting the market from late 2016 through 2019. He concludes that Gemtech would be unable to generate $36 million in sales during the earn-out period.

**Rebuttal**: Mr. Yacek does not understand my analysis. Mr. Yacek states that my analysis relies on 2016 for baseline revenues, that is not accurate.[1] My analysis relied on Gemtech's actual units sold during 2016 and does not include any backorders. This is the same data that S&W relied on for their internal model.[2] This confirms that S&W viewed 2016 as a relevant historical reference when modeling earn-out expectations and for strategic planning. Mr. Yacek describes "ghost orders" as artificially inflating demand for suppressors but my analysis accounts for the downturn since I relied on actual market data as captured in the ATF Form 3 suppressor data, which reflected the downturn in the market.

Additionally, Mr. Yacek's discussion of "fog of war" where manufacturers are producing products at large volumes while at the same time demand for those products is eroding,[3] contradicts Gemtech's issue presented by Mr. Pickett that Gemtech would have manufacturing capacity issues not a surplus of unsold inventory.[4]

Mr. Yacek's discussion of AcuSport going bankrupt is not relevant to Gemtech. Acusport's bankruptcy would not have negatively impacted Gemtech's domestic sales. Mr. Yacek failed to demonstrate that any of Gemtech's competitors ceased operations during that period. Gemtech was focused on selling through a distributor called Silencer Shop, along with other smaller distributors, who have remained in operation.

Ultimately, my analysis was conservative and assumed that approximately 1.75 million suppressors would be sold from August 7, 2017 through December 31, 2024. This assumption is conservative based on data contained in the ATF Firearms Commerce in the United States statistical reports which shows that from February 2018 to May 2024 approximately 2.05 million suppressors were registered.[5] Therefore my estimate of the sales opportunity in the suppressor market is reasonable.

---

[1] Yacek Report, p. 8.
[2] See Cell located in Row 11, Column 7.
[3] Yacek Report p. 10.
[4] Pickett Report, p. 19-25.
[5] United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update 2018. Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024

| ATF Firearms Commerce in the United States - Annual Statistical Update | | |
|---|---|---|
| Date | Total Registered Silencers | Increase Since Last Period |
| 12/2010 | 285,087 | - |
| 3/2012 | 360,534 | 75,447 |
| 4/2013 | 494,452 | 133,918 |
| 3/2014 | 571,750 | 77,298 |
| 2/2015 | 792,282 | 220,532 |
| 2/2016 | 902,805 | 110,523 |
| 4/2017 | 1,360,020 | 457,215 |
| 2/2018 | 1,489,790 | 129,770 |
| 5/2019 | 1,750,430 | 260,640 |
| 4/2020 | 2,042,720 | 292,290 |
| 5/2021 | 2,664,770 | 622,050 |
| 5/2024 | 3,536,620 | 871,850 |

### C. GT's Market Share Assumptions Are Speculative (Section IV.C)

Mr. Yacek claims that the market share claims in my analysis are not supported by the evidence. He opines that Gemtech could not have raised prices without losing sales, as higher prices usually lead to fewer units sold. He asserts that market share data from ATF reports (Form 3/Form 4) is inflated because Gemtech's three-tier distribution system creates more documentation per unit than direct-to-retailer models.

He argues that the suppressor market is highly competitive, with new companies and unpredictable changes from product innovation or marketing. He points out that law enforcement and military endorsements also significantly influence consumer choices. Additionally, lengthy ATF approval delays for civilian purchases (Form 3/Form 4), which can take many months, negatively impacted sales and were beyond manufacturer control.

Mr. Yacek believes Gemtech would have lost market share if it had continued operating from 2017 to the present.

Mr. Yacek argues that the post-2016 period was "painfully slow," leading to numerous business failures. S&W's "conservative model" itself turned out to be "overly optimistic."

**Rebuttal:** Once again, Mr. Yacek does not understand my analysis. Mr. Yacek states that my analysis relies on 2016 for baseline revenues, that is not accurate.[6] My analysis relied on Gemtech's actual unit sales during 2016. The market decrease that Mr. Yacek belabors that I didn't account for is shown in Table 1 of my report and implemented in my analysis. Further, we now know that from February 2017 until June 2024 approximately 3.5 million suppressors were registered.[7] Prior to February 2017 only 1.3 million suppressors were registered. This demonstrates there was a large sales opportunity for Gemtech to capitalize on.

