RICK VASQUEZ FIREARMS, LLC

CONSULTING SERVICES

To: Kim J. Trout & Alyssa R. Jones
Trout & Jones, PLLC

From: Richard Vasquez
Rick Vasquez Firearms, LLC

I have been retained by Trout & Jones, PLLC to provide an opinion on a report provided by Orchid Advisors. I have over 40 years' experience working on firearms and maintaining my own FFL. During my tenure at ATF, I worked in the Firearms Technology Branch for 12 years rising to the position of Acting Branch Chief of the Firearms Technology Branch (FTB). My final two years with ATF I was with Field Operation where I was the Acting Chief of the Firearms Training Branch.

In my capacity with FTB I wrote the first formal Standard Operating procedures (SOP) for FTB. During this time frame I also spearheaded the advanced firearms training for Industry Operations Inspectors/Investigators. I wrote numerous classes on all aspects of the GCA, NFA, and importation procedures for ATF and other Federal agencies. Additionally, I organized and assisted with preparing the SOPs for the NFA Branch

After leaving ATF I worked for FFLGUARD (a compliance company) and administered ATF procedures to several hundred customers. I have provided on-site compliance training to all levels of FFLs. Additionally, I have my own compliance LLC, my own shooting school, and security

consulting business. I have sold my share in Active Crisis Consulting but continue to dabble in security training.

Further qualifications:

Firearms Instructor, Consulting and Testifying Expert, Compliance Expert, and Concealed Carry Expert to Governments and Private Industry

Rick Vasquez is a certified law enforcement and United States Marine Corps firearms shooting instructor. During employment with the U.S. government, Rick provided foreign and domestic firearms training and technical assistance to the Border Patrol, Customs and Border Protection, Secret Service, and many other federal and state law enforcement agencies. He is widely recognized in both the state and federal courts as a subject matter expert with respect to firearms and ammunition and has testified in numerous criminal and civil matters involving firearms.

Rick is also a United States government certified firearms classification expert who has represented the U.S. government as a firearms technical representative to aid other nations. He not only provides firearms and ammunition classification expertise but also assists both foreign and domestic governments in firearms origin, functionality, and importability. He has also worked within the U.S. federal government assisting various departments and agencies with firearms policies and issues. His training, experience, and background make him a continued valuable resource to both governments and private companies as a technical advisor on National Firearms Act (NFA), Gun Control Act (GCA), International Traffic in Arms (ITAR), Arms Export Control Act (AECA), and manufacturing- and import-related concerns.

EXPERTISE & SERVICES OFFERED

- Provide expert advice and testimony in criminal, civil, and administrative matters involving firearms.
- Testing of firearms and silencers.
- Tailored firearms training in a state-of-the-art training facility, including firearms safety and firearms manipulation.
- Provider of security protocols, site surveys, and personal security training.
- Preparation of Standard Operation Procedures for ranges and FFL operations.
- Preparation of FFL compliance and SOPs for compliance.
- Preparation of standard safety briefs.
- Firearms identification training based on the needs of the agency.
- Evaluation of firearms related to ATF firearms classification and firearms import compliance.
- NFA classification, NFA transfer procedures, and NFA forms.
- Machinegun identification and function checks.
- Foreign weapons identification and use.
- Nomenclature on all firearms.
- Ammunition identification.
- U.S. firearms regulations and marking requirements.
- Expert services on the importation of firearms and firearms components under the GCA and AECA.
- Armorer, firearms safety instructor, and certified gunsmit_______

Articles authored:

1. Articles:

A. In the previous ten years, I have authored the following publications:
B. October 2015 Peer Review of articles for Swiss Small Arms Survey, "MECHANICS OF FIREARMS TRAFFICKING"
C. January 2016 Small Arms review, "80% RECEIVERS" MYTHS AND TRUTHS"
D. April 2016 Small Arms Review, "WHAT ARE SILENCERS AND HOW ARE THEY REGULATED"
E. October 2016 Small Arms Review, "GIFTING A FIREARM"
F. January 2017 Small Arms Review, "SHOTGUN VS FIREARM"
G. 2022 Center for Disease Control, "FIREARMS AND AMMUNITION IDENTIFICATION"
H. More Trouble in Paradise, Rick Vasquez, Pistol Stabilizing Braces, and Joe Biden's America, Will Dabbs MD

I. Amicus Brief No. 23-852 In the Supreme Court of the United States__ MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., *Petitioners*, V.JENNIFER VANDERSTOK, ET AL., *Respondents*.

I have been asked to review a report conducted by Philip Milks from Orchid Advisors. Philip conducted a review of the operating procedures and the compliance program that Gemini had in place. For the purpose of reviewing the report I was provided with a copy.

The report by Phil is approximately 19 pages long and copies of the A&D book were attached which adds several thousand pages. There is no reason to review and explain the majority of the report as it consists of the regulations pertaining to conducting business as an FFL and an SOT holder. Even though these regulations are cited there is no indication they were inserted for violations that occurred. It is very

heavy on all procedures that should be followed not how those procedures apply to Gemini and S&W. Mr. Milks did not affirmatively assert that Gemini's FFL would have been terminated.

To be clear I did not have the opportunity to review the operation of the company. My review is what has been provided by Phil Milks. As part of this review I read all of the emails provided with the report.

Comments:
To ensure my comments are read in context I put my comments into the report where I was commenting. My review will begin with the paragraph I have inserted below. It appears that S&W did not take over Gemini when the purchase was initiated. It was a purchase of inventory and a working relationship.

# EXHIBIT B

## I. SCOPE OF THIS REPORT

On June 29, 2017, Gemini Technologies, Inc. ("GT" or "Plaintiff") and Smith & Wesson signed an Asset Purchase Agreement ("APA") for the sale of Plaintiff's assets to Smith & Wesson. Among many other necessary actions, part of the transition required obtaining certain government licenses, permits, and approvals for both domestic and international operations and sales. As with any corporate acquisition, also required was the training of Plaintiff's employees on the standard operating procedures and corporate policies of Smith & Wesson, not

least of which were its compliance requirements.

Following the execution of the APA and during the course of addressing government requirements and integrating the Gemtech brand and GT's employees into Smith & Wesson's organization, the relationship between the Parties deteriorated. Following termination of the then-owner of Plaintiff, Ron Martinez, litigation ensued.

I have been asked to analyze whether certain actions taken by Defendants following the acquisition of GT's assets were necessary and/or reasonable insofar as they pertain to Defendants' regulatory obligations under the GCA and NFA.

## II. MATERIALS RELIED UPON OPINIONS

I have reviewed and relied on documents, transcripts of testimony, and other information provided to me as described in Exhibit B, in addition to Orchid's regulatory assessments of Plaintiff's facilities conducted as part of the due diligence process in advance of the acquisition of Plaintiff's assets by Smith & Wesson, one of which I was a party thereto (the Eagle, ID facility).

My opinions stated in this report are all expressed to a degree of reasonable certainty, based upon my education, training, and experience as an attorney and regulatory professional in the firearms industry. More information may become available, including, but not limited to, expert reports and deposition testimony, and production of information relative to facts or circumstances not stated in the operative complaint or documents I have reviewed which may result in a need for my opinions stated herein to be supplemented or amended. Therefore, I reserve the right to amend or supplement this report.

Comments:

My review will begin with the paragraph I have inserted below. It appears that S&W did not take over Gemini when the purchase was initiated. It was a purchase of inventory and a working relationship.

**“”II. SCOPE OF THIS REPORT**

On June 29, 2017, Gemini Technologies, Inc. (“GT” or “Plaintiff”) and Smith & Wesson signed.
an Asset Purchase Agreement (“APA”) for the sale of Plaintiff’s assets to Smith & Wesson. Among many other necessary actions, part of the transition required obtaining certain government licenses, permits, and approvals for both domestic and international operations and sales. As with any corporate acquisition, also required was the training of Plaintiff’s employees on the standard operating procedures and corporate policies of Smith & Wesson, not least of which were its compliance requirements.

