# *GEMINI TECHNOLOGIES*

***vs***

# *SMITH & WESSON*

---

## DANIEL NAKASHIMA

## July 14, 2024

DEPOIDAHO
Local Realtime Reporting & Videography Experts
PO Box 44385, Boise, ID 83711
depoidaho.com

Exhibit C

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

- - - - - - - - - - - - - - - -x Case No.
: 1:18-CV-00035-CWD

GEMINI TECHNOLOGIES, INCORPORATED, an Idaho Corporation,

Plaintiff,

vs.

SMITH & WESSON CORP., a Delaware corporation, and AMERICAN OUTDOOR BRANDS CORPORATION, Nevada corporation,

Defendants.
- - - - - - - - - - - - - - - -x

VIDEOTAPED ZOOM DEPOSITION OF DANIEL NAKASHIMA
July 14, 2024

VOLUME 1
Pages 1 - 260

Reported Remotely By:
Brooke R. Bohr
IDAHO CSR No. 753
Federal Certified Realtime Reporter
NCRA Registered Professional Reporter



VIDEOTAPED ZOOM DEPOSITION OF DANIEL NAKASHIMA, taken at the instance of the Plaintiff, VIA ZOOM, commencing at 9:04 a.m., on July 14, 2024, before Brooke R. Bohr, Court Reporter, Registered Professional Reporter by Testing, a Notary Public in and for the State of Idaho, pursuant to notice, and in accordance with the applicable rules of civil procedure.

A P P E A R A N C E S

FOR PLAINTIFF (APPEARING REMOTELY)

Kim J. Trout, Esq.
TROUT LAW, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
Ktrout@trout-law.com

FOR DEFENDANTS (APPEARING REMOTELY)
Erik F. Stidham, Esq.
Jennifer Jensen, Esq.
HOLLAND & HART LLP
800 W. Main St., Ste. 1750
Boise, ID 83702-7714
PO Box 2527
Boise, ID 83701-2527
Phone: (208) 342-5000
Fax: (208) 343-8869
Efstidham@hollandhart.com

ALSO PRESENT (REMOTELY): Ronald J. Martinez
Kevin Kluckhohn
Vladimir Korneychuk - Videographer



W I T N E S S


| | |
|---|---|
| DANIEL NAKASHIMA | Page: |
| Examination by Mr. Stidham | 5 |


* * * * *

E X H I B I T S


| | | Page: |
|---|---|---|
| Exhibit 105 | E-MAIL CHAIN DATED 3/7/2017 | 131 |
| Exhibit 109 | E-MAIL CHAIN DATED 3/14/2017 | 155 |
| Exhibit 134 | E-MAIL CHAIN DATED 8/14/2017 | 242 |
| Exhibit 163 | E-MAIL CHAIN DATED 8/29/2017 | 219 |
| Exhibit 164 | E-MAIL CHAIN DATED 9/15/2017 | 228 |
| Exhibit 165 | E-MAIL CHAIN DATED 10/31/2017 | 235 |
| Exhibit 166 | E-MAIL CHAIN DATED 1/15/2018 | 239 |


* * * * *

PREVIOUSLY MARKED EXHIBITS


| | | Page: |
|---|---|---|
| Exhibit 14 | (First Referenced) | 177 |
| Exhibit 48 | (First Referenced) | 199 |


* * * * *



ZOOM DEPOSITION
July 14, 2024, 9:37 a.m.

THE VIDEOGRAPHER: We are now on the record. My name is Vladimir Korneychuk, representing DepoIdaho.
The date today is July 14th, 2024. The time is approximately 9:37 a.m. This deposition is being held via Zoom remote videoconference.
The caption of this case is Gemini Technologies, Inc. v. Smith & Wesson Corp., et al. Case No. 1:18-cv-00035-CWD. The case is filed in the US District Court for the District of Idaho.
The name of the witness is Daniel Nakashima.
Would counsel please identify yourselves and the parties you represent. After which, our court reporter, Brooke Bohr, will swear in the witness.
MR. STIDHAM: Erik Stidham for the defendants.
MR. TROUT: Kim Trout for the plaintiff.
MS. JENSEN: Jen Jensen. I'm also here for the defendants.

DANIEL NAKASHIMA,
produced as a witness at the instance of the Defendants, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. STIDHAM:

**Q. So, Mr. Nakashima, as I think you're aware, I'm -- I'm the attorney, excuse me, representing AOB and Smith & Wesson in a dispute with Gemini Technologies.**
**Could you state your name for the record, sir.**
A. Yes. Daniel Jacob Anthony Nakashima.
**Q. And where do you reside, Mr. Nakashima?**
A. Currently, I'm in Portland, but I reside in Boise, Idaho.
**Q. And could we get -- could you provide us with your residential address.**
A. For Boise, it is 7936 West Hummel Drive, Boise, Idaho 83709.
**Q. Okay. And where you're residing in Portland, could you provide that address?**
A. It is 1514 Southeast 167th Avenue, Portland, Oregon 97233.



