IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,
Plaintiff,
vs.
SMITH & WESSON, CORP., a Delaware corporation; and AMERICAN OUTDOOR BRANDS CORPORATION, a Massachusetts corporation,
Defendants.

Case No. 1:18-CV-00035-CWD

VIDEOTAPED DEPOSITION OF JAKE KUNSKY

July 10, 2024

Boise, Idaho

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR





Exhibit D

VIDEOTAPED DEPOSITION OF JAKE KUNSKY

BE IT REMEMBERED that the videotaped deposition of JAKE KUNSKY was taken by the Defendants at the law offices of HOLLAND & HART, LLP, located at 800 W. Main Street, Ste. 1750, Boise, Idaho, before Veritext Legal Solutions, Rebecca Martin, Court Reporter and Notary Public in and for the State of Idaho, on Wednesday, the 10th day of July, 2024, commencing at the hour of 9:00 a.m. in the above-entitled matter.

APPEARANCES:

For the Defendants:
HOLLAND & HART, LLP
By: JENNIFER JENSEN, Esq.
ZACHERY J. McCRANEY, Esq.
800 W. Main Street, Ste. 1750
Boise, Idaho 83702
Telephone: (208) 383-3910
Facsimile: (208) 279-8692
jmjensen@hollandhart.com
zjmccraney@hollandhart.com

For the Plaintiff:
TROUT LAW, PLLC
By: KIM J. TROUT, Esq.
3778 N. Plantation River Drive, Ste. 101
Boise, Idaho 83703
Telephone: (208) 577-5755
Facsimile: (208) 577-5756
ktrout@trout-law.com

Also Present: Stephan Andreychuk, videographer
Ron Martinez

Page 2

INDEX
EXAMINATION

| JAKE KUNSKY | PAGE |
|---|---|
| By: MS. JENSEN | 6 |

EXHIBITS

| No. | | Page |
|---|---|---|
| Exhibit 69 | 02/22/2017 e-mail Bates stamped GT007919 (1 page) | 185 |
| Exhibit 70 | March 2017 e-mail chain Bates stamped GT114959 through 114963 (5 pages) | 196 |
| Exhibit 71 | Facebook messages Bates stamped GT082188 through 82192 (5 pages) | 199 |
| Exhibit 72 | 04/27/2017 e-mail Bates stamped SW070935 (1 PAGE) | 211 |
| Exhibit 73 | 2017 e-mail chain Bates stamped GT005998 through GT005999 (2 pages) | 215 |
| Exhibit 74 | 09/25/2017 e-mail Bates stamped SW254685 through 254686 (2 pages) | 226 |
| Exhibit 75 | 09/27/2017 e-mail chain Bates Stamped SW201580 through 201582 (3 pages) | 231 |
| Exhibit 76 | 09/28/2017 e-mail with attachment Bates stamped SW201724 through 201730 (7 pages) | 233 |

Page 3

EXHIBITS (Cont.)

| | | |
|---|---|---|
| Exhibit 77 | 10/06/2017 e-mail Bates stamped SW509949 (1 page) | 236 |
| Exhibit 78 | 10/11/2017 e-mail with attachment Bates stamped SW322841 through 322845 (5 pages) | 238 |
| Exhibit 79 | October 2017 e-mail chain Bates stamped SW405573 through 405574 (2 pages) | 238 |
| Exhibit 80 | 06/29/2017 Non-Competition, Non-Solicitation, Confidentiality and Inventions Agreement (12 pages) | 239 |
| Exhibit 81 | Employee records for Jake Kunsky (18 pages) | 249 |

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We're going on the record. The time is 9:07 a.m. Today's date is July 10th, 2024.
This is media unit 1 of the video-recorded deposition of Jake Kunsky in the matter of Gemini Technologies, Incorporated, versus Smith & Wesson Corp, filed in the United States District Court for the District of Idaho. Case Number is 1:18-CV-00035-CWD.
The location of this deposition is 800 West Main Street, Suite 1750, Boise, Idaho 83702.
My name is Stephan Andreychuk, representing Veritext, and I'm the videographer. The court reporter today is Becky Martin, also from Veritext.
Counsel and all present will now state their appearances for the record.
MS. JENSEN: Jennifer Jensen from Holland & Hart on behalf of Smith & Wesson and AOB.
MR. McCRANEY: Zack McCraney from Holland & Hart on behalf of the defendants.
MR. TROUT: Kim Trout for the plaintiff.
MR. MARTINEZ: Ron Martinez, the plaintiff.

