IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, )
INCORPORATED, an Idaho ) Case No. 1:18-CV-00035-CWD
corporation, )
Plaintiff, )
vs. )
SMITH & WESSON, CORP., a )
Delaware corporation; and )
AMERICAN OUTDOOR BRANDS )
CORPORATION, a Massachusetts )
corporation, )
Defendants. )
__________________________________)

VIDEOTAPED 30(b)(6) DEPOSITION OF GEMINI TECHNOLOGIES,

TESTIMONY OF RONALD JOHN MARTINEZ

TAKEN MAY 28, 2024

REPORTED BY:
ANDREA L. CHECK, CSR No. 748, RPR, CRR
Notary Public





Exhibit E

THE VIDEOTAPED 30(b)(6) DEPOSITION OF GEMINI TECHNOLOGIES, TESTIMONY OF RONALD JOHN MARTINEZ was taken on behalf of the Defendants at the offices of Holland & Hart, LLP, 800 West Main Street, Suite 1750, Boise, Idaho, commencing at 9:20 a.m. on May 28, 2024, before Andrea L. Check, Certified Shorthand Reporter and Notary Public within and for the State of Idaho, in the above-entitled matter.

APPEARANCES:

For the Plaintiff:
Trout Law, PLLC
BY MR. KIM J. TROUT, ESQ.
& MR. STEVEN F. SCHOSSBERGER, ESQ.
3778 North Plantation River Drive, Suite 101
Boise, Idaho 83703
ktrout@trout-law.com
sschossberger@trout-law.com

For the Defendants:
Holland & Hart, LLP
BY MR. ERIK F. STIDHAM, ESQ.
& MR. ZACHERY J. McCRANEY, ESQ.
800 West Main Street, Suite 1750
Boise, Idaho 83701-2527
efstidham@hollandhart.com

Also Present Remotely: Pasha Korneychuk



INDEX


| TESTIMONY OF RONALD JOHN MARTINEZ | PAGE |
|---|---|
| Examination by Mr. Stidham | 6 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Notice of Videotaped Rule 30(b)(6) Deposition of Gemini Technologies, Incorporated | 10 |
| Exhibit 13 | Email from Ron Martinez to Andrew Fulmer and Matt Buckingham, Dated 2-06-17, with Attachments, GT007930 - GT008024 (Not sequential) | 49 |
| Exhibit 14 | Printed PowerPoint Presentation: Executive Review of International Sales Potential, SW137078 - SW137103 | 100 |
| Exhibit 15 | Email Strings, Top Email from Robert Cicero to James Debney, Dated 9-20-17, SW107703 - SW107707 | 159 |
| Exhibit 16 | Plaintiff's First Amended Initial Disclosures | 163 |
| Exhibit 17 | Asset Purchase Agreement | 220 |




EXHIBITS (Continued)


| | | |
|---|---|---|
| Exhibit 18 | Email from Andrew Fulmer to Multiple Recipients, Dated 5-25-17, SW107715 | 265 |
| Exhibit 19 | Email Strings, Top Email from Alexander Crown to Ron Martinez, Dated 4-21-16, SW195726 - SW195727 | 275 |
| Exhibit 20 | Second Amended Complaint and Demand for Jury Trial | 279 |




PROCEEDINGS

VIDEOGRAPHER: Good morning. We are going on the record at 9:20 a.m. on May 28th, 2024. Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Ron Martinez as 30(b)(6) for Gemtech, Inc., taken by counsel for the plaintiff in the matter of Gemtech, Inc., versus Smith & Wesson, Corp., et al., filed in the United States District Court for the District of Idaho, Case No. 118-CV-00035-CWD.

My name is Pasha Korneychuk, representing Veritext, and I am the videographer. The court reporter is Andrea Check from the firm Veritext. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present will now state their appearances

and affiliations for the record, beginning with the noticing attorney.
MR. STIDHAM: Erik Stidham of Holland & Hart on behalf of the defendants.
MR. McCRANEY: Zach McCraney of Holland & Hart on behalf of the defendants.
MR. TROUT: Kim Trout of Trout Law on behalf of the plaintiff.
VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness and then counsel may proceed.
COURT REPORTER: Okay. Will you raise your right hand, please.
THE WITNESS: Yes.

RONALD JOHN MARTINEZ,
first duly sworn to tell the truth relating to said cause, testified as follows:

EXAMINATION
QUESTIONS BY MR. STIDHAM:
Q. Good morning, Mr. Martinez.
A. Good morning.
Q. My name is Erik Stidham, and I represent the defendants in this case.

