IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,
Plaintiff,

vs.

SMITH & WESSON, CORP., a Delaware corporation; and AMERICAN OUTDOOR BRANDS CORPORATION, a Massachusetts corporation,
Defendants.

Case No. 1:18-CV-00035-CWD

VIDEOTAPED DEPOSITION OF RON MARTINEZ

June 3, 2024

Boise, Idaho

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR

VIDEOTAPED DEPOSITION OF RON MARTINEZ

BE IT REMEMBERED that the videotaped deposition of RON MARTINEZ was taken by the Defendants at the law offices of HOLLAND & HART, LLP, located at 800 W. Main Street, Ste. 1750, Boise, Idaho, before Associated Reporting & Video, a Veritext Company, Rebecca Martin, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Monday, the 3rd day of June, 2024, commencing at the hour of 9:00 a.m. in the above-entitled matter.

APPEARANCES:

For the Defendants:
HOLLAND & HART, LLP
By: ERIK F. STIDHAM, Esq.
ZACHERY J. McCRANEY, Esq.
800 W. Main Street, Ste. 1750
Post Office Box 2527
Boise, Idaho 83701-2527
Telephone: (208) 342-5000
Facsimile: (208) 343-8869
efstidham@hollandhart.com
zjmccraney@hollandhart.com

For the Plaintiff:
TROUT LAW, PLLC
By: KIM J. TROUT, Esq.
3778 N. Plantation River Drive, Ste. 101
Boise, Idaho 83703
Telephone: (208) 577-5755
Facsimile: (208) 577-5756
ktrout@trout-law.com

Also Present: Mia Shrosbree, videographer



INDEX

EXAMINATION


| RON MARTINEZ | PAGE |
|---|---|
| By: MR. STIDHAM | 5 |


EXHIBITS


| No. | | Page |
|---|---|---|
| Exhibit 45A | Stock Sale Agreement Gemini Technologies, Incorporated (5 pages) | 87 |
| Exhibit 46A | 08/03/2017 e-mail chain with attachments (10 pages) | 129 |
| Exhibit 47A | 04/19/2017 e-mail with attachment (2 pages) | 177 |
| Exhibit 48 | September 2017 e-mail chain (5 pages) | 218 |
| Exhibit 49 | 01/28/2018 e-mail chain (2 pages) | 270 |
| Exhibit 50 | 01/28/2018 e-mail chain (2 pages) | 270 |
| Exhibit 51 | Complaint (86 pages) | 274 |
| Exhibit 52 | 09/18/2017 e-mail with attachments (28 pages) | 282 |
| Exhibit 53 | Handwritten notes (162 pages) | 305 |


**Exhibits 45A, 46A, and 47A were referred to as Exhibits 45, 46, and 47 in the deposition proceeding.**



P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. Today's date is June 3rd, 2024, and the time is 9:08 a.m.
For the record, this is the videotaped deposition of Ron Martinez, taken by the defendants in the matter of Gemini Technologies Inc. versus Smith & Wesson Corp., et al., Case Number 1:18-CV-00035-CWD, in the United States District Court for the District of Idaho.
The videotaped deposition is being held at the offices of Holland & Hart, whose address is 800 West Main Street, Suite 1750, in Boise, Idaho.
The videotaped deposition is being recorded by Mia Shrosbree and reported by Rebecca Martin of Associated Reporting and Video, a Veritext company.
Will Counsel please state their appearances and any stipulations for the record.
MR. TROUT: Kim Trout from Trout Law on behalf of the plaintiff.
MR. STIDHAM: Erik Stidham of Holland & Hart on behalf of the defendants, and also with me is my colleague, Zack McCraney, of Holland & Hart.



THE VIDEOGRAPHER: With that, will the court reporter please swear the witness.

RON MARTINEZ,

a witness having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. STIDHAM:
Q. Thank you, Mr. Martinez.
As you know from our 30(b)(6) deposition, I'm Erik Stidham. I represent the plaintiffs -- excuse me, the defendants in this case.
Same rules as last time, Mr. Martinez. If I ask you a question and for any reason you don't understand it, please ask me to rephrase.
Is that fair?
A. Yes, sir.
Q. And if I ask you a question and you respond, I'll assume that you understood the question.
Is that fair?
A. Yes.
MR. TROUT: I object to the form.

Before the closing on the APA, were you responsible for authorizing efforts to pursue international sales?
A. Yes. Before the closing of August, yes.
Q. Okay.
A. I was told to continue to do what we were doing.
Q. Okay. And did you apprise folks at Smith & Wesson regarding what travel, and specifically what international opportunities, were being pursued prior to the August 30th BEC presentation?
A. Yes.
Q. Okay.
A. And they had that list early on of the countries we were pursuing back in -- I think we did a list in February or March. I can't remember. Then, yeah, they knew.
Q. Okay. When was the first time that you interacted with anyone at compliance at Smith & Wesson?
MR. TROUT: Object to the form.
THE WITNESS: I would have to look at my notes. I would have to look at my notes to give you --

Page 166

Q. (BY MR. STIDHAM) I meant --
A. (Inaudible crosstalk.)
Q. Excuse me.
I meant after signing of the APA. After the signing of the APA --
A. In August, closing of the company.
Q. Yeah.
When did you first --
A. After the closing.
Q. After the closing is the first time you interacted with compliance at Smith & Wesson; is that correct?
A. I don't know if it was the first time. I have to look at my notes. But as far as I was concerned, that's when we really started engaging compliance, was after closing in August.
Q. Okay. Thank you.
So what do you recall about -- well, post-closing, what do you recall about the first -- as being the first significant interaction between Gemtech folks and Smith & Wesson compliance?
MR. TROUT: Object to the form.
THE WITNESS: They had no idea how to process suppressors. They didn't understand the processes of suppressors and the checks and

Page 167

balances with them.
Q. (BY MR. STIDHAM) Okay. What do you mean when you say, "They had no idea how to process suppressors?"
Are you talking about for international sales?
A. I'm saying for all suppressor sales.
Q. Okay. All right. I just want to understand what you're saying.
What do you mean when you say, "They didn't understand how to process suppressors"?
A. They never sold suppressors, and there's -- it's a long process of checks and balances, of authorizations, sign-offs, ATF, different forms, Form 3, Form 4, Form 5s. They did not know that. They worked in the firearms industry, which is completely different guns than actual suppressors. It was the non-NFA item.
Q. Okay. What, if any, facts are you relying upon for the statement that Smith & Wesson didn't understand how to process suppressors?
A. I'm sure they're detailed in my notes, but I remember we were talking about transferring to law enforcement, and they didn't know what we were talking about. I think it was 4 and 5s at the

Page 168

time. There was things that came up and my team would say, "This Hope is telling us no and she has no clue."
That's from my team. And I have notes on that. I'm like, "What do you mean? Why are we being stopped on this?"
So there was all kinds of different things that were going on that she was unaware of. She didn't know the processes of suppressors.
Q. So what is it -- I'm trying to understand what you're pointing to.
It seems like you're talking about a particular instance, and you said that...
You were talking about "transferring to law enforcement, and they didn't know what you were talking about."
Tell me what you meant by that statement.
A. Suppressors have different forms, process, Form 3s, Form 4s, Form 5s, and there was something going on on the sales side that we were transferring to. I think it was Spokane. I'm not sure what law enforcement it was. A law enforcement agency somewhere. I don't know which one. I can't recall which one. We did a lot.

Page 169

And she stepped in and told the team, "You can't do it."
Our team was like, "What are you talking about?"
And she didn't know. So I don't -- again, it would be in my notes, the details, but that was one example I remember off the top of my head.
Q. Okay. And what, if any, steps did you undertake or direct your folks at Gemtech to undertake to get any EUCs or licenses for international transactions transferred from Gemtech to Smith & Wesson?
MR. TROUT: Object to the form.
THE WITNESS: At the time, there was no reason to.
Q. (BY MR. STIDHAM) I'm talking post-closing.
A. Yeah. There was no reason to because we already signed the EUCs and the DPS 83s in the licenses overseas, and that's a six- to eight-month process going through the State Department, ATF. There's -- and, obviously, international and signing off -- it all depends on the country, and the law enforcement or military signing off on it.



So those are lengthy processes, but there was no discussion post-closing of doing anything like that, especially licenses. The licenses were still fine.
Q. Did you get any counsel? I mean, what was your authority to -- what was your authority for the belief that you, now a Smith & Wesson employee working for Smith & Wesson, could sell products that are now Smith & Wesson products pursuant to EUCs and licenses that were issued for a different company?
MR. TROUT: Object to the form.
THE WITNESS: We were -- I was told -- we were told before that those licenses -- they knew what projects we had and what were in process. They never came back to me and said, "Oh, Ron, we're going to have to change all these," because you can keep -- my understanding, you can keep the same licenses, and they knew which ones we had in place. They knew what we were doing before we closed. They knew what we were doing with those different countries.
I was actually in one of the countries on the phone talking, I think, to Matt Buckingham when I was in Abu Dhabi for UAE.



Q. (BY MR. STIDHAM) But here's my question, sir, is: When you say -- I want to make sure I'm understanding when you say "they knew" and things general like that.
Let me first understand this: What, if any, authority can you point me to that authorizes Smith & Wesson to sell Smith & Wesson suppressors using a Gemtech license?
MR. TROUT: Object to the form.
THE WITNESS: I'm not an attorney, and I don't know if we had to change. I was understanding they knew that we had spent six to eight months to get these licenses approved, and they were shipping no problem with any type of -- keeping licenses until they shipped, and then when you do another DSP 83, at that point, they would get their licenses, because our licenses were good, and we were part of Smith & Wesson. Gemtech was a part of Smith & Wesson. We were a division of the -- or a department -- I'm not sure the language they use, of the Smith & Wesson firearms.
Q. (BY MR. STIDHAM) My question, sir, was: Do you have any authority, legal authority, or understanding of a statute, anything like that, that you can point me to that you believe



authorizes -- authorized you, as a Smith & Wesson employee, to sell Smith & Wesson suppressors using a Gemtech -- Gemini Technology, Gemtech license?
MR. TROUT: Object to the form.
THE WITNESS: When I sold Gemtech, they knew the things we were doing overseas. They told me to continue to do what we were doing overseas. We had these projects well in advance, six to eight months prior to almost a year prior, that was part of the projections, projections of the earnout and everything else. They knew that.
I was never -- Matt Buckingham told me, "Continue to run Gemtech as Gemtech."
And Gemtech brand -- matter of fact, from the SWOT analysis, you'll find in the strengths department that Gemtech's international brand name is extremely strong, so it wouldn't have been switched to Smith & Wesson, it would have continued as Gemtech.
Q. (BY MR. STIDHAM) You understood, did you not, after closing that you were no longer an employee of the Gemtech corporate entity?
You understood that, correct?
A. Yes, sir.
Q. Let me just ask it maybe a little



Exhibit F

Q. So why is it that you believe it's within the law to use a license to a different corporation -- a license issued to a different corporation and sell -- and then sell on behalf of -- sell on behalf of a different corporation?
MR. TROUT: Object to the form of the question.
Q. (BY MR. STIDHAM) Because that's what was occurring, correct?
MR. TROUT: Same objection.
THE WITNESS: Gemtech was a part of Smith & Wesson, so licenses were a part of Smith & Wesson. So they knew, we knew, when they purchased Gemtech, that all these things came with it, with the licensing. So I don't know at the time that it was necessary for them to stop the licensing. I don't think that -- I don't think that was necessary for them to do that because there were projects being shipped and time was of the essence. They knew about those. I don't know why they did what they did. They didn't talk with me. We didn't get Mark Barnes, the attorney that does internationals, involved. They just did it. In fact, I think she was a consultant at the time too. So I don't know.
Q. (BY MR. STIDHAM) All right. This is

Page 226

why -- I'm not trying to make you look like a moron, sir, but you keep saying Smith & Wesson -- excuse me, Gemtech was a part of Smith & Wesson.
What do you mean when you say that? The assets were purchased, not the entity, correct?
A. No, we were a part of Smith & Wesson. Gemtech became a part of Smith & Wesson.
Q. The assets got purchased by Smith & Wesson; isn't that correct?
MR. TROUT: I'm going to object to the form --
Q. (BY MR. STIDHAM) Is that correct?
MR. TROUT: -- it's been asked and answered. Please.
MR. STIDHAM: Come on, Kim.
MR. TROUT: Please don't badger the witness.
MR. STIDHAM: I'm not badgering the witness.
Q. (BY MR. STIDHAM) I just want to understand -- I want to make sure I understand.
You understand the difference between an asset purchase agreement and a merger, correct?
MR. TROUT: Objection to the form of the question.
THE WITNESS: Yes, sir, I do.
Q. (BY MR. STIDHAM) Okay. Did you speak

Page 227

with Ms. Hall-Cloutier or anyone else about this process that was being followed of submitting a new application for these -- the UAE, Bahrain, and Saudi opportunities?
A. I talked to Daniel Nakashima. I said, "What is going on here?" Because he talked to Patricia. I said, "Could you tell me what she said?"
And I remember what he said. "She said, 'We did it. Deal with it.'"
And I said, "Did she explain why?"
He goes, "No. Her answer was, 'We did it. Deal with it.'"
Q. What was your role again at this time?
A. It was general manager for Gemtech.
Q. And did you think that these opportunities were important?
A. Oh, absolutely.
Q. Then why didn't you call somebody rather than just talking to your subordinate to address the issue?
MR. TROUT: Object to the form.
THE WITNESS: I more -- more than likely I did. I probably picked up the phone and called Rob. I don't remember. I have to look at my

Page 228

notes.
But my first thing was to go to him, my compliance, and say, "What is going on here," because I was unaware of this and I didn't think it was necessary, but I didn't know.
Q. (BY MR. STIDHAM) But you didn't know, correct?
A. No, I didn't know.
Q. Right.
As you sit here today, you still don't know whether that -- what Ms. Cloutier has laid out in her e-mail of September 11, 2017, regarding resubmittal or converting the licenses is necessary?
MR. TROUT: Object to the form.
THE WITNESS: I don't, but I know it did not get processed on the 13th.
Q. (BY MR. STIDHAM) Okay.
A. That, I do know.
Q. Take a look up at the e-mail above that, September 15, 2017.
Do you see that?
A. Yes.
Q. And that's to Mr. Nakashima from Ms. Hall-Cloutier. She states: The Saudi and

Page 229

Bahrain licenses have been submitted.
You see that?
A. Yes, sir.
Q. Okay. She also says she's e-mailed both license officers.
Do you see that statement?
A. Uh-huh.
Q. Anything you're critical about there with regard to the steps she was taking?
MR. TROUT: Object to the form.
THE WITNESS: I don't know if it was necessary to do what she did because she stopped the process. I'm not sure if those licenses were ever completed. I don't know -- obviously, the projects never went forward. They were stopped. Were they stopped because they never got the product? Were they stopped because the licenses had to go through the process again? Were they stopped because I was fired, Jason Pace was fired, and basically the entire Gemtech team was dismantled? I don't know.
Q. (BY MR. STIDHAM) So is it fair to say you don't know whether or not any of these issues that you've laid out caused Smith & Wesson to not be able to secure the Saudi or Bahrain opportunity?

Page 230

MR. TROUT: Object to the form.
THE WITNESS: Two things: One, I would never have sold Gemtech had I known what Smith & Wesson was going to do --
Q. (BY MR. STIDHAM) That's not my question, sir.
A. On this question here, you said that -- Bahrain, I do know, from what Jason Pace said, that those projects went to SIG, and SIG got those projects. So Gemtech did not get those projects.
Q. So you've got some hearsay that SIG got the projects.
You don't know what the contract is that SIG got; is that fair -- you don't know what the terms of the contract were; is that fair?
A. No, sir.
Q. Do you have any source of information that SIG got the contract, other than what Mr. Pace said?
A. I heard that at the SHOT Show from people that said they got the contract --
(Clarification by the court reporter.)
THE WITNESS: SHOT show.
Q. (BY MR. STIDHAM) Is it fair to say you don't know whether SIG would have got that contract

Page 231

even if Gemtech would have pursued it?
A. We were specified --
Q. How do you know that they didn't have a specification for SIG?
A. Because they were talking to us and they told us they were talking to us.
Q. Who is "they"?
A. Saudi Arabia. I was over --
Q. The country of Saudi Arabia was talking to you.
Who was talking to you?
A. When we were over at IDEX, okay, and UAE, we met with lot of people. So when they look at a product, they look at a product for the sound decibel, they look at the length, the weight. All those factors go into what they specified for their rifles. And at the time, Gemtech was the specified product they wanted on their rifles, was Gemtech. Nobody else, it was Gemtech.
Q. How do you know there wasn't a similar specification in place for SIG products?
A. There wasn't. They told us it was Gemtech.
Q. Who is it that told you?
A. The people involved from Saudi Arabia.

Page 232

Q. Who are the people involved from Saudi Arabia that told you?
A. I can't remember their names at the time.
Q. Do you know whether they had any authority? Do you know whether they were just saying stuff that they didn't know for sure? I mean, you don't know who they were. Who were they?
A. I don't remember their names.
MR. TROUT: I'm going to object to the form of the question. It's been asked and answered.
Q. (BY MR. STIDHAM) So what was their authority?
MR. TROUT: Object to the form.
Q. (BY MR. STIDHAM) Do you know what the authority of these people were that were talking to you?
MR. TROUT: Same objection.
THE WITNESS: Authorities enough to put in a PO to move forward in the process for the DSP for the end users. That, I do know.
Q. (BY MR. STIDHAM) Do you know whether or not a PO was put in place for SIG to proceed concurrently?
A. They told us at the time we were the

Page 233

Mr. Cicero asked you not to include some discussion regarding licensing in the presentation and he asked you that before the presentation, correct?
A. Yes, sir.
Q. Okay. You didn't follow that direction, correct?
A. I told him I was going to present that --
MR. TROUT: I'm going to object to the form.
THE WITNESS: I told him I was going to present that to educate the rest of the team. He disagreed with that. I said, "Do you have a problem with that?"
And he -- he said, "You're presenting."
I said "Okay."
Q. Okay.
A. So I presented. He was not -- my boss was James Debney.
Q. (BY MR. STIDHAM) So you didn't consider Mr. Cicero to be your boss regarding compliance issues?
A. No --
MR. TROUT: Object to the form.
THE WITNESS: But it was a generalized presentation to the whole team --

Page 290

MR. STIDHAM: Okay.
THE WITNESS: -- and James Debney knew what I was presenting. He said it was good to present everything to the team, and that's exactly what I did.
Q. (BY MR. STIDHAM) Okay. Anybody in addition to Mr. Cicero that gave you feedback, suggestions, regarding the BEC proposal beforehand that you didn't follow?
A. You keep saying I "didn't follow."
No.
Q. Okay.
A. I mean -- no. I mean, you may -- Hope may have been in a chain with him. I don't remember. But no.
Q. Did anybody give you any feedback that the way you were presenting business opportunities and potential market lacked credibility and reflected poorly on you?
A. No.
MR. TROUT: Object to the form.
THE WITNESS: No.
Q. (BY MR. STIDHAM) Okay. Did you authorize Mr. Pace to go on a month-long trip to Turkey and other high-risk countries, despite being

Page 291

apprised before the closing of Gemtech that you would need to follow -- the Gemtech brand would need to follow Smith & Wesson's very specific approval process for international activity?
MR. TROUT: Object to the form.
THE WITNESS: I was never told about a specific approval process from Smith & Wesson and BEC before I closed Gemtech. That was all a complete surprise to me after I closed. I would have never sold Gemtech.
And if I approved travel, most of that travel is done way in advance, so more than likely I approved that travel for Jason way in advance, because I know we were -- Turkey was one of the projects we were moving forward with, and we met with some people from Turkey at IDEX.
Q. (BY MR. STIDHAM) So did you understand before you signed the asset purchase agreement that there was a compliance department at Smith & Wesson?
MR. TROUT: Object to the form.
THE WITNESS: Compliance department for firearms, not for suppressors.
Q. (BY MR. STIDHAM) Did you understand that there was an in-house legal team at Smith & Wesson

Page 292

before you signed the APA?
A. Well, I knew there was a legal team, obviously. They were involved with some of the stuff.
Q. Did anybody ever tell you that you would somehow operate the Gemtech brand outside Smith & Wesson's compliance group and outside of their in-house legal team?
MR. TROUT: Object to the form.
THE WITNESS: I was told to take Gemtech, move it forward with what we were doing, is what I was told before I signed the APA. They said, "We will keep the team intact and we'll move forward, and there's a big upside for the earnout, and there was a model made, it's a perfect fit."
They told me that, and my understanding from them, from Matt Buckingham and from Andy Fulmer and James Debney, at -- the discussions that I was the secret sauce, the team, "We're going to keep this intact, we're going to move forward, keep doing what you're doing."
Q. (BY MR. STIDHAM) My question was: Did anybody tell you that you would have authority to operate outside of the in-house compliance and legal group at Smith & Wesson?

Page 293

MR. TROUT: Object to the form.
THE WITNESS: No one told me specifically, "You're to only operate -- You can only operate outside" -- nobody mentioned, "You have to go to compliance and legal team for everything."
I was told to run the business and move the business forward in a very positive manner to growth.
Nobody told me from Smith & Wesson, Matt Buckingham or James Debney, for that matter, who was my boss, and Andy Fulmer that I couldn't do anything without legal and compliance. We were all within the legal -- everything we did was legal.
Q. (BY MR. STIDHAM) Well, I think there's a dispute about that that will be handled.
A. Really? Okay.
Q. So, Mr. Martinez, are you -- I just want to make sure I'm understanding this.
Are you contending that you believed that you would be independent of in-house legal and compliance once you joined Smith & Wesson?
MR. TROUT: Object to the form. It's been asked and answered.
Can we please move on, sir.
THE WITNESS: That's not what I said.



Q. (BY MR. STIDHAM) Well, what did you say, then?
A. You can probably read back what I said.
Q. Okay. So do you think -- if you were in management's position and somebody joined the company, the acquisition of a small $10 million company, and they created compliance risk for the overall institution, and the person running that group seemed defiant of the compliance and legal group, would that cause you concern?
MR. TROUT: Object to the form. It's an improper hypothetical.
THE WITNESS: I was not defiant of them. My boss was James Debney and Matt Buckingham, and I -- they asked me -- nobody sat me down and said, "Ron, you cannot move forward without legal's approval and without compliance approval."
Again, if I would have known that in advance, I would never have sold Gemtech to --
Q. (BY MR. STIDHAM) Do you have any understanding as to what type of legal risk you and Mr. Pace would be creating for the Smith & Wesson organization while you were Smith & Wesson employees if you violated international -- ITAR or any other regulations?



MR. TROUT: Object to the form.
THE WITNESS: We didn't violate any ITAR regulations. Let me please finish my answer here --
Q. (BY MR. STIDHAM) Well, that's not my question.
Do you understand what type of a risk --
MR. TROUT: Excuse me.
Q. (BY MR. STIDHAM) -- would be imposed --
MR. STIDHAM: No.
Q. (BY MR. STIDHAM) Do you understand what type of risk would be posed for Smith & Wesson if a Gemtech employee violated ITAR or any of the other regulations? Do you know what kind of risk that poses?
MR. TROUT: I'm going to object to the form of the question. It's been asked and answered.
Q. (BY MR. STIDHAM) Go ahead --
MR. STIDHAM: I'm sorry, Kim.
MR. TROUT: With all due respect, Counsel, you're badgering Mr. Martinez, and I'd ask you to discontinue, please.
Q. (BY MR. STIDHAM) Do you have any understanding -- I'll read it again.
Mr. Trout's objection obviously stands.



Do you have any understanding as to what type of legal risk you or Mr. Pace would be creating for Smith & Wesson if you were acting in violation of ITAR or any other federal laws?
A. Gemtech was never --
MR. TROUT: I'm going to object to the form.
THE WITNESS: Gemtech was never acting in anything illegal overseas. We did everything by the book and legal with international. I did not know Smith & Wesson had a problem legally with the FBI. Whatever they had years prior, I was never informed of that, nor was I informed about the BEC before I sold Gemtech. I would never have sold Gemtech --
Q. (BY MR. STIDHAM) Please answer the question --
A. I just did.
Q. -- do you have any understanding as to the type of risk -- well, let me ask it this way: Do you have any understanding as to the type of risk that a corporation faces if it violates ITAR or other federal regulations?
MR. TROUT: Object to the form.
THE WITNESS: We dealt with that at Gemtech for overseas --






Exhibit F

Q. (BY MR. STIDHAM) Do you have any understanding as to the risks, the legal consequences --
MR. TROUT: Would you please allow the witness to finish his response, Counsel?
MR. STIDHAM: He's not responding, Kim.
MR. TROUT: Well, you and I can agree to disagree. Allow the man to talk --
MR. STIDHAM: We can. I'll start a new question. Strike that question. I'll ask a new one.
Q. (BY MR. STIDHAM) Do you have any understanding as to what type of penalties or legal consequences a company faces if it violates ITAR or any other laws relating to the international sale of firearms?
MR. TROUT: Object to the form.
THE WITNESS: I don't know what the penalties are, but I do know we did everything legally with ITAR, with Gemtech, and we knew that. We went right by the book. The DPS 83, US State Department approvals, the ATF approvals, we did things by the book at Gemtech, so I wouldn't -- that didn't cross my mind because we did everything legally. So I don't know what the penalties would



have been because we did things legally.
Now, in regards to them having their problems --
Q. (BY MR. STIDHAM) Sir, that's not my question --
A. -- I didn't know about.
Q. That's not my question.
My question is your understanding as a CEO in the industry of the risks posed.
Do you understand that a company could be debarred based on violations of ITAR?
MR. TROUT: Object to the form.
THE WITNESS: We made sure we were in compliance and I didn't know --
Q. (BY MR. STIDHAM) I'm asking whether you understand the risks, sir.
A. -- and I didn't know --
Q. Sir, we can -- somebody else will decide whether or not you were in violation.
My question is: Do you understand the consequences that are faced by Smith & Wesson if they hire -- if they allowed you or Mr. Pace to act in violation of federal regulations in pursuing the opportunities that you laid out in the BEC -- to the BEC?



MR. TROUT: Object to the form --
THE WITNESS: We were not acting in violation --
MR. TROUT: Object to the form --
Q. (BY MR. STIDHAM) You understand --
THE REPORTER: I can't get three people at once.
MR. STIDHAM: Sorry. That's my fault.
THE REPORTER: This is a problem.
MR. STIDHAM: That's my fault.
THE WITNESS: I tried to answer him.
Q. (BY MR. STIDHAM) Come on, Mr. Martinez.
Do you understand what consequences are?
A. Oh, boy, here we go again.
Q. I know --
MR. TROUT: I'm going to object to the form --
MR. STIDHAM: No, Kim, he's not going to answer it.
MR. TROUT: -- and I'm going to instruct the witness not to answer. You're badgering him --
MR. STIDHAM: I'm not badgering him.
MR. TROUT: -- and this has gone beyond the pale. This is not proper conduct --
MR. STIDHAM: Kim, tell me when you're done.



MR. TROUT: -- under Rule 83 of the local Rules of Civil Procedure.
MR. STIDHAM: Well, Kim, your strategy of not helping to get your witness frame and respond to questions is --
MR. TROUT: You can't say --
MR. STIDHAM: -- whatever your approach is.
MR. TROUT: I'm sorry, you can't call anything I say a strategy because that's a falsehood, and you are very, very good at spreading falsehoods.
MR. STIDHAM: Kim, I'm sick of that and I'm sick of these false accusations from you.
MR. TROUT: Well, I'm sick of you making false accusations.
MR. STIDHAM: Okay.
MR. TROUT: So if you want to conduct yourself civilly, ask a question, do not repeat it, allow the gentleman to answer.
Q. (BY MR. STIDHAM) Do you have any understanding as to what penalties Smith & Wesson would face if it turned out, despite your best intentions, that your actions or Mr. Pace's actions violated ITAR or other federal regulations?
MR. TROUT: Object to the form. It's been







Exhibit F

asked and answered.
THE WITNESS: We did not violate anything, and I don't know if there -- were there penalties because we never -- we had to deal with that. We did everything legally by US and ITAR compliance.
Q. (BY MR. STIDHAM) To your understanding, correct?
A. We had no violations. No, we did things to the ITAR regulations.
Q. Did you approve business class travel for Joey Harris, despite that being contrary to Smith & Wesson policy?
MR. TROUT: Object to the form of the question.
THE WITNESS: What?
Q. (BY MR. STIDHAM) While you were running Gemtech at Smith & Wesson, did you approve first class travel for Joey Harris, despite that being contrary to Southwest [sic] policy?
MR. TROUT: Object to the form.
THE WITNESS: I don't recall. I have no idea what you're talking about.
Q. (BY MR. STIDHAM) Did you hire an employee Paxton, an employee Pavloc, an employee Middleton, an employee Schlub, without approval



from Smith & Wesson?
MR. TROUT: Object to the form.
THE WITNESS: I don't know who some of these people are. I didn't hire anybody after -- you're talking about after Smith & Wesson purchased Gemtech? No --
MR. STIDHAM: Okay.
THE WITNESS: -- there was nobody that was hired on after Smith & Wesson purchased Gemtech. No, we were trying to get one person hired, Peter Johnson, and we needed James Debney's approval, and it took weeks and he never approved him. That was the only person we were trying to bring on.
I have no idea who you're talking about with these other folks. Middleton was already there at Gemtech. I don't know who the other people that you're talking about.
Q. (BY MR. STIDHAM) Did you make any comments about Kevin Frank's physical appearance, age, weight, or diabetes while he was your employee?
MR. TROUT: Object to the form.
THE WITNESS: No.
THE VIDEOGRAPHER: I need just a minute to switch out my memory card here.



MR. STIDHAM: Okay. We are just about done.
THE VIDEOGRAPHER: We can stay on the record if you'd like.
MR. STIDHAM: Okay. How much time do you got left?
THE VIDEOGRAPHER: Four minutes.
MR. STIDHAM: Let's see if we can get that done.
Q. (BY MR. STIDHAM) Mr. Martinez, do you believe that you -- strike that.
Did you approve Mr. Pace for international business travel after the BEC?
MR. TROUT: Object to the form.
THE WITNESS: Not that I recall. We did -- travel would have been done beforehand. Not that I can recall.
Q. (BY MR. STIDHAM) And my question was just: Did you -- do you recall -- did you --
A. No --
Q. -- approve his travel?
A. -- I don't -- did I approve the travel when he worked for Gemtech?
Q. No.
After the closing, while you were working for Smith & Wesson and after the BEC, did



you approve Mr. Pace for international travel?
A. Most of the travel would have been done in advance. I don't recall.
Q. Okay. After the BEC, did you direct Mr. Pace to not travel internationally for business?
A. I don't recall on that.
Q. Do you recall being told after the BEC that Mr. Pace should not be traveling internationally for business until some compliance issues were addressed?
MR. TROUT: Object to the form.
THE WITNESS: We talked about compliance before the BEC. I don't recall if we talked about it after the BEC. He was doing some training online or -- I can't remember the training process, but he was doing some training stuff.
MR. STIDHAM: Can we go off the record for just a second?
THE VIDEOGRAPHER: Yes. We are off the record. The time is 5:39 p.m.
(A recess was taken from 5:39 p.m. to 5:46 p.m.)
(Deposition Exhibit No. 53 was marked.)
THE VIDEOGRAPHER: All right. We are back on the record. The time is 5:46 p.m.

incorrect.
Q. Could it be that you're just not remembering or interpreting your notes from seven years ago accurately?
A. No, it says: Compliance --
MR. TROUT: Object to the form.
THE WITNESS: It says: Compliance shared.
"Compliance shared" is that we would have compliance in Boise and they would have compliance in Springfield. It was shared.
Q. (BY MR. STIDHAM) So are you contending that Mr. Fulmer is lying when he writes that he had a conversation and discussed: The fact that our international compliance controls will be thorough when vetting new international sales opportunities?
MR. TROUT: I'm going to object to the form.
THE WITNESS: We did not go through international -- there's two things on here.
One, compliance to Springfield was not on -- was not part of that. We talked about compliance being shared.
Second, international. He never said this -- "compliance controls vetting new sales opportunity" because I would have put that down and I would have remembered that. That was not. I



would have remembered that.
MR. STIDHAM: Mr. Martinez, thanks for your patience. I don't have any more questions.
THE WITNESS: Okay.
THE REPORTER: Any follow-up, Mr. Trout?
MR. TROUT: No. Thank you very much for your help.
THE VIDEOGRAPHER: Okay. Well, this concludes today's videotaped deposition of Ron Martinez. The time is 6:00 p.m., and we are off the record.

(The deposition concluded at 6:00 p.m.)
* * *
(Signature was requested.)



REPORTER'S CERTIFICATE

STATE OF IDAHO )
) ss.
COUNTY OF ADA )

I, REBECCA MARTIN, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 13th day of June, 2024.

Rebecca Martin

REBECCA MARTIN
RPR and Notary
Public in and for the
State of Idaho

My Commission Expires: 08-27-2024



Kim J. Trout, Esq.
Ktrout@trout-law.com
June 13, 2024
RE: Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
6/3/2024, Ron Martinez (#6710877)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at Calendar-Idaho@Veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ron Martinez (#6710877)

ERRATA SHEET

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Ron Martinez Date



Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ron Martinez (#6710877)

ACKNOWLEDGEMENT OF DEPONENT

I, Ron Martinez, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Ron Martinez Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC