Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
Cameron L.McCue (ISB #12329)
HOLLAND & HART LLP
800 West Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho 83701-2527
Telephone: (208) 342-5000
Email: efstidham@hollandhart.com
jmaiko@hollandhart.com
clmccue@hollandhart.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SMITH & WESSON SALES COMPANY, a Delaware corporation; and SMITH & WESSON BRANDS, INC., a Nevada corporation,<br><br>Defendants. | Case No. 1:18-CV-00035-REP<br><br>**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF MATTHEW J. MURDOCK** |

## I. INTRODUCTION

Gemtech asks the Court to admit expert testimony on breach-of-contract damages from a model designed for a different claim. Matthew Murdock originally created his Rescissory Model to support Gemtech's fraud-in-the-inducement claim—a claim that sought to calculate what Gemtech would have earned had Smith & Wesson never acquired it. After the Court dismissed that fraud claim, Murdock imported the model unchanged to support the only claim remaining for trial: breach of contract under Section 1.6(c) of the Asset Purchase Agreement. The mismatch is fundamental. The breach-of-contract claim turns on the revenue Smith & Wesson would have

generated from Gemtech-brand products *after* the acquisition—not on how a standalone Gemtech would have performed in a world where the acquisition never occurred. Murdock's model does not answer the question this claim presents. It ties no revenue loss to any of the thirteen specific breaches alleged, disaggregates no breach-caused loss from ordinary market effects, and rests on assumptions that Gemtech's President supplied and Murdock accepted without independent verification.

**First,** the model does not fit the claim to be tried. Gemtech's sole surviving claim is for breach of contract: it alleges that thirteen actions by Smith & Wesson violated Section 1.6(c) of the Asset Purchase Agreement, causing Gemtech to lose its Earn-Out Payment. The damages question follows directly—how much revenue from Gemtech-brand products did Smith & Wesson fail to generate, after acquiring and integrating the brand, because of those thirteen actions? Murdock never answers that question. His Rescissory Model instead projects what a standalone Gemtech would have earned in a hypothetical world where the acquisition never occurred and Gemtech continued as an independent, niche suppressor manufacturer. A model that measures the performance of a company that no longer exists cannot quantify the loss the surviving claim requires.

**Second,** Murdock performed no decision-specific causation analysis. He assumed liability, calculated a single aggregate revenue shortfall, and never traced any portion of that shortfall to any of the thirteen challenged actions. **Third,** the model rests on a market-share assumption supplied by Gemtech's principal and applied at 100% probability—without a downside scenario, a discount rate, or any risk adjustment.

Each ground independently warrants exclusion. Smith & Wesson respectfully requests that the Court exclude Murdock's damages opinions in their entirety or, in the alternative, limit his testimony to the narrow subjects identified in Section V.

## II. BACKGROUND

### A. Murdock's Qualifications, Retention, and Directions from Plaintiff's Counsel.

Murdock holds a degree in actuarial science and an MBA, and as an expert witness he has worked primarily in personal-injury and wrongful-death cases. Declaration of Erik F. Stidham, Ex. A (Murdock 18:6–20). He had never calculated rescissory damages before this engagement. *Id.* at 23:2–4. He has never quantified revenue from per-unit assumptions for a manufacturer, and he conceded that he is not an expert in running a manufacturing business. Before this engagement he had never worked on a suppressor-industry case, and as to the firearms industry generally he answered, "Not that I recall." Murdock Dep. 14:12–18. He is not a lawyer and has no training in legal research. Murdock Dep. 26:20–24.

Gemtech retained Murdock as its damages expert before its fraud-in-the-inducement claim was dismissed. At the direction of Gemtech's counsel, Murdock created a rescissory model—something he had never done before—that purports to show the gross revenue Gemtech would have obtained had it never been acquired by Smith & Wesson. He never built a model specifically to address breach of contract damages. Instead, contrary to any accepted methodology, Murdock used his Rescissory Model, without modification, to calculate the supposed Earn-Out losses. Murdock Dep. 213:2–17; 214:2–7.

### B. The Rescissory Model.

The Rescissory Model was not designed to measure what Smith & Wesson would have earned from Gemtech-brand products had it operated the Business in compliance with Section

1.6(c). As Murdock confirmed in his deposition, the Rescissory Model is "based on a hypothetical where Gemtech operates without Smith & Wesson." Murdock Dep. 211:18–212:2. The model projects 29 months of Gemtech's pre-transaction operating history forward across a hypothetical period of roughly eight years, which encompasses the three-year Earn-Out Period. It generates three revenue scenarios built on assumed market shares of 12%, 15%, and 20%, and those scenarios require unit growth of 114% to 256% above Gemtech's 2016 production peak of 18,523 units. Murdock Report at 12–13. On the cost side, the model freezes Gemtech's 2016 cost ratios—cost of goods sold ranging from 46.4% to 72.6% of revenue by product line, plus operating expenses at 34.5%—and applies them unchanged to every projection year. Murdock Report at 15–16; Murdock Dep. 68:22–24.

The market-share inputs that drive the revenue in the Rescissory Model came from Murdock's "discussions with Mr. Martinez," Gemtech's principal, together with an assumption about "what we felt like would be upper bound scenario." Murdock Dep. 258:4–7. The rescissory framework itself came "from counsel," and Murdock did not check its legal basis. Murdock Dep. 110:1–2; 32:18–20. The Rescissory Model assumes a capacity expansion to roughly 256% of 2016 levels, resting on a single letter Gemtech solicited from Alexandria Pro-Fab five days before the rebuttal deadline, which Murdock did not independently verify. Murdock Dep. 97–98. The only justification Murdock offered for using the Rescissory Model to calculate the revenue relevant to the Earn-Out damages for breach of contract was an assumption; Murdock assumed that Smith & Wesson "would have been able to operate the company similarly or better" than Gemtech's prior management. Murdock Dep. 64:19–65:4.

The Rescissory Model contains no decision-specific causation analysis and no disaggregation of breaching from non-breaching causes; instead, Murdock stated he "looked at the [breach of contract] claim as a whole." Murdock Dep. 209:12–15.

The Rescissory Model assigns 100% probability to Gemtech maintaining its baseline market share for the entire period, assigns no probability but calculates Scenarios 2 and 3 in which Gemtech would grow market share. Murdock's Rescissory Model does not contemplate any downside scenario in which Gemtech were to lose market share: "I don't have a scenario in there where the market share is below what they have done historically." It applies no discount rate and runs no sensitivity analysis on the cost ratios. And it subtracts no integration costs, no corporate overhead, and no capital expenditures; Murdock performed no capital-expenditure analysis. Murdock Dep. 126:21–24.

**C. Only the Section 1.6(c) Breach Claim Remains for Trial, and the Relevant Damages Question Follows from It.**

This case arises from Smith & Wesson's acquisition of Gemtech in 2017. The APA provided a base purchase price of $11.4 million plus a contingent Earn-Out Payment calculated at $0.15 per dollar of gross revenue above a $36 million threshold, capped at $17.1 million, over a thirty-six-month Earn-Out Period running August 7, 2017 to August 7, 2020. APA §§ 1.6(a)–(b) (Dkt. 194-14). Maximum total consideration was $28.5 million. Gemtech generated approximately $7.2 million in revenue during the Earn-Out Period, and the Earn-Out never triggered.

Section 1.6(c) granted the Buyer "sole discretion with regard to all matters relating to the operation of the Business." That discretion is subject to two express limitations: the Buyer "shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of

avoiding or reducing the Earn-Out Payment," and "agrees to consult with Ronald J. Martinez in advance of any decision" the Buyer knows "will negatively impact the Earn-Out Payment." The provision closes with the parties' acknowledgments that "there is no assurance" of any Earn-Out Payment and that they "solely intend the express provisions of this Agreement to govern their contractual relationship with respect to the subject matter of this Section 1.6." APA § 1.6(c) (Dkt. 194-14).

In its Third Amended Complaint, Gemtech has identified 13 actions that it contends breached Section 1.6(c). Third Amended Complaint ¶¶ 88, 92-125.

## III. LEGAL STANDARD

Rule 702 permits expert testimony only if the proponent demonstrates that the opinion will more likely than not help the trier of fact, rests on sufficient facts or data, reflects reliable principles and methods, and applies those principles reliably to the case. Fed. R. Evid. 702(a)–(d). The 2023 amendment placed that burden expressly on the proponent, responding to courts applying a "liberal admissibility" standard under which a proponent needed only to show the evidence was "sufficient" for a reasonable juror to credit it. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Committee identified decisions treating sufficiency challenges as always going to weight rather than admissibility as "an incorrect application of Rules 702 and 104(a)." *Id.* The Court must find the foundation sufficient by a preponderance; only then do criticisms go to weight. *Id.*

The Court acts as gatekeeper and "must ensure that all admitted expert testimony is both relevant and reliable." *Glenn v. B & R Plastics, Inc.*, 326 F. Supp. 3d 1044, 1056 (D. Idaho 2018) (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017)); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 593–94 (1993). That obligation is not discretionary: a court "cannot abdicate its role as gatekeeper, nor delegat[e] that role" to the factfinder. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1048–51 (9th Cir. 2025). An opinion "connected to existing data only by the ipse dixit of the expert" does not satisfy the Rule, *id.* at 1048 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)), and the key inquiry is "whether an expert had sufficient factual grounds on which to draw conclusions." *Id.* at 1051.

A motion in limine "limit[s] in advance testimony or evidence in a particular area," *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009), and pretrial exclusion remains appropriate in a bench trial where opinions are unreliable. *See Alves v. United States*, No. 3:19-cv-00044-REP, 2022 U.S. Dist. LEXIS 105246, at *4–11 (D. Idaho June 10, 2022). This District has excluded a damages expert who "simply adopt[ed] and ratif[ied]" a party's calculations, performed no independent analysis, and "simply parrot[ed]" the party's position. *Cleaver v. Transnation Title & Escrow, Inc.*, No. 1:21-cv-00031-AKB, 2024 WL 326848 (D. Idaho Jan. 29, 2024). It likewise excluded damages testimony where the witness had never performed the valuation task at issue and conceded he was not an expert in that area. *TB Holding Co. v. Hagemeyer N. Am., Inc.*, No. 2:22-cv-00246-REP, 2025 U.S. Dist. LEXIS 146520, at *5–6, *8 (D. Idaho Aug. 15, 2025).

## IV. ARGUMENT

### A. Murdock's Revenue Model Does Not Fit the Breach-of-Contract Claim.

Murdock calculates breach-of-contract damages under the Earn-Out using revenue from his Rescissory Model—a model that purports to show the revenue Gemtech would have generated had it never been acquired. Stidham Decl., Ex. B (GEC Report) at 14, 16-19; *id.*, Ex. A (Murdock Dep.). But the surviving claim asks a different question: what revenue would Smith & Wesson

have generated after the acquisition absent the alleged breaches? This mismatch is structural and requires exclusion. Rule 702(d) requires Gemtech to demonstrate that the opinion "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). The Rule permits expert testimony only if it "help[s] the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), and only if it "logically advance[s] a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. A court may exclude testimony where the analytical gap between the data and the opinion is "simply too great." *Joiner*, 522 U.S. at 146. In the damages context, the model must be "consistent with [the] theory of liability" and "measure only those damages attributable to" that theory. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

The Rescissory Model was built for the dismissed fraud claim, which sought damages based on how Gemtech would have performed had it never been acquired. Contract damages are different. Under Delaware law, they measure Gemtech's expectation interest—the position Gemtech would have occupied had Smith & Wesson performed Section 1.6(c), a world in which the acquisition occurred and Smith & Wesson operated the business. *Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 146 (Del. 2009) ("Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed."); *Restatement (Second) of Contracts* § 347. No surviving theory asks what Gemtech would have earned absent the acquisition.

A proper model thus must posit a world in which Smith & Wesson acquired and operated the Gemtech brand—subject to its corporate structure, overhead, manufacturing plans, capital budgeting, sales channels, and broader objectives. Within that world, the model must isolate

revenue that would have been earned absent the breaches. The Rescissory Model does the opposite: it posits a world in which the acquisition never occurred. The two counterfactuals differ across at least seven categories:

**Cost structure.** The Rescissory Model uses Gemtech's standalone costs: Idaho facility lease, payroll, Abrams Airborne manufacturing, and modest overhead. Stidham Decl., Ex. B (GEC Report) at 15-16. A proper model would include Smith & Wesson's corporate overhead (legal, HR, finance, IT, SEC compliance, executive management) and manufacturing transition costs. Murdock concedes he used Gemtech's 2016 cost ratios—suppressor COGS at 46.4%, operating expenses at 34.5%—unchanged, ignoring every cost the acquisition would introduce. *See id.*, Ex. A (Murdock 60:8-61:10, 62:2-63:10, 67:14-68:6, 130:4-17, 202:15-203:8); *id.*, Ex. B (GEC Report) at 16.

**Management and decision-making authority.** The Rescissory Model, by building in Gemtech's historical data, assumes the Gemtech brand would be prioritized over any Smith & Wesson brand. A proper model would reflect that Smith & Wesson holds "sole discretion with regard to all matters relating to the operation of the Business," subject only to Section 1.6(c)'s bad-faith and consultation constraints. Smith & Wesson could reallocate resources, transition manufacturing, reduce product lines, and make operational decisions that reduce Gemtech revenue while serving broader corporate interests.

**Capital allocation.** Similarly, the Rescissory Model assumes unlimited capital devoted to Gemtech. *Id.*, Ex. A (Murdock 232:5-233:10). A proper model would account for competing demands within Smith & Wesson's capital budget. As President Mark Smith testified, Smith & Wesson must balance "assets for the best return overall" across product lines. *Id.*, Ex. C (Mark Smith 145:3-146:6).

**Manufacturing environment.** Murdock assumes unlimited capacity and outsourced manufacturing. *See id.*, Ex. A (Murdock 125:17-126:3). The record shows otherwise: the June 27, 2017 Board Presentation states "Gemtech employees will be hired by SWC" and "Assembly/ATF Compliance will immediately move to Springfield[.]" *Id.*, Ex. D (SW135510) at SW135517.

**Market share.** Murdock makes no adjustment to his analysis to account for how Gemtech's historical market share might or would change post-acquisition under Smith & Wesson's ownership.

**Revenue recognition.** The Rescissory Model rests on open-ended lost-profits calculations for a hypothetical standalone company; a proper model would consider only revenue in "Total Sales of Business" under the APA.

**Risk profile.** Mr. Pickett identified obstacles Gemtech would have faced regardless of ownership—manufacturing capacity, engineering-drawing limitations, ATF violations, market-share reduction from moving up-market, and financing risk to which standalone Gemtech would have been exposed and Smith & Wesson was not. *Id.*, Ex. E (Pickett Report) at 30-31 Murdock did not account for these in his analysis. *See id.*, Ex. B.

A single unsupported assumption bridges the model to the surviving claim. Murdock testified, "Well, I assumed Smith & Wesson would have been able to operate the company similarly or better" than Gemtech's prior management based on Smith & Wesson's "years of experience within the firearms industry." *Id.*, Ex. A (Murdock 63:16-64:4). Yet he conceded: "I don't know enough about the internal workings of Smith & Wesson." *Id.*, Ex. A (Murdock 205:4–5). He identified no benchmarking, comparables, or financial modeling. That is *ipse dixit*—an assertion connected to the data "only by" the expert's say-so. *Joiner*, 522 U.S. at 146. Pickett

reached the opposite conclusion: "the financial evidence indicates to me that it is speculative to assume that GT would have outperformed S&W with its operation of the Gemtech brand." Stidham Decl., Ex. E (Pickett Report) at 30.

Murdock's assumption reflects that he missed the point, perhaps reflecting that he has never done this type of damages analysis before and that his education in actuarial services does not provide the foundation needed for this type of work. That Smith & Wesson would have managed the Business "similarly or better" does not establish identical costs, zero overhead, unlimited capital, unchanged capacity, or the same risk profile. Each is a separate input requiring separate analysis; Murdock performed none. *Id.*, Ex. A (Murdock 208:5–209:11). Where an expert relies "solely or primarily on experience," he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Murdock offered no explanation. The assumption also let him avoid building a breach model: without it, he would have had to project the post-acquisition world with actual costs, overhead, integration expenses, and resource constraints.

The contemporaneous record contradicts the assumption. Murdock's declaration dismisses post-acquisition performance: "The revenue and growth that has been realized by Gemtech under S&W control, is irrelevant." Stidham Decl., Ex. F (GEC Rebuttal Report) at 7. It is not irrelevant—it is the closest evidence of performance under good-faith management. The assumption also does hidden work: by presuming Smith & Wesson would have performed at least as well as standalone Gemtech, the model presupposes that nothing but the breach explains the shortfall—the question Murdock was retained to analyze, not a premise he could assume. Smith & Wesson was not

obligated to maximize revenue from Gemtech-brand products; it could balance resources against other aspects of its business.

The mismatch is neither abstract nor curable by cross-examination. The two counterfactuals turn on a binary variable—whether the acquisition occurred—and every downstream input depends on which side the model assumes. A weight objection presumes the model aims at the correct target and merely strikes it imprecisely; cross-examination can expose imprecision but cannot redirect a model aimed at the wrong target. Even if Murdock had performed decision-specific causation analysis, tested each assumption for probability, and modeled downside risk, the breach opinion would still fail Rule 702(d) because the revenue projections feeding the earn-out formula derive from a standalone-company model, not a model of Smith & Wesson's operation of the Business.

**B. Murdock Performed No Decision-Specific Causation Analysis and Did Not Disaggregate Breaching from Non-Breaching Causes.**

The record shows that Murdock does know the proper method for calculating breach of contract damages; Murdock's report states the correct standard. It explains that the breach analysis "calculates the economic loss associated with the earn-out had the alleged breaches not occurred," measured "based upon the reasonable expectations of the parties as it existed before or at the time of the breach." Murdock Report at 6. That standard requires three steps: identify the alleged breaches, construct a scenario in which those breaches do not occur, and measure the revenue increment attributable to eliminating them. Murdock performed none of them. Asked directly whether he "looked at particular breaches of the APA and calculate[d] the impact of those particular breaches on revenue," he answered: "No." Murdock Dep. 70:4–7. He explained instead that he "utilized what I would expect to have happened going forward had Smith & Wesson

operated Gemtech as it had been operating previously." Murdock Dep. 70:8–11. Asked what breaches he used in calculating breach damages, he identified none: "there was no earnout that was ever paid. And so there was nothing to compare to, right. So I utilized, again, the revenue projection that we just discussed. That's it." Murdock Dep. 58:11–19.

Asked what conduct caused the revenue not to be earned, he answered: "There's nothing I'm saying that this specific act caused this." Murdock Dep. 203:19–20. Asked whether he had examined each alleged cause and quantified it, he answered: "that is not something I did, look at each specific cause and tried to quantify each of the—the causes." Murdock Dep. 208:19–25. And asked what the causation was, he denied that the analysis was required at all: "I don't have to line it exactly cause—cause-by-cause." Murdock Dep. 209:22–25.

In fact, the Rescissory Model does not merely omit the causation analysis; it substitutes an assumption for it. Murdock testified: "I'm assuming there's liability. I'm assuming there's a breach. And that's very standard in a damage analysis." Murdock Dep. 201:5–7. His model treats liability as a given: "On the breach of contract side, it assumes that relative to the market, if Gemtech continued to perform similarly, then revenues would be what my baseline model is." Murdock Dep. 205:21–24. He described the operation directly: "all I'm doing is saying, okay, well, if that's true, right, I'm making that assumption that that's true, then what would revenues have been expected to look like." Murdock Dep. 209:25–210:4. Asked what actions he based his opinion on such that "but for those actions, this revenue would have been earned," he deferred the question entirely: "those are legal determinations that need to be answered, right, and concluded on." Murdock Dep. 202:15–203:1.

Further, when asked whether the Earn-Out was missed "because of a breach or because of circumstances that don't constitute a breach," he answered that the question is "a legal

determination that needs to be made," and confirmed that it is not a determination he was making. Murdock Dep. 228:1–13.

Murdock has not performed any causation analysis and has supplied a Rescissory Model that cannot be used to calculate damages based on specific findings of breach. As a result, the model is of no use to the Court. The Court must determine what harm flowed from the specific decisions it finds to breach Section 1.6(c), and a single undifferentiated shortfall figure cannot answer that question. The failure implicates two requirements at once: the causal basis is insufficient under Rule 702(b), and the application does not reliably connect the methodology to the facts of this case under Rule 702(d). A model that does not identify which actions caused which portion of the loss is not a damages model that can be used.

Murdock also conceded that the revenue generated turns on factors other than the alleged breaches and that he did not evaluate those factors or their impacts on the revenue. Murdock acknowledged that Smith & Wesson had "autonomy to run the company" and that there could be "situations where things might not go how you intend with business" that would cause the Earn-Out to be missed absent any breach. Murdock Dep. 200:9–12, 206:7–9. Asked whether a causation analysis would require examining non-breaching conduct affecting revenue, such as supply-chain problems, he answered that he did not know "enough about the situation internally to be able to make any opinion on that." Murdock Dep. 226:10–227:3.

Murdock therefore analyzed none of the documented factors that impacted revenue independent of any breaches, including, but not limited to, the failure of the Hearing Protection Act and the resulting industry-wide contraction in suppressor demand; capacity constraints during the manufacturing transition, including the limited capacity of Gemtech's primary manufacturer; failures and exits of competing suppressor manufacturers; Gemtech's pre-acquisition operational,

financial, and quality-control limitations; and the broader post-2016 firearms-market contraction. *See id.*, Ex. A (Murdock Dep. 236:12–15) (as to "I don't know the answer to that question"). Nor did Murdock address Smith & Wesson's resource-allocation judgments, which would affect revenue but would not constitute a breach of Section 1.6(c). *See* Stidham Decl., Ex. C (Smith 145:8–146:6) (Smith & Wesson CEO testified the company had to "balance those assets and direct them towards activities that [it] felt would have the best return overall for the business.").

Failure to account for obvious alternative explanations creates an analytical gap the Court is entitled to reject. *Joiner*, 522 U.S. at 146. And an expert may not tell the factfinder what result to reach on an ultimate issue. *Hardy v. Kish*, No. 1:23-cv-00306-BLW, 2025 U.S. Dist. LEXIS 141438, at *6 (D. Idaho July 22, 2025). Rule 704(a) permits ultimate-issue testimony, but it does not permit an expert to assume the answer and present that assumption as a finding. Murdock's damages testimony and his Rescissory Model are of no use to the Court. If the Court finds some of the 13 alleged acts proven and others not, Murdock's model supplies no mechanism for computing the damages attributable to the proven acts, because it never measured them separately. The Court should exclude the causation-dependent opinions. In the alternative, it should preclude Murdock from opining that any Smith & Wesson conduct caused the revenue shortfall, permitting at most presentation of projections as express assumptions.

**C. The Market-Share Assumption Is Unsupported and Causes the Entire Opinion to Fail.**

An expert's opinion is inherently unreliable if he assumes market share without analyzing its underpinnings. *See, e.g.*, *Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 893 (E.D. Wis. 2010) (excluding expert's damages opinion premised on market share because its

methodology was unreliable); *Van Der Valk v. Shell Oil Co.*, Case No. SACV 03-565-JVS(JTLx), 2004 U.S. Dist. LEXIS 30692, at *13-14 (C.D. Cal. Nov. 15, 2004) (excluding expert damages calculation in part because it was "unreasonable" to assume plaintiff's market share would have remained the same over time).

In *Fail-Safe*, the expert relied on executives' projections about product sales and "parrot[ed]" the company's assumptions in preparing his calculations. *Id.* at 889. The court held that reliance is "utterly circular in its logic and the epitome of an unreliable methodology." *Id.* Moreover, the expert did not analyze how competitors might disrupt the company's competitive position in the market and assumed its market share would "remain static over time," relying on "general platitudes about the strength of" the company. *Id.* at 891.

Murdock's opinion should likewise be excluded because it assumes the Gemtech brand would maintain the same market share post-acquisition and alternatively assumes growth in market share based on nothing more than Gemtech's representations that it would obtain new sales opportunities. Stidham Decl., Ex. B (GEC Report) at 11. Like the expert in *Fail-Safe*, Murdock omits any analysis of competitor activity and how the Gemtech brand would keep or increase its market share in light of that factor. *Id.*, Ex. A (Murdock 236:16-237:10, 238:23-239:18). He testified, "I think the baseline assumption is that they would maintain their position within the market, yes." *Id.*, Ex. A (Murdock 237:3-5).

And it was just an assumption. Murdock performed no independent market analysis: no industry reports, no trade publications, no analysis of ATF-tracked suppressor registrations beyond the Form 3 counts, no comparable-company financials, and no analysis of competitive dynamics, market segmentation, new entrants, or how many suppressor manufacturers have sustained a 12%-or-greater share. *See id.*, Ex. B (GEC Report) at 11. He conceded he could not locate reliable data

on competitor market-share changes. *Id.*, Ex. A (Murdock 238:23-239:18). His pricing assumption—$612 average price per suppressor—is drawn from the first five months of 2017, and his market-share baseline from 2016. *Id.*, Ex. B (GEC Report) at 12. Neither period was representative: 2016 reflected a demand surge driven by anticipated regulatory change, and early 2017 reflected elevated pricing ahead of the Hearing Protection Act's failure. *Id.*, Ex. H (Yacek Report) at 4–7. Murdock combined the highest market-share year with the highest observed price from a different period and adjusted for neither. *Id.*, Ex. E (Pickett Report) at 28.

## V. CONCLUSION

Smith & Wesson respectfully requests that the Court exclude Murdock's damages opinions in their entirety. In the alternative, Smith & Wesson requests the following narrower relief:

1. Preclude the lost-profits and rescissory opinions as addressing no surviving claim and, as to the rescissory opinions, as irrelevant under Rules 401 and 402; and limit Murdock to the mechanical Earn-Out arithmetic applied to a revenue figure the Court determines.

2. Exclude the causation-dependent opinions. In the alternative, preclude Murdock from opining that any Smith & Wesson conduct caused the revenue shortfall.

3. Exclude any opinion resting on the market-share assumptions taken from Martinez.

DATED this 28th day of September, 2026.

HOLLAND & HART LLP
By *<u>/s/ Erik F. Stidham</u>*
Erik F. Stidham
Jennifer M. Aiko
Cameron L. McCue
Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28th day of September, 2026, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Kim J. Trout<br>Alyssa R. Jones<br>TROUT & JONES, PLLC<br>3778 N. Plantation River Dr., Ste. 101<br>Boise, ID 83703<br>Telephone: (208) 577-5755<br>*Attorneys for Plaintiff* | ktrout@trout-law.com<br>ajones@trout-law.com |

*/s/ Erik F. Stidham*
Erik F. Stidham
of HOLLAND & HART LLP