THE GEC GROUP

# Rebuttal Report to Jeffrey S. Pickett

***Gemini Technologies, Incorporated, an Idaho Corporation v. Smith & Wesson Corp., a Delaware Corporation, and American Outdoor Brands Corporation, a Massachusetts corporation***

**July 22, 2025**

Matthew J. Murdock

950 West Bannock Street, Suite 1100
Boise, ID 83702

## I. Introduction

This report serves to rebut the opinions and findings presented by Jeffrey S. Pickett, CPA/ABV, of Lone Peak Valuation Group (hereafter "Mr. Pickett"), in his Expert Witness Report dated May 21, 2025 (the "Pickett Report"). Mr. Pickett's report aims to review and respond to the reports of Matthew Murdock (the "Murdock Report" or "GEC Report") and Thomas South dated June 21, 2024 . This rebuttal will address the criticisms and alternative conclusions presented in the Pickett Report, demonstrating where Mr. Pickett's analysis is flawed, incomplete, or based on a misinterpretation of facts or standard methodologies.

## II. Rebuttal Arguments

### A. Rebuttal to Pickett's Opinion 1 & 2: The Earn-Out Structure

Mr. Pickett asserts that the Earn-Out structure in the Asset Purchase Agreement (APA) was "consistent with what [he] typically recommends to clients who enter into Earn-Out agreements" and was "structured in a manner that benefits both buyer and seller." He highlights that Earn-Outs are effective when parties differ on future financial performance and that the optimal structure incentivizes both parties, ideally based on a revenue hurdle with a percentage paid that is less than the incremental profit margin.

**Rebuttal:** The core of Gemtech's claim is that S&W did not fulfill their contractual obligations post-close and made misrepresentations and/or material omissions prior to closing that, if disclosed, would have made Gemtech reconsider their sale of the assets. If these allegations are true, then the "optimal structure" of the Earn-Out becomes irrelevant, as the buyer allegedly took actions that prevented the Earn-Out from being achieved, directly undermining the principle of mutual benefit that Mr. Pickett espouses.

Mr. Pickett directly contradicted his statement that it would be financially unreasonable to conclude that a buyer would intentionally take actions with the sole objective of avoiding paying the Earn-Out by introducing the idea that ultimately, the buyer of the business should be able to operate the business in a way that maximizes

the value of that business, as opposed to maximizing the Earn-Out payment. Thus, Mr. Pickett explains a reason why S&W, in their mind, chose to take action that would avoid paying the Earn-Out.

Mr. Pickett highlights that the APA acknowledges the risk of no Earn-Out payment and contains a clause stating that "Buyer shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder." This clause itself implies that such bad faith actions are a recognized risk, and Gemtech's claim alleges that S&W acted in bad faith, regardless of the theoretical "optimal" structure of the APA. The presence of this clause suggests that the upfront payment was indeed tied to the expectation of the Earn-Out being pursued in good faith.

Mr. Pickett concludes that since his incremental profit margin of 69.35% is bigger than the 15% they would have to pay on the earn-out, both parties would benefit and it wouldn't make sense for S&W to deliberately reduce sales to avoid the earn-out. However, this is beside the point and contradicts Mr. Pickett's own statements. Mr. Pickett quotes Mr. Mark Smith, President & CEO of Smith & Wesson Brands, Inc., who states that "the goal of the company...is not to maximize any one product or product portfolio at the expense of others. It's to manage the overall success of the business. So we balance resources within the organization based on the – you know, we only have limited resources. We have limited assets. We have limited human assets and limited physical assets."[1] Therefore, the question isn't whether the Gemtech venture would be profitable with the Earn-Out, it's if the venture is *more* profitable than other ventures within S&W, as determined by S&W. Again, undermining the idea that the execution by S&W, as alleged, was aligned with mutual incentivization.

In summary, Mr. Pickett's opinion on the Earn-Out structure focuses solely on its theoretical design without adequately addressing the alleged breach of contract and misrepresentations by S&W, which are central to Gemtech's claim. The purpose of the Earn-Out was to bridge the gap in revenue expectations, but if S&W then actively sabotaged the revenue generation, the Earn-Out's "optimal" structure becomes irrelevant in the face of alleged bad faith conduct.

[1] Pickett Report, p. 31.

### B. Rebuttal to Pickett's Opinion 3: Nonsensical Foregoing of Profits

Mr. Pickett argues that it is "nonsensical" and "defies logic" that S&W would forego between $19.2 million and $38.0 million in profits (as calculated in the Murdock Report) to avoid paying an Earn-Out of $1.1 million to $3.5 million. He asserts that S&W would not act against its own best interests.

**Rebuttal:** According to Mr. Pickett, S&W decided to allocate resources away from Gemtech,[2] perhaps due to perceived difficulties in integrating the brand, supply chain issues, or a shift in overall corporate strategy. Mark Smith's deposition acknowledges that the company's goal is not to maximize one product line at the expense of others, but to manage the overall success of the business and allocate resources for the best overall return for shareholders.[3] This means that even if Gemtech could have produced revenues to generate an Earn-Out, Mr. Pickett indicates that S&W has prioritized other ventures that they deemed to be more profitable. This decision, while perhaps rational for S&W, does not absolve them of potential contractual obligations or damages related to the Earn-Out.

Mr. Pickett concludes that he would have expected revenues to increase after the Earn-Out period if S&W was purposefully suppressing Gemtech revenues during this time period. Mr. Pickett fails to demonstrate that S&W made a good faith effort to sell Gemtech products after their purchase. By doing so, he asks one to accept the actual performance of Gemtech under S&W as their good faith effort. For example, if S&W failed to actively market Gemtech products, one would expect damage to their brand that cannot be quickly reversed. Additionally, Mr. Pickett admits that resources were prioritized to different parts of the S&W organization by S&W.[4] Mr. Pickett states that Gemtech's 2024 annual revenues were around $1 million.[5] This is around 90% less than what revenues were when Gemtech was acquired in 2017 in a market that has more than doubled since the purchase date.[6] The revenue and growth that has been realized by Gemtech under S&W control, is irrelevant and has no bearing on what Gemtech's capabilities would have been had the operations been handled in good faith.

---

[2] Pickett Report, p. 31.
[3] Smith, Mark. Deposition Transcript, July 31, 2024, pp. 145-146.
[4] Pickett Report, p. 31.
[5] Pickett Report, p. 12.
[6] Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024

Mr. Pickett states that "the notion that a buyer should maximize an Earn-Out payment when it is not in the best interest of maximizing the value of a company is akin to the tail wagging the dog."[7] This is a straw man argument. The Plaintiff's claim is not that S&W should prioritize the Earn-Out above all else, but that S&W's actions allegedly constituted a breach of contract or misrepresentation that prevented Gemtech from achieving its potential, thereby triggering damages. The question is whether S&W's actions were in bad faith or breached contractual obligations, which then led to damages for Gemtech.

### C. Rebuttal to Pickett's Opinion 4: Fair Market Valuation and Upfront Payment

Mr. Pickett concludes that his valuation analysis supports the upfront cash payment of $10,160,000 as "reasonably consistent with the fair market value of Gemtech at the time of the Transaction under the assumption that revenues over the first three years would be $36 million." He states that this amount "reasonably reflected the value of Gemtech assuming it would not generate sufficient revenue to pay an Earn-Out."

**Rebuttal:** Mr. Pickett fails to address the allegation that S&W's actions caused this underperformance and prevented the Earn-Out from being realized, thereby reducing the actual value delivered to Gemtech's sellers below the agreed-upon potential.

Mr. Pickett's valuation analysis for Opinion 4 is a self-serving exercise that attempts to validate the upfront payment by sidestepping the fundamental issue of whether S&W's alleged actions undermined the realization of the full consideration contemplated by the APA and whether the buyer's actions allowed for a good faith attempt to achieve the contingent Earn-Out and/or did not provide misrepresentations to Gemtech.

### D. Rebuttal to Pickett's Opinion 5: Lost Profits Exceeding Maximum Purchase Price

Mr. Pickett argues that "the economic losses arising from an action such as this generally cannot exceed the value of the subject business." He points out that the Murdock Report's calculated lost profits (ranging from $19.2 million to $38.0 million ) exceed the maximum total available purchase price of Gemtech, which he states was

---

[7] Pickett Report, p. 8.

between $10.2 million and $28.5 million. He concludes that this renders the Murdock Report's calculation of damages "speculative and unreliable."

**Rebuttal:** Mr. Pickett's assertion that lost profits[8] cannot exceed the maximum value of the business at the time of transaction is a misapplication of damages principles, particularly in cases involving fraud or breach of contract where the goal is to make the injured party whole.

Mr. Pickett is attempting to say that the lost profits cannot exceed the maximum purchase price. What he is actually saying is the expected lost profits that were established in 2017 at the time of the transaction wouldn't exceed the "maximum purchase price" in 2017. What he fails to consider is that actual lost profits, and in-turn the value of the business, can exceed the purchase price based on actual performance of the business and the market it operates in. As with any acquisition, companies will overperform and underperform the expectation that was set at the time of the purchase. We now have the benefit of hindsight and actual market performance that demonstrates the suppressor market has experienced significant growth, but at the time in 2017 there was uncertainty about how much the suppressor market could grow. Rarely will a company's actual future profits equal the purchase price of the business, there is no crystal ball that can accurately predict future performance, and a contractual price does not mean that is the limit on future cash flows for an organization.

Mr. Pickett argues that if Gemtech's owners believed such profits could have been generated, they "would have never been willing to sell Gemtech for the price agreed to in the APA." Mr. Pickett fails to consider other factors of why Mr. Martinez would sell Gemtech. Mr. Martinez believed there were opportunities, resources, relationships, etc. that would help Gemtech to maximize value with S&W. Ron expected to work hard at S&W and be rewarded through wages, stock options, and other benefits long-term.

Therefore, Mr. Pickett's argument is flawed because it conflates the maximum contractual Earn-Out payment with the total potential lost profits that Gemtech might have suffered due to alleged wrongful conduct. The Earn-Out only compensated for sales up to a certain point; if Gemtech would have continued to grow and generate profits beyond that, those profits would be recoverable damages. Mr. Pickett arguing that the maximum total available purchase price of Gemtech as established in the APA

[8] Lost profits are rescissory damages as presented and modeled here and in my original report.

is the maximum possible performance of Gemtech is not accurate. In addition, I've been advised by counsel that Mr. Pickett's asserted legal theory is fiction. The goal of rescissory damages is to restore the injured party, and in some cases, that may legitimately exceed the negotiated contingent consideration if the actions of the breaching party led to a larger economic loss. I have calculated the rescissory damages of Gemtech to a reasonable degree of economic certainty.

### E. Rebuttal to Pickett's Opinion 6: Failure to Address Intervening Factors

Mr. Pickett details "intervening factors" that he claims the Murdock Report failed to address, implying they would have impeded Gemtech's ability to increase sales and profits independently. I will address each point individually.

**Rebuttal:** Mr. Pickett does not perform any economic analysis on many of the factors listed below, and fails to verify or quantify many of the factors discussed.

#### 1. Capacity Limitations of Gemtech's Manufacturer, Abrams Airborne

Mr. Pickett highlights issues with Gemtech's relationship with Abrams Airborne, including late payments and Abrams holding completed products, and that Abrams "lacked the capacity to produce the products ordered, let alone the increased quantities required." He also notes that Mark Smith identified supply chain issues as a reason for lagging sales post-transaction.

**Rebuttal:** According to Schedule 4 and 5 of Mr. Pickett's report, he assumed that the maximum capacity that Gemtech could obtain is 18,523 units which is how many units they sold in 2016. It would be expected that a company could increase their manufacturing capacity over an 8 year period in a growing industry. It is unreasonable to assume that Gemtech would not be able to increase capacity from 2016 levels. Ron was in active discussions with Alexandria Pro-Fab that would allow Gemtech to exceed their capacity in 2016.[9] Furthermore, my analysis did not assume Gemtech would exceed their 2016 capacity until 2020 under Scenario 1 and 2 and 2019 under Scenario 3. Thus, providing Gemtech additional time to ramp up capacity.

S&W themselves recognized capacity concerns but believed their own manufacturing facilities could replace and expand the manufacturing needs.[10] This indicates S&W

---

[9] Letter from Alexandria Pro-Fab Co., Inc, July 17, 2025.
[10] Pickett Report, p. 22.

either accepted the risk or believed they could mitigate it, and thus cannot attribute subsequent failure solely to pre-existing Gemtech issues.

The very nature of the acquisition and subsequent alleged actions by S&W (like laying off staff and diverting resources) would have disrupted Gemtech's ability to manage its supply chain effectively. If S&W absorbed Gemtech's operations, it was S&W's responsibility to manage these supply chain issues, not use them as an excuse for underperformance, if those issues could have been resolved independently by Gemtech.

Mr. Pickett criticizes the lack of explanation for why Alexandria Pro-Fab wasn't the primary manufacturer for its capacity. At the time of the transaction with S&W, Gemtech was utilizing multiple manufacturers including Abrams, Alexandria Pro-Fab, and Primary Weapons Systems (PWS), along with several others. Had Gemtech not sold to S&W, Gemtech would have expanded relationships with Alexandria Pro-Fab to meet demand or secure other manufacturing partners and would have continued manufacturing relationships with existing manufacturers.[11] The limitations with Abrams do not equate to a permanent ceiling on Gemtech's growth especially since Gemtech was actively moving away from Abrams to other manufacturers.

2. **Flawed Drawings and Specifications**

Mr. Pickett claims that Gemtech's designs had "significant flaws and did not work," leading to a delay of "seven to eight months" for S&W to troubleshoot and modify them. He also mentions the "hand-fitting" process at Gemtech's Idaho facility as labor-intensive and limited scalability, attributing it to flawed designs.

**Rebuttal:** Mr. Pickett once again unreasonably assumes that Gemtech's 2016 capacity of 18,523 units would never increase. In 2016, Gemtech was facing actual capacity constraints as described above and still achieved over $10 million in revenue with these alleged "flawed drawings and specifications." In Mr. Pickett's report, Schedule 5.1 to 5.3 assumes that Gemtech would not be able to increase their capacity established in 2016 over the next eight years. Mr. Pickett provides no explanation as to why capacity could not be increased beyond manufacturing capacity that Gemtech had already established in 2016 and was seeking to improve in 2017. He ignores the possibilities over eight years to improve product design for easier and faster

[11] Letter from Alexandria Pro-Fab Co., Inc, July 17, 2025.

manufacturing, improvements to existing processes and efficiencies, and expanding manufacturing partners. As mentioned above, my capacity projections allow additional time for Gemtech to increase its capacity.

S&W, a company founded in 1852 and a leading firearms manufacturer, would have conducted extensive due diligence on Gemtech's designs and manufacturing processes before the acquisition. If there were "significant flaws," this should have been identified. Engineering teams worked directly with manufacturers to address any issues found during the manufacturing process.

The hand-fitting process was part of Gemtech's existing successful operation. My projections for increased capacity imply that Gemtech would have addressed issues, if it remained independent. Gemtech was expanding manufacturing at Alexandria Pro-Fab, which they felt would resolve this issue. Attributing S&W's subsequent delays to Gemtech's initial designs, without acknowledging S&W's own capacity to resolve them or Gemtech's potential to do so independently, is disingenuous.

### 3. Violations of Federal Laws (ATF)

Mr. Pickett states that S&W discovered Gemtech had finished inventory without serial numbers (a violation of ATF regulations) and that some Gemtech suppliers were also in violation. He claims this resulted in the destroyed product and that the Murdock Report "overstated damages as it assumed that Gemtech's operations would have continued with no adjustments for these violations."

**Rebuttal:** Mr. Pickett fails to prove this point and to quantify how many units were impacted by the claimed violation and what impact that would have on damages.

According to the July 2025 report of Richard Vasquez, None of these ATF violations against Gemtech required additional correction after Gemtech quickly resolved them nor did these violations cause them to lose Federal Firearms Licenses (FFL).[12] After review, Mr. Vasquez found only examples of clerical and administrative errors or personality conflicts and no evidence of incomplete traces, intentional regulatory violations, or any disregard for FFL requirements. He concludes that the asset transfer to S&W posed no apparent risk.[13]

---

[12] Vasquez Report, pp. 34, 41-42.
[13] Vasquez Report, p. 42.

Just like many of Mr. Pickett's other assertions, Mr. Pickett provides no quantifiable impact for this claim and Mr. Vasquez concludes that there was no apparent risk with the asset transfer to S&W. I relied on the financials of Gemtech which would have included the cost of any destroyed product, therefore the damages I presented are not overstated.

**4. Strategic Shift to Higher-Priced Products and Market Share Decline**

Mr. Pickett points out that Gemtech's market share (based on units sold) declined from 12.0% in 2016 to 11.5% in 2017, and that this coincided with a strategic shift to higher-priced suppressors like the Integra. He argues that the Murdock Report's assumption of maintaining or increasing market share (12%, 15%, and 20% in Scenarios 1, 2, and 3 respectively) is speculative.

**Rebuttal:** The market share that is presented in my report is demonstrative that Gemtech had established a market share of approximately 12%. The units sold in 2017 were annualized based on 5 months of sales data available and is a difference of 438 additional units needing to be sold in 2017 to obtain a 12.0% market share. My report's scenarios for market share growth (15% and 20%) are tied to "additional efforts and opportunities", such as placing products in big box stores (e.g., Cabela's ), partnerships with firearms manufacturers and effective marketing through social media influencers and websites.

Ron was focused on selling Gemtech products through Silencer Shop, the largest suppressor distributor in the United States. A relationship that was important to S&W even in 2020 as they identified Silencer Shop as their number one distributor for suppressors.[14]

The five months of data in 2017 demonstrates that Gemtech was successfully shifting to higher-priced units while holding their market share very similarly to 2016 as they ramped up capacity efforts for the higher priced units. Gemtech had product back-ordered as noted in my report, which highlights that demand for their product was not falling; it was once again a capacity issue.[15]

---

[14] SW354714-354722.
[15] Murdock Report, pp. 10-11.

### 5. Gemtech's Financial Difficulties

Mr. Pickett presents evidence of Gemtech's cash flow shortages and inability to obtain additional financing, suggesting this would impede its growth. He highlights emails indicating a maxed-out line of credit and the bank's condition of a second lien on Mr. Martinez's house if the sale failed.

**Rebuttal:** It is common for smaller businesses, especially those experiencing rapid growth or strategic shifts, to experience cash flow constraints and utilize lines of credit to their maximum.[16] This indicates a functioning financial relationship, not a complete inability to secure funds.

However, Mr. Pickett's argument is misguided. According to Mr. Martinez, the e-mail that Mr. Pickett refers to on line 602 of his report, where Mr. Pickett concludes Gemtech was in financial difficulty, was initiated to facilitate a buyout of Gemtech shareholder Kel Whelan as required by the APA. This increased line of credit wasn't part of Gemtech's normal business operations. In the normal course of business, if Gemtech needed an increase in their line of credit, Mr. Martinez would contact Washington Trust and they would increase the line of credit based on their relationship. This is demonstrated in the June 25th e-mail, which Mr. Pickett presented in his report from Jack Heath, President of Washington Trust Bank. The e-mails shown on rows 597 and 599 of Mr. Pickett's report assumed that Gemtech was not in a strong financial situation. Mr. Pickett misunderstands the nature of the e-mails and presents Gemtech's financial situation under false pretenses. He ignores that these discussions regarding Mr. Martinez's line of credit are related to closing the transaction as dictated by the APA, not a part of Gemtech's normal business operations. According to Mr. Martinez, S&W was intimately aware of Gemtech's financial status at the time of the acquisition. Gemtech was not experiencing a cash flow shortage nor did they need additional loans to operate.

### 6. Foregoing Other, More Profitable Opportunities (S&W's Resource Allocation)

Mr. Pickett reiterates Mark Smith's deposition testimony that S&W's goal is to "manage the overall success of the business," balancing limited resources and directing them towards activities with the "best return overall for the business," not maximizing any

[16] Binks, Martin R., and Christine T. Ennew. "Growing Firms and the Credit Constraint." Small Business Economics 8, no. 1 (1996): 17–25.

one product line. He uses this to argue that S&W was justified in allocating resources away from Gemtech, especially given the failure of the HPA.

**Rebuttal:** While S&W directors have fiduciary duties to act in the best interests of the company and shareholders , the APA also explicitly states that S&W "shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder." The crux of the plaintiff's claim is whether S&W's actions crossed the line into bad faith, regardless of their broader corporate strategy. Mark Smith's deposition acknowledges in reference to Gemtech that the decision to reduce force was due to "a lot of business factors" and "revenue wasn't coming in as we anticipated", but this doesn't preclude the possibility that S&W's actions actively contributed to that revenue shortfall.[17]

In summary, Mr. Pickett's "intervening factors" represent challenges that any business might face. The key question for damages is whether S&W's alleged actions exacerbated these challenges for Gemtech, prevented Gemtech from overcoming them, or constituted a breach of their contractual obligations related to the acquisition and the Earn-Out.

### F. Rebuttal to Pickett's Opinion 7: Failure to Account for Risk

Mr. Pickett argues that the Murdock Report failed to account for risk and uncertainty by not discounting projected cash flows, implying that the forecasted cash flows were assumed to be earned with "absolute certainty." He states that "all years of the claimed damages should be discounted back to the date that the alleged damage was incurred." He provides examples of risks not accounted for, such as increased competition, capacity issues, and ATF violations.

**Rebuttal:** While Mr. Pickett emphasizes "absolute certainty", the AICPA guidance he cites discusses two approaches: "risk-adjusted discount rate" (Capital Markets Approach) and "adjustments for risk directly in the cash flow" (Expected Cash Flow Approach). My report's projections, by their nature, are "but-for" scenarios that account for a hypothetical reality like that of an Expected Cash Flow Approach. If the projections are based on reasonable assumptions of market conditions and Gemtech's capabilities, the "risk" may be addressed through the construction of the "but-for" scenario itself rather than solely through a discount rate. My analysis

[17] Pickett Report, p. 23.

accounts for risk and reduces uncertainty by relying on the actual past performance of the suppressor market as captured in the number of ATF Form 3 applications per year. This establishes the market opportunity available for Gemtech to capture with reasonable certainty. By establishing the market revenue opportunity, I attempted to discount Gemtech's performance based on their potential market share which was stable over 29 months to calculate the revenue opportunity available to Gemtech under Scenario 1.[18]

The Capital Markets Approach relies on systematic and unsystematic risk to calculate a discount rate to apply to cash flows. I chose to not implement this approach in my analysis by relying on a single discount rate to account for risk because I have accounted for systematic risk (market risk) by using actual historical performance of the suppressor market during the damage period which encompasses the market risk related to things such as economic downturn and inflation. The unsystematic risk (idiosyncratic or specific risk) is partly captured by my reliance on actual suppressor market data to capture the risk specific to the industry Gemtech was operating in. The other idiosyncratic risk can be captured in my market share assumption for Gemtech, based on a 29 month operating period. My approach is reasonable.

My analysis assumes Gemtech would have continued to operate and grow. If the "but-for" cash flows are well-supported by evidence of Gemtech's potential and market conditions, then the application of a discount rate to all past and future lost profits would be excessive, especially if it leads to double-counting risk already considered in the "but-for" projection.[19]

Even if we consider Mr. Pickett's approach, he states that his method should account for pre-judgment interest but he does not calculate the pre-judgment interest in his report, and thus he understates damages using his own proposed methodology.[20] To demonstrate this, if I were to account for prejudgment interest utilizing the Idaho statutory rate of 12%, even when using Mr. Pickett's overstated discount rate, the damages would range from $15.7 million to $31.2 million. As one can see, the differences presented by Mr. Pickett relative to my report after adjusting for pre-judgment interest are much smaller than those presented in his report.

[18] The Comprehensive Guide to Economic Damages: Volume One, Fifth Edition, Chapter 6, p. 97.
[19] Robert Dunn & Everett Harry, "Determining Economic Damages" (10th ed.). AICPA Forensic and Valuation Services Practice Aid.
[20] Pickett Report, p. 34.

| Impact on Lost Profits by Accounting for Pickett's Risk Factor and Pre-Judgment Interest | | | |
|---|---|---|---|
| Scenario | Lost Profits Net of S&W Payments (Original) | Lost Profits Net of S&W Payments and Pre-judgement Interest | Lost Profits Per Pickett Net of S&W Payments |
| 1 | $19,290,704 | $15,745,759 | $8,101,756 |
| 2 | $26,692,246 | $22,155,112 | $12,613,503 |
| 3 | $38,007,063 | $31,209,303 | $19,234,702 |

As another example, if we applied a risk free rate and discounted the past losses, the damages would range between $25.5 million to $47.6 million, after accounting for pre-judgment interest.

| Impact on Lost Profits by Accounting for Risk-Free Rate Factor and Pre-Judgment Interest | | | |
|---|---|---|---|
| Scenario | Lost Profits Net of S&W Payments (Original) | Lost Profits Net of S&W Payments + Pre-judgement Interest | Lost Profits Per Pickett Net of S&W Payments |
| 1 | $19,290,704 | $25,549,886 | $8,101,756 |
| 2 | $26,692,246 | $34,494,086 | $12,613,503 |
| 3 | $38,007,063 | $47,616,672 | $19,234,702 |

The damages presented in my report are reasonable and appropriately account for risk.

### G. Rebuttal to Pickett's Opinion 8: Lack of Analysis for Market Share Growth

Mr. Pickett contends that the Murdock Report lacks sufficient analysis to support its assumptions of Gemtech maintaining or increasing its market share (12%, 15%, and 20% in various scenarios). He dismisses opportunities like Cabela's and partnerships with firearms manufacturers as unquantified, and criticizes the reliance on Mr. Martinez's beliefs and three years of historical sales.

**Rebuttal:** Mr. Pickett unfairly downplays the potential and planning that underpinned Gemtech's market share projections. My analysis gives time for the ramp up of additional capacity to meet the customer demand for the suppressor market.

Gemtech's sales improved under Ron Martinez's leadership, with total sales increasing to $11.2 million in 2016, of which $7.5 million were suppressor sales. This demonstrates

a positive growth trajectory leading up to the acquisition, providing a basis for projecting future growth.

My report details concrete opportunities that Gemtech was actively pursuing:

- **Cabela's:** Martinez's belief that Cabela's would purchase a significant number of SKUs and push them to over 70 stores represents a substantial potential revenue stream.
- **Firearms Manufacturers:** Partnerships to replace flash hiders with Gemtech Quickmounts represent a significant Original Equipment Manufacturer (OEM)-style sales channel. This was a strategic initiative that could reasonably drive market share growth.
- **Marketing Efforts:** Gemtech had successfully leveraged social media influencers, magazine ads, and social media advertising (Facebook, Instagram) to increase brand awareness indicating a planned marketing strategy, not just a vague hope for growth. Gemtech's tax returns reflect the additional efforts of advertising and marketing under Mr. Martinez's leadership starting in 2015.

| Gemtech's Advertising Expenses as Reported on Gemtech's Annual Tax Returns | | | | | | |
|---|---|---|---|---|---|---|
| 2011 | 2012 | 2013[21] | 2014 | 2015 | 2016 | 2017 |
| $114,412 | $142,474 | $172,259 | $301,608 | $659,321 | $666,923 | $669,590 |

Mr. Pickett's criticism of these opportunities as "unquantified" is a semantic distinction. My report identifies these opportunities as contributing factors to the projected market share growth. While precise revenue figures for each might not be individually broken out in the report because Gemtech was sold before these came to fruition and S&W did not capitalize on these opportunities, they collectively support the reasonableness of the overall market share assumptions.

Ultimately, my analysis was conservative and assumed that approximately 1.75 million suppressors would be sold from August 7, 2017 through December 31, 2024. This assumption is conservative based on the data contained in the ATF Firearms

[21] I did not have access to the 2013 tax return, this is from Gemtech's P&L.

Commerce in the United States statistical reports which shows that from February 2018 to May 2024 approximately 2.05 million suppressors were registered.[22] To emphasize, the data stopping in May 2024 results in an understatement of the actual market of suppressors sold in 2024. Therefore, my estimate of the sales opportunity in the suppressor market is reasonable.

| ATF Firearms Commerce in the United States - Annual Statistical Update | | |
|---|---|---|
| Date | Total Registered Silencers | Increase Since Last Date |
| 12/2010 | 285,087 | - |
| 3/2012 | 360,534 | 75,447 |
| 4/2013 | 494,452 | 133,918 |
| 3/2014 | 571,750 | 77,298 |
| 2/2015 | 792,282 | 220,532 |
| 2/2016 | 902,805 | 110,523 |
| 4/2017 | 1,360,020 | 457,215 |
| 2/2018 | 1,489,790 | 129,770 |
| 5/2019 | 1,750,430 | 260,640 |
| 4/2020 | 2,042,720 | 292,290 |
| 5/2021 | 2,664,770 | 622,050 |
| 5/2024 | 3,536,620 | 871,850 |

As demonstrated in the table above there were 2,046,830 suppressors registered from February 2018 through May 2024. Scenario 1 from my original analysis assumed that Gemtech would sell 203,138 or 12% of the expected market. With additional data available now my Scenario 1 only assumes a 10% market share of the known sales from February 2018 through May 2024. Also this does not include additional suppressors registered from August 2017 to February 2018 and June 2024 through December 2024.

[22] United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update 2018. Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024

| | | Projected Market (Aug. 2017 to Dec. 2024) | | Actual Market (Feb. 2018 to May 2024) | |
|---|---|---|---|---|---|
| | Units Sold | Market | Market Share | Market | Market Share |
| Scenario 1 | 203,138 | 1,692,817 | 12.0% | 2,046,830 | 9.9% |
| Scenario 2 | 252,870 | 1,692,817 | 14.9% | 2,046,830 | 12.4% |
| Scenario 3 | 327,732 | 1,692,817 | 19.4% | 2,046,830 | 16.0% |

Mr. Pickett states my report didn't address the competitive landscape, disadvantages or advantages of the suppressor market. However, I do address this in my report and I reviewed documentation relevant to this.[23] Gemtech products have been sold for decades and have maintained a positive reputation with customers over that time.[24] When S&W announced their purchase of Gemtech, James Debney, President and CEO of American Outdoor Brands, said, "Gemtech is widely recognized for producing some of the finest rifle and pistol suppressors in the market. Gemtech's strong product development capabilities, combined with our experience in brand management and our manufacturing expertise, will help us to efficiently develop both firearms and suppressors, minimizing our time to market for both product categories. We view this acquisition as opportunistic, allowing us to enter the suppressor category, which resonates strongly with our core firearm consumer, at a time when the market is particularly soft. These elements combine to make Gemtech an excellent fit with our long term strategy."[25] This indicates that S&W viewed Gemtech had a strong competitive position in the market and a product that could capture market share. Ultimately, I account for this by relying on Gemtech's actual market share of the suppressor market.

In summary, my report provides a narrative of strategic initiatives and a growing market that, when combined with Gemtech's pre-acquisition performance, supports the projected market share increases. Mr. Pickett's dismissal of these factors as speculative relies on a higher burden of proof than is reasonable for a "but-for" projection, especially when S&W's alleged actions prevented the full realization of these opportunities. There have been significant opportunities in the suppressor

---

[23] Murdock Report, p. 2. GT00359-00363.
[24] GT000360.
[25] https://ir.smith-wesson.com/news-releases/news-release-details/smith-wesson-corp-acquire-gemini-technologies

market since 2017 and Gemtech was positioned to capitalize on the industry growth.[26] Meanwhile, Mr. Pickett fails to present a market share and focuses on a 2016 manufacturing capacity which ultimately concludes that Gemtech's market share would have been 6% before applying a discount rate.[27]After adjusting for the discount rate that Mr. Pickett applied, his assumption is that Gemtech would have a 4% market share.[28] Mr. Pickett fails to justify why Gemtech's market share would be so low relative to their historical performance prior to being acquired by S&W.

### H. Rebuttal to Pickett's Opinion 9: Financial Model vs. Projection

Mr. Pickett distinguishes between financial models used for "stress testing" and "projections," suggesting that S&W's internal "rate of return model" was merely a conservative scenario presented to the board to meet a minimum required rate of return for the base purchase price, not a realistic forecast.

**Rebuttal:** Mr. Pickett attempts to minimize the significance of S&W's internal financial models, but his explanation still supports the idea that S&W had expectations for Gemtech's performance that were not presented to Gemtech prior to the acquisition. Thomas J. South outlines these issues further in his report dated June 20, 2024.

I am a credentialed actuary with significant experience in evaluating financial disclosures included in public company filings with the U.S. Securities and Exchange Commission (SEC). Historically, I have participated in audits of public companies as well as filings included in quarterly (10-Q) and annual (10-K) filings.

I have also served on finance, risk, and audit committees, where I helped review and oversee financial statements and public disclosures. This work required an understanding of both SEC regulations and the professional standards that govern the preparation of financial disclosures, including those related to mergers and acquisitions.

It is my understanding that the model being referenced by Mr. Pickett was disclosed by S&W as part of their 10-K and 10-Q filings. A financial model being disclosed in its 10-K or 10-Q, particularly in the context of a material transaction such as a business

---

[26] https://smokinggun.org/nssf-americans-bought-1-4-million-silencers-in-first-six-months-of-2024/
[27] See Pickett Report, Schedule 2 to 2.2 as he assumes only Gemtech would sell 124,949 to 132,026. Whereas the number of suppressors registered from February 2018 to May 2024 was 2,048,832.
[28] He assumes Gemtech would produce 83,696 to 89,774 units from August 2017 through December 2024.

acquisition, must reflect a good-faith, reasonable estimate of management's expectations at the time. It is not acceptable to later recharacterize that model as merely a "stress test" or an unrealistic scenario if it was used to justify the acquisition to the board and incorporated—explicitly or implicitly—into the company's public filings.

This principle is reinforced by both SEC regulations and U.S. GAAP standards, particularly ASC 805 – Business Combinations, which KPMG references in their Valuation Summary as of August 8, 2017, where the Gemtech Earn-Out is valued at $100,000. ASC 805 requires that acquirers measure and recognize the fair value of assets acquired, liabilities assumed, and any resulting goodwill at the acquisition date using the acquisition method. This process often relies on financial models and projections, which must reflect management's best estimates, not hypothetical or extreme-case scenarios, unless specifically disclosed as such.

Under ASC 805, assumptions that support the valuation of future cash flows (used to value intangible assets or test for goodwill impairment) must be supportable and aligned with management's actual plans and outlook.[29] Any use of highly speculative or "stress test" projections would not comply with ASC 805 unless those projections were clearly identified as non-base-case and used strictly for sensitivity analysis—not as the basis for fair value or board approval.

Further, under Regulation S-K, Item 303(a), companies are required to disclose "known trends or uncertainties" that are reasonably likely to affect financial performance.[30] The Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section must be a transparent narrative that shows investors how management views the business. Any model used to justify a major transaction—and especially one that is included in a public filing—is presumed to be material and must meet the threshold of being not misleading, reasonably supported, and disclosed in good faith.

In my opinion, financial models presented to a company's board to justify an acquisition—and subsequently disclosed in a 10-K or 10-Q—must reflect reasonable, supportable expectations consistent with both SEC disclosure obligations and U.S.

[29]ASC 805 – Business Combinations, FASB Accounting Standards Codification (especially ASC 805-10-25 and ASC 805-20-25).
[30]17 C.F.R. § 229.303(a) (Regulation S-K, Item 303).

GAAP, including ASC 805. Downplaying the model after the fact as merely a "stress test" or unrealistic undermines the reliability of the disclosure and is inconsistent with the standards of care required for public company reporting and governance.

**I. Rebuttal to Pickett's Opinion 10: Domestic and International Police and Military (DIPM) Sales and the May 21, 2025 Expert Report of Robert G. Suber of MGS, LLC.**

Mr. Pickett discounts the potential for Domestic and International Police and Military (DIPM) sales, arguing that Gemtech lacked manufacturing capacity, S&W was incentivized to make these sales, and there was uncertainty about achieving them. He highlights Jason Pace's testimony acknowledging "no guarantee" of closing sales.

Additionally Robert G. Suber, of MGS, LLC (hereafter "Mr. Suber"), in his Expert Witness Report dated May 21, 2025 opines that S&W's compliance program is reasonable and that Gemtech's international sales projections, particularly those in the Executive Review of International Sales Potential (the "BEC" Presentation), were unrealistic and reflected a lack of industry experience and credibility, leading to his conclusion that S&W did not unreasonably prevent Gemtech from making sales and that Gemtech's brand reputation was poor.

**Rebuttal:** This does not impact my analysis, as DIPM sales were not taken into consideration and my analysis was completed independently.

However, Mr. Pickett's and Mr. Suber's dismissal of DIPM sales potential ignores significant pre-acquisition efforts and the alleged direct interference by S&W.

My report explicitly alleges that S&W's general counsel and compliance director "had already canceled the licensing to permit the shipment of the products for international demonstrations and sales," unbeknownst to Mr. Martinez and Mr. Pace. This is a direct allegation of S&W actively thwarting potential sales, not simply choosing other profitable opportunities. If this is true, it is not about a lack of Gemtech capacity or S&W's incentives; it is about S&W preventing the realization of these sales.

Mr. Pickett argues Gemtech lacked capacity. However, had S&W not purchased Gemtech and Gemtech retained control, Gemtech would have focused on building or securing the necessary capacity to fulfill these orders. It is S&W's alleged

responsibility for failing to bring that capacity to bear post-acquisition, or for preventing Gemtech from doing so independently.

Mr. Pace's testimony that there was "no guarantee" of closing sales is a statement of commercial reality. No deal is ever "guaranteed" until signed. However, "no guarantee" does not equate to "no potential" or "no probability." Businesses pursue opportunities that have a reasonable probability of success. If S&W allegedly cut off the ability to pursue these opportunities, it is a lost potential for Gemtech that should be considered.

Mr. Pickett argues that S&W was incentivized to make these sales and would have pursued them if "actually realizable and feasible." Again, this ignores the reality of deliberate interference. The most crucial point, as alleged, is S&W's active cancellation of licensing. Additionally, S&W fired Mr. Pace and Mr. Martinez and as stated by Mr. Pickett, allocated resources to different parts of their operations and away from Gemtech pursuits. This is not about S&W's incentives; it's about alleged deliberate action that prevented the sales.

In conclusion, the dismissal of DIPM sales by Mr. Pickett relies on shifting blame to Gemtech's pre-existing limitations while ignoring the explicit allegations of S&W's direct interference that allegedly prevented the realization of these substantial opportunities. I am not providing an opinion on any lost DIPM sales and my analysis is presented independent of these opportunities. However, if it is determined by the trier of fact that there is a lost opportunity of DIPM sales, they should be added to the damages I presented in my report utilizing the tool I provided in Appendix A, based on the magnitude of the DIPM sales that are determined to have been lost.

## III. Conclusion

Mr. Pickett's Report attempts to question the methodologies, assumptions, and the underlying factual basis for Gemtech's claims indicated in my report. However, Mr. Pickett's criticisms are found to be flawed, incomplete, or based on a misinterpretation of facts or standard methodologies.

Unlike Mr. Pickett, I utilized a method that was based on a specific state of facts, prepared a model based on Gemtech's historical data and the market data, and

demonstrated to a reasonable degree of economic certainty, the calculation of Gemtech's damages as a result of post-closing breaches as well as pre-closing misrepresentations.

Despite Mr. Pickett's lengthy report, he adopts almost the entirety of my analysis and model by utilizing the same assumptions I established. The only two factors that Mr. Pickett ultimately varies on are Gemtech's manufacturing capacity and applying a discount rate. For Mr. Pickett to assume that Gemtech could not make any improvements to their annual capacity over a 7 year period is unreasonable. Mr. Pickett's discount rate applied to Gemtech is excessive based on the data available and fails to consider the risk already captured in my analysis.

The purpose of my report, particularly in the context of rescissory damages, is to illustrate what Gemtech would have achieved had the alleged wrongful conduct not occurred. Mr. Pickett's report fails to provide a compelling counter-narrative that fully accounts for the alleged actions of S&W and their direct impact on Gemtech's economic potential.

The arguments presented in this report aim to demonstrate that Gemtech's claims of economic loss, as outlined in my report, remain robust and are not rendered speculative or unreliable by Mr. Pickett's analysis. Mr. Pickett's analysis is flawed, incomplete, or based on a misinterpretation of facts or standard methodologies. My analysis is reasonable and economically sound.

**Bibliography**

Plaintiff's Economic Loss Report by Matthew Murdock: 6/21/2024.

Defendants Designation of Expert Witnesses': 5/21/2025.

Exhibit A: Lone Peak Valuation Group Expert Report: 5/21/2025.

Exhibit C: Expert Report of Robert G. Suber: 5/21/2025.

Exhibit D: Expert Report of Hank Yacek: 5/21/2025.

Text Confirming SOCOM Pursuit: 2016.

Exhibit 590 Email: Manufacturing Issues: 4/28/2020.

Email: Suppressors Silencer Shop Priority Distributor: 7/27/2020.

Letter: Pro-Fab Confirming Operation Abilities: 7/17/2025.

United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update 2018.

Alcohol, Tobacco, Firearms and Explosives Firearms Commerce in the United States, Statistical Update 2024.