IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation, | ) Case No. |
| | ) 1:18-CV-00035-CWD |
| Plaintiff, | ) |
| vs. | ) |
| SMITH & WESSON, CORP., a Delaware corporation; and AMERICAN OUTDOOR BRANDS CORPORATION, a Massachusetts corporation, | ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION OF JAKE KUNSKY

July 10, 2024

Boise, Idaho

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR



Exhibit 2

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

JAKE KUNSKY,

a witness having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. JENSEN:
Q. Good morning, Mr. Kunsky.
A. Good morning.
Q. Have you ever had your deposition taken before?
A. No.
Q. Well, I'm just going to go over a few ground rules, then, and feel free to ask any questions if you have them at this early point about how the deposition will work.
But first off, I'll ask: Do you have any health situations that might impair your ability to hear, understand, or respond to the questions today?
A. No.
Q. Are you on any medications that may impair your ability to hear, understand, or respond



to the questions today?
A. No.
Q. Then as far as ground rules go, we do need verbal responses.
Do you understand that?
A. Yes.
Q. Okay. And that's just because, you know, while we are videoing, we're also having a transcript taken, and so we'll need to have it clear in the record whether they're yeses or noes versus nods of the head, et cetera.
And then I'll also ask that you'll allow me to finish my full question before beginning to answer.
Do you understand that?
A. Yes.
Q. Okay. And that also just makes the record clearer. And I will say that sometimes I do pause, and that can be annoying, but I'll just ask you to bear with me.
And then if you for any reason don't understand my question, would you ask me for clarification?
A. Yes.
Q. Okay. And so then if you do answer a



question, I'm going to assume that you did understand it; is that fair?
MR. TROUT: Object to the form.
Q. (BY MS. JENSEN) You can go ahead and answer.
A. If I answer it that I understood it?
Q. Yes.
A. I guess it's open for discussion. I'm hoping I understood it, but I don't know if I did. It isn't a fact statement.
Q. Okay. So if you answer a question, then you believe that you understood it?
A. To the best of my knowledge.
MR. TROUT: Object to the form.
Q. (BY MS. JENSEN) Yes.
MR. TROUT: You can answer.
THE WITNESS: Yeah.
Q. (BY MS. JENSEN) Okay. That's fine.
A. It doesn't mean I know for sure what the question was. I'm just trying my best to answer it.
Q. Sure. Of course.
Okay. And then we will try to take breaks. I like to take breaks about once every hour just to give everyone a chance to stand up and



stretch and et cetera, but if you feel the need to take a break at another time, please feel free to do so.
And then -- and I will just ask that you don't take a break while a question is pending. So answer the question, then you can take a break whenever you feel.
Does that make sense?
A. Yes.
Q. Okay. Thanks.
So, Mr. Kunsky, did you prepare for your deposition today?
A. I'm here.
What do you mean, "prepare"?
Q. Did you review any documents --
A. No.
Q. -- in anticipation of your deposition today?
A. No.
Q. Okay. Did you review any records or files?
A. No.
Q. Did you speak to anyone in anticipation of your deposition today?
A. Yes.





Exhibit 2

(Clarification by the court reporter.)
THE WITNESS: Account. Sorry, that's my Bruneau kicking in.
Q. (BY MS. JENSEN) Did you ever participate in sourcing raw materials?
A. No, not then. No, I -- I did for myself a lot when I was doing the contracting. So I was familiar with it, I knew the accountholders, but at Gemtech they had a person that did that.
Q. Who at Gemtech was responsible for sourcing raw materials when it was something that Gemtech was doing and not the vendor?
A. I think it would have been Taylor Knapp.
Q. What was his title?
A. That guy wore a lot of hats, so I don't know. I know he did compliance at one point. He was the purchaser. His title changed a few times during that course, I believe. He was a go-to guy. He could get -- he'd do anything kind of guy.
Q. Were you ever aware of any issues that Gemtech had with sourcing sufficient raw materials when it was up to Gemtech to find those raw materials?
MR. TROUT: Object to the form.
THE WITNESS: I wasn't -- I didn't -- I

Page 134

wasn't involved in that. I can say on my side, we didn't have any issues sourcing materials. Sometimes price would change, but it's a commodity. It changes often.
Q. (BY MS. JENSEN) And that wasn't really part of your job to source materials?
A. It was not. Not for Gemtech. For myself, for my own business, during the same timeframe, I had no issues getting materials.
Q. So did you personally interact with the external manufacturers in your capacity as, you know, an R&D director for Gemtech?
A. Some, yeah. Depending on the accounts, some quite a bit and some less.
Q. Okay. Which manufacturers did you have interactions with?
A. I mean, I worked with all of them a little bit, but mainly it would have been Dave Adamson, Pro-Fab, and Gary Abrams was probably the main ones I dealt with.
Q. Does Dave Adamson's manufacturing business have a name?
A. Like, APD or something. APD? They're no longer in business, so I don't know.
Q. When did they go out of business?

Page 135

A. Like, two years ago or something like that, I believe. Actually, they didn't go out of business. They sold. Sorry. They have sold the business -- that business is still there, but he doesn't own it anymore.
Q. Do you know who Mr. Adamson sold AP Manufacturing [sic] to?
A. A guy named Craig that's in a wheelchair. That's all I know. I don't know his last name or -- he got paralyzed in the military or something like that. That's all I know about him.
Q. Do you know if the buyer, Craig, whether he had a name for his business?
A. He bought their business too. They had a -- well, a machining business and then a suppressor business. So he purchased StingerWorx Suppressors.
Q. Sorry, so Craig purchased StingerWorx?
A. Uh-huh.
Q. And also APD Manufacturing?
A. Yeah, because it was all kind of one. They were separate, but I think it's all one now.
Q. And to your understanding, when did that purchase occur?
A. I think it's about two years ago.

Page 136

Q. Do you know whether the purchaser, Craig, did further -- excuse me.
Do you know whether the purchaser, Craig, after purchasing APD Manufacturing continued to manufacture for outside vendors like Gemtech?
A. I think he did, yes, but not Gemtech.
Q. Do you know why that was?
A. I believe when Smith & Wesson bought Gemtech, they -- well, what I was told, they were going to do all the manufacturing in-house at their facility in Massachusetts, was the business model I was told, so they wouldn't be needing other vendors.
Q. So what I understand, you worked with APD Manufacturing until they sold, correct?
A. Uh-huh.
Q. And then you mentioned also working with Pro-Fab.
Is that Alexandria Pro-Fab?
A. Yes. Yep.
Q. And what were your -- who was your contact at Alexandria Pro-Fab?
A. I'm looking at his face. Sorry, it's been a while too. What is his name? Let me look it up. Dave Dahl.

Page 137

Q. How do you spell last name?
A. D-a -- is it h-l? Yeah, D-a-h-l.
Q. And what was his title?
A. I think he was, like, operations manager. He ran the machine shop.
Q. And how often were you interacting with Mr. Dahl?
A. Pretty often. Yeah, weekly, at least, I'd say.
Q. What was the nature of those interactions?
A. Basically at the timeframe we were shopping machine shops, and they had all the capability that we needed to do what we -- to grow to the next level, and we had already engaged with them on multiple projects, and they were doing a fantastic job, and their clients are John Deere and Polaris, so they're very -- they were -- they were the speed we needed to grow quickly.
Q. So what projects had Alexandria Pro-Fab completed for Gemtech?
A. I can't remember what parts they were making, to be honest. It was a variety of parts, but I can't remember the specific ones. No assemblies, that I know of. It was all



sub-assemblies, but quite a variety. They were capable of making anything we made and quickly. They were a really good machine shop.
Q. Do you know whether Alexandria Pro-Fab had manufactured any suppressors for anyone?
A. Yeah, I believe they -- yeah, they had made a lot of firearm accessories, firearms, suppressors. They were -- I don't know what brand they made, but...
They didn't release brand names to us because they manufactured for a lot of different companies, and then that was part of the nondisclosure as far as who the companies were, but walking around the shop I could see firearm parts everywhere, just because of my background and knowledge.
Q. So you toured the facility at Alexandria Pro-Fab?
A. I did.
Q. Did you see any suppressor parts when you were walking around?
A. Yes.
Q. Did you ask at any point whether Alexandria Pro-Fab was set up to do suppressor manufacturing?



A. Absolutely.
Q. And tell me about --
A. That's why we were there, yeah.
Q. Tell me about that discussion that you had.
MR. TROUT: Object to the form.
THE WITNESS: I mean, really, so suppressor manufacturing is based off of what type of machine you have. So the round parts you need a lathe, and they had multiple lathes that were ideal for suppressor manufacturing.
Q. (BY MS. JENSEN) Anything else about Alexandria Pro-Fab that was, to your mind, a good fit for Gemtech for manufacturing suppressors?
A. They were something I hadn't seen before personally on a professional level, and multi-generation. They were probably four generations into it, where I'm from the West and, I mean, even the town I live in is, like, a hundred years old. So they were 2- to -- 200 years-plus of manufacturing, tribal knowledge is really strong, quality control was a massive department, and the fears I had of gauging and checking things that we've been implementing, they were light years ahead on. They were really good at what they did.



They're a lean manufacturer, so the parts they ship for John Deere or Polaris get installed on the product the day they ship, and if they can't get installed, the other will fine the company $50,000 a day and send the whole line home because they can't install the part. So their performance has to be at a very high level. Those are things that we don't see here in the West, and they were -- they were the perfect fit.
Q. So you talked about the fears you had about gauging, based on earlier experience with other manufacturers.
What was it about Alexandria Pro-Fab that made you feel better about the gauging issue?
A. Not only did they have -- they had all the gauges already. We weren't having to provide them. They had the capability of making gauges in-house. So they could make them themselves. That's their level of competence. So there wasn't any, like, sending them out to get inspected, losing them for eight weeks, having to use a spare one. They made them and inspected them on site. Very efficient.
Q. So with other manufacturers in the past when you did have gauging issues, I thought you had





**Exhibit 2**

testified that the manufacturers might have had gauges, but they were different from the ones that Gemtech had; is that right?
A. They could be made by a different manufacturer, and there could be some slight differences. On paper, they're not supposed to be. They're, like, to the national standard. It's out of the Machinist's Handbook, it should be. But real life, there's variance that exists, and even temperature can change a gauge. The day it was made could change the gauge slightly. So there can be some variance.
But if you build to the Machinist's Handbook, it has that variance built in. But if you start on the wrong side of it, you can get in trouble. There's not any room for error. If you build in the middle, you can have air left and right.
Q. So did you do anything to verify that Alexandria Pro-Fab's gauging system was proper for Gemtech's needs?
A. Yeah. We did an on-site inspection.
Q. And what did you do to inspect?
A. Checked the parts with the gauges.
Q. And what does that entail? What does

Page 142

that process look like?
A. Measuring -- use other measurement instruments to measure measuring instruments.
Q. Have you ever engaged in that gauging testing at other manufacturers?
A. No, because they couldn't make their own gauges or have their own testing department for it, at least the ones I dealt with. I think there was some other accounts that were big that may have had that, but I didn't personally build that.
But the facts of using measuring instruments through my career came up very often from the mechanic side. Automotive technology, we used torque wrenches that had to go through the same process and get measured. We had to send them out. On the weapons side in the Army, we had measuring instruments that checked all different things that had to get sent out. So it's a common thing in my field of work.
Q. So what kind of instruments did you use to check the gauges at Alexandria Pro-Fab?
A. Other measuring instruments.
Q. Are there names for the other measuring instruments?
A. Calipers.

Page 143

Q. Calipers?
Anything else?
A. So if you want to check a plug gauge, you use a ring gauge. If you want to check a ring gauge, you use a plug gauge. So you can use gauges against each other to validate them.
Q. And is that what you did at Alexandria Pro-Fab?
A. Yeah.
Q. And how long did it take to do this check of the gauges that you're describing?
A. It's pretty quick. Minutes.
Q. What else did you do while you were at Alexandria Pro-Fab?
A. Just kind of walked the floor, get to know the people, get -- you know, we got a tour, right? So watch their processes. I'm trying to think of what else. Just talked to the owner, things like that.
Q. How big was Alexandria Pro-Fab's production facility?
A. It's the biggest one I've been to. I think they were -- I want to say they had, like, 250 machines. It was substantially bigger than any of the other ones we dealt with. They were usually

Page 144

five to ten machines, maybe. So it was a big jump in capability, capacity.
Q. When you say "250 machines," like, what's included in a -- in that category of machines?
A. CNC machines that can cut the individual parts.
Q. And as you were doing the tour, I mean, how many individuals did you observe, I guess, on the production floor?
A. All the machines were running, it seemed like. Every machine had a person or two. Some had two. It was very active, very busy, very structured. They had a good structure.
Q. Did you have an idea what volume of production Alexandria Pro-Fab was engaging in each year of firearms?
A. I don't know specifically, but I know one -- one item, bulk carriers, they were doing, like, 10,000 bulk carriers a month, and that's substantial in our industry. That's a really big number. And that's really -- and they're pretty complicated and they're round. So that was kind of a validation mark for me. If they could do that, our parts were substantially easier than the bulk

Page 145

carrier, and the same machine could run it. So capability-wise, they had lots of it for our specific type of parts.

Q. And did you have an idea what the volume of production Alexandria Pro-Fab had per year as to suppressors?

A. I don't know, no.

Q. Did you gain an understanding through your interactions with people at Alexandria Pro-Fab or your tour whether or not Alexandria Pro-Fab had capacity to take on new work?

A. They did.

Q. And what's the basis of your understanding for that?

A. Looking at their job schedule and using them. We had been using them too. You know, they had capability, and they had added a second facility and had more room to grow, so if we needed to add in more machines, they were -- they could grow with us.

Q. Where was the second facility that you mentioned?

A. It was either right next to it or it was part -- maybe they lengthened it. I can't remember. It was one of the two. But it was right



there at the same site.

Q. And you don't recall what products -- what Gemtech products they produced for Gemtech?

A. I can't remember. I know probably, like, baffles and end caps and -- subcomponents. I don't remember them doing a full assembly.

Q. Do you remember what volume of production they were engaging in for Gemtech, even if you don't remember which exact products?

A. Quite a bit. I know we were moving more and -- we were giving them more and more work because of their performance. Quality was good, pricing was good, turnaround was good.

Q. So give me an idea, estimates of volume, understanding that you're not going to know exactly how many.

A. Thousands of parts.

Q. In a year or are we talking about --

A. Month.

Q. In a month?

A. I felt like, yes. It was subassemblies, right, not full assemblies, to my knowledge. I wasn't writing the POs, again, like I said, but --

Q. Okay.

A. -- we were getting a lot of -- that's



the purchaser that does that. Everything about Pro-Fab was looking really good for us.

Q. And when did you visit Pro-Fab, Alexandria Pro-Fab?

A. I don't know. I have no idea. Yeah, I can't remember.

Q. Was it when you were director of R&D at Gemtech?

A. Yeah, I don't know when. I cannot remember.

Q. Do you remember --

A. I know I went there. I walked it. I don't know when.

Q. Do you remember if anyone else from Gemtech was with you on that site visit?

A. I cannot remember that. I don't remember who would have went.

Q. About how long were you on site at Alexandria Pro-Fab?

A. I think it was two days, like, one day and then the next day, I believe. One or two days.

Q. So full days at the facility for two days or are we talking about shorter meetings?

A. It was, like, in and out. Like, go there, look at the -- because they kind of put us



through different departments. So it was -- yeah, at least a full day of inside the facility looking at things. So even went through shipping to quality control, machining, receiving of the material, and it's a big facility.

Q. Did you participate in entering into any contracts with Alexandria Pro-Fab on behalf of Gemtech?

A. No.

Q. Do you know if anyone at Gemtech did enter into contracts with Alexandria Pro-Fab?

A. That's not -- I have no idea.

Q. Did you visit -- was that a single visit to Alexandria Pro-Fab that you engaged in?

A. For Gemtech, yes.

Q. For Gemtech.

Oh, so had you visited Alexandria Pro-Fab at another point in time?

A. Later, after that. I had been back there before -- yeah, not before. After that point, I had been back there since, I guess.

Q. When you talk about the later visit, do you mean after you were no longer with Gemtech?

A. Correct.

Q. I know you said you didn't recall

price -- precisely when you visited Alexandria Pro-Fab, but do you recall whether this was during the time that Gemtech was, you know, considering -- or Smith & Wesson and Gemtech were considering entering into the asset purchase?
MR. TROUT: Object to the form.
THE WITNESS: I wouldn't have known. I didn't know that -- we didn't get informed about the purchase until the purchase had already happened, sadly. There wasn't an in-between time for me personally. But I would probably say it was before the purchase, but I don't know.
Q. (BY MS. JENSEN) Did you continue to have -- did you have further communications with Alexandria Pro-Fab after the purchase?
A. I think so, yeah, I believe, but I can't -- I didn't have to deal with them that much, I guess. They were more on the production side, so...
Again, if I had to get involved on the R&D side, it's because there was an issue. But they were a good standing account. I don't remember having to -- they didn't have to get me involved, that I know of.
Q. All right. And then the third



manufacturer that you named was, you said, Mr. Abrams.
Is that Abrams Airborne?
A. Uh-huh. Yes.
Q. And tell me about that professional relationship that you had with Gary Abrams.
MR. TROUT: Object to the form.
THE WITNESS: Gary Abrams is an industry member that's known, people know him, and I've just kind of -- even at SHOT Show, our big industry show, he was, like, a booth away from us. I knew him more on that level than anything else for the -- more of the relationship, and then dealing with him on machining stuff, I never dealt with him directly personally.
Q. (BY MS. JENSEN) Okay. Did you deal directly with anyone else at Abrams Airborne about any machining issues of Gemtech products?
A. No. It was all -- I think Blake handled that account.
Q. At some point in time while you were at Gemtech, did Abrams Airborne stop producing product for Gemtech?
A. I think that was after I left, I believe. Yeah, it would have been after.



Q. So to your understanding, Abrams Airborne did stop producing Gemtech product?
A. I don't know if he stopped completely, but I know they had, like -- there was issues going on. I don't know whose issues they were, but there was issues.
Q. All right. Were there any other external manufacturers that you interacted with while you were in Gemtech R&D?
A. No.
Q. When you worked for Gemtech, did you own any Gemtech suppressors?
A. Yes.
Q. Which ones?
A. 32 of them, all of them.
Q. Is that all of them?
A. It's more than all. I had multiples of each SKU.
Q. Did you own suppressors from any other brands?
A. Not at that time. They were all Gemtech ones.
Q. Why did you own all of those 32 Gemtech suppressors?
A. Especially early on, if we -- we would



do product trade. If we did a show or an event, when I was a contractor, they -- that was an incentive. You could get a free suppressor from the company. That was an incentive part of it. Other ones I just bought.
And then another part of the employee incentive was you could buy, I think maybe -- I think it was, like, four suppressors at cost a year, things like that. Phil Dater, one of the original owners, gave me one one time as a gift. That's -- so, yeah, I slowly accumulated.
Q. Do you still have those suppressors?
A. Yes.
Q. So you mentioned that you found out about the acquisition by Smith & Wesson kind of at the time or after it occurred; is that correct?
A. They came and did a -- I don't know what you'd call it, like, an announcement --
Q. And who is "they"?
A. -- and all of us --
Smith & Wesson team and Ron and everyone involved in that.
Q. Okay.
A. HR. There was, like, a small group of them.





Exhibit 2

Q. (BY MS. JENSEN) I mean, if you take a look at the serial numbers on the two pages ending in 81 and 82 and compare them, Mr. Kunsky, does that look like the second page is just a repeat of what's on the first page?
MR. TROUT: Object to form.
THE WITNESS: I don't know. None of this has -- that is not familiar to me, so I don't know.
Q. (BY MS. JENSEN) Okay.
A. Yeah, I don't know.
Q. At the time of Smith & Wesson's acquisition of Gemtech, was Gemtech selling Quicksand?
MR. TROUT: Object to form.
THE WITNESS: We already talked about that, didn't we?
Q. (BY MS. JENSEN) We talked about the development of Quicksand to another product, correct?
A. Well, you're asking me if they were selling it. I thought they were, but I don't know. I don't know if the new model name is swapped out or -- I'm not 100 percent on that one. That was a sales thing, and there wasn't issues with it, so I don't know.



Q. Excuse me.
I know that you said that you didn't recall whether or not the revised Quicksand model, you didn't know what the name was, correct?
A. I cannot remember it. Yeah, I don't know.
Q. Would it have had a different name than Quicksand?
A. Potentially. Based off the trend, I would think they would have renamed it, but I just cannot recall it.
Q. Okay. So I'm just trying to understand, it would be called, like, the Quicksand-II or something like that?
A. Based off their other models, they didn't tend to do that. They would rename completely a new name.
Q. Okay.
A. Well, around the Smith & Wesson era, they wouldn't do that, but there was old suppressors they did do that with, like the Outback-II, that was -- I would guess they would have renamed it. That's my final answer, I guess.
Q. So this one has been marked as Exhibit 14 previously. I'm not actually going to



get into the weeds with this one.
So my first question is: Have you seen this before?
A. No, not that I've seen. It doesn't look familiar, but maybe, potentially, and -- I don't know. It doesn't ring a bell.
MS. JENSEN: Okay. I'd like to take five minutes just to consult with Mr. McCraney. So if we could go off the record briefly, then I think we're just about done.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Going off the record. The time is 5:14.
(A recess was taken from 5:14 p.m. to 5:21 p.m.)
THE VIDEOGRAPHER: Going back on the record. The time is 5:21.
MS. JENSEN: Mr. Kunsky, thank you for your time. I have no further questions at this time.
MR. TROUT: I have no questions.
THE VIDEOGRAPHER: Okay. This concludes the video deposition of Jake Kunsky. Going off the record. The time is 5:21.
(The deposition concluded at 5:21 p.m.)
* * *
(Signature was requested.)



REPORTER'S CERTIFICATE

STATE OF IDAHO )
) ss.
COUNTY OF ADA )

I, REBECCA MARTIN, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 22nd day of July, 2024.

Rebecca Martin

REBECCA MARTIN
RPR and Notary
Public in and for the
State of Idaho

My Commission Expires: 08-27-2024