Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
Cameron L. McCue (ISB #12329)
HOLLAND & HART LLP
800 West Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho 83701-2527
Telephone: (208) 342-5000
Email: efstidham@hollandhart.com
jmaiko@hollandhart.com
clmccue@hollandhart.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SMITH & WESSON SALES COMPANY, a Delaware corporation; and SMITH & WESSON BRANDS, INC., a Nevada corporation,<br><br>Defendants. | Case No. 1:18-CV-00035-REP<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE RE INTERNATIONAL, DOMESTIC MILITARY, AND LAW ENFORCEMENT SALES** |

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................ 1

II. BACKGROUND ........................................................ 1

A. Supposed International Sales Opportunities ........................................................ 3

B. Supposed Domestic Military and Law Enforcement Opportunities ........................................................ 7

III. LEGAL STANDARD ........................................................ 8

IV. ARGUMENT ........................................................ 8

A. No Witness May Opine on the Probability Potential Sales Would Close. ........................................................ 8

B. Future Losses Must Be Proven with Reasonable Certainty— Whether Something Is More Likely Than Not to Occur. ........................................................ 9

C. No Witness May Testify that Any International Sales Opportunity Was Probable or Certain. ........................................................ 9

D. No Witness May Testify that Any Military or Law Enforcement Sales Opportunity Was Probable or Certain. ........................................................ 10

V. CONCLUSION ........................................................ 10

## I. INTRODUCTION

Gemtech's only remaining claim is that Smith & Wesson breached the Earn-Out Provision of the Asset Purchase Agreement ("APA"). Dkt. 211 at 29, 37–38. To recover, Gemtech must show that Gemtech-brand gross revenue would have exceeded $36 million in the thirty-six months after the August 7, 2017 closing. Actual revenue for that period was about $7.2 million, less than one-fifth of the threshold. To close that gap, Gemtech plans to ask the Court to assume that a list of hoped-for international, military, and law enforcement deals would have closed. The evidence contradicts that assumption, and the rules of evidence do not allow it.

Gemtech's Amended Initial Disclosures called $228,015,000 in potential international sales across thirteen countries a "reasonable international sales expectanc[y]." They also implied an expert disclosure would support that figure. No expert ever explained how any of those sales were probable or how the number was calculated. Gemtech now intends to use lay testimony from Jason Pace, its former Director of International Sales, who it says will testify that "with hindsight, Gemtech would have closed the UAE and Saudi opportunities." Pace's own deposition testimony undercuts that opinion. The projected $130 million Saudi opportunity rested on $43,000 in sales in process, with no contract. Many of the projections assumed sales of machine gun suppressors that were still prototypes and had never been sold to anyone. Several opportunities, including Poland, Turkey, and Tunisia, involved countries where Gemtech had no sales history, and negotiations there were at most preliminary. Pace conceded that no opportunity not already licensed or under contract was guaranteed to close.

The supposed domestic military and law enforcement opportunities are on even weaker footing. Gemtech's revenue projections lumped military, law enforcement, international, and big-box retail sales together into round numbers. Its Rule 30(b)(6) designee could not explain

how those numbers were reached. And Pace testified he had no knowledge of sales revenue by customer type. None of the three people Gemtech identified as knowing about military or law enforcement sales is on its trial witness list.

The law does not allow speculation to fill these gaps. A lay witness may not give an opinion that seeks to predict the probability of future events. Future losses must be proven with reasonable probability, meaning that they were more likely than not to occur. And a witness may not project new business untethered to the company's actual operational history.

Smith & Wesson therefore asks the Court to rule before trial that no witness may testify that any international, domestic military, or law enforcement sales opportunity was probable or certain to close. A ruling now will also settle the scope of deposition designations and live testimony at the trial.

## II. BACKGROUND

After summary judgment, Gemtech's only remaining claim is that Smith & Wesson breached the Earn-Out Provision of APA. Dkt. 211 at 29, 37–38. The earn-out depended on Gemtech-brand gross revenue during the thirty-six months after the August 7, 2017 closing. APA §§ 1.6(a)–(b) (Dkt. 194-14). Smith & Wesson would owe an earn-out payment only if that revenue exceeded $36 million, and payments were capped at $17.1 million. *Id.* Gemtech-brand revenue during the earn-out period was approximately $7.2 million, far below the $36 million threshold. Dkt. 213, ¶ 151.

The APA gave Smith & Wesson "sole discretion with regard to all matters relating to the operation of the Business," subject to two limits: it could not take actions "in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment," and it had to

consult Martinez before a decision "only if [it] has knowledge that such decision will negatively impact the Earn-Out Payment." APA § 1.6(c); *see also* Dkt. 211 at 5–6.

Gemtech seeks to prove at trial that Smith & Wesson breached the Earn-Out Provision. As for damages, Gemtech appears to seek to include international, domestic military, and law enforcement sales numbers to demonstrate how much revenue Smith & Wesson should have generated but for breach of the APA. This Motion relates to whether Gemtech may offer opinion as to the probability of such sales closing and thus whether they can be "counted" toward reaching the $36 million threshold or beyond it.

**A. Supposed International Sales Opportunities**.

Throughout this lawsuit, Gemtech has relied on vague potential international sales opportunities it contends could have been achieved post-acquisition. Martinez, testifying as Gemtech's 30(b)(6) designee, stated that the international opportunities were documented in a BEC presentation. Stidham Decl., Ex. A (Gemtech 30(b)(6) 79:25-80:20). Gemtech's Amended Initial Disclosures confirm Gemtech's position: that the $228,015,000 of international opportunities in the BEC presentation was a "reasonable international sales expectanc[y]." *Id.*, Ex. B (12-1-23 Gemtech Amd Initial Discl. at 6). The Amended Initial Disclosures and the PowerPoint deck used in the BEC presentation reference opportunities in thirteen potential countries. *Id.*, Ex. B (12-1-23 Gemtech Amd Initial Discl. at 5); *id.*, Ex. C (Depo. Ex. 21 at SW085744). The 13 countries were Saudi Arabia, Bahrain,[1] Denmark,[2] Poland, United Arab

---

[1] As to Bahrain, the presentation recites "Current Sales to date: 45,500," "waiting for airline approval to ship to end user." *Id.*, Ex. C (Depo. Ex. 21 at SW085750). There is no projection of future anticipated sales. *See id.*, Ex. C (Depo. Ex. 21 at SW085751).

[2] As to Denmark, the presentation recites "EUC for $350,000 received along with import permit" without further projection of future anticipated sales. *See id.*, Ex. C (Depo. Ex. 21 at SW085752-53).

Emirates, Turkey, Philippines, Belgium, Indonesia, Tunisia, Lithuania, Latvia, and South Africa. *Id.*

Gemtech's Amended Initial Disclosures implied an expert report would be prepared to substantiate the $228,015,000 figure for supposed lost international sales. The Disclosures state: "Based on data about known sales opportunities, Plaintiff's reasonable international sales expectancies for the earnout period could reasonably be expected to reach $228,015,000.00 in total international sales. On January 19, 2024, Plaintiff will provide Defendant with its expert witness disclosure." *Id.*, Ex. B (12-1-23 Gemtech Amd Intial Discl. at 6).

Gemtech never disclosed an expert opinion to explain how any international sales opportunities could be considered probable, how the $228,015,000.00 was reasonable, or on what data it was based.

Moreover, the deposition of the Director of International Sales for Gemtech, Jason Pace, demonstrates the international opportunities were solely speculation. Pace testified regarding the opportunities he and Martinez presented to the BEC.

(1) <u>Saudia Arabia</u>. The PowerPoint presentation states:

- End User: Special Security Forces
    - Foreign consignee: MRKAS
- Opportunity:
    - 25,000 machine guns ~ $1,400 per unit
    - 100,000 rifles ~ $700 per unit
    - 50,000 pistols ~ $500 per unit
- Gross sales potential: $130 Million

Stidham Decl., Ex. C (Depo. Ex. 21 at SW085748). Pace anticipated the $130 million projection based on a "sales in process" totaling $43,000, less than 1/3000th of the projected revenue. *See id.*, Ex. C (Depo. Ex. 21 at SW085748-49); *id.*, Ex. D (Pace 141:3-10). The number of products listed was the sum total of everything MRKAS allegedly needed, even though there was no

contract in place between MRKAS and Gemtech or Smith & Wesson, and other vendors were free to sell to MRKAS. *Id.*, Ex. D (Pace 133:8-134:22). Other than the $43,000 of sales in process, MRKAS had not promised, ordered, or otherwise committed to purchase from Gemtech. *Id.*, Ex. D (Pace 145:25-147:7). Pace admitted the machine gun suppressor models Gemtech intended to sell to MRKAS were only at the prototype stage and had yet to be sold to anyone. *Id.*, Ex. D (Pace 135:4-137:11). Indeed, the machine gun suppressors Gemtech wished to sell to military end users (MGS and MK39) had no sales history. *Id.*, Ex. A (Gemtech 30(b)(6) 110:23-113:13) (unable to identify any pre-APA MGS sales or MK39 sales).

(2) Poland. The putative $10,500,000 opportunity was based on an "[i]nitial order for 2 of many samples with the potential to reorder what fits their need." *Id.*, Ex. C (Depo. Ex. 21 at SW085754). Gemtech had had no past orders from Poland. *Id.* at SW085755.

(3) United Arab Emirates. Pace anticipated "Gross Sales potential: $22,995,000" when there had been only $1,000 of prior sales. *Id.*, Ex. C (Depo. Ex. 21 at SW085756-57). The presentation projects "15,000 OOW's M240's and M249's purchased ~$1,400[.]" *Id.*, Ex. C (Depo. Ex. 21 at SW085756). Pace testified this referred to the machine gun suppressors that had never been sold. *Id.*, Ex. D (Pace 162:10-23, 135:4-137:11). There was no commitment to a sale, only a request for a demonstration. *Id.*, Ex. D (Pace 164:8-12). Despite these admissions, Pace testified that "I can tell you that Gemtech would have closed the UAE and Saudi opportunities." *Id.*, Ex. D (Pace 178:17-179:2).

(4) Turkey. Pace projected "Gross Sales Potential: $35,000,000," although Gemtech had never sold to Turkey, *id.*, Ex. C (Depo. Ex. 21 at SW085758), and negotiations were only at a "preliminary" stage, *id.*, Ex. D (Pace 167:1-4). The $35 million figure was based on the "the number of M-240 Bravos and M-249s sold to Turkey by Ohio Ordnance at that time," *id.*, Ex. D

(Pace 167:16-24), not on any contract, promise, or order extended to Gemtech. The suppressors supposedly to be sold were the machine gun suppressors still in prototype. *Id.*, Ex. D (Pace 167:25-168:6, 135:4-137:11).

(5) Tunisia. Pace admitted negotiations were in very early stages and that Gemtech "didn't have a request for proposal, we didn't have LOIs or an EUC." *Id.*, Ex. D (Pace 175:6-25). Any putative opportunity included the machine gun suppressors that had never been sold before. *Id.*, Ex. D (Pace 176:7-15).

(6) South Africa. This lead was also "still an early opportunity." *Id.*, Ex. D (Pace 177:22-178:1). "It doesn't even have numbers. Deliveries TBD. I must have been involved with this, but it's inconsequential." *Id.*, Ex. D (Pace 178:8-10).

(7) Philippines, Belgium, Indonesia, Lithuania, Latvia. For these countries, there is no evidence that Gemtech's supposed opportunity was based on anything other than speculation and hope. Pace agreed there was no guarantee to close on any opportunity that was not already in license or not subject to a contract. *Id.*, Ex. D (Pace 179:24-180:7).

Notwithstanding these broad-ranging admissions, Gemtech states it will call Pace to testify at trial live, if he is available. Among other things, Gemtech intends to have him testify about "the international sales opportunities he developed before and immediately after the sale, including with the United Arab Emirates, Saudia Arabia (MRKAS), Bahrain, the United Kingdom Ministry of Defence, Denmark and Turkey[.]" Dkt. 235 at 6. Gemtech intends to offer Pace "to testify that, with hindsight, Gemtech would have closed the UAE and Saudi opportunities." *Id.* Gemtech has identified no other witness to testify about the likelihood that any of the international sales opportunities could have closed. *See id.* at 1-27.

**B. Supposed Domestic Military and Law Enforcement Opportunities**.

Gemtech includes in its revenue projections round numbers for total sales it assumed would occur, lumping together military, law enforcement, international, and big-box retailers. Gemtech projected $25 million for 2017, which included a combined figure of $3.5 million representing "international, military, law enforcement, and/or big box stores that we were working with at the time[.]" *Id.*, Ex. A (Gemtech 30(b)(6) 56:23-57:10). Gemtech's 2018 revenue projection assumed the 2017 amount and adjusted upward to assume Gemtech would obtain 25% market share in 2018, $85 million. *See id.*, Ex. A (Gemtech 30(b)(6) 58:6-61:16). For 2019, Gemtech projected revenue of $150 million "based on the growth that we projected, as well as the projects we were working on in military, international, and big box stores." *Id.*, Ex. A (Gemtech 30(b)(6) 68:3-10). Gemtech's 30(b)(6) witness (Martinez), however, was unable to explain how that number was reached or even confirm what documentation might exist underlying the yearly revenue projections. *See id.*, Ex. A (Gemtech 30(b)(6) 68:3-79:4).

Pace testified he was not "privy" to sales revenue information, including whether such revenue was from military or law enforcement orders, or whether such revenue was from international or domestic sales. *Id.*, Ex. D (Pace 64:7-65:4).

In discovery, Gemtech identified two individuals with knowledge of military sales and one individual with knowledge of law enforcement sales: CJ Dugan "was knowledgeable regarding military sales," Vincent Baertschi "assisted in sales to special forces," Leroy Graham "worked with law enforcement sales." *Id.*, Ex. E (2-5-20 Gemtech Initial Discl. at 5-7). These three individuals have not been identified as trial witnesses. *See* Dkt. 235 at 1-27. Gemtech has not identified any other individual with knowledge of military or law enforcement sales opportunities. *See id.* Although Gemtech's Witness Disclosure states that Jake Kunsky is

expected to testify "that Smith & Wesson dropped a pending M27 United States Marine Corp suppressor project," he was not a sales representative nor was he disclosed earlier as an individual with knowledge of military sales.

## III. LEGAL STANDARD

The Court "must decide any preliminary question about whether . . . evidence is admissible," Fed. R. Evid. 104(a), and may do so before trial, *see* Fed. R. Evid. 103(b); Fed. R. Civ. P. 16(c)(2)(C). A motion in limine is "a procedural mechanism to limit in advance testimony or evidence in a particular area," *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009), and a "useful tool[] to resolve issues which would otherwise clutter up the trial," *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017). Even in a bench trial, such motions "may be appropriate" for "logistical and other reasons," *Heller*, 551 F.3d at 1112, and a ruling here will set the scope of deposition designations and live testimony. *See Alves v. United States*, No. 3:19-cv-00044-REP, 2022 U.S. Dist. LEXIS 105246, at *4–11 (D. Idaho June 10, 2022) (excluding expert testimony before bench trial).

## IV. ARGUMENT

### A. No Gemtech Witness May Opine on the Probability Potential Sales Would Close.

A lay witness may not offer an opinion that "necessarily speculates on the probability of future events[.]" *Seyb v. Members of the Idaho Bd. of Med.*, No. 1:24-cv-00244-BLW, 2026 U.S. Dist. LEXIS 123124, at *7 (D. Idaho June 2, 2026). Moreover, Rule 701 "prohibits opinions" based on statements from unidentified third parties "well beyond [the witness's] own personal experience," *United States v. Lloyd*, 807 F.3d 1128, 1155 (9th Cir. 2015). The same principle applies to projected revenue. A company officer may testify to revenue lost on existing accounts "based on [the company's] actual operating history," but not to projections of new business

where the proponent has "not shown how the projected revenue losses relate to [the company's] actual operational history." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, No. 2:04-CV-08-BES-LRL, 2006 U.S. Dist. LEXIS 97235, at *20–21 (D. Nev. Mar. 6, 2006), *aff'd*, 523 F.3d 1051 (9th Cir. 2008).

### B. Future Losses Must Be Proven with Reasonable Certainty—Whether Something Is More Likely Than Not to Occur.

"The standard applied in proving future events or future losses is reasonable probability, namely, whether something is more likely to happen than not." *Re v. Gannett Co.*, 480 A.2d 662, 668 (Del. Sup. Ct. 1984) (holding plaintiff could not rely on testimony concerning implementing an agreement between the parties because obtaining the funds necessary to implement the agreement had not been established with reasonable certainty).

### C. No Gemtech Witness May Testify that Any International Sales Opportunity Was Probable or Certain.

Gemtech has indicated its intent to offer Pace to testify that international sales opportunities were likely to occur, and as to Saudi Arabia and the United Arab Emirates, the sales "would have closed." Such testimony is improper from a lay witness, *see Seyb*, 2026 U.S. Dist. LEXIS 123124, at *7, and Pace was not disclosed to provide any expert testimony, much less this particular opinion, *see* Dkt. 222.

Gemtech's intended testimony that the sales were likely or certain to close is not founded on "actual operational history," *Nationwide Transp. Fin.*, 2006 U.S. Dist. LEXIS 97235, at *20-21, and is inherently speculative because other than a couple modest potential sales, there was no sales history with these companies. *See Re*, 480 A.2d at 668 (requiring future events or losses be proven more likely to happen than not); *supra* Part II.A. And in any event, Pace's own deposition testimony relating to the speculative nature of the opportunities contradicts any

opinion that Gemtech was more likely than not to close the international sales opportunities. *See supra* at Part II.A.

**D. No Witness May Testify that Any Military or Law Enforcement Sales Opportunity Was Probable or Certain**.

Military and law enforcement sales cannot be used in any Gemtech damages model because lay witnesses may not predict the likelihood of future events. *Seyb*, 2026 U.S. Dist. LEXIS 123124, at *7. Moreover, Gemtech has no witness at trial with personal knowledge to discuss military or law enforcement sales. *See supra* Part II.B. Gemtech did not even break out supposedly expected revenue from military buyers from law enforcement buyers—or even from international opportunities or "big-box" store sales. *See supra* Part II.B. Gemtech should not be permitted to speculate as to military or law enforcement revenue it contends should be part of the revenue calculation for purposes of achieving the $36 million earn-out threshold.

## V. CONCLUSION

Smith & Wesson respectfully requests this Court grant its Motion in Limine Re International, Domestic Military, and Law Enforcement Sales and bar any Gemtech witness from testifying as to the probability of any international, domestic military, or law enforcement sale closing.

DATED this 23rd day of November, 2026.

HOLLAND & HART LLP

By *\/s/ Erik F. Stidham*
Erik F. Stidham
Jennifer M. Aiko
Cameron L. McCue
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 23rd day of November, 2026, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kim J. Trout
Alyssa R. Jones
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703
Telephone: (208) 577-5755

- ktrout@trout-law.com
- ajones@trout-law.com

*Attorneys for Plaintiff*

*/s/ Erik F. Stidham*
Erik F. Stidham
for HOLLAND & HART LLP

40284023.v1