IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, )
INCORPORATED, an Idaho ) Case No. 1:18-CV-00035-CWD
corporation, )
Plaintiff, )
vs. )
SMITH & WESSON, CORP., a )
Delaware corporation; and )
AMERICAN OUTDOOR BRANDS )
CORPORATION, a Massachusetts )
corporation, )
Defendants. )
_________________________________)

VIDEOTAPED 30(b)(6) DEPOSITION OF GEMINI TECHNOLOGIES,

TESTIMONY OF RONALD JOHN MARTINEZ

TAKEN MAY 28, 2024

REPORTED BY:

ANDREA L. CHECK, CSR No. 748, RPR, CRR

Notary Public



Exhibit A

and affiliations for the record, beginning with the noticing attorney.
MR. STIDHAM: Erik Stidham of Holland & Hart on behalf of the defendants.
MR. McCRANEY: Zach McCraney of Holland & Hart on behalf of the defendants.
MR. TROUT: Kim Trout of Trout Law on behalf of the plaintiff.
VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness and then counsel may proceed.
COURT REPORTER: Okay. Will you raise your right hand, please.
THE WITNESS: Yes.

RONALD JOHN MARTINEZ,
first duly sworn to tell the truth relating to said cause, testified as follows:

EXAMINATION
QUESTIONS BY MR. STIDHAM:
Q. Good morning, Mr. Martinez.
A. Good morning.
Q. My name is Erik Stidham, and I represent the defendants in this case.



Mr. Martinez, would you state your full name for the record.
A. Ronald J. Martinez, or John is the middle name.
Q. And what was the year of your birth, Mr. Martinez?
A. 1966.
Q. Thank you. And where do you currently reside?
A. In Eagle, Idaho.
Q. Mr. Martinez, have you ever had your deposition taken before?
A. Once.
Q. And can you give me just the general context of that?
A. It was just general -- it was a long time ago, ten years ago.
Q. What did it relate to?
A. It was a discussion within the company, so...
Q. So you had a -- was there a lawsuit involved?
A. Yes.
Q. And were you a party to that lawsuit?
A. Yes. I would guess I was, yes.
Q. Okay. Were you a plaintiff or a defendant?
A. Plaintiff.
Q. What was the lawsuit about?



A. Discussion of employment.
Q. When you say "discussion," did you -- just so I'm clear, as the plaintiff were you asserting legal claims against your employer?
A. Yes, sir.
Q. And which employer was that?
A. It was HSBC.
Q. And what was the nature of your allegations?
A. I had left the company, and they owed some money.
Q. What did they owe money for?
MR. TROUT: I'm going to object to the line of questioning. It's far outside of the 30(b)(6) notice for which Mr. Martinez is appearing.
MR. STIDHAM: Mr. Trout, that's fair. I was just trying to get some background. But I would ask, Mr. Trout, if you'd just object to form in the future.
Q. (BY MR. STIDHAM) But we'll get some more background on that when we take your individual deposition. Okay?
But, anyway, you've had your deposition taken at least once; is that fair?
A. Yes, sir.
Q. Okay. Did you have a chance to talk with your attorneys regarding deposition procedures prior to this



deposition here today?
A. Yes.
Q. And did you meet with your attorneys to prepare for this deposition?
A. Yes.
Q. And I don't want to ask about the substance of those conversations. Okay? So I'm not asking that.
But who did you meet with to prepare for your deposition here today?
A. My attorneys.
Q. And who is that, specifically?
A. Kim Trout and Steve.
Q. And how long did you meet with them to prepare for your deposition?
A. A few hours. I don't recall the exact amount of time.
Q. No, an estimate is fine, sir; that's all I'm looking for.
A. A few hours.
Q. Okay. And when did that take place?
A. Last week.
Q. And did you do anything else to prepare for your deposition here today?
A. Yeah. I read the second amended complaint, looked that over, looked over the notes here that you

Gemtech, and wanted to purchase Gemtech, so the answer is yes.
Q. So in 2017 -- but in February of 2017 my question is: Was Gemtech -- or GT, excuse me -- interested in, potentially, being acquired by Smith & Wesson at that point in time?
A. Yes.
Q. In February of 2017, why was Gemtech -- GT, excuse me -- interested in a potential acquisition by Smith & Wesson?
A. They contacted me and said that they were interested in purchasing Gemtech.
Q. And my question is, why was Gemtech interested in the potential of being acquired?
A. And my discussions with them was that the synergies to be number one in the world, and economic, very positive economic outcomes.
Q. When you say "synergies," what are you referring to in this context?
A. Matt Buckingham and Andy Fulmer and James Debney said they were interested in purchasing Gemtech for the team, the brand, the IP, the company.
Q. Okay. You said that -- and, again, I'm trying to understand what Gemtech's interest is, okay, in pursuing negotiations at this point in time. All right?



MR. TROUT: Object.
Q. (BY MR. STIDHAM) So what is Gemtech -- why is Gemtech interested in exploring a potential acquisition in February of 2017?
MR. TROUT: Object to the form.
THE WITNESS: Well, with the synergies of the companies and what they told me. So it would be to go to the next level, sizewise, as well as economic positive with us.
Q. (BY MR. STIDHAM) What's the economic -- what are you referring to as "economic positive with us"?
A. The growth, the profitability.
Q. At this point in time, in February of 2017, did Gemtech feel like it needed to be acquired by a larger entity?
A. No.
MR. TROUT: Object to the form.
THE WITNESS: No.
Q. (BY MR. STIDHAM) In February of 2017, was Gemtech of the mind that it could -- or GT -- of the mind that it could just continue doing business on its own without a larger partner?
A. Yes.
Q. So let's take a look at -- a couple pages in. If you look at the Bates number on the bottom,



Mr. Martinez, I'm at page GT7935.
A. Yes.
Q. Can you tell me what's reflected on page GT7935?
A. It looks like projections and assumptions.
Q. And were the -- and at the top of that page, correct, there's a bar, and it says, "Profit & Loss By Year"; correct?
A. Yes.
Q. Okay. And this page was prepared by GT; correct?
A. Yes, sir.
Q. So if I look at the first column under the heading there, it says "2017," and then below that "Total Revenue of 25 million"; is that correct?
A. Yes.
Q. So can you tell me what that $25 million under "2017" on page GT7935 is meant to indicate?
A. Total revenue.
Q. And that's the total revenue that GT expected in 2017?
A. Correct.
Q. And what was the projection of $25 million for 2017 based on?
A. I mentioned it earlier, but it was 11.3 to



4 million -- it was 11.367, the exact number, I guess -- with a 20 percent growth, brought that number to 13.6 million, and then we had about $8 million in back orders, brings it to 21.6, and then we had about $3.5 million, which would be either international, military, law enforcement, and/or big box stores that we were working with at the time, that equaled to 25 million.
Q. Out of the -- looking at the 2017 number of 25 million on page 7935, what percentage of that 25 million is anticipated to be international sales?
A. I don't recall the exact number. I said -- no.
Q. Okay. And then if I go down that column, GT is predicting a net profit for 2017 of $3,000,367 -- excuse me -- $3,367,710; is that correct?
A. Yes, sir.
Q. Then if we go over to the next column, which is "2018," GT is projecting sales revenue of $85 million; is that correct?
A. Yes.
Q. What is that projection of $85 million based on?
A. From what I recall, it was the 25 million. Taken the percentage of growth, we figured -- our projection was about 25 percent in regards to market





Exhibit A

share for 2018. You take those numbers, revenue, and move them over, and we looked at our back orders as well -- well, we looked at our projections at that point for 2018, then what we had in the pipeline we were looking at.
Q. Okay. So let's talk about that 2018 projection of $85 million a little bit more.
I think you indicated that for 2018 you took a percentage of growth based on the $25 million projection; is that correct?
A. Yeah.
Q. And what was that -- what was the basis for that projected percentage of growth for 2018?
A. Well, we looked at the growth and market share, and we believed we can get up to 25 percent market share in 2018.
Q. So when you -- what was the basis for GT's belief that it could get up to 25 percent market share in 2018?
A. Oh, we believe from 12 percent to 18 percent for 2017. We had a good relationship, looking at the projections, that would bring us up to 25 percent.
Q. So you said you had a good relationship with the projections. I guess, let me try to ask it more specifically: I mean, what -- can you point me to the

Page 58

specific foundation in data or facts that GT was relying upon for its projection of a 25 percent market share in 2018?
MR. TROUT: Object to the form.
THE WITNESS: We looked at the projects we were working on and the potentials of those projects and the amounts.
Q. (BY MR. STIDHAM) So when you say you're looking at the projects you were working on for the 2018 projections, what projects are you referring to?
A. As I mentioned before, at the end of '17 it was -- the 3.5 million was military, law enforcement, and international sales, as well as big box. And the same thing goes in regards to 2018, it was look at those areas in growth.
Q. Did GT do any analysis regarding what a 25 percent share of the suppressor market is in terms of dollars?
MR. TROUT: Object to the form.
THE WITNESS: We looked at, obviously, what we would end up in 2017 and moved that over for projections for 2018, and the growth and market was an estimate.
Q. (BY MR. STIDHAM) Based on what?
A. Based on sales, back orders, as well as projects and projections and what we were working with

Page 59

of new business.
Q. So you've referred to "back orders" a couple times. I want to make sure I'm understanding what you're referring to.
So when you're referring to looking at back orders as a basis for projecting sales going to the next year, can you tell me what you're referring to as "back orders"?
A. Orders that were placed on products that we had in suppressors and ammunitions and accessories that we had to get, to get in stock, to ship.
Q. So when you say products that you had, you mean products that you're selling, not products that you currently had available in inventory; is that correct?
A. Yeah, products we were selling. We had to get them in inventory to ship them out.
Q. Okay. And so when you were accounting -- for purposes of your accounting relating to revenue, was Gemtech considering in its revenue for that year an item that had been ordered but had not yet been fulfilled?
A. I don't understand the question. If you can repeat that for me, please.
Q. Sure. With regard to the back ord ers, were those being booked as revenue when the order was made or when the order was filled, fulfilled?

Page 60

A. When the order is shipped.
Q. So how much, as far as back orders, was GT believing it would be able to ship in order to come up with this total revenue estimate in 2017 of 25 million?
MR. TROUT: Object to the form.
THE WITNESS: Well, we would like to ship all the back orders.
Q. (BY MR. STIDHAM) I know, but this is a projection, right, regarding what -- well, let me back up.
Is this projection that's reflected on GT7935 intended to be the company's best analysis regarding what the company believes will occur as far as revenue, sales?
MR. TROUT: Object to the form.
THE WITNESS: Yes.
Q. (BY MR. STIDHAM) So -- and with regard to the back orders that were in existence, how much of the 2025 -- excuse me -- how much of the 2017 25 million relates to back orders that GT believed would actually be shipped in 2017?
A. At that time it was about 8 million.
Q. What was the reason for -- what were some of the reasons that Gemtech had -- excuse me -- I keep saying "Gemtech." Can we just say "GT" -- that GT had

Page 61


Exhibit A

to international sales that went beyond what was required by United States law?
MR. TROUT: Object to the form.
THE WITNESS: I was unaware of the BEC and the processes and procedures.
Q. (BY MR. STIDHAM) You were unaware of --
A. Before I sold Gemtech, the BEC, of the processes and procedures.
Q. And what are the processes and procedures that you were unaware of until -- of the BEC until after you sold GT's assets?
MR. TROUT: Object to the form.
THE WITNESS: That every single country, every project we were working on had to have their approval.
Q. (BY MR. STIDHAM) Anything else about the BEC that you were unaware of before you sold the assets that would have prevented you from selling the assets --
A. I was not --
Q. -- had you known it?
A. I was not aware that Smith & Wesson had a situation with the FBI and something international. I had no idea about that.
Q. My question was about the BEC, though. And we can get to the others, but I'm trying to understand your questions about the BEC.

Page 66

You had indicated before that had you known about the BEC, you would not have sold the company?
A. Yes.
Q. And I asked you, what was it about the BEC that you were not aware of that you believe had you known it, you would not have proceeded with the acquisition. You identified that the BEC needed to approve transactions in every country you were going to sell in; is that correct?
MR. TROUT: Object to the form.
Q. (BY MR. STIDHAM) Correct, sir?
MR. TROUT: You can answer.
Q. (BY MR. STIDHAM) Correct?
A. Yes.
Q. What else, if anything, about the BEC do you contend you were unaware of prior to the acquisition that if you'd been aware of it, you wouldn't have moved forward with the acquisition?
MR. TROUT: Object to the form.
THE WITNESS: I did not know about the BEC and that we had to go in front of the BEC for every country's approval.
Q. (BY MR. STIDHAM) Anything else?
A. Not that I can recall right now.
Q. So let's get back to, if we can, the

Page 67

Exhibit 13, Mr. Martinez.
A. Yes.
Q. Okay. So -- and then if we look at 2019 -- again, I'm on page 7935 -- you project -- excuse me -- GT projects revenue of 150 million?
A. Uh-huh.
Q. What is that based off?
A. Again, based on the growth that we projected, as well as the projects we were working on in military, international, and big box stores.
Q. So I'd asked again what the 150 million was based off, and you said -- one of the things you said it was based off was "based on the growth we projected"?
A. Uh-huh.
Q. What was the growth you projected?
A. Well, we figured at 25 percent on the domestic side you get multiple. But the domestic side we figured that about stable, maybe 25, 28. We were hoping in that regards. So we looked at those numbers and carried those over. Then we looked at, again, the projections we had and the projects we were working on in international, military, and law enforcement, as well as big box stores.
Q. Okay. But what is -- when you say you were working on it, how is it -- what was your basis for

Page 68

projecting that you would get -- well, what percentage of the project's revenue that you were working on were you projecting to get in order to come up with the $150 million revenue number for 2019?
A. On the -- on that presentation we did showed 80 percent pull-through on the international sales.
Q. I just want to make sure I'm understanding.
So 80 percent of the $150 million for 2019 is based on international sales?
A. I didn't say that.
Q. Okay. I'm trying to understand, sir. So let me --
A. 80 percent of --
Q. Go ahead.
A. -- the projects we put on that presentation, we only put on projects on that presentation that had a value of 80 percent of closing.
Q. Okay. I appreciate it. Thank you --
A. Yeah.
Q. -- for that clarification.
So you're -- if I'm understanding you correctly, you're saying that the $150 million projection is based on looking at the projects that were being pursued as reflected in the BEC presentation and assuming an 80 percent success rate?

Page 69


**Exhibit A**

A. Not that -- just that. As I said earlier, it was the domestic sales growth. We projected about -- we were hoping about 28 percent overall market share. So you carry over the numbers and the growth in that regards, then we looked at the projects we were working on. I mentioned big box stores, military, as well as international sales.
Q. So what is the -- let's just kind of break that down -- what is the basis that GT had for assuming an 80 percent success rate on the international projects that were being pursued, as reflected in the BEC presentation?
A. International sales in suppressors is a very long process. It starts with Jason Pace going internationally to call on the end users. Then you go through a DSP-83 process.
Q. I guess I want to make sure you understood my question.
What is the basis to believe that you had an 80 percent chance of succeeding in getting those projects?
A. When you go through a DSP process, it takes the end user -- it may be military, excuse me, or law enforcement -- would have to put in a purchase order that that is the product they wanted. They would put

Page 70

that signed signature into that particular government. The particular government would sign off on that process that, yes, we accept the military, law enforcement, whatever it may be, to have this product at this price, and this is what we're looking at.
At that point it goes over to the U.S. state department. The U.S. state department reviews and makes sure everything is in order with ITAR and regulations. After it went through the U.S. state department, it would go to the ATF, because they're suppressors. And then the ATF would go through the process.
And once the ATF went through the process, they would get the okay that, yes, we can move forward and sell. It's a six-to-eight-month process. It's a lengthy process.
Q. I understand, sir, that you testified it's a lengthy process, but I guess what I'm trying to understand is what was the basis for Gemtech believing that it would have an 80 percent success rate in actually getting signed contracts and shipping product for the projects reflected in the BEC presentation?
MR. TROUT: Object to the form.
THE WITNESS: When the end user, the military, law enforcement, would say this is the product, they would put the specification, the weight, the length, the

Page 71

size, the decibel ratings, the attachments, will it attach to their guns or not, all that, and that is specifically specified a Gemtech product. So on suppressors when they specified Gemtech or a suppressor is -- that is what they're asking for.
Q. (BY MR. STIDHAM) So you're contending -- I just want to make sure I'm understanding -- are you contending that 80 percent of the projects reflected in the BEC presentation had gone through the DSP-83 process?
A. I would have to go back and look at every single one, but, yes, would be my...
Q. Okay. That's -- so I just want to make sure I'm understanding.
A. I have to look at the -- every one on there. I don't remember. I don't have it in front of me.
Q. Okay. Let me phrase it another way to see if I understand. Is Gemtech contending that if an international buyer had gone through -- or had -- are we talking about -- let me back up.
Are you talking about a completed DSP-83 process? Are you talking about just one that's initiated --
MR. TROUT: Object to the form.
Q. (BY MR. STIDHAM) -- that results in this

Page 72

80 percent likelihood of sales from GT's perspective?
MR. TROUT: The same objection.
THE WITNESS: Would it be DSP-83? I can't recall the exact -- I'll have to -- I just can't recall the exact, but more than likely the DSP-83.
Q. (BY MR. STIDHAM) Understanding, but I guess here's my question: GT believes that it had an 80 percent success rate based on the DSP-83 process; correct?
A. And the end user and what they wanted, yes.
Q. Okay. Now, the DSP-83 process involves more than just GT and the end user; correct?
MR. TROUT: Object to --
Q. (BY MR. STIDHAM) You listed the process going through ATF, et cetera?
A. Uh-huh.
Q. Okay. Remember you need to say "yes" or "no."
A. Yes.
Q. Here's what I'm just trying to get my head around, sir: Is it GT's position that it has an 80 percent success rate regarding a sale if the DSP-83 process is initiated; or is that 80 percent likelihood based on the DSP-83 process having been completed?
MR. TROUT: I'll object to the form.
You can answer.

Page 73

THE WITNESS: Repeat that again. I just want to make sure I have this clear.
Q. (BY MR. STIDHAM) Sure. GT's position is that it's basing its 80 percent likelihood of success based on the DSP-83 process; correct?
A. It's more to that. It's the person involved, the end user, but that and initiating the DSP-83.
Q. Okay. And this -- is this 80 percent likelihood to succeed based on the DSP-83 process being initiated; or is it based upon the DSP-83 process being completed?
MR. TROUT: Object to the form.
THE WITNESS: It would be a combination of both, mostly completed, but there were some we were in the process. I would have to look at the list, and some we were in the process.
Q. (BY MR. STIDHAM) Since we're asking -- just asked this question: Has GT done anything to find out whether any of the proposed sales for silencers that it was pursuing, as reflected in the BEC presentation, were actually completed by a competitor?
A. I've been out of the market, so...
Q. So is it fair to say that with regard to those opportunities in the BEC proposal, GT can't say whether or not those opportunities -- or those -- the projected

Page 74

sales occurred for any suppressor company?
A. I have not looked, so it may have or may not. I don't know.
Q. That's all I'm asking is whether you knew or not, and the answer is you don't know; correct?
A. I don't know.
Q. All right. Let's get back and, hopefully, move through a little more quickly this Exhibit 13 that I gave you; okay?
A. All right.
Q. Okay. So taking a look at, again, page GT7935, there's a list of assumptions there.
Do you see at the bottom?
A. Yes, at the bottom.
Q. Revenues are -- and I'm reading the first line under "ASSUMPTIONS" -- are you there, sir, where it begins --
A. Yes.
Q. -- "Revenues are estimates"?
A. Uh-huh.
Q. So that line reads, "Revenues are estimates by year of the development and closing opportunities listed on the Gemtech Revenue Resource Summary."
Do you see that?
A. Yes, sir.

Page 75

Q. Can you tell me what the "Gemtech Revenue Resource Summary" was?
A. I don't recall what he -- what we called that. I don't recall that. I don't recall that name. It could have been the weekly report. I don't remember the exact name we used.
Q. Do you know whether or not Gemtech actually kept a listing of the opportunities it was developing and closing in any given year?
A. We'd have them down, but we looked at what projects we were working on -- repeat the question. I'm not sure if we kept a file of it. I don't recall at this time, but we knew.
Q. Okay. And I guess what I'm trying to find out is, you know, look at that first sentence: "Revenues are estimates by year of the development and closing of opportunities listed on the Gem Tech Revenue Resource Summary."
Do you see that?
A. Uh-huh.
Q. And did -- understanding you're not aware of anything called the "Gemtech Revenue Resource Summary," I'm asking: Did Gemtech keep a list of opportunities it was developing and closing that then were used to come up with the revenue estimates?

Page 76

MR. TROUT: Object to the form.
Q. (BY MR. STIDHAM) That are reflected on this page?
A. Yeah, so --
MR. TROUT: The same objection.
Go ahead.
THE WITNESS: Yes. We would have our people who work in the military, here are the projects we're working on. Here's international, here's what we're working on. Law enforcement, here's what we're working on. And their projections of closing of those, yes.
Q. (BY MR. STIDHAM) And how would you -- how would Gemtech -- excuse me, GT -- calculate the likelihood of closing those developing opportunities in order to come up with its projections for revenue?
A. It would depend if we were the specified product. In the silencer world if you're specified, it's very difficult to have somebody else knock you off.
Q. But you don't know whether the transaction is going to go forward, correct, even if you're specified?
MR. TROUT: Object to the form.
THE WITNESS: Repeat that question again. I want to make sure --
Q. (BY MR. STIDHAM) Sure.
A. -- I answer that right.

Page 77

Q. (BY MR. STIDHAM) If you're talking about specified products, are we talking about government sales? International sales? What are we talking about?
MR. TROUT: Object to the form.
THE WITNESS: Both. I mean, when I said we looked at military, law enforcement, and international, it was Gemtech-specified products.
Q. (BY MR. STIDHAM) So is Gemtech, in coming up with these revenues, assuming 100 percent success on such projects so long as it's the specified product?
A. It depends on the project, it depends on where we're at with the project.
Q. And can you point me to any documentation that would have been used in order to come up with the anticipated sales revenue that's reflected on page GT7935?
MR. TROUT: Object to the form.
THE WITNESS: I don't have access to any of that from back then, no.
Q. (BY MR. STIDHAM) Did you prepare this sales revenue projections yourself that are reflected on GT7935, or is that something Mr. Thompson or someone else did?
A. Again, we sat down, Mr. Thompson, on the whiteboard and put down where we had military projects,



LE, and international, and what was 80 percent on those, and we put them down, and here came the number -- again, which also included domestic sales, growth, et cetera, and big box stores, too.
Q. So with regard to the projections reflected here in 2017 of $25 million, can you identify for me what projects Gemtech was relying upon closing in order to come up with that 25 -- excuse me -- which opportunities Gemtech was relying upon closing to come up with the 25 million?
MR. TROUT: Object to the form.
THE WITNESS: As I mentioned before, you took the 11.3, 11.4 million, and you looked at the back orders -- you'd look at the growth of 20 percent, gave us the 13.6, we looked at the back orders, brought us to 21.6, and as I mentioned before, the 3.5 million was a combination of international, law enforcement, military, and big box stores.
Q. (BY MR. STIDHAM) And which projects were those that made up the 3.5?
A. Don't have the exact projects in front of me, but the big box store would be like Cabela's; military would be a military project we were working on, or projects; and then international.
Q. And can you -- are those identified anywhere



in any documentation as to what those opportunities were specifically that go into the 2017 projection?
A. Well, international would have on that BEC presentation.
Q. Okay.
A. But the other ones we had on the whiteboard, and we received that information from those areas, from departments.
Q. But it's not written down anywhere?
A. Not that I can recall. I know we did a whiteboard on those.
Q. Okay. What about 2018, the $85 million, can you identify for me any written list or documentation that would reflect the opportunities that GT anticipated closing in order to come up with a revenue number of 85 million?
A. Again, as I mentioned before, it would be the carryover in growth we projected for domestic, and then the listing of the international projects, obviously, was on that BEC list.
Q. So understanding there's just a generalized -- that these numbers on GT7935 include just a general anticipation of growing consumer market share, I understand that, but I want to talk about the specific opportunities, military, government, or international.



A. And big box.
Q. And big box, thank you. Can you identify for me which projects, military, international, government, or big box, GT believed that it would achieve in order to make the $85 million number for 2018?
A. I know on the internationals on the BEC presentation, so that's self-explanatory there. On the big box was Cabela's. We were working with Gander Mountain, Sportsman's Warehouse, and other big box stores. On military, it was, again, different military projects.
Q. And where would the records be kept of the military projects that were being pursued by Gemtech before the -- excuse me -- before the asset purchase?
A. It would be within the people that had that area.
Q. And who would that be?
And, again, I'm talking the time frame, you know, before the APA -- well, strike that.
I'm talking about the time frame reflected in the submittal of this document, February of 2017.
A. It would have been the people working on the projects, R&D and the sales.
Q. And who were they?
A. Jake Kunsky would be R&D.







Exhibit A

A. That was communication with Jason and the end user, which was communicated back to me. Here's what we're looking at for shipping. That also would help us with manufacturing to make sure we're able to get the product out.
Q. Okay. So with regard to each of these opportunities, is it your belief that GT would have been able to manufacture enough of the -- or have manufactured enough of the units to meet the sales opportunities outlined here?
A. Yes, sir.
MR. TROUT: I'll object to the form. The answer can stand.
Q. (BY MR. STIDHAM) Okay. All right. I'm still on that page that ends 137083. The top bullet point is "Saudi Arabia," and then "End User: Special Security Forces."
Do you see that?
A. Okay, yes. Okay.
Q. So it lists here "Opportunity: 25,000 machine guns ~ $1,400 per unit"; correct?
A. Yes, sir.
Q. What was the -- what was the GT product that was going to be used on -- to satisfy the demand for 25,000 machine guns?



A. We called it the MGS, machine gun suppressor.
Q. Had Gemtech manufactured any MGS units?
A. Yes, sir.
Q. How many had it sold prior to this?
A. We -- it had gone through the testing of those, and we did -- we were on the cover of Small Arms Review of the machine gun. They did a torture test of 14,000 continuous rounds, and it also included flash hiding at night, it included -- it was about a 14-page article. We were on the front cover of the magazine. That was a study on the MGS.
Q. So my question was: Had -- was there anything more than a prototype of the MGS?
A. Well, we manufactured it, and we did the testing, and we were selling it. Because we're now getting this new product out to market.
Q. So, I guess, are you telling me that it was beyond the prototype stage?
A. Oh, yeah. It was ready for manufacture.
Q. Did GT ever sell any MGS units?
A. We were in the process of doing it until Smith & Wesson.
Q. Did -- let me phrase it this way so it's clear: Before the asset purchase agreement, had GT ever sold an MGS unit?



A. I would have to look at what they ordered here, but I think they ordered an MGS unit. I have to look at the order. I don't know.
Q. And you think there's a written order somewhere for this?
A. There's paperwork of what they ordered for the $43,000 --
Q. Okay.
A. -- somewhere.
Q. So let me try to refine the question a little bit further still: Did GT ever deliver an MGS unit to anyone?
A. I don't know if it was on that list of the 43,000. If so, it did. But I don't know it was on that list.
Q. What about the MK39, was that something that was being produced by GT before the asset purchase agreement?
A. Yes, sir.
Q. Was that --
A. We manufactured before.
Q. Was that a prototype?
A. It was ready to go.
Q. So have -- other than prototypes that have been used for testing, prior to the asset purchase



agreement, had GT ever sold the MK39 to any customers?
A. I don't recall what customers. I know that there was a variety of customers that were looking at purchasing that. But I don't recall -- I just don't recall which people have done it at that time. Because it was new and coming to the market.
Q. And let me try to refine that question, because I understand -- I do want to separate out maybe some customer expressing interest.
I'm asking: Can GT identify any instance in which an MK39 was actually sold and delivered to a customer prior to the asset purchase agreement?
A. I don't recall.
Q. Okay. If we look, again, at the opportunity in Saudi Arabia, what's listed as an opportunity in Saudi Arabia, it says, "25,000 machines guns ~ 1400 per unit."
If I understood your testimony, those would have been MGS?
A. Yes, we call it the MGS.
Q. Okay. And then the 100,000 rifles at $700 per unit, that's reflected on the presentation --
A. Uh-huh.
Q. -- which GT product would that have been?
A. Those were the shields.




**Exhibit A**

REPORTER'S CERTIFICATE

I, ANDREA L. CHECK, CSR No. 748, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 6th day of June, 2024.

Andrea Check

ANDREA L. CHECK, CSR No. 748, RPR, CRR
Notary Public
1109 West Main Street, Suite 220
Boise, Idaho 83702

My Commission expires July 20, 2028.



Kim J. Trout
ktrout@trout-law.com

June 7, 2024

RE: Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
5/28/2024, Ronald John Martinez 30(b)(6) (#6706852)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at Calendar-Idaho@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions



Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ronald John Martinez 30(b)(6) (#6706852)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Ronald John Martinez 30(b)(6) Date



Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ronald John Martinez 30(b)(6) (#6706852)

ACKNOWLEDGEMENT OF DEPONENT

I, Ronald John Martinez 30(b)(6), do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________________________ ________________
Ronald John Martinez 30(b)(6) Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC