UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

\+ + + + +

IN THE MATTER OF:

GEMINI TECHNOLOGIES,
INCORPORATED,

Plaintiff,

v.

SMITH & WESSON CORP. AND
AMERICAN OUTDOOR BRANDS
CORPORATION,

Defendant.

Civil Action No.
1:18-cv-00035-CWD

Thursday,
May 30, 2024

Reston, Virginia

DEPOSITION OF:

JASON PACE

called for examination by Counsel for the Defendant, pursuant to Notice of Subpoena, at Spaces Reston Station, located at 1900 Reston Metro Plaza, when were present on behalf of the respective parties:

APPEARANCES:

On Behalf of the Plaintiff:

KIM J. TROUT, ESQ.
STEVEN SCHOSSBERGER, ESQ.
Trout Law, PLLC
3778 Plantation River Drive
Suite 101
Boise, ID 83703
208-577-5755
ktrout@trout-law.com

On Behalf of the Defendant:

ERIK F. STIDHAM, ESQ.
Holland & Hart LLP
800 W. Main Street
Suite 1750
Boise, ID 83702
208-342-5000
efstidham@hollandhart.com



CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jason Pace | 5 | | | |


| EXHIBIT NO. | | PAGE |
|---|---|---|
| Exhibit 21 | SW085742 | 125 |
| Exhibit 22 | GT045741 | 180 |
| Exhibit 23 | SW465864 | 180 |
| Exhibit 24 | GT039739 | 182 |
| Exhibit 25 | GT039385 | 184 |
| Exhibit 26 | GT038019 | 189 |
| Exhibit 27 | GT034771 | 193 |
| Exhibit 28 | GT034809 | 196 |
| Exhibit 29 | GT034277 | |
| Exhibit 30 | GT033330 | 203 |
| Exhibit 31 | GT032666 | 207 |
| Exhibit 32 | SW040628 | 209 |
| Exhibit 33 | GT032548 | 212 |
| Exhibit 34 | GT006192 | 214 |
| Exhibit 35 | SW107708 | 217 |
| Exhibit 36 | SW151109 | 218 |
| Exhibit 37 | GT006040 | 247 |
| Exhibit 38 | SW415383 | 251 |
| Exhibit 39 | SW068537 | 261 |
| Exhibit 40 | SW041575 | 261 |
| Exhibit 41 | GT072920 | |
| Exhibit 42 | SW001846 | |
| Exhibit 43 | SW144178 | 285 |
| Exhibit 44 | SW068402 | 289 |
| Exhibit 45 | SW391139 | |
| Exhibit 46 | GT003192 | 316 |
| Exhibit 47 | SW390777 | 316 |




P-R-O-C-E-E-D-I-N-G-S

9:17 a.m.

VIDEOGRAPHER: Good morning, we are going on the record at 9:17 a.m. on May 30, 2024. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit number one in the recorded deposition of Jason Pace in the matter of Gemini Technologies Incorporated v. Smith & Wesson Corp and American Outdoor Brands Corporation filed in the United States District Court for the District of Idaho, Case No. 1:18-cv-00035-CWD.

The location of this deposition is at Spaces in Reston at Metro Plaza. My name is Teofilo Farmerio, representing Veritext. The court reporter today is Eric Mollen from the firm Veritext. At this time, will all counsel present, including remotely, please state your appearances and affiliations for the record beginning with the noticing attorney.

MR. STIDHAM: Erik Stidham of Holland



& Hart on behalf of the defendants.

MR. TROUT: Kim Trout, Trout Law on behalf of the plaintiff.

VIDEOGRAPHER: Will the Court reporter please swear in the witness, and counsel may proceed.

WHEREUPON,

JASON PACE

Was called for examination by Counsel for the Defendants, and after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. STIDHAM:

Q Thank you, Mr. Pace. Would you state your full name for the record, sir?

A Jason Winston Pace.

Q And Mr. Pace, where do you reside?

A I reside in Doha, Qatar.

Q Mr. Pace, have you ever had your deposition taken before?

A No.

Q Okay. So let me cover just a couple of ground rules, hopefully make it a little bit smoother today. I guess the first one is I have a bad habit of pausing in the middle of my

because, unfortunately, their budget is peanuts.
Q So could you tell me, would those sales be reflected in Gemtech's records?
A They should be.
Q They should be? Can you give me a sense for what you would call the magnitude of the sales? And I'm talking about sales in military and law enforcement while you were at Gemtech.
A I can't. The reason why is because once I interacted with a customer, once I gave them exactly what they needed, I then handed it over to the administrative process. My expertise is not generating sales receipts. My expertise is in getting the customer interested in what they've asked for and then giving them the solution to how they go about getting it.
Q Okay, so while you were at Gemtech, am I correct in understanding after you did, I think what you said your primary function was, would that then be handed off to other Gemtech sales people to go through the process of finalizing POs and all that kind of stuff?
THE WITNESS: Yes.

Page 62

MR. TROUT: Object to the form.
MR. STIDHAM: And do you recall who at Gemtech played that role of turning your work into actual sales and purchase orders?
THE WITNESS: There was an entire team in Boise, 15 people, that would not only do the back end of my sales, they would cold call or they would call these stores that we have in our library, if you will, and push.
BY MR. STIDHAM:
Q Okay. Do you recall the name Alex Crown?
A Mm-mm, I do not. Does he go by a different name?
Q Well, we'll get into the documents and I'll be able to make sure I'm not mis-remembering this. In the documents we'll get to relate it to some folks at Gemtech. And I'll ask again who you recall, okay?
A Sure.
Q Let me just ask this again. I'm asking just for your best recollection. Do you recall ever -- can you give me any estimate regarding how much was made in sales to United States military during your period at Gemtech?

Page 63

So during the period of time you were at Gemtech -- let me try and ask it better, during the time you were at Gemtech, do you recall how much revenue was made through sales to the military?
A I don't have that information.
Q Do you recall as part of your job, receiving data that would break down revenue based on whether the sales was to military, law enforcement, and also whether it's domestic or international?
A I was not privy to that information. It's not something that I would focus on in my role at Gemtech.
Q Okay, that might help me. Let me just ask a couple more questions about your role to clarify that then. Were you -- maybe this fits with what you've explained to me as your role as not necessarily closing the sales and the paperwork. Were you getting data as part of your job regarding getting sales from Gemtech?
A No.
Q Okay. So while you were at Gemtech, you were not provided monthly or even annual

Page 64

sales data? Revenue data, excuse me.
A If they did provide it to me, and I don't know if they did or not, it is not something that I cared to review.
Q And just explain why not in the context of your job. Kind of explain to me why that's not relevant to what you were doing.
A So I'm trying to find an analogy that would suit. I like find the customer, figuring out if it's an actual opportunity, and closing the deal and moving forward.
Q So when you say close the deal in that context, I want to understand that and judge from what you said previous. What do you mean by
close the deal?
A So with the example of the UAE, we found a customer, he wanted a specific product, he provided a reasonable way to get export licensing and approvals. And once we had the End User Certificate, it was at that point that - once you had all the information and they had all the numbers, and so I stopped focusing on or I don't focus on -- I kind of remember it was like 379 9mil suppressors, but what they

Page 65

happened.
Q All right. Take a look at the next page in if you would. And it's got a slide that is DSP-83.
A Yes.
Q Did you participate in putting together that slide?
A I put together this entire presentation.
Q Okay. And if we go through this presentation, and I'm assuming that based on my question that you put it together and need to clarify that, please just, you know, stop me and make that clarification.
A Okay.
Q But I'll proceed as if, without asking whether it was you ever time just based on the assumption that you're responsible for --
A Okay.
Q -- this slide deck. Is that fair?
A Yes.
Q So what was your intent in putting together this slide on DSP-83?
A Just to make Smith & Wesson aware



that we were aware of how this had been filed, DSPs. This isn't an actual picture of one of the EUCs.
Q Okay. So if I'm understanding correctly, that slide, and tell me if I'm assuming correctly, the subsequent slides that say required pre-approval paperwork, licensing process, and licensing process, that was intended to indicate to Smith & Wesson that the Gemtech group knew how to deal with the regulatory environment?
A Yes, these were the actual documents from TRUST.
Q And who is TRUST again, sir?
A TRUST is the intermediary for the UAE.
Q And I think we used the term before, consignee. Is that correct?
A On the DSPs, where they sign, where it says consignee.
Q And what's your understanding as to what that term means in the context of these types of transactions.
A What would I think it means?
Q Yes.



A The State Department wants to know what intermediary money is being transferred to.
Q Okay. So let's move on to the next slide. It's a little further into the slide deck, if we could. I'm at SW85748.
A Okay.
Q And that slide begins Saudi Arabia, CPI 46. Do you see that?
A Yes.
Q Do you know what the CPI 46 is meant to indicate?
A No.
Q So if we look at that slide, first bullet point, end user, Special Forces --
A That might be the corruption index, the CPI might be the corruption index.
Q Okay. So if we look at the next bullet point, it says end user, Special Security Forces, and then the bullet point, foreign consignee, MRKAS. Do you see that?
A On which page?
Q I'm sorry, same page.
A Okay.
Q The first bullet under the heading,



Saudi Arabia, CPI46. That's where I'm at. Are you there?
A Yes.
Q So first bullet is end user, Special Security Forces, and then the sub-bullet is foreign consignee, MRKAS. Do you see that?
A Yes, I do.
Q Okay. And at this point in time that you put together the slide, did Gemtech have a contractual relationship with MRKAS?
A No. We had not signed a contract. We had prior sales documents including requests for a quotation, LOI, and we had an EUC from MRKAS.
Q Okay. But not a contract for them to serve as foreign consignee, is that fair?
A Say your last?
Q Did you have a written -- not you, excuse me. Did Gemtech or Smith & Wesson, to your knowledge, have a contract for MRKAS to serve as foreign consignee for a sale to Saudi Arabia as outlined in this slide?
A They were signed as the consignee on the EUC they provided.
Q Okay. Any direct contract between

Gemtech or Smith & Wesson with MRKAS?
A Not to my knowledge.
Q Was, to your understanding, was MRKAS free to work with competitors of Gemtech regarding this bid?
A Yes.
Q And then, sir, if we go down to the next section, it says opportunity. Do you see that?
A Yes.
Q And it says 225,000 machine guns, and the next bullet, 100,000 rifles, next bullet, 50,000 pistols. Do you see that?
A Yes.
Q Where did you come up with these numbers, sir?
A From Mrkas.
Q And what, to your understanding, did these numbers represent?
A They represented the number of rifles that the Special Security Forces needed and had on hand to outfit with suppressors.
Q So with regard to that same page, 25,000 machine guns, $1,400 per unit, which Gemtech branded product is contemplated would

Page 134

satisfy that opportunity or would address that opportunity?
A M-240 Bravos and the 5.56 frame.
Q Okay. So you were looking at a -- you were anticipating a machine gun would be which caliber, sir?
A So the one in the picture is 7.62x51, which is a M-240 Bravo, a standard machine gun used by Saudi Arabia. And the M-249 is the 5.56 variant.
Q And which Gemtech products were you contemplating would be used with those -- suppressors would be used with those?
A The Gemtech MGS.
Q Do you know whether there was a MGS even in prototype for 5.56 caliber?
A Yes, I do.
Q Was there an MGS suppressor in production for the 5.56 caliber.
A Yes.
Q And was there an MGS suppressor in production for the 7.62 caliber?
A Yes, there was.
Q And how do you know that, sir?
A We have warranted the demonstration.

Page 135

I've held it in my hand, I've shot it, and I have video of it.
Q When you say it, just for the record, what are you referring to, sir?
A I have video of a demonstration done by me with the M-240 Bravo 7.62x51 machine gun, just outside Austin, Texas.
Q And using an MGS suppressor?
A Yes.
Q Do you know whether or not, at this point in time, Gemtech had ever sold an MGS suppressor?
A They had not. It was a prototype.
Q For both the 7.62 and the 5.56?
A I retract that statement. They had sold machine gun suppressors to the U.K. Ministry of Defense.
Q Do you know whether they had sold the same suppressors that you were contemplating fulfilling this opportunity?
A No. These suppressors were an upgraded version based on Dr. Dater's previous sale to the U.K. Ministry of Defense.
Q And I just want to make sure that I've got this clear, and clear-up maybe some of

Page 136

usage of pronouns here. When we say these, let me ask it this way.
Had Gemtech previously sold the model of MGS for either the 7.62 caliber or the 5.56 caliber that you were contemplating would be needed to address what you've listed here as an opportunity for 25,000 machine guns?
A No. The previous model of MGS suppressor was sold to the U.K. Ministry of Defense. This upgraded prototype variant had not been sold yet.
Q Understood. I appreciate your clearing that up.
So with regard to the next item under opportunity, you say 100,000 rifles. Which Gemtech product were you contemplating would satisfy that opportunity?
A I'm not 100 percent certain, but I think it was probably the ONE.
Q Okay. And then kind of a similar question with regard to the 50,000 pistols that are listed on this page at $500 per unit, what Gemtech suppressor were you contemplating would satisfy that opportunity?
A The same 9 millimeter suppressors

Page 137

that we were offering to the UAE government.
Q And do you recall what the model name for that was?
A I do not recall that.
Q And with regard to the 9 millimeter that you were talking about, do you know whether that was a prototype at this stage?
A It was not a prototype.
Q Do you know whether there were any flaws or issues with regard to that suppressor?
A I do not know if there were any flaws with that suppressor.
Q Then just to backup and look under that opportunity, you know, the numbers we've got here, 25,000, 100,000, 50,000, I just want to make sure I understand this. Those numbers reflect information that was provided to you by Mrkas, is that correct?
A That's correct.
Q Okay. Any other source of that information other than Mrkas?
A No.
Q Then with regard to pricing there that's associated with the opportunity, do you know where that pricing, how that pricing was



arrived at?
A These were based on the MAP pricing, the minimum acceptable price for a sale to international customers.
Q Okay. Go to the next page, sir. Next page is also Saudi Arabia. And the first bullet point says previous licenses. Do you see that?
A Yes.
Q Okay. And then you've got two bullet points down here. Do you recall what those were referring to?
The current sales to date, completion of loan purchase caused the release of another PO shipment expected delivered in three weeks.
Q And am I correct in understanding those two previous, what you've identified the bullet points as two previous licenses, those add up to $43,000 in sales?
A Let's see. So I'm not familiar, I don't recollect what the previous license numbers are referring to.
Q Okay. So let me back up and maybe clean that up. You see a bullet point there



that says previous licenses, and then there's two bullet points under that.
A Okay.
Q As you sit here today, do you know what those bullet points are referring to?
A I don't recall.
Q Okay. Then we see a heading that -- or a line that says current sales to date, $43,000.
A Yes.
Q Can you tell me what that refers to?
A I'm guessing that refers to previous sales, it wasn't done by me, to Saudi Arabia.
Q Okay.
(Simultaneous speaking.)
MR. STIDHAM: So just to clarify, you put this slide deck together, but some of the information that you used was provided by others. Is that fair?
THE WITNESS: Correct. And this could be current sales. This could be some of what was on Mrkas, Saudi Arabia's EUC. So you've got that document as well. And I remember it having numbers in lines on it and just got the EUC alone. It might by why you



got this $43,000 from --
BY MR. STIDHAM:
Q Fair enough. And just as you sit here today, do you know if that $43,000 reflects sales that have been completed or sales that were processed?
A That disclosed sales in process. This is reflective of the EUC that we have for Mrkas, and this number is reflective of the summation of that.
Q Okay. And stated another way, the $43,0000 of product had not yet been delivered at the time of the slide, is that fair?
A The EUC that we had from Mrkas was filed and pending license approval.
Q But the product was not yet in Mrkas' hands, is that fair?
A Correct.
Q All right. Next entry there says completion of one purchase causes the release of another PO shipment, is expected to deliver within three weeks. Can you tell me what you're referring to there, to the best of your recollection?

A I believe the numbers that we had put in -- on the EUC were above their initial purchase order. So once the first purchase was done, they would purchase the remainder of the amount on the EUC.
Q And combine those, to your recollection, would have come up to $43,000?
A I think the initial purchase was $43,000.
Q Okay. And I'm just asking for your recollection today.
A Yes.
Q So next line down, delivery of the MGS shields and MK39 will be sent quarterly over the next three years. Can you tell me what that means?
A Yes, it's kind of an ambiguous statement on my part. I think I was trying to preempt the conversation that this was going to be an ongoing thing. I think this was based off of conversations that I had with Mrkas.
Q Okay. And when you say will be sent quarterly, are you referring to this total gross potential opportunity on the previous page?



Can you say again last --
Q So I'm sorry if I worded that awkwardly. Let me give it another shot. I'm trying to kind of understand that language about will be sent quarterly over the next three years.
A Yes.
Q What are referring to that will be delivered over the next three years? Are you talking about this total gross potential on the other side of the previous page of $130 million?
A Yes.
Q Okay. And are you contemplating that there's going to be different purchase orders over -- different quarterly purchase orders over the next three years that potentially could reach $130 million?
A Correct.
Q Okay. And then if we look also at that sentence, you write delivery of MGS SHIELD and MK39. See that, see that line, sir?
A I do, yes.
Q So is the MK39 the Gemtech model that you're contemplating could address the



50,000 pistols opportunity?
A I don't recall what that $130 million is. I recall exactly what that suppressor is. The MGS, I know. SHIELD, I believe, was the 5.56 suppressor for the assault rifle. So it's not the ONE.
Q So is it fair to say then that those two would address the machine gun and rifle opportunity, and the MK39 would be addressing the pistol opportunity on the previous page?
A It's a fair assumption.
Q Okay. And then you've listed down there, it's a little bit hard to read, but foreign contacts. See that?
A Yes.
Q And who are those individuals? Are they with -- they're with Mrkas, correct?
A Correct.
Q And would those be the two individuals that you contemplated, if this opportunity came to fruition, would be called?
A The foreign consignee is Mrkas. The point of contact is Mohammed Smimih.
Q Okay. And then again, talking about this Saudi Arabia opportunity --



A Having Nabeel Kommoth --
(Simultaneous speaking.)
Q Oh, I didn't mean to cut you off. Go ahead, sir.
A I think Nabeel Kommoth is the CEO of Mrkas.
Q Okay. All right, talking about these two slides and what's listed here as the Saudi Arabia opportunity, is it fair to say that there was no guarantee that Gemtech would actually get sales in the magnitude of $130 million to Saudi Arabia?
A When this was written, the billing that was more than adequately satisfied was what was listed on the end user certificate. I don't recall the line items, but the EUC listed a number of products, more than three, of what they wanted. And they had drafted an EUC, and signed it, you know, to be sent in to U.S. Department of State, DDTC.
Q Okay. And the only EUC in place at the point in time that this presentation was made was for the $43,000, correct?
A I believe so.
Q And at this point in time that the

presentation was made, there was no commitment from Saudi Arabia to purchase $130 worth of products from Gemtech, correct?
MR. SCHOSSBERGER: Objection to form.
THE WITNESS: $130, or $130 million?
MR. STIDHAM: I might have misspoke, so let me just rephrase, let me restate that question, Mr. Pace.
At the time this presentation was made, Saudi Arabia -- at the time this presentation was made, had Saudi Arabia committed in writing to purchase $130 million worth of products from Gemtech?
THE WITNESS: No, they had not.
BY MR. STIDHAM:
Q At this point in time that this presentation was made, had Mrkas promised that Gemtech would get $130 million worth of product sales related to this opportunity?
A They had not.
Q Is it fair to say that there would need to be a number of events that would need to occur before Gemtech would realize sales potential of $130 million on the Saudi Arabia



opportunity?
A The event that needed to occur was an approval license to the EUC and subsequent shipment of the items listed on the EUC.
Q And subsequent orders for more than $43,000 worth of product, correct?
A Correct.
Q Do you have an understanding as to who in Saudi Arabia makes the purchase decisions for the government, or seen decisions like this for the government? Or is it, well, I guess not fair, do you know whether there's a person or a variety of people that are involved in those decisions for Saudi Arabia?
A I'm aware of them. One of them is the Ministry of Defense, or Saudi's Arabia's equivalent. And the other one is like their State Department or administrative, it's like the Secretary of State. I forget exactly what the acronym is.
But they've got two departments. One of them is for military, one of them is for police. And those two entities are the ones that do all of the purchasing.
Q And there's a variety of individuals



within both of those organizations, I assume?
A Correct.
Q Let's move on the next country that's in the slide deck, Bahrain. And that's at SW85750. Do you see that, Mr. Pace?
A Yes, I do.
Q Okay. So if we look at the first bullet point there, end user, Bahrain Defense Force, foreign consignee, Caracal, is that correct?
A That's correct.
Q Okay. Just looking at this slide deck, did you have a sense of whether, excuse me, were you able to identify the potential sales related to Bahrain? And to be fair, you might want to take a look at the next slide deck too. Because you provided two slides on this.
A So yes, looking at these two pages, it looks like this Bahrain opportunity had the potential sale for $45,500. It looks like it was waiting for an airway bill. But there are no numbers stipulating, like, how big this opportunity is. This was a new customer.
Q Okay. So is it fair to say that,



when you put together the slide decks regarding Bahrain in this presentation, you were simply identifying for Smith & Wesson that there was a new relationship that you were seeking to create with Bahrain.
A I think the relationship was established, because it's got previous licenses. I don't recall this being my customer. This was probably done -- this was probably another person's opportunity. But it looks like there was EUC, it was approved. And we were just waiting for an airway bill to ship.
Q So let me try to kind of --
A That's right.
Q -- make sure I'm understanding your testimony, then. So with regard to Bahrain, to the best of your recollection, this was not an opportunity that you were involved in generating. Is that fair?
A To the best of my recollection, yes. I do remember, on top of licenses being pulled, or cancelled, or zeroed out, there were airway bills that were also cancelled as well.
Q Okay. Cancelled?

fire demonstrations in the UAE utilizing semi-automatic .338 Lapua sniper rifles manufactured by a company. I can't recall their name.
Q Okay. And then you've got 2,000 Gemtech SHIELDs, see that?
A Yes, I do.
Q And those are referring to Gemtech suppressors?
A Yes, they are.
Q Okay. So I guess I'm trying to -- let me just back up, then. With regard to the 15,000 Ohio Ordnance guns, you've got $1,400 next to that. What is that to reflect?
A That reflects the purchase price for the MGS suppressor.
Q Okay. The machine gun suppressor?
A Yes.
Q Okay. Do you know which caliber we're talking about there?
A That's a 7.62 951. And it says 249, so that's 5.56 as well.
Q So both caliber?
A Yes.
Q Do you know what the split was to be?



A From the 15,000?
Q Yes.
A I do not.
Q So then we go down to the 700 GM-9s. What's the suppressor product associated with that?
A That's the 9 millimeter suppressor.
Q Okay. And then the Arrows, I apologize if you already said this, but what is the suppressor product associated with the Arrows?
A 338 Lapua.
Q All right. So the next page if we could, about the UAE opportunity, identifies current sales to date of $1,000. Is that correct?
A That's correct.
Q So that was the sales that had actually taken place at the time of this presentation?
A I believe that was for the transfer for the IDEX demonstration.
Q Okay. And then below there you've got a bullet point for delivery. You state these purchases are currently understandings



and will move to purchase orders and end user certificates after demo of previously shipped product. Do you see that? Is that a --
A Yes.
Q Was that a true and accurate statement at the time?
A Yes.
Q And is it fair to say that there was no guarantee in place that the demo would result in a purchase order -- in further purchase orders? Is that fair?
Correct.
Q Then if we look at the next bullet point, it says Arrow demo in September. So is that fair to say that the Arrow demo had not yet occurred?
A Where are you looking?
Q I'm sorry. In delivery, I'm at the second sub-bullet. It reads Arrow demo in September with 900 Arrows.
A Ninety Arrows?
Q Excuse me, 90 Arrows. And then 500 SHIELDs delivered by biannual. See that, sir?
A Yes.
Q And so I guess my first question



was, is this referring to an Arrow demo that will take place in September?
A That's correct.
Q So it hadn't taken place as of the time of the presentation, correct?
A During the time of the presentation, it had not taken place, no. It did happen. It did take place.
Q Yes, okay. But just at this point in time, it had not yet taken place, correct?
A Correct.
Q And there was no commitment at this point in time for the presentation for the purchase of any Arrows or any SHIELD suppressors from Gemtech?
A Correct.
Q And then there's a reference in that last bullet point to a machine gun demo that's contemplated in October. Do you see that?
A Yes.
Q And that would have been a demo that was contemplated for the MGS suppressor. Is that correct?
A Yes.
Q And do you know which caliber the

demo was going to be at?
A 7.62x51 and 5.56.
Q And then you've got, in that last sub-bullet point, you've got 1,000 Q1, 7,000 Q5, and 7,000 Q9. Can you tell me that's referring to?
A Either they were quarters that -- I don't know.
Q Is it fair, just as you sit here today, you don't recall what that was referring to? Is that fair?
A I do not.
Q All right. Sorry, this is taking me awhile to plow through. I'll try to be more efficient. Let's move on the Turkey one.
Next slide. SW85758, do you see that, Mr. Pace?
A Yes, I do.
Q And then on that first page you've got end user, Special Operations Department of Turkey. Do you see that?
A Yes, I do.
Q And is this Turkey opportunity something that you personally have worked on?
A Yes, I did.



Q Okay. And what was the stage that negotiations were in with Turkey at the time of this presentation?
A They were preliminary. I knew the purchaser or the buyer, not the country of Turkey, but I knew the companies that purchased these machine guns, and had visited them, and was probably discussing demonstrations and follow-on sales.
Q And if we look at the -- just to make sure you have a chance to look at the next slide too on Turkey, at this point in time of the presentation no sales had taken place, correct?
A Correct.
Q And on that first slide regarding Turkey, you've got a gross sales potential of $35 million. See that?
A Yes.
Q And can you tell me what that number is based on?
A The number is based on the number of M-240 Bravos and M-249s sold to Turkey by Ohio Ordnance at that time.
Q And again, if there were to be a



suppressor provided by Gemtech for those Ohio Ordnance guns, which suppressors would those be?
A Those would be the MGS suppressors.
Q The machine gun suppressors?
A Yes.
Q Then let's look at the second slide on Turkey if we could. I've got a bullet point, delivery with some sub-bullet points down there. Are you there, Mr. Pace?
A Yes.
Q Okay. So it says a DSP-83 has been built, and we're waiting for signatures from the Turkish Special Ops. So am I correct in understanding, at the point of time of this presentation, the Turkish Special Operations representative had not signed the DSP-83?
A Correct.
Q And then the subsequent bullet points all reflect events that, I guess, you're hoping will occur, right --
A Correct.
Q -- but are not guaranteed to occur, correct?
A Correct.



Q And also when I look at those bullet points under delivery, especially the last three, are those future events that you're hoping will occur that will take years into the future?
A These were based on Ohio Ordnance sales and delivery.
Q Okay. Did you have any hopes regarding what the timeframe would be if it turned out that Gemtech was lucky enough to be able to sell suppressors to Turkey for the deliveries?
A Yes, they wanted these machine guns shipped with suppressors.
Q Okay. So that's why you're talking in terms of the 15,000 units to be shipped bi-annually. In that last bullet point, you're referring to your understanding from Ohio Ordnance as to the shipping schedule for their guns?
A Yes.
Q All right. Let's take a look at the next bullet.
Well, I guess one more question, I'm sorry, if we could go back to Turkey. You've

A I do not.
Q Is it fair to say then that, with regard to the -- are you able to provide me testimony regarding the Indonesia opportunity as to whether or not that was likely to come to be?
A No.
Q Are you able to provide me testimony regarding the Indonesia opportunity -- excuse me, regarding what stage the Indonesia opportunity was at?
A No.
Q And is it fair to say you can't testify to the accuracy of any of the statements contained in the slides relating to the Indonesia opportunity?
A Correct.
Q Next is Tunisia. And I think we're at Bates Number SW85764. Do you see that?
A Yes.
Q Were you involved in the Tunisia opportunity?
A Yes.
Q And what was your involvement in the Tunisia opportunity?

Page 174

A I had an initial visit with Tunisian MOD.
Q Okay. And is that kind of the stage it was at, just an initial visit?
A Yes.
Q And so is it fair to say that the Tunisia -- any opportunity relating to Tunisia that's reflected in this slide is in the very early stages?
A Correct. We were working with Rainier Arms suppressors, vendor agnostic. We could court other rifle manufacturers. And Ranier Arms was in negotiations for, or had sold 18,000 rifles and machine guns to Tunisia.
Q And then I'm jumping down to the third major bullet point, potential to close. Do you see that?
A Yes, I do.
Q You identified that TBD, didn't you?
A Yes.
Q And is that because, at this stage, you didn't know what the potential was for actually closing this opportunity?
A Correct, we didn't have a request for proposal, we didn't have LOIs or an EUC.

Page 175

Q Okay. And the information regarding the Tunisia opportunity and, you know, the number of units, do you know where that information came from?
A This came from my meeting with the Tunisian MOD and with Ranier Arms.
Q Okay. And then, I guess, just one thing to highlight, under gross potential sales, the second sub-bullet, the hunt, that should be 10,000 M-240s with MGS. See that, sir?
A Yes.
Q Those are again, the MGS again is the machine gun suppressor?
A Yes.
Q Almost to the end. The next slide is Lithuania. Were you involved in the Lithuania opportunity?
A No.
Q So it is fair to say you can't testify regarding what stage the -- excuse me. Can you testify regarding what stage the Lithuania opportunity was at?
A No.
Q Can you testify regarding whether or

Page 176

not the Lithuania opportunity was likely to close?
A No.
Q Next page, sir, is Latvia. Do you see that?
A Yes.
Q And that's Bates Number SW85766. Were you personally involved in the Latvia opportunity?
A No.
Q Can you testify regarding the scope of the Latvia opportunity?
A No.
Q Can you testify regarding whether or not you think it is more likely than not that Gemtech would make sales, was going to make sales in Latvia?
A I cannot testify to that.
Q The next slide is South Africa. Do you see that, Mr. Pace?
A Yes.
Q Were you involved in the South Africa opportunity?
A I don't recall. I must have been, but I also don't recall. But this is still an

Page 177

early opportunity.
Q Okay. And why is it that you say you must have been.
A Because it was Africa. I would have spearheaded that.
Q So what stage was the South Africa opportunity at that's identified in this slide?
A Early on. It doesn't even have numbers. Deliveries TBD. I must have been involved with this, but it's inconsequential. This ROI, this presentation, is as much for my tracking as it is for, well, was for our future Smith & Wesson parent company.
Q Okay. And when you say this ROI, are you referring to the entire slide deck?
A Yes, I am.
Q Okay. Is it fair to say, even if Mr. Martinez had stayed at Gemtech, and even if you had stayed at Gemtech, there's no guarantee that Gemtech would have been able to close any of the opportunities identified in the slide deck beyond those that had already been put into a license or a contract?
MR. SCHOSSBERGER: Object to form.
THE WITNESS: With hindsight, I can



tell you that Gemtech would have closed the UAE and Saudi opportunities.
MR. STIDHAM: Can I just -- I want to make sure you heard the way I phrased it, to be fair to you.
As you sit here today, there's no guarantee that Gemtech would have closed any of the opportunities beyond those that were already contracted. And I said guarantee.
THE WITNESS: That were already contracted?
BY MR. STIDHAM:
Q So there's a number that we -- maybe I'm making it too complicated. But let me try to un-complicate the questions by breaking it up a little bit, okay?
So you went through and patiently answered a number of questions regarding the slide deck. And we identified some that you identified that were already in license or had some form of contract related to them. Do you recall that?
A Yes, I do.
Q Okay. So I'm talking about the opportunities that are identified in the slide



deck that are not already in license or not already subject to a contract, okay?
A Okay.
Q With regard to those, isn't it fair to say there was no guarantee that Gemtech would be able to close those?
A That's a fair assessment.
Q You want to take just a quick five-minute break?
A Sure.
MR. STIDHAM: Steven, could we go off the record?
MR. SCHOSSBERGER: Okay.
VIDEOGRAPHER: The time is now 2:18. We are going off the record.
(Whereupon, the above-entitled matter went off the record at 2:18 p.m. and resumed at 2:31 p.m.)
MR. STIDHAM: So, Mr. Pace, I put two exhibits in front of you. One we've marked Exhibit 22 and one we've marked as Exhibit 23.
(Whereupon, the documents referred to were marked as Exhibits 22 and 23 for identification.)
MR. STIDHAM: If you take a look at



Exhibit 22, that appears to be an email from you on July 22, 2016, to Mr. Martinez. Do you see that?
BY MR. STIDHAM:
Q And the first line says, I'm back from Romania, ready to initiate my employment with Gemtech. Do you see that?
A Yes, I do.
Q And then if I direct your attention to Exhibit 23, that looks to be an email from Lance Henning to Frank Lerum, copying Mr. Martinez and Ms. Snyder.
And the subject is Jason, our new outside sales account manager starting in September. Do you see that?
A Yes, I do.
Q And the reason I provide these exhibits is maybe to help us identify when you first started doing work for Gemtech.
A Okay.
Q So based on these emails that are Exhibits 22 and 23, is it fair to say that you started working for Gemtech sometime around the first of September 2016?
A Yes.

A No.
Q Who had you -- who authorized you to go to UAE?
A Ron Martinez.
Q And when did he authorize you to do that?
A I don't recall.
Q Was it shortly before you took the trip?
A It might have been.
Q Okay. I don't have any more questions at this time, Mr. Pace. I really do appreciate your patience in working with us and making this work.
A Thanks.
COURT REPORTER: The time is now 6:00 o'clock. We are going off the record.
(Whereupon, the taking of deposition in the above-entitled matter was concluded at 6:00 p.m., signature having been waived.)



C E R T I F I C A T E

This is to certify that the foregoing transcript
Deposition of: Jason Pace
In the matter of: Gemini Technologies
Incorporated v. Smith & Wesson Corp
Before: US District Court
Date: 05-30-24
Place: Reston, Virginia
were duly recorded and accurately transcribed under my direction; further, that said transcript is a true and accurate record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this action in which this deposition was taken; and further that I am not a relative nor an employee of any of the parties nor counsel employed by the parties, and I am not financially or otherwise interested in the outcome of the action.

Court Reporter