IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

GEMINI TECHNOLOGIES, )
INCORPORATED, an Idaho ) Case No. 1:18-CV-00035-CWD
corporation, )
Plaintiff, )
vs. )
SMITH & WESSON, CORP., a )
Delaware corporation; and )
AMERICAN OUTDOOR BRANDS )
CORPORATION, a Massachusetts )
corporation, )
Defendants. )
_________________________________)

VIDEOTAPED 30(b)(6) DEPOSITION OF GEMINI TECHNOLOGIES,

TESTIMONY OF RONALD JOHN MARTINEZ

TAKEN MAY 28, 2024

REPORTED BY:

ANDREA L. CHECK, CSR No. 748, RPR, CRR

Notary Public





**Exhibit A**

and affiliations for the record, beginning with the noticing attorney.
MR. STIDHAM: Erik Stidham of Holland & Hart on behalf of the defendants.
MR. McCRANEY: Zach McCraney of Holland & Hart on behalf of the defendants.
MR. TROUT: Kim Trout of Trout Law on behalf of the plaintiff.
VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness and then counsel may proceed.
COURT REPORTER: Okay. Will you raise your right hand, please.
THE WITNESS: Yes.

RONALD JOHN MARTINEZ,
first duly sworn to tell the truth relating to said cause, testified as follows:

EXAMINATION
QUESTIONS BY MR. STIDHAM:
Q. Good morning, Mr. Martinez.
A. Good morning.
Q. My name is Erik Stidham, and I represent the defendants in this case.



Mr. Martinez, would you state your full name for the record.
A. Ronald J. Martinez, or John is the middle name.
Q. And what was the year of your birth, Mr. Martinez?
A. 1966.
Q. Thank you. And where do you currently reside?
A. In Eagle, Idaho.
Q. Mr. Martinez, have you ever had your deposition taken before?
A. Once.
Q. And can you give me just the general context of that?
A. It was just general -- it was a long time ago, ten years ago.
Q. What did it relate to?
A. It was a discussion within the company, so...
Q. So you had a -- was there a lawsuit involved?
A. Yes.
Q. And were you a party to that lawsuit?
A. Yes. I would guess I was, yes.
Q. Okay. Were you a plaintiff or a defendant?
A. Plaintiff.
Q. What was the lawsuit about?



A. Discussion of employment.
Q. When you say "discussion," did you -- just so I'm clear, as the plaintiff were you asserting legal claims against your employer?
A. Yes, sir.
Q. And which employer was that?
A. It was HSBC.
Q. And what was the nature of your allegations?
A. I had left the company, and they owed some money.
Q. What did they owe money for?
MR. TROUT: I'm going to object to the line of questioning. It's far outside of the 30(b)(6) notice for which Mr. Martinez is appearing.
MR. STIDHAM: Mr. Trout, that's fair. I was just trying to get some background. But I would ask, Mr. Trout, if you'd just object to form in the future.
Q. (BY MR. STIDHAM) But we'll get some more background on that when we take your individual deposition. Okay?
But, anyway, you've had your deposition taken at least once; is that fair?
A. Yes, sir.
Q. Okay. Did you have a chance to talk with your attorneys regarding deposition procedures prior to this



deposition here today?
A. Yes.
Q. And did you meet with your attorneys to prepare for this deposition?
A. Yes.
Q. And I don't want to ask about the substance of those conversations. Okay? So I'm not asking that.
But who did you meet with to prepare for your deposition here today?
A. My attorneys.
Q. And who is that, specifically?
A. Kim Trout and Steve.
Q. And how long did you meet with them to prepare for your deposition?
A. A few hours. I don't recall the exact amount of time.
Q. No, an estimate is fine, sir; that's all I'm looking for.
A. A few hours.
Q. Okay. And when did that take place?
A. Last week.
Q. And did you do anything else to prepare for your deposition here today?
A. Yeah. I read the second amended complaint, looked that over, looked over the notes here that you

forward?
A. Yeah. That would, yes.
Q. Because the process didn't go forward; correct?
A. No, Smith & Wesson stopped it.
Q. Okay. And how did Smith & Wesson stop it?
A. They stopped the product from being shipped and the freight forwarder, and they canceled the Gemtech licenses.
Q. Okay. And did that cause a delay?
A. Oh, absolutely.
Q. How long of a delay was needed in order to lose the opportunity?
A. Well, I know they didn't ship it, and I was gone; they had fired me. So I don't know, but it was a travesty, and it was six to eight months to get us to that process, a long process to get us to the next stage. And when you cancel a license, it takes "X" months to get another license, and then almost, in a sense, you're restarting the whole process.
Q. So do you have an -- you say that the license was canceled?
A. Yes, sir.
Q. What is that understanding based on?
A. That's what I was told.

Page 122

Q. By who?
A. By Daniel Nakashima and Smith & Wesson, that they --
Q. Who at Smith & Wesson, sir?
A. I don't remember the person's name. I want to say Hope. They stopped the license -- the Gemtech license, they canceled it, without my knowledge or consultation.
Q. That was after you had left the company?
A. No.
Q. Okay. So while you were still with the company the license was canceled?
A. Yes. I have no idea why they did it. Nobody talked to me. They just went ahead and did it.
Q. So is it fair to say you don't know what the reason was for, as you say, canceling the license?
A. No.
Q. Have you ever asked anyone why the -- at Smith & Wesson why the license was canceled, to your understanding?
A. I think the response they told Daniel was they just did it. I could not get an answer.
Q. Is that what Daniel told you?
A. Yeah. "We did it," and "deal with it," I think is what the answer -- was what he had in an email.

Page 123

Q. So I just want to make sure I'm understanding. Are you talking about a conversation with Mr. Nakashima, or are you talking about reviewing an email?
A. A combination of both, if I remember right.
Q. What's the conversation you had with Mr. Nakashima?
A. We were upset that they canceled the license without my knowledge or approval. That took six to eight months to go through that process. It is a long process for a sale. And it was a huge opportunity for us.
Q. So here I just want to make sure I'm understanding what you're listing here to, "Previous licenses: 050625117 was completed in the last 3 months."
Do you know what that refers to?
A. No, sir.
Q. Do you know what "050630259" relates to?
A. No, but I'm sure those licenses -- most of the licenses are adopted for -- again, through the DSP process from the end user. The military, law enforcement going to the country after they put their PO and approval for the country to get approval to go through our U.S. state department for approval, after that to the ATF. So my guess is that license had

Page 124

certain products and pricing that were approved for this particular project for Saudi Arabia.
Q. Okay. Going -- one more question. You say this was a sale to the Royal Guard in Saudi Arabia?
A. The Special Security Forces.
Q. Special Security Forces?
A. Yeah. The Royal Guard, I think, was UAE, but okay.
Q. Looking at the opportunity, 25,000 machine guns. And I apologize, maybe I misunderstood, but I don't think I got an answer to this question: Did -- where does that number 25,000 machine guns, where does that number come from for the size of the opportunity?
A. From Saudi Arabia.
Q. You think -- is there something in writing that Saudi Arabia provided saying we're looking for this?
A. I don't know. And I'm sure MRKAS and/or Jason Pace, if that's what they said they needed, that's what they needed.
Q. Okay. Take a look at the next slide, I think, kind of as far as the next country on the slide.
A. Sure.
Q. Bahrain.
A. Uh-huh.

Page 125

A. Please give me the question. I mean, it just -- I --
Q. Sure. Here it is: I'm asking for your understanding, the individual who signed the contract, as to what it means -- this phrase means, "Buyer" -- and do you understand "Buyer" in this context means Smith & Wesson?
A. Yes, I do, sir.
Q. Okay. And do you understand, in the context of that sentence, that "Business" means operation of the Gemtech brand?
MR. TROUT: Object to the form.
Q. (BY MR. STIDHAM) Well, strike that.
Do you have any understanding as to what the term "Business," that's defined in that sentence, means?
MR. TROUT: The same objection.
THE WITNESS: It doesn't say "Gemtech," but it says "Business."
Q. (BY MR. STIDHAM) Okay. And do you understand that there's definitions in the agreement and the APA has terms that are defined?
A. It's been a long time, sir, so...
What page is that on?
Q. Sure. Page 41. 10.4, I'd direct your attention there, sir.



A. Okay.
Q. Are you at Section 10.4?
A. Yes, sir.
Q. Sir?
A. Yes, sir.
Q. Would you read Section 10.4 into the record?
A. "Business. The term" --
MR. TROUT: I'm going to object to the form of the question. The document speaks for itself. You don't need to read it into the record.
Q. (BY MR. STIDHAM) He can read it into the record. Go ahead.
MR. TROUT: He does not need to do that. You're badgering the witness, Counsel. I apologize.
MR. STIDHAM: I'm trying to move forward. I'll read it into the record if that's easier for Mr. Trout to handle.
Q. (BY MR. STIDHAM) Section 10.4, "Business. The term 'Business' shall mean (i), the design, manufacturing, and sale of silencers and suppressors for firearms (but for the avoidance of doubt, excluding integrally suppressed firearms), (ii) the design, manufacturing, and sale of silencer and suppressor accessories, and (iii) the sale of Company-branded ammunition."



Do you see that?
THE WITNESS: Yes, sir.
Q. (BY MR. STIDHAM) And did I read that accurately?
A. Yes, sir.
Q. And did you read that -- did you have an opportunity to read that definition prior to signing the asset purchase agreement?
A. I don't recall. I read a lot of papers.
Q. Did anybody prevent you from reading that definition before you signed?
A. Nobody prevented me, no.
Q. So with the understanding that that's how business is defined in this agreement, let's go back to 1.6. Okay?
A. Sure.
Q. And direct your attention again to 1.6(c) where the phrase begins, "Buyer shall have sole discretion with regard to all matters relating to operation of the Business."
Do you see that?
A. Yes, sir.
Q. So what is your understanding of what that phrase means?
MR. TROUT: Object to the form of the question.



THE WITNESS: Sole discretion of operation of the business, but they committed bad faith. But that's what it says. Sole discretion of the business.
Q. (BY MR. STIDHAM) Smith & Wesson has that; correct?
A. Yes, they're the ones.
Q. And then it continues on after the semicolon; correct?
A. Yes.
Q. It says, "provided, that the Buyer shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder."
Do you see that?
A. Yes, sir.
Q. Okay. And in this context, what is your understanding with regard to the phrase, "actions in bad faith"?
MR. TROUT: Object to the form.
THE WITNESS: Again, I'm not an attorney, but actions in bad faith is, basically, not moving forward in a way that the earnout can be made. And bad faith, in my book, are facts. And the bad faith is they fired myself, director of international sales -- they pretty




Exhibit A

much fired the entire company, people that have been there for decades, if they didn't quit. They closed down Idaho here.

All those actions they took, to me, are bad faith and prevented the earnout. Because the entire company -- as I said before, preserving the elements of success per that presentation, they said, "We will preserve the elements of success."

Well, no, they took the race car and took off the wheels and the driver and tore it apart; or if you want to say a ship, took the ship and took the entire crew off. But they closed down Gemtech, they fired everybody, the whole company, after decades of success. That, in my book, is bad faith.

Q. (BY MR. STIDHAM) So do you have an understanding as to what the term "bad faith" means?

I understand you're saying that some acts constitute bad faith. My question is what is your understanding as to the meaning of the term "bad faith"?

MR. TROUT: Object to the form of the question, calls for a legal conclusion.

THE WITNESS: Again, I'm not an attorney, but my common bad faith is taking actions in bad faith: closing Gemtech, shutting down the company, firing almost everybody, the entire team, that the success --



the elements of success are now gone, they are destroyed. That, to me, is bad faith.

Q. (BY MR. STIDHAM) Do you have any -- looking at that sentence again, do you have any understanding as to what the term "specific purpose" means in this context?

A. Oh, boy, here we --

MR. TROUT: Object to the form, same objection, calls for a legal conclusion.

THE WITNESS: What do you mean by "specific purpose"? What was your question on that?

Q. (BY MR. STIDHAM) Sir, you signed this agreement, and my question is about what your understanding is when you signed the agreement. Okay?

What did you understand the phrase "specific purpose" to mean in this -- in the context of this sentence when you signed the agreement?

MR. TROUT: Object to the form.

THE WITNESS: Boy, like I said, I'm not a lawyer. I don't look at the specific wording. I look at the overall. I look at things like bad faith. I look at different words. With the earnout, 15 cents per dollar, 17.1.

I rely on the attorneys to go through for me and go through the wordsmith part of it. I'm just not a



wordsmith person saying specific meanings of -- what I may think is something, you may think is something, and we may be on totally different pages.

Q. (BY MR. STIDHAM) Mr. Martinez, seriously, I want to get through this. The question is your understanding. You're telling me a lot of things, but I'm asking you answer -- please answer the specific question.

What was your understanding when you signed this of the phrase "specific purpose" in that sentence?

MR. TROUT: The same objection, calls for a legal conclusion.

THE WITNESS: It says "specific purpose of avoiding or reducing the Earn-Out." "Bad faith that would have specific purpose in avoiding the Earn-Out." The actions they took were bad faith, and they certainly avoided the earnout.

Q. (BY MR. STIDHAM) So do you feel like you understand the common-sense term of the word "specific"?

MR. TROUT: Counsel, I'm going to object again and ask you to move forward. You've now reiterated the same question a number of times. You, apparently, don't care for his answer, but he has attempted to --

MR. STIDHAM: It's not a -- he's not attempting to answer, Kim. Please -- Kim, please stop



with the speaking objections.

MR. TROUT: You and I can agree to disagree. Don't instruct me, please, sir, what to do. I'm saying that you're badgering the witness. That's a violation of local Rule 83, and I would please ask you to stop.

MR. STIDHAM: I would please ask you to direct your client to answer the questions.

MR. TROUT: He's done it multiple times.

MR. STIDHAM: Well, that's a violation of Rule 83 to say that.

Q. (BY MR. STIDHAM) So with regard to this sentence, I just want to -- let me ask it this way: Do you have any understanding as to what the term "specific purpose" means in the context of that sentence?

MR. TROUT: Object to the form.

THE WITNESS: You're saying the context of the sentence. And you said I didn't -- you were saying do I know what the word "specific" is. Again, they committed bad faith that, basically, reduced the earnout, and there's no question about that.

Q. (BY MR. STIDHAM) Sir, I'm asking for your understanding of the term, not what you think people did.

A. That's not what I think; that's what they did. Sorry to interrupt.





Exhibit A

MR. STIDHAM: Motion to strike, nonresponsive.
Q. (BY MR. STIDHAM) Do you have an understanding as to what "specific purpose" means in the context of that sentence?
MR. TROUT: Object to the form.
THE WITNESS: Again, I am not an attorney to go through here and go through the wordsmithing of everything in here.
Q. (BY MR. STIDHAM) Okay.
A. I just know that they -- in bad faith they did not allow us, and I understood it, to go forward to have an opportunity for the earnout.
Q. Okay. All right. Then the next sentence reads, "Buyer agrees to consult with Ronald J. Martinez in advance of any division made relating to the operation of the Business only if Buyer has knowledge that such decision will negatively impact the Earn-Out Payment."
Do you have an understanding as to what that provision means?
MR. TROUT: Object to the form.
THE WITNESS: They were to consult me if there's anything negative with the earnout. Well, they didn't consult me when they fired me; they didn't consult me when they fired Jason Pace; they didn't

Page 238

consult me when they fired almost the entire company, other than the people who left; they didn't consult me when they closed down Gemtech Idaho.
I would have never sold Gemtech had I known what Smith & Wesson was going to do. And they didn't consult me for any of that stuff. So if -- and, again, taking a ship or a race car and taking it -- tearing it apart and saying, oh, yes, it's still going to run a race, it's not going to happen when everybody is shut down and fired and gone. There were people there who were there with our company for decades. So, no, they did not consult me in making decisions at all.
Q. (BY MR. STIDHAM) What is your understanding of what it means to consult in this context?
MR. TROUT: Object to the form.
THE WITNESS: They were to consult me if they were going to do something like what they did, and they did not.
Q. (BY MR. STIDHAM) Isn't it fair to say in the context of this sentence, consult does not mean that -- is different than saying Mr. Martinez has veto power or Mr. Martinez has any ability to decide; is that fair?
MR. TROUT: Object to the form.
THE WITNESS: When Matt Buckingham --
Q. (BY MR. STIDHAM) Sir, I'd ask you --

Page 239

A. And I'm going to tell you why that's in here.
Q. No, no.
MR. TROUT: Excuse me, Counsel --
MR. STIDHAM: No, come on.
MR. TROUT: Will you let him answer the question.
MR. STIDHAM: Kim, please restrain him. He's just making speeches. I understand he's got contentions. I've tried to give him as much free road as I can, but we need to get out of here, Kim, so please.
MR. TROUT: I understand that we need to get out of here.
MR. STIDHAM: Please control Mr. Martinez.
MR. TROUT: I'm going to allow him to answer the question in whatever fashion he sees fit. I believe that's what you've asked him to do here today.
MR. STIDHAM: I'm asking -- I would like him to respond to the question, Kim.
MR. TROUT: He's doing his best, sir.
MR. STIDHAM: Do you want the question again, sir?
THE WITNESS: Yes, please.
Q. (BY MR. STIDHAM) In the context of the sentence, isn't it fair to say "consultant" does not

Page 240

mean that you have veto power or that you have the authority to make a final decision?
MR. TROUT: Object to the form.
THE WITNESS: They were to consult me if they were going to act in bad faith. And I will tell you the reason that's in there is because I was concerned when I sold Gemtech that they were going to do exactly what they did, what they assured me they were not going to do. They said, "We'll make sure we put in here that we consult you if anything is going to be negative towards the business," and they did not on anything.
Q. (BY MR. STIDHAM) Okay. So in the context of this case, what, if anything, does Gemtech consider -- contend would have gone differently if, I think you said -- mentioned your firing. What would have gone differently had -- strike that.
What would have gone differently, if anything, had Smith & Wesson consulted you before terminating you?
MR. TROUT: Object to the form.
THE WITNESS: I would have been continuing to lead a successful business.
Q. (BY MR. STIDHAM) So your contention is had they consulted with you, you would not be terminated?
A. Well, we had a discussion. We would have said -- I was never expecting that. And I was never

Page 241

REPORTER'S CERTIFICATE

I, ANDREA L. CHECK, CSR No. 748, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 6th day of June, 2024.

Andrea Check

ANDREA L. CHECK, CSR No. 748, RPR, CRR
Notary Public
1109 West Main Street, Suite 220
Boise, Idaho 83702

My Commission expires July 20, 2028.



Kim J. Trout
ktrout@trout-law.com

June 7, 2024

RE: Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
5/28/2024, Ronald John Martinez 30(b)(6) (#6706852)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at Calendar-Idaho@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions



Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ronald John Martinez 30(b)(6) (#6706852)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Ronald John Martinez 30(b)(6) Date



Gemini Technologies, Inc. v. Smith & Wesson Corp., Et Al.
Ronald John Martinez 30(b)(6) (#6706852)

ACKNOWLEDGEMENT OF DEPONENT

I, Ronald John Martinez 30(b)(6), do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Ronald John Martinez 30(b)(6) Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC





Exhibit A