Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
Cameron L. McCue (ISB #12329)
HOLLAND & HART LLP
800 West Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho 83701-2527
Telephone: (208) 342-5000
Email: efstidham@hollandhart.com
jmaiko@hollandhart.com
clmccue@hollandhart.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| GEMINI TECHNOLOGIES, INCORPORATED, an Idaho corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SMITH & WESSON SALES COMPANY, a Delaware corporation; and SMITH & WESSON BRANDS, INC., a Nevada corporation,<br><br>Defendants. | Case No. 1:18-CV-00035-REP<br><br>**DEFENDANTS' TRIAL BRIEF** |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

III. GEMTECH'S CLAIMS AND SMITH & WESSON'S DEFENSES .......... 3

A. Gemtech's Only Remaining Claim Fails Because It Cannot Prove Breach or Resulting Damages. .......... 3

1. The Court should enforce the unambiguous Earn-Out Provision as written, without resort to extrinsic evidence. .......... 4

2. Delaware courts enforce efforts obligations that parties write into earn-out provisions, and the APA contains none. .......... 4

3. Gemtech cannot prove that Smith & Wesson breached either limit on its discretion. .......... 7

4. Gemtech cannot prove damages resulting from any alleged breach. .......... 14

B. Any recovery would be limited to benefit-of-the-bargain damages, which Gemtech's evidence does not measure. .......... 15

IV. OBJECTIONS TO GEMTECH'S PRE-TRIAL SUBMISSIONS .......... 15

A. Exhibit List .......... 15

B. Witness Statements .......... 16

## I. INTRODUCTION

After summary judgment, one claim is left in this case: Gemtech's claim that Smith & Wesson breached the Earn-Out Provision of the Asset Purchase Agreement ("APA"). The Court has already dismissed Gemtech's fraud and implied covenant claims. Gemtech will not be able to prove the remaining claim at trial.

The Earn-Out Provision is unambiguous, so the Court should enforce it as written. It gives Smith & Wesson "sole discretion with regard to all matters relating to the operation of the Business," limited in only two ways. APA § 1.6(c). First, Smith & Wesson may not take actions "in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment" ("Act Proviso"). *Id.* Second, Smith & Wesson must consult Ronald J. Martinez before a decision "only if [it] has knowledge that such decision will negatively impact the Earn-Out Payment" ("Consultation Contingency"). *Id.* The APA does not require Smith & Wesson to try to achieve an earn-out. Delaware courts enforce duties to make an effort that sophisticated parties write into their agreements, and they will not create one where the parties left it out. Gemtech's theory of breach depends on exactly that kind of unwritten duty.

Gemtech cannot prove a breach of the Act Proviso. Bad faith is a subjective standard. A buyer does not breach a provision like this one by cutting staff, declining to invest in a brand, moving resources to other brands, or integrating a brand poorly. Liability requires evidence that the buyer specifically intended to defeat the earn-out, and Gemtech has none. The APA gave Smith & Wesson every financial reason to want the Gemtech brand to succeed, because it kept 100% of brand revenue up to $36 million and 85% above that. Each decision Gemtech challenges was a legitimate use of Smith & Wesson's discretion: (1) terminating Martinez and Pace, who were at-will employees; (2) winding down the Idaho operations and reducing Gemtech employees; (3) suspending international sales; and (4) placing Miele in charge of the Gemtech brand. Witnesses

will testify that compliance liabilities, manufacturing problems, and Smith & Wesson's duty to direct its limited resources to its shareholders' best return drove those decisions.

Gemtech also cannot prove a breach of the Consultation Contingency. That duty arises only if Smith & Wesson actually knew that a decision would negatively affect whether an Earn-Out Payment was paid, or how much. None of the challenged decisions meets that test.

Finally, Gemtech cannot prove resulting damages. There was no breach, and the APA gave Martinez no power to override any decision even if he had been consulted. If Gemtech could recover anything, it would be limited to benefit-of-the-bargain damages. Gemtech's damages evidence instead measures how the brand would have performed if the sale had never happened. That is the damages theory behind the fraud-in-the-inducement claim the Court dismissed, and Gemtech cannot properly rely on it now.

## II. BACKGROUND

At summary judgment, this Court dismissed Gemtech's fraud claims and its claims for breach of the implied covenant of good faith and fair dealing.

The remaining breach of contract claim turns on the text of the Earn-Out Provision, which reads in full:

> Subject to the terms and conditions set forth in this Agreement and the Collateral Agreements, subsequent to the Closing, Buyer shall have sole discretion with regard to all matters relating to the operation of the Business; provided, that Buyer shall not, directly or indirectly, take any actions in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment hereunder. In addition, Buyer agrees to consult with Ronald J. Martinez in advance of any decision made relating to the operation of the Business only if Buyer has knowledge that such decision will negatively impact the Earn-Out Payment. The Company and the Stockholders further acknowledge that (i) there is no assurance that the Company will receive any Earn-Out Payment and Buyer has not promised or projected any Earn-Out Payment, and (ii) the parties hereto solely intend the express provisions of this Agreement to govern their contractual relationship with respect to the subject matter of this Section 1.6.

APA § 1.6(c) (emphasis in original).

Gemtech pleads nine decisions, each with its own failure-to-consult allegation, which Gemtech contends constitute breaches of the Earn-Out Provision:[1]

| No. | Pleaded act or decision | TAC ¶¶ |
|---|---|---|
| 1 | Hold on all current export licenses (Bahrain, MRKAS, UK MOD), August 29, 2017 | 98 |
| 2 | Postponement of Jason Pace's international demonstrations, travel, and activities "[i]mmediately following August 7, 2017" | 103–04 |
| 3 | Termination of Martinez, September 18, 2017 (intent allegations at ¶¶ 100–02) | 99 |
| 4 | Termination of Pace, September 28, 2017 | 105–06 |
| 5 | January 2018 decision to reduce the five-person inventory and control group | 109 |
| 6 | February 1, 2018 terminations under the "GT RIF Plan" | 117–19 |
| 7 | May 15, 2018 assignment of Gemtech brand management to Tony Miele | 120–21 |
| 8 | June 27, 2018 terminations of remaining Idaho employees | 122–23 |
| 9 | Decision to wind down and close the Idaho operations, carried out beginning January 2019 | 115, 124–25 |

## III. GEMTECH'S CLAIMS AND SMITH & WESSON'S DEFENSES

### A. Gemtech's Only Remaining Claim Fails Because It Cannot Prove Breach or Resulting Damages.

To prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damage to the plaintiff. *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 139 (Del. 2022).

The first element, the existence of a contract, is undisputed. Gemtech cannot carry its burden on the other two: Smith & Wesson did not breach the Earn-Out Provision, and Gemtech suffered no resulting damage.

[1] The nine decisions are explained more fully in Smith & Wesson's Motion in Limine Re Construction of 1.6(c).

**1. The Court should enforce the unambiguous Earn-Out Provision as written, without resort to extrinsic evidence.**

The Earn-Out Provision is unambiguous. *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (explaining contract language unambiguous unless susceptible to more than one reasonable interpretation). "The determination of ambiguity lies within the sole province of the court." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010). Here, the Court treated the Earn-Out Provision as unambiguous in its Memorandum Decision and Order on Summary Judgment. *See* Dkt. 211 at 23-24 (analyzing Earn-Out Provision).

When, as here, an agreement is unambiguous, the Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016). "[C]lear and unambiguous terms are interpreted according to their ordinary and usual meaning." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). The Court should "strictly construe contract language, especially when, as here, it was negotiated by sophisticated parties, or parties with sophisticated counsel." *Franco v. Avalon Freight Servs. LLC*, No. 2020-0608-MTZ, 2020 Del. Ch. LEXIS 359, at *6 (Del. Ch. Dec. 8, 2020).

Background facts may not be used to alter unambiguous language chosen by the parties. *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018); *see also In re Viking Pump, Inc.*, 148 A.3d at 648 (courts analyze the "four corners of the agreement" when the language is unambiguous).

**2. Delaware courts enforce efforts obligations that parties write into earn-out provisions, and the APA contains none.**

Gemtech's theory of breach incorrectly assumes that the law requires a buyer to try to achieve an earn-out whenever an agreement contemplates a possible earn-out. *See, e.g.*, Dkt. 199 at 4 (Gemtech arguing that Smith & Wesson's "admitting to making poor business decisions"

should result in summary judgment in Gemtech's favor on breach of contract); *id.* at 5 (Gemtech arguing that reducing the possibility of an earn-out demonstrates a genuine dispute of material fact as to breach of contract).

That assumption is wrong. Delaware courts strictly construe the express language of earn-out clauses and will not read into them an efforts obligation the parties did not write. *See STX Bus. Sols., LLC v. Fin.-Info-Techs., LLC*, 2024 Del. Ch. LEXIS 354 (Oct. 31, 2024) (dismissing claim because language "Buyer shall not take any action in bad faith with respect to Seller's ability to earn the Earn-Out Consideration or with the specific intention of causing a reduction in the amount thereof" did not impose a duty to try to achieve an earn-out). The *STX* provision closely parallels the Act Proviso here: both bar bad-faith action aimed at the earn-out, and neither requires the buyer to pursue it.

The cases enforcing efforts obligations confirm the point, because in each the obligation came from express contract language. In every one, the buyer's "sole discretion" was cabined by an express duty to use "commercially reasonable efforts" to achieve earn-out milestones. *See, e.g.*, *Meyers v. Zimmer Biomet Holdings, Inc.*, No. 2025-0732-BWD, 2026 Del. Ch. LEXIS 202, at *8-9 (Del. Ch. May 1, 2026) (agreement providing buyer "sole discretion" to direct post-acquisition business, expressly subject to duty "to use commercially reasonable efforts" to achieve earn-out milestones); *S'holder Rep. Servs., LLC v. Alexion Pharms., Inc.*, No. 2020-1069-MTZ, 2024 Del. Ch. LEXIS 318, at *36, *89 (Del. Ch. Sept. 5, 2024) (cabining buyer's "sole discretion" with express contractual requirement that it use "commercially reasonable efforts" to achieve certain milestones); *Himawan v. Cephalon, Inc.*, No. 2019-0034-KSJM, 2018 Del. Ch. LEXIS 585, at *37 (Del. Ch. Dec. 28, 2018) (reading "sole discretion" language together with express duty to use

commercially reasonable efforts to achieve earn-out milestones). The APA has no comparable clause.

Enforcing these provisions as written serves the purpose of an earn-out, which is to "allocate risk" between buyer and seller where uncertainties exist. *Neurvana Med., LLC v. Balt USA, LLC*, 2020 Del. Ch. LEXIS 77 (Del. Ch. Feb. 27, 2020). The parties' bargained-for duties in the face of those uncertainties should be honored, not rewritten. *See Obsidian Fin. Grp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 Del. Ch. LEXIS 74, at *20-21 (Del. Ch. Apr. 22, 2021) ("The value of a potential earn-out 'is inextricably linked to the estimated probability of the contingent event's occurrence.'"). Gemtech accepted that risk expressly, acknowledging that "there is no assurance that the Company will receive any Earn-Out Payment" and that Smith & Wesson "has not promised or **projected** any Earn-Out Payment." APA § 1.6(c) (emphasis added).

As in *STX*, the parties here chose not to include a duty to seek an Earn-Out Payment. The Court should apply the Earn-Out Provision as drafted.

This is not to say that "sole discretion with regard to all matters relating to the operation of the Business" means Smith & Wesson's post-acquisition decisions lacked any limitation. Rather, the APA limits Smith & Wesson's "sole discretion" in two ways. First, Smith & Wesson could not act "in bad faith that would have the specific purpose of avoiding or reducing the Earn-Out Payment." APA § 1.6(c). Second, Smith & Wesson was required to consult with Martinez if Smith & Wesson knew that a decision "will negatively impact the Earn-Out Payment." *Id.* As explained below, Gemtech will be unable to prove a breach of either.

**3. Gemtech cannot prove that Smith & Wesson breached either limit on its discretion.**

**a) The Act Proviso requires proof that Smith & Wesson acted in subjective bad faith with the specific purpose of defeating an Earn-Out Payment.**

Smith & Wesson's sole discretion to direct its business was limited such that it could not act "in [1] **bad faith** [2] that would have the **specific purpose** of avoiding or reducing the Earn-Out Payment[.]" APA § 1.6(c) (emphasis added). Gemtech must therefore prove both elements: a culpable state of mind and an act directed at the Earn-Out Payment.

**i. Bad faith requires a conscious wrong, not poor business judgment.**

Bad faith is a subjective, not objective, standard. *See, e.g.*, *ev3, Inc. v. Lesh*, 114 A.3d 527, 540 (Del. 2014) (holding party suing for breach of contract on a provision giving defendant "sole discretion, to be exercised in good faith" must present evidence of defendant's subjective bad faith); *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*, 75 A.3d 101, 111 (Del. 2013) (holding contract duty of "good faith" is not a standard of objective reasonableness).

"[B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different than the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 346 (Del. 2013).

The element of bad faith in the context of a buyer managing a brand post-acquisition under similar earn-out provisions is not satisfied by negligence, poor performance, or acts that reduce the likelihood of achieving an earn-out. *See, e.g.*, *Paperless Sols. Grp., Inc. v. MIB Grp., Inc.*, 2025 Del. Super. LEXIS 264, at *9-10 (Del. Super. Ct. May 21, 2025) (dismissing breach claim because failure to invest in the brand did not indicate bad faith).

In *Vista Outdoor Inc. v. Reeves Family Trust*, the court dismissed a breach of earn-out claim at summary judgment. 234 F. Supp. 3d 558, 570 (S.D.N.Y. 2017). Plaintiff failed to raise a genuine dispute of material fact that buyer had acted in bad faith. *Id.* Buyer's "poor job" of integrating the acquired brand into its corporate structure did not evidence bad faith, particularly where buyer and seller both benefited from the brand's higher revenue. *Id.* at 564, 570. It would be irrational for the buyer to seek to avoid an earn-out by depressing revenue; buyer would be hurting its own bottom line. *See id.* at 570. The same is true here: Smith & Wesson kept 100% of Gemtech brand revenue up to $36 million and 85% above it.

An example of bad faith is instructive. *Conlon v. CGI Manufacturing Buyer LLC* involved an earn-out provision that permitted the buyer discretion to make "reasonably appropriate" "business decisions" and required the buyer to "act in good faith and . . . not take . . . any action or engage in any conduct with the purpose of circumventing the achievement of any Earnout Payment, artificially decreasing the 2022 EBITDA or 2023 EBITDA, or otherwise hindering or diminishing the Seller's ability to earn or receive the Earnout Payment." 2026 Del. Super. LEXIS 276, at *6-7 (Del. Ch. June 15, 2026). Viewing the evidence in the light most favorable to the plaintiff, the court found a genuine dispute of material fact as to breach. The buyer's executive sent an email with the subject line "Earnout and 'Clean' Bloomingdale books," stating, "I'd like to get a sense (for all of us) the degree to which the earnout is 'in play.' If you share the agreement (or that part of it), I can assess and determine what gymnastics we need." *Id.* at *30. After this email, the buyer retroactively applied a new policy that eliminated $1.32 million in gross profits from the acquired brand's books. *Id.* The buyer also lacked the funds to pay an earn-out, indicating the retroactive accounting had been done with the purpose of preventing an earn-out. *Id.* The plaintiff also cited evidence that he had been terminated and that the seller's resources had been

diverted to support other brands. *Id.* at *9, 29. Although the court considered this evidence in finding a genuine dispute of material fact, it emphasized that it was "not holding that [buyer] breached the EPA when using [seller's] resources to assist its affiliates' shipments." *Id.* at *29-30. The decisive evidence was of a bad-faith specific purpose: the "gymnastics" email and retroactive accounting, coupled with the buyer's inability to pay an earn-out.

**ii. Specific purpose requires proof of motive, not foreseeable effect.**

Courts hold that buyers do not breach substantially similar earn-out provisions absent evidence that the buyer's post-acquisition decision was taken with the specific intent to prevent or reduce an earn-out payment. *See, e.g.*, *Lazard Tech. Ps., LLC v. Qinetiq N. Am. Operations LLC*, 114 A.3d 193, 195 (Del. 2015) (affirming dismissal because the earn-out provision required seller to prove buyer acted with the **motivation** to avoid the earn-out, not just that the seller acted knowing its actions would reduce the likelihood of an earn-out); *Sharma v. Trizetto Corp.*, No. 15-419-LPS, 2016 U.S. Dist. LEXIS 122990, at *8-10 (D. Del. Sept. 12, 2016) (dismissing breach of earn-out claim because allegations of replacement of sales team, neglect of business, and poor performance did not state a claim for breach based on acting with the specific purpose of avoiding or reducing an earn-out payment).

A breach of the Act Proviso turns on whether there is evidence of the buyer's specific purpose to reduce or avoid an earn-out. By contrast, when the evidence shows only that a buyer took actions it could anticipate would reduce or avoid an earn-out (reducing its workforce, declining to invest in the brand, diverting resources to other brands, or failing to integrate the brand into the corporate structure), there is no breach. The presence or absence of evidence of the buyer's specific motive is dispositive.

**iii. The Act Proviso relates only to an "Earn-Out Payment," not Gemtech revenue generally.**

The Act Proviso specifically refers to the "Earn-Out Payment," a defined term in Section 1.6. It does not mean revenue from Gemtech brand sales, as Gemtech seems to assume. It means actual payments once the $36 million threshold has been met. Thus, affecting revenue is not enough. Gemtech must prove a bad-faith act taken for the specific purpose of affecting whether an Earn-Out Payment occurs or its amount.

**b) No evidence shows that Smith & Wesson acted with the purpose of defeating an Earn-Out Payment.**

Gemtech will be unable to prove Smith & Wesson acted in bad faith for the specific purpose of avoiding or reducing an earn-out. The APA itself shows Smith & Wesson had the financial incentive to pursue an Earn-Out Payment, not the reverse, because it retained 100% of Gemtech brand revenue up to $36 million and 85% of Gemtech brand revenue above $36 million. This situation stands in stark contrast to *Conlon*, where the buyer could not afford to pay an earn-out and was willing to engage in retroactive accounting after admitting it would perform "gymnastics" to the extent the earn-out was "in play." 2026 Del. Super. LEXIS 276, at *29-30. Gemtech has no evidence that anyone at Smith & Wesson exercised bad faith or wanted to prevent an earn-out.

**i. Decisions 1 and 2: The export-license hold and the pause in international sales activity reflected legal and commercial necessity.**

Gemtech will try to establish that Robert Cicero's mandate to hold Gemtech licenses post-acquisition constitutes a bad faith breach. Not so. The evidence will show that ITAR export authorizations belong to the registered entity and do not survive a change in ownership.

Gemtech will also attempt to prove that placing a hold on international sales constitutes breach. But the evidence of international sales (if admitted) will show that purported sales

opportunities were speculative. The evidence will show that many transactions had problems including product quality and design defects.

#### ii. Decisions 3 and 4: Martinez's and Pace's terminations do not constitute a breach of the Act Proviso.

Gemtech alleges Martinez's and Pace's terminations "without cause" constitute bad faith conduct taken for the specific purpose of avoiding an Earn-Out Payment. *See* Dkt. 213, ¶¶ 99, 100-01, 105-06.

First, the terminations are objective facts, not evidence of subjective intent, and they prove nothing about Smith & Wesson's state of mind or any supposed purpose of avoiding or reducing an earn-out.

Second, these decisions were not made in bad faith because they were not wrongful. *See SIGA Techs., Inc.*, 67 A.3d at 346 (bad faith "implies the conscious doing of a wrong"). Smith & Wesson will demonstrate that Martinez, Pace, and others could be terminated at will. The HR-46 policy the TAC cites does not alter their executed employment agreements; it lists only "guidelines" intended for plant workers, who could be disciplined for "horseplay" or other workplace violations warranting graduated disciplinary measures.

Nor can Gemtech prove that these terminations, made under Smith & Wesson's rights as an at-will employer and its "sole discretion" to direct the business, were pretextual. There is no evidence that Smith & Wesson desired, or had a specific purpose of, impairing or preventing an earn-out. James Debney, Smith & Wesson's CEO at the time of the terminations, will testify that he lost confidence in Martinez after a remarkably poor presentation that revealed Martinez's unfounded claims about future sales opportunities. He will testify that Pace was terminated because he disobeyed orders to stop international travel while compliance issues were being

evaluated. Smith & Wesson did not need cause to terminate Martinez and Pace, and the liability their continued employment presented stood to harm its shareholders.

#### iii. Decisions 5, 6, 8, and 9: Closing operations in Idaho and other Gemtech employee terminations do not prove a breach.

Gemtech has also argued that closing operations in Idaho and terminating other Gemtech employees breached the Earn-Out Provision. But Gemtech will be unable to prove its contention because it lacks any evidence of Smith & Wesson's subjective purpose to avoid or reduce an earn-out. Mark Smith, Smith & Wesson's current CEO, who oversaw all Smith & Wesson operations during the earn-out period, will testify that Smith & Wesson had, and has, finite resources and makes business decisions to direct those resources toward activities that will provide the best overall return for its shareholders. He will testify that Smith & Wesson's decisions were not driven by an intent to avoid or reduce an earn-out but were ordinary operations consistent with Smith & Wesson's duties to its shareholders. Exercising its discretion, Smith & Wesson acted with the understanding that Gemtech would not provide a better return than other brands. Other Smith & Wesson executives with knowledge, including Robert Cicero and Deana McPherson, will testify that Gemtech posed compliance liabilities and had significant manufacturing problems, reducing any return on investment in the brand. Compliance experts Robert Suber and Philip Milks will testify about Gemtech's significant compliance problems and the potential liability that would have arisen from continuing operations without material change.

Gemtech can only speculate about Smith & Wesson's intent, and its position improperly focuses solely on Gemtech's interests rather than on the scope of Smith & Wesson's business that Section 1.6(c) contemplates. Smith & Wesson's post-acquisition business decisions were made for legitimate purposes, well within the proper scope of its discretion.

**iv. Decision 7: Assigning an experienced manager, Tony Miele, to the Gemtech brand was an ordinary exercise of discretion.**

There is no evidence that placing an experienced Smith & Wesson manager over the Gemtech brand was done in bad faith or for the specific purpose of avoiding or reducing the Earn-Out Payment. Gemtech may dislike that Martinez was no longer in charge of Gemtech, or believe that Martinez could have done a better job, but that does not show any nefarious motive or specific purpose behind Miele's placement.

**c) The Consultation Contingency was never triggered because Smith & Wesson did not know any decision would negatively impact the Earn-Out Payment.**

As to the second category of conduct, failure to consult, a condition precedent to consultation is Smith & Wesson's "knowledge" that an act "will negatively impact the Earn-Out Payment." APA § 1.6(c). First, "knowledge" means "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." BLACK'S LAW DICTIONARY (9th ed. 2004). Second, there must be certainty as to the negative impact of the act. *See Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *168 (Del. Ch. July 12, 2010) (providing "will" is mandatory language). Third, the negative impact must be not to Gemtech brand "revenue" generally but specifically to "the Earn-Out Payment," meaning whether revenue crosses the $36 million threshold and how far it progresses above it. Thus, the duty to consult with Martinez arises only if Smith & Wesson: (1) had actual knowledge that an intended act (2) would negatively impact (3) whether an earn-out is paid or the amount of an earn-out payment.

No decision or act Gemtech alleges meets this condition precedent. Gemtech alleges that Smith & Wesson breached the Consultation Contingency because it did not consult Martinez before nine decisions: (1) holding all current export licenses on August 29, 2017; (2) postponing

Pace's international sales activity on August 7, 2017; (3) terminating Martinez's employment; (4) terminating Pace's employment; (5) the January 2018 reduction in force; (6) the February 2018 reduction in force; (7) assigning Miele to Gemtech brand management on May 15, 2018; (8) the June 2018 reduction in force; and (9) winding down and closing the Idaho operations in January 2019. Dkt. 213, ¶¶ 98-99, 103-06, 109, 115, 117-25.

Gemtech will be unable to carry its burden to show that the condition precedent arose. The evidence will show that export licenses did not carry over to a buyer, that the supposed international sales opportunities had significant problems, that Martinez and Pace posed significant liabilities to the Gemtech brand, and that both Smith & Wesson and Gemtech expected Smith & Wesson to change the manufacturing process and location after the acquisition. In other words, Smith & Wesson did not have knowledge—certainty—that these decisions reallocating resources and managing personnel would negatively impact whether or to what extent Gemtech could achieve an earn-out. They were decisions within Smith & Wesson's rightful discretion, and many were aimed at controlling problems Gemtech itself had caused.

Gemtech argues that terminating Martinez effectively nullified the consultation duty. That argument assumes the duty arose. It did not, because Smith & Wesson took no action it knew would eliminate or reduce an Earn-Out Payment.

**4. Gemtech cannot prove damages resulting from any alleged breach**.

Gemtech will not be able to prove resulting damages. First, there is no breaching conduct from which damages could result. Second, Gemtech will be unable to establish how any outcome would have been different had Martinez been consulted. The APA did not give Martinez authority to override any decision Smith & Wesson made.

### B. Any recovery would be limited to benefit-of-the-bargain damages, which Gemtech's evidence does not measure.

"Contract damages are designed to place the injured party . . . in the same place as he would have been if the contract had been performed." *Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotation marks omitted); Restatement (Second) of Contracts § 347. The damages evidence Gemtech intends to introduce incorrectly seeks to measure how the Gemtech brand would have performed had the sale to Smith & Wesson never occurred—the theory of damages Gemtech urged for its fraud-in-the-inducement claim, which has been dismissed. Gemtech may not rely on a damages methodology "if it measures damages attributable to theories of liability that are no longer part of the case." *R.I. Off. of the Gen. Treasurer v. Boeing Co.*, 182 F.4th 422, 441 (4th Cir. 2026) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)); *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 585 F. Supp. 3d 1326, 1332-33 (M.D. Fla. 2022) (refusing to allow party to rely on damages opinion when it used "the wrong measure of damages," incorrectly seeking lost profits instead of loss-of-use damages).

## IV. OBJECTIONS TO GEMTECH'S PRE-TRIAL SUBMISSIONS

Gemtech's Witness List (Dkt. 235) and Exhibit List (Dkt. 236) reflect Gemtech's intent to try a case about what Smith & Wesson's executives supposedly knew, intended, and allegedly hid before signing, and about duties Smith & Wesson never owed to Gemtech. In other words, Gemtech intends to put on its dismissed fraud case, including its fraud damages case.

### A. Exhibit List

As further identified in **Exhibit A** to this Trial Brief, Smith & Wesson objects to Plaintiff's proposed trial exhibits on the grounds summarized in Exhibit A to this brief and preserves each ground under Federal Rule of Civil Procedure 26(a)(3)(B) and Federal Rule of Evidence 103. Smith Wesson notes that several exhibits on its Exhibit List are offered conditionally for limited

purposes or will be withdrawn based on this Court's rulings. For example, Smith & Wesson has a number of exhibits that predate the final contract but are not offered as parol evidence; some will need to be redacted to protect personal information; and others fall outside the scope of what Smith & Wesson believes is relevant but have been identified given Gemtech's expansive view of its case. Smith & Wesson has also identified expert reports that it will withdraw, provided the Court agrees that Gemtech's expert reports listed as exhibits are excluded as hearsay.

**B. Witness Statements**

Gemtech's Witness List (Dkt. 235) demonstrates that Gemtech, as anticipated in Smith & Wesson's Daubert motion relating to non-retained experts (Dkt. 222), seeks to improperly use lay witnesses to offer expert testimony, including Mr. Martinez, Mr. Thompson, Mr. Pace, Mr. Kunsky, Mr. Dater, and Mr. Nakishima. Consistent with that motion, Smith & Wesson will object to opinion evidence from any Gemtech witness regarding the likelihood of closing any particular sale; the reasonableness of Gemtech's compliance programs, policies, practices, or decisions; the reasonableness of Smith & Wesson's Business Ethics Committee programs, policies, practices, or decisions; the reasonableness of any other Smith & Wesson compliance programs, policies, practices, or decisions; and the viability of Gemtech product designs.

Smith & Wesson reserves the right, consistent with District Local Rule Civ. 16.3, to file objections to the admissibility of any evidence identified by Gemtech in its pre-trial submissions to the Court.

DATED this 23rd day of November, 2026.

HOLLAND & HART LLP

By *　/s/ Erik F. Stidham*
Erik F. Stidham
Jennifer M. Aiko
Cameron L. McCue
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of November, 2026, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kim J. Trout
Alyssa R. Jones
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703
Telephone: (208) 577-5755

*Attorneys for Plaintiff*

- ktrout@trout-law.com
- ajones@trout-law.com

*/s/Erik F. Stidham*
Erik F. Stidham
for HOLLAND & HART LLP