Mr. Yacek provides an Exhibit C to his report that contains third party data from a provider named RetailBI that claimed Gemtech made up 5% of the revenue for the civilian consumer market in 2017. According to RetailBI's own website, the data is generated through anonymous reporting. I have no way to verify the reliability of this data presented by Mr. Yacek from RetailBI, nor does he.[8] For example, in his Exhibit C on page 38 and 39 he presents the same data with two different chart titles calling into question the reliability of the dashboards he presents. Additionally, there isn't a way to track what percent of the market is captured in RetailBI's data. For example, Gemtech never reported sales to independent third parties nor did Mr. Martinez want to participate by sharing sales data. Without additional information from Mr. Yacek or RetailBI, this data is not a reliable source to rely on for an expert opinion. If RetailBI was not provided data from a retailer, or was provided incomplete or inaccurate data, that would impact the market share that is presented. For example, S&W stated in an internal e-mail that Silencer Shop is Gemtech's number one distributor and makes up 65% of the U.S. consumer suppressor market; it is unknown if Silencer Shop's sales data was provided to RetailBI.[9] Mr. Yacek could never prove this, because the reporting to RetailBI is anonymous. Additionally, I understand that these retailers would have to opt-in to sharing their data with RetailBI so the likelihood that RetailBI collects enough data to represent the market is highly questionable, and Mr. Yacek does not prove its reliability. Aside from the issues with RetailBI data, Mr. Yacek fails to present 2016 sales data which is prior to the S&W acquisition of Gemtech in August of

[6] Yacek Report, p. 11-12.
[7] https://smokinggun.org/nssf-americans-bought-1-4-million-silencers-in-first-six-months-of-2024/
[8] https://gogearfire.com/solutions/retailbi/
[9] SW354714-354722.

2017 and relies only on sales data from 2017 and after, which isn't relevant because that is the period of S&W's alleged wrongdoing, and S&W admittedly were not focused on allocating resources to Gemtech.[10] Furthermore, comparing the 5% market share in 2017 for Gemtech as alleged by RetailBI and the 12% I utilize in my report is an apples and oranges comparison. RetailBI states they are comparing *revenues*, whereas my analysis compares *units*.

Mr. Yacek attempts to argue that RetailBI data is more accurate for calculating market share than relying on Gemtech's actual units sold within a year compared to the number of ATF Form 3 suppressor applications. My discussion above regarding the reliability of the RetailBI data is still applicable, whereas the ATF Form 3 gives a much more accurate picture of the total suppressor market from an independent government source. He has not provided any evidence that the Form 3 suppressor applications that I use to establish the total annual suppressors sold are wrong. I am aware of the timing issue with ATF Form 3 suppressor applications, but I still have found it to be the most reliable predictor of the actual number of units sold especially when accounting for multiple years of projected losses. Mr. Yacek attempts to argue that additional paperwork would be an issue for Gemtech but this is irrelevant. I'm unsure what issue this creates since Gemtech was already dealing with this process in 2016 and their market share and performance includes this process. With the report of Mr. Yacek, it is unclear how comparing Gemtech's actual units sold to ATF Form 3 suppressor applications would be problematic. If ATF Form 3s were overstated because of cancelled orders that would decrease the amount of ATF Form 3s processed and increase Gemtech's market share.

Mr. Yacek incorrectly assumes that my analysis relies on Gemtech raising product prices, increasing gross margins and maintaining or growing market share.[11] This is not accurate. My report specifically outlines that higher prices were tied to specific, higher-cost products (like the Integra) that commanded such prices. Gemtech was focusing marketing and manufacturing efforts on more expensive products.[12] This shift in product mix does not go against typical supply-demand theory if Gemtech was increasing the supply of more expensive products that customers were ready and willing to purchase, if demand was exceeding supply, which appears to be the case. Gemtech's strategy to increase efforts in marketing and manufacturing more higher-priced products would naturally allow Gemtech to increase the revenue per

[10] Pickett Report, p. 31.
[11] Yacek Report, p. 12.
[12] Murdock Report, p. 12.

unit while growing market share. The 2017 sales data I present for Gemtech supports that market demand for higher priced products was available. Mr. Yacek doesn't consider that demand for a product can change due to a change in customers' tastes and preferences.

My model utilizes actual market data to benchmark Gemtech's performance to. It is irrelevant that 2016 was high or low, because our model uses a relative index to demonstrate Gemtech's performance in the market. Their performance was steady relative to the market over a 29 month period (January 2015 through May 2017) as indicated in my report. And thus, my analysis accounts for market fluctuations and the expected impact those would have in my projections.

Mr. Yacek opines that Gemtech would have lost market share to larger and better funded competitors.[13] This is in opposition to James Debney, President and CEO of American Outdoor Brands at the time of the acquisition, who said "Gemtech is widely recognized for producing some of the finest rifle and pistol suppressors in the market. Gemtech's strong product development capabilities, combined with our experience in brand management and our manufacturing expertise, will help us to efficiently develop both firearms and suppressors, minimizing our time to market for both product categories."[14] This claim is unsupported and ignores the efforts Gemtech was making to grow their brand and drive additional sales before the S&W acquisition. If the highly suspect data presented in Exhibit C of Mr. Yacek's report is deemed reliable, SilencerCo lost 30% of their market share from 2017 to 2024. The data shows that companies like Gemtech could maintain or grow their market share as SilencerCo gave up a significant portion of their market share. If S&W had the "expertise and market savvy," why did it not leverage these strengths to help Gemtech maintain or grow its market share in the face of competition and ATF delays?[15] Mr. Yacek fails to account for S&W's alleged actions directly contributing to Gemtech's struggles, post-acquisition, not market forces alone.

Mr. Yacek also discusses an opportunity, the 2017 SOCOM Suppressors Solicitation, where he indicates that law enforcement and military endorsements significantly influence consumer choices and ultimately a manufacturer's market share. It is important to note that Mr. Martinez was actively pursuing this exact opportunity while

---

[13] Yacek Report, p. 15.

[14] https://ir.smith-wesson.com/news-releases/news-release-details/smith-wesson-corp-acquire-gemini-technologies

[15] Yacek Report, p. 14.

at Gemtech, as mentioned in the Appendix of my report.[16] It is my understanding that S&W chose not to pursue this opportunity after Mr. Martinez's termination. Mr. Martinez knew that getting Gemtech products to law enforcement and the military was important to sell more units to consumers. Mr. Yacek credits this contract with allowing SureFire to gain market share. So, one has to ask what would have happened if Gemtech was able to secure this contract and how would it have impacted its future market share?

Mr. Yacek presents his "Final Thoughts" operating under the assumption that no wrongful acts occurred and if Mr. Martinez was managing the business, it would have performed the same. His discussion of retailers and distributors going out of business is once again not relevant to Gemtech. Mr. Yacek failed to demonstrate that any of Gemtech's competitors ceased operations during the period in question. Gemtech was not a "typical" business that would necessarily succumb to market pressures in the same way, especially if it had received the proper support and strategic focus from S&W as anticipated in the acquisition. There were no signs of business failure to Gemtech at the time of purchase in August 2017, which is the period Mr. Yacek describes as a time "no one could have foreseen just how poor the industry would become".[17] Ultimately S&W failed to help Gemtech realize its potential and Mr. Yacek cannot simply blame Gemtech's performance, post-acquisition, on market conditions.

### III. Conclusion

Mr. Yacek's Report attempts to question the methodologies, assumptions, and the underlying factual basis for Gemtech's claims indicated in my report. However, Mr. Yacek's criticisms are found to:

- **Misunderstand Damage Analysis and Data Reliance:** He fundamentally misunderstands my analysis, particularly regarding the use of 2016 data. My analysis relies on Gemtech's actual unit sales in 2016 to establish market share, not a baseline of revenues. My analysis already accounts for the market downturn that Mr. Yacek continually discussed throughout his report and I had already utilized reliable ATF Form 3 suppressor data, which also accounted for the market downturn he was describing.

---

[16] Murdock Report, p. 25. GT084257-84261.
[17] Yacek Report, p. 15.

- **Utilize Unreliable Third-Party Data:** His use of RetailBI data in Exhibit C, lacks verifiable data.
- **Provide Irrelevant Arguments and Misattribution of Underperformance:** Much of his discussion about the market is irrelevant, as he failed to demonstrate how Gemtech would be impacted differently from what I presented in my report. Mr. Yacek fails to account for S&W's alleged actions directly contributing to Gemtech's struggles, rather than market forces alone.
- **Fail to Quantify:** Ultimately Mr. Yacek fails to quantify anything presented in his report and provides no guidance of its alleged impact to the damages I presented.

Mr. Yacek's analysis is economically unsound, speculative, and unreliable. My analysis and opinions are formulated and expressed within a reasonable degree of economic certainty.

# Bibliography


Plaintiff's Economic Loss Report by Matthew Murdock: 6/21/2024.

Defendants Designation of Expert Witnesses': 5/21/2025.

Exhibit A: Lone Peak Valuation Group Expert Report: 5/21/2025.

Exhibit D: Expert Report of Hank Yacek: 5/21/2025.

Text Confirming SOCOM Pursuit: 2016.

Exhibit 590 Email: Manufacturing Issues: 4/28/2020.

Email: Suppressors Silencer Shop Priority Distributor: 7/27/2020.

Letter: Pro-Fab Confirming Operation Abilities: 7/17/2025.

United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update 2018.

Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024.

EXHIBIT 5

# EXHIBIT 5

THE GEC GROUP

The GEC Group is GREEN

You can email us documents, or for larger and more secure transfers, you can use our e-transfer service located at https://thegecgroup.wetransfer.com.
If unavoidable exigencies require the use of paper, please contact us for a mailing address at 312-922-8001.

# Economic Testimony Given By Matthew J. Murdock

| Year | Client | Case | Case Number | Court | Location | Type |
|---|---|---|---|---|---|---|
| 2017 | Brian Monico<br>Burke Wise Morrissey and Kaveny<br>161 N Clark St., Suite 3250<br>Chicago, IL 60601 | Johnson-Young v. Northshore | 2014L006816 | State - IL - Cook County | Chicago, IL | Deposition |
| 2017 | Dan Terlekyj<br>Joseph Klest Law Firm<br>1701 E Woodfield Road Ste. 909<br>Schaumburg, IL 60173 | Hotak v. Hamidi | 2014L007009 | State - IL - Cook County | Chicago, IL | Deposition |
| 2017 | Scott Britton<br>Ford & Britton, PC<br>120 N. LaSalle St. Ste. 950<br>Chicago, IL 60602 | Olszewski v. Powers and Sons | 14 L 008462 | State - IL - Cook County | Chicago, IL | Deposition |
| 2018 | Brian Monico<br>Burke Wise Morrissey and Kaveny<br>161 N Clark St #3250<br>Chicago, IL 60601 | Johnson-Young v. Northshore | 2014L006816 | State - IL - Cook County | Chicago, IL | Trial |
| 2018 | Jarom Whitehead<br>Pedersen and Whitehead<br>199 N. Capitol Blvd., Suite 500<br>Boise, ID 83702 | Ackerschott v. Mountain View Hospital | CV-16-4723 | State - ID - Bonneville County | Idaho Falls, ID | Trial |
| 2018 | Cory Mattson<br>EVN Law<br>801 N 500 W #150<br>Bountiful, UT 84010 | Seastrand v. US Bank, et al. | 2:17-cv-00214 | Federal - UT - Central Division | Provo, UT | Deposition |
| 2019 | Walter Bithell<br>Bithell Law Offices<br>199 N Capitol Blvd #500<br>Boise, ID 83702 | Rex Baum Farms, et al. v. Fremont County Weed Department, et al. | cv-2017-433 | State - ID - Fremont County | Boise, ID | Deposition |
| 2019 | Amir Tahmassebi<br>Konicek & Dillon<br>70 West Madison Street, Suite 2060<br>Chicago, IL 60602 | Peter Smith Ely, et al. v. Ruth Pivar, et al. | 15L8387 | State - IL - Cook County | Chicago, IL | Deposition |
| 2019 | Jarom Whitehead<br>Pedersen and Whitehead<br>199 N. Capitol Blvd., Suite 500<br>Boise, ID 83702 | Julie Jackson, et. al. v. Kirt M. McKinlay, et. al. | CV - 2016 - 1076 | State - ID - County of Bingham | Boise, ID | Deposition |
| 2019 | Jarom Whitehead<br>Pedersen and Whitehead<br>199 N. Capitol Blvd., Suite 500<br>Boise, ID 83702 | Julie Jackson, et. al. v. Kirt M. McKinlay, et. al. | CV - 2016 - 1076 | State - ID - County of Bingham | Blackfoot, ID | Trial |
| 2019 | Gary Cooper<br>Cooper & Larsen<br>151 N 3rd Ave # 210<br>Pocatello, ID 83201 | Steve Briggs and Teresa Briggs v. North Idaho Home Health, et. al. | CV28-18-7096 | State - ID - County of Kootenai | Boise, ID | Deposition |

THE GEC GROUP

The GEC Group is GREEN

You can email us documents, or for larger and more secure transfers, you can use our e-transfer service located at https://thegecgroup.wetransfer.com.
If unavoidable exigencies require the use of paper, please contact us for a mailing address at 312-922-8001.

# Economic Testimony Given By Matthew J. Murdock

| Year | Client | Case | Case Number | Court | Location | Type |
|---|---|---|---|---|---|---|
| 2020 | Jerome Bowen<br>Bowen Law Offices<br>9960 W. Cheyenne Ave Suite 250<br>Las Vegas, NV 89129 | Jermaine L. Asher, et. al. v. Willie F. Worthams, Jr., et. al. | A-17-764364-C | State - NV - Clark County | Las Vegas, NV | Deposition |
| 2021 | James Farnan<br>Ridge & Downes<br>230 West Monroe Street, Suite 2330<br>Chicago, IL 60606 | Catherine Overstreet v. Roy Strom Refuse Removal Service, Inc., et. al. | 18L5539 | State - Illinois - Cook County | Chicago, IL | Deposition |
| 2022 | Jerome Bowen<br>Bowen Law Offices<br>9960 W. Cheyenne Ave Suite 250<br>Las Vegas, NV 89129 | Margaret Thayer v. Los Prados Community Association, Inc., et. al. | A-19-787856-C | State - NV - Clark County | Las Vegas, NV | Trial |
| 2022 | Scott Britton<br>Ford & Britton, PC<br>120 N. LaSalle St. Ste. 950<br>Chicago, IL 60602 | Robert Harris v. Northeastern Illinois Regional Commuter Railroad Corporation, et. al. | 2018 L 010353 | State - IL - Cook County | Chicago, IL | Deposition |
| 2022 | Paul Festenstein<br>Condon & Cook<br>55 W. Monroe Street, Suite 3430<br>Chicago, IL 60603 | Candice Chavez and Jared Meister v. 1st Choice Lawn Service, Inc., et. al. | 2019 L 005209 | State - IL - Cook County | Chicago, IL | Deposition |
| 2022 | Robert Bingle<br>Wise Morrissey<br>161 N Clark St., Suite 3250<br>Chicago, IL 60601 | Angela Balfanz v. Daniel Friday | 19 L 009641 | State - IL - Cook County | Chicago, IL | Deposition |
| 2023 | Jerome Bowen<br>Bowen Law Offices<br>9960 W. Cheyenne Ave Suite 250<br>Las Vegas, NV 89129 | Jermaine L. Asher, et. al. v. Willie F. Worthams, Jr., et. al. | A-17-764364-C | State - NV - Clark County | Las Vegas, NV | Hearing |
| 2023 | Paul Festenstein<br>Condon & Cook<br>55 W. Monroe Street, Suite 3430<br>Chicago, IL 60603 | Candice Chavez and Jared Meister v. 1st Choice Lawn Service, Inc., et. al. | 2019 L 005209 | State - IL - Cook County | Chicago, IL | Trial |
| 2023 | Kevin Paule<br>Hill Ward Henderson<br>101 E. Kennedy Blvd., Suite 3700<br>Tampa, FL 33602 | Peter Nicoletti v. Jones Lang LaSalle Americas, Inc. | 1:21-cv-01454 | Federal - IL - Northern District | Chicago, IL | Deposition |
| 2023 | David Comstock<br>Law Offices of Comstock & Bush<br>199 N. Capitol Blvd., Ste. 500<br>Boise, ID 83701 | Marcia Lane, et. al. v. Bryan Anderson M.D., et. al. | CV01-19-20921 | State - ID - Ada County | Boise, ID | Trial |
| 2023 | Andrea Camacho<br>Camacho Mauro, LLP<br>40 Wall Street, 41st Floor<br>New York, NY 10005 | Ronald Valerio v. Eaton Electric, Inc. | 306522/2014 | State - New York - County of Bronx | New York, NY | Hearing |

THE GEC GROUP

The GEC Group is GREEN

You can email us documents, or for larger and more secure transfers, you can use our e-transfer service located at https://thegecgroup.wetransfer.com.
If unavoidable exigencies require the use of paper, please contact us for a mailing address at 312-922-8001.

## Economic Testimony Given By Matthew J. Murdock

| Year | Client | Case | Case Number | Court | Location | Type |
|---|---|---|---|---|---|---|
| 2024 | Kim Trout<br>Trout Law PLLC<br>3778 Plantation River Dr., Ste. 101<br>Boise, ID 83703 | Black Butte Ranch, LLC v. Bootjack Dairy M&D LLC et al. | CV32-23-00003 | State - ID - Lincoln County | Shoshone, ID | Trial |
| 2024 | Amir Tahmassebi<br>Konicek & Dillon<br>70 West Madison Street, Suite 2060<br>Chicago, IL 60602 | Peter Smith Ely, et al. v. Ruth Pivar, et al. | 15L8387 | State - IL - Cook County | Chicago, IL | Trial |
| 2024 | Brian Hetzer<br>Duncan Law Group<br>161 N. Clark St., Ste 2550A<br>Chicago, IL 60601 | Lindsay Starwalt, et al. v. Christie Clinic, PLLC, et al. | 202219124 | State - IL - Cook County | Chicago, IL | Deposition |