Gemini could have surrendered their license and submitted all A&D records and any 4473s to the ATF if they were closing. If remaining in business, they should have been advised to obtain a new license, which would benefit both parties by separating old and new records under a new corporation. S&W’s license is not liable for issues with Gemini’s former license. FFLs are typically advised to update licenses during major changes.

This statement confirms the transfer of ownership. Inspection findings from the previous owner do not carry over; each FFL’s inventory and procedures are independently inspected. For example, if S&W is inspected after acquiring

inventory, only their records are reviewed. Violations found in one FFL Corp. records do not impact another. Gemini retained its license at the correct address until S&W obtained theirs.

*Top of Page 4*

*"With limited exceptions6, FFLs are only valid for one physical address unless a variance7 is obtained from the ATF. Finally, because of the licensing requirements and necessary vetting of applicants by the ATF, FFLs are not transferrable from one legal entity to anothers. Thus, in the case of an asset purchase, such as the one at issue here, if the acquiring company plans on continuing operations at the physical premises that were being utilized by the target company, the acquiring company must obtain an FFL in its own name prior to beginning operations. Should the acquiring company not already be operational in that state, it must go through the necessary processes under state law to establish and register its company to conduct business in the state prior to applying to the ATF for an FFL."*

Licenses are neither intermingled nor transferable, and the associated records are also not transferred. The firearms inventory was purchased and transferred to S&W. These are physical items that can be touched and inventoried. Not any of the issues Gemini had in the past (which were administrative) stopped the transfer of assets.

## III. CASE BACKGROUND AND OPINIONS

### A. Regulatory Requirements of the GCA and NFA

The ATF is the primary governmental authority charged with the enforcement of the criminal and regulatory provisions of the GCA and NFA. The implementing regulations of those Acts can be found at Parts 478 and 479 of the Code of Federal Regulations ("CFR"). The administrative regulations and other Rulings and guidance documents issued by the ATF can effectively be grouped into four main subject areas: licensing, recordkeeping, security and asset control, and firearm identification.

1. *Licensing*

The GCA requires that any individual or entity that desires to engage in the business of manufacturing, importing, or dealing in firearms[1] obtain the appropriate federal firearms license ("FFL") from the ATF[2]. Should

that licensee also desire to deal in firearms regulated by the NFA[3] – such as silencers – after obtaining their FFL they must go through a separate process to register as a Special Occupational Taxpayer[4] ("SOT"). Retention of the FFL and the ability to remain in business in the firearms industry is conditioned upon compliance with all applicable laws and regulations under the GCA and NFA.

As part of the FFL licensing process, the individuals who will operate the company – Responsible Persons ("RP") – undergo a background check to ensure they are not in a class of persons prohibited by law from possessing firearms and/or ammunition[5]. In light of federal and state prohibitions on certain classes of individuals from possessing firearms and ammunition, companies possessing FFLs ("licensees") are expected not to employ individuals who are subject to such prohibitions in positions which would provide them access to and/or possession of firearms and ammunition.

---

[1] The term "firearm" as used herein should be read to include silencers as they are so defined under applicable law unless otherwise noted. *See* 18 USC 921(a)(3)(C).
[2] 18 USC 923(a).
[3] Firearms regulated under the NFA include silencers, short-barreled rifles, short-barreled shotguns, machine guns, "any other weapons", and destructive devices, all as defined by applicable law. *See* 27 CFR 479.11.
[4] 27 CFR 479.31.
[5] 18 USC 923(d)(1)(B).

With limited exceptions[6], FFLs are only valid for one physical address unless a variance[7] is obtained from the ATF. Finally, because of the licensing requirements and necessary vetting of applicants by the ATF, FFLs are not transferable from one legal entity to another[8]. Thus, in the case of an asset purchase, such as the one at issue here, if the acquiring company plans on continuing operations at the physical premises that were being utilized by the target company, the acquiring company must obtain an FFL in its own name prior to beginning operations. Should the acquiring company not already be operational in that state, it must go through the necessary processes under state law to establish and register its company to conduct business in the state prior to applying to the ATF for an FFL.

As previously noted, each FFL may define products and operating methods differently from others. FFL business can only be conducted at the actual address on the license.

2. *Recordkeeping*

The core of a licensee's daily operations to meet federal regulatory obligations primarily revolves around recordkeeping. From the ATF's perspective, perfection of a company's FFL records should be the daily objective, as the various records maintained in the industry enable law enforcement authorities to trace firearms that are used unlawfully. Recordkeeping errors and omissions may compromise law enforcement's ability to trace firearms, which presents various safety risks and vulnerabilities, including the inability to establish critical information needed for criminal prosecution. Of the many records that are required to be kept, two are of particular relevance in the context of this situation.

a. <u>The Book of Acquisition and Disposition</u>

One of the primary records maintained by every licensee is the Book of Acquisition and Disposition ("A&D Book" or "Bound Book"). The A&D Book includes a log of all firearms received (or "acquired") and transferred (or "disposed") by the business through the course of operation[9]. Acquisitions and dispositions come in various forms (e.g., original manufacture, receipt from a third party, etc.) and include the change of a regulated firearm from one physical state or classification to another[10]. The A&D Book contains three categories of information applicable to each transaction: (1) information about the firearm (to include its serial number, manufacturer, importer (if applicable), model, caliber or gauge, and type); (2) acquisition information, or information about the source of the firearm (to include date of acquisition, name of the source of the firearm, the license information of the licensee, if applicable, and the address of the source); and (3) disposition information, or information about to whom the firearm was transferred (to include the date of disposition, name of the transferee, the license information of the licensee, if applicable, and the address of the transferee). The A&D Book may be maintained.

---

[6] Companies holding FFLs may utilize a location away from their licensed premises for storage of inventory. However, such companies are expected to notify the ATF of the "alternative storage location" such that the ATF is aware of where the company is maintaining its regulated inventory and can inspect such location to ensure compliance with ATF regulations. *See* FFL Newsletter, March 2006, pg. 8.

[7] ATF may issue authorization to a licensee to deviate from prescribed regulatory procedures when a request is received from the licensee and meets certain criteria. *See* 27 CFR 478.22, 27 CFR 479.26.
[8] 27 CFR 478.51.
[9] *See* 27 CFR 478.121; 27 CFR 478.122; 27 CFR 478.123; 27 CFR 478.125.
[10] For example, if a licensee has a "Receiver" in its inventory and it uses that receiver to assemble a "Rifle", the A&D Book must reflect this change in form and the licensee must make the applicable entries in the A&D Book.

in hard copy form as mandated by regulation or may be retained in an electronic format provided it is compliant with ATF Ruling 2016-1[11].

Depending upon the type of FFL an entity holds and the firearm that is the subject of the record, the time allotted for recording these acquisitions and dispositions varies. In the case of a manufacturer, such as is at issue here, the licensee has seven days to record the acquisition of a firearm regulated under the GCA,[12] but must record the acquisition of a firearm regulated under the NFA, such as a suppressor, by the close of the next business day.[13] Regardless of firearm type, the manufacturer has seven days to record the disposition of the firearm[14]. Further, the record is to reflect the date the physical process of acquisition or disposition occurred, not the date on which the record was created[15].

The time limit for recording a firearm in the A&D book can be confusing—even major FFL corporations and ATF staff often misunderstand the definition of manufacturing. I frequently clarify this for the firearms industry, compliance organizations, and ATF employees. As an FTB expert, I defined manufacturing functions for all of ATF to include writing policy letters and ATF rulings. These standards were accepted by the firearms industry. I also instructed the Tax and Trade Bureau (TTB) on these definitions during their integration with the treasury.

Manufacturers may partially complete firearms and choose not to record them if they believe the manufacturing process has not advanced to the point where the ATF would consider the item a firearm. Currently, there are no explicit written guidelines detailing which machining steps constitute the creation of a firearm. This ambiguity also affects the recording of firearms on Form 2. In some instances, NFA firearms are documented before completion; for example, a silencer is not considered complete until fully assembled, and a receiver does not qualify as a finished firearm until additional processes are performed. Manufacturers may mark these incomplete firearms and subsequently record them on a Form 2. However, because the item has not yet changed form or become a complete firearm, it may be inadvertently omitted from entry into the Acquisition & Disposition (A&D) book.

In short, and as can be deduced from the information above, the A&D Book is very similar to a general ledger of debits and credits. As a firearm is received, its information and source are recorded in a row on one side of the ledger; as the firearm is transferred, the information regarding

the transferee is recorded in the same row on the other side of the ledger. While the idea is simple in concept, implementation of the mandate requires careful thought on behalf of the licensee. While a small retailer with a couple hundred square foot store may only have a handful of firearms coming and going per day, the largest manufacturers in the country have thousands of firearms being machined, thousands more being assembled, thousands more being received from third parties, and thousands more being shipped out. An actual physical book or simple spreadsheet maintained by a single individual may be appropriate for the former, but a complex electronic system with daily input from hundreds of employees is likely required for the latter.

Should the A&D Book be mismanaged – whether by untimely entries, completely omitted entries, or inaccurate entries – the ability of law enforcement to trace firearms used in crimes or to prevent crime before it even happens can be severely compromised. A few examples can illustrate.

If a manufacturer delays recording the acquisition of a firearm by a few weeks, it frustrates the manufacturer's ability to determine if and when a firearm is stolen. Without an immediate entry of the serial number, a physical inspection of that batch of firearms may not reveal that one is missing. Consequently, the manufacturer might remain unaware of the theft and fail to alert authorities promptly. This oversight can give a bad actor additional time to use the stolen firearm in a crime or sell it on the black market and can frustrate law enforcement's efforts to prevent and solve crimes.

A second example shows how inaccurate information can create traceability problems. Assume a manufacturer has sold hundreds of firearms to a retailer that operates multiple stores in multiple states. If that manufacturer records an incorrect destination address for several of the firearms in

---

[11] ATF Ruling 2016-1 is a ruling issued by ATF that authorizes the use of electronic A&D Books in lieu of the bound volumes required by regulation. It sets forth 14 conditions which must be met in order to utilize electronic records.

[12] 27 CFR 478.123(a).

[13] *Ibid.*

[14] 27 CFR 478.123(b).

[15] *See* 27 CFR 478.123(a) ("...each licensed manufacturer shall record...*the date of* such manufacture or other acquisition..."; 27 CFR 478.123(b) ("The record shall show *the date of* such sale or other disposition...) (emphasis added).

its A&D Book and the firearms are stolen while in transit, the manufacturer's report to the authorities about the theft may have authorities investigating the matter in a completely different jurisdiction, impeding the criminal investigation and allowing more time for a firearm to be used in a crime. Omitted and inaccurate records can result in impacts on tracing and thereby impact public safety.

Tracing firearms is a critical role of ATF. I Have traveled to most Central American Countries, Colombia, Mexico, France, many US Sates, and others to provide tracing classes. The majority of improper traces are conducted by US Law Enforcement. This is garbage in garbage out. In other words, they do not complete a trace request properly. When a trace gets to a manufacturer or the first person who put a serial number on it, they for the most part jump through hoops to find the nexus of the firearm. The clearer an A&D book is the smoother the trace can occur. But once again this is not unique to Gemini, there are many incidents where major FFL corporations have done this also. There is nothing in the ROV that ATF has been tracing Gemini firearms. Additionally, there is nothing in the ROV that indicates Gemini did not complete any trace requests that ATF submitted to Gemini,

b. NFA Registrations

The second record of relevance to be discussed are more accurately described as a collection of records; NFA registrations. Stated briefly, all firearms regulated under the NFA that are not in the possession of government authorities are registered in a central repository named the National Firearms Registration and Transfer Record ("NFRTR"). Each NFA firearm is registered to an identified individual or organization (e.g., a corporation, LLC, or trust). Like the A&D Book and all other records mandated by the ATF, the NFRTR's accuracy aids in the tracing of firearms and prosecution of criminal acts and thus its inaccuracy also presents potential risk to public safety.

NFA registrations are effectuated by filing applicable paperwork with the ATF. The specific paperwork depends upon the type of registration (e.g., transfer of an existing NFA item or creation of a new NFA item), and the types of parties involved (e.g., federal firearm licensee/SOT, consumer, government entity, etc.). Manufacturer licensees who have also registered as an SOT generally file the following NFA Forms for the following purposes[16]:

- Form 2[17] – Upon creation of a new NFA firearm, this is the firearm's original registration in the NFRTR.
- Form 3[18] – Utilized by a federal firearm licensee/SOT to transfer an NFA firearm to another federal firearm licensee/SOT.[19]
- Form 4[20] – Utilized by a federal firearm licensee/SOT to transfer an NFA firearm to an individual or entity that does not hold both an FFL and SOT.[21]

- Form 5[22] – Utilized by a federal firearm licensee/SOT to transfer an NFA firearm to a government agency.

---

[16] Other purposes exist for these forms, however, only the applicable summaries are stated above.
[17] 27 CFR 479.103.
[18] 27 CFR 479.88.
[19] One single firearm may be identified on several Forms 3 before it lands in a consumer's hands. For example, if a manufacturer sells a single firearm to a distributor who then sells it to a retailer who in turn advertises the firearm online which is purchased by a customer in another state, that single firearm would appear on three (3) Forms 3 even though only one consumer sale is made. A Form 3 would be filed for each of the following transfers in that scenario: manufacturer to distributor; distributor to retailer; retailer to licensee in the online purchaser's state who would then file a Form 4 to transfer it to the retailer.
[20] 27 CFR 479.84.
[21] This Form is also utilized by consumers to transfer NFA-controlled firearms to other consumers or even to an FFL/SOT. Like Forms 3, one single firearm may be identified on multiple Forms 4. Subsequent Forms 4 after the initial Form 4 would be a "used" firearm transfer.
[22] 27 CFR 479.90.

- Form 9[23] – Utilized by a federal firearm licensee/SOT to export an NFA firearm. The licensee/SOT must have an approved export license issued by the Department of State or Commerce prior to filing the Form 9.

Upon ATF approval of any of these Forms, the firearm is registered in the NFRTR to the transferee identified on the Form. Therefore, the federal firearm licensee/SOT filing these Forms is not permitted to ship or transfer the firearm(s) identified on the Forms until ATF has approved such transfer. Further, in the eyes of the ATF, with limited exception, the registrant is the only person or entity who is legally entitled to possess that NFA firearm and thus the ATF expects prompt or near-immediate shipment of the firearm upon the licensee's/SOT's receipt of the approved Form.[24]

3. *Security and Asset Control*

The ATF has no regulations that mandate specific security controls, and none exist in the GCA or NFA. However, implied throughout both Acts and ATF regulations is an obligation on behalf of all licensees to implement some form of reasonable security measures to ensure that firearms are accounted for while in the possession of the licensee.

First and foremost, it is a criminal offense for certain individuals to possess firearms or ammunition,[25] and it is unlawful for anyone – including licensees – to sell or otherwise dispose of firearms or ammunition to such individuals[26]. It is therefore an obligation of a licensee to not permit access to firearms or ammunition to such individuals and to implement controls to ensure such access does not occur. This includes securing their licensed premises in general and potentially specific areas of their licensed premises in which firearms are present. If a licensee permits unvetted individuals – whether employees or third parties – to roam throughout their facility without some level of control or monitoring, it has the potential to provide such prohibited persons access to firearms or ammunition.

Through the population and maintenance of the A&D Book discussed above, and the requirement to inform ATF and local law enforcement of firearms that are missing[27], licensees are responsible for knowing what firearms are on their premises at all times. It is therefore an obligation of a licensee to secure firearms within their control to a reasonable extent to deter the theft or loss of firearms.

Given the lack of regulations specifying certain security measures and the many types of premises and locations at which licensees may operate, it is incumbent upon each licensee to determine how they will secure their premises[28]. At the least secure end of the spectrum, one may see a facility with locked doors. At the other end of the spectrum, a licensee may implement robust, multi-

[23] 27 CFR 479.114.

[24] The ATF has traditionally allotted a 30-day grace period for the transferring party to ship or transfer the NFA firearm. Upon expiration of that 30-day period the ATF expects notification of the failure to transfer with an explanation of the circumstances leading to the delayed transfer.

[25] 18 USC 922(g).

[26] 18 USC 922(d).

[27] 27 CFR 478.39a.

[28] While some states have adopted legislation or promulgated regulations within their borders mandating certain security requirements, with respect to the current litigation, no such states are involved.

layered security measures consisting of property line fencing and barbed wire, electronic badged access to the facility to monitor the presence of individuals arriving and departing, differing authorization levels on badges to permit or restrict certain personnel from accessing different areas within the facility itself, metal detection apparatus, monitored camera coverage on the premises with backed up recording for a defined period of time, and armed security personnel. Most of the industry falls within those two ends of the spectrum with very few having a top-tier security package as described above.

4. *Firearm Identification*

Firearm identification as mandated by the federal regulations[29] consists of engraving certain information on a firearm. The primary identifying marking of a firearm is its serial number. The serial number is what permits traceability of firearms through all licensees' records. With limited exception, a serial number may not be duplicated once it has been applied to a firearm[30] (as this would destroy traceability). The serial number must be engraved on the frame or receiver of the firearm to a depth of .003" and must be of a height no less than 1/16th of an inch[31].

Certain other markings must also appear on the firearm to include the manufacturer's name and its city and state of operation, the model of the firearm, and the caliber or gauge of the firearm.

As with the records, it is paramount these markings are engraved accurately on the firearm as well as recorded in the records. Without this alignment traceability of firearms is destroyed and public safety may be put at risk.

Serial numbers are not authorized to be duplicated.

B. **State of Plaintiff's Compliance at the Time of Acquisition**

Orchid was contracted prior to the acquisition of Plaintiff's assets to assess Plaintiff's facilities for the purpose of determining current levels of compliance with government regulations and to provide an estimate of cost to address any operational matters – whether rooted in process, technology, or education – that were identified as leading to any observed regulatory deficiencies. Following the visit of the Eagle and Tucson locations, Orchid provided two reports to Smith & Wesson, dated April 25, 2017[32] and May 26, 2017[33]. The following is my opinion of the state of compliance at the facilities based upon my observations and those reports insofar as they pertain to the regulatory matters discussed above[34].

---

[29] 27 CFR 478.92.

[30] The ATF permits silencer manufacturers to re-use serial numbers already engraved on a silencer if the following circumstances exist: (1) a manufacturer FFL/SOT has made a silencer (2) that has not left the manufacturer's premises (3) which is determined by the manufacturer to be defective. *See*, National Firearms Act Handbook, April 2009, pg. 175 "Frequently Asked Questions – Silencers".

[31] Due to recent regulatory revisions included in ATF 2021R-05F there is a cutoff date (August 24, 2022) at which time additional information must be engraved on the frame or receiver depending upon the manufacturer and type of firearm. To simplify the regulatory requirements for present purposes those distinctions are omitted.

[32] P. Milks Stealth ID Report

[33] SW546606 – J. Rydberg Stealth AZ Report.

[34] To be clear, there are many other regulatory mandates that fall into the four categories above that were not discussed. For example, there are dozens of other records to be maintained in addition to the A&D Book and NFA registrations. Any regulatory requirements not discussed above nor addressed here are omitted for one of three

1. *Recordkeeping*

a. The Book of Acquisition and Disposition

The A&D Books at both facilities had significant issues with both respect to the structure of the books themselves as well as the accuracy of the records contained therein. The state of the A&D Books and the manner in which they were maintained resulted in thousands of incorrect record entries, each representing regulatory violations.

Is there any record where ATF decided to revoke the license because of the method that records were kept. I could not find any. However, I did find where Gemini was attempting to correct any issues they discovered. In addition, Gemini had retained counsel to assist it with its compliance programs.

2016-06-16 AM1113 O.Miller Eml re Michigan A&D Book_SW302158 Owen Miller reviewing Gemtch Michigan and calling out discrepancies.; *See also*, Melissa Burgess email from October 2016 regarding a detailed review while she was employed at Mark Barnes & Associates.

The latest ATF ROV from the most recent inspection was reviewed and there was nothing in the report where ATF indicated they were going to revocation or even a warning. When ATF reviews an FFL if mistakes have been made it is critical that the manufacturer finds the mistakes and shows a correction. ATF sees that perhaps a duplicate serial number was used but the manufacturer found it and made the necessary correction. Same as a missing firearm. Did the manufacturer research it and find a solution even if it results in reporting it missing? I have worked with major manufacturers where this procedure was found on a large scale. ATF has allowed the addition of a prefix to differentiate the serial number. or had manufacturers recall and destroy firearms. Based upon my experience and training, these administrative issues would not likely result in Gemini losing its FFL.

i. Structure of the A&D Books

It was NOT discovered that due to the use of this electronic system firearms were stolen and concealed. There is no indication firearms were lost or concealed. In the record of inspection did ATF inform Gemini to remove this system and install a different system? No. ATF did not point out any failures in the system. Firearms that cannot be located are not the same as stolen firearms. Firearms are frequently destroyed during manufacturing and through administrative hiccups become misplaced due to being discarded prior to accounting. When a missing or destroyed firearm is discovered it is reported as such.

Plaintiff maintained two types of electronic records at each of the Eagle and Tucson facility. The Eagle facility utilized a homegrown software program it had created itself. The Tucson facility utilized a simple Excel spreadsheet. While neither of these are, in themselves, noncompliant, they lacked critical controls to assist the licensee in avoiding recordkeeping violations. For example, the Tucson A&D Book – being an Excel worksheet – could easily have information deleted from it and therefore provided ample opportunity for theft of firearms to be concealed. Further, the Tucson A&D Book was managed by multiple employees who emailed the file back and forth, providing even more opportunity for concealment of theft or loss of critical data. The Tucson A&D Book was also maintained by a "permanent intermittent employee" on a computer owned by a third party in violation of ATF Ruling 2016-1[35].

This permanent intermittent employee term does not seem to be an issue. All of the requirements were followed. See below:
§ 340.401 Definitions.

The regulations and the ruling specify the type of employee that should be managing an A&D book. Is the third-party server computer accessible at the licensed premises during business hours? If so, what is the violation?

The intermittent employee use was verified by legal counsel: (b) \2016-03-30 PM0240 O.Miller Eml re Gemtech Tucson Planning_SW481009.pdf"

9. Electronic firearms acquisition and disposition records may be stored on a computer server or device owned and operated by the licensee, or contracted/leased by the licensee through a host facility (e.g., remote server or cloud storage provider), provided that:
a. The firearms acquisition and disposition records are readily accessible through a computer or device located at the licensed premises during regular business hours; and
b. The licensee's server is located within the United States or its territories, or if a host facility is used, that facility must have a business premises within the United States or its territories, and must be subject to U.S. legal process. Licensees are

strongly encouraged to ensure that there are proper and robust security protection measures in place (e.g., encryption) to ensure all data is protected.
10. If the licensee contracts with, leases from, or changes a host facility (e.g., remote server or cloud storage provider), the licensee must, within 30 days, notify his/her respective ATF Area Office of the name and address of the host facility.
11. Each licensee must maintain its firearms acquisition and disposition records on a separate/partitioned database that cannot be intermingled with the records associated with another license.

The Eagle facility maintained their A&D Book in three separate books. This is not the best practice in the industry and generally results in creation of regulatory violations. Typical examples include omission of acquisition records in the case of multiple employees managing the books and each assuming the other has acquired a given firearm on the book, and creation of multiple acquisition records for the same firearm which can result in conflicting disposition information.

It is best practice to use only one A&D book, but it is not restricted by the regulations.

ii. Accuracy of the A&D Books

The lack of controls in the A&D Books, the manner in which information was entered, the lack of employee knowledge on the requirements of the A&D Book, and the absence of company policies and procedures led to thousands of errors in the regulatory records maintained between the two facilities.

---

reasons: (a) the action required under the regulation is not of a nature such that modification to the business process would have been material enough to warrant a significant enough investment to modify and was thus not investigated in our time on site (e.g., application of a serial number outside the range permitted by a variance); (b) a violation of an applicable regulation would be so minor that ATF is not likely to issue citation or more extreme penalties (e.g., posting of a copy of the license); or (c) no violation was found with respect to the applicable regulation.

[35] Condition 9 of ATF Rul. 2016-1 governs where the electronic record's data is stored. It permits storage on a server or physical device (e.g., computer, hard drive, etc.) owned by the licensee or on a remote server operated by a host facility (e.g., cloud server) with whom it has a contractual agreement.

Despite not performing a full data analysis on Plaintiff's A&D Books, Orchid still discovered thousands of errors in Plaintiff's A&D Books. Perhaps the most egregious recordkeeping violation discovered at the Eagle facility was the disposition of serial numbers in the A&D Book as being physically destroyed *prior to* their actual physical destruction. While on site, Orchid viewed over 20 intact firearms that were, according to the A&D Book, destroyed several months prior to our arrival. This presents an obvious safety risk, in addition to compliance violations.

Also at the Eagle facility, in dozens of instances the name of the transferee was completely omitted from the record. The transferee's name is not only required by regulation, but lack of such a name is potentially fatal to tracing a firearm. In hundreds of instances, the FFL number and/or address of the transferee was not recorded, which constitutes additional violations. And for inventory that was on site at the time of our visit, the storage location was recorded in the disposition field that, at best, demonstrates a lack of knowledge regarding how to operate the records and, at worst, another violation of the regulatory requirements[36]. Other data inaccuracies representing regulatory violations include serial numbers on the A&D Book with duplicate acquisition entries,[37] and firearms being acquired using the incorrect date of acquisition.

The Tucson visit revealed contradiction between the records of the two facilities resulting in additional recordkeeping violations. In approximately 3,900 instances, the disposition date of firearms being shipped to Eagle in the Tucson records was a date *after* the acquisition date of the firearms at the Eagle facility; a physical and logical impossibility. In approximately 100 instances, the acquisition date in Eagle of firearms shipped from Tucson was 315 days after the disposition date from the Tucson records, an implausible scenario considering standard shipping times. These findings highlight a serious flaw in the recordkeeping processes at both facilities, which necessitated immediate attention and remedial action to ensure compliance with regulatory standards.

Based on my experience viewing the records of hundreds of federal firearms licensees and viewing the records of Plaintiff's FFL and the reports resulting therefrom, it is clear that there were significant accuracy issues and violations in the records. I am of the opinion that had Orchid performed a deeper analysis, it is more likely than not we would have found at least several hundred more, and potentially thousands of additional recordkeeping violations. It is my assessment that these errors stem from inadequate technology, lack of company policies to ensure adherence to the law, lack of standard operating procedures to standardize recordkeeping practices, and lack of employee education on behalf of those charged with maintaining the records. Employee negligence or outright disregard for known regulatory obligations cannot be ruled out. While these issues were created by employees executing their duties, it is incumbent upon the Responsible Person to ensure compliance with ATF regulations. In my opinion, the violations identified reveal that the Responsible Person and executive personnel were not monitoring the company's state of compliance with ATF regulations.

These seem to be issues that are correctable. But S&W only bought the inventory of Gemini.
2018-10-16 PM0607 H.Sholes Eml re Gemtech FFL A&D Records_SW367670-367671
If it was a concern of S&W, they could have discussed the issue with Gemini and if

necessary, the IOI who provided oversight.

---

[36] The requirements of the A&D Book are extremely simple with respect to additional information that does not involve the firearm, the acquisition source, and the transferee (e.g., storage location): "*Additional columns* can be utilized to capture certain additional information (e.g., inventory number, new/used, *etc.*), *so long as the additional information is separate* from the required information and the required information is readily apparent." (ATF Ruling 2016-1, Condition #1) (emphasis added). GT did not keep such additional information separate.

[37] This could have been evidence of a recordkeeping error (citable) and/or could have represented multiple firearms on premises with the same serial number (citable), both of which are compliance violations.

b. NFA Registrations

Plaintiff also demonstrated poor compliance controls and/or lack of understanding of the effect of NFA registrations at its facilities and among its personnel. Upon creation of an NFA firearm at the Tucson facility, that licensee would – as required – file a Form 2 to register the NFA firearm. Upon registration of the NFA firearm, the licensee would submit paperwork to transfer the NFA firearm to its Eagle facility. At that point in time, the Eagle facility would acquire the NFA firearms on their A&D Book even though the firearm was still physically at the Tucson facility. This procedure is not a violation by the Tucson facility FFL, but rather a recordkeeping violation by the Eagle FFL. Nevertheless, it demonstrates a lack of understanding on behalf of the personnel managing the regulatory records of the effect of NFA registrations.

At the Tucson facility, four Form 2s were sampled to investigate alignment with the A&D Book records, and it was discovered that the dates on the registrations and the A&D Book differed by nearly a week.

The most egregious NFA registration violation was already noted above. The Plaintiff's employees filed paperwork with the NFA Branch[38] of the ATF attesting to the fact that NFA regulated firearms were destroyed and requesting that the ATF remove such items from the NFRTR. In conjunction with the recordkeeping violations, this removal from the NFRTR of items that were not actually destroyed would have rendered these firearms completely untraceable. Finally, Plaintiff's employees admitted to shipping NFA assets to transferees prior to receiving the required approval from the ATF.

Is this the situation where they were waiting for the removal to come back prior to destruction? It would not be recommended to destroy any firearm prior to receiving notification from ATF. Of course, manufacturers can destroy any defective firearm when they want. Under the GCA regulations, any FFL can destroy defective firearms regulated by the GCA.

Shipping NFA items prior to approval, especially dealer to dealer was a common occurrence in the NFA community. This common practice began when the transfer times were exceedingly long. SOTs would transfer the item on a form 3 so the receiving SOT could commence a Form 4 to a customer. The Form3s would be approved prior to the Form 4 being reviewed by the NFA. This method shaved off several months of transfer time. I discussed this with the branch chief Steve Albro who is now the division chief and informed any of the customers I dealt with to cease this practice, however it was common at the time of Gemini's operations. As is clear

from the communication I've reviewed between Gemini and Melissa Burgess and others, Gemini strived to comply with the NFA and the best practices of compliance under the GCA.

As with the recordkeeping violations, the actions taken by the employees in charge of Plaintiff's regulatory compliance is demonstrative of an environment with very weak to completely absent company procedures or policies to ensure the company abided by federal regulations. If such policies or procedures did exist, they were not followed by employees.

2. *Security and Asset Control*

The security and asset control measures in place at the Plaintiff's facilities at the time leading up to acquisition of Plaintiff's assets by Smith & Wesson could be classified as existing on the lower end of the spectrum of control.

With respect to physical security measures, there were not many more security measures in place other than locking of the doors upon the close of business. Despite dealing in NFA regulated firearms and parts and pieces thereof that are very concealable and transportable, there were no metal detection apparatus at either facility. Further, there was no camera coverage in place at the Eagle assembly facility that would aid any investigation in the event of the theft of these highly portable goods. At both facilities the garage doors were open and unattended throughout the day.

[38] Now known as the NFA Division.

Control over assets at the facilities was also questionable. At the Eagle location, regulated products were walked outside between the various suites in the office park with no procedure in place to confirm the quantity of assets entering one address matched the quantity of assets exiting the prior address; again providing opportunity for diversion of assets. It was also noted at the Eagle location that sales sample and demonstration firearms that would be in the hands of sales personnel would be obtained by employees at the premises and returned thereto on an honor system[39]. While this is not technically a violation, it does present yet another company practice that provides ample opportunity for theft of firearms.

As stated previously, the ATF does not have specific regulations governing security measures or how assets are controlled within the four walls of a federal firearm licensee's building. Yet, given other regulations and the inherent nature of these assets, most licensees take it upon themselves to implement some security measures, no matter how meager.

However, it is my opinion that given the size and character of Plaintiff's company at the point in time, it was observed its security measures were subpar and below that of its peers in the industry, and even below that of operations of significantly smaller scale and resources. Considering the attractiveness of the products to bad actors the choices made with respect to security measures were questionable at best. At the very minimum, a well-controlled environment does not see its largest doors open and unattended or unmonitored throughout the day providing potential bad actors the opportunity to misappropriate regulated assets. Camera coverage, lacking at the Eagle location, is another bare minimum for nearly every firearm manufacturer I have observed. Movement of NFA firearms between suites and buildings at the Eagle location in an unsecured public office park without verification procedures at either end of the movement was also an alarming procedure. Combined with the recordkeeping deficiencies noted above, the security and asset control methods in place created an environment with so great an opportunity for concealed theft that I struggle to recall another environment with similar deficiencies.

The GCA, NFA, or the CFR, does not specify any security posture. As a security consultant having served two tours of security duty in the USMC (selected by Battalion Commander to Lead the Detachment at the American Embassy Moscow from 1994-1996 due to security issues), working for Diplomatic Security as a firearms and tactics instructor, and having started my own security firm, I believe that it is prudent to have some type of measures in place to prevent theft, fire, flood, or even electronic issues that could cause the loss of all a business's documents. It is inherent for me when entering a firearms business or any business to observe what type of security procedures both human and electronic are in place. When visiting any FFL I advise them on what I see and what can be improved. However, a security program due to cost is not only based on possibility of a break-in but on location and threat level.

If a business is in an industrial area with certain security measures already in place, or there is no perceived threat in the location of the business, the facility is staffed 24 hours, then the physical security put in place could be negligible. There is no "one size fits all plan". Therefore, it is left up to the owner to determine what precautions must be put in place.

Movement of firearms in a manufacturing environment is a common practice. It does not matter if there is a possibility of a concealed theft, or any type of theft; what matters is has theft occurred. If thievery abounds, security measures will slow it down, but it will not stop theft. As indicated in Mr. Milks notes there has never been any report of theft or loss.

2017-05-26 Orchard Advisors SW AZ Stealth Diligence Memo_SW546608
Theft/Loss:
a. No theft / loss has ever been reported. It should be noted that the ATF has not visited the facility and your target has not conducted an independent wall-to-wall physical despite the shared inventory access and the fact that ATF / Inventory transactions are managed by employees who are paid by both organizations.
b. There are 770 serial numbers that show as Open Dispositions in Tucson despite the fact that they show as received / acquired in Boise. The observation is particularly troubling giving the % error (770 / 5,100 and that this only relates to six months of operation).

3. *Firearm Identification*

Plaintiff's method of applying markings to its firearms was performed at the time of our assessment in a manner comparable to most similarly-sized manufacturers in the industry – use of a laser engraver with a manual serial number input. It does through its highly manual process, however, provide some level of risk of improper duplication of serial numbers or use of improper serial number ranges. Of more concern was our observation of several receivers that had been fully machined but remained unmarked for several months at the Tucson facility. Yet again, the lack of a serial number on a firearm and its nonappearance in the regulatory records renders it subject to concealed theft, providing risk to the company and public safety.

Firearms, silencers and silencer components are required to be marked when complete as a silencer. Duplication is always possible, and due diligence must be adhered to regardless of if the serial numbers are manually or electronically counted.

Silencer components do not have to be serialized by the manufacturer until a

complete silencer has been assembled. This direction was in an ATF ruling and has been codified in the new frame or receiver rule 2021R-05F

4. *Compliance Program Management*

The ATF does not require a company to establish a compliance program. However, given the nature of the regulations and the fact that operational personnel (e.g., assembly, shipping & receiving, etc.) have a far greater impact on a company's level of compliance and risk profile than

[39] Firearms could also be shipped by the company to its employees in the field.

the compliance department in any manufacturing environment, in my opinion and experience it is nearly impossible to operate in compliance with federal firearms regulations without establishing such a program. While there are many elements of an effective compliance program[40], I would group the key components of an effective compliance program into four categories.

First is polices and procedures. Without documented policies and procedures there is no compliance program. These documents are the backbone of a compliance program, drafted to specify appropriate corporate and employee behavior.

Second would be education and training. First and perhaps foremost, the head of any compliance department must have the appropriate expertise in the relevant subject area(s) to establish and manage a company's compliance program. Beyond the person "responsible for" compliance, however, the entire workforce must be trained in the regulatory requirements not only generally applicable to the company, but they should also be trained in those requirements that are specifically applicable to their job duties. If an employee is not educated and unaware, they cannot know whether their action is compliant or not.

Third, the best compliance programs – at least when dealing with ATF regulations – utilize the technology that is available to them to the fullest extent possible with the resources available to them. As calculators reduce mathematical errors and handheld GPS reduces chances of becoming lost, so too does properly configured and deployed software help reduce the regulatory violations created by the human element.

And finally, security. Especially when dealing with firearms, security is of significant importance. A company may have policies drafted by the best corporate counsel, procedures drafted by the smartest managers, and the most expensive technology available on the market. If there is no security supporting these systems, regulated assets can disappear, records are then incorrect, and traceability of these assets is lost.

Our reports do not identify the existence or nonexistence of a documented compliance program complete with policies and procedures at Plaintiff's facilities. The errors that were viewed were so open and obvious with very little investigation required, and of such a fundamental nature that it cannot be credibly claimed a compliance program was in place to ensure compliance with federal regulations. The most basic ATF recordkeeping policy at any company would dictate that acquisitions and dispositions be recorded when they happen, in a timely fashion, and specify the very simple elements of information to be recorded. As discussed above, the A&D Books at Plaintiff's facilities exhibited violations of such a fundamental nature (e.g., not entering the transferee's name) that it is our belief no documented policies or procedures existed[41]. If they did exist, they were ignored.

It appears counsel did put a compliance program in place,

2016-03-25 PM0841 M.Burgess Eml re Compliance Plan_SW060124

[40] For example, the United States Sentencing Commission identifies seven minimum elements of an effective compliance and ethics program within The Organizational Sentencing Guidelines at Section 8B2.1(b) that I believe all FFLs should strive to achieve.

[41] On October 21, 2016, Daniel Williams did state to outside counsel via email that he desired to create "an SOP to make things better here". (*Ref*, SW606816 – 2016-10-24 AM1040 D.Williams Eml re Inspection) It is not apparent that this was accomplished.

The most glaring example of the complete absence of any program that bears repeating again was the disposition of undestroyed firearms as having been destroyed and the attestation to federal authorities that NFA firearms were destroyed and direction to remove them from the NFRTR when they were in fact not destroyed. Not only not destroyed prior to such actions, but not destroyed for several months prior to our visit. Such an action is simply so far beyond the pale of acceptable actions under the GCA and NFA it cannot be claimed any policies, procedures, or controls were in place or adhered to.

With respect to education and training, I cannot speak to any training that was provided to the broader employee group. What I can speak to is the lack of training and expertise of the individual who Plaintiff placed in charge of maintaining the company's compliance with federal firearms laws. I in no way mean to disparage the individual placed in charge of ATF compliance at Plaintiff nor do I in any way mean to imply he was not intelligent. However, Mr. Nakashima was hired at GT in late July or early August of 2016 per his testimony during his deposition. It was his first job out of college, and he was tasked with filing paperwork with the ATF. Within 6 months of his hire his superior departed and he was placed "in charge of compliance" for all aspects of the GCA, NFA, and Arms Export Control Act of 1976 for a company that dealt in arms nationally and internationally. The violation of any of these Acts could have resulted in the company being shut down by the Federal government, fined millions of dollars, or having employees arrested for conduct in contravention of these Acts. It is, in my opinion, irresponsible of a company to place such an inexperienced individual in such a position.

Mr. Nakashima's inexperience can be gleaned from his testimony during his deposition. When asked in multiple different ways what his duties and/or responsibilities were as head of compliance, he primarily and almost exclusively referred to paperwork that he was required to file. When pressed on matters concerning how he ensured that sales agents operating in foreign countries were behaving appropriately, he could only allude to sporadic discussions that had occurred at various points in time. When asked about international sales and evaluating foreign consignees to assess risk, Mr. Nakashima was unaware of what should be done beyond the text of the Federal regulations. It is fairly clear from the text of the deposition that Mr. Nakashima was unaware about concepts such as debarred parties, OFAC sanctions, and due diligence on foreign parties (whether an entity or individual).

While international transactions and the regulations thereunder are beyond the scope of this report, the responses to those inquiries makes it clear that Mr. Nakashima did not hold the requisite expertise or background to have been placed in the position in which he was. Also not mentioned in his responses about his job duties was any reference to a compliance program, creating documented policies and procedures for employees to follow (excluding a passing mention of a "policy" the company had for sales personnel to "check[] in and check[] out any of the items in our inventory"), training the workforce on ATF regulations, performing internal audits of the company, or reporting the company's risk profile to executive leadership. His responses and the state of the facilities at the time paint a picture of a clerical compliance "clerk" as opposed to an employee or officer of the company responsible for evaluating and mitigating the company's regulatory risk profile.

As for the utilization of technology at the company, the Plaintiff did spend money on creation of a homegrown electronic recordkeeping system to maintain the required A&D Book records at the Eagle facility. However, although GT created this homegrown electronic software to maintain the A&D Book at the Eagle location, given the violations noted above and in our report it was either insufficient or not being utilized properly.[42] Further, the fact that this same technology was not deployed at its second location – which used an Excel file – was a questionable decision introducing additional regulatory risk.

And as for security as part of a compliance program, I have stated above my concerns with their security.

The discussion is of past practices. S&W was purchasing inventory. If the inventory purchased was recorded and disposed of to S&W properly, past practices have nothing to do with the purchase of the property. Of course, if there was criminal action that showed the physical item being transferred was a part of a criminal conspiracy that part could be seized. From reading the emails all inventory transferred to S&W was accounted for.

The regulations are non-specific on destruction of firearms and timeliness of the destruction. Of course, common practice is when a firearm is removed from the NFRTR it should be destroyed as soon as possible simply to take it out of your inventory. If these firearms that were supposed to be destroyed were still on inventory, then they at a minimum are not lost and should continue to be recorded.

atf-ruling-76-25_0_0_0

The Orchid report speculates regarding fines, arrests, violations, and being shut down. In my opinion and experience, none of the administrative issues would result in the loss of Gemini's FFL, and Gemini was working with Counsel to remain in compliance

C. **Prudence of S&W's Actions as it Pertains to GCA and NFA Regulatory Obligations**

Questions have been raised regarding the prudence of S&W's actions insofar as they pertain to taking over ATF regulatory compliance and certain business decisions that followed as a result following execution of the APA and during the period of the transition for which I have been asked to provide insight.

In my opinion, S&W had no option but to take over the compliance function of GT and make the

decisions they did with respect to that responsibility. I hold this opinion irrespective of any of the penalties that were imposed upon S&W following charges levied against them as a result of alleged FCPA violations that had occurred several years prior to the acquisition as those charges have little to no relation to matters regulated by ATF.

As discussed above, once the APA was entered into, it was incumbent upon S&W to establish a legal entity in Idaho where the Gemtech brand would continue to operate and obtain its own FFL and SOT. This process generally takes approximately eleven weeks[43] although ATF may under special circumstances expedite such applications. Even when expedited it still takes several weeks for both the FFL and SOT to be issued and the entity to be properly licensed. Thus, no matter what, S&W would have had to pause operations to a certain extent until it could properly become licensed at the Eagle facility.

Under certain conditions a target company such as Plaintiff may continue to operate under its legal umbrella using its FFL/SOT for the benefit of an acquiring company without pausing operations; this is sometimes accomplished by adding a Transitional Services Agreement ("TSA") as an addendum to the APA (sometimes a separate TSA is executed altogether). However, there are practical and regulatory complications that render this a short-term solution, and facts may present themselves to render this a solution that should not be entertained and that a pause on operations is more preferable.

---

[42] During our brief visit we did not perform a deep dive into the software to determine whether the software was fully compliant or what, if any, regulatory controls were contained within.

[43] Under 18 USC 923(d)(2) ATF has sixty days to approve or deny the application for an FFL and although it often takes longer the Bureau most often complies with that timeline. After receipt of the FFL the entity must thereafter apply for the SOT which generally takes 2-4 weeks.

The first issue to address when operating under a TSA is the additional negotiation that may result to identify assets of the prior company excluded from the APA, assets subject to the time period in which the TSA is operational, and assets included in the APA. The second practical consideration is the relative lack of control of the acquiring company over the target company's employees. Whether an issue of loyalty to old owners or bosses, the fact that new corporate leadership may not be physically on site so there is no appearance of repercussions, or any other reason that may apply, until a target is fully integrated with the purchaser there is less control. This was demonstrated in the case at hand whereby Mr. Nakashima and Mr. Pace conspired to ignore corporate direction on whether they were permitted to resume operations and proceeded to attempt to perform a sale of assets to foreign parties[44].

Next is the legal matter of the fact that an acquiring company cannot operate a target company (its own distinct legal entity) indefinitely. The regulations do not even contemplate or address a situation governed by a TSA, but ATF has approved of their use in the past. However, even if not "indefinitely" operating under a TSA, given their ambiguous status as a legal mechanism for a company acquisition if the integration process takes too long there could be questions about unlicensed dealing in firearms as the profits and benefits received by the target company are all supposed to flow to the acquiring company who is not licensed to perform the regulated and licensed activity at that location.

Finally, and specifically with respect to the acquisition at issue, given the effectively absent compliance controls and business practices of the employees that provably created risk on a day-to-day basis that were reported by Orchid Advisors to S&W during the due diligence process, it presented far too much risk for an organization like S&W to tolerate, and were I counsel to them and involved in that transition I would have advised them to proceed as they did. Information on S&W's ATF compliance program provides further insight.

S&W, as a large corporation with hundreds of employees and significant resources, had developed a robust, yet efficient, ATF compliance program. The program was replete with dozens of policies and procedures covering nearly every activity that occurred on their premises having to deal with regulated assets. They had multiple employees as part of their compliance apparatus including a General Counsel/Chief Compliance Officer to whom the Director of Compliance reported and a Board of Directors to whom regulatory affairs were to be reported. S&W had invested over six figures in the development of a robust recordkeeping system that monitored all transactions as they were performed and automatically entered the appropriate acquisitions and dispositions into the A&D Book. And with respect to the security of its regulated assets, S&W has multi-layered security protocols at its manufacturing facilities consisting of armed guards, lot fencing, metal detection systems, supervised entry and exit, grounds cameras and cameras on the manufacturing floors and at areas of ingress and egress, and invite-only visitor policies. The lack of security would not have been tolerable for S&W upon acquisition, nor should it have been as a manufacturer of firearms.

GT013163-13166 – 2017-08-14 PM0533 On Aug 15, 2017, at 12:33 AM, Daniel Nakashima <Daniel.Nakashimaa,gemtech.com> wrote:

Jason,

I currently have a request in with the compliance director with S&W about getting our exports back up and running. That being said, I plan to continue operations and ask forgiveness later. See the attachments.

I need more information to adjust the sales order, including any consignees, their addresses, end-user addresses.
Let me know if you need anything further.
Best,Daniel

The explanation of this email by Mr. Milks appears to be nefarious in nature, but it is more an overzealous employee. After reading the entire email it appears that employees were attempting to secure contracts for major sales and were in a hurry to get proper authorization in place. Showing a lack of patience the employee makes a comment that could be taken the wrong way.

---

[44] *Ref*, GT013163-13166 – 2017-08-14 PM0533 D.Nakashima Eml re paperwork is ready for signatures, wherein Daniel Nakashima emailed Jason Pace "I currently have a request in with the compliance director with S&W about getting our exports back up and running. That being said, I plan to continue operations and ask forgiveness later."

## IV. PENALTIES FOR VIOLATION OF GCA & NFA REGULATIONS

Between the two Gemtech facilities we observed violations of the regulations issued pursuant to both the Gun Control Act and the National Firearms Act. The potential penalties for the regulatory violations range from minor to crippling.

At the lowest end of the spectrum are a citation issued in a Report of Violations ("ROV") following an ATF inspection. These are not financial in nature and the net effect of a violation in an ROV is to establish that a violation has occurred that can later be used as a establishing a licensee's history of repeated violations should the ATF find a similar violation in the future. Repeated violations can lead to loss of a company's license.

The next potential penalty is a Warning Letter issued by ATF following an inspection. These are more punitive in nature and effectively notify the licensee that the ATF deems the violations serious. The Letter will direct the licensee to ensure that the violations do not occur in the future or additional adverse actions will be taken by the ATF.

A Warning Conference is the next level of action the ATF can take. A Warning Conference is similar in nature to a Warning Letter but involves the ATF – generally the Director of Industry Operations ("DIO") for the area in which the licensee conducts business – bringing the RP(s) of the FFL to the ATF offices to discuss the seriousness of the violations. Warning Conferences generally see the DIO giving an FFL their last chance at addressing the regulatory violations. Should the same violations continue after a Warning Conference the ATF may move to revoke the company's license.

Revocation is the last non-financial and non-criminal penalty. Revocation of a company's FFL is a finding by the ATF the RPs of the license willfully violated the Gun Control Act. This finding prevents those RPs from holding an FFL in their name, from operating a company as an RP, or from being employed by a licensee in a position that would render them an RP.[45]

The effect of a license revocation on a firearms business varies from company to company. The immediate effect of a license revocation is that the company is at least temporarily not operational[46]. Companies may not engage in commerce in firearms without a license. For small businesses this may mean that the company goes out of business as the owner/operator has lost their ability to hold a Federal Firearms License. For a large corporation such as Smith & Wesson, the result of a license revocation would mean that those executive officers and other employees who are RPs would have to be terminated and replaced with new individuals who could run the company as an RP.

It must be noted here that the non-financial and non-criminal penalties listed above need not occur step by step. Stated otherwise, the ATF can revoke a license for a licensee's first regulatory

[45] *See* 18 USC 923(d)(1)(C).

[46] Unless the licensee appeals the revocation.

violation and multiple courts have agreed that the ATF may revoke a license for a single willful violation.[47]

Beyond the penalties listed above, both the Gun Control Act and National Firearms Act provide statutory authority to impose financial and criminal sanctions for violations of regulatory provisions. With respect to recordkeeping regulations, the GCA at 18 USC 924(a)(3)(B) provides that "Any [licensee] who knowingly…violates subsection (m) of section 922[48], shall be fined under this title, imprisoned not more than one year, or both." With respect to other general matters under the GCA, such as serialization and marking, 18 USC 924(a)(1)(D) provides that anyone who "willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both." The NFA at 28 USC 5871 provides that: "Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both." Further, the NFA also contains a forfeiture provision for any firearm regulated under the NFA that is involved with any violation.

Our due diligence assessments did not include a total mock inspection and analysis of all records and inventory. However, in our limited time on site we did note several thousand recordkeeping entries that were not compliant with regulatory requirements as well as representations made to ATF that NFA-controlled firearms were destroyed when they were in fact not yet physically destroyed. As can be gleaned from above, compiling the penalties identified above for several thousand instances of violation would amount to tremendous amounts of potential penalties.

## Conclusion:

The report provided by Phil was authoritative and thorough. However, it missed the mark. The area from his report that is significant is highlighted in yellow below.

### In his own words

**Executive Summary**

The following is a summary of our ATF diligence observations.

1. The legitimacy of the relationship between the parties and the use of the temporary employment to avoid traditional on-site presence, recordings and transfers, as well as the nature of IP ownership, leasing, and other financial relationships is a legal matter beyond our expertise. However, we believe it is worthy of further consideration by S&W. We recommend that you obtain copies of the MOU, ATF-issued variances, lease agreements and Mark Barnes issued letters between the two parties and the ATF.
   - Additionally, it should be noted that we identified other practices that conflict with the argument supporting their relationship. For example, the desktops and servers that house the A&D book are owned by Abrams conflicting with Ruling 2016-1.

2. We did not observe any issues that would likely result in license revocation. However, we did note several *moderate to high-level* violation risks. It should be noted that the ATF has not visited the facility and your target has not conducted an independent wall-to-wall physical despite the shared inventory access and the fact that ATF / Inventory transactions are managed by employees who are paid by both organizations. (See comment below regarding 770 non-reconciling open dispositions).

When reading the commentary in the manner that it was written it is swayed to imply that ATF would be swooping in at any minute and S&W would be out of business because of the record keeping by Gemini. Yet when Gemini was inspected the violations given were immediately corrected and ATF moved on with no recommendations for additional scrutiny. There is no implication that as a result of the inspection ATF asked to see [S&W's compliance manuals]. There was no warning conference. All discrepancies were fixed by Gemini.

The transition could have been smoother if Gemini had secured a new license and established a clear starting point for transactions with S&W, while focusing

more on adapting to S&W's business practices. Despite these oversights, S&W was not liable for Gemini's compliance issues.

To revoke an FFL's license, the ATF must prove flagrant and willful noncompliance with regulations. This can occur after a single visit if there is evidence of widespread disregard for recordkeeping or missing firearms without accountability. In this case, while recordkeeping issues were noted after inspection and reported to Gemini all issues were corrected, the FFL has never been threatened with license revocation.

After reviewing Mr. Milks' report and all related emails, I found only examples of clerical and administrative errors, as well as personality conflicts. There is no evidence of incomplete traces, intentional regulatory violations, or disregard for FFL requirements. The asset transfer to S&W poses no apparent risk. Furthermore, and based upon my education, training, and experience, the administrative issues raised in Mr. Milks' report do not rise to the level of revocation, and more probably than not, Gemini would not have lost its FFL

Respectfully submitted,

Richard (Rick) Vasquez

ATF O. 3310.4b

149. FEDERAL FIREARMS LICENSEES (FFLS).

FEDERAL FIREARMS LICENSEES (FFLS). This paragraph sets forth policy and

procedures for obtaining licensee warrants and conducting criminal investigations of licensed persons, their agents or employees, and business entities engaged in the firearms business.

a. In passing the GCA, as amended, Congress declared that the purpose of the act was to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence while not placing undue Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms for lawful activity.

b. Most persons licensed to engage in the firearms business are pursuing their interests for lawful purposes. It is the policy of ATF to initiate criminal investigations of licensees only when there is reason to believe that they are engaged in criminal activity such as dealing in stolen/contraband firearms or ammunition, knowingly supplying firearms to criminals, terrorists, gang offenders, or juveniles, or engaged in such willful and flagrant violations that it can be reasonably assumed that the firearms will find their way into the hands of criminals, terrorists, gang offenders, or juveniles.

(1) The GCA provides misdemeanor penalties for licensees who make false statements or representations with respect to information required in their records (18 U.S.C. § 922(m)). The successful use of misdemeanor charges enhances licensee denials or revocations. In cases of flagrant and willful violations of recordkeeping requirements that can be shown to pose a genuine threat to the public safety, the licensee should be recommended for felony prosecution under 18 U.S.C. § 922(b)(5) and/or 18 U.S.C. § 1001.