**Q. Thank you.**
**And what's your -- I know we've had some current e-mail correspondence with -- with my office, but could you provide your -- the e-mail address you would like us to use, to the extent we need to reach out and contact you.**
A. Yes.
It is danieljanakashima@gmail.com.
**Q. Mr. Nakashima, are you represented by an attorney with regards -- with regards to this deposition?**
A. No.
**Q. Mr. Nakashima, have you had your deposition taken before?**
A. No.
**Q. Well, let me go -- have you had a chance to talk with anybody to prepare for this deposition?**
A. No.
**Q. Did you speak with Mr. Trout to prepare for this deposition?**
A. Not to prepare, no.
**Q. Okay. Did you speak with Mr. Trout regarding this litigation?**
A. Not in a while.



**Q. Okay. We'll -- we'll revisit that.**
**But it sounds like you really haven't had a chance to talk to anybody about how a deposition proceeds; is that correct?**
A. I mean, I did -- I have spoken with Mr. Trout, just about how a deposition looks. But that was when we were originally going through the e-mail conversation, I don't know, maybe a half a month ago, two weeks ago.
**Q. Okay. Okay. And what did you discuss with Mr. Trout?**
A. We just discussed what to expect with the deposition, as far as kind of the outline of what a deposition looks like.
**Q. Did you discuss at all any -- any -- anything substantive regarding the deposition, like what particular types of questions were anticipated or what types of documents specifically you would -- he anticipated you would see?**
A. No.
**Q. Okay. So did you review any documents to prepare for this deposition here today?**
A. No.
**Q. Okay. So let -- let me followup on**



**where I was a little bit before, which is just kind of how -- a couple of things about this deposition.**
**First, it is very important that we don't talk over one another in this deposition. If we do, it will make it hard on the court reporter.**
**Do you understand that?**
A. Yes.
**Q. And I have a very bad habit of pausing in the middle of my questions, Mr. Nakashima. So please just do your best to let me get the entire question out before you respond, so that we can make it easier on the court reporter.**
**Is that fair?**
A. Yes.
**Q. And if I ask you a question, Mr. Nakashima, and for any reason you don't understand the question or would like some clarification, you know, please don't hesitate to ask me for any clarification.**
**Is that fair?**
A. Yes.
**Q. If I ask you a question and you respond, I'll -- I'll understand that you**

**understood the question.**
**Is that fair?**
MR. TROUT: Object to the form.
**Q. BY MR. STIDHAM: Is that fair?**
MR. TROUT: Same objection.
You can answer, Daniel. I'm going to make objections to preserve our record. And you can answer if you understand the question, sir.
THE WITNESS: Sure.
**Q. BY MR. STIDHAM: So just so the record is clear -- and again, accepting Mr. Trout's objection to form, if I ask you a question and you respond, I'll -- I'll assume that you understood the question.**
**Is that fair?**
MR. TROUT: Object to the form.
**Q. BY MR. STIDHAM: Would you respond, Mr. Nakashima?**
A. Yes.
**Q. Mr. Nakashima, is there any -- anything, such as medication or anything else that is going on in -- in your life right now that -- that would make it difficult for you to give your best recollection of your answers here today?**
A. No.



**Q. Mr. Nakashima, could you give me just an overview of your education?**
**Let me start with -- well, I understand you went to Bishop Kelly and graduated there, correct?**
A. Correct.
**Q. And after Bishop Kelly, I understand you went to the College of Idaho; is that correct?**
A. Correct.
**Q. And what degree -- did you graduate from the College of Idaho?**
A. Yes.
**Q. And what degree did you obtain at the College of Idaho?**
A. I obtained a bachelor degree in science for biology with a minor -- three minors in French, analytical chemistry and history.
**Q. And, Mr. Nakashima, I understand you're currently studying to be an osteopath; is that correct?**
A. Correct.
**Q. Did you receive any formal education, other than the education that you're undergoing now to be an osteopath after you graduated College of Idaho?**



A. I attended Boise State for a few classes.
**Q. What were those classes in, sir?**
A. Biochemistry.
**Q. And when did you graduate from the College of Idaho?**
A. May of 2016.
**Q. And when did you start studying to be an osteopath?**
**And again, ballpark is fine, sir.**
A. My classes started in August of 2021.
**Q. Getting close to residency then?**
A. Yes, sir. I'm in my fourth year.
**Q. And kind of similarly, I'd like to get an overview before we get too far along regarding your -- your work history.**
**So after graduating from College of Idaho, I understand that your first job out of college was with Gemini Technologies or Gemtech; is that correct?**
A. I was -- I worked a couple of smaller jobs, but Gemtech was my first professional job.
**Q. Okay. And just quickly, what were the -- what -- what were the jobs that you're referring to as a couple of smaller -- smaller**



**jobs after you graduated C of I?**
A. Yeah. Well, during school, I worked in retail at Old Navy. And then after college -- well, it started in college, as well. I started working at the YMCA. And so I'd been working both at Old Navy and the YMCA through college. And then after college, prior to starting at Gemtech.
**Q. Is that the YMCA in Caldwell?**
A. That's where I started. And then I transitioned over to the YMCA in Eagle.
**Q. Is that when Scott Curtis was still at the YMCA?**
A. The name is familiar, but I don't know off the top of my head.
**Q. Fair enough.**
**So when was it, approximately, that you started working at Gemtech, if you can recall?**
A. I would say late July, early August, I believe, of 2016.
**Q. Let me back up, also about, you know, this deposition.**
**Have you spoken with Mr. Martinez -- Mr. Ron Martinez to prepare for this deposition?**
A. No.
**Q. Have you spoken with Mr. Martinez**

**regarding this lawsuit?**
A. Not in any substantial context. I occasionally will meet with Ron because we're still talking to each other. But as far as the intricacies of the lawsuit, no.
**Q. So if I could maybe move things along by general under -- let me -- let me restate what I understand.**
**You meet with -- you have met with Mr. Martinez and the lawsuit has been a point of discussion, but -- is that fair?**
A. It is a topic that Ron and I have discussed when we had lunch together in the past, is probably the clearest way to state that.
**Q. Okay. And when is the last time you spoke with Mr. Martinez regarding this litigation?**
A. Maybe two months ago when we sat down for lunch -- either a month or two months ago.
**Q. So it sounds like -- and you continue to have social contact with Mr. Martinez?**
A. When my schedule allows it, yes.
**Q. So how often do you -- how -- how often do you have lunch, on average, with Mr. Martinez?**
A. On average, probably once every two to three months.



**Q. Do you continue to stay in contact with Mr. Mark Thompson?**
A. No.
**Q. Other than Mr. Martinez, is there anybody who was -- anyone else at Gemini Technologies who you continue to stay in contact with?**
A. No.
**Q. I understand that you are friends with one of Mr. Martinez's sons; is that correct?**
A. Yes.
**Q. And who is that? Which son is that?**
A. Matthew.
**Q. And do you and Matthew Martinez continue to stay in contact?**
A. Yes.
**Q. Have you and Mr. -- have you and Matthew Martinez discussed the lawsuit at all?**
A. No.
**Q. So going back to your job at Gemtech, what was the role -- what was your first role at Gemtech when you got hired?**
A. My first role was as a compliance coordinator under previous Compliance Director Owen.



**Q. Is that Mr. Owen Miller?**
A. Yes, sir.
**Q. And give me just a second, Mr. Nakashima. I need to reopen something on my computer.**
**Thank you for your patience.**
**When you say you were compliance coordinator when you first started out, what were in your duties as a compliance coordinator?**
A. My duties included helping to file forms for the transfer of suppressors under the guidance of Owen. Other than that, maintaining compliance in our facility.
**Q. When you joined Gemtech, did you have any prior training regarding the type of compliance that would be relevant to Gemtech?**
A. No.
**Q. Have you taken any classes relating to compliance -- compliance relative to Gemtech?**
A. No.
**Q. Have you obtained any type of certification relating to any types of certification relevant to the business of Gemtech?**
A. Prior to being hired?
**Q. Well, first, yes, and then I'll ask**



**afterwards, too.**
**But first I think -- I understand you didn't have any training at all or certifications relevant to compliance before you got hired by Gemtech; is that correct?**
A. Yes.
**Q. So after -- after you were retained by Gemtech, did you obtain any certifications relating to compliance?**
A. There are no certifications, per se, but attending different conferences and getting continuing education credits.
**Q. Okay. So is it your understanding that there's no certifications relevant to either domestic or international compliance?**
MR. TROUT: Object to the form.
**Q. BY MR. STIDHAM: That -- that would be relevant to the work of Gemtech?**
MR. TROUT: Same objection.
THE WITNESS: Could you repeat the question?
**Q. BY MR. STIDHAM: Sure.**
**I understood your -- I'm just following up on what -- I'm trying to clarify my understanding of your -- one of your answers.**
**Is it your testimony that there are no**

**certifications that are -- that are available that are relevant to compliance that would govern Gemtech's business?**
MR. TROUT: Object to the form.
THE WITNESS: I'm not really sure how to answer that question.
**Q. BY MR. STIDHAM: Well, I'm asking whether you have any understanding of certifications that were relevant to the work you did at Gemtech.**
MR. TROUT: Same objection.
**Q. BY MR. STIDHAM: Is it your testimony that there are no such certifications?**
MR. TROUT: Same objection.
THE WITNESS: Again, I'm not sure how to answer that question.
I -- you're asking whether or not there are any certifications that would help to work in the compliance role; is that correct?
**Q. BY MR. STIDHAM: Following up on -- let me just go back to the statement that you made that I'm trying to follow up on, so maybe that can get us on the -- the same page.**
**I said -- my question was, so after you were retained by Gemtech, did you obtain any**



**certifications relating to compliance?**
**And you stated: "There are no certifications, per se."**
**So I was following up on that. When you say that there were no certifications, per se, what do you mean by that?**
MR. TROUT: Object to the form.
THE WITNESS: So to clarify, I was trying to say that I did not receive any certifications after starting working at Gemtech.
**Q. BY MR. STIDHAM: Thank you. That's -- that clarifies what I was trying to understand. I appreciate that.**
**So you mentioned that you had -- did you take any -- any classes or receive any instruction relating to compliance while you were at Gemtech?**
A. When I initially started, Owen Wilson had me complete a course for compliance. I do not recall what the name of that course was, but I do remember computer modules that were completed within the first week of being there.
**Q. Thank you.**
**Any -- any other coursework or instruction, other than the modules you just**



**identified, that you received while you were working in compliance for Gemini or Gemtech?**
A. Well, I was mentored by Owen. So he was a wealth of knowledge. Additionally, I attended import/export compliance conferences. I also attended Idaho-specific import and export compliance trainings, as well as attending an NFA handbook training, as well.
**Q. Okay. Let me follow up on those a little bit, if I could.**
**You indicated that you attended import/export compliance conferences. Could you identify what those conferences were?**
A. I don't remember what it was called specifically or the title of it, but it was a multiday conference that took place in Arizona, I would imagine sometime between September and November of 2016.
**Q. And then you -- excuse me.**
**You indicated that -- well, any other -- before I move on -- you've identified this one that you recall in Arizona. Any other import or export compliance conferences that you attended, other than that one?**
A. There was a state-specific Idaho



import/export compliance that took place, I believe, the spring of 2017. It took place at the Boise State -- in their upstairs.
**Q. Any other compliance training that you can recall besides what you've already identified that you received?**
**Oh, to be fair, sir, you -- strike that last question.**
**You did mentioned that -- to be fair, you mentioned that you also attended an NFA handbook training, as well.**
A. Correct.
I don't recall when that was. I believe that it was led by Mr. Rick Vasquez.
**Q. Do you recall about when that was, sir?**
A. I don't.
**Q. So other than the Arizona conference, the Idaho conference at BSU and the NFA conference with Mr. Vasquez, did you attend any other conference or training related to compliance?**
A. Not that I can remember at this point.
**Q. You mentioned that when you first started out, you were working as a compliance coordinator, if I've got that title correct. What were your duties as --**

**these questions.**
**Did you have any role in overseeing compliance issues relating to Gemtech's interactions with these contract manufacturers?**
A. Are you asking me specifically when I was a compliance coordinator or --
**Q. Yes. Yes. And I appreciate that request for clarification. Yes, while you were a coordinator.**
A. In my role as a coordinator, I maintained a relationship with our parties that we're overseeing at the separate facilities for the manufacturing. So I would argue that, yes, I was somewhat involved, and I was building those relationships at that time.
**Q. Okay. At some point, I understand Mr. Miller was moved out of Gemtech by Mr. Martinez; is that correct?**
MR. TROUT: Object to the form.
THE WITNESS: I guess.
**Q. BY MR. STIDHAM: Okay. Well, Mr. -- Mr. Miller left, correct, Gemtech?**
A. Correct.
**Q. And Mr. Martinez wanted him to leave -- Mr. Miller to leave Gemtech, correct?**



A. I was under the impression it was a decision by all of the management.
**Q. Okay. And what is -- your understanding that it was a decision by all of the management to move out Mr. Miller, what is that based on?**
A. My understanding was that there were regular weekly meetings that talked about all of the company items. And I don't know -- I wasn't present for them. So I have no -- no idea whose decision it was. But at no point in time was I under the impression it was specifically Mr. Martinez's.
**Q. Okay. Well, you referred to Gemtech -- or all of management. Who is -- who are you referring to as management at Gemtech, other than Mr. -- while you were an employee, other than Mr. Martinez?**
A. Each department head was present for most of those meetings. So over my time at Gemtech, that included marketing, which at that time was Alexander. Sales, which at that time was Joey. Engineering, which constituted Blake, as well as Mark Thompson and Ron Martinez, and Taylor Knapp as well.



**Q. And it is your understanding that -- is it fair to say that it is your understanding, though, that Mr. Miller was asked to leave Gemtech?**
A. Yes.
**Q. Okay. Was it ever explained to you why Mr. Miller was asked to leave Gemtech?**
A. No.
**Q. Did Mr. Miller ever share with you why he believed -- why he was asked to leave Gemtech?**
A. I seem to recall Owen was involved with some suppressor association. I don't know if that was a move to go and work for that association or what. It was never made clear to me.
**Q. So just so I understand, Mr. Miller never told you why -- why it was, to his understanding, that he was asked to leave Gemtech?**
A. I don't recall.
**Q. Did anyone else -- Mr. Martinez or anyone else ever tell you why Mr. Miller was asked to leave Gemtech?**
A. Not that I remember.
**Q. So after -- after Mr. Miller was asked to leave Gemtech, did your position at Gemtech change?**



A. My title changed and my responsibilities increased.
**Q. Okay. What was your title after Mr. Miller was moved out?**
A. Director of Compliance.
**Q. Do you recall about when it was, in time, that you were moved -- moved to Director of Compliance?**
A. Not specifically, no.
**Q. Can you give me an estimate? I mean, was it six months after you arrived or longer than that?**
MR. TROUT: Object to the form.
THE WITNESS: I think it was within six months, but I don't -- I do not recall.
**Q. BY MR. STIDHAM: And as Director of Compliance, how did your duties change or expand?**
A. Well, I was the only one that was present to do any kind of forms. So that's one. I, additionally, had to oversee all of our sales staff that were not within Idaho. So all of our marketing people that would have possession of any Gemtech property, as well as maintaining the compliance that we already talked about.
**Q. Did those compliance obligations over**

Page 109

break do you want to take, Kim?
MR. TROUT: Well, I assume -- are we taking a lunch or no?
MR. STIDHAM: Yeah, I -- that's what I was going to suggest to Mr. Nakashima. I just didn't know if we want to go Pacific Time lunch or Mountain Time lunch. But I suggest we take at least 30 or 45 minutes at some point for lunch. And I do think -- you know, it depends, but I do have a couple more hours of questions, I think, potentially.
MR. TROUT: Yeah. Let's go off the record and take a lunch.
MR. STIDHAM: Okay.
THE VIDEOGRAPHER: Off the record at 12:14 p.m.
(Lunch recess.)
THE VIDEOGRAPHER: Back on the record at 1:03 p.m.
**Q. BY MR. STIDHAM: Mr. Nakashima, I just wanted to ask a couple of follow-up questions on something we were discussing a little bit before the break.**
**So do you recall there being any discussion at Gemtech, other than what you've**

Page 110

**already shared, regarding your -- strike that.**
**You -- you shared with me some discussions you had with Mr. Cicero and Ms. Sholes about who you would be reporting to after the Smith & Wesson acquisition.**
**So separate from that, do you recall there being any discussions at Gemtech regarding what operations would look like at Gemtech after the Smith & Wesson acquisition?**
MR. TROUT: Object to the form.
THE WITNESS: I don't know that there -- I don't remember any specific conversations. My impression was that we were just going to continue business as usual.
**Q. BY MR. STIDHAM: Okay. And what -- can you tell me what that impression was based on, to the best of your recollection?**
A. No one said otherwise.
**Q. Okay. Fair enough.**
**Let's -- let's talk about, if we could, about the transition -- your transition to being a Smith & Wesson employee.**
**How -- what -- what were your tasks as Director of Compliance relating to that transition? Give me an overview of the tasks you**

Page 111

**were engaged in relating to the transition to Smith & Wesson.**
A. I was told to -- to sum it up, to transition all items over to the Smith & Wesson license from the Gemtech license as soon as possible and to finish the pending orders as soon as possible. That was the only direction that I had had.
**Q. Were there any issues that you recall that prevented you from doing that, from completing orders, what -- excuse me, from completing what you referred to as pending orders?**
A. Just waiting for form approvals to come back was one. And then, two, in regards to any of the international orders, I had already stated that one of them -- well, all of them were canceled.
Other than that, I don't know -- there was some difficulty getting the new system up and running because they didn't want to use the system that we were using.
**Q. So let me follow up on some of that.**
**First, you said all international transitions -- transactions were canceled?**
**Did I understand that correctly?**

Page 112

A. I believe so.
I know specifically -- I remember one of the licenses was -- we were just about ready to act on -- and I mean, I believe that we were -- had it all set aside, taped up, ready to be packaged, had the port of exportation, importation set up, as well as the end user agreement, knew where it was going, and that license was canceled specifically. That's the one I remember the most about.
**Q. Was that to Saudi Arabia?**
A. I believe so.
**Q. Okay. Did that involve machine gun suppressors?**
A. I believe so.
**Q. All right. And then how is it that you learned that this license that you believe was for Saudi Arabia was canceled?**
A. I don't recall if I received an e-mail from the DDTC that the license had been canceled or if it was an e-mail. I believe, if I remember it well, I went in to track the status of it, because we were monitoring it pretty closely so we could get things taken care of and again close out these pending orders.

And when I went to the DDTC website, I believe that the license had been terminated. And when I reached out to Hope about it, I remember getting an e-mail back that said: We canceled it. Deal with it.

**Q. Did you talk to her -- did you talk to her about that?**

A. I tried to, but it didn't go anywhere.

**Q. What do you mean by that?**

A. Her final phrase of saying, "deal with it," that was fairly clear, as far as that was the end of that discussion.

**Q. When you said she said "deal with it," was that an e-mail or was that in an oral conversation?**

A. It was an e-mail, I believe.

**Q. So what did you do after you had this e-mail with Hope Sholes?**

A. I left it as it was.

Our relationship was not one of working together for the right objectives, it seemed. I think that we -- our relationship was already not the smoothest because of the transition, and she was not pleased with how long it was taking to close the pending orders.



**Q. All right. So my question was, what did you do after -- after you had this e-mail with Sholes and you said left it as is. What do you mean you left it "as is"?**

A. I didn't pursue the discussion any further.

**Q. Were you -- did you get involved in getting the -- the license set up for that transaction under the Smith & Wesson name?**

A. No. There was no direction. It was -- they canceled the orders and then they didn't want anything else done at that time. There was no followup to -- there was no discussion about, hey, we canceled it; we canceled it because we wanted it to be done under the Smith & Wesson license. There was no, hey, we canceled it because we're pending valuation. There was nothing additional besides, "deal with it."

**Q. And again, I want to make sure I cover this.**

**You said you got an e-mail that said, "deal with it," and then you didn't speak to her about it; is that correct?**

A. Correct.

**Q. Okay. Did you write an e-mail response**



**to her about it?**

A. I probably cordially said, okay, thank you for your input.

**Q. Okay. Do you recall one way or another whether you responded?**

A. I don't.

**Q. Okay. Did you have any involvement in getting the licenses -- the licenses in place for international transactions of Gemtech branded products in Smith & Wesson's name?**

A. No. I was not brought on or given the tools to perform any kind of transactions underneath the Smith & Wesson name. I was given an access to the system they used to monitor inventory, but everything was held. And we were under the instruction not to perform any transactions.

**Q. And this was -- you were -- so I want to make sure I have the time period right.**

**You're saying that during the period of transition around the APA -- excuse me, around the timing of the closing of the asset sale, you were put on hold regarding transactions?**

**Is that what you're saying?**

A. Correct.



My understanding is that between that timeframe, August until my termination in February of the next year, we were in a holding pattern. I believe that the sales team was also instructed not to pursue -- not to pursue sales, because we were not given the ability to complete them.

**Q. Okay. What's your understanding -- well, let's track that down a little bit.**

**You said August until your termination, we were in a holding pattern. I believe the sales team -- okay. Let me stop right there.**

**What do you mean when you say you were "in a holding pattern"?**

A. We were not -- we were instructed by Smith & Wesson to not pursue anything, to complete all pending orders, and then try to transition and move all inventory off of the Gemtech license as soon as possible.

**Q. When you say "we were instructed," are you talking -- is the "we" just you?**

A. I mean, I guess specifically me. But like I said, I believe that the sales team was also under the same impression. If we weren't able to transfer product, why would they call customers and try to sell product to them?

**Q. Did you talk to the sales folks about this, about this holding pattern? Did you talk to the salespeople at Gemtech?**
A. I heard their frustration. I'm not sure.
**Q. Who did you -- I'm sorry. Go ahead, sir. Finish your sentence. Finish your sentence.**
A. Just -- we didn't have a formal meeting to discuss it, but there was an over -- there was an overarching theme of frustration of not being able to do their jobs as the sales team.
**Q. So tell me -- tell me who you're talking about. Overarching theme -- this overarching theme, who, if anyone on the sales team did you discuss this with?**
A. All of the sales team that was still there currently. I don't remember who was there at that time.
**Q. Was Alex Crown there?**
A. I believe so. But he was more marketing, not sales.
**Q. So did you have any discussions about the transition with Alex Crown?**
A. In what capacity?
**Q. What do you mean "in what capacity"? I**



**said, did you have any discussions with Alex Crown regarding the transition?**
A. Yes.
**Q. And what do you recall regarding those discussions?**
A. It didn't sound like there was clear direction for anyone. So everyone was worried about pending termination.
**Q. What do you mean by that?**
**You said there -- so, sir, I mean, you know, I appreciate your answer as it is. But when you talk in very general statements about anyone, "we," I'm just going to come back and -- and try to get it clarified exactly who you're talking about. So let me follow up.**
**You said it didn't -- so everyone was worried about pending termination. What makes you believe everyone was terminated about pending termination and who are you talking about as "everyone"?**
MR. TROUT: Object to the form.
THE WITNESS: I believe that all of the employees that were currently at Gemtech did not have enough clarity in moving forward to know whether or not they would have a job at



Smith & Wesson.
**Q. BY MR. STIDHAM: Okay. And what time period are you talking about relating to this perception of yours?**
A. Probably after Ron was fired.
**Q. So going back to your statement about the sales team -- I want to see exactly what you said.**
**You said you heard frustration from the sales folks. Can you identify for me again who you're talking about as the sales folks who were frustrated?**
A. Anyone there who was in the sales department. I don't remember who was there at that time.
**Q. Can you identify a single person in the sales group that was there at that time that you believe expressed frustration to you?**
A. Joey.
**Q. What's Joey's last name?**
A. I don't remember.
**Q. Anybody besides Joey that you can identify?**
A. Probably Andrew.
**Q. Andrew? What's Andrew's last name?**



A. Ike.
**Q. Anybody else?**
A. I don't remember if there was anybody else on our sales team at that time.
**Q. So let's -- let's back up a little bit and -- and maybe get some of these timeframes a little bit tighter.**
**So I think, to clarify, I might have had the wrong date when I said the closing was. I think closing the asset purchase agreement was August 7th, but any -- anyway, of 2017.**
**Anyway, kind of using that early August timeframe for a closing as a reference, what, if anything, about your -- you know, your duties changed, as far as what you were doing day-to-day, after the closing on or around -- on or around August 7th?**
A. Well, we were preparing to move into a new building. There was -- the direction that I had had was to complete all pending Gemtech transfers, move all inventory from Gemtech to the Smith & Wesson FFL license, and to not perform any new transactions.
**Q. And that is not any new transactions, either domestic or international? Is that what**


Exhibit C

**you're saying?**
A. Domestic, international.
**Q. Okay. And just so I'm clear, who -- who is it that you contend gave you that direction?**
A. Hope.
**Q. Did you ever speak with Rob Cicero around -- regarding this -- these supposed directions?**
A. No.
**Q. Why not?**
A. The only time I spoke with Ron, he was very direct and made it clear that Hope was my supervisor. And so I never felt like I had the relationship where I could actually talk to Rob.
**Q. I think in your answer, you said -- I want to make sure I get the names correctly.**
**In your prior answer, you said, "The only time I spoke with Ron, he was very direct."**
**Did you -- did you mean Rob?**
A. Yes, sir.
**Q. Thank you. I just wanted to make sure that was clear in the record.**
**So bottom line is, you never -- you**



**never contacted Rob Cicero about any concerns you had relating to what you were being directed to do by Hope; is that fair?**
MR. TROUT: Object to form.
THE WITNESS: Sure.
**Q. BY MR. STIDHAM: Did you discuss this direction with Ron Martinez before he was terminated?**
A. I relayed what I had heard, yes.
**Q. And what did Mr. Martinez say?**
A. I don't remember.
**Q. You don't remember, even in general, what Mr. Martinez told you when you -- you indicated that you were not to process any sales?**
MR. TROUT: Object to form.
THE WITNESS: In general, there was probably frustration. I don't remember exactly what he said.
**Q. BY MR. STIDHAM: Did you discuss with him what to do -- what -- what, if anything, you should do?**
A. No. Again, the hierarchy was pretty clearly defined.
**Q. So is it fair to say that -- well, did you discuss -- do you recall anything at all**



**regarding any discussion you had with Mr. Martinez relating to this supposed direction to hold off on processing sales?**
MR. TROUT: Object to form.
THE WITNESS: I don't recall the specifics of that conversation, no.
**Q. BY MR. STIDHAM: Do you recall in general the conversation?**
MR. TROUT: Object to form.
THE WITNESS: In general, I believe he was frustrated, like anyone would be.
**Q. BY MR. STIDHAM: Well, what do you recall telling him?**
A. I probably showed him the direct e-mail.
**Q. Well -- and I want to understand -- I don't want to go -- I just want to clarify based on what you think might have happened versus what you recall happening.**
**Do you recall whether or not you showed him any e-mails?**
A. I don't recall off the top of my head, no.
**Q. So going back to kind of this time period after that, the closing of the August asset**



**purchase agreement -- excuse me, closing of the asset purchase agreement in early August.**
**Were you involved in an international sales presentation that was made by Mr. -- well, that was made by Mr. Martinez on August 30th of 2017?**
A. Can you ask your question again, please?
**Q. Yeah.**
**Were you involved in any way in the sales presentation that Mr. Martinez made on August 30 of 2017, regarding international sales?**
A. I remember discussing it.
**Q. Do you remember assisting in the development of a PowerPoint?**
A. I think that we had talked about inventory. But as far as if I made the PowerPoint, I don't believe so. I don't think I made it.
**Q. Do you recall participating in any way in providing input for the PowerPoint?**
A. As stated, I helped discuss potential inventory and then probably verified the countries as not being on the ITAR, countries to not deal with.

jump back on?
THE WITNESS: That's fine.
THE VIDEOGRAPHER: Off the record at 2:13 p.m.
(Recess taken.)
THE VIDEOGRAPHER: Back on the record at 2:19 p.m.
**Q. BY MR. STIDHAM: Mr. Nakashima, were you -- what's an empowered official, as it relates to DSP-83?**
A. Yeah. So in order to make and file documentations, the Federal Government requires people to be, quote, unquote, empowered people. That involves a background screening, fingerprinting and a clean record, so that it is their verification that I am -- I am not going to be inappropriate in using or speaking on behalf of the company or filing any of these forms.
**Q. And were you an empowered official, as it relates to signing DSP-83's for Gemtech?**
A. Correct.
**Q. Okay. And I don't think we -- we touched on this earlier, but just to be clear. Did you ever receive any training regarding the FCPA?**



A. Can you explain the FCPA and what it stands for?
**Q. Yeah. Do you know what the FCPA stands for?**
A. I don't remember off the top of my head. That's why I'm asking.
**Q. Well, so you're -- you're not familiar with the acronym FCPA as it relates to exports?**
A. I don't remember off the top of my head what the FCPA is.
**Q. Okay. How did you learn how to apply for export licenses?**
A. Besides the conference that we already spoke about?
**Q. So is that where you -- so you did mention a conference earlier today, and I believe you said it was a three-day conference in Arizona that you went to in 2016; is that -- is that correct?**
A. Correct.
And then I believe that there's also a program online that will walk you through the process. And then I had the previous mentor, Owen, as we discussed. And if at any point I had questions, we had firearms legal counsel,



Mark Barnes, at our disposal, as well as Rick Vasquez with his substantial knowledge.
**Q. Okay. So any other training besides that?**
A. Not that I remember off the top of my head.
**Q. Okay. Did Gemtech have a company compliance manual?**
A. I'm sure they did.
**Q. Do you recall whether or not there was -- not just whether you assume there was. Do you recall whether there was a G -- a Gemtech compliance manual?**
A. I would imagine there's a binder with one in it.
**Q. Did you ever review it?**
A. Probably initially, when I was hired on. And then at some point, if I needed to refer to it, I'm sure it was there.
**Q. And can you describe -- describe it for me?**
A. Describe which part?
**Q. Again -- I guess, maybe let me back up.**
**Are you saying you assume there was a GT company compliance manual or are you saying**



**there was?**
MR. TROUT: Object to the form.
**Q. BY MR. STIDHAM: I just want to make sure I'm understanding.**
MR. TROUT: Same objection.
THE WITNESS: I don't remember off the top of my head if we had a binder with that specific title on it. But as far as a company compliance program, yes, it existed.
**Q. BY MR. STIDHAM: Okay. And how was it memorialized, if at all?**
A. Besides the binder?
**Q. That's -- let me back up. I just -- I was unclear whether you were saying you assume there was a binder or there was a binder.**
**Was there a binder?**
A. I am fairly certain there was a binder.
**Q. Okay. Do you know who wrote it, who prepared it?**
A. I don't know who authored it, no.
**Q. And can you describe it for me? I mean, how long was it? Do you recall what the title of it was?**
A. No.
**Q. Do you recall how long it was, how many**

**pages?**
A. No.
**Q. Okay. Do you know where it was kept?**
A. It would have been in my office.
**Q. Did you ever see it anywhere other than in a binder form -- kept anywhere other than a binder form?**
A. I don't remember.
**Q. Did you update the company compliance manual during the period of time that you were at Gemtech?**
A. I don't remember.
**Q. Okay. Was there a process in place at Gemtech relating to updating the company compliance manual?**
A. I don't recall.
**Q. Do you know whether it was updated manually, if at all?**
A. I don't recall.
**Q. What, if any, steps were taken to ensure that the company compliance manual was up-to-date?**
A. I don't recall.
**Q. Well, do you recall any -- any steps that were in place to ensure that the company**



**compliance manual stayed up-to-date?**
A. I don't recall.
**Q. So how did -- I'm ask -- I think I had asked about you -- what, if anything, you had done regarding due diligence for international customers today. I want to -- I want to make sure I'm asking some of those questions broadly enough that I'm not missing something.**
**Did Gemtech perform due diligence on its customers, domestic or international, any kind of due diligence at all regarding the customers?**
MR. TROUT: Object to the form, asked and answered.
THE WITNESS: Any due diligence that needed to be performed on our customers was completed by the Federal Government by the items and the lines that they provide, as far as conducting any kind of international exportation or importation, according to the ITAR regulations.
**Q. BY MR. STIDHAM: Okay. My question, though, is -- is regarding what, if anything, the company did. I understand your testimony that the government provides some level of due diligence regarding potential customers.**
**My question is what, if anything, did**



**Gemtech do? Did Gemtech do any type of due diligence of any kind regarding its customers, either domestic or international?**
MR. TROUT: Object to the form, asked and answered.
THE WITNESS: Gemtech followed the Federal guidelines as they are outlined.
**Q. BY MR. STIDHAM: Where -- what's the Federal guideline you're talking about as outlined regarding the due diligence that Gemtech should perform on customers?**
A. You're talking about international customers?
**Q. No. I said foreign or domestic.**
**What guidelines do you say -- well, here is what I want to understand. Are you contending there are guidelines that direct what Gemtech should do, as far as performing due diligence on its customers?**
MR. TROUT: Object to the form, asked and answered.
THE WITNESS: In order for any person to own an item, such as a suppressor, under the NFA Act, they have to be approved by the Federal Government. So domestic -- domestic people that



want to own a suppressor have to be approved by the Federal Government. People overseas or internationally are also approved by the Federal Government, the DTCC and ATF.
**Q. BY MR. STIDHAM: So I understand what you're saying about approval from the Federal Government.**
**My question is about what, if anything, Gemtech did. I just want to make sure we're understanding each other. Did Gemtech perform any due diligence of any kind regarding its customers, either international or domestic?**
MR. TROUT: Object to the form, asked and answered.
THE WITNESS: So in order to complete any kind of purchase, you have to have a company form, because of the NFA Act. So I'm confused by your question.
**Q. BY MR. STIDHAM: Well, I -- I'm -- I'm not understanding your confusion.**
**I understand that you're saying that there were forms filled out and the government would have to approve the forms, correct?**
A. Correct.
**Q. And that would include the government**


Exhibit C

Case 1:18-cv-00035-REP Document 222-5 Filed 09/28/26 Page 14 of 14



**Did you ever tell anyone at Smith & Wesson that Martinez and Pace had already scheduled product demonstrations, and that such sales had a historically high rate of closing and that AOB, Smith & Wesson, Gemtech could close the sales with minimal additional effort?**

A. Again, international sales was not in my expertise. I was compliance. So as far as that statement, I don't know how to answer that.

**Q. Okay. Did Mr. Martinez ever discuss with you the earnout provision that's in the APA, the asset purchase agreement?**

A. Not in any detail.

MR. STIDHAM: Mr. Nakashima, I know I took a lot longer than I had hoped today. I appreciate your patience. I don't have any further questions.

THE WITNESS: Okay. Thank you.

MR. TROUT: Mr. Nakashima, I don't have any questions for you. And as a professional, I apologize for the waste of your valuable time today.

MR. STIDHAM: Kim, you remain the class act that you always have been. Talk to you soon. Thanks, Brooke, and thanks everybody else.



THE VIDEOGRAPHER: This concludes the video recorded deposition of Daniel Nakashima. Off the record at 4:56 p.m.

(The deposition adjourned at 4:56 p.m.)

-oo0oo-



V E R I F I C A T I O N

STATE OF IDAHO )
)
County of __________ )

I, DANIEL NAKASHIMA, being first duly sworn on my oath, depose and say:

That I am the witness named in the foregoing deposition, taken on July 14, 2024, consisting of pages numbered 1 to 260, inclusive;

That I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

____________________________________

DEPONENT

Signed and sworn before me this of , .

_______________________________________________

NOTARY PUBLIC

_______________________________________________

Residing at

_______________________________________________

My commission expires

Job No. 35703



REPORTER'S CERTIFICATE

I, BROOKE R. BOHR, CSR No. 753, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction.

That the foregoing is a true and correct record of all testimony given, to the best of my ability.

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 29th day of July, 2024.

BROOKE R. BOHR NOTARY PUBLIC STATE OF IDAHO

Brooke R. Bohr

Brooke R. Bohr, CSR No. 753
Notary Public

Commission Expires: October 23, 2025


Exhibit C