Page 5

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

JAKE KUNSKY,

a witness having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. JENSEN:

Q. Good morning, Mr. Kunsky.
A. Good morning.
Q. Have you ever had your deposition taken before?
A. No.
Q. Well, I'm just going to go over a few ground rules, then, and feel free to ask any questions if you have them at this early point about how the deposition will work.
But first off, I'll ask: Do you have any health situations that might impair your ability to hear, understand, or respond to the questions today?
A. No.
Q. Are you on any medications that may impair your ability to hear, understand, or respond



to the questions today?
A. No.
Q. Then as far as ground rules go, we do need verbal responses.
Do you understand that?
A. Yes.
Q. Okay. And that's just because, you know, while we are videoing, we're also having a transcript taken, and so we'll need to have it clear in the record whether they're yeses or noes versus nods of the head, et cetera.
And then I'll also ask that you'll allow me to finish my full question before beginning to answer.
Do you understand that?
A. Yes.
Q. Okay. And that also just makes the record clearer. And I will say that sometimes I do pause, and that can be annoying, but I'll just ask you to bear with me.
And then if you for any reason don't understand my question, would you ask me for clarification?
A. Yes.
Q. Okay. And so then if you do answer a



question, I'm going to assume that you did understand it; is that fair?
MR. TROUT: Object to the form.
Q. (BY MS. JENSEN) You can go ahead and answer.
A. If I answer it that I understood it?
Q. Yes.
A. I guess it's open for discussion. I'm hoping I understood it, but I don't know if I did. It isn't a fact statement.
Q. Okay. So if you answer a question, then you believe that you understood it?
A. To the best of my knowledge.
MR. TROUT: Object to the form.
Q. (BY MS. JENSEN) Yes.
MR. TROUT: You can answer.
THE WITNESS: Yeah.
Q. (BY MS. JENSEN) Okay. That's fine.
A. It doesn't mean I know for sure what the question was. I'm just trying my best to answer it.
Q. Sure. Of course.
Okay. And then we will try to take breaks. I like to take breaks about once every hour just to give everyone a chance to stand up and



stretch and et cetera, but if you feel the need to take a break at another time, please feel free to do so.
And then -- and I will just ask that you don't take a break while a question is pending. So answer the question, then you can take a break whenever you feel.
Does that make sense?
A. Yes.
Q. Okay. Thanks.
So, Mr. Kunsky, did you prepare for your deposition today?
A. I'm here.
What do you mean, "prepare"?
Q. Did you review any documents --
A. No.
Q. -- in anticipation of your deposition today?
A. No.
Q. Okay. Did you review any records or files?
A. No.
Q. Did you speak to anyone in anticipation of your deposition today?
A. Yes.

Q. Okay. Who did you speak to?
A. I spoke to Mr. -- is it Trout? Yes.
Q. Okay. And when was that?
A. Yesterday.
Q. Okay. And for how long?
A. I don't know. Under an hour -- yeah, under 30 minutes, I think.
Q. Okay. Did you speak to anyone else in anticipation of your deposition today?
A. No.
Q. Okay. So you didn't speak to Mr. Martinez?
A. I spoke to him here.
Q. Okay.
A. But, no, I did not before I got here.
Q. So when you say "here," you mean this morning when you arrived at the deposition?
A. Correct.
Q. Okay. Mr. Kunsky, are you aware what this case is about?
A. Yes.
Q. Okay. And what is your understanding of generally what the case is about?
MR. TROUT: Object to the form.
You can answer.

Page 10

THE WITNESS: Like, broadly?
Q. (BY MS. JENSEN) Yeah.
A. Just it's an opinion-based thing.
Is that -- you want my opinion on what I think it is?
Q. Your understanding of it.
MR. TROUT: Object to the form.
THE WITNESS: Yeah. I mean, my understanding is that -- I mean, I guess I'm trying to be as broad as possible, but I guess I don't know exactly the details of it, but there's an issue with the way -- the idea of why AOB bought Gemtech and what they did with it after they bought it.
Q. (BY MS. JENSEN) Okay. So I'd like to start out asking you some questions about your background.
So starting with your educational background, did you complete high school?
A. Yes.
Q. And when was that?
A. 2000.
Q. And did you complete any education after high school?
A. Yes.

Page 11

Q. Where did you go to complete that education?
A. Wyoming.
Q. Excuse me?
A. Wyoming.
Q. Wyoming?
And what was the name of the school that you went to?
A. WyoTech.
Q. Okay. And did you obtain a degree there?
A. Yeah. I completed all requirements for that course.
Q. And what was the degree?
A. It's an automotive technology --
Q. Okay.
A. -- certificate. So it wasn't a bachelor's or anything like that.
Q. Okay. And when did you complete that automotive technology certificate?
A. It would have been 2001, I believe.
Q. And did you go on to do any other education after that 2001 certification?
A. Not in the civilian form, but military-wise, yes.

Page 12

Q. Okay. And what was that education in the military?
A. Leadership schools and different -- I mean, there's a whole list of it, airborne school, air assault school, rappel master school. There's, I mean, endless list, machine gun training. Lots of different schools.
Q. Sure.
A. Recon school.
Q. And about how long did these various schools take in the aggregate, just so I have an idea?
A. I don't know. Like, out of my -- I spent 22 years there, I'd say four of them I was in school -- in a school setting as a student.
Q. Okay. And did any of this education that you did with the military include engineering?
A. Engineering?
Q. Yes.
A. I did not go to engineering school for the military, no.
Q. Okay. Did you ever complete any engineering training?
A. Nope.
Q. So to try to keep things efficient I'll

Page 13





Exhibit D

A. Usually it was an eight-week -- was the goal, eight weeks or less.
Q. And what kind of components?
A. Those were muzzle devices, so suppressor mounts.
Q. So are suppressor mounts hardware that attach a suppressor to a gun barrel?
A. Uh-huh. Yes.
Q. Any other kind of components that these outside manufacturers would produce for you?
A. It was mostly -- yeah, it was all -- at that -- well, no, they did produce suppressors as well.
Q. Which suppressors?
A. The Arrow.
Q. Any other model?
A. I think that was the only one I had a personal PO for that I, you know, delivered.
Q. So was this PO for the Arrow, was this in connection with your contract relationship with Gemtech?
A. Yes, the Arrow is a Gemtech suppressor.
Q. And what was the quantity on this PO for the Arrow?
A. I have no idea. It's been years now.



Over a hundred, at least, I would say. I can't remember what it was, though.
Q. And did you fulfill the PO?
A. Yes.
Q. Were there any other POs for suppressors that you fulfilled when you were a contractor for Gemtech?
A. No.
Q. Who was the buyer on this Arrow PO?
A. Gemtech.
Q. Did you ever work with end users --
A. No.
Q. -- to fulfill any orders?
A. No.
Q. Okay.
Okay. For context, you became an employee of Gemtech at some point in time in your relationship with Gemtech, correct?
A. Yes.
Q. When was that?
A. I think I might have that in here.
It looks like around 20- -- yeah, 2016 maybe, in that timeframe.
Q. And why did you decide to go from being a contractor to an employee?



A. The need and the -- there was just so much work that I just needed to -- I could devote all my time to one company where before I was doing multiple companies. So the need for R&D was great at that time.
Q. When you went from being a contractor -- when you went from being a contractor to an employee, did your role with Gemtech -- did your responsibilities, I should say, did your responsibilities with Gemtech change?
A. Yes.
Q. How so?
A. Before that, I was -- like I had mentioned before, I'd mainly work on my own projects and bring them and present them. So it wasn't assignment-based.
And then when I came on full-time with Gemtech, I was the director of R&D, and then I was assigning -- working with the company to assign projects that we should work on, and not just designing myself, but working with a team to design products.
Q. So when you became an employee of Gemtech, were you immediately the director of R&D or did you have a different title?



A. I think I just came on as R&D first. It was just basic R&D.
Q. What was the title for that?
A. R&D. I mean, I don't think it was very specific. It was just R&D team member. I don't think there was a lot of structure below the director. It was like --
Q. Who was the director at the time when you came on -- came into the R&D team?
A. Blake Young.
Q. And who else was on the R&D team besides you and Blake Young?
A. Gray Beaudry, Jason Harper, Travis -- I can't remember his last name. That was the main members.
Q. Were there any other members?
A. There was people that helped out, but I don't feel like they were designing and developing. They were supporting sales.
Q. I do want to go back to the Arrow PO.
So jumping back to that topic, how long did it take for you to fulfill that PO?
A. I don't know. I don't know the exact timeframe. I'd say a few months.
Q. And when was the PO placed?

buying the company, so it was very active at that -- whenever they bought it. I can't remember that date. I don't know that date offhand, but it was very active, and even a part of the demonstrations we would do for Smith & Wesson when they'd come out for their site visits pre-purchase, so they were viewing it functioning.
Q. Okay. So the integrated Glock was a prototype during the time that Smith & Wesson was considering the purchase of Gemtech in 2017?
A. It was a functioning unit.
Q. Well, what does "functioning unit" mean?
A. That it functions, that it operates. You can fire it. It does everything it's supposed to do.
Q. Was it ready for sale if it's a functioning unit?
A. I would have sold it, absolutely. It just wasn't mass produced. It just needed to be mass produced.
But, yes, the unit we had was functional. It just needed mass produced.
Q. Had it gone through testing?
A. Absolutely.
Q. Who did the testing?



A. Myself, Blake, Travis, Jason.
Q. And by "Blake," you mean Mr. Young?
A. Blake Young.
Q. What's Travis's last name?
A. We didn't know that earlier, remember?
Q. Was it Fishburn?
A. No.
Q. No?
What about Jason's last name?
A. Harper.
Q. And what did the testing entail that you and Blake and Travis did?
A. The same -- like, yeah, function, sound performance, durability. That was the main -- holsterability, sight package integration, weapons light integration. I think that's about it.
Q. So describe what function testing looks like.
A. Typically you put three rounds in a magazine. You lock the slide to the rear, you drop the slide, it should load the first round. The weapon should be able to fire. Load the second round automatically. It should be able to fire again. Load the third round automatically, and lock -- it should auto lock its slide to the rear.



Q. And how many times do you repeat that process that you just described when you're function testing a prototype?
A. It depends on the project and the requirements. So those are written specific to each one, and even on that project specifically, there's 10-plus different ammo weights and types that could make it function differently, so a lot.
Q. Well, give me an idea.
MR. TROUT: Object to form.
Q. (BY MS. JENSEN) How much is "a lot"?
MR. TROUT: Same objection.
THE WITNESS: I don't know what the actual round count was, it's been too long, but a sufficient amount to get it through testing.
Q. (BY MS. JENSEN) Is it, like, 20 times?
MR. TROUT: Object to form.
THE WITNESS: Too many variables with ammo type to know. I mean, that's always open to -- well, to back up from there, there's no product like that that exists, so there's no test to take that's already out there, so you're writing the test as you're developing it to try to meet an overall mission.
Q. (BY MS. JENSEN) So you didn't have any



specific testing requirements for the integrated Glock?
A. They don't exist.
Q. But you didn't have any specific requirements for the integrated Glock?
A. We went off past ones for other projects that are similar, but there isn't an integrated Glock test because there isn't an integrated Glock in the world but that one, so you're writing the test.
Q. So how many times would you load the integrated Glock when performing this function test? I mean, I'm looking for some kind of idea.
Is it, like, a thousand times? Ten times? I need an idea of some kind, and I --
A. I'd say in general we're at least going to shoot a hundred rounds of each type of -- each round.
Q. Okay.
A. But there's also -- there's either what you want, what should be done, what we think, and what the budget says. So you could put a -- we could build a requirement that doesn't exist and then run it past budgeting and they could deny it because it's too many -- it's too much money for --

and that will objectively give you your number just because of budgeting, even though it has nothing to do with function.
So there's no, like, perfect answer for any of that.
Q. So do you recall how many times you did engage in loading the -- or I should say the team performed this function test on the integrated Glock?
MR. TROUT: Object to form.
THE WITNESS: This wasn't a one-time event. It was -- we went to Glock headquarters and shot it for Glock. We put lots of rounds through it. We had it at SHOT Show, at an offsite event where the Smith & Wesson team were there to see it. We shot it internally in the facility and tested it. Like, there's just -- I don't have a measurable way of -- it got shot sufficiently.
Q. (BY MS. JENSEN) So are you counting showing the integrated Glock at Glock headquarters as part of the function testing?
A. Absolutely. It has to perform in front of the client. So --
Q. And then --
A. -- it's functioning while we're shooting



it.
Q. And then do you count shooting it at SHOT Show as part of function testing?
A. Absolutely.
Q. So do you remember, even an estimate, of how many times you function-tested the team -- the R&D Gemtech team function-tested the integrated Glock?
MR. TROUT: Object to form.
THE WITNESS: Like, the round count or how many times we actually shot it?
Q. (BY MS. JENSEN) Round count.
MR. TROUT: Same objection.
THE WITNESS: I don't know. I don't know the round count.
Q. (BY MS. JENSEN) So I still asked for an estimate earlier, and I don't believe I got an answer.
I mean, do you estimate it's in the teens? In the hundreds? In the thousands?
MR. TROUT: Object to form.
THE WITNESS: I mean, I don't know. I'm not the one loading every round and tracking that. That's not at all in my job description.
Q. (BY MS. JENSEN) Okay. So you don't know



how many rounds went through function testing for the integrated Glock?
MR. TROUT: Same objection.
THE WITNESS: I don't know specifically, no.
Q. (BY MS. JENSEN) Was the function testing tracked in any way by Gemtech?
A. I'm sure it would have been, but I don't know who did it or -- there was -- at the time for every project there was a binder with all the testing requirements and round counts and everything. So yeah, someone would have been tracking it. It just wasn't my responsibility. Including, like, sound data and all that, that was all in that book.
Q. So we talked some about function testing. Tell me about how durability testing worked.
A. Same thing. Kind of working backwards from an in-state has to meet this round count with this rate of fire, is typically how it starts, and then there's a timeline that it has to do that in, and that's different for every product type.
Once that's set, then you have to meet that objective, or if no one can meet it, then they change it to make it meetable.



Q. So are there any external requirements for durability testing, or was this something that Gemtech was creating -- were these requirements something that Gemtech was creating for itself?
A. For military solicitations, there's requirements that they give that we have to meet.
For civilian -- for the civilian market, some of them are required based on laws of the land, like OSHA, things that have certain requirements they want you -- you know, safety requirements. And then the other ones are performance-based, the performance we're after.
Q. So what durability requirements were there external to Gemtech that you were testing for on the integrated Glock?
A. External? There wasn't any for the integrated Glock. The public doesn't -- no one knew about the integrated Glock outside of the team because it's a internal R&D project, so it wasn't public. And there isn't another one that exists, so there wasn't any external requirements because there wasn't one.
Does that make sense?
Q. I understand it was a new product.
I just mean: Were there any other




Exhibit D

Q. And would you just look at that for thread specs or -- excuse me, for threads or were there other aspects of a product that you wanted to check using the Machinist's Handbook?
A. For that specifically, we'd use the Machinist's Handbook.
For material type, we'd use a metallurgy book, which shows stresses and heat changes and things like that for the actual material type. So that book was also used as well. It's an MSC book.
Q. And what does "MSC" stand for?
A. I think it's actually the company that makes it.
Q. So you don't know if it stands for anything?
A. No. It's very old. I don't know. It's the company name, I think.
Q. And then you also mentioned referencing websites as you're checking the accuracy of blueprints.
What websites were those?
A. There was a specific one for thread specs. I can't remember the name. I'd have to look it up. But it's basically a digital version of the Machinist's Handbook so you can look it up



quickly and not flip page by page.
Q. Any other websites that you remember referencing to check accuracy of blueprints?
A. No. The rest is all done by the team members, and certain people are supposed to be qualified to check them for their accuracy.
Q. So were there individuals on the R&D team who were primarily doing the checking of the blueprints for accuracy?
A. Yes. The two mechanical engineers, Gray and Blake.
Q. Did they also create blueprints?
A. Yes.
Q. What else did Blake Young do as -- you know, in his capacity as the R&D -- is it lead? I forget. Director?
MR. TROUT: Object to form.
Q. (BY MS. JENSEN) In 2016?
A. I don't know the years very well here.
Q. Well, maybe that was not necessary to have a year.
A. When he was --
Q. When Blake Young was the R&D director, what else did he do besides create blueprints and check accuracy of blueprints?



A. Test and develop product.
Q. What was his educational background?
A. Mechanical engineer.
Q. Do you know what degrees he had?
A. No.
Q. Do you know what other experience he had in mechanical engineering?
A. Pre the Gemtech, he worked at the new product development lab for BSU, which is a component of the college campus. It was where we recruited him out of.
Q. When did Blake Young join Gemtech?
A. I don't know the year. I'd guess around 2014, I'm going to say. I don't know, though, for sure.
Q. Did Blake Young ever come up with ideas for new products for the Gemtech R&D team to pursue or create?
A. I'm trying to think. I think all of his projects were based off assignment.
Q. Assignment from whom?
A. At first it would have been Tom Collins, is who hired him and was the CEO then, and then it would have been Ron Martinez.
Q. So we've talked about a couple different



products that were your idea to create.
Were there any others during your time at Gemtech that -- new products that you came up with and presented the idea to Gemtech?
A. While I was a full-time employee, is that what you're saying, or at any time, I guess is what I'm asking?
Q. Let's start with while you were a full-time employee.
A. I think we covered them all, but...
Q. So then were there others, then, that were not while you were a full-time employee?
A. Yeah. The Blast Jacket, I created and presented, and I think they still sell it. I don't know. I haven't looked in a long time. But it was a forward blast director accessory.
With the Arrow project, we had to create a mount for it. So it had a three-lug mount. So the mounting system, the muzzle device, everything was from scratch. There wasn't anything to mount it out there. So created that.
That's the -- the birth of the QDA, the .22 device, was actually a -- through a blast diverter director mount. That's where we got the idea for the mount that I presented that they ended

the problem, that's when we could come in and try to help.
But if they ordered them black and they came in brown, they sent them back. They're just wrong.
MS. JENSEN: Well, it is 12:23, so I think we should take a 30-minute lunch break, unless anyone has objections to that.
MR. TROUT: That's fine.
MS. JENSEN: Okay. Why don't we go off the record.
THE VIDEOGRAPHER: Going off the record. The time is 12:24.
(A recess was taken from 12:24 p.m. to 1:03 p.m.)
THE VIDEOGRAPHER: Going back on the record. The time is 1:03.
Q. (BY MS. JENSEN) Mr. Kunsky, did Gemtech offer you any job-related training?
A. No.
Q. Sorry, I didn't catch that.
A. No.
Q. Did Gemtech offer the research and development team any job-related training?
A. I know there was certain -- yeah, I'd say yes. There was an offer to at least one



specific person to send them back to college to finish their degree.
Q. Who was that?
A. Travis Bundy.
Q. Do you know what degree he was finishing?
A. Physics.
Q. Do you know whether Travis Bundy took Gemtech up on that offer?
A. He did not.
Q. Did anyone in the R&D team at Gemtech have a physics degree?
A. No.
Q. Did anyone on the R&D team at Gemtech have an engineering degree?
A. Yes.
Q. Who is that?
A. To my knowledge, Gray and Blake.
Q. Anyone else?
A. No.
Q. So we've talked some about the R&D team while you were a member, R&D specialist at Gemtech.
Once you were director of R&D, did the make-up of that team change?
A. Yes.



Q. How so?
A. Well, I became the leader of the team, and then at that point -- oh, I'm trying to think of what they called it, but Gray and Blake were kind of separated into the other facility. I can't remember what they called them, but it was something -- basically they reviewed all the drawings. With the purchase of Smith & Wesson -- or Smith & Wesson purchasing, they wanted all the drawings redone and converted to their format.
Q. So when you say, "they" wanted the drawings redone, you mean Smith & Wesson?
A. Yes. So that was a mountain of -- there was a lot of work with that, like, hundreds of man hours, and they sat there and did that for quite a while.
Q. So when you said that Gray and Blake went to the "other facility," what facility is that?
A. There was two facilities adjacent from each other and one had, like, the main office, like, the R&D machine shop cell, assembly, barrel threading, sales and customer service, and the other one was the warehouse with -- there was some marketing guys there, purchasing was there. It was



just another facility. They shipped -- shipping was there. They just moved right across the street, basically.
Q. Okay. And this is -- these facilities are the ones in Eagle, Idaho?
A. Yes.
Q. Okay.
A. Yeah.
Q. So at the time that you were director of R&D at Gemtech, did you bring on any additional team members to R&D?
A. No.
Q. Did you let go any of the R&D team members during your time as director?
A. We let go one guy, but he wasn't directly R&D. He was barrel threading. So I was a part of that, but it -- he didn't work for me directly.
Q. What was his name?
A. Oh, what was his name? He drives a Jeep. I don't know his name.
Q. I guess I should say, he wasn't one of the individuals that we talked about earlier --
A. He was not, no.
Q. -- on the R&D team?




Exhibit D

then.
(Deposition Exhibit No. 78 was marked.)
THE WITNESS: Okay.
Q. (BY MS. JENSEN) Mr. Kunsky, do you recall this e-mail and attachment?
A. I can't remember for sure. I wish I knew the date I was there. Yeah, maybe I was there.
Q. Okay. And for the record, it's an October 10th, 2017, e-mail; is that right?
A. Yeah.
Q. So do you remember any meetings or conference calls that occurred for an MK39 review that Smith & Wesson was directing?
MR. TROUT: Object to the form.
THE WITNESS: I mean, we had a lot of meetings. I can't remember this one specifically, so...
I don't know. I don't remember it specifically, but we had meetings with Jeremy Beu, product meetings.
MS. JENSEN: Let's mark this as Exhibit 79.
(Deposition Exhibit No. 79 was marked.)
THE WITNESS: Yep.
Q. (BY MS. JENSEN) Okay. Have you seen



this e-mail exchange before, Mr. Kunsky?
A. No.
Q. Does this refresh your recollection as to when you left Gemtech?
A. There it is, yep. It looks like the -- is it the 11th?
Q. Yeah.
So fair to say you left on or around October 11th, 2017?
A. Uh-huh.
Q. Okay. Did you have a noncompete agreement with Smith & Wesson?
A. I'm not sure. I don't know if -- I don't know if we had one or not.
MS. JENSEN: Let's mark this as Exhibit 80.
(Deposition Exhibit No. 80 was marked.)
Q. (BY MS. JENSEN) Ready?
A. Yeah.
Q. Okay. Does this document, Exhibit 80, refresh your recollection as to whether or not you had a noncompete with Smith & Wesson?
A. Yep.
Q. And you did have a noncompete with Smith & Wesson?
MR. TROUT: Object to the form.



THE WITNESS: There's a document here.
Q. (BY MS. JENSEN) Is that your signature at the end of the noncompete agreement?
A. It is.
Q. So let's go to page SW578095.
A. Yep.
Q. Do you see the paragraph, 1(a) Noncompetition?
A. Uh-huh.
Q. And would you just read that paragraph for the record?
A. During the term of employee's employment with employer and for the period of 12 months after employee's employment with employer terminates for any reason, employee shall not (whether directly or indirectly, as owner, principal, agent, stockholder, director, officer -- yeah.
You want me to read all that?
Q. Please.
A. Director, officer, manager, employee, contractor, consultant, partner, participant, or in any other capacity), or provide services to promote, participate, assist, or engage in activities for employee's own benefit or for any corporation, partner- -- partnership, association,



entity, or other person which is competitive business (as defined below).
Q. Thank you.
And would you read the definition of competitive business? And then that's all the reading I will ask.
MR. TROUT: Object to the form. Document speaks for itself.
THE WITNESS: Yeah, I can read it. Yeah.
Q. (BY MS. JENSEN) Please go ahead.
A. I think it's not -- I don't need to read it. I already read it.
Q. Okay.
A. You can read it too, right?
Q. Do you understand the terms --
A. I understand the terms.
Q. -- that you have read?
A. Yes.
Q. Okay. So when you went to Maxim, were you in violation of this agreement?
MR. TROUT: Object to the form.
THE WITNESS: No. We made firearms, not suppressors.
Q. (BY MS. JENSEN) So is your testimony that Maxim didn't produce any suppressors?





Exhibit D

Q. (BY MS. JENSEN) I mean, if you take a look at the serial numbers on the two pages ending in 81 and 82 and compare them, Mr. Kunsky, does that look like the second page is just a repeat of what's on the first page?
MR. TROUT: Object to form.
THE WITNESS: I don't know. None of this has -- that is not familiar to me, so I don't know.
Q. (BY MS. JENSEN) Okay.
A. Yeah, I don't know.
Q. At the time of Smith & Wesson's acquisition of Gemtech, was Gemtech selling Quicksand?
MR. TROUT: Object to form.
THE WITNESS: We already talked about that, didn't we?
Q. (BY MS. JENSEN) We talked about the development of Quicksand to another product, correct?
A. Well, you're asking me if they were selling it. I thought they were, but I don't know. I don't know if the new model name is swapped out or -- I'm not 100 percent on that one. That was a sales thing, and there wasn't issues with it, so I don't know.



Q. Excuse me.
I know that you said that you didn't recall whether or not the revised Quicksand model, you didn't know what the name was, correct?
A. I cannot remember it. Yeah, I don't know.
Q. Would it have had a different name than Quicksand?
A. Potentially. Based off the trend, I would think they would have renamed it, but I just cannot recall it.
Q. Okay. So I'm just trying to understand, it would be called, like, the Quicksand-II or something like that?
A. Based off their other models, they didn't tend to do that. They would rename completely a new name.
Q. Okay.
A. Well, around the Smith & Wesson era, they wouldn't do that, but there was old suppressors they did do that with, like the Outback-II, that was -- I would guess they would have renamed it. That's my final answer, I guess.
Q. So this one has been marked as Exhibit 14 previously. I'm not actually going to



get into the weeds with this one.
So my first question is: Have you seen this before?
A. No, not that I've seen. It doesn't look familiar, but maybe, potentially, and -- I don't know. It doesn't ring a bell.
MS. JENSEN: Okay. I'd like to take five minutes just to consult with Mr. McCraney. So if we could go off the record briefly, then I think we're just about done.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Going off the record. The time is 5:14.
(A recess was taken from 5:14 p.m. to 5:21 p.m.)
THE VIDEOGRAPHER: Going back on the record. The time is 5:21.
MS. JENSEN: Mr. Kunsky, thank you for your time. I have no further questions at this time.
MR. TROUT: I have no questions.
THE VIDEOGRAPHER: Okay. This concludes the video deposition of Jake Kunsky. Going off the record. The time is 5:21.
(The deposition concluded at 5:21 p.m.)
* * *
(Signature was requested.)



REPORTER'S CERTIFICATE

STATE OF IDAHO )
) ss.
COUNTY OF ADA )

I, REBECCA MARTIN, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 22nd day of July, 2024.

Rebecca Martin

REBECCA MARTIN
RPR and Notary
Public in and for the
State of Idaho

My Commission Expires: 08-27-2024