Page 6

Mr. Martinez, would you state your full name for the record.
A. Ronald J. Martinez, or John is the middle name.
Q. And what was the year of your birth, Mr. Martinez?
A. 1966.
Q. Thank you. And where do you currently reside?
A. In Eagle, Idaho.
Q. Mr. Martinez, have you ever had your deposition taken before?
A. Once.
Q. And can you give me just the general context of that?
A. It was just general -- it was a long time ago, ten years ago.
Q. What did it relate to?
A. It was a discussion within the company, so...
Q. So you had a -- was there a lawsuit involved?
A. Yes.
Q. And were you a party to that lawsuit?
A. Yes. I would guess I was, yes.
Q. Okay. Were you a plaintiff or a defendant?
A. Plaintiff.
Q. What was the lawsuit about?

Page 7

A. Discussion of employment.
Q. When you say "discussion," did you -- just so I'm clear, as the plaintiff were you asserting legal claims against your employer?
A. Yes, sir.
Q. And which employer was that?
A. It was HSBC.
Q. And what was the nature of your allegations?
A. I had left the company, and they owed some money.
Q. What did they owe money for?
MR. TROUT: I'm going to object to the line of questioning. It's far outside of the 30(b)(6) notice for which Mr. Martinez is appearing.
MR. STIDHAM: Mr. Trout, that's fair. I was just trying to get some background. But I would ask, Mr. Trout, if you'd just object to form in the future.
Q. (BY MR. STIDHAM) But we'll get some more background on that when we take your individual deposition. Okay?
But, anyway, you've had your deposition taken at least once; is that fair?
A. Yes, sir.
Q. Okay. Did you have a chance to talk with your attorneys regarding deposition procedures prior to this

Page 8

deposition here today?
A. Yes.
Q. And did you meet with your attorneys to prepare for this deposition?
A. Yes.
Q. And I don't want to ask about the substance of those conversations. Okay? So I'm not asking that.
But who did you meet with to prepare for your deposition here today?
A. My attorneys.
Q. And who is that, specifically?
A. Kim Trout and Steve.
Q. And how long did you meet with them to prepare for your deposition?
A. A few hours. I don't recall the exact amount of time.
Q. No, an estimate is fine, sir; that's all I'm looking for.
A. A few hours.
Q. Okay. And when did that take place?
A. Last week.
Q. And did you do anything else to prepare for your deposition here today?
A. Yeah. I read the second amended complaint, looked that over, looked over the notes here that you

Page 9

forward?
A. Yeah. That would, yes.
Q. Because the process didn't go forward; correct?
A. No, Smith & Wesson stopped it.
Q. Okay. And how did Smith & Wesson stop it?
A. They stopped the product from being shipped and the freight forwarder, and they canceled the Gemtech licenses.
Q. Okay. And did that cause a delay?
A. Oh, absolutely.
Q. How long of a delay was needed in order to lose the opportunity?
A. Well, I know they didn't ship it, and I was gone; they had fired me. So I don't know, but it was a travesty, and it was six to eight months to get us to that process, a long process to get us to the next stage. And when you cancel a license, it takes "X" months to get another license, and then almost, in a sense, you're restarting the whole process.
Q. So do you have an -- you say that the license was canceled?
A. Yes, sir.
Q. What is that understanding based on?
A. That's what I was told.

Page 122

Q. By who?
A. By Daniel Nakashima and Smith & Wesson, that they --
Q. Who at Smith & Wesson, sir?
A. I don't remember the person's name. I want to say Hope. They stopped the license -- the Gemtech license, they canceled it, without my knowledge or consultation.
Q. That was after you had left the company?
A. No.
Q. Okay. So while you were still with the company the license was canceled?
A. Yes. I have no idea why they did it. Nobody talked to me. They just went ahead and did it.
Q. So is it fair to say you don't know what the reason was for, as you say, canceling the license?
A. No.
Q. Have you ever asked anyone why the -- at Smith & Wesson why the license was canceled, to your understanding?
A. I think the response they told Daniel was they just did it. I could not get an answer.
Q. Is that what Daniel told you?
A. Yeah. "We did it," and "deal with it," I think is what the answer -- was what he had in an email.

Page 123

Q. So I just want to make sure I'm understanding. Are you talking about a conversation with Mr. Nakashima, or are you talking about reviewing an email?
A. A combination of both, if I remember right.
Q. What's the conversation you had with Mr. Nakashima?
A. We were upset that they canceled the license without my knowledge or approval. That took six to eight months to go through that process. It is a long process for a sale. And it was a huge opportunity for us.
Q. So here I just want to make sure I'm understanding what you're listing here to, "Previous licenses: 050625117 was completed in the last 3 months."
Do you know what that refers to?
A. No, sir.
Q. Do you know what "050630259" relates to?
A. No, but I'm sure those licenses -- most of the licenses are adopted for -- again, through the DSP process from the end user. The military, law enforcement going to the country after they put their PO and approval for the country to get approval to go through our U.S. state department for approval, after that to the ATF. So my guess is that license had

Page 124

certain products and pricing that were approved for this particular project for Saudi Arabia.
Q. Okay. Going -- one more question. You say this was a sale to the Royal Guard in Saudi Arabia?
A. The Special Security Forces.
Q. Special Security Forces?
A. Yeah. The Royal Guard, I think, was UAE, but okay.
Q. Looking at the opportunity, 25,000 machine guns. And I apologize, maybe I misunderstood, but I don't think I got an answer to this question: Did -- where does that number 25,000 machine guns, where does that number come from for the size of the opportunity?
A. From Saudi Arabia.
Q. You think -- is there something in writing that Saudi Arabia provided saying we're looking for this?
A. I don't know. And I'm sure MRKAS and/or Jason Pace, if that's what they said they needed, that's what they needed.
Q. Okay. Take a look at the next slide, I think, kind of as far as the next country on the slide.
A. Sure.
Q. Bahrain.
A. Uh-huh.

Page 125

their fraud" that I found out later?
A. Uh-huh.
Q. What are you referring to there?
A. There was, I guess, an FBI -- something overseas, that there was a committing of international sales -- some of the Smith & Wesson people did some sales, and they were fined a couple million dollars and were under strict restrictions with sales of overseas. I had no idea about that.
Q. So did GT conduct any -- do any due diligence of their own relating to Smith & Wesson before signing the APA?
A. We did -- we did a SWOT analysis: Strength, Weaknesses, Opportunities, Threats. Went back and visited Smith & Wesson, talked to them on the phone, met them in person, asked them questions.
Q. Did you look at any -- did GT look at any SEC filings?
A. We did not look back -- we did not see that, no.
Q. And my understanding is you contend you didn't see anything relating to the -- to fines relating to international transactions, but my question is: Did GT review any SEC filings prior to entering the APA?
A. Not that I can recall.



Q. Why not?
A. I trusted them. They came to Gemtech, and they wanted to purchase Gemtech, and we asked them questions, we visited, we did analysis. They knew international was big for our potential sales growth. And they even said, "We're going to help you grow internationally." I think it was in my employment agreement, actually, if I remember right.
Q. So I just want to make sure I understand. You didn't -- GT did not look at any SEC filings because they contend that they trusted Smith & Wesson?
A. I trusted the representatives that were talking to me, and then I found out I was being misled later, obviously.
Q. So what is your understanding of -- what is GT's understanding of what, if any, impact the issue of Smith & Wesson paying some fines related to international transactions in prior years had on the GT brand once it was acquired?
MR. TROUT: Object to the form of the question.
THE WITNESS: Well, it basically steamrolled into the international sales. From my understanding, those fines and the problems they had led to the BEC committee on all international sales and restrictions.



So even though Gemtech abides by ITAR and the U.S. laws and regulations for our sales and through ATF, everything was legal, they went through the right process, I did not under -- did not know there was a whole other layer from Smith & Wesson that a committee would go through and decide whether or not we were going to sell to a country or not. Even though the U.S. government deemed it legal, that committee may not. I did not know that.
Q. (BY MR. STIDHAM) So what did the -- well, what does GT contend that the U.S. government deemed legal that the -- as it relates to GT that BEC -- the BEC did not?
MR. TROUT: Object to the form.
THE WITNESS: It depends on the country we were working with. We go through the process of the DSP-83 in which the military or law enforcement would do a PO to the government or consignee; that government would go forward, put the PO in to the U.S. state department; the U.S. state department would approve or not approve and go in to the ATF; the ATF would approve or not approve, and then go forward to us.
So a country that we may be working with, let's say the UAE or Saudi Arabia, that we found and went through the process that was legal to sell



suppressors overseas, that committee may say, "No, you cannot."
Q. (BY MR. STIDHAM) I guess I just want to make sure I understand this.
So is GT contending that GT believed that it would have -- strike that.
Is GT contending that they understood that the Gemtech executive team would have control over international compliance after the brand was acquired by Smith & Wesson?
MR. TROUT: Object to the form.
THE WITNESS: Repeat that again.
MR. STIDHAM: Sure.
THE WITNESS: I want to make sure I understand this.
Q. (BY MR. STIDHAM) Yeah. And let me --
A. Please, yes.
Q. Again, don't hesitate to tell me if you need to clarify it.
A. Yeah, please.
Q. So I'm trying to understand, kind of, what -- well, let me just ask the question: So did the GT executive team, yourself included, believe that the GT executive team would continue to control compliance for the -- relating to the sale of Gemtech -- the Gemtech







Exhibit E

brand products after the asset purchase agreement?
A. Yes.
MR. TROUT: Object to the form.
THE WITNESS: Yes.
Q. (BY MR. STIDHAM) What was that based on?
A. That we would continue our success, Gemtech would continue its success moving forward and have support with Smith & Wesson in different areas. And the strength, weaknesses, opportunities, and threats -- the strength that they had was the dealers network and then extra manufacturing. So, obviously, that played a part. But we were told that as a unit we would continue to keep moving forward.
Q. All right. So I just want to focus in on this component, though, the compliance.
Does GT contend that it was told by anybody at Smith & Wesson that after the asset purchase agreement the GT brand executive team would control compliance?
MR. TROUT: The same objection, object to the form.
THE WITNESS: We would move forward with how we were moving forward in the past.
Q. (BY MR. STIDHAM) Who told you that you would move -- and I understand -- here's what I'm trying to understand, sir. I believe you said you were told "we



would move forward," something like that, as you had in the past. I'm talking specifically about compliance.
Was there anything represented to the GT executive team relating to how compliance would be handled after the asset purchase agreement?
MR. TROUT: The same objection, object to the form.
THE WITNESS: They told me we would continue our existing operations by -- I was told that by Matt Buckingham. And in regards to, specifically, compliance, there was not -- there was no specific conversation in regards to compliance because Gemtech was abiding by ATF regulations and always passed every ATF inspection, as well as international compliances we had no problem with, everything was always compliant.
Q. (BY MR. STIDHAM) Okay.
A. And suppressors were new to Smith & Wesson. We were the experts in suppressors.
Q. Okay. Again, I'm trying to understand what was either represented or, I think -- I'm just trying to understand what you've listed here.
So you talked about the BEC. If I understand it correctly, you contend that it should have been disclosed that there would be a business ethics -- well, strike that.



What are you contending should have been disclosed -- I'm sorry -- on compliance? I'm a little confused.
MR. TROUT: I'm going to object to the form. All asked and answered.
THE WITNESS: So what is the question?
Q. (BY MR. STIDHAM) Let me -- well --
A. Help me out with the question; I'll see if I can answer it.
Q. Yeah, sure, I'll try to ask it better.
So was it GT's understanding -- well, strike that.
Did -- is GT contending that Smith & Wesson did anything to convey that GT, the former employees of GT, once they moved to Smith & Wesson, would have complete control over compliance and no oversight from the larger Smith & Wesson entity?
MR. TROUT: Object to the form.
THE WITNESS: Those specifics were not talked about because they did not have suppressors, and Gemtech had the expert team, the tribal knowledge with suppressors.
Q. (BY MR. STIDHAM) And the expert team was Mr. Nakashima and Mr. Pace?
A. With international it was. With -- and then



also domestic you had Daniel Nakashima. But we also used outside training. And we also had Mark Barnes, an outside consultant and two other attorneys.
Q. I'm sorry, who was the outside consultant?
A. Mark Barnes, an attorney who did international and compliance, and did all kinds of compliance for ATF and suppressors.
Q. And is he with a firm?
A. Yes, sir.
Q. Which firm?
A. I don't know off the top of my head. I don't remember off the top of my head.
Q. Okay. Did you -- did Gemtech believe that it would just continue to use its own outside counsel after the asset purchase agreement, Mr. Barnes?
MR. TROUT: Object to the form.
Q. (BY MR. STIDHAM) Well, strike that.
I understand before the asset purchase GT was using Mr. Barnes to help with international compliance; correct?
A. We only used him if we had a question, if there was a question that was out of the ordinary. We didn't use him all of the time.
Q. Okay.
A. So if there was something -- it was pretty




Exhibit E

REPORTER'S CERTIFICATE

I, ANDREA L. CHECK, CSR No. 748, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 6th day of June, 2024.

Andrea Check

ANDREA L. CHECK, CSR No. 748, RPR, CRR
Notary Public
1109 West Main Street, Suite 220
Boise, Idaho 83702

My Commission expires July 20, 2028.

Page 286

Kim J. Trout
ktrout@trout-law.com

June 7, 2024

RE: Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
5/28/2024, Ronald John Martinez 30(b)(6) (#6706852)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at Calendar-Idaho@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 287

Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ronald John Martinez 30(b)(6) (#6706852)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________

________________________________ _______________
Ronald John Martinez 30(b)(6) Date

Page 288

Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ronald John Martinez 30(b)(6) (#6706852)

ACKNOWLEDGEMENT OF DEPONENT

I, Ronald John Martinez 30(b)(6), do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Ronald John Martinez 30(b)(6) Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